# COMMONWEALTH OF MASSACHUSETTS
# SUPREME JUDICIAL COURT

---

## SJC-12457

---

COMMONWEALTH

v.

DAVID T. CHALUE

---

**BRIEF FOR THE DEFENDANT**
**ON APPEAL FROM THE BERKSHIRE SUPERIOR COURT**

**\*CONTAINS REFERENCE TO IMPOUNDED MATERIALS\***

---

ANDREW S. CROUCH
Attorney for the Defendant
22 Putnam Avenue
Cambridge, MA 02139
(617) 441-5111
acrouch@andrewcrouch.com
BBO# 648496

SEPTEMBER 2019

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.......................................................................6

STATEMENT OF THE ISSUES.............................................................17

STATEMENT OF THE CASE................................................................18

STATEMENT OF FACTS......................................................................21

SUMMARY OF THE ARGUMENT.......................................................35

ARGUMENT

I.     WHEN POLLING OF THE JURY REVEALED THAT ONE
JUROR DID NOT AGREE WITH THE VERDICT, THE
JUDGE ERRED IN ADMINISTERING A DYNAMITE "TUEY-
RODRIQUEZ" CHARGE TO A LONE MINORITY JUROR
AND IN FAILING TO ALLOW THE MOTION FOR A
MISTRIAL.........................................................................................38

     A.    The Court Erred In Giving A Private Tuey-Rodriquez
Charge To A Lone Minority Juror In Circumstances
That Were Inherently Coercive...............................................40

          1.    Courts Should Not Give Dynamite Charges
Where They Know The Identity Of Any
Minority Jurors................................................................46

          2.    Where The Court Knows The Identity Of The
Minority Jurors, Giving Them A Private
Dynamite Instruction Is Inherently Coercive..............48

2

II.   PREJUDICIAL ERROR RESULTED FROM THE
      ALLOWANCE OF SUBSTANTIAL IRRELEVANT AND
      HIGHLY PREJUDICIAL EVIDENCE OF THE DEFENDANT'S
      AFFILIATION WITH THE ARYAN BROTHERHOOD AND
      VEIOVIS'S POSSESSION OF UNRELATED WEAPONS AND
      ANATOMICAL ILLUSTRATIONS WHICH SERVED NO
      PURPOSE OTHER THAN TO IMPLY TO THE JURY THAT
      CHALUE HAD A VIOLENT CRIMINAL PROPENSITY............55

      A.   Voluminous Evidence Of Chalue's Affiliation With
           The Aryan Brotherhood Pervaded The Trial, Yet Bore
           No Relevance To Any Proper Purpose..................56

      B.   Anatomical Drawings And Weapons Found In Veiovis's
           Apartments Were Not Relevant To Any Proper Purpose
           Where The Manner Of Dismemberment Was Not In
           Accord With The Illustrations And Many Of The
           Weapons Were Excluded From Having Inflicted
           Those Wounds........................................63

           1.   Where The Commonwealth's Evidence Showed
                That Several Of The Weapons Depicted In The
                Photographs Found In Veiovis's New Apartment
                That Chalue Never Visited Could Not Have Been
                Used In The Killings Or Dismemberment, These
                Items Had No Relevance And Their Admission
                Was Prejudicial Error..........................64

           2.   Where The Anatomical Drawings Of Amputations
                Were Not Related To The Dismemberment That
                Occurred Here, The Numerous Photographs Of These
                Items In A Location In Veiovis's Apartment Where
                Chalue Never Visited Lacked Relevance And Likely
                Caused Unfair Prejudice........................66

III.   THE COURT ERRED IN ADMITTING HALL'S STATEMENTS
       TO ELY AND DAWSON, THAT WERE NOT MADE IN
       FURTHERANCE OF THE JOINT VENTURE AND SO WERE
       INADMISSIBLE HEARSAY............................................................68

IV.    THE COMMONWEALTH'S STATEMENTS TO THE JURY
       REPEATEDLY MISSTATED THE EVIDENCE, IMPLIED
       KNOWLEDGE OF CHALUE'S INTENT TO KILL A TRIAL
       WITNESS, AND IMPROPERLY USED OTHER BAD ACT
       EVIDENCE TO ARGUE THAT CHALUE HAD A CRIMINAL
       PROPENSITY, NECESSITATING A NEW TRIAL......................73

       A.    In Its Opening Statement The Commonwealth Made
             Numerous Material Misstatements Of The Evidence
             To Follow That It Had No Good Faith Belief Would Be
             Supported By The Evidence, Resulting In A Substantial
             Likelihood Of Miscarriage Of Justice....................................74

       B.    Prejudicial Error Resulted From The Commonwealth's
             Remarks In Summation Implying Knowledge That
             Chalue Intended To Kill A Witness, Comment
             Exceeding The Permissible Use Of The Other Bad Act
             Evidence, And Material Misstatement Of The Evidence.....79

             1.    The Commonwealth Misstated The Evidence By
                   Again Averring Several Times That Chalue Was
                   A Lookout During The Burial, And Compounded
                   That Error By Adding That Chalue Planned To
                   Kill Daniel Cole If He Returned Home.........................79

             2.    The Commonwealth Misstated The Evidence By
                   Again Claiming That Chalue Destroyed Evidence
                   By Burning Clothing, Despite The Testimony
                   That Only Hall Had Done So.........................................81

3.   The Commonwealth Far Exceeded The Proper Limited Use Of The Other Bad Act Evidence Of Chalue's Membership In The Aryan Brotherhood By Employing That Evidence To Argue That Chalue Planned The Murders And Controlled Hall....................................................................83

4.   The Objected To Improper Comments Resulted In Prejudicial Error Requiring Reversal Where They Related To The Heart Of The Issues At Trial And Were Not Cured By The Court's General Instructions................................................................84

V.   THE MOTION JUDGE ERRED IN DENYING THE DEFENDANT'S MOTION TO SUPPRESS AS OFFICERS LACKED PROBABLE CAUSE TO SEIZE HIM AND HIS CELLULAR PHONE WHERE THERE WAS AN INSUFFICIENT NEXUS BETWEEN THE SUSPECTED CRIMINAL ACTIVITY AND THE PHONE...............................87

A.   The Motion Judge's Factual Errors....................................88

B.   The Police Lacked Probable Cause To Stop And Seize Chalue...................................................................89

C.   The Police Lacked Probable Cause To Seize The Defendant's Phone.................................................94

VI.   THIS COURT SHOULD EXERCISE ITS AUTHORITY UNDER GENERAL LAW CHAPTER 278, SECTION 33E.........101

CONCLUSION.................................................................105

ADDENDUM...................................................................106

MASS R. APP. P. 16(K) CERTIFICATE................................131

CERTIFICATE OF SERVICE.............................................132

## TABLE OF AUTHORITIES

### CASES

<u>United States Supreme Court Cases</u>

*Anderson v. United States*,
 <u>417 U.S. 211</u> (1974)........................................................................70

*Brasfield v. United States*,
 <u>272 U.S. 448</u> (1926)........................................................................46

*Brewer v. Williams*,
 <u>430 U.S. 387</u> (1977)........................................................................88

*Bruton v. United States*,
 <u>391 U.S. 123</u> (1968)........................................................................72

*Chapman v. California*,
 <u>386 U.S. 18</u> (1967)........................................................................73

*Crawford v. Washington*,
 <u>541 U.S. 36</u> (2004)........................................................................72

*Darden v. Wainwright*,
 <u>477 U.S. 168</u> (1986)........................................................................56

*Donnelly v. DeChristoforo*,
 <u>416 U.S. 637</u> (1974)....................................................................78, 86

*Jenkins v. United States*,
 <u>380 U.S. 445</u> (1965)...............................................................41, 54-55

*Kotteakos v. United States*,
 <u>328 U.S. 750</u> (1946)........................................................................54

*Krulewitch v. United States,*
    336 U.S. 440 (1949) ...........................................................71

*Lowenfield v. Phelps,*
    484 U.S. 231 (1988).....................................................41, 46

*Michigan Dep't of State Police v. Sitz,*
    496 U.S. 444 (1990).........................................................90

*Minnesota v. Dickerson,*
    508 U.S. 366 (1993).........................................................90

*Riley v. California,*
    134 S. Ct. 2473 (2014)......................................................99

*United States v. Mendenhall,*
    446 U.S. 544 (1980).........................................................90

*Wainwright v. Witt,*
    469 U.S. 412 (1985).........................................................39

*Wong Sun v. United States,*
    371 U.S. 471 (1963).......................................................100

<u>Federal Cases</u>

*Darks v. Mullin,*
    327 F.3d 1001 (10th Cir. 2003) .......................................49

*Smalls v. Batista,*
    191 F.3d 272 (2nd Cir. 1999).........................................54

*United States v. Ajiboye,*
    961 F.2d 892 (9th Cir. 1992) .....................................46-47

*United States v. Angiulo,*
    485 F.2d 37 (1st Cir. 1973) ............................................39

*United States v. Boardman,*
    419 F.2d 110 (1st Cir. 1969)............................................................39

*United States v. Brown,*
    426 F.3d 32 (1st Cir. 2005)..........................................................49-50

*United States v. Collins,*
    665 F.3d 454 (2d Cir. 2012)..................................................50, 53-54

*United States v. Green,*
    962 F.2d 938 (9th Cir. 1992)...........................................................47

*United States v. Peters,*
    349 F.3d 842 (5th Cir. 2003)...........................................................54

*United States v. Varoudakis,*
    233 F.3d 113 (1st Cir. 2000)....................................................62, 68

*United States v. Williams,*
    547 F.3d 1187 (9th Cir. 2008)........................................................47

*United States v. Zabriskie,*
    415 F.3d 1139 (10th Cir. 2005)..................................40, 48, 50, 53

*White v. Medina,*
    2011 U.S. Dist. LEXIS 51347 (D. Colo. May 11, 2011)..................48

*Williams v. United States,*
    338 F.2d 530 (D.C. Cir. 1964).........................................................46

Massachusetts Cases

*Brunson v. Commonwealth,*
    369 Mass. 106 (1975) ....................................................................38

*Commonwealth v. Akara,*
    465 Mass. 245 (2013) ............................................................59, 84

*Commonwealth v. Alphas,*
430 Mass. 8 (1999) ...................................................56, 64

*Commonwealth v. Aviles,*
461 Mass. 60 (2011) ...................................................61

*Commonwealth v. Bannister,*
94 Mass.App.Ct. 815 (2019) .......................................57-58

*Commonwealth v. Barbosa,*
463 Mass. 116  (2012) .................................................65

*Commonwealth v. Barros,*
435 Mass. 171 (2001)..................................................88

*Commonwealth v. Berry,*
466 Mass. 763 (2014)..................................................101

*Commonwealth v. Bookman,*
386 Mass. 657 (1982)..................................................88, 100

*Commonwealth v. Bright,*
463 Mass. 421 (2012) .................................................69-70

*Commonwealth v. Brown,*
477 Mass. 805 (2017) .................................................79

*Commonwealth v. Bryant,*
482 Mass. 731 (2019) .................................................68

*Commonwealth v. Buckley,*
478 Mass. 861 (2018)..................................................92

*Commonwealth v. Bush,*
427 Mass. 26 (1998)...................................................104

*Commonwealth v. Carnes,*
457 Mass. 812 (2010) .................................................40

*Commonwealth v. Colon-Cruz,*
  408 Mass. 533 (1990) .....................................................................70

*Commonwealth v. Cordero,*
  477 Mass. 237 (2017).....................................................................92

*Commonwealth v. Coren,*
  437 Mass. 723 (2002)..........................................................80, 85-86

*Commonwealth v. Crayton,*
  470 Mass. 228 (2014).........................................................55, 59, 63

*Commonwealth v. Cruz,*
  459 Mass. 459 (2011).....................................................................92

*Commonwealth v. Cruzado,*
  480 Mass. 275 (2018).........................................................94-95, 98

*Commonwealth v. Dagraca,*
  447 Mass. 546 (2006).....................................................................73

*Commonwealth v. Dilone,*
  385 Mass. 281 (1982)...........................................................103-104

*Commonwealth v. Dorazio,*
  472 Mass. 535 (2015).....................................................................60

*Commonwealth v. Dorelas,*
  473 Mass. 496 (2016).................................................................95, 99

*Commonwealth v. Dung Van Tran,*
  463 Mass. 8 (2012)........................................................................55

*Commonwealth v. Dunn,*
  407 Mass. 798 (1990).....................................................................57

*Commonwealth v. Dwyer,*
  448 Mass. 122 (2006).....................................................................61

*Commonwealth v. Fazio*,
    375 Mass. 451 (1978)................................................................74, 78

*Commonwealth v. Firmin*,
    89 Mass.App.Ct. 62 (2016)................................................................41

*Commonwealth v. Flebotte*,
    417 Mass. 348 (1994).............................................41, 51, 54, 65, 85

*Commonwealth v. Forde*,
    367 Mass. 798 (1975)................................................................100

*Commonwealth v. Fulgiam*,
    477 Mass. 20 (2017)................................................................96

*Commonwealth v. Gomez*,
    450 Mass. 704 (2008)................................................................39

*Commonwealth v. Gonsalves*,
    429 Mass. 658 (1999)................................................................92

*Commonwealth v. Gonsalves*,
    445 Mass. 1 (2005)................................................................73

*Commonwealth v. Guisti*,
    434 Mass. 245 (2001)................................................................39

*Commonwealth v. Hebert*,
    379 Mass. 752 (1980)................................................................38

*Commonwealth v. Helfant*,
    398 Mass. 214 (1986)................................................................55, 57

*Commonwealth v. Hrabak*,
    440 Mass. 650 (2004)................................................................86

*Commonwealth v. Hubbard,*
　　45 Mass.App.Ct. 277 (1998)............................................................76

*Commonwealth v. Hunt,*
　　82 Mass.App.Ct. 1119 (2012)....................................................76-77

*Commonwealth v. Jefferson,*
　　416 Mass. 258 (1993)................................................................102

*Commonwealth v. Johnson,*
　　461 Mass. 44 (2011)..................................................................100

*Commonwealth v. Leach,*
　　73 Mass.App.Ct. 758 (2009)..........................................................71

*Commonwealth v. Lopes,*
　　478 Mass. 593 (2018)..................................................................58

*Commonwealth v. Kaupp,*
　　453 Mass. 102 (2009)..................................................................94

*Commonwealth v. Merry,*
　　453 Mass. 653 (2009)..................................................................82

*Commonwealth v. Mills,*
　　47 Mass.App.Ct. 500 (1999)..........................................................62

*Commonwealth v. Misquina,*
　　82 Mass.App.Ct. 204 (2012)..........................................................85

*Commonwealth v. Montez,*
　　450 Mass. 736 (2008)..................................................................85

*Commonwealth v. Morin,*
　　478 Mass. 415 (2017)..............................................................94, 96

*Commonwealth v. O'Brien,*
    65 Mass.App.Ct. 291 (2005)...................................39, 51, 53

*Commonwealth v. Pearce,*
    427 Mass. 642 (1998)......................................................82

*Commonwealth v. Penta,*
    361 Mass. 894 (1972)......................................................100

*Commonwealth v. Phifer,*
    463 Mass. 790 (2012)......................................................99

*Commonwealth v. Phim,*
    462 Mass. 470 (2012)................................................58-59, 84

*Commonwealth v. Pleasant,*
    366 Mass. 100 (1974)......................................................69

*Commonwealth v. Ramos,*
    430 Mass. 545 (2000)......................................................93

*Commonwealth v. Robles,*
    423 Mass. 62 (1996)......................................................94

*Commonwealth v. Rodriquez,*
    364 Mass. 87 (1973)......................................................39-40

*Commonwealth v. Rodriguez,*
    430 Mass. 577 (2000)......................................................43

*Commonwealth v. Rollins,*
    354 Mass. 630 (1968)......................................................40

*Commonwealth v. Rolon,*
    438 Mass. 808 (2003)......................................................101

*Commonwealth v. Santiago,*
    425 Mass. 491 (1997)......................................................86

*Commonwealth v. Sharpe,*
    454 Mass. 135 (2009)...................................................................69

*Commonwealth v. Shelley,*
    374 Mass. 466 (1978)...................................................................81

*Commonwealth v. Silva,*
    455 Mass. 503 (2009)...................................................................75

*Commonwealth v. Simpkins,*
    470 Mass. 458 (2015)..................................................................105

*Commonwealth v. Stewart,*
    454 Mass. 527 (2009) ..................................................................72

*Commonwealth v. Stoute,*
    422 Mass. 782 (1996)...................................................................90

*Commonwealth v. Sylvia,*
    456 Mass. 182, 188 (2010).............................................................78

*Commonwealth v. Tiscione,*
    482 Mass. 485 (2019)...................................................................50

*Commonwealth v. Torres,*
    453 Mass. 722 (2009)...............................................................49, 52

*Commonwealth v. Tremblay,*
    480 Mass. 645 (2018)...................................................................88

*Commonwealth v. Veiovis,*
    477 Mass. 472 (2017)...................................................63, 65, 67-68

*Commonwealth v. Vinnie,*
    428 Mass. 161 (1998)...............................................................62-68

*Commonwealth v. White,*
    475 Mass. 583 (2016)..................................................94-95, 97, 99

*Commonwealth v. Woodward,*
    427 Mass. 659 (1998)......................................................................101

*Commonwealth v. Zanetti,*
    454 Mass. 449 (2009)......................................................................104

*Ray v. Commonwealth,*
    463 Mass. 1 (2012)......................................................................40, 51

State Cases

*State v. Ginter,*
    300 P.3d 1278 (Utah Ct. App. 2013)................................................52

## CONSTITUTIONAL PROVISIONS

United States Constitution

Fourth Amendment, United States Constitution..................87, 89-91, 99

Fifth Amendment, United States Constitution................................74, 86

Sixth Amendment, United States Constitution.........38-39, 62, 68, 72, 86

Fourteenth Amendment, United States Const.....62, 68, 72, 87, 89-91, 99

Massachusetts Declaration of Rights

Article 12, Massachusetts Decl. of Rights............38-39, 62, 68, 72, 74, 86

Article 14, Massachusetts Decl. of Rights.............................87, 89-91, 99

Article 29, Massachusetts Decl. of Rights................................................39

# STATUTES AND OTHER AUTHORITIES

## Massachusetts General Laws

General Law chapter 234, section 34.......................................................53

General Law chapter 265, section 1.........................................................18

General Law chapter 265, section 26.......................................................18

General Law chapter 268, section 13B.....................................................18

General Law chapter 278, section 33E...........................38, 101, 104-105

## Court Rules

Massachusetts Rule of Criminal Procedure 27(d)...........................38, 53

## Massachusetts Guide to Evidence

§ 401.............................................................................................................61

§ 403.............................................................................................................55

§ 404(b).............................................................................................55, 57, 59

§ 801(d)(2)(E)..............................................................................................69

## <u>STATEMENT OF THE ISSUES</u>

1.    Whether the trial court erred in administering a private, modified Tuey-Rodriquez dynamite charge to a lone minority juror after polling revealed that she did not agree with the verdict.

2.    Whether the trial court erred in allowing over objection Hall's hearsay statements to two witnesses outside of the alleged joint venture where the incriminating admissions undermined rather than furthered the joint venture,

3.    Whether the trial court erred by admitting, over numerous objections, substantial irrelevant and highly prejudicial evidence of his affiliation with the Aryan Brotherhood.

4.    Whether the trial erred by admitting, over objections, grotesque and graphic anatomical illustrations depicting human amputations and photographs of unrelated weapons from Veiovis's apartment, where the evidence was not relevant to any proper purpose and its prejudicial effect far outweighed any probative value.

5.    Whether the Commonwealth's improper remarks in its opening statement and summation misstated the evidence, argued inferences not based in the record, suggested knowledge of facts not in evidence, and appealed to the jury's emotions, requiring reversal of the convictions.

6.    Whether the motion judge erred in denying the defendant's motion to suppress where officers lacked probable cause to seize and photograph him and there was an insufficient nexus between the suspected criminal activity and his phone.

7.    Whether, under the unusual circumstances of the case, the verdict should be reduced pursuant to General Law chapter 278, section 33E, where a reduction would be more consonant with justice.

## STATEMENT OF THE CASE

David Chalue appeals from judgments of conviction of three counts each of first degree murder based on extreme atrocity and cruelty and deliberate premeditation, G.L. c. 265, s. 1, kidnapping, G.L. c. 265, s. 26, and witness intimidation, G.L. c. 268, s. 13B, for offenses against David Glasser, Robert Chadwell, and Edward Frampton. (R.4-30) [1] (Docket No. 1176CR00140).

On October 6, 2011, a Berkshire County grand jury returned indictments charging Chalue with three counts each of murder, kidnapping, and witness intimidation. (R.31-49). Two codefendants, Adam Lee Hall and Caius Veiovis were similarly indicted. A fourth codefendant, David Casey, was indicted on nine counts of accessory after the fact to a felony.

On June 18, 2012, Chalue filed a *McCarthy* motion to dismiss. (R3.3). On August 7, 2012, shortly before a scheduled hearing on the motion, the Commonwealth procured superseding indictments on the same offenses. (R.50-66).

---

[1] Trial transcripts are cited by volume and page as (T__/__), and the Record Appendix as (R._).

On September 23, 2013, Chalue filed a motion to suppress evidence. (R2.4). After hearings on October 11, 2013 and October 28, 2011, the court denied the motion. (R.67).

On October 30, 2013, the codefendants' cases were severed and transferred to Hampden Superior Court.

On March 31, 2014, Chalue filed a motion in limine to exclude items seized from Veiovis's home. (R.78, 83). On April 8, 2014, he moved in limine to preclude evidence of his affiliation with the Aryan Brotherhood as prior bad act evidence. (R.79). He also moved in limine to preclude Jason Lemieux from testifying to alleged statements by Chalue. (R.84). The court denied these motions.

A jury trial began on April 22, 2014, the Honorable C. Jeffrey Kinder presiding.

The jury deliberated for several days. On the fourth day, the foreperson announced the jury had reached unanimous verdicts, and reported verdicts of guilty on all counts. (T18/4). Following the verdict, the defense requested that the jurors be polled individually, and the first juror inquired of reported that the verdicts were not hers. (T18/10). The court announced its intention to reassemble the jurors and instruct

them to resume their deliberations as they had not returned a unanimous verdict. (T18/12). The court denied Chalue's request for a mistrial. (T18/12). The court recalled the jurors, restated that their decision must be unanimous, and ordered them to resume deliberations. (T18/12). Court reconvened and the court alerted counsel at sidebar that the juror in seat number one, Ms. Duquette, was refusing to reenter the jury deliberation room. (T18/13). Over the defendant's repeated objections, the court administered a private modified Tuey-Rodriquez charge to Ms. Duquette. (T18/13-16; 19/3-4). The court also denied defense counsel's request for a full polling of the jury. (T18/14). The jury then resumed its deliberations. (T17/13). The next day, the court denied counsel's renewed motion for a mistrial and his objection to the giving of a Tuey-Rodriquez charge. (T19/4-6). Before allowing the jury to continue its deliberations the next day, the court administered another modified Tuey-Rodriquez charge, this time to the full jury, despite observing that it had shown no evidence of deadlock. (T19/6). The jury continued deliberations and returned verdicts of guilty on all charges. (T19/11).

The court sentenced Chalue to consecutive terms of natural life on counts 10-12; to 10 years incarceration on counts 13 and 16, concurrent

with the sentence on count 10; to 10 years incarceration on counts 14 and 17, concurrent with the sentence on Count 11; and to 10 years incarceration on counts 15 and 18, concurrent with the sentence on count 12.

The defendant filed a notice of appeal on May 23, 2014, and his case was docketed in this court on December 21, 2017. (R.121).

## STATEMENT OF THE FACTS

Chalue, Veiovis and Hall were charged with kidnapping Glasser, Frampton, and Chadwell in the early hours of August 28, 2011, and killing them at an unknown location.

The Commonwealth presented several days of testimony regarding Hall's background with Glasser. In July 2009, Hall learned Glasser had stolen some scrap metal from his home in Peru, then beat him with a bat and made him sign over his truck, resulting in criminal charges. (T3/169-171, 175, 178-184, 207). In 2010, while awaiting trial, Hall enlisted Nicole Brooks and Alexandra Ely, as well as Scott Langdon and Casey's sister in a plan to discredit Glasser by framing him for crimes against Brooks. (T4/13-52, 59-60, 64-65, 80-93). Police believed Hall and the others framed Glasser. (T4/53, 94, 164).

Chalue, Hall, and Veiovis began to socialize together in late August, 2011. (T4/212; T6/33-36, 72). Hall was a high-ranking member of a local Hells Angels chapter and Veiovis wanted to become a Hells Angels prospect. (T4/65, 101, 139-140, 221; T5/164-166; T6/73, 192, 242, 256; T7/22-23; T8/142). Casey was an associate of the Hells Angels and a close friend of president Joe Williams. (T6/255-256; T7/23). Chalue was an Aryan Brotherhood ("AB") member. (T5/166; T6/73, 101-103; T7/23).

On August 26, 2011, Hall, Veiovis, Chalue, and Katelyn Carmin went to several bars. (T5/18-20, 42-44). Hall ranted about Glasser, saying he was "going to kill that motherfucker" for ruining his life. (T5/20-22, 45, 50). Veiovis responded everything would be fine and Chalue stayed quiet. (T5/21-22). Hall spoke to Casey on the phone, then complained that Casey would not give him the keys to his bulldozer. (T5/23-26).

On Saturday evening, Allyson Scace and Kayla Sewell met Hall, Veiovis, and Chalue outside the Hells Angels clubhouse in Lee. (T5/89-90, 122-123, 130-131). Scace, Sewell, Veiovis, and Chalue together went to Veiovis's apartment in Pittsfield. (T5/91-92, 108-109, 124, 131). Hall

went separately, stopping first at Steven Hinman's house where he had several firearms, including a Glock .45 semiautomatic. (T5/91-93, 109, 124, 131, 143-144, 160). Hall arrived at Veiovis's residence with a bag containing three or four handguns. (T5/94-96, 111).

Glasser and Frampton lived in Pittsfield, and Chadwell lived across the street. (T3/71, 74-76, 115-116). Archambault saw Glasser, Frampton, and Chadwell in their kitchen after 10:00PM. (T3/140). Sometime before 2AM, Archambault heard banging on the front door. (T3/141, 150-154). People made attempts to reach Glasser, Frampton, and Chadwell, and later they were reported missing. (T3/82-90, 98-101, 105-112).

Hurricane Irene hit the area overnight on Saturday. At 1:30AM, Hall arrived at Edwin Sutton's home in Pittsfield, where his daughters Ocean Sutton and Rose Dawson, and Ely were present. (T5/168-169, 172-173, 182; T6/44, 80, 111). Hall borrowed Dawson's cell phone and departed in a Jeep. (T5/179, 183-192; T6/45, 112).

At 5:30AM, Hall entered a store wearing wet, dirty attire. (T5/201-204). He went to Sutton's home, parked, and left in Veiovis's Jeep. (T7/121-122, 138). Chalue was not present. (T7/138).

At 10:30AM, Hall, Veiovis, and Chalue arrived at Sutton's house in Veiovis's Jeep. (T6/47, 81-82). Hall asked Ely and Dawson to come to his house for breakfast, and gave them wet money to buy provisions. (T6/47-48, 84-85, 112-114). Hall was wet and not wearing shoes. (T6/48). Ely and Dawson drove Hall's Buick. (T6/48, 82, 113). At Hall's house, he returned Dawson's phone and told her to delete the call log and not tell anyone he had borrowed it. (T6/116-118). Chalue slept in a bedroom. (T6/87-88, 93). After breakfast, Ely and Dawson drove the Buick home, and Hall, Veiovis, and Chalue retrieved it later that day. (T6/54).

At 2PM on Sunday, Hall arrived at Casey's home in Canaan, New York. (T6/223-224). Hall said he was having car trouble in Becket and Casey called Alan Pavoni, who agreed to let Hall park in his driveway at 119 Johnson Road. (T6/158-159, 225; T7/23-27). Hall told Casey he "ousted" Glasser, and killed "the fat guy and the nigger." (T6/226-227). Hall said he tried to shoot Glasser but when the gun misfired, Glasser ran into the woods. (T6/229-230). Casey testified that he was not sure but thought Hall said, "Davey was on him real quick." (T6/230, 255; T7/62-65). He acknowledged he told investigators and the grand jury several times that Hall did not name whoever had helped him kill the

24

victims and said this was truthful. (T7/44, 48-52). In his prior testimony at Hall's trial, Casey testified that Hall did not name anyone who had assisted him. (T7/65-66, 68, 79-81).

According to Casey, Hall said the other man shot Glasser but not fatally, and brought him back to Hall, who shot him and cut off his head. (T6/230-231). Hall said he later stabbed, tortured, and killed the black guy. (T6/231-232). Casey testified that Hall told him they chopped up the bodies and that the guy with him liked this. (T6/232; T7/48).

Hall asked Casey to bury the men on his property, and Casey said no. (T6/234, 237). Hall asked if he was still working at Daniel Cole's property at 593 Woodmere Road, Becket with his excavator. (T6/234-235). Hall asked Casey to dig a hole there, and they arranged to meet there in the morning. (T6/235-239).

Hall arrived at Pavoni's house Sunday evening with two people and parked the Buick. (T6/159-164, 171, 182-186). A Jeep then picked him up. (T6/164-165, 168-169, 178). Chalue was not present. (T6/167, 192).

On Monday morning at Pavoni's house, Hall introduced Chalue to Casey as "Davey," and said he was in the AB. (T6/240, 242-243, 252,

257; T7/61-62). Casey did not mention Chalue's presence in his numerous statements to police, despite his knowledge that Chalue had been arrested, and explained it was because he did not think Chalue had anything to do with the murders because Hall did not mention Chalue when he described committing the crimes. (T6/252-253; T7/35-36, 43-48, 61, 74).

Hall spoke to Casey about burying the bodies and made Chalue step out of earshot. (T6/259-260). Hall and Casey walked over to the Buick where Hall opened the trunk and remarked, "They're starting to smell." (T6/243-244, 259-260; T7/78-79). Hall directed Chalue to remain at Pavoni's house and he and Casey went to Cole's property. (T6/244, 260, 269; T7/20-21). Cole's property was not visible from Pavoni's property, which is three miles away. (T6/262; T10/175-180).

Hall and Casey started the excavator, then returned to Pavoni's house for the Buick. (T6/244-245, 260-262, 264, 266). Chalue continued to remain at Pavoni's house. (T6/262, 265-266, 269; T7/20-21, 76). Casey dug a hole in a clearing in a wooded area, then took several trash bags from the Buick's trunk and buried them in the hole. (T6/246-249, 267; T7/21).

During this time, Chalue made four unanswered calls to Hall's phone between 11:58AM and 12:34PM and sent text messages saying "Hey, what's going on?" and "Dude, I'm ready to leave. I don't know what to tell you." (T10/123-124, 160-165, 175-176, 183). Hall's phone was turned off. (T10/165, 180-185).

When Cole came home from work on Monday, he noticed muddy tracks but Casey denied moving the excavator. (T6/251; T8/158-160, 164). Casey told Pavoni not to tell police that he and Hall had been at their house. (T6/172, 205, 210-211, 250, 254; T7/38).

Police questioned Casey on September 9, 2011, but he did not tell them everything he knew or the location of the bodies. (T6/251; T7/34). After learning Hall was arrested, police again questioned Casey and he said Hall buried the bodies on Cole's property, but again denied his own involvement. (T6/251-252; T7/34-36). After Casey's arrest on September 16, 2011, he told police what Hall told him about ousting Glasser and that Hall participated in burying the bodies. (T7/38-46). Casey hoped to and did receive consideration on his case by testifying at his codefendants' trials. (T7/42, 52-55, 60-62, 67, 70).

On Monday, August 29, Hall and Dawson used a hose to wash out the interior of Hall's Hyundai at Sutton's house. (T6/56-56, 90-92, 119; T7/141). Chalue did not assist. (T6/56, 92; T7/141). Ely and Dawson testified that Hall mentioned that the guy and two of his friends were missing. (T6/120). Dawson testified that later in a private conversation Hall said one of the men was fixing a computer, one was lying on a couch, and one was playing a video game. (T6/121).

At 4:37PM, Hall and another man, not Chalue, brought the Buick to a salvage yard and sold it for scrap. (T7/92-108; T13/5). At 8:43PM Hall and Chalue went to Walmart, where Hall bought boots and socks, telling an employee that his were soaked. (T7/197, 203, 207-210; T8/19).

That night, Hall and Chalue took Ely and Dawson to the clubhouse. (T6/62-63, 121-122). Hall and Chalue were very drunk and Hall acted out a scene where he chased someone who said, "Help me," and Chalue pointed and laughed. (T6/63-67, 94-96, 88, 122-133). Hall said, "you should have seen the look on his face" and said someone had to watch, and Chalue did not respond. (T6/130-131). Hall referred to someone as Butch or Butcher. (T6/67, 132-133).

28

Ocean spent Tuesday night with Hall and Chalue at the clubhouse. (T5/99-100; T7/122-124, 142). The next morning, Hall burned some of his Hells Angels insignia clothing. (T7/124, 142-145; T8/143). Hall, Chalue, and Ocean went out to eat in Hall's Hyundai, but left when he got a phone call, stopping the car on a bridge. (T7/125-127, 145, 158). From the driver's seat, Hall threw an empty shoebox, empty bags, and socks through the passenger window into the river. (T7/127-128, 134-135, 146-149, 158-159, 165-166, 175-176). Chalue picked up items that Hall failed to throw over the railing, and threw them into the river. (T7/127, 136, 148-149; T8/127). Investigators later searched the riverbanks downstream and found pieces of cardboard from a shoebox of the same boots Hall purchased. (T7/214-229; T8/19).

On Sunday, September 4, police set up a command post on Potter Mountain Road. (T8/55, 61, 84-87, 117). At 11:00AM, Hall drove on Potter Mountain Road in a Jeep, then returned. (T8/51-54, 62-63). Trooper Michael Goonan was alerted and followed the Jeep to a gas station. (T8/64-65, 85-88). After some conversation with Hall, Goonan gave an exit order and patfrisked and photographed Hall, Veiovis, and Chalue. (T8/72-79, 150). Officers seized Hall's boots and socks, the Jeep,

and all cell phones. (T8/90, 108-110). That night, police arrested Hall on unrelated charges. (T7/149-150; T8/143).

On Friday, September 9, after speaking to Casey, investigators searched Cole's property and observed a recently excavated area. (T8/160, 166-168). On Tuesday, September 14, they recovered from the ground fifteen plastic bags containing the dismembered bodies of Glasser, Frampton, and Chadwell. (T8/186-200, 208). Each man had gunshot and stab wounds, and other injuries. (T8/212-217; T9/24-66). The projectiles recovered were fired from a .45 caliber Glock pistol. (T10/25-28, 37-38). Forensic anthropologist Dr. James Pokines examined the bones and concluded that the damage was caused by hacking trauma from a heavy bladed implement such as a butcher knife, meat cleaver, or machete. (T9/73-74). The injuries could not have been inflicted by a small knife, chainsaw, hatchet, or ax. (T9/75, 92, 100-101, 103).

On September 5, Lieutenant David Foley told Chalue he was going to be arrested. (T13/17-18, 20). Chalue remained in the area and he and Veiovis were arrested on September 10, 2011. (T13/17, 20-21).

Lieutenant Foley told Veiovis that Hall was a rat and had offered to work with the FBI to set up the Hells Angels clubhouse. (T13/20-21, 28).

Police executed search warrants for two apartments at 10 Cloverdale Street, one Veiovis vacated on September 1 and one where he thereafter resided. (T9/131, 136, 171). In the vacated apartment, officers seized and photographed anatomical illustrations showing amputations hanging on an upstairs wall and inside an attaché. (T9/76, 138-139, 155-157, 174). In Veiovis's new apartment, they found numerous knives, cleavers, hatchets, a machete, a sickle, and a bat with nails. (T9/145, 148-151, 154). The weapons tested negative for blood and were photographed but not seized. (T9/165, 187).

Hall was thrown out of the Hells Angels after his arrest when they learned of his offer of assistance to the FBI. (T4/109, 115-118; T6/189; T7/29). Witnesses testified they felt free to give statements against Hall after his ouster from the club. (T4/111, 118; T5/153; T6/189).

Christopher Letalien and Chalue were in segregation at the Berkshire County House of Correction ("BCHOC") in September 2011. (T10/206; T11/34-35). Letalien testified Chalue got angry and told him not only did he have one body, he had three bodies, he made them

disappear and fourteen days later they were found cut into pieces in the bottom of a ditch. (T11/38, 40). After Chalue was transferred in October, Letalien asked his lawyer if it would lessen his sentence to tell investigators about Chalue. (T10/209-210, 232; T11/43, 45, 82). He acknowledged he was previously aware of the triple homicide from other sources. (T11/68-69). Letalien was impeached with his previous work with police in exchange for money and with several contemporaneous recorded telephone conversations in which he coerced family and friends to lie to help with his pending case. (T11/47-64, 76-79, 92-113). In one conversation he remarked that his "ace" was his testimony against Chalue, and that it would be okay because Chalue was not a Hells Angel. (T11/117-123). After Letalian gave information to the police, his bail was substantially reduced with the Commonwealth's agreement and he was released. (T11/124-125).

In October, 2011, Jason Lemieux and Chalue were briefly housed in the segregation unit of BCHOC. (T11/137, 155-156). Lemieux testified that during their brief daily recreational time Chalue talked to him about his case. (T11/140-143, 153-155, 187). Although he claimed Chalue began telling him about his case in October, in recorded

telephone conversations in September Lemieux relayed numerous details about the murders. (T11/157-163, 190-192). For his testimony in Chalue's trial, the Commonwealth dismissed three pending charges of rape and reduced his sentence to house arrest. (T11/148-149, 174-179, 192-196).

Jethro Kempton, an AB member, met Chalue at Souza-Baranowski Correctional Center ("SBCC") where Chalue was held pretrial. (T11/212-213, 227-228; T12/20, 32-33). Chalue complained that fellow inmate Jeffrey Cashman had been lying about him to police and telling the details of his discovery materials, and showed Kempton Cashman's handwritten letters. (T12/21-22, 26-29). He testified that Chalue told him details about the murders, including several details that conflicted with the physical evidence, such as the weapons used. (T11/234-240, 244; T12/29-31, 43-44). After Kempton was denied parole, he contacted prosecutors with this information, said he was willing to do anything, and requested to be paroled. (T12/31-38, 48). They replied that if he cooperated with them they would see what they could do, and he hoped for consideration in his case. (T12/36-37, 49).

In 2013, Cashman and Chalue were both in the segregation unit at SBCC during a ten-day period. (T12/55-56, 100-101). Cashman testified that two days after they met, in violation of prison rules, Chalue sent a corrections officer to him with a "novel" consisting of his legal matters including discovery with hand written notes and a note asking him to read it. (T12/62-65, 92-95, 140-141; T13/22-23). The note included, "Keep in mind the names of all the rats in this case, I'm sure they will all be making their way up this way. And yes they're all in the hat. Listen, I'm willing to reinstate you but I first have to know without a doubt, one hundred percent, are you willing to give your life for this thing, because once you're in there's no way out. That means making your bones when the time comes." (T12/65). Cashman took notes with the intention of going to the District Attorney. (T12/142, 162-163).

Cashman said Chalue told him Hall was angry at a man who intended to testify against him and Chalue suggested Hall kidnap him at night and kill him. (T12/77-79). Chalue purportedly told him that the night of the hurricane he, Hall, and Trash forced their way into the house and drove the three occupants away.  (T12/79-81, 143). They drove the bodies to Casey in New York in the Jeep, and Casey was

34

angry as he only expected one body. (T12/81-82, 145-146). According to Cashman, Chalue said after they left Casey they went to one of Hall's properties where they all took part in beating, torturing, killing, and cutting up the victims with a reciprocating saw. (T12/82-85, 151-155). Chalue said when they were buried he was in a car parked in a driveway, which Hall and Rose later cleaned with a hose. (T12/85-87, 150-151). A tan car was crushed to destroy evidence. (T12/86). Hall threw or kicked some items off a bridge, including a gun. (T12/87, 157-161).

Cashman wrote to District Attorney Capeless with information about the case and requests for protection, an identity change, and relocation to a more comfortable facility where he could chew tobacco and earn good time credit to reduce his sentence, and volunteer at a non-profit. (T12/90, 98-102, 117-118, 124-139, 160-161).

## SUMMARY OF THE ARGUMENT

When polling of the jury revealed the identity and vote of a lone minority juror, the court erred in giving a private, modified Tuey-Rodriquez charge to that single juror in circumstances that were inherently coercive. The premature administration of the dynamite

charge, over the defendant's objection, improperly put the weight of the court on the single juror and raised serious questions as to the independence of the jury and the propriety of the convictions. Where substantial rights of the defendant were affected, a new trial is required. (Br.38-55).

The court erred in allowing, over objections, Hall's statements to Ely and Dawson of his knowledge that men were missing and what each had been doing when they disappeared. The remarks were not admissible pursuant to the hearsay exception for statements of a joint venturer where they undermined rather than furthered any joint venture by revealing incriminating information to persons outside the conspiracy. Where the statements provided the most direct evidence that Hall was present at the kidnapping, it cannot be said with fair assurance that their erroneous admission did not influence the jury or had but slight effect. (Br.55-68).

Prejudicial error resulted from the court's admission, over numerous objections, of substantial irrelevant and highly prejudicial evidence of other bad acts of Chalue and Veiovis. The court allowed a spate of evidence through numerous witnesses of Chalue's AB

affiliation, and a substantial amount of graphic anatomical illustrations depicting human amputations and photographs of various weapons, including some that could not have been used in this case, from Veiovis's apartments. This overwhelming other bad act evidence was not relevant to any proper purpose and its prejudicial effect far outweighed any probative value. (Br.68-73).

The Commonwealth's opening statement and summation were permeated with improper remarks misstating the evidence, arguing inferences not based in the record, suggesting knowledge of facts not in evidence, and appealing to the jury's emotions of fear of and anger toward Chalue. The combination of these several improper comments requires reversal of the convictions where they were not cured by the instructions and went to the heart of the matter for the jury's consideration. (Br.73-86).

The motion judge erred in denying the motion to suppress where officers lacked probable cause to seize and photograph Chalue. The police lacked particularized suspicion that he had committed any crime to justify the stop and seizure. When police seized his phone, there was an insufficient nexus between the suspected criminal activity and the

phone and there was no probable cause to believe it would contain evidence concerning the crimes. (Br.87-100).

This court should conduct plenary review of the defendant's case and grant him relief pursuant to General Law chapter 278, section 33E. (Br.101-105).

## ARGUMENT

I.   **WHEN POLLING OF THE JURY REVEALED THAT ONE JUROR DID NOT AGREE WITH THE VERDICT, THE JUDGE ERRED IN ADMINISTERING A DYNAMITE "TUEY-RODRIQUEZ" CHARGE TO A LONE MINORITY JUROR AND IN FAILING TO ALLOW THE MOTION FOR A MISTRIAL.**

The jury verdict in a criminal trial must be unanimous. See *Brunson v. Commonwealth*, 369 Mass. 106, 120 (1975). Although the decision to poll a jury is in the trial judge's discretion, once the decision to poll is made, it must appear that the verdict is unanimous. See *Commonwealth v. Hebert*, 379 Mass. 752, 754-755 (1980). "If after the poll there is not a unanimous concurrence, the jury may be directed to retire for further deliberations or may be discharged." Mass.R.Crim.P. 27(d).

"The Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights guarantee a criminal

defendant the right to a trial by an impartial jury." See *Commonwealth v. Guisti*, 434 Mass. 245, 251 (2001). "Article 29 of the Massachusetts Declaration of Rights also guarantees 'the right of every citizen to be tried by judges as free, impartial and independent as the lot of humanity will admit.'" *Id.* at 251 n.8. An "impartial" jury consists of "jurors who will conscientiously apply the law and find the facts." See *Wainwright v. Witt*, 469 U.S. 412, 423 (1985). While "[t]he weight and credibility of the evidence is the province of the jury," *Commonwealth v. Gomez*, 450 Mass. 704, 711 (2008), jurors must "apply the law as interpreted by the court." See *United States v. Boardman*, 419 F.2d 110, 116 (1st Cir. 1969). Accordingly, "[w]hen instructing the jury, a judge must avoid language that may coerce the jury into reaching a verdict." See *Commonwealth v. O'Brien*, 65 Mass.App.Ct. 291, 294 (2005).

There is a special danger of jury coercion where a judge's supplemental instructions are addressed to a jury whose deliberations have reached a point of deadlock. See *United States v. Angiulo*, 485 F.2d 37, 39 (1st Cir. 1973). Generally, where the judge believes that the jury are deadlocked, the Tuey-Rodriquez charge, set forth in *Commonwealth v. Rodriquez*, 364 Mass. 87, 101-102 (1973), may be

given. See *Ray v. Commonwealth*, 463 Mass. 1, 6 (2012). This charge is designed to urge the jury to reach a verdict, if possible, "by giving more serious consideration to opposing points of view." See *Commonwealth v. Carnes*, 457 Mass. 812, 827 (2010).

## A. The Court Erred In Giving A Private Tuey-Rodriquez Charge To A Lone Minority Juror In Circumstances That Were Inherently Coercive.

Courts have long maintained concerns about the potentially destructive nature of this particular charge on fragile jury deliberations, labeling it a "dynamite," "nitroglycerin," "third degree," or "shotgun" charge. See *Rodriquez*, 364 Mass. at 100; *United States v. Zabriskie*, 415 F.3d 1139, 1148 n.13 (10th Cir. 2005) (same about federal equivalent, the Allen[2] charge). Because it "has a 'sting' and can, if improperly phrased or improvidently given, risk 'coercion' of the jury to reach a verdict with which they are not fully comfortable," this charge "should not be employed prematurely or indiscriminately." *Commonwealth v. Rollins*, 354 Mass. 630, 638 (1968).

---

[2] 'Allen charge' is the name for supplemental jury instructions given when jurors are apparently deadlocked. See *Allen v. United States*, 164 U.S. 492, 501-502 (1896).

As defense counsel objected to the court's giving of the Tuey-Rodriquez charge to the lone minority juror, the error is preserved and this court reviews under the prejudicial error standard to consider whether the judge erred, and, if so, whether we can be certain that the improper instruction "did not influence the jury, or had but very slight effect." See *Commonwealth v. Flebotte*, 417 Mass. 348, 353 (1994).

"A judge crosses the line between enlightening the jurors' understanding [of the law] and coercing them [into returning a verdict] when 'he overcomes the will by the weight of his authority.'" See *Commonwealth v. Firmin*, 89 Mass.App.Ct. 62, 65 (2016). One example of overbearance is the improper administration of the charge to a purportedly deadlocked jury. See *Jenkins v. United States*, 380 U.S. 445, 446 (1965). To determine whether a dynamite charge is coercive, this court looks at the instruction in its context and under all circumstances. See *Lowenfield v. Phelps*, 484 U.S. 231, 237 (1988).

At 3PM on the fourth day of deliberation, the jury sent a note announcing that it had reached a unanimous verdict. (T18/4). After verdicts of guilty on all charges were announced, the defendant asked to poll the jury. (T18/10). When the clerk inquired of the juror in seat

number one if she agreed with the verdicts, she replied "no." (T18/11). The court excused the jury, recessed, and upon returning with the parties suggested that it would reassemble the jurors and instruct them to resume deliberations as they had not returned a unanimous verdict. (T18/11-12). The court denied the defendant's request for a mistrial. (T18/12). It recalled the jurors, restated that their decision must be unanimous, and ordered them to resume deliberations. (T18/12). Five minutes later, the court reconvened and the court alerted counsel at sidebar that the juror in seat number one, Ms. Duquette, was refusing to reenter the deliberation room. (T18/13). The court informed counsel that he planned to call her to sidebar and speak with her.

> My plan is to bring her in here and have a conversation with her in your presence at sidebar to make clear to her that she should not surrender any honestly held opinions about the facts of this case, on the other hand she should listen with an open mind and continue to deliberate with her fellow jurors in an effort to reach a unanimous verdict.
>
> It's a little bit delicate because I don't want to say or do anything that might prompt a statement about the contents of their deliberations, which I want to stay away from, but I think we're at a bit of an impasse at the moment, and until I attempt to persuade here that her obligation is to continue to try and work toward a verdict, I think she's not going to go in there. And so that's my plan. I'll hear you with respect to my plan, if you have any other suggestions. (T18/13).

Defense counsel again objected and moved for a mistrial, which the court denied. (T18/13-14). The court also denied the request for a full polling of the jury. (T18/14). At sidebar, the court had the following exchange with the juror:

> THE COURT: First of all, I just want you to listen, I don't need you to say anything, okay?
> MS. DUQUETTE: Okay.
> THE COURT: As I instructed you before, if you have any honestly held feelings about the facts of this case, no one is suggesting that you surrender those feelings. On the other hand, it is important that you listen to your fellow jurors with an open mind and see if you can come to a unanimous decision. I'm going to ask that you return to deliberate with them. I know it might be difficult but it is important that you keep an open mind and listen, and again, it's important that you not surrender your feelings if convinced.
> MS. DUQUETTE: Okay.
> THE COURT: Can you do that?
> MS. DUQUETTE: Yes, sir.
> THE COURT: Thank you very much. You may be excused.

(T18/15).

After the juror left the room, defense counsel objected to the judge's interaction with the juror, stating that he had given a limited Tuey-Rodriquez charge. (T18/15). Defense counsel first objected to the giving of the charge to the juror and then asked the court to give the charge to the remaining jurors, and the court denied the requests.

(T18/15-16). The jury resumed deliberations, returning two-and-a-half hours later asking to be excused for the evening. (T17/13).

Before deliberations began the next morning, defense counsel renewed his motion for a mistrial noting the unusual behavior of the jury during and following the poll. (T19/3). He noted that people saw jurors, including the foreperson, act out when asked to return to deliberate further. (T19/3). He reported that the foreperson threw a pencil on a chair, slammed his book on a chair, and shook his head. (T19/3-4). Counsel deemed the behavior "an extreme reaction" and noted that several other jurors were crying. (T19/4). Counsel noted that the court's intended instruction, another modified Tuey-Rodriquez charge to be given to the entire jury, could create an undue influence on the single minority juror. (T19/4).

In response, the court noted that it had also observed a reaction from some of the jurors, but downplayed the nature of the reaction, deeming it not necessarily unusual and noting that the jury was frustrated. (T19/5-6). The court noted that the jury had never stated that it was deadlocked, observing:

> We have not heard, once, from this jury that they are at an impasse of any kind. They have continued their deliberations

> after having been sent out yesterday for well over two hours, and when told that they had an option to continue yesterday evening or come back today and resume their deliberations they elected to come back today without suggesting that they were at an impasse.

(T19/6). After the court denied his renewed request for a mistrial and after his objection to the charge, counsel asked the court to alter the new supplemental instruction that he planned to give the jury. (T19/6-8). The court then instructed the jury:

> So, two other points before I get to my questions -- well, I want to give you an instruction after I ask my questions, which I hope will address some of the issues that I observed yesterday...Ladies and gentlemen, I know from my own observations of you yesterday, that some of you had an emotional reaction when the verdict was announced, when you were ordered to resume your deliberations after I determined that the verdict was not unanimous, and then again at the end of the day when I ordered you to return here today for continued deliberations. You will recall that I earlier instructed you that emotion or sympathy, passion or prejudice, should play no role in your deliberations. I urge you to follow that instruction and remove emotion from your deliberations in an effort to reach a unanimous verdict, if you can do so in good conscience. Please try to be patient and respectful of the views of your fellow jurors as you work toward that end. I now excuse you to continue your deliberations.

(T19/9-11). The jury exited at 9:26AM, and returned at 2:35PM with unanimous verdicts of guilty on all charges. (T19/11).

### 1. Courts Should Not Give Dynamite Charges Where They Know The Identity Of Any Minority Jurors.

It has long been held that courts may not inquire of a jury the nature or extent of its numerical division during deliberation. See *Brasfield v. United States*, <u>272 U.S. 448</u> (1926). The rule is a prophylactic one, designed to shield the jury from the unpredictable effects of both the inquiry itself and the jury's knowledge of the judge's awareness of its division. See *Brasfield*, <u>272 U.S. at 450</u>. "If a trial judge inquires into the numerical division of the jury and then gives an Allen charge, the charge is per se coercive and requires reversal." *United States v. Ajiboye*, <u>961 F.2d 892, 893-894</u> (9th Cir. 1992). Even where the court inadvertently becomes aware of the division of the jurors, it must proceed carefully when considering any supplemental or dynamite charges. See *Williams v. United States*, <u>338 F.2d 530, 532-33</u> (D.C. Cir. 1964).

When giving a dynamite charge, a court must avoid supplemental instructions that target jurors in the minority. See *Lowenfield*, <u>484 U.S. at 237-38</u>. Where the judge knows the identity of the jurors in the minority and the jurors in return know the judge knows of their status, coercion is especially likely as the minority jurors could interpret the

supplemental charge as directed specifically at them. See *Ajiboye*, 961 F.2d at 893-94; *United States v. Williams*, 547 F.3d 1187, 1207 (9th Cir. 2008) (reversible error to give charge when court knew identity of holdout juror).

Where there was a single identified individual in the minority following a unanimous verdict, the judge's supplemental charge can only be read by the dissenting juror as leveled at her. She could hardly escape reasoning that the judge was not likely to believe that she could persuade the rest of the jury to adopt her view, one to which some of the other jurors reacted with negative emotion; and that she, individually, was being urged by the judge to reconsider her vote. See *United States v. Green*, 962 F.2d 938, 944 (9th Cir. 1992) (noting danger that minority jurors would believe judge was directing his remarks to them rather than to jury as a whole). The giving of the supplemental Tuey-Rodriquez charge under these circumstances was coercive and constituted reversible error.

## 2. Where The Court Knows The Identity Of The Minority Jurors, Giving Them A Private Dynamite Instruction Is Inherently Coercive.

The usual concern about the coercive effect of a dynamite charge when given to an entire jury panel is substantially exacerbated when the court specifically directs it at a lone minority juror. See *Zabriskie*, 415 F.3d at 1147-1148. In *Zabriskie,* the 10th Circuit held that giving an Allen charge, which inherently possesses some risk of coercing dissenting jurors, becomes coercive as a matter of law when delivered only to minority jurors. See 415 F.3d at 1148. "Our latent and lingering concern that jurors in the minority position will be coerced into yielding to the majority is made manifest when an Allen charge is delivered only to dissenting jurors and especially when it is done in private." See *id.* "Separate instruction of individual jurors not only defeats the equality implicit among jurors, it has the potential to be perceived as a directive from the judge on the issue of disagreement among the jurors." See *White v. Medina*, 2011 U.S. Dist. LEXIS 51347, at *28-30 (D. Colo. May 11, 2011).

By singling out a lone minority juror for individualized questioning while deliberations were proceeding, the court improperly

placed the weight of the court on her in an inherently coercive manner.
See *United States v. Brown*, 426 F.3d 32, 39 (1st Cir. 2005) (noting
dangers in so doing and that trial court correctly believed it would have
been unduly coercive). Contrast *Darks v. Mullin*, 327 F.3d 1001, 1014
(10th Cir. 2003) (neutrally phrased supplemental instruction directed at
all jurors rather than to those holding a minority view reduces
possibility of coercion). Following the polling of the jury, which revealed
that Duquette did not agree with the verdict, the court ordered the jury
to resume deliberations. When the court officer reported that she
declined to deliberate, the court opted not to simply direct her to resume
or confirm she was willing to do so. Contrast *Commonwealth v. Torres*,
453 Mass. 722, 731-737 (2009) (when juror reported not guilty verdict
during polling, judge properly directed jury to exit, noted lack of
unanimity for the record, and instructed them to resume deliberations).
In contrast to *Torres*, which involved a juror exhibiting far more
troubling behavior than occurred here, the court went far beyond simply
checking on the upset juror and making sure she was able to resume
deliberations. As the judge himself noted, it is not unusual for jurors to
experience strong emotions during the course of deliberation, especially

in the fourth day of jury consideration after a long presentation of evidence. In extreme situations, judges can order a cooling off period for the jurors to take a break or suspend deliberations for the day. See *Commonwealth v. Tiscione*, 482 Mass. 485, 491-492 (2019).

Despite the availability of these other options, the court chose to deliver a Tuey-Rodriquez charge to a single juror it knew to be in the minority, in a coercive environment where her juror peers were not present. See *Zabriskie*, 415 F.3d at 1147-1148. This constitutes reversible error. Where, as here, the communication involves a supplemental instruction to a single juror in a minority position, the potential for prejudice is particularly acute. See *United States v. Collins*, 665 F.3d 454, 462 (2d Cir. 2012) ("The court singled out a dissenting juror, and emphasized to him the importance of reaching a verdict. We cannot ignore the possibility that [the juror] walked out of the ex parte conference with the impression that he should not stand in the way of a prompt resolution of the case."); *Brown*, 426 F.3d at 39 (substantial potential for prejudice if court were to single out one juror for questioning).

It cannot be assured here that the court's action, objected to by the defendant, did not influence the jury or had but very slight effect. See *Flebotte*, 417 Mass. at 353. The instruction was not a typical Tuey-Rodriquez charge. Generally, "[t]he purpose of the [Tuey-Rodriquez] instruction is to encourage a purportedly deadlocked jury to consider seriously and with an open mind the views and arguments of each member." *Ray*, 463 Mass. at 3 n.3. Instead, it departed from the directive that trial judges avoid deviating from the court-approved language of the Tuey-Rodriquez charge. See *O'Brien*, 65 Mass.App.Ct. at 294-295. The judge did not provide the isolated juror with the full Tuey-Rodriquez charge, including that jurors in the majority should consider the views of those in the minority, among other portions. In its context and under all the circumstances, the judge's instruction to the single minority juror had potentially coercive effect. It was given almost immediately after the polling revealed the lone minority juror and where she knew the judge knew of her status. It was given only to her, in the absence of the protection of anonymity or as part of the larger jury panel, and only she was asked to keep an open mind and to see if she could "come to a unanimous decision." (T18/15). That the court

intended to counterbalance the statements urging acquiescence and

unanimity by including language that "no one is suggesting that you

surrender those feelings," this cautionary language was insufficient to

outweigh the coercive effect of the knowledge that one juror stood alone

against the others. See *State v. Ginter*, 300 P.3d 1278, 1281 (Utah Ct.

App. 2013) (despite employing protective language, dynamite charge

reversible error as minority juror's identity was known).

Moreover, it was error in the first instance to give a Tuey-

Rodriquez charge before the jury announced any deadlock or impasse.

See *Rodriquez*, 364 Mass. at 100. The court itself had observed that the

jurors were not deadlocked but merely frustrated, observing after the

polling:

> We have not heard, once, from this jury that they are at an
> impasse of any kind. They have continued their deliberations after
> having been sent out yesterday for well over two hours, and when
> told that they had an option to continue yesterday evening or
> come back today and resume their deliberations they elected to
> come back today without suggesting that they were at an impasse.

(T19/6). Despite the lack of unanimity in the verdict revealed by the

polling, there was no indication that the jury believed they were

deadlocked. Compare *Torres*, 453 Mass. at 731-732 (judge correctly did

not administer Tuey-Rodriguez charge after jury returned with

nonunanimous verdict after polling). In the absence of evidence of a deadlock, the judge had the authority to send the jury back to continue their deliberations. See *id.* at 735-736, citing G.L. c. 234, § 34; Mass.R.Crim.P. 27(d). The decision to prematurely give a dynamite charge in circumstances not requiring one was further error requiring reversal and especially coercive in the circumstances of the minority juror. See *O'Brien*, 65 Mass.App.Ct. at 296 ("instructions given to a jury that have not reached the point of deadlock may have an impermissibly coercive effect"). The proper course would have been to permit deliberations to proceed without judicial intervention and, if circumstances later changed to demonstrate a deadlock, to address the issue at that time with an appropriate charge. See *Rodriquez*, 364 Mass. at 98.

The court cannot dismiss the possibility of prejudice even where deliberations continue for an extended period after delivery of such an instruction. See *Zabriskie*, 415 F.3d at 1143-44, 1148 (modified Allen instruction was coercive, even where jury deliberated at least six hours after instruction); *Collins*, 665 F.3d at 463-464 (that jury deliberated for one full day after ex parte conference does not require finding of

harmless error); *Gypsum*, 438 U.S. at 433, 469 (improper colloquy at 12PM, jury returned verdict the next morning); *United States v. Peters*, 349 F.3d 842, 845, 849 (5th Cir. 2003) (reversible error where jury returned verdict day after improper ex parte communication with foreman); *Smalls v. Batista*, 191 F.3d 272, 281 (2nd Cir. 1999) (length of deliberation did not diminish coerciveness of supplemental charge).

The premature administration of a Tuey-Rodriquez charge, in circumstances where the court knew the identity of the lone minority juror, raises serious questions as to the independence of the jury and the propriety of the convictions. While it is possible the jury would have reached the same conclusion, even in the absence of the judge's instructions, this is not the point or the governing standard of review. Instead, the court considers whether it can say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error," whether it is possible to conclude that substantial rights were not affected. See *Flebotte*, 417 Mass. at 353; *Kotteakos v. United States*, 328 U.S. 750, 764-765 (1946). Where prejudice is likely, as here, justice requires a new trial. See *Jenkins*, 380 U.S. at 446 ("the principle

that jurors may not be coerced into surrendering views conscientiously held is so clear as to require no elaboration").

## II. PREJUDICIAL ERROR RESULTED FROM THE ALLOWANCE OF SUBSTANTIAL IRRELEVANT AND HIGHLY PREJUDICIAL EVIDENCE OF THE DEFENDANT'S AFFILIATION WITH THE ARYAN BROTHERHOOD AND VEIOVIS'S POSSESSION OF UNRELATED WEAPONS AND ANATOMICAL ILLUSTRATIONS WHICH SERVED NO PURPOSE OTHER THAN TO IMPLY TO THE JURY THAT CHALUE HAD A VIOLENT CRIMINAL PROPENSITY.

"It is well settled that the prosecution may not introduce evidence that a defendant previously has misbehaved, indictably or not, for the purposes of showing his bad character or propensity to commit the crime charged, but such evidence may be admissible if relevant for some other purpose." *Commonwealth v. Helfant*, 398 Mass. 214, 224 (1986); see also Mass.G.Evid. § 404(b). Even if relevant to a proper purpose, the evidence will not be admitted if its probative value is outweighed by the risk of unfair prejudice to the defendant. See *Commonwealth v. Crayton*, 470 Mass. 228, 249 (2014); Mass.G.Evid. §§ 403, 404(b)(2). Determinations of the relevance, probative value, and prejudice of such evidence are left to the sound discretion of the judge. See *Commonwealth v. Dung Van Tran*, 463 Mass. 8, 14-15 (2012). Where a trial court admits evidence that is so unduly prejudicial that it renders

the trial fundamentally unfair, federal and state constitutions provide mechanisms for relief. See *Darden v. Wainwright*, 477 U.S. 168, 179-183 (1986).

Where the defendant preserved his rights by objecting, the appellate court inquires whether there is a reasonable possibility that the error might have contributed to the jury's verdict, and the Commonwealth bears the burden of showing the absence of error, and the risk of doubt when any exists as to the error being nonprejudicial. See *Commonwealth v. Alphas*, 430 Mass. 8, 23 (1999).

### A. Voluminous Evidence Of Chalue's Affiliation With The Aryan Brotherhood Pervaded The Trial, Yet Bore No Relevance To Any Proper Purpose.

Over the defendant's numerous objections and motion in limine to exclude, the Commonwealth introduced substantial evidence that Chalue was a member of the Aryan Brotherhood, a notorious neo-nazi prison gang and national crime syndicate known for its white-supremacist ideology and for being responsible for a large percentage of prison murders.[3] (M8/129-130; M9/53-54, 63-64, 81-82; T11/5; T6/7-9,

---

[3]     https://www.splcenter.org/fighting-hate/extremist-files/group/aryan-brotherhood. Last visited 7/21/2019.

12-17, 101-103, 243, 252; T11/5-15, 25-29, 213-220, 222, 229-230; T12/5-7, 9, 56-59, 67-72; T13/5-8, 15-16) (R.79, 81, 84). The court erred in admitting this evidence where it had no discernable probative value to any permissible purpose, and the risk of prejudice outweighed any perceived probative value. See *Commonwealth v. Dunn*, <u>407 Mass. 798, 807</u> (1990). Evidence of other bad acts such as gang affiliation may be admissible only where it is relevant to some other permissible purpose, and due to its potential to be highly prejudicial to a defendant, must be excluded unless it comes within one of the permitted uses. See *Helfant*, <u>398 Mass. at 224</u>; Mass.G.Evid. § 404(b).

Evidence relating to Chalue's membership in and future plans to assume a leadership role in the AB, his tattoos and writings with AB-related symbols, and of a key witness's fear of the organization was not relevant to any permissible purpose. The alleged motive for the killings was not AB-related where the Commonwealth's theory was that the killings were motivated by Hall's personal vendetta against Glasser, neither of whom were affiliated with the AB. Contrast *Commonwealth v. Bannister*, <u>94 Mass.App.Ct. 815, 816</u> (2019) (evidence that defendant and victim were in rival gangs and had prior altercations admissible as

relevant to defendant's motive and animosity toward the victim).

Chalue's AB membership was likewise not relevant to demonstrate a

joint venture where none of the other codefendants were associated

with that organization, but rather were members or friends of the Hells

Angels, an unrelated gang to which Chalue had no affiliation. Contrast

*Commonwealth v. Phim*, 462 Mass. 470, 477 (2012) (that defendant was

in a gang and codefendant sympathized with that gang relevant to

whether they were acting in concert as joint venturers). It was not

relevant to explaining the circumstances of the killings where the

manner of the killings did not implicate the AB. Contrast

*Commonwealth v. Lopes*, 478 Mass. 593, 605 (2018) (defendant's

statement at crime scene, "Homes Ave., motherfuckers," placed

significance of gang at issue). The Commonwealth's stated purpose, to

corroborate the testimony of the jailhouse informants that Chalue

disclosed details of the offenses to them due to a shared AB

membership, was not only unsupported by any offer of proof on that

subject, it was contradicted by Cashman's testimony. (M9/53-54, 64;

T6/13, 103; T10/14; T11/5, 10-11, 28-29). Although Cashman was

supposedly a beneficiary of this purported policy of incarcerated AB

members sharing their legal materials, he specifically denied the existence of such a practice. (T12/95).

This court has urged caution in admitting gang-related evidence because it "risks prejudice to the defendant in that it may suggest a propensity to criminality or violence." See *Phim*, 462 Mass. at 477. Although "not all gangs are the same and not all gang affiliations are the same," community attitudes towards gang violence are likely to color such evidence. See *Commonwealth v. Akara*, 465 Mass. 245, 267-268 (2013). This is particularly true where the AB is not a local gang that might be unfamiliar to the jury, but a nationally known gang associated with murder and organized crime that sparks fear and repulsion. Because such evidence is inherently prejudicial, this court has imposed a more exacting standard than that applied to other categories of relevant evidence, mandating that it is inadmissible where its probative value is outweighed by the risk of unfair prejudice to the defendant, even if not substantially so. See *Crayton*, 470 Mass. at 249 n.27; Mass.G.Evid. § 404(b).

The court's balancing of these interests was in error where the evidence was devoid of relevance and the risk of unfair prejudice far

outweighed any permissible purpose. The Commonwealth made more than a passing reference to Chalue's AB membership. See *Commonwealth v. Dorazio*, 472 Mass. 535, 542-543 (2015). It mentioned Chalue's AB membership in its opening statement multiple times. (T3/37, 57, 59). Over Chalue's objection, the Commonwealth introduced myriad evidence that he separately told Dawson and Ely that he was an AB member (T6/12-17, 101-103), that Hall told Casey that Chalue was a member (T6/7-9, 243), that Casey feared repercussions from the AB for testifying (T6/252), that Kempton, Cashman, and Lemieux knew Chalue to be a member (T11/144), that Chalue's tattoos and writings were AB symbols relating to Adolf Hitler (T11/222; T13/5-8, 15-16) (R.79, 81, 84, 91, 117-120), of the meaning of certain phrases used by the AB to initiate a physical attack or murder of an inmate (T12/67-72), that prison officials frequently searched the cells of Chalue and other AB members of while he was held pretrial (T11/228), and that while in prison awaiting trial on this case he planned to ascend to a leadership role (T11/213-215, 229-230). In closing, over the defendant's objection, the Commonwealth described Chalue as "The guy who strolls in and takes over the local Aryan Brotherhood." (T14/64, 80-84). Defense

counsel had to blunt this information by addressing it in his own opening and closing statements, acknowledging it "may sound scary, it may sound concerning." (T3/67; T14/29, 37-38). The deluge of other bad act evidence had no tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. See *Commonwealth v. Aviles*, 461 Mass. 60, 70 n.8 (2011); Mass.G.Evid. § 401.

Given the lack of relevance of this evidence, where it pervaded the trial from start to finish it was likely to have had the precise effect on the jury that underlies the purpose for its exclusion: to paint Chalue as having a propensity for violent crimes such as murder due to his status as a member or leader of the AB. It likely distracted the jury in their assessment of the charges against him, which were entirely unrelated to his membership. See *Commonwealth v. Dwyer*, 448 Mass. 122, 128-130 (2006).

The error of the admission of this evidence was not diminished by the limiting instruction. Although the court's stated purpose for allowing this evidence was to explain Chalue's relationship to Cashman and Kempton, the instruction broadly stated that it could be considered

"insofar as it relates to the nature of the relationship between Mr. Chalue and other witnesses in the case." (T6/243; T11/213-214; T13/3-4, 15-16; T14/91-92). Where numerous other witnesses testified about their knowledge of Chalue's membership, including Dawson, Ely, and Casey, who also testified that he feared AB retaliation because of his testimony, the jury cannot be assumed to have followed this limiting instruction in the manner in which it was intended. See *Commonwealth v. Mills*, 47 Mass.App.Ct. 500, 506 (1999).

Where Chalue challenged the erroneous admission of the prior bad acts, this court must determine, "after pondering all that happened without stripping the erroneous action from the whole, [whether] the judgment was not substantially swayed by the error." See *Commonwealth v. Vinnie*, 428 Mass. 161, 163 (1998). The admission of the numerous citations to Chalue's other bad acts violated fundamental due process protections and undermined his right to a fair trial. See Sixth and Fourteenth Amendments, United States Constitution; article 12, Massachusetts Declaration of Rights; *United States v. Varoudakis*, 233 F.3d 113, 120 (1st Cir. 2000).

**B.  Anatomical Drawings And Weapons Found In Veiovis's Apartments Were Not Relevant To Any Proper Purpose Where The Manner Of Dismemberment Was Not In Accord With The Illustrations And Many Of The Weapons Were Excluded From Having Inflicted Those Wounds.**

The Commonwealth admitted into evidence several photographs of items found in Veiovis's apartments, including anatomical illustrations depicting amputation located upstairs in the apartment he recently vacated, and photographs of weapons found in his subsequent apartment. (T9/73-74, 76-77, 157-158) (R.78, 83, 92-116). The defendant twice moved in limine to exclude this evidence and objected to its admission arguing that its probative value was outweighed by the risk of unfair prejudice. (T9/9-12, 134, 143, 157-158) (R.78, 83).

As this court found in Veiovis's sppeal, the photographs constituted other bad act evidence, prone to impermissibly show a propensity to commit the crimes charged, and must be excluded unless offered for a purpose other than character or propensity, such as to establish motive, opportunity, intent, preparation, plan, knowledge, identity, or pattern of operation. See *Commonwealth v. Veiovis*, 477 Mass. 472, 481-482 (2017). citing *Crayton*, 470 Mass. at 249. Where the probative value of the evidence was not outweighed by the risk of unfair

prejudice and there is a reasonable possibility that the error might have

contributed to the verdicts, its admission was prejudicial error. See

*Alphas*, 430 Mass. at 23.

> **1.   Where The Commonwealth's Evidence Showed That Several Of The Weapons Depicted In The Photographs Found In Veiovis's New Apartment That Chalue Never Visited Could Not Have Been Used In The Killings Or Dismemberment, These Items Had No Relevance And Their Admission Was Prejudicial Error.**

In the apartment where Veiovis resided on September 12, officers

found numerous knives, cleavers, hatchets, a machete, a sickle, and a

bat with nails. (T9/74, 145, 148-151, 154, 157-158) (R.94). All of the

weapons tested negative for blood and were photographed but not

seized. (T9/165, 187). The Commonwealth presented no evidence that

Chalue had ever been to this apartment. Dr. Pokines concluded the

wounds to the bones were caused by hacking trauma from a heavy

bladed implement such as a butcher knife, meat cleaver, or machete.

(T9/73-74). The injuries could not have been inflicted by a small knife,

chainsaw, hatchet, or ax. (T9/75, 92, 100-101, 103).

Where the spiked bat, sickle, and hatchets[4] could not have been used to inflict the wounds, photographs depicting these items bore no relevance to any purpose other than to show that Veiovis, and by association Chalue, had a propensity to violence. "Where a weapon definitively could not have been used in the commission of the crime, we have generally cautioned against admission of evidence related to it." *Commonwealth v. Barbosa*, 463 Mass. 116 122 (2012); see also *Veiovis*, 477 Mass. at 485-486 (because there was no evidence that baseball bat with spikes could have been used in killings or dismemberments, judge erred in admitting photograph). The error in the admission of this evidence likely influenced the jury where it demonstrated a cache of weapons capable of inflicting violence, but not the type of violence inflicted here. See *Flebotte*, 417 Mass. at 353.

---

[4] Although testimony at Veiovis's trial was "the machete, cleaver, hatchets, and various knives found in the defendant's apartment were consistent with the types of tools used to dismember the victims, and could have served as the means to accomplish the dismemberment," the testimony here was the hatchets could not have been the instrument used. (T9/75).

2.     **Where The Anatomical Drawings Of Amputations Were Not Related To The Dismemberment That Occurred Here, The Numerous Photographs Of These Items In A Location In Veiovis's Apartment Where Chalue Never Visited Lacked Relevance And Likely Caused Unfair Prejudice.**

Officers seized and photographed numerous anatomical illustrations showing amputations hanging on an upstairs wall and inside an attaché in Veiovis's vacated apartment. (T9/76, 138-139, 155-157, 174) (R.92, 95-116). Dr. Pokines testified that the amputations depicted are different from dismemberment, and that the only consistency between the illustrations and the bodies was that some of the drawings depicted limb bones. (T9/76-77). Both the collage and the attaché were located upstairs, not visible from the first floor where Chalue visited on one occasion. (T9/174). Neither Scace nor Sewell, also present at that time, testified to seeing the drawings even though Sewell went upstairs.

The illustrations appear to be from vintage medical textbooks depicting medical procedures. (R.95-116). Of the numerous illustrations admitted into evidence, few depict what appear to be surgical amputations performed with precision medical instruments. As Dr. Pokines testified, the amputations shown are distinct from the

dismemberment by hacking trauma done to the victims here. (T9/76-77). The bulk of the illustrations graphically depict exposed muscles, internal organs, and bones, tourniquets, and surgical procedures. (R.92, 95-116). Most disturbing is an illustration of an infant still attached to an umbilical cord with his chest cavity opened. (R.102).

Although a majority of this court found that the illustrations were relevant to non-propensity purposes for Veiovis, the same analysis does not support Chalue's connection to the items. This court held that the drawings were relevant to Veiovis's identity as a participant in the killings, his state of mind as a person fascinated by amputation and human dissection, and his motive for the killings to seize the opportunity to engage in actual amputations and human dissection. See *Veiovis*, 477 Mass. at 484-485. In contrast, Veiovis's possession of these illustrations outside of the view of Chalue as a one-time visitor to the first floor of his apartment was not probative of any proper purpose as to Chalue, who was not alleged to have shared or had knowledge of Veiovis's interests.

Where Chalue only knew Veiovis for a short period of time and possessed no such items himself, Veiovis's interest in amputation is not

probative of motive or identity as to Chalue. See *Commonwealth v. Bryant*, 482 Mass. 731, 734-735 (2019). The techniques depicted in the illustrations were not consistent with the crimes. As to Chalue this evidence was "quintessential, impermissible propensity inference." See *Veiovis*, 477 Mass. at 494 (Lowy, J., dissenting). It cannot be said with certainty that the judgment was not substantially swayed by the error in admitting this highly inflammatory evidence. See *Vinnie*, 428 Mass. at 163. The admission of this graphic and irrelevant evidence violated Chalue's fundamental due process protections and undermined his right to a fair trial, requiring reversal of the convictions. See Sixth and Fourteenth Amendments, United States Constitution; article 12, Massachusetts Declaration of Rights; *Varoudakis*, 233 F.3d at 120.

## III. THE COURT ERRED IN ADMITTING HALL'S STATEMENTS TO ELY AND DAWSON, OUTSIDE OF CHALUE'S PRESENCE, THAT WERE NOT MADE IN FURTHERANCE OF THE JOINT VENTURE AND SO WERE INADMISSIBLE HEARSAY.

Over the defendant's objections, Ely and Dawson testified to separate statements Hall made on Monday, August 29, 2011, at the Sutton residence. (M9/64-66, 77-80; T6/56-62, 119-121) (R.81). Ely testified that Hall spoke to her and Karen Sutton and said that some men had been missing and mentioned Glasser. (T6/56-62). Dawson

testified that Hall mentioned, "that guy and two of his friends had gone missing," and later when she and Hall were alone he said when they went missing, "one of them was fixing the computer, one, was laying on the couch, and one was sitting in front of the couch playing video games." (T6/119-121). Where these statements undermined rather than furthered the alleged joint venture and provided the most direct evidence that one of the codefendants was present at the kidnapping, it cannot be certain that the erroneous admission did not influence the jury or had but very slight effect, and prejudicial error resulted. See *Commonwealth v. Sharpe*, 454 Mass. 135, 141 (2009).

Extrajudicial statements of joint venturers may be admissible against the others involved if made during the pendency of the cooperative effort and in furtherance of its goal. See *Commonwealth v. Pleasant*, 366 Mass. 100, 104 (1974); Mass.G.Evid. § 801(d)(2)(E). "Accordingly, our cases make clear that '[c]onfessions or admissions of conspirators or joint venturers' to strangers or third parties unsympathetic to the goals of the venture 'are not admissible . . . as vicarious statements of the other members of the conspiracy or joint venture.'" *Commonwealth v. Bright*, 463 Mass. 421, 433 n.16 (2012)

("Ahart's description of the alleged events surrounding the murder - essentially, a confession - can hardly be characterized as furthering an interest to cover up the crime.").

Hall's statements allegedly disclosing his knowledge that Glasser and others were missing and what the men were doing at that time fail to meet the criteria for admissibility as non-hearsay where they were not made in furtherance of the goal of the joint venture, but rather objectively served to thwart its purpose. See *Commonwealth v. Colon-Cruz*, 408 Mass. 533, 543 (1990). Hall's three separate statements casually revealing to at least three people his incriminating knowledge that the men were missing before the police began investigating their disappearance, and what the men were doing when they went missing, demonstrates that the statements are at odds with the purpose for excluding joint venturer statements from hearsay restrictions. "The rationale for both the hearsay-conspiracy exception and its limitations is the notion that conspirators are partners in crime," and therefore agents of one another. See *Anderson v. United States*, 417 U.S. 211, 219 n.6 (1974). "And just as the declarations of an agent bind the principal only when the agent acts within the scope of his authority, so the

declaration of a conspirator must be made in furtherance of the

conspiracy charged in order to be admissible against his partner." *Id.*,

citing *Krulewitch v. United States*, 336 U.S. 440, 442-443 (1949).

Disclosures of incriminating details of one person's knowledge of a

crime to multiple individuals who are not members of the joint venture

cannot be said to be within the scope of authority of a member of a joint

venture.

Hall's statements to numerous persons outside of the joint

enterprise served no common purpose or goal. Whereas Hall allegedly

solicited Casey to assist in disposing of the bodies and so made

statements to him that are encompassed in the hearsay exception, the

Commonwealth presented no evidence that Hall similarly sought out

Ely, Dawson, or Sutton to take part in the joint venture, or that the

women perceived the remarks to be invitations to do so. See

*Commonwealth v. Leach*, 73 Mass.App.Ct. 758, 766 (2009) (statements

shortly after crime for purpose of concealing crime admissible against

each defendant).  The Commonwealth argued:

> Well, he's, in a sense, trying to get their silence by dragging them
> in, telling them something so that they feel involved and therefore
> feel reluctant to say whatever it is they find out; and if the police
> come around, to feel like, well, geez, I know something and maybe

> I'll get charged if I do. I think this is something that he's done throughout in this case.

(T6/60). As defense counsel noted in reply, "It's hard to imagine how it's made in furtherance of it. His suggestion that he's trying to elicit her loyalty by dropping this information is beyond conjecture. It is far-fetched." (T6/61-62). The court described it as a "close call" and relied on its ruling to admit the statements at Hall's prior trial. (M9/65-66; T6/60). These breaches of the alleged joint venture to Ely, Dawson, and Sutton harmed rather than helped the enterprise where they were nothing more than unnecessary disclosures of incriminating knowledge and achieved no goal of the joint enterprise. See *Commonwealth v. Stewart*, 454 Mass. 527, 537 (2009).

The statements at issue were inadmissible hearsay that violated Chalue's constitutional rights to confront his accusers. See Sixth and Fourteenth Amendments, United States Constitution; *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004); *Bruton v. United States*, 391 U.S. 123, 126 (1968); art. 12, Massachusetts Declaration of Rights. They were testimonial in nature and are barred by the Confrontation Clause where a reasonable person in the position of the declarant would objectively foresee them as being used in the investigation or

72

prosecution of a crime. See *Commonwealth v. Gonsalves*, 445 Mass. 1, 7-15 (2005).

The objected-to testimony on these highly incriminating statements was crucial to the Commonwealth's case against Chalue where it implied that Hall had knowledge that men were missing before the information was made public, and was the only evidence describing the kidnapping itself. Compare *Commonwealth v. Dagraca*, 447 Mass. 546, 554 (2006) (error not harmless where defendant's erroneously admitted statements were the only direct evidence bearing on a critical point in an otherwise circumstantial case). Where the Commonwealth cannot establish that the constitutional violation resulting from the improper admission of this testimonial hearsay was harmless beyond a reasonable doubt, the defendant is entitled to a new trial. See *Chapman v. California*, 386 U.S. 18, 23 (1967).

## IV.  THE COMMONWEALTH'S STATEMENTS TO THE JURY REPEATEDLY MISSTATED THE EVIDENCE, IMPLIED KNOWLEDGE OF CHALUE'S INTENT TO KILL A TRIAL WITNESS, AND IMPROPERLY USED OTHER BAD ACT EVIDENCE TO ARGUE THAT CHALUE HAD A CRIMINAL PROPENSITY, NECESSITATING A NEW TRIAL.

The prosecutor's opening statement and summation were improper where he repeatedly misstated the evidence, argued

inferences that found no basis in the record, suggested that he had knowledge of facts not in evidence, and attempted to excite the jury's passion and prejudice. The combined effect of these improprieties, taken in the context of his entire remarks and the judge's boilerplate instructions, requires reversal of the convictions and a new trial where it infringed Chalue's rights to a fair trial. See Fifth Amendment, United States Constitution; art. 12, Massachusetts Declaration of Rights.

A.   **In Its Opening Statement The Commonwealth Made Numerous Material Misstatements Of The Evidence To Follow That It Had No Good Faith Belief Would Be Supported By The Evidence, Resulting In A Substantial Likelihood Of Miscarriage Of Justice.**

In his opening words to the jury, the prosecutor made several critical misstatements of the evidence that the jury would hear, skewing their view of the case. "The proper function of an opening is to outline in a general way the nature of the case which the counsel expects to be able to prove or support by evidence." *Commonwealth v. Fazio*, 375 Mass. 451, 454 (1978). The prosecutor's expectation must be "reasonable and grounded in good faith." See *id.* at 456. Where counsel did not object, this court will review to determine if any misconduct created a

substantial likelihood of a miscarriage of justice. See *Commonwealth v. Silva*, 455 Mass. 503, 514 (2009).

The prosecutor made two[5]/[6] references to Chalue having acted as a lookout while Hall and Casey buried the bodies. (T3/33, 50). No evidence materialized at trial to support these comments, where instead the testimony showed that while Hall and Casey buried the bodies at the Cole property, Chalue was three miles away at Pavoni's house, not visible from that location. (T6/262; T10/175-180). The prosecutor, who requested that the jury view these locations, knew the distance and lack of visibility between these locations. He was additionally aware that at the relevant time, Chalue made calls and sent text messages to Hall asking "what's going on?" and informing Hall that he was ready to leave, that went unanswered because Hall's phone was off. (T10/123-124, 160-165, 175-176, 180-185). With this knowledge, it was

---

[5] "You're also going to hear about the text messages from the Defendant at the time of burial while he was acting as a lookout for Adam Hall and the other man." (T3/33).

[6] "And that after they pick up the car that David Casey and Hall go in Casey's truck, they drive to the Cole property, make sure that Cole is not home. Come back, get the gold Buick and drive it over to the Cole property and in a separate car, a third car, is the Defendant. And he waits outside the property as a lookout." (T3/50).

disingenuous to twice tell the jury that Chalue acted as a lookout during the burial, and therefore that he had specific knowledge of Hall's and Casey's activities. The failure of this evidence to materialize was entirely expected by the prosecutor, and the defendant has shown the requisite bad faith to warrant reversal. See *Commonwealth v. Hubbard*, 45 Mass.App.Ct. 277, 281-282 (1998).

The prosecutor previewed additional evidence that it could not have expected to present by saying of Chalue and Hall, "They leave, they go back to the clubhouse, that the two men burn some clothing there." (T3/52). Based on the pretrial statements of Ocean Sutton and Trooper Michael Scott, the prosecutor would have known at the time of his opening statement the testimony would be that Hall burned his own Hells Angels insignia clothing and that Chalue did not assist. (T7/124, 142-145; T8/143). This remark prejudiced Chalue by incorrectly informing the jury he destroyed evidence when in fact it was Hall who had done so.  See *Commonwealth v. Hunt*, 82 Mass.App.Ct. 1119 (2012) (unpublished 1:28) (reversal where prosecutor, aware at time of opening statement that testimony linking the defendant to certain damaging

evidence would not be forthcoming, despite Commonwealth's otherwise robust but not overwhelming case).

The prosecutor made several additional misstatements that promised forthcoming evidence that Chalue procured the guns that were used to commit the murders and that in 2009 he "decided he was going to take recompense from Glasser" by luring him to his home in Peru. He remarked:

> The Defendant then stopped this location here in Lenox, to get the guns that were used. (T3/34).

> There are other locations here involved. You will hear talk about the defendant's own property in the rural town of Peru, east of Pittsfield. (T/34-35).

> First, you're going to hear this starts back in July of 2009 over a few carburetors that belonged to the Defendant that David Glasser took to a recycling yard to have them scrapped to get a little bit of money. The Defendant heard about it, went down and identified and got them back and decided that he was going to take recompense from Glasser. And on July 21 of that year, he lured David Glasser up to his home I talked to you about in Peru. (T/38).

From the context adduced in the trial evidence, the prosecutor mistakenly accused Chalue of the actions when in fact it was Hall who procured guns in 2011 and who had a vendetta against Glasser stemming from the 2009 incident. Where the mistaken comments were

not corrected, the jury was left with the impression that Chalue also had a personal history with one of the victims that included a physical attack, and Chalue had foreknowledge of the murders because he procured the firearms.

Where these misstatements permeated the Commonwealth's opening statement and served to accuse Chalue of incriminating acts that the evidence attributed solely to Hall, this presents "a situation where the force of the prosecutor's opening remarks was overwhelmingly prejudicial and likely to leave an indelible imprint on the jurors' minds" warranting reversal of the convictions. See *Fazio*, 375 Mass. at 455. This is the rare case where the prosecutor engaged in a bad faith forecasting of the evidence that prejudiced the defendant by falsely connecting him to the destruction of incriminating evidence, to the murder weapons, and to the primary victim providing a personal motive where one was absent. The improper statements contributed to a substantial likelihood of a miscarriage of justice and deprived the defendant of state and federal rights to a fair trial. See *Commonwealth v. Sylvia*, 456 Mass. 182, 188 (2010); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).

**B.    Prejudicial Error Resulted From The Commonwealth's Remarks In Summation Implying Knowledge That Chalue Intended To Kill A Witness, Comment Exceeding The Permissible Use Of The Other Bad Act Evidence, And Material Misstatement Of The Evidence.**

The prosecutor in summation presented a second round of false narratives not based in the record evidence. Where defense counsel objected to the following remarks, this court will review for prejudicial error. See *Commonwealth v. Brown*, 477 Mass. 805, 818 (2017).

**1.    The Commonwealth Misstated The Evidence By Again Averring Several Times That Chalue Was A Lookout During The Burial, And Compounded That Error By Adding That Chalue Planned To Kill Daniel Cole If He Returned Home.**

As he did in his opening, the prosecutor again in closing asserted several times, without factual basis in the record, that Chalue acted as a lookout while Casey and Hall buried the bodies at a location three miles away. To this misstatement of the evidence the prosecutor then added an additional problematic assertion by saying that Chalue intended to kill Daniel Cole if he came home during the burial.

> And as his being a lookout, the idea that can't possibly happen because Hall's phone is out, what do you think the plan was going to be, that if Mr. Cole decided to come home during the middle of the day he's going to call him? They're going to drop what they are doing and leave all of the evidence there? No, unfortunately, ladies and gentlemen, he was just simply going to follow Hall until he

got there. And at that point Mr. Cole would just be another witness. (T14/64-65).

The record tests also corroborate that Adam Hall's phone traveled at the same time and place that Casey said from Canaan, New York on Sunday, back to Pittsfield area. And it also corroborates that Adam Hall was at the scene of the burial on Monday morning and the Defendant was in the vicinity of Farmstead Road and Rt. 20 acting as a lookout. (T14/77).

And that corroborates Dave Casey exactly about them being involved in the burial and the defendant's involvement as a lookout. (T14/77).

Defense counsel objected to the implication that there was a plan for Chalue to deal with whatever witnesses came along as not supported in the record. (T14/80). Where the Commonwealth's theory of the case was that Frampton and Chadwell were killed because they were witnesses to Glasser's kidnapping and murder, the prosecutor's meaning when he said that "Mr. Cole would just be another witness" was clear. As Chalue, waiting at Pavoni's house, could not see three wooded miles to know if Cole were to return home during the burial and there was no evidence that Chalue, if confronted with Cole would even know who he was let alone seek to attack him, this statement far exceeds any fair inference from the evidence. See *Commonwealth v. Coren*, 437 Mass. 723, 730 (2002). The only purpose for this remark was

to intimate that Chalue was "depraved" and had a "lust" for killing, and

would have killed any and every person he were to encounter, an

impermissible appeal to the jury's emotions of fear. (T14/57). "Such

elements of irrationality and irrelevance introduced into the trial can

only serve to make it less likely that the jury will return a verdict based

on fair, calm consideration of the evidence." See *Commonwealth v.*

*Shelley*, 374 Mass. 466, 470 (1978). Neither was the comment that the

cell phone evidence "corroborates Dave Casey exactly about ... the

defendant's involvement as a lookout" based on the evidence where

Casey testified that he had no knowledge that Chalue or anyone would

be acting as a lookout to warn if someone was approaching. (T7/21-22).

> ## 2. The Commonwealth Misstated The Evidence By Again Claiming That Chalue Destroyed Evidence By Burning Clothing, Despite The Testimony That Only Hall Had Done So.

As he had in his opening, the prosecutor again in summation

misrepresented the evidence by holding fast to his position that Chalue

burned his clothing as consciousness of guilt evidence demonstrating

that he therefore participated in the murders.

> Ocean Sutton, the Defendant's former girlfriend testified that the
> Defendant and Hall got rid of evidence, first by burning clothes in
> the clubhouse on a steel plate. That was corroborated by Trooper

Scott who went there and found that, and the scorching on it. (T14/68-69).

These remarks either contradict or ignore the evidence. Ocean testified that Hall alone burned clothing, and it was his own clothing as it bore a Hells Angels insignia. (T7/124, 142-145). Trooper Scott "corroborated" Ocean's testimony insofar as he observed scorching on the metal plate, but also in affirming his investigation yielded information that only Hall had burned clothing, not Chalue. (T8/143). Although defense counsel objected to this comment as not an accurate statement of the testimony, the prosecutor nonetheless responded, "I suggest they did it together." (T14/81, 83). Where this comment was in direct contrast to the actual testimony, it was improper. See *Commonwealth v. Pearce*, 427 Mass. 642, 646 (1998). It had the prejudicial effect of suggesting Chalue destroyed evidence containing forensic evidence due to his participation in the murders, and so bolstering the Commonwealth's entirely circumstantial case. See *Commonwealth v. Merry*, 453 Mass. 653, 667 (2009).

### 3. The Commonwealth Far Exceeded The Proper Limited Use Of The Other Bad Act Evidence Of Chalue's Membership In The Aryan Brotherhood By Employing That Evidence To Argue That Chalue Planned The Murders And Controlled Hall.

Despite the myriad discussions concerning the admission of evidence of Chalue's involvement in and intention to assume a leadership role in the AB and the court's instructions on the limited purpose for which the jury could consider the evidence, the Commonwealth ignored the court's guidance and used it to argue Chalue's bad character and criminal propensity.

> Well, you have to ask yourself, did the Defendant take orders from The Big Dummy? Without knowing beforehand or even asking afterwards? The guy who strolls in and takes over the local Aryan Brotherhood, he's the one unknowingly taking orders? Ask yourselves, really? (T14/64).

Counsel objected to this as exceeding the limited purpose of showing Chalue's relationship to Kempton and Cashman, and noted that "it's serious because the whole Aryan Brother is likely to be misused, and we've been careful so far." (T14/80-84). The court responded that because its instruction referenced Chalue's relationship with "any witness" it would not give a curative instruction. (T14/84).

As argued above in section III, because evidence of gang affiliation is inherently prejudicial to a defendant as suggesting a criminal or violent propensity, it is admissible only where relevant to some other permissible purpose. See *Phim*, 462 Mass. at 477. Community attitudes towards gang violence, such as fear and anger, are likely to color such evidence. See *Akara*, 465 Mass. at 267-268. The prosecutor's use of Chalue's gang affiliation to argue that because he "strolls in and takes over the local Aryan Brotherhood" he therefore gave orders to Hall was blatant propensity use intended to inform the jury that Chalue controlled Hall and masterminded the murders. Although the Commonwealth was entitled to marshal its evidence that one of the jailhouse informants testified that Chalue suggested that Hall get rid of Glasser, its use of his status as a leader of the organization to suggest he controlled Hall into killing the men was a critical breach of the limited proper use of that evidence.

> ### 4. The Objected To Improper Comments Resulted In Prejudicial Error Requiring Reversal Where They Related To The Heart Of The Issues At Trial And Were Not Cured By The Court's General Instructions.

Where the improper remarks misstated the evidence on critical issues, bolstered the Commonwealth's otherwise not overwhelming

case, and appealed to emotion, it cannot be said that the errors did not influence the jury or had but very slight effect. See *Flebotte*, 417 Mass. at 353. Defense counsel's objections and requests for curative instructions indicate the harmfulness of the statements. Contrast *Commonwealth v. Montez*, 450 Mass. 736, 748 (2008) (lack of objection is some indication that argument was not unduly prejudicial).

The comments misstated the evidence in ways favorable to the Commonwealth by mischaracterizing testimony as damaging or corroborative where it was neither, averring that Chalue intended to kill a testifying witness, and using impermissible criminal propensity evidence to argue that he orchestrated the crimes charged. The improper comments went to the heart of the matters for the jury's determination where they bolstered the Commonwealth's otherwise circumstantial case on issues on which the prosecution bore the burden of proof beyond a reasonable doubt. See *Commonwealth v. Misquina*, 82 Mass.App.Ct. 204, 207 (2012).

The court declined defense counsel's request for curative instructions. (T14/86). The boilerplate instructions given neither specifically addressed nor cured the errors. See *Coren*, 437 Mass. at

731. They did not operate to neutralize the prejudicial effect of the remarks. See *Commonwealth v. Hrabak*, 440 Mass. 650, 657 (2004). In the instance of the instruction that Chalue's AB membership could be considered for his relationship with all witnesses, and so implicitly his relationship with Hall, who was not a member, the instruction served to compound rather than cure the error.

Although the jury may be expected to sort out excessive claims made by the prosecutor, these statements undermined his obligation to argue the case "in a way that states the evidence clearly and fairly and inspires confidence that the verdict was reached based on the evidence," infringing the defendant's right to a fair trial. See *Commonwealth v. Santiago*, 425 Mass. 491, 494 (1997). Where the prejudicial and improper statements in both the opening statement and closing argument struck at the integrity of the verdicts, were not cured by the instructions, and the Commonwealth's evidence was not overwhelming, they deprived Chalue of his state and federal rights to a fair trial and a reversal of his convictions is required. See *Donnelly*, 416 U.S. at 643; Fifth and Sixth Amendments, United States Constitution; article 12, Massachusetts Declaration of Rights.

## V.   THE MOTION JUDGE ERRED IN DENYING THE DEFENDANT'S MOTION TO SUPPRESS AS OFFICERS LACKED PROBABLE CAUSE TO SEIZE HIM AND HIS CELLULAR PHONE WHERE THERE WAS AN INSUFFICIENT NEXUS BETWEEN THE SUSPECTED CRIMINAL ACTIVITY AND THE PHONE.

The defendant moved to suppress the fruits of the September 4, 2011 warrantless seizure and search of himself and his cellular phone, arguing that police lacked reasonable suspicion to detain him and lacked probable cause to seize his phone. See Fourth Amendment, United States Constitution; art. 14, Massachusetts Declaration of Rights. (R2.4). The court found probable cause to stop and that exigent circumstances and the automobile exception to the warrant requirement applied. (R.75-76). The decision focused primarily on Hall's actions and ties to the missing men, and as to Chalue it relied solely on reports that he was "hanging out" with Hall in the days before and after the men went missing, his presence at Walmart when Hall bought boots, and his "evasive" comments to police during the September 4 stop. (M4/168-169) (R.70-72). The only mention of Chalue's phone was a reference to testimony that in the FBI's review of Hall's phone records they "detected what appeared to be a three-way call involving Hall and Chalue on the morning of Sunday, August 28." (M4/176; M5/90) (R.71).

87

In general, in reviewing a ruling on a motion to suppress, this court accepts the judge's subsidiary findings of fact absent clear error but conducts an independent review of his ultimate findings and conclusions of law. See *Commonwealth v. Tremblay*, 480 Mass. 645, 652 (2018). A judge's findings of ultimate fact deriving from the subsidiary findings are open to reexamination by the reviewing court, as are his conclusions of law. See *Commonwealth v. Barros*, 435 Mass. 171, 173-174 (2001). As the issues here are of constitutional dimensions, the court's appellate function requires that it make an independent determination on the correctness of the judge's "application of constitutional principles to the facts as found." *Commonwealth v. Bookman,* 386 Mass. 657, 661 n.6 (1982), citing *Brewer v. Williams*, 430 U.S. 387, 403 (1977).

A.   **The Motion Judge's Factual Errors.**

The court's finding of fact that police had knowledge that Chalue was at a Hells Angels party with Hall and Veiovis on the afternoon of August 27, was clearly erroneous where Captain Smith testified that they did not possess that information until after their detention at the gas station. (M5/75) (R.70-71). Although in the Conclusions of Law

section of the decision the court found that "Hall and his co-defendants"
demonstrated consciousness of guilt by destroying evidence upon
learning that police were at Glasser's home and by conducting counter-
surveillance of the police, Chalue was not known to have been a
participant in either activity. (R.70, 74-75). The court also incorrectly
attributed Hall's cell site locator information (CSLI) that his phone was
in the area of Pittsfield State Forest at the time of the last known
contact with one of the missing men to Chalue. (R.71). The court
inaccurately found that Chalue and Veiovis's presence with Hall in that
vicinity on September 4 "reasonably suggested that Hall and his co-
defendants had hidden evidence of the men's disappearance" there
previously and "returned" on September 4 to either retrieve or conceal
evidence, when only Hall was connected to that area by CSLI. (R.74-75).
The court relied on these erroneous findings in its probable cause and
exigent circumstances determinations.

## B.   The Police Lacked Probable Cause To Stop And Seize Chalue.

The Fourth Amendment and article 14 provide that every person
has the right to be secure against unreasonable searches and seizures of
his or her possessions, with article 14 providing greater protections

than the federal provision. See *Minnesota v. Dickerson*, <u>508 U.S. 366, 379</u> (1993). The seizure and subsequent search and photographing of Chalue without the requisite probable cause were violations of his state and federal constitutional rights.

As argued below, officers constitutionally seized Chalue when they stopped the vehicle in which he was riding. See also *United States v. Mendenhall,* <u>446 U.S. 544, 554-555</u> (1980). A seizure occurs under the Fourth Amendment and article 14 whenever an agent of the government stops a motor vehicle. See *Commonwealth v. Rodriguez*, <u>430 Mass. 577, 579</u> (2000), citing *Michigan Dep't of State Police v. Sitz*, <u>496 U.S. 444, 450</u> (1990). Captain Smith properly characterized the stop as a detention on his orders. (M5/68). After the officers located the Jeep at the gas station, Captain Smith directed several officers to respond there, including marked patrol officers from the Massachusetts State Police, Pittsfield Police Department, and Federal Bureau of Investigation. (M4/189, 215-216). In light of the display of officers from multiple departments, the circumstances show Chalue was not free to leave. See *Commonwealth v. Stoute*, <u>422 Mass. 782, 786</u> (1996). Officers made clear to the defendants that they were not free to leave and would

have to wait to speak with additional officers. (M4/187, 226). Smith acknowledged that identifying the individuals only took five minutes but he continued the detention for nearly an hour so that police could investigate them with interviews and interrogation, and search the Jeep. (M4/223, 225-226). When the individuals asked if they could leave, the officers ordered them out of their vehicle, pat frisked them for weapons, and photographed them. (M4/191, 226). At this point, the men had not made any furtive movements, had not tried to flee, and had not engaged in any illegal behavior. (M4/59-60; M5/57). The officers decided to further seize Chalue's cell phone despite his request to retrieve it. (M4/200). Accordingly, in light of the circumstances, the defendant had been seized for purposes of the Fourth Amendment and article 14.

Here there was no particularized suspicion that the defendant had committed any crime to justify his stop and seizure. Captain Smith testified that Chalue had not broken any laws at the time he was seized during the vehicle stop. (M5/59-60). At the time the Jeep turned around, Captain Smith acknowledged that its occupants had done nothing illegal or unusual in turning around in the face of a police barricade. (M5/49-51). After the Jeep turned around, Captain Smith directed

officers to stop the vehicle and to inquire of the passengers. At this point, Captain Smith and the officers believed that Hall was driving but did not know who the other passengers were. (M4/184, 225).

A valid investigatory stop "cannot 'last longer than reasonably necessary to effectuate the purpose of the stop.'" See *Commonwealth v. Cruz*, 459 Mass. 459, 465 (2011). The scope of a stop may only extend beyond its initial purpose if the officer is confronted with facts giving rise to a reasonable suspicion that "further criminal conduct is afoot." See *Commonwealth v. Cordero*, 477 Mass. 237, 243 (2017). Where an officer conducts an "uneventful threshold inquiry giving rise to no further suspicion of criminal activity, he may not prolong the detention or expand the inquiry." See *Commonwealth v. Buckley*, 478 Mass. 861, 873 (2018); *Commonwealth v. Gonsalves*, 429 Mass. 658, 663 (1999) (individuals do not expect officers conducting traffic stops to engage in "stalling tactics, obfuscation, strained conversation, or unjustified exit orders, to prolong the seizure in the hope that, sooner or later, the stop might yield up some evidence of an arrestable crime").

At the time of Chalue's seizure, the police officers lacked any basis to detain, frisk, or search him. A review of the judge's decision reveals a

dearth of support necessary to meet the Commonwealth's burden of proving that it had probable cause to seize and search him. While the decision contains many references to Hall, Chalue's connections at the time of the stop to any criminality are minimal and do not rise to a level supporting probable cause for his seizure and search. At best, the Commonwealth demonstrated that at the time of the stop officers believed that Hall and Chalue had been seen together during the week when the men went missing, that Chalue had gone to Wal-Mart with Hall on August 29, that Chalue was in the Aryan Brotherhood, and that police had "detected what appeared to be a three-way call involving Hall and Chalue on the morning of Sunday August 28. (R.69-71). The court further relied on the defendants' behavior at the time of the stop, namely their refusal to cooperate with the police, which it deemed to be "evasive." (R.75). This evidence was insufficient to justify the stop and seizure of Chalue.

As there was nothing particularized to Chalue at the time of the stop to justify his seizure, search, and photographing, it was error to deny the motion to suppress. See *Commonwealth v. Ramos*, 430 Mass. 545, 550-551 (2000) (photograph of defendant taken by the police was a

direct result of the police officers' unlawful seizure of the defendant and must be suppressed under "fruit of the poisonous tree" doctrine).

### C. The Police Lacked Probable Cause To Seize The Defendant's Phone.

Police may seize an item from a defendant if they have probable cause to believe that it was connected to the crime. See *Commonwealth v. Robles*, 423 Mass. 62, 66 (1996). Probable cause requires a substantial basis for concluding that the item is related to the criminal activity under investigation. See *Commonwealth v. Kaupp*, 453 Mass. 102, 110 (2009). When police seized Chalue's phone, they lacked probable cause to believe it would contain evidence concerning the crimes being investigated. See *Commonwealth v. White*, 475 Mass. 583, 590 (2016) (probable cause analysis beings at the moment of seizure). Whether there is probable cause to believe that a cell phone contains evidence of a crime is a fact-intensive inquiry and must be resolved based on the particular facts of each case. See *Commonwealth v. Morin*, 478 Mass. 415, 426 (2017).

Where each man had a unique possessory interest in his own phone, it was improper for the court to attribute the evidence against and actions of Hall to Chalue and his property. See *Commonwealth v.*

*Cruzado*, 480 Mass. 275, 282 (2018) (defendant with possessory interest in cell phone had standing to contest its seizure). That the Commonwealth had evidence that Hall used his phone during the time of the suspected crimes and they suspected that Chalue may have been a joint venturer with Hall does not implicate Chalue's phone. Police "may not rely on the general ubiquitous presence of cellular telephones in daily life, or an inference that friends or associates most often communicate by cellular telephone, as a substitute for particularized information that a specific device contains evidence of a crime." See *White*, 475 Mass. at 590-591. Police first must obtain information that establishes the existence of some "particularized evidence" related to the crime. See *Commonwealth v. Dorelas*, 473 Mass. 496, 502 (2016).

That the FBI "detected what appeared to be a three-way call involving Hall and Chalue on the morning of Sunday August 28" did not elevate the evidence to probable cause to believe Chalue participated in the crimes and used his phone to do so. (R.69-71). There was no testimony as to who initiated this call, what time it was made, the identity of the third party to the call, the CSLI for any of the parties, and whether the call even connected, from which to conclude that this

call related to the suspected crimes. Information that an individual communicated with another person, who may have been linked to a crime, without more, is insufficient to establish probable cause to search either individual's cellular telephone. See *Commonwealth v. Fulgiam*, 477 Mass. 20, 34-35 (2017) (although the Commonwealth established defendant sent text messages to victim and his alleged accomplice on day of murder, not sufficient to establish probable cause); *Morin*, 478 Mass. at 427 (nothing in affidavit indicated that defendant's cellular telephone would contain particular evidence related to the crime under investigation). "That the defendant used his cellular telephone at unspecified times to communicate with someone implicated in the crime 'elevated their relationship to a matter of importance in the investigation[;], it did not, without more, justify intrusion into the content of that communication.'" *Id.*, 478 Mass. at 427-428, quoting *Fulgiam*, 477 Mass. at 34.

The Commonwealth further failed to demonstrate the police had probable cause to believe Chalue's phone would have evidence of the crimes being investigated. Indeed, it failed to assert any particularized information that it expected to find on the phone. The fleeting

testimony regarding the possible three-way call was of no help in the probable cause calculus where the witnesses and the Commonwealth offered no explanation of the significance of this information or what might be gleaned from the phone itself to elucidate this. (M4/176; M5/90). As in *White*, the police did not have any information that a cell phone was used in the crimes under investigation, "nor did they claim that there existed a particular piece of evidence likely to be found on such a device," but based the seizure on their belief that the defendant was involved in the crime and their general experience that the phones can often contain evidence relevant to crimes. See *White*, 475 Mass. at 590. Where the detectives lacked any information establishing the existence of evidence likely to be found on the cell phone and so lacked the nexus required for probable cause to seize it, suppression was required. See *White*, 475 Mass. at 592.

That officers lacked probable cause to believe Chalue's phone contained evidence of the crimes being investigated is born out by the hearing testimony. Captain Smith testified that after Hall was observed driving the Jeep on Potter Mountain Road, he directed officers to stop the vehicle and to inquire of the passengers. (M4/180-182, 225). When

the codefendants asked if they could leave the scene, officers ordered them out of their vehicle, pat frisked them for weapons, and took their photographs. (M4/187, 191, 226). After Captain Smith's arrival, he decided to seize Hall's boots and socks and the Jeep. (M4/199, 201, 218; M5/71, 74). At Hall's request, Smith permitted him to retrieve his phone and some other items from the Jeep before it was towed, and he intended to let Hall leave with his phone despite the incriminating information he had relating Hall's phone to the crimes being investigated. (M4/158-159, 178, 199, 219; M5/31-33, 37, 72-73, 79, 87, 89). Smith testified that it was not until Chalue also requested to retrieve his phone from the Jeep that he decided to also seize the phones. (M4/200-201, 218-219; M5/71-73, 87). He did not describe any particular information or evidence that he expected to find on Chalue's phone. Contrast *Cruzado*, 480 Mass. at 282 (probable cause to believe phone would contain evidence of the crime where police had information that defendant and victim had been together on the day of the murder and that a witness recently overheard defendant confessing to the murder to an unidentified person on a cell phone).

"[T]oday's cellular telephones are essentially computers, capable of storing enormous quantities of information, personal, private, and otherwise, in many different forms. They present novel and important questions about the relationship between the modern doctrine of search incident to arrest and individual privacy rights." *Commonwealth v. Phifer*, 463 Mass. 790, 797-798 (2012). Individuals have significant privacy interests at stake in their cellular telephones and the probable cause requirement under the Fourth Amendment and art. 14 serve to protect these interests. See *Dorelas*, 473 Mass. at 502 n.11; *Riley v. California*, 134 S. Ct. 2473, 2488-2491 (2014). Where the Commonwealth failed to meet its burden of proving that the seizure of Chalue's phone was based on probable cause to believe that it contained evidence concerning the crimes being investigated, the court erred in not allowing the defendant's motion to suppress. See *White*, 475 Mass. at 590.

The motion judge's decision also briefly touched on two additional justifications for the seizure, namely exigent circumstances and the automobile exception. The decision as to the applicability of the exigent circumstances exception does not specifically relate in any way to the

defendant's phone and it did not suggest there was reason to believe that it contained any evidence relating to the suspected crimes. (R.75). As there was no probable cause to demonstrate a link between the phone and the offense, exigent circumstances cannot provide a basis for the seizure. See *Bookman*, 77 Mass.App.Ct. at 551. The circumstances were not so exigent, urgent, and unforeseeable that obtaining a warrant was impracticable. Moreover, police may not manufacture an exigency to avoid the necessity of obtaining a search warrant. See *Commonwealth v. Forde*, 367 Mass. 798, 807 (1975).

As argued above, there was no probable cause to believe that the phone contained evidence of a crime and as such it was not subject to seizure under the automobile exception. In the absence of probable cause to seize the phone, no independent right exists under the automobile exception to the warrant requirement. See *Commonwealth v. Johnson*, 461 Mass. 44, 49 (2011). Consequently, evidence seized pursuant to the stop and seizure should have been suppressed. See *Wong Sun v. United States*, 371 U.S. 471, 484-488 (1963); *Commonwealth v. Penta*, 361 Mass. 894, 895 (1972).

## VI.    THIS COURT SHOULD EXERCISE ITS AUTHORITY UNDER GENERAL LAW CHAPTER 278, SECTION 33E.

Under section 33E, this court must "consider a defendant's entire case, taking into account a broad range of factors, when determining whether a conviction of murder in the first-degree was a miscarriage of justice that warrants a reduction in the degree of guilt." See *Commonwealth v. Berry*, 466 Mass. 763, 769 (2014). In addition to reducing the verdict, section 33E permits this court to enter a verdict of not guilty or order a new trial if it is satisfied that the verdict was against the law or the weight of the evidence, or for any other reason that justice may require. See G.L. c. 278, § 33E. The defendant respectfully requests that this court conduct plenary review of his case and grant him such relief as he may be entitled.

A reduction in the verdict may be proper even where the evidence is sufficient to support the verdict. See *Commonwealth v. Rolon*, 438 Mass. 808, 821 (2003). As with a challenge to the weight of the evidence, in deciding whether the verdict comports with justice this court may review all the evidence, including the defendant's version of the facts. See *Commonwealth v. Woodward*, 427 Mass. 659, 668 (1998).

The court will review the whole case broadly, with consideration of the 'thrust' of the evidence. See *Commonwealth v. Jefferson*, <u>416 Mass. 258, 267</u> (1993). The court may also consider whether bias or misapprehension on the part of the jurors may have influenced the verdict. See *id.* at 267.

The critical shortcomings in the case against Chalue are illustrated in the grand jury proceedings and motion to dismiss the indictments for lack of probable cause, filed on June 18, 2012. (R3.3). At that time the evidence of Chalue's participation in the kidnappings and murders was circumstantial, tenuous, and weak. Despite hearing three days of testimony, the grand jury heard no evidence that Chalue engaged in criminal activity, that he had any issue with or relation to the victims, or that he was implicated by forensic evidence.

The defendant's motion to dismiss lists every reference to Chalue in the grand jury minutes. As at the subsequent trial, the overwhelming bulk of the evidence presented to the grand jury related not to Chalue but to Hall's actions, many undertaken years before the murders. The only evidence of Chalue's participation was that Chalue went with Hall when he met Casey at Pavoni's property. (R3.5). According to Casey,

Chalue did not participate in any conversations about burying the bodies and was not present for the burials. (R3.5). No evidence suggested that Chalue had been present during the kidnappings or the murders, only that he had socialized with Hall in the week before and after the murders. (R3.5-13). Based on the limited presentment, the defendant asserted that the grand jury did not hear sufficient evidence to establish probable cause that he kidnapped, intimidated, or murdered the three victims.

In response to the motion to dismiss, the Commonwealth returned to the grand jury and presented additional evidence, heavily relying on testimony from two self- interested and unreliable jailhouse informants, Lemieux and Letalien, and procured an identical set of nine indictments. While Chalue was held on the challenged first set of indictments, the Commonwealth used his pre-trial incarceration on legally insufficient charges to expose him to a series of jailhouse informants.

The defendant acknowledges the standard of this court's review that "issues of credibility [are] assumed to be resolved within reason for the Commonwealth." See, e.g. *Commonwealth v. Dilone*, 385 Mass. 281,

286 (1982). However, "[t]he question of guilt must not be left to conjecture or surmise." See *Commonwealth v. Bush*, <u>427 Mass. 26, 30</u> (1998). The evidence supporting the Commonwealth's theory that Chalue was a perpetrator of these offenses was so incredible that it should have been disregarded by the trial judge and properly required findings of not guilty or consideration under this court's 33E authority. Contrast *Dilone*, <u>385 Mass. at 286</u> (the question of the witnesses' credibility in that case did not create an "extreme situation" such as to require the judge to disregard it in its entirety). The weight of the evidence against him derived from these unreliable witnesses who each possessed substantial reasons to fabricate their testimony. Where the Commonwealth was required to prove beyond a reasonable doubt that he committed the offenses, the patent unreliability of the jailhouse informants' testimony should be considered for relief under 33E.

This court has previously held that "[m]ere knowledge that a crime is to be committed is not sufficient to convict the defendant" and that "[m]ere presence at the scene of the crime is not enough to find a defendant guilty." See *Commonwealth v. Zanetti*, <u>454 Mass. 449, 470</u> (2009). "Presence alone does not establish a defendant's knowing

participation in the crime, even if a person knew about the intended crime in advance and took no steps to prevent it." *Id.* Chalue's social interactions with the codefendants, both before and after the time the Commonwealth alleges the murders occurred, does not support a finding beyond a reasonable doubt of any express or implied agreement to act in concert during or after the offenses. See *Commonwealth v. Simpkins*, 470 Mass. 458, 462-463 (2015)

Chalue asks this court to provide him such relief as he may be entitled pursuant to review under General Law chapter 278, section 33E.

## CONCLUSION

For the above-stated reasons, the defendant asks this Honorable Court to reverse his convictions, set aside any findings of law and fact, order judgment to enter for the defendant, or order a new trial.

<div style="margin-left:40%">

Respectfully Submitted,
DAVID CHALUE,
By his attorney,

*Andrew S. Crouch*
Andrew S. Crouch (BBO# 648496)
22 Putnam Avenue
Cambridge, MA 02139
(617) 441-5111
acrouch@andrewcrouch.com
</div>

September 17, 2019

## ADDENDUM

Fourth Amendment, United States Constitution..................................108

Fifth Amendment, United States Constitution...................................108

Sixth Amendment, United States Constitution...................................108

Fourteenth Amendment, United States Constitution..........................108

Article 12, Massachusetts Declaration of Rights.................................109

Article 14, Massachusetts Declaration of Rights.................................109

Article 29, Massachusetts Declaration of Rights.................................109

General Law chapter 234, section 34....................................................110

General Law chapter 265, section 1......................................................110

General Law chapter 265, section 26....................................................110

General Law chapter 268, section 13B..................................................112

General Law chapter 278, section 33E..................................................113

Massachusetts Rule of Criminal Procedure 27....................................114

Massachusetts Guide to Evidence § 401..............................................115

Massachusetts Guide to Evidence § 403..............................................115

Massachusetts Guide to Evidence § 404..............................................115

Massachusetts Guide to Evidence § 801..............................................117

Memorandum Of Decision And Order On Defendants'
Motions To Suppress Evidence Seized From Jeep
Wrangler On 9/4/11...............................................................118

*Commonwealth v. Hunt*, 82 Mass.App.Ct. 1119 (2012)
(unpublished 1:28)..............................................................129

Fourth Amendment, United States Constitution

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Fifth Amendment, United States Constitution

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

Sixth Amendment, United States Constitution

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

Fourteenth Amendment, United States Constitution

Section 1.

All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor

shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Article 12, Massachusetts Declaration of Rights

No subject shall be held to answer for any crimes or offence, until the same is fully and plainly, substantially and formally, described to him; or be compelled to accuse, or furnish evidence against himself. And every subject shall have a right to produce all proofs, that may be favorable to him; to meet the witnesses against him face to face, and to be fully heard in his defense by himself, or his council at his election. And no subject shall be arrested, imprisoned, despoiled, or deprived of his property, immunities, or privileges, put out of the protection of the law, exiled, or deprived of his life, liberty, or estate, but by the judgment of his peers, or the law of the land.

And the legislature shall not make any law, that shall subject any person to a capital or infamous punishment, excepting for the government of the army and navy, without trial by jury.

Article 14, Massachusetts Declaration of Rights

Every subject has a right to be secure from all unreasonable searches, and seizures, of his person, his houses, his papers, and all his possessions. All warrants, therefore, are contrary to this right, if the cause or foundation of them be not previously supported by oath or affirmation; and if the order in the warrant to a civil officer, to make search in suspected places, or to arrest one or more suspected persons, or to seize their property, be not accompanied with a special designation of the persons or objects of search, arrest, or seizure: and no warrant ought to be issued but in cases, and with the formalities prescribed by the laws.

Article 29, Massachusetts Declaration of Rights

It is essential to the preservation of the rights of every individual, his life, liberty, property, and character, that there be an impartial

interpretation of the laws, and administration of justice. It is the right of every citizen to be tried by judges as free, impartial and independent as the lot of humanity will admit. It is, therefore, not only the best policy, but for the security of the rights of the people, and of every citizen, that the judges of the supreme judicial court should hold their offices as long as they behave themselves well; and that they should have honorable salaries ascertained and established by standing laws.

General Law chapter 234, section 34

If a jury, after due and thorough deliberation, return to court without having agreed on a verdict, the court may state anew the evidence or any part thereof, explain to them anew the law applicable to the case and send them out for further deliberation; but if they return a second time without having agreed on a verdict, they shall not be sent out again without their own consent, unless they ask from the court some further explanation of the law.

General Law chapter 265, section 1

Murder committed with deliberately premeditated malice aforethought, or with extreme atrocity or cruelty, or in the commission or attempted commission of a crime punishable with death or imprisonment for life, is murder in the first degree. Murder which does not appear to be in the first degree is murder in the second degree. Petit treason shall be prosecuted and punished as murder. The degree of murder shall be found by the jury.

General Law chapter 265, section 26

Whoever, without lawful authority, forcibly or secretly confines or imprisons another person within this commonwealth against his will, or forcibly carries or sends such person out of this commonwealth, or forcibly seizes and confines or inveigles or kidnaps another person, with intent either to cause him to be secretly confined or imprisoned in this commonwealth against his will, or to cause him to be sent out of this commonwealth against his will or in any way held to service against his will, shall be punished by imprisonment in the state prison for not more

than ten years or by a fine of not more than one thousand dollars and imprisonment in jail for not more than two years. Whoever commits any offence described in this section with the intent to extort money or other valuable thing thereby shall be punished by imprisonment in the state prison for life or for any term of years.

Whoever commits any offense described in this section while armed with a firearm, rifle, shotgun, machine gun or assault weapon shall be punished by imprisonment in the state prison for not less than ten years or in the house of correction for not more than two and one-half years. The provisions of the preceding sentence shall not apply to the parent of a child under 18 years of age who takes custody of such child. Whoever commits such offense described in this section while being armed with a firearm, rifle, shotgun, machine gun or assault weapon with the intent to extort money or other valuable thing thereby shall be punished by imprisonment in the state prison for life or for any term of years but not less than 20 years.

Whoever commits any offense described in this section while armed with a dangerous weapon and inflicts serious bodily injury thereby upon another person or who sexually assaults such person shall be punished by imprisonment in the state prison for not less than 25 years. For purposes of this paragraph the term "serious bodily injury" shall mean bodily injury which results in a permanent disfigurement, protracted loss or impairment of a bodily function, limb or organ or substantial risk of death. For purposes of this paragraph, the term "sexual assault" shall mean the commission of any act set forth in sections 13B, 13B1/2, 13B3/4, 13F, 13H, 22, 22A, 22B, 22C, 23, 23A, 23B, 24 or 24B.

Whoever, without lawful authority, forcibly or secretly confines or imprisons a child under the age of 16 within the commonwealth against his will or forcibly carries or sends such person out of the commonwealth or forcibly seizes and confines or inveigles or kidnaps a child under the age of 16 with the intent either to cause him to be secretly confined or imprisoned in the commonwealth against his will or to cause him to be sent out of the commonwealth against his will or in any way held to service against his will, shall be punished by imprisonment in the state prison for not more than 15 years. The

provisions of the preceding sentence shall not apply to the parent of a child under 16 years of age who takes custody of such child.

General Law chapter 268, section 13B

(1) Whoever, directly or indirectly, willfully

(a) threatens, or attempts or causes physical injury, emotional injury, economic injury or property damage to;

(b) conveys a gift, offer or promise of anything of value to; or

(c) misleads, intimidates or harasses another person who is:

(i) a witness or potential witness at any stage of a criminal investigation, grand jury proceeding, trial or other criminal proceeding of any type;

(ii) a person who is or was aware of information, records, documents or objects that relate to a violation of a criminal statute, or a violation of conditions of probation, parole or bail;

(iii) a judge, juror, grand juror, prosecutor, police officer, federal agent, investigator, defense attorney, clerk, court officer, probation officer or parole officer;

(iv) a person who is furthering a civil or criminal proceeding, including criminal investigation, grand jury proceeding, trial, other criminal proceeding of any type, probate and family proceeding, juvenile proceeding, housing proceeding, land proceeding, clerk's hearing, court ordered mediation, any other civil proceeding of any type; or

(v) a person who is or was attending or had made known his intention to attend a civil or criminal proceeding, including criminal investigation, grand jury proceeding, trial, other criminal proceeding of any type, probate and family proceeding, juvenile proceeding, housing proceeding, land proceeding, clerk's hearing, court-ordered mediation, any other civil proceeding of any type with the intent to impede,

obstruct, delay, harm, punish or otherwise interfere thereby, or do so with reckless disregard, with such a proceeding shall be punished by imprisonment in a jail or house of correction for not more than 2 and one-half years or by imprisonment in a state prison for not more than 10 years, or by a fine of not less than $1,000 nor more than $5,000, or by both such fine and imprisonment.

(2) As used in this section, "investigator" shall mean an individual or group of individuals lawfully authorized by a department or agency of the federal government, or any political subdivision thereof, or a department or agency of the commonwealth, or any political subdivision thereof, to conduct or engage in an investigation of, prosecution for, or defense of a violation of the laws of the United States or of the commonwealth in the course of his official duties.

(3) As used in this section, "harass" shall mean to engage in any act directed at a specific person or persons, which act seriously alarms or annoys such person or persons and would cause a reasonable person to suffer substantial emotional distress. Such act shall include, but not be limited to, an act conducted by mail or by use of a telephonic or telecommunication device or electronic communication device including but not limited to any device that transfers signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photo-electronic or photo-optical system, including, but not limited to, electronic mail, internet communications, instant messages or facsimile communications.

(4) A prosecution under this section may be brought in the county in which the criminal investigation, grand jury proceeding, trial or other criminal proceeding is being conducted or took place, or in the county in which the alleged conduct constituting an offense occurred.

General Law chapter 278, section 33E

In a capital case as hereinafter defined the entry in the supreme judicial court shall transfer to that court the whole case for its consideration of the law and the evidence. Upon such consideration the court may, if satisfied that the verdict was against the law or the weight

of the evidence, or because of newly discovered evidence, or for any other reason that justice may require (a) order a new trial or (b) direct the entry of a verdict of a lesser degree of guilt, and remand the case to the superior court for the imposition of sentence. For the purpose of such review a capital case shall mean: (i) a case in which the defendant was tried on an indictment for murder in the first degree and was convicted of murder in the first degree; or (ii) the third conviction of a habitual offender under subsection (b) of section 25 of chapter 279. After the entry of the appeal in a capital case and until the filing of the rescript by the supreme judicial court motions for a new trial shall be presented to that court and shall be dealt with by the full court, which may itself hear and determine such motions or remit the same to the trial judge for hearing and determination. If any motion is filed in the superior court after rescript, no appeal shall lie from the decision of that court upon such motion unless the appeal is allowed by a single justice of the supreme judicial court on the ground that it presents a new and substantial question which ought to be determined by the full court.

Massachusetts Rule of Criminal Procedure 27

(a) Return
The verdict shall be unanimous. It shall be a general verdict returned by the jury to the judge in open court. The jury shall file a verdict slip with the clerk upon the return of the verdict.

(b) Several offenses or defendants
If there are two or more offenses or defendants tried together, the jury may with the consent of the judge at any time during its deliberations return or be required by the judge to return a verdict or verdicts with respect to the defendants or charges as to which a verdict has been reached; and thereafter the jury may in the discretion of the judge resume deliberation. The judge may declare a mistrial as to any charges upon which the jury cannot agree upon a verdict; provided, however, that the judge may first require the jury to return verdicts on those charges upon which the jury can agree and direct that such verdicts be received and recorded.

(c) Special questions

The trial judge may submit special questions to the jury.

(d) Poll of jury
When a verdict is returned and before the verdict is recorded, the jury may be polled in the discretion of the judge. If after the poll there is not a unanimous concurrence, the jury may be directed to retire for further deliberations or may be discharged.

Massachusetts Guide to Evidence § 401

Evidence is relevant if

(a) it has any tendency to make a fact more or less probable than it would be without the evidence and

(b) the fact is of consequence in determining the action.

Massachusetts Guide to Evidence § 403

The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Massachusetts Guide to Evidence § 404

(a) Character evidence

(1) Prohibited uses
Evidence of a person's character or a character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait.

(2) Exceptions for a defendant or victim in a criminal case
The following exceptions apply in a criminal case:

(A) a defendant may offer evidence, in reputation form only, of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it;

(B) where the identity of the first aggressor or the first to use deadly force is in dispute, a defendant may offer evidence of specific incidents of violence allegedly initiated by the victim, or by a third party acting in concert with or to assist the victim, whether known or unknown to the defendant, and the prosecution may rebut the same with specific incidents of violence by the defendant; and

(C) a defendant may offer evidence known to the defendant prior to the incident in question of the victim's reputation for violence, of specific instances of the victim's violent conduct, or of statements made by the victim that caused reasonable apprehension of violence on the part of the defendant.

(3) Exceptions for a witness
Evidence of a witness's character for truthfulness or untruthfulness may be admitted under Sections 607, 608, and 609.

(b) Crimes, wrongs, or other acts
(1) Prohibited uses
Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) Permitted uses
This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. However, evidence of other bad acts is inadmissible where its probative value is outweighed by the risk of unfair prejudice to the defendant, even if not substantially outweighed by that risk. Evidence of such an act is not admissible in a criminal case

against a defendant who was prosecuted for that act and acquitted.

Massachusetts Guide to Evidence § 801(d)(2)(E)

The following definitions apply under this Article:
...

(d) Statements that are not hearsay
A statement that meets the following conditions is not hearsay:
...

(2) An opposing party's statement
The statement is offered against an opposing party and

(A) was made by the party;

(B) is one the party manifested that it adopted or believed to be true;

(C) was made by a person whom the party authorized to make a statement on the subject, or who was authorized to make true statements on the party's behalf concerning the subject matter;

(D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or

(E) was made by the party's coconspirator or joint venturer during the cooperative effort and in furtherance of its goal, if the existence of the conspiracy or joint venture is shown by evidence independent of the statement.

*14)* )

# COMMONWEALTH OF MASSACHUSETTS

BERKSHIRE, SS

SUPERIOR COURT
NOS. BECR 2011-0139, 0140, 0141

## COMMONWEALTH

### v.

## ADAM HALL, ~~DAVID CHALUE~~E and CAIUS VEIOVIS

## MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTIONS TO SUPPRESS EVIDENCE SEIZED FROM JEEP WRANGLER ON SEPTEMBER 4, 2011

The defendants, Adam Lee Hall ("Hall"), David Chalue ("Chalue") and Caius Veiovis ("Veiovis"), are charged with the murders of David Glasser ("Glasser"), Edward Frampton ("Frampton") and Robert Chadwell ("Chadwell"), and related offenses. Each has filed a motion to suppress the fruits of a warrantless search of Veiovis's Jeep Wrangler and their persons on September 4, 2011. Specifically, the defendants argue that the police lacked reasonable suspicion to detain them and probable cause to seize their property. For the reasons that follow, I conclude that the motions to suppress must be **DENIED**.

## FINDINGS OF FACT

Following a hearing and review of the exhibits, I find the relevant, credible facts as follows:

### 1.  Hall's Relationship to Glasser

As of August 27, 2011, Glasser was scheduled to testify at trial in a kidnapping case against Hall that was scheduled to begin in Berkshire Superior Court three weeks later, on Monday, September 19, 2011. That kidnapping case involved a scheme by Hall in August of 2010, to discredit Glasser in another case in which Hall was charged with assaulting Glasser with a baseball bat in July of 2009. In that earlier case, Hall is alleged to have lured Glasser to his

1

property in Peru, Massachusetts, on July, 21, 2009, and beaten him with a bat in retaliation for a suspected theft of Hall's property. It is also alleged in that action that Hall forced Glasser to sign over the title of his truck to Hall and threatened to have Glasser killed in jail if he implicated Hall.

In the kidnapping case, it is alleged that on August 14, 2010, Hall, assisted by others, arranged to have Glasser drive to upstate New York. While stopped en route at a convenience store, a bag containing a loaded gun was hidden under the driver's seat of Glasser's truck. Hall's female accomplice went to the New York State Police and claimed that Glasser had tried to rob her with a gun and sexually assault her. Based on the claimed attack, the New York State Police contacted authorities in Massachusetts who arrested Glasser in Pittsfield the following day and discovered the gun in his truck. The scheme unraveled and Hall's two main accomplices admitted their involvement and implicated Hall in the plan to frame Glasser.

Hall, the Sergeant-at-Arms of the Berkshire County chapter of the Hell's Angels outlaw motorcycle gang, told Nicole Brooks, an accomplice in the scheme to discredit Hall that "If [this scheme] doesn't work, then I'll just have him disappear."

## 2.  The Disappearance of Glasser, Frampton and Chadwell

David Glasser lived in an apartment on the first floor at 254 Linden Street in Pittsfield with Frampton. Chadwell, a friend and neighbor, had been staying at their apartment while his was undergoing repairs. Glasser was last seen outside his apartment at 10:00 p.m. on Saturday, August 27, 2011, by his upstairs neighbor, Lisa Archambeault ("Archambeault").

At around 11:30 p.m. on Saturday, August 27, 2011, Willie Haywood received a telephone call from Chadwell. When Chadwell failed to call back, Haywood called the Piitsfield Police on Monday and asked for a well-being check. An officer went to the house on Monday August 29, 2011, but got no response.

2

Archambeault tried to rouse the occupants of the Glasser-Frampton apartment Sunday morning because Glasser's truck was blocking the driveway. She could hear that the television was on, but got no response. She returned repeatedly throughout Sunday and Monday, with no success.

A friend, John Barton, stopped by the apartment on Sunday afternoon, but found no one home. He returned on Monday and let himself in through the unlocked rear door. No one was present, but the television was on, the apartment appeared orderly, and Frampton's cat was there. Barton returned during the week on his own to feed the cat.

Frampton's social worker, concerned that Frampton missed an appointment, went to the apartment on Monday, knocked and got no answer. She returned the following day, Tuesday, August 30th, with a colleague and entered through the unlocked door. No one was there, the television was still on. Nothing appeared awry. She found it odd that Frampton would leave for an extended time without arranging care for his cat. Later that evening, Chadwell's brother, Leslie, contacted the Pittsfield Police and reported his brother missing. The social worker filed a missing person report with the Pittsfield Police.

On Wednesday, August 31, 2011, police went to the apartment and found that a wallet, cell phones, and medications belonging to the men were still in the apartment. Glasser's truck remained in the driveway. Friends said he never went anywhere without his truck. Glasser and Frampton had a habit of cashing government checks immediately upon receipt. Government checks they received that week went untouched.

### 3.   The Development of Hall, Chalue and Veiovis as Suspects

Edward Sutton reported that on Tuesday, August 30, 2011, Hall stated that the "witness" had "disappeared" and that it was "too bad." Brittany Breault, Sutton's daughter, informed

3

police that on the day after the storm[1], Hall asked if Davey (Chalue) could shower at the house since there was no water at Hall's Peru residence. Sutton also told police that Hall had two vehicles, a gold Buick and a purple Hyundai Elantra, both with Vermont plates. On Thursday, September 1st Breault said that Hall was at the house with the purplish-blue Elantra with Vermont plates and that Hall had "scrapped" the Buick.

Cell phone records showed that Hall's cell phone received messages or calls from Rose Dawson (a female associate of his, and Edward Sutton's daughter) and Steven Hinman (an associate of Hall and the Hell's Angels) shortly after the police arrived at the Linden Street apartment on Wednesday, August 31st, to look for Glasser, Frampton, and Chadwell. Shortly after those calls on Wednesday, August 31st, a car fitting the description of Hall's Elantra drove into Lenoxdale from the direction of the Hell's Angels clubhouse in Lee and proceeded to park on the Mill Street Bridge. A man fitting Hall's description threw shoes, socks, other clothing, a bag and a box from a bridge into the river. There were two other people in the car with him.

A search of the river under the Mill Street Bridge on Saturday, September 3rd, revealed a sneaker, a piece of clothing and a portion of a Wal-Mart box for a pair of size 11 camouflage Herman Survivor boots. Wal-Mart sales records and video surveillance showed Hall purchasing a pair of boots on Monday, August 29th, while accompanied by Chalue. Hall told a Wal-Mart employee as he was leaving the store that he was wearing the boots out of the store because his socks and boots were soaked.

On Thursday, September 1, 2011, Edward Sutton, told police that Hall had been "hanging out" the past week with a man named "Davey," who was in the Aryan Brotherhood (Chalue), and a man called "Trash," who drove a Jeep (Veiovis). On Saturday afternoon, August 27th,

---

[1] The weekend of Friday, August 26th, to Sunday, August 28th, 2011, was the weekend that Tropical Storm Irene passed through Berkshire County.

4

Hall, Chalue and Veiovis attended a Hell's Angels party in Springfield. They were photographed by police leaving the party together around 7:00 pm.

On Friday, September 2nd, Veiovis and Eric Fox, both wearing Hell's Angels support gear, conducted what police perceived to be counter-surveillance of the parking lot containing the vehicles for the District Attorney's Office and the State Police Detective Unit investigating the disappearance of Glasser, Frampton, and Chadwell. Two days earlier, two men in an Elantra registered in Vermont in Hall's name, but to a different vehicle, a gold Buick, had conducted similar counter-surveillance in the parking garage across the street, where additional vehicles belonging to the District Attorney's Office and the State Police Unit were parked.

Leslie Chadwell reported that he had been told by a friend of Glasser's, A.J. Johnston, that Johnston had been approached by someone wearing Hell's Angels clothing several weeks earlier, and had been told to tell his friend (Glasser) that he needed to change his story.

The F.B.I. obtained an emergency subpoena authorizing it to "ping" or electronically locate Hall's cell phone. Records reflected that calls involving the phone emanated from the area of the Pittsfield State Forest between 10:41 p.m. on Saturday, August 27th and 1:12 a.m. on Sunday, August 28th. They also detected what appeared to be a three-way call involving Hall and Chalue on the morning of Sunday, August 28th. On Saturday, September 3rd, State Forest rangers reported that Forest workers had detected the smell of decomposition in the State Forest in an area off Potter Mountain Road.

### 4.   Initial Contact with the Defendants

On Sunday, September 4th, officers conducting a field search in the Pittsfield State Forest saw a black Jeep drive up Potter Mountain Road to a point within sight of the search area. The Jeep abruptly turned around and drove away from the State Forest. Shortly thereafter, the officers were alerted to the fact that the Jeep was being driven by Hall and was headed in the

5

direction of Pittsfield.  The officers left the State Forest to try to find the Jeep, which was soon

located at the corner of Peck's Road and Wahconah Street in Pittsfield.  The Jeep, registered to

Veiovis, turned onto Wahconah Street and proceeded about a quarter-mile before turning into a

BP gas station.  At approximately 11:25 a.m. the officers followed the Jeep into the station,

where the Jeep was parked at the gas pumps.

Hall was driving the Jeep, Veiovis was in the passenger seat, and Chalue was in the rear

well; the rear seat and spare tire had been removed from the Jeep.  The officers recognized that

Veiovis fit the description of a man named "Trash" who was a suspect in the kidnapping and

disappearance of the three men.  Chalue also fit the description of another suspect named

"Davey."  Veiovis had left the passenger seat and gone into the station's store.  He returned to

the Jeep and began pumping gas.

Meanwhile, officers engaged Hall and Chalue in conversation, asking what they were

doing.  When asked his name, Chalue pointed to Hall and said, "just his friend."  When asked

who owned the Jeep, Chalue shrugged his shoulders and Hall said it was his friend's.  When

asked who the friend was, Hall just smiled.  Hall asked if they were free to go.  He was told by

officers to stay because a couple of other officers were on their way to talk to them.  When Hall

was told that other officers would be arriving to ask them questions, Hall stated that "whatever

they wanted to know, [I] already forgot."  When Veiovis returned to the Jeep and was asked his

name, he pointed to Hall and said, "I'm with him."  Other officers arrived at the station.  Hall,

Chalue and Veiovis were asked to get out of the Jeep and they were pat-frisked and their

photographs taken.  Veiovis had a large folding knife on his person.  Otherwise, the pat frisk

searches revealed nothing.

6

### 5.   Hall's Statements

Captain Richard Smith, the commanding officer of the Massachusetts State Police Berkshire Detective Unit, arrived at the BP station.  At approximately 12:10 p.m., Captain Smith told Hall he was not under arrest and was free to leave. Hall indicated that he understood.  Hall was wearing boots that appeared new.  Smith asked Hall what size they were and Hall replied, "eleven."[2]  Captain Smith decided that the boots, Hall's socks, the Jeep and its contents, and the cell phones of the three would be seized and held in anticipation of obtaining search warrants.  Those items were seized and held until search warrants were obtained on September 7 and 10, 2011.

Smith asked Hall where he was the night of the hurricane.  Hall replied he was with lots of people that night and that "If you want to know who I was with, you can call my lawyer."  Smith asked who that was, and Hall replied, "Bill Rota."   Hall continued speaking without being questioned.  He said to Smith that he didn't want to say who his friends were for fear of being harassed by the police, that he knows who the police are talking to because they tell him, and that he knows what the whole thing is all about, that everyone does.  Hall continued, saying that it was obvious to him what happened and what was going on, the police know about it and "even the kid across the street on the bike knows it."  Smith then asked Hall who "everyone" was.  Hall replied that it wasn't his job to help the police figure it out, he's just taking care of himself, and it's obvious that the police can figure it out.  Smith asked Hall who he was talking about.  Hall responded, "you know who I am and what we do."

There was a conflict in the evidence regarding Hall's mention of his attorney.  Hall testified that on six separate occasions he told the first two officers who arrived on the scene that he wanted to speak with his attorney.  Officers Michael Goonan and John Mazzeo, the first officers

---

[2] Trooper Zullo had informed the officers at the station what she had learned that morning from Wal-Mart about the purchase, video and statement by Hall at Wal-Mart on Monday, August 29th.

7

to arrive at the BP station, testified that they interacted with Hall, Chalue and Veiovis at the BP

station, but that Hall never mentioned his attorney or asked for one in their conversation with

him. I credit the officers' testimony on that point.

## CONCLUSIONS OF LAW

### 1.  Probable Cause to Seize

With probable cause, the police may seize property to prevent destruction or removal of

evidence during the relatively short time needed to obtain a search warrant. Commonwealth v.

Gentile, 437 Mass. 569, 573 (2002).  To establish probable cause, the officers must have more

than a suspicion, but not a prima facie case, let alone proof beyond a reasonable doubt.

Commonwealth v. Santaliz, 413 Mass. 238, 241 (1992).  Employing this standard to the facts of

this case, I conclude the police had probable cause to believe that Adam Hall and his companions

were responsible for the disappearance of Glasser, Frampton, and Chadwell, and that the items

seized were instrumentalities or evidence of crimes related to that disappearance.

First, Glasser, Frampton, and Chadwell disappeared under suspicious circumstances.

They left their apartment without taking their wallets or medications, and without turning off the

television or the computer.  They failed to cash checks directly, as was their habit.  No

arrangements had been made for the care of Frampton's house pet.  Glasser was scheduled to

testify against Hall on September 19th.  Hall had previously tried to eliminate or discredit Glasser

as a witness against him by framing him for crimes in New York.  Hall had previously stated,

"If [this scheme] doesn't work, then I'll just have him disappear."

Second, Hall and his co-defendants demonstrated consciousness of guilt immediately

after they learned that the police had visited Glasser's empty apartment on Wednesday, August

31st by disposing of evidence, conducting counter-surveillance of the police, and by returning to

8

the State Forest early Sunday morning and abruptly departing upon discovering the police presence there. Their appearance at the State Forest, where Hall's cell phone had been electronically tracked immediately before the last known contact with one of the missing men, and where the odor of decomposition had been reported, reasonably suggested that Hall and his co-defendants had hidden evidence of the men's disappearance at the State Forest and that they returned either to conceal additional evidence or to retrieve items they believed would be discovered by the police during their search of the Forest.

Third, Hall and his co-defendants were evasive at the BP gas station. Hall stated to investigators that "whatever they wanted to know, [I] already forgot." Both Chalue and Veiovis, when asked to provide their names, replied by saying that they were "with him." Taken together, these facts established probable cause to seize the Jeep and the items of personal property.

Moreover, exigent circumstances justified seizing them in preparation for obtaining search warrants to avoid any loss or destruction of evidence while they obtained the search warrant." Gentile, at 575. Hall had already been observed discarding evidence at the Mill Street Bridge and police reasonably suspected that he returned to the State Forest either to conceal additional items related to Glasser's disappearance or to retrieve previously-discarded items to prevent them from being discovered by the police searching the Forest for evidence. The police had reason to believe that the Jeep contained evidence relating to Glasser's disappearance, possibly in the form of weapons or tools, or in the form of trace evidence such as bodily fluids, hairs, or fabric. It was reasonable to infer from counter-surveillance conducted by the co-defendants, together with their evasive responses to the officers' questions at the gas station, that they knew the police suspected that they were responsible for Glasser's disappearance and that they were not inclined to cooperate. I conclude, therefore, that the police acted reasonably by

9

seizing the Jeep and the cell phones to preserve them while they obtained search warrants for those items.

As to any other items seized from the vehicle, having found probable cause, I find that the automobile exception to the warrant requirement justified the search and seizure. Commonwealth v. Motta, 424 Mass. 117, 122 (1997).

## 2. Hall's Statements

Hall argues that his statements should be suppressed because they were made without the benefit of Miranda warnings and that they were not voluntary. I disagree. The threshold determination is whether Miranda warnings were even necessary. Miranda warnings are only necessary when someone is subject to custodial interrogation. Commonwealth v. Jung, 420 Mass. 675, 688 (1995). Hall bears the burden of proving custody. Commonwealth v. Hilton, 443 Mass. 597, 609 (2005). The Supreme Court has recognized four indicia of custody: (1) the place of interrogation; (2) whether the officers have conveyed to the person being questioned any opinion that he is a suspect; (3) the nature of the interrogation, that is, whether it was aggressive or informal; and (4) whether, at the time the statements were made, the suspect was free to end the interview. Commonwealth v. Groome, 435 Mass. 201, 212 & n. 13 (2001). The test is whether a reasonable person in the defendant's position would experience the environment as coercive. Commonwealth v. Larkin, 429 Mass. 426, 432 (1999). Applying these factors in this case, I conclude that Hall was not in custody. The police contact occurred outside in a public place. Hall was never informed he was a suspect. There was nothing formal or aggressive about the questions and he acknowledged that he understood he was free to leave.

Finally, I find beyond a reasonable doubt that Hall's statements were the product of his rational intellect and free will. Commonwealth v. Davis, 403 Mass. 575, 581 (1988). There was nothing about the nature of the contact that suggests his will was overborne.

10

## CONCLUSION

For all the foregoing reasons, the Motion to Suppress is **DENIED.**

_C. Jeffrey Kinder_
C. Jeffrey Kinder
Associate Justice of the Superior Court

DATED: November 26, 2013



11

## *Commonwealth v. Hunt*

Appeals Court of Massachusetts

November 5, 2012, Entered

11-P-950

**Reporter**

2012 Mass. App. Unpub. LEXIS 1117 *; 82 Mass. App. Ct. 1119; 977 N.E.2d 106

COMMONWEALTH vs. DANIEL SCOTT HUNT.

**Notice:** DECISIONS ISSUED BY THE APPEALS COURT PURSUANT TO ITS *RULE 1:28* ARE PRIMARILY ADDRESSED TO THE PARTIES AND, THEREFORE, MAY NOT FULLY ADDRESS THE FACTS OF THE CASE OR THE PANEL'S DECISIONAL RATIONALE. MOREOVER, *RULE 1:28* DECISIONS ARE NOT CIRCULATED TO THE ENTIRE COURT AND, THEREFORE, REPRESENT ONLY THE VIEWS OF THE PANEL THAT DECIDED THE CASE. A SUMMARY DECISION PURSUANT TO *RULE 1:28*, ISSUED AFTER FEBRUARY 25, 2008, MAY BE CITED FOR ITS PERSUASIVE VALUE BUT, BECAUSE OF THE LIMITATIONS NOTED ABOVE, NOT AS BINDING PRECEDENT.

PUBLISHED IN TABLE FORMAT IN THE MASSACHUSETTS APPEALS COURT REPORTS.

**Disposition:** [*1] Judgment reversed. Verdict set aside.

**Judges:** Cypher, Katzmann & Milkey, JJ.

## Opinion

MEMORANDUM AND ORDER PURSUANT TO *RULE 1:28*

After a jury trial in District Court, the defendant was convicted of receiving a stolen motor vehicle, *G. L. c. 266, § 28(a)*. His lead argument on appeal is that he is entitled to a new trial based on an error that the prosecutor made during her opening statement. Because we agree, we reverse.

Background. While investigating an apparently unrelated matter, a police officer observed a car being driven by a man wearing a light-colored hat. After learning that the car had been reported stolen, the police officer doubled back to the car, which was at this time parked. The defendant, who was wearing a light-colored hat, was found standing outside the vehicle in close proximity to it. The keys to the vehicle were discovered near him on the ground. The defendant's defense was that he was merely an innocent passerby who happened to be in the wrong place at the wrong time. After the police returned the car to the victim, the victim pointed out that there was a key on her key chain that did not belong to her. That key was attached to a supermarket courtesy card. Through a statement made [*2] to police by Vinnie Ferlisi (apparently an employee of the supermarket), the police learned that the courtesy card belonged to the defendant. Prior to the trial, the defendant filed a motion in limine that, inter alia, sought to exclude police witnesses from testifying as to what Ferlisi told them (on hearsay grounds). On the day of trial, the judge allowed the motion with respect to Ferlisi's out-of-court statements. The prosecutor in fact assented to the motion with respect to those statements, and she noted that Ferlisi himself was unavailable to testify. Nevertheless, during her opening statement, the prosecutor told the jury that the police took the courtesy tag to the grocery store that had issued it and "it came back to [the defendant]." The defendant immediately asked for a mistrial, which was denied. The defendant then requested that the judge instruct the jury to disregard the prosecutor's reference to the courtesy tag. The judge instead gave a general instruction that opening statements do not constitute evidence.

Discussion. In an opening statement, a prosecutor may state "anything she reasonably, and in good faith, expect[s] to prove." *Commonwealth v. Qualls, 440 Mass. 576, 586, 800 N.E.2d 299 (2003)*, [*3] citing *Commonwealth v. Errington, 390 Mass. 875, 883, 460 N.E.2d 598 (1984)*. At the time the prosecutor made her opening statement here, she was aware that evidence linking the defendant to the courtesy card would not be forthcoming. The Commonwealth concedes that the prosecutor's reference to that evidence was error,[1] but argues

---

[1] Emphasizing the prosecutor's knowledge that the evidence would not be coming in, the defendant argues that the error could not have been made in good faith. The Commonwealth characterizes the error as "negligent" and "inadvertent," and it argues that the prosecutor likely forgot that the evidence would not be admitted. For purposes of resolving this appeal, it is sufficient to note that the prosecutor could not have reasonably believed that the evidence would be

2012 Mass. App. Unpub. LEXIS 1117, *3

that the error was harmless. The question we face is whether the prosecutor's misstatement was of such potential prejudice that the defendant's timely request for a mistrial should have been granted. We agree with the defendant that it was.

Although the Commonwealth had a robust case based on evidence properly admitted at trial, such proof was not overwhelming. It was up to the jury to determine whether  [*4] reasonable doubt remained as to whether the defendant was the innocent passerby he claimed to be. Proof that the defendant's courtesy card had been put on the victim's key ring by itself would have eviscerated the innocent passerby defense. Moreover, this was a one-day trial in which the jury retired to deliberate less than three hours after hearing the prosecutor's reference to the devastating (but absent) evidence. Under these circumstances, even with the judge's instruction that opening statements should not be taken as evidence, we cannot say with any confidence that the prosecutor's misstatement could not have influenced the jury's verdict. This is one of those rare cases where an error in the prosecutor's opening statement was "irretrievably and fatally prejudicial to the defendant in the circumstances." *Commonwealth v. Bearse, 358 Mass. 481, 487, 265 N.E.2d 496 (1970)*. The defendant is therefore entitled to a new trial.[2]

Judgment reversed.

Verdict set aside.

By the Court (Cypher, Katzmann & Milkey,  [*6] JJ.),

---

forthcoming.

---

[2] The defendant also argues that a sign-in sheet from the victim's place of work was improperly admitted under the business record statute. *G. L. c. 233, § 78*. That record showed that on the date that the victim's keys were taken from her workplace, someone signed in at that  [*5] workplace using the same name as the defendant. The defendant argues, inter alia, that the sign-in sheet could not be considered sufficiently reliable absent a showing that someone at the workplace was verifying the identity of those signing it. That argument was recently rejected by the Supreme Judicial Court in analogous circumstances. *Commonwealth v. Siny Van Tran, 460 Mass. 535, 551, 953 N.E.2d 139 (2011)* (airline records properly admitted "not as proof of the defendants' actual identities as the passengers listed on the flight documents, but simply for the purpose of showing that the statements were made by someone, even, perhaps, a person being untruthful, who held themselves out to be these men"). The defendant additionally argues that the Commonwealth did not demonstrate that the sign-in sheet otherwise qualified as a business record. For example, he argues that the victim herself was not qualified to testify as to the manner in which the sign-in sheet records were kept. We do not reach such arguments because it is not clear that the Commonwealth will seek to introduce the document in the same manner in any retrial.

Entered: November 5, 2012.

---

**End of Document**

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Andrew S. Crouch, hereby certify, pursuant to Massachusetts Rule of Appellate Procedure 16(k), that this brief complies with all applicable rules of court pertaining to the filing of briefs and the type-volume limitation of MRAP 20(a)(2)(A).

1. The brief contains 17,993 words excluding the parts of the brief exempted by MRAP 20(a)(2)(D).

2. The brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Century Schoolbook.

*Andrew S. Crouch*
Andrew S. Crouch

## <u>CERTIFICATE OF SERVICE</u>

I, Andrew S. Crouch, hereby certify that I have served electronic copies of the foregoing appellant's brief and record appendix upon the parties through the Court's electronic filing system on September 17, 2019, including:

David F. Capeless, Esq.
Office of the District Attorney/Berkshire
7 North Street
P.O. Box 1969
Pittsfield, MA 01202

*Andrew Crouch*
Andrew S. Crouch