COMMONWEALTH OF MASSACHUSETTS
SUPREME JUDICIAL COURT

---

SJC-12457

---

COMMONWEALTH

v.

DAVID T. CHALUE

---

REPLY BRIEF FOR THE DEFENDANT
ON APPEAL FROM THE BERKSHIRE SUPERIOR COURT

---

ANDREW S. CROUCH
Attorney for the Defendant
22 Putnam Avenue
Cambridge, MA 02139
(617) 441-5111
acrouch@andrewcrouch.com
BBO# 648496

OCTOBER 2020

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.........................................................................4

STATEMENT OF FACTS.........................................................................8

ARGUMENT

I.    THE JUDGE TWICE ERRED IN ADMINISTERING A
DYNAMITE "TUEY-RODRIQUEZ" CHARGE TO A LONE
DISSENTING JUROR AND TO THE FULL JURY........................8

       A.    Aware Of The Status Of The Lone Dissenting Juror,
The Court Administered A Private And Incomplete
Tuey-Rodriquez Charge In Circumstances That Were
Inherently Coercive..................................................................9

       B.    After Administering A Coercive Supplemental Tuey-
Rodriquez Charge To A Single Dissenting Juror, The
Court Compounded That Error By Delivering A Second
Such Instruction To The Full Jury......................................10

II.    PREJUDICIAL ERROR RESULTED FROM THE ALLOWANCE
OF SUBSTANTIAL IRRELEVANT AND HIGHLY
PREJUDICIAL EVIDENCE OF THE DEFENDANT'S
AFFILIATION WITH THE ARYAN BROTHERHOOD AND
VEIOVIS'S POSSESSION OF UNRELATED WEAPONS AND
ANATOMICAL ILLUSTRATIONS WHICH SERVED NO
PURPOSE OTHER THAN TO IMPLY TO THE JURY THAT
CHALUE HAD A VIOLENT CRIMINAL PROPENSITY.............13

       A.    Voluminous Evidence Of Chalue's Affiliation With The
Aryan Brotherhood Pervaded The Trial, Yet Bore No
Relevance To Any Proper Purpose........................................19

III.    THE COURT ERRED IN ADMITTING HALL'S STATEMENTS
        TO ELY AND DAWSON THAT WERE NOT MADE IN
        FURTHERANCE OF THE JOINT VENTURE AND SO WERE
        INADMISSIBLE HEARSAY................................................................24

CONCLUSION..................................................................................................29

ADDENDUM......................................................................................................30

MASS. R. APP. P. 16(K) CERTIFICATE..................................................33

CERTIFICATE OF SERVICE.................................................................34

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

<u>United States Supreme Court Cases</u>

*Allen v. United States*,
    <u>164 U.S. 492</u> (1896)........................................................................18

*Burton v. United States*,
    <u>196 U.S. 283</u> (1905)........................................................................10

*Lowenfield v. Phelps*,
    <u>484 U.S. 231</u> (1988)........................................................................11

<u>Federal Cases</u>

*Miller-Bey v. Stine*,
    <u>159 F.Supp.2d 657</u> (E.D. Mich. 2001)..............................................11

*United States v. Mitchell*,
    <u>720 F.2d 370, 372</u> (1983)................................................................15

*Simpson v. West*,
    <u>2006 U.S. Dist. LEXIS 31133</u> (E.D.N.Y. May 18, 2006)................11

*United States v. Ajiboye*,
    <u>961 F.2d 892</u> (9th Cir. 1992)..........................................................18

*United States v. Burgos*,
    <u>55 F.3d 933</u> (4th Cir. 1995)...........................................10, 11, 15, 16

*United States v. Nichols*,
    <u>820 F.2d 508</u> (1st Cir. 1987)...........................................................16

*United States v. Robinson*,
    544 F.2d 611 (2d Cir. 1976)....................................................11, 17, 18

*United States v. Sae-Chua*,
    725 F.2d 530 (9th Cir. 1984)........................................................10, 18

*United States v. Sawyers*,
    423 F.2d 1335 (4th Cir. 1970)......................................................10, 11

*United States v. Varoudakis*,
    233 F.3d 113 (1st Cir. 2000).............................................................24

Massachusetts Cases

*Commonwealth v. Beckett*,
    373 Mass. 329 (1977)........................................................................27

*Commonwealth v. Bright*,
    463 Mass. 421 (2012)........................................................................29

*Commonwealth v. Clarke*,
    418 Mass. 207 (1994)........................................................................27

*Commonwealth v. Colon-Cruz*,
    408 Mass. 533 (1990)........................................................................25

*Commonwealth v. Dunn*,
    407 Mass. 798 (1990)........................................................................20

*Commonwealth v. Mascolo*,
    6 Mass.App.Ct. 266 (1978)...............................................................15

*Commonwealth v. O'Brien*,
    65 Mass.App.Ct. 291 (2005).......................................................14, 15

*Commonwealth v. Pleasant*,
    366 Mass. 100 (1974)........................................................................25

*Commonwealth v. Rollins*,
   354 Mass. 630 (1968)........................................................................14

*Commonwealth v. Torres*,
   453 Mass. 722 (2009)..................................................................12, 13

*Commonwealth v. Wood*,
469 Mass. 266 (2014)....................................................25, 26, 27, 28

Other Jurisdictions

*State v. Ginter*,
   300 P.3d 1278 (Utah Ct. App. 2013)..............................................17

## CONSTITUTIONAL PROVISIONS

United States Constitution

Sixth Amendment.........................................................................24

Fourteenth Amendment................................................................24

Massachusetts Declaration of Rights

Article 12......................................................................................24

## STATUTES AND OTHER AUTHORITIES

<u>Massachusetts Guide to Evidence</u>

Section 801(d)(2)(E)......................................................................................25

The defendant writes briefly to address certain facts and arguments propounded by the Commonwealth in its brief.

## FACTS

In its brief, the Commonwealth repeatedly claims that at the Hell's Angels clubhouse on Monday evening following the murder, "Chalue chased Hall holding his hand out as if he had a gun as Hall cried "Help me, help me..." (Com.Br.25, 62). The evidence does not support this. The relevant witness, Rose Dawson, did not say that Chalue chased Hall or held his hand out like a gun. Seemingly confused by the Commonwealth's questions, Dawson said she did not know how Chalue pointed at Hall and then said his finger was outstretched but that she did not know what it meant or looked like. (T6/62-67, 122-134). The court sustained an objection when the prosecutor attempted to tell the jury what Chalue's hand motion looked like. (T6/126). Dawson testified that it was Hall who acted out a scene and that Chalue only pointed and laughed at Hall. (T6/63-67, 94-96, 88, 122-133).

The Commonwealth's statement that Chalue and Hall bought boots together at the Walmart is not supported by the evidence where

Trooper Zullo testified that the store video showed Hall purchasing boots while Chalue was merely present. (Com.Br.26; T8/19).

## ARGUMENT

### I. THE JUDGE TWICE ERRED IN ADMINISTERING A DYNAMITE "TUEY-RODRIQUEZ" CHARGE TO A LONE DISSENTING JUROR AND TO THE FULL JURY.

In Chalue's primary brief, he challenges several coercive actions engaged in by the trial court in dealing with the jury. He first argues that the trial court erred in giving a modified Tuey-Rodriquez charge to a lone holdout juror in the absence of any other jurors. In response to this argument, the Commonwealth contends that the court did not give such an instruction to the minority juror but merely engaged in a mild inquiry to confirm that the juror could continue deliberations. (Com.Br.46). Chalue further argued in his brief that the court erred in giving a modified and premature Tuey-Rodriquez charge to the entire jury as it reiterated the charge given to the lone juror, amounting to a second exhortation that the juror agree with the majority. The Commonwealth acknowledges the jury was not deadlocked but again argues that the trial court did not give a Tuey-Rodriquez charge to the full jury.

9

**A.    Aware Of The Status Of The Lone Dissenting Juror, The Court Administered A Private And Incomplete Tuey-Rodriquez Charge In Circumstances That Were Inherently Coercive.**

At the heart of Allen and Tuey-Rodriquez style charge jurisprudence is the basic principle that a defendant has "the right to have the jury speak without being coerced." See *United States v. Burgos*, 55 F.3d 933, 936 (4th Cir. 1995), quoting *United States v. Sawyers*, 423 F.2d 1335, 1341 (4th Cir. 1970). In cases holding that the giving of such a charge was not coercive, courts have "frequently laid emphasis on the fact that the judge, in giving the charge, was unaware of the nature or extent of numerical division, concluding from that fact that there was no danger that the minority jurors would believe that the judge was directing his remarks to them rather than to the jury as a whole." See *United States v. Sae-Chua*, 725 F.2d 530, 531-532 (9th Cir. 1984). Where the court is aware of the numerical division, extra care is required and when the division reveals a lone holdout, even greater care is required. See *Burton v. United States*, 196 U.S. 283, 307 (1905) (where the jury break down is eleven to one, "the most extreme care and caution [are] necessary in order that the legal rights of the defendant should be preserved.")

10

Courts are clear that the greatest peril lies in cases where the trial judge instructs a lone or minority juror. See *Lowenfield v. Phelps*, 484 U.S. 231, 237-38 (1988); *United States v. Robinson*, 544 F.2d 611, 620 n.14 (2d Cir. 1976). Contrast *Simpson v. West*, 2006 U.S. Dist. LEXIS 31133, at *21-22 (E.D.N.Y. May 18, 2006) (no error where judge in delivering the Allen charge did not specifically speak to the minority juror, which indicates that no juror was individually coerced by the instruction); *Miller-Bey v. Stine*, 159 F.Supp.2d 657, 666 (E.D. Mich. 2001) (no error where instructions did not single out a minority of jurors and no polling had been done).

Where the court does administer a dynamite charge despite awareness of the existence of a lone juror, this court should evaluate the charge from the perspective of a juror in the minority. See *Burgos*, 55 F.3d at 940; *Sawyers*, 423 F.2d at 1349 (Soboleff, J. dissenting) ("when the jurors know that the judge has been advised precisely how they are divided...the effect of an Allen charge is unavoidably to add the judge's influence to the side of the majority...In this predicament minority jurors are likely to develop a sense of isolation and the impression that they are the special object of the judge's attention.") Here, the lone juror

knew the judge was aware of her status as being in the minority. She
and others had just witnessed her fellow jurors react to her 'no'
response to the jury poll by throwing their pens and paper and getting
visibly upset. She was keenly aware that she was in the minority and
that her fellow jurors were against her position. In that perilous and
uncomfortable context, the judge, who knows her status, stepped in and
told her twice in a short, individual instruction that she should keep an
open mind and listen to her fellow jurors in the majority to see if she
could come to a unanimous decision. Where the lone holdout quite
obviously knew that she was "the special object of the judge's attention,"
the distinct possibility of coercion is apparent.

The court's interaction with the lone holdout juror was not a mere
inquiry into whether she could continue to impartially deliberate as the
Commonwealth suggests. Contrast *Commonwealth v. Torres*, 453 Mass.
722, 731-737 (2009) (when juror reported not guilty verdict during
polling, judge properly directed jury to exit, noted the lack of unanimity
for the record, and instructed them to resume deliberations). While the
judge did make inquiry of the juror's ability and willingness to continue
deliberating, it was sandwiched in between two admonitions that the

lone holdout listen to her fellow jurors with an "open mind" and see if she could come to a unanimous decision. Instead of properly limiting the inquiry, as in *Torres*, to a mere inquiry about the juror's continued deliberation, the court ventured into dangerous and prohibited territory that courts around the country have warned judges against entering and administered the special, individual instruction. The defendant's primary brief discusses at length a litany of federal and out-of-state cases, each of which decry the dangers of individually administering a dynamite-style charge to a juror the court knows to be in the minority or a holdout. The Commonwealth largely ignores these cases in its brief although they make clear that where the judge knows the identity of the jurors in the minority and the jurors in return know the judge knows of their status, coercion is especially likely. The giving of the supplemental charge to the identified lone, holdout juror under these circumstances was coercive and constituted reversible error.

**B.   After Administering A Coercive Supplemental Tuey-Rodriquez Charge To A Single Dissenting Juror, The Court Compounded That Error By Delivering A Second Such Instruction To The Full Jury.**

In determining whether the decision to give the supplemental instruction to the full jury affected Chalue's substantial rights, it

remains important to note that it was error to give the dynamite charge instruction in the first place. The Commonwealth acknowledges and accepts the trial court's finding that the jury was not deadlocked when it gave the supplemental charge. (Com.Br.45; T19/6). Courts have repeatedly been advised of the dangers of using the Tuey-Rodriquez charge prematurely and in the absence of a deadlock. See *Commonwealth v. Rollins*, 354 Mass. 630, 638 (1968) (premature dynamite charge poses inherent danger due to its "sting" and risk of coercion). The Commonwealth does not address the defendant's argument that the court's decision to prematurely give a dynamite charge in circumstances not requiring one was further error requiring reversal. See *Commonwealth v. O'Brien*, 65 Mass.App.Ct. 291, 296 (2005) ("instructions given to a jury that have not reached the point of deadlock may have an impermissibly coercive effect").

The Commonwealth is correct that the supplemental charges given to both the lone juror individually and then subsequently to the

full jury were not the full Tuey-Rodriquez instruction.[1] That the shortened charges departed from the standard language is another problem, as trial judges have long been directed to avoid deviating from the court-approved language of the Tuey-Rodriquez charge. See *O'Brien*, 65 Mass.App.Ct. at 294-295. In the traditional Allen charge, one of the most likely sources of coercion is rooted in the court's admonition to the jury that members of the minority reconsider the position taken by those in the majority. See *Burgos*, 55 F.3d at 936. Compare *United States v. Mitchell*, 720 F.2d 370, 372 (1983) (reversing conviction and remanding for retrial based, in part, on charge that jurors should "open up [their mind] and reevaluate their opinions...reconsider the opinions and statements of your fellow jurors, and do it open-mindedly, not stubbornly, but open-mindedly in the spirit of cooperation"). Despite telling the individual juror to "listen to

---

[1] The Commonwealth cites favorably to *Commonwealth v. Mascolo*, 6 Mass.App.Ct. 266, 273 (1978) in support of its argument that the supplemental instruction to the full jury was not a coercive, premature, and partial Tuey-Rodriquez charge. (Com.Br.44). However, *Mascolo* is inapposite where it did not involve a Tuey-Rodriquez charge to a single juror or a second such instruction to the jury, nor did it include "an oft criticised element of the Tuey charge," namely an instruction that jurors in the minority should reconsider their position without an equivalent instruction to the majority.

your fellow jurors with an open mind and see if you can come to a unanimous decision," the trial court here failed to instruct both the lone juror and the full jury that those in the majority should also consider the views of those in the minority. See *Burgos*, 55 F.3d at 941 n.8 (critical component of Allen charge is that it addresses the responsibilities of both the majority and minority). The one-sided instruction likely led the single dissenting juror to take it as a reminder to listen to the others as the court failed to instruct her fellow jurors in the majority to similarly consider her minority opinion. Instead, the second instruction stressed the importance of unanimity where only the lone juror had been specifically instructed to consider the majority's viewpoint. Contrast *United States v. Nichols*, 820 F.2d 508, 511-12 (1st Cir. 1987) (modified Allen charge included specific reminder that "not only should jurors in the minority reexamine their positions, but jurors in the majority should also do so"). That the trial court intended to counterbalance the statements urging acquiescence and unanimity by including language that "no one is suggesting that you surrender those feelings," this cautionary language was insufficient to outweigh the coercive effect of the knowledge that one juror stood alone against the

others. See *State v. Ginter*, 300 P.3d 1278, 1281 (Utah Ct. App. 2013) (despite employing protective language, dynamite charge was reversible error as minority juror's identity was known). In considering the court's departures from the standard Tuey-Rodriquez charge, the language employed in the supplemental instruction had the same meaning and effect and under the circumstances present here merits findings of coercion and error.

These errors are compounded where the court had already given a solitary instruction to the holdout juror and where the court, the lone juror, and her fellow jurors were all aware of her status. In reviewing the language of the instruction, the court must not ignore the overall potential for coercion. While the charge did mention "good conscience," it also instructed the jurors—and in reality only the one identified dissenting juror—that they should deliberate "in an effort to reach a unanimous verdict..." (TXVII/10-11). Subjecting the lone juror to two Tuey-Rodriquez style instructions left her with the inescapable conclusion that they were leveled at her. See *Robinson*, 544 F.2d at 620 n.14 ("The giving of two charges after the judge knows there is only one dissenter on the jury seems substantially more coercive. The second

charge must inevitably heighten the dissenter's impression that the court is speaking specifically to him or her when it admonishes the jurors 'that they should listen, with a disposition to be convinced, to each other's arguments.'"), quoting *Allen v. United States*, <u>164 U.S. 492, 501</u> (1896). The juror could hardly escape reasoning that the judge was not likely to believe that she could persuade the opposing eleven jurors to adopt her position, especially in light of the overtly negative response to the jury poll, and that she, individually, was being urged by the judge to reconsider her vote. See *Sae-Chua*, <u>725 F.2d at 532</u>. The circumstances here demonstrate coercion and reversal is required. See *id.; United States v. Ajiboye*, <u>961 F.2d 892, 894</u> (9th Cir. 1992).

Moreover, courts have rarely upheld a conviction where the jury or certain members received two Allen-style charges. *See Robinson*, <u>560 F.2d at 524-525</u> (dissent) ("there is apparently no case, in this or any other circuit, upholding the giving of two Allen charges after the jury informs the judge of its 11-1 split.") The second charge was not necessary and could not be otherwise than coercive. See *id.* "The fact that such a case has not arisen is itself indicative of a well-founded reluctance on the part of trial judges twice to tell a lone holdout to listen

to other jurors' views" and when a judge so instructs the lone holdout, "the effect...is unavoidably to add the judge's influence to the side of the majority..." with the sole minority juror "develop[ing] a sense of isolation and the impression that [he or she is] the special object of the judge's attention." See *id.* (citations omitted). The conclusion that there was impermissible coercion here is unavoidable.

II.   **PREJUDICIAL ERROR RESULTED FROM THE ALLOWANCE OF SUBSTANTIAL IRRELEVANT AND HIGHLY PREJUDICIAL EVIDENCE OF THE DEFENDANT'S AFFILIATION WITH THE ARYAN BROTHERHOOD AND VEIOVIS'S POSSESSION OF UNRELATED WEAPONS AND ANATOMICAL ILLUSTRATIONS WHICH SERVED NO PURPOSE OTHER THAN TO IMPLY TO THE JURY THAT CHALUE HAD A VIOLENT CRIMINAL PROPENSITY.**

A.   **Voluminous Evidence Of Chalue's Affiliation With The Aryan Brotherhood Pervaded The Trial, Yet Bore No Relevance To Any Proper Purpose.**

The defendant argues that the court erred in admitting as prior bad acts voluminous evidence of his Aryan Brotherhood membership, over his numerous objections and motion in limine to exclude it. (M8/129-130; M9/53-54, 63-64, 81-82; T11/5; T6/7-9, 12-17, 101-103, 243, 252; T11/5-15, 25-29, 213-220, 222, 229-230; T12/5-7, 9, 56-59, 67-72; T13/5-8, 15-16) (R.79, 81, 84). This evidence had no discernable probative value to any permissible purpose and the risk of prejudice

outweighed any perceived probative value. See *Commonwealth v. Dunn*, 407 Mass. 798, 807 (1990).

The Commonwealth suggests the jury did not know "what type of organization the Aryan Brotherhood was" because the witnesses did not describe the organization's white supremacist and neo-Nazi ideologies. (Com.Br.52). It is clear from the record that jurors did not require witness testimony about AB's platform to know that it is a nefarious and fear-inducing organization. As one example, in impanelment each individual juror was told that they would hear evidence that Chalue had affiliation with the Aryan Brotherhood, and was asked if it would prevent them sitting as a fair and impartial juror. (T1/28-221; T2/30-200). Immediately after this question, the court informed each juror that a victim was African-American and Chalue is white. (T2/28-221; T2/30-200). Three potential jurors responded the evidence of Chalue's AB affiliation would prevent them from a fair judgment of the case and were excused. (TI/101, 153; TII/45). Not a single juror asked the court to explain what the AB is, likely either because of a prior familiarity with it or perhaps because the word "Aryan," a term commonly used in the

context of purported white racial superiority, is directly stated in the organization's name.

The Commonwealth's brief argues that, in addition to corroborating Cashman's and Kempton's testimony as was addressed in the defendant's primary brief, the AB evidence was also relevant "to explain how Hall, when recruiting Casey to aid in burying the victims' remains, used Chalue's AB membership to scare Casey into completing his task and to assure him that if he did indeed cooperate 'everything will be okay.'" (Com.Br.51-52). Initially, although this sentence in the brief reads as though the reassurance that "everything will be okay" was said by Hall to Casey, it is actually a quotation of the prosecutor from his argument to the court on the defendant's motion in limine to exclude the testimony. (M9/65)[2]. As the court recounted when discussing this motion, Casey's grand jury testimony was that Hall told him Chalue was an AB member, you have to kill someone to get in, and he had done time in federal prison. (M9/63-64). It did not include an explicit nor implicit reference to Casey's cooperation. The

---

[2] The Commonwealth cites to this volume as TII, while the defendant cites this volume as M9.

Commonwealth's brief also cites to evidence that was allowed in Hall's trial but excluded from Chalue's, that "[i]n contrast to Hall's trial, the court here ruled Casey was not permitted to testify to the full introduction, which added, 'You have to kill someone to become a member. He's OK. You can trust him.' (TII/64-67)." (Com.Br.52, n.10). This restatement of the evidence from Hall's trial, although beyond the record, demonstrates Hall's remark was not used as a threat to induce Casey's cooperation, but was reassurance that Chalue would not report on Hall's and Casey's actions.

The Commonwealth's argument is also factually incorrect, as according to Casey he was not made aware of Chalue or his AB membership until one day after he agreed to help Hall dispose of the bodies and helped him plan the burial details. Hall arrived at Casey's home on Sunday afternoon and while they sat in Casey's truck, Hall told him of the murders. (T6/223-233, 255; T7/70, 72). Hall asked Casey to bury the bodies and before Casey answered, Hall "said he wouldn't harm Scott Langdon" or Casey's sister. (T6/235-236; T7/71). Casey was "numb, nervous, and scared" from Hall's implication and feared if he did not help, Hall or the Hells Angels would harm Casey's family members

22

and the Pavonis, so he made detailed arrangements with Hall to bury the bodies on Monday. (T6/236-239, 254-256; T7/73). At the time Casey helped Hall plan the burial, he did not know Chalue[3] or know of his alleged involvement, and had no reason to think the AB was involved. (T6/240, 242-243, 253; T7/43). When Casey and Hall parted ways after the burial, Hall said, "remember, keep your mouth shut. Even in jail, I can make things happen," again implying Hall would harm Casey, with no allusion to a threat of harm from the AB. (T6/249). Casey's only mention of his fear of the AB was to explain why he later lied to the police on September 9th about his own involvement in the burials, as he feared repercussions from the Hells Angels or AB if he "started telling the whole story." (T6/251-252). There was no evidence that Chalue's AB affiliation was a factor in Casey's "recruitment" by Hall where he did not learn of that association until after he helped Hall plan the disposal of the victims' remains and arrived to carry out that plan. (T6/242-243).

---

[3] During the conversation in the truck, Hall's only purported mention of Chalue, who was then unknown to Casey, was that Casey "thought" Hall said, "Davey was on him real quick," although Casey was "not sure about that." (T6/230, 255; T7/50, 62-64, 66, 73).

The admission of so much irrelevant and highly prejudicial evidence of Chalue's AB status and desire to ascend its ranks violated his due process protections and right to a fair trial. See Sixth and Fourteenth Amendments, U.S. Constitution; article 12, Massachusetts Declaration of Rights; *United States v. Varoudakis*, 233 F.3d 113, 120 (1st Cir. 2000).

## III.  THE COURT ERRED IN ADMITTING HALL'S STATEMENTS TO ELY AND DAWSON THAT WERE NOT MADE IN FURTHERANCE OF THE JOINT VENTURE AND SO WERE INADMISSIBLE HEARSAY.

Chalue argues prejudicial error resulted from the admission, over his objections, of Alexandra Ely's and Rose Dawson's testimony as to separate statements Hall made on August 29, 2011, at the Sutton residence. (M9/64-66, 77-80; T6/56-62, 119-121) (R.81). Ely testified Hall told her and Karen Sutton that some men were missing and mentioned Glasser. (T6/56-62). Dawson testified that Hall said, "that guy and two of his friends had gone missing," and later when they were alone Hall told her that when they went missing, "one of them was fixing the computer, one, was laying on the couch, and one was sitting in front of the couch playing video games." (T6/119-121). The defendant argues these remarks were inadmissible as statements of a joint venturer

where they did not further the alleged joint venture as is required for this hearsay exception, but instead breached it by revealing incriminating details to several people outside of the joint enterprise. See *Commonwealth v. Colon-Cruz*, 408 Mass. 533, 543 (1990).

The Commonwealth's cited case, *Commonwealth v. Wood*, 469 Mass. 266 (2014), does not contradict the defendant's argument as the Commonwealth suggests. For the extrajudicial statement of one joint venturer to be admissible against another, it must meet two requirements: it was made during the pendency of the cooperative effort and in furtherance of its goal. See *Commonwealth v. Pleasant*, 366 Mass. 100, 104 (1974); Mass.G.Evid. § 801(d)(2)(E). The defendant in *Wood* challenged the statements of his joint venturer by arguing the first requirement was not met, the joint enterprise had concluded by the time of the statements, and the court disagreed. See *Wood*, 469 Mass. at 280-281. Here, the defendant does not dispute the circumstances sufficiently demonstrated the purported joint venture was ongoing at the time of Hall's statements. He argues that the statements failed the second required factor where they did not further but rather hindered

the goal of the joint venture. *Wood*'s holding is inapplicable to this issue.

The Commonwealth also cites to the court's analysis in *Wood* to support its assertion that Hall "shared the incriminating statements with Ely and Dawson with the intent to involve them in the conspiracy so that if the police asked questions of them, they would deny any knowledge out of fear of being charged with being members of the conspiracy." (Comm.Br.64). On this issue, the facts of the present case are readily distinguishable from *Wood*.

There, Wood and Butler shot Thompson and fatally injured Tripp in a botched robbery and kidnapping plot. See *Wood*, 469 Mass. 268. DaSilva, Butler's roommate and girlfriend, testified as to statements Wood made to Butler which Butler then told her a few hours after the incident, as well as statements Butler made to her a few days later. See *id.* at 278-279. DaSilva testified that on returning home after the incident, Butler made several incriminating statements that Wood took Tripp's ATM card saying he would slit her throat if he could not get money from her account, that when Wood returned without any money Butler slit her throat and Thompson broke free from his restraints, and

so Wood shot her in the face. See *id.* at 279. DaSilva testified that a few days later, Butler told her that he and Wood had burned Thompson's car, that Thompson had survived, and that he was going to have to kill Wood because he had failed to kill Thompson. See *id.* at 279-280. After finding that Wood and Butler's joint venture was ongoing at the time of statements in the hours following the incident, the court turned to the statements a few days later and found that the evidence showed that Butler was still trying to "avoid detection and detention" as shown by his concern that Thompson was alive and might identify him. See *id.* at 280-281, citing *Commonwealth v. Clarke*, 418 Mass. 207, 219 (1994).

As cited by the Commonwealth, the court noted that in his reference to having to kill Thompson, "the jury could have concluded that Butler was attempting to frighten DaSilva and ensure that she did not speak to the police, given that she was one of only two people who could implicate him in the murder." See *Wood*, 469 Mass. at 281, citing *Commonwealth v. Beckett*, 373 Mass. 329, 340 (1977) (one joint venturer making statement to encourage another not to speak to police supports finding that statement was made in furtherance of joint venture). The court's finding was based on DaSilva's status as more

than a mere a passive recipient of these statements, but as one with advanced knowledge of and involvement in the crimes. DaSilva was smoking crack in her home with Thompson and Butler when Butler told her he was going to take Thompson out and that Thompson would not be coming home. See *Wood*, 469 at 270. DaSilva then watched but did nothing as Butler and Wood held a gun to Thompson's head, robbed him, then kidnapped him. See *id.* at 270. DaSilva was present when Butler and Wood returned to her apartment after the incident and witnessed them splitting money and removing and bagging their clothing, observing blood on a pair of gloves. See *id.* at 272.

The court found that Butler's later statement to DaSilva that he might have to kill Thompson was a continuation of the joint venture by attempting to frighten DaSilva from speaking to police, as she and Thompson were the only two people who could implicate him.  See *id.* at 281. Unlike Ely, Dawson, and Sutton, DaSilva was directly involved in not only the cover up but also the crimes themselves where she had knowledge that Butler planned to kill Thompson before it happened and sat idly by while Butler and Wood robbed and kidnapped him with the promise that he would not be returning. Hall's remarks to them that

28

the men were missing and what they were doing when they disappeared did not similarly implicate Ely, Dawson, or Sutton in wrongdoing, nor did it embroil them in the joint venture. Hall's statements revealing incriminating knowledge to multiple strangers to the conspiracy were not admissible as vicarious statements of Chalue. See *Commonwealth v. Bright*, 463 Mass. 421, 433 n.16 (2012) ("Ahart's description of the alleged events surrounding the murder—essentially, a confession—can hardly be characterized as furthering an interest to cover up the crime.").

## CONCLUSION

For the above-stated reasons, Chalue asks this Honorable Court to reverse his convictions, set aside any findings of law and fact, order judgment to enter for the defendant, or order a new trial.

Respectfully Submitted,
DAVID T. CHALUE,
By his attorney,

*Andrew S. Crouch*

Andrew S. Crouch
BBO# 648496
22 Putnam Avenue
Cambridge, MA 02139
(617) 441-5111
October 26, 2020          acrouch@andrewcrouch.com

## <u>ADDENDUM</u>

Sixth Amendment, United States Constitution......................................31

Fourteenth Amendment, United States Constitution............................31

Article 12, Massachusetts Declaration of Rights...................................31

Massachusetts Guide to Evidence § 801.................................................31

Sixth Amendment, United States Constitution

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

Fourteenth Amendment, United States Constitution

All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Article 12, Massachusetts Declaration of Rights

No subject shall be held to answer for any crimes or offence, until the same is fully and plainly, substantially and formally, described to him; or be compelled to accuse, or furnish evidence against himself. And every subject shall have a right to produce all proofs, that may be favorable to him; to meet the witnesses against him face to face, and to be fully heard in his defense by himself, or his council at his election. And no subject shall be arrested, imprisoned, despoiled, or deprived of his property, immunities, or privileges, put out of the protection of the law, exiled, or deprived of his life, liberty, or estate, but by the judgment of his peers, or the law of the land.

Massachusetts Guide to Evidence § 801(d)(2)(E)

The following definitions apply under this Article:
...

(d) Statements that are not hearsay
A statement that meets the following conditions is not hearsay:
...

(2) An opposing party's statement
The statement is offered against an opposing party and

(A) was made by the party;

(B) is one the party manifested that it adopted or believed to be true;

(C) was made by a person whom the party authorized to make a statement on the subject, or who was authorized to make true statements on the party's behalf concerning the subject matter;

(D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or

(E) was made by the party's coconspirator or joint venturer during the cooperative effort and in furtherance of its goal, if the existence of the conspiracy or joint venture is shown by evidence independent of the statement.

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Andrew S. Crouch, hereby certify, pursuant to Massachusetts Rule of Appellate Procedure 16(k), that this reply brief complies with all applicable rules of court pertaining to the filing of briefs and the type-volume limitation of MRAP 20(a)(2)(A).

1. The reply brief contains 4,495 words excluding the parts of the brief exempted by MRAP 20(a)(2)(D).

2. The brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Century Schoolbook.

*Andrew S. Crouch*
Andrew S. Crouch

## <u>CERTIFICATE OF SERVICE</u>

I, Andrew S. Crouch, hereby certify that I have served electronic copies of the foregoing appellant's reply brief upon the parties through the Court's electronic filing system on October 26, 2020, including:

Joseph A. Pieropan, Esq.
David Capeless, Esq.
Office of the District Attorney/Berkshire
7 North Street
PO Box 1969
Pittsfield, MA 01202

*Andrew Crouch*
Andrew S. Crouch