# SUPREME JUDICIAL COURT
# FOR THE COMMONWEALTH OF MASSACHUSETTS

**SUFFOLK, SS**                                    **NO. SJC-12457**

---

**COMMONWEALTH**

**Appellee**

**v.**

**DAVID T. CHALUE**

**Appellant**

---

## ON APPEAL FROM A JUDGMENT OF THE
## BERKSHIRE SUPERIOR COURT

---

## BRIEF OF THE COMMONWEALTH, APPELLEE

---

**BERKSHIRE DISTRICT
ATTORNEY'S OFFICE**

**DAVID F. CAPELESS**
**Special Assistant District Attorney**
**Berkshire District**
**7 North Street, P.O. Box 1969**
**Pittsfield, MA  01202-1969**
**Tel. 413-443-5951**
**david.f.capeless@mass.gov**
**BBO #072570**

**On brief:  Joseph A. Pieropan, Special Assistant District Attorney**
            **Berkshire District**
            **joseph.a.pieropan@mass.gov**
            **BBO #550420**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................... 6

ISSUES PRESENTED .......................................... 11

STATEMENT OF THE CASE ............................... 13

STATEMENT OF THE FACTS ........................... 16

- The Beating of David Glasser ............ 16

    ❖ The Scheme to Bring False
       Charges Against David Glasser
       in New York ............................... 16

- The Kidnapping and Murders of
  David Glasser, Edward Frampton, and
  Robert Chadwell ................................ 17

- The Defendant's Case ......................... 29

SUMMARY OF ARGUMENT ............................ 30

ARGUMENT ......................................................... 36

I.   When the Polling of the Jury Revealed
     that Its First Verdict was not Unanimous,
     the Trial Judge Properly Directed the Jury
     to Resume Its Deliberations Without
     Delivering Any Part of a
     *Tuey-Rodriquez* Charge to Either the
     Lone Identified Dissenting Juror or the
     Entire Jury ............................................ 36

- The Jury's Deliberations ......................... 37

- The Standard of Review .......................... 41

2

A. The Judge's remarks reminding the jurors that emotion, sympathy, passion, and prejudice should play no role in their deliberations did not constitute a dynamite charge ............................................................ 41

B. The Trial Judge did not give the only-identified dissenting juror a *Tuey-Rodriquez* charge nor did he coerce the juror into returning a verdict ................................................ 46

II. The Trial Court Properly Admitted Evidence of Chalue's Membership in the Aryan Brotherhood to Show the Context of His Relationship with Witnesses Who Were Fellow Members of the Brotherhood; and of Veiovis's Sharp Bladed Instruments and Anatomical Drawings Depicting Human Dissection and Amputation ..................................... 50

• The Standard of Review .......................... 51

A. Evidence of Chalue's membership in the Aryan Brotherhood was highly relevant to the jury's assessment of the credibility of three witnesses who provided highly incriminating evidence against Chalue ..................... 51

B. Chalue did not suffer substantial prejudice as a result of the admission of photographs of sharp bladed instruments and of anatomical drawings depicting human dismemberment, all seized from Veiovis's apartment, that proved that Veiovis, in a joint venture with Hall and Chalue, had the means and state of mind to dismember the victims ................................................................ 57

III. The Trial Court Properly Admitted Hall's Remarks to Alexandra Ely and Rose Dawson, Made Less Than Two Days After the Murders, Revealing the Fact That Glasser, Chadwell, and Frampton Were Missing and Describing Their Activities When Hall, Veiovis, and Chalue Kidnapped Them, Because They Were Statements Made in Furtherance of the Conspiracy .................................. 60

• The Standard of Review .......................... 61

IV. In His Opening Statement, the Prosecutor Properly Summarized the Evidence He Reasonably Anticipated to Prove at Trial, and in His Closing Argument He Argued Facts in the Trial Record and Fair Inferences From Those Facts ............... 65

V. The Trial Judge Properly Denied Chalue's Motion to Suppress Evidence ................................................................ 68

1. The Standard of Review............................69

2. Facts Found by the Court at the Motion to Suppress Evidence ..............................69

3. Discussion ................................................75

VI. This Court Should Decline to Exercise Its Plenary Authority Pursuant to G.L. c. 278, § 33E ...................................86

CONCLUSION  ....................................................88

ADDENDUM ........................................................89

CERTIFICATE OF COMPLIANCE ...................94

CERTIFICATE OF SERVICE..............................95

APPENDIX  ........................................................ CA1

# TABLE OF AUTHORITIES

## Cases

*Bennett v. Lewis,*
2013 U.S. Dist. LEXIS 109113 (E.D. Cal. 2013)..........................................31, 52

*Commonwealth v. Alphas,*
430 Mass. 8 (1999)....................................................................................51, 61

*Commonwealth v. Arthur,*
94 Mass. App. Ct. 161 (2018)...........................................35, 84, 85, 86

*Commonwealth v. Auclair,*
444 Mass. 348 (2005) ..................................................................33, 66

*Commonwealth v. Beckett,*
373 Mass. 329 (1977) ...................................................................... 64

*Commonwealth v. Beldotti,*
409 Mass. 553 (1991) ...................................................................... 84

*Commonwealth v. Brown,*
477 Mass. 805 (2017) ...................................................................... 66

*Commonwealth v. Cinelli,*
389 Mass. 197, cert. denied, 464 U.S. 860, 78 L. Ed. 2d 165, 104 S. Ct. 186
(1983)............................................................................................. 84

*Commonwealth v. Coonan,*
428 Mass. 823 (1999) ...................................................................... 87

*Commonwealth v. DePina,*
476 Mass. 614 (2017) ...................................................................... 61

*Commonwealth v. Diaz,*
   19 Mass. App. Ct. 29 (1984)...................................................................................... 42

*Commonwealth v. Donahue,*
   430 Mass. 710 (2000) ................................................................................................ 83

*Commonwealth v. Eckert,*
   431 Mass. 591 (2000) ................................................................................................ 69

*Commonwealth v. Evans,*
   438 Mass. 142 (2002) .................................................................................... 32, 58, 59

*Commonwealth v. Flebotte,*
   417 Mass. 348 (1994) ................................................................................................ 41

*Commonwealth v. Francis,*
   432 Mass. 353 (2000) ................................................................................................ 49

*Commonwealth v. Fraser,*
   410 Mass. 541 (1991) ................................................................................................ 76

*Commonwealth v. Gentile,*
   437 Mass. 569 (2002) .............................................................. 34, 69, 79, 80, 82, 84

*Commonwealth v. James,*
   424 Mass. 770 (1997) .......................................................................................... 32, 60

*Commonwealth v. John,*
   442 Mass. 329 (2004) .......................................................................................... 32, 57

*Commonwealth v. Jones,*
   432 Mass. 623 (2000) ................................................................................................ 66

*Commonwealth v. Kilburn,*
   426 Mass. 31 (1997) .................................................................................................. 86

*Commonwealth v. Kozec,*
   399 Mass. 514 (1987) ................................................................................................ 66

*Commonwealth v. Lopez,*
  451 Mass. 608 (2008) ........................................................................ 76

*Commonwealth v. Magee,*
  423 Mass. 381 (1996) ........................................................................ 69

*Commonwealth v. Maldonado,*
  429 Mass. 502 (1999) ........................................................................ 54

*Commonwealth v. Marquetty,*
  416 Mass. 445 (1993) ........................................................................ 86

*Commonwealth v. Mascolo,*
  6 Mass. App. Ct. 266 (1978) ................................................... 30, 44, 45

*Commonwealth v. Matta,*
  483 Mass. 357 (2019) ........................................................................ 77

*Commonwealth v. O'Brien,*
  65 Mass. App. Ct. 291 (2005) ...................................................... 42, 45

*Commonwealth v. O'Toole,*
  326 Mass. 35 (1950) .......................................................................... 58

*Commonwealth v. Pina,*
  430 Mass. 66 (1999) .......................................................................... 87

*Commonwealth v. Rodriquez,*
  364 Mass. 87 (1973) .......................................................................... 43

*Commonwealth v. Santiago,*
  425 Mass. 491 (1997) ........................................................................ 66

*Commonwealth v. Spencer,*
  465 Mass. 32 (2013) .......................................................................... 51

*Commonwealth v. Stoute,*
  422 Mass. 782 (1996) ........................................................................ 76

Commonwealth v. Sylvia,
  456 Mass. 182 (2010) ............................................................................................ 65

Commonwealth v. Thinh Van Cao,
  419 Mass. 383, cert. denied, 515 U.S. 1146, 115 S. Ct. 2588, 132 L. Ed. 2d 836
  (1995)..................................................................................................................... 76

Commonwealth v. Torres,
  453 Mass. 722 (2009) ...................................................................... 31, 47, 48, 49

Commonwealth v. Veiovis,
  477 Mass. 472 (2017) ..................................................................................... 32, 57

Commonwealth v. White,
  475 Mass. 583 (2016) ............................................................................................ 85

Commonwealth v. Whitman,
  453 Mass. 331 (2009) ............................................................................................ 66

Commonwealth v. Wood,
  469 Mass. 266 (2014) ..................................................................................... 33, 63

Commonwealth v. Yesilciman,
  406 Mass. 736 (1990) ............................................................................................ 69

Jenkins v. United States,
  380 U.S. 445, 446, 85 S. Ct. 1059, 13 L. Ed. 2d 957 (1965)............................... 42

Terry v. Ohio,
  392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)............................. 76

United States v. Abel,
  469 U.S. 45 (1984)......................................................................................... 32, 56

United States v. Collins,
  665 F.3d 454 (2nd Cir. 2012).............................................................................. 49

United States v. Keys,
  899 F.2d 983 (10th Cir. 1990)................................................................. 32, 55, 56

*United States v. Zabriskie,*
   415 F.3d 1139 (10th Cir. 2005) ............................................................. 49

## **Statutes**

G.L. c. 265, § 1 ...................................................................................... 13

G.L. c. 265, § 26.................................................................................... 14

G.L. c. 268, § 13B ................................................................................. 14

G.L. c. 278, § 33E ................................................................... 13, 35, 86

## ISSUES PRESENTED

I.  Whether, after the polling of the jury revealed that the jury's verdicts were not unanimous, the trial judge's remarks reminding all the jurors that emotion, sympathy, passion, and prejudice should play no role in their deliberations, and the judge's sidebar conversation with the lone identified dissenting juror, urging her to keep an open mind, listen, and not surrender her feelings, did not constitute a partial *Tuey-Rodriquez* charge that coerced the jury's verdict.

II. Whether the trial judge properly permitted four witnesses to testify that David Chalue was a member of the Aryan Brotherhood for the limited purpose of establishing Chalue's relationship with witnesses who acted with him or in whom Chalue confided; and whether the trial judge properly found relevant and admissible at Chalue's trial photographs of weapons and anatomical drawings depicting human dissection seized from the apartment of Caius Veiovis, who, with Chalue and Adam Hall, kidnapped, tortured, and murdered David Glasser, Robert Chadwell, and Edward Frampton, that demonstrated that all three members of the joint venture had access to sharp-edged instruments consistent with the type used to torture and dismember the three victims.

11

III.   Whether the trial judge properly admitted at David Chalue's trial

statements made by Adam Hall to Alexandra Ely and Rose Dawson, that

David Glasser, Robert Chadwell, and Edward Frampton had disappeared

and describing the three victims' activities immediately prior to their

disappearance, thereby revealing that Hall knew that the men were

missing prior to the date when police learned this fact, where Hall made

these remarks intending to prevent Ely and Dawson from reporting to the

police their knowledge of the joint venture by Hall, Chalue, and Veiovis

to murder these men, thereby furthering the conspiracy.

IV.   Whether that the prosecutor caused David Chalue any unfair prejudice in

his opening statement by stating facts he reasonably expected to prove, or

in his closing argument by relying upon established facts and reasonable

inferences drawn from those facts.

V.   Whether the trial judge properly denied David Chalue's motion to

suppress evidence impounded by the police and later searched pursuant

to timely-issued search warrants, where the police had probable cause to

believe the evidence, including Chalue's cellular telephone that police

knew had been used to communicate with Adam Hall's cellular telephone

during the time when Glasser, Chadwell, and Frampton suspiciously

disappeared near midnight during a tropical storm, was linked to the

crime and where exigent circumstances justified the impoundment of the

evidence to preserve it for a future search.

VI.     Whether this Court should exercise its plenary powers pursuant to

G.L. c. 278, § 33E, where the jury returned three verdicts of first-degree

murder, all based upon the theories of deliberate premeditation with

malice aforethought and extreme atrocity and cruelty, that were well-

founded in the record evidence.

## **STATEMENT OF THE CASE**[1]

In October of 2011, the Berkshire County grand jury indicted David Chalue,

together with Adam Hall and Caius Veiovis, for the August 28, 2011, kidnapping

and murders of David Glasser, Robert Chadwell, and Edward Frampton.

Chalue was arraigned on these indictments on October 12, 2011. (R.10).

In addition to the three counts of murder, (G.L. c. 265, § 1), indictment

no. 1176CR00140, numbered 1 thru 9, charged Chalue with three counts of

---

[1] References to the record will appear as follows:  to the trial transcript
as"(TVol/Page)"; to the trial exhibits as "(TExNo)"; to the Defendant's brief
As "(DBPage)"; to the Commonwealth's Appendix as "(CAPage)"; to the pretrial
hearing transcripts as "(PTVol/Page)"; to the pretrial exhibits as "(PTExNo)"; to
the Record Appendix appearing in the defendant's brief as "(R.Page)".

kidnapping, (G.L. c. 265, § 26), and three counts of intimidation of a witness, (G.L. c. 268, § 13B). (R.5-7). The Superior Court ordered Chalue held without the right to bail. (R.10).

On August 8, 2012, the same grand jury that deliberated in 2011 returned ten additional indictments, numbered 10 thru 18, against Chalue charging him with the same crimes charged in numbers 1 thru 9. (R.13).

The Commonwealth filed motions for joinder of offenses and defendants on December 7 and 20, 2012, and it filed entries of nolle prosequi on indictments numbered 1 thru 9 on December 21, 2012. (R.14).

The Superior Court specially assigned Kinder, J., to this matter on February 25, 2013. (R.15). The Superior Court, Kinder, J., allowed Chalue's motion for severance from co-defendants Veiovis and Hall on October 30, 2013. (R.19).

The Superior Court, Kinder, J., conducted hearings on Chalue's motions to suppress evidence on October 11, October 28, and November 21, 2013. The Court denied the motions on November 26, 2013. (R.19).

Jury selection commenced in the Hampden Superior Court on April 22, 2014, and concluded on April 23, 2014. (R.26). The parties made opening statements on April 25, 2014, and the trial continued until May 12, 2014, when counsel made their closing arguments. (R.26-28).

The jury delivered its verdicts to the Court on May 16, 2014, finding Chalue guilty on three counts of murder in the 1st degree (nos. 11-140-10 - 12)[2] and on all other indictments. (R.28-29).

The Superior Court, Kinder, J., sentenced Chalue to three consecutive life terms on the murder indictments[3]; to 8-10 years State prison, concurrent with the life sentence imposed on no. 11-140-10, on the kidnapping and intimidation of a witness indictments (nos. 11-140-13 & 16); to 8-10 years State prison, concurrent with the life sentence imposed on no. 11-140-11, on the kidnapping and intimidation of a witness indictments (nos. 11-140-14 & 17); to 8-10 years State prison, concurrent with the life sentence imposed on no. 11-140-12, on the kidnapping and intimidation of a witness indictments (nos. 11-140-15 & 18). (R.29).

Chalue filed his notice of appeal on May 23, 2014. (R.29). This Court entered this matter on its docket on December 21, 2017.

---

[2] The verdicts specified guilt on theories of deliberate premeditation with malice aforethought and extreme atrocity and cruelty. (TXVII/12-16).

[3] The Court credited Chalue 983 days held on bail awaiting trial on the murder indictments. (R.29).

## STATEMENT OF THE FACTS

### THE BEATING OF DAVID GLASSER

In July 2009, Adam Hall was upset because he believed that David Glasser had stolen motorcycle parts from him and sold them for scrap. (TIII/168-171,175-176). Hall lured Glasser to his Peru residence and beat him with a baseball bat as Glasser tried to defend himself. (TIII/176-182,186). Hall then forced Glasser to sign over the title to his pickup truck, which Hall sold. (TIII/182-184,186,190-192). The truck was later recovered by the police. (TIII/193-195;TIV/193-194).

### The Scheme To Bring False Charges Against David Glasser In New York

As trial for the beating case loomed in August, 2010 (TIV/13), Hall devised a scheme to discredit Glasser as a witness. (TIV/12-31,79-80,122). Hall had previously tried on several occasions to enlist others to discredit Glasser. (TI/208-213,219-221;TV/139-140;TVII133-134)[4]. The plan was to have a girlfriend, Nicole Brooks, falsely accuse Glasser of trying to kidnap her and shooting at her. (TIV/20,29,122). Hall arranged to have photographs taken of Glasser so that Brooks could identify him to the police; he provided Brooks with a description of Glasser's truck and the license plate number; he took Brooks out to a secluded spot in New York where the "attack" was to have taken place, and shot bullets into a tree as "evidence". (TIV/18-21,37,63,81-84;TEx71-72). Finally, Hall

---

[4] There are two transcript volumes labelled XII AM. References to testimony on January 27, 2013, will appear as "(TXIIAM 1/27No.)."

arranged to have Glasser drive another of the accomplices, Scott Langdon, to New York, where Langdon planted the gun and Brooks's purse in Glasser's truck. (TIV/34-35,40-46,86-90,179-181). Hall vowed that if the plan failed he "would have to make Glasser disappear." (TIV/58-59).

Brooks provided a statement to the New York State Police (TIV/48-51,150-151;TEx68) but, to Hall's expressed dismay, Glasser returned to Massachusetts before he could be arrested by the New York authorities. (TIV/90-92,132). Glasser was arrested by the Pittsfield Police. (TIV/133,154,176-177). The scheme unraveled when the accomplices admitted their roles in Hall's plan. (TIV/52-55,93-96,133-135,137). Corroborating telephone records and surveillance video were also discovered by the police. (TIV/198-207).

### THE KIDNAPPING AND MURDERS OF DAVID GLASSER, EDWARD FRAMPTON, AND ROBERT CHADWELL

During the weekend of August 27th-28[th], 2011, Tropical Storm Irene battered western New England bringing heavy rains on Sunday. (TIV/207,238; TV/17,87,201,222-223;TVI/157-158,182,212-213,223).

With trial for the beating and kidnapping cases approaching, Hall unsuccessfully tried to bribe Glasser to not testify against him. (TIV/78-79,102-103).

Glasser told a friend on August 26th that "he was worried about testifying in a trial coming up ... [and he was] going to hide out for the weekend and stay in the house." (TIII/161-162).

Glasser lived in a first-floor apartment on Linden Street in Pittsfield with Edward Frampton. (TIII/73-75,116,138,170;TIV/77). Glasser was in his forties and Frampton in his late fifties. (TIII/80). Both were clients of mental health and social services agencies. (TIII/70,72-75,103). Neither was regularly employed, and they both received federal disability assistance. (TII/72,78). Frampton suffered from a circulation problem, which limited his ability to get around. (TIII/76-77). Robert Chadwell, a neighbor in his forties (TIII/111-112), lived across the street. (TIII/112, 115-116,122-123). On Saturday afternoon, August 27th, Chadwell visited Glasser and Frampton and stayed into the evening. (TIII/139-140). The three men were last heard from around 11:20 pm that night. (TIII/125-126; TEx28). On Sunday morning, the apartment was silent except for the television, and there was no response to the door or telephone. (TIII/141-142). Glasser's truck – his prized possession (TIII/78,159-160) – remained in the driveway. (TIII/85,110,142;TEx4). On Monday morning, Glasser did not show up to help a friend as planned and Frampton did not appear at a scheduled doctor's appointment. (TIII/82-84,162). The apartment was empty (TIII/85-92,104-1-5) and calls to the three went unanswered (TIII/92,104,117-118,162). When police

18

entered the apartment on Wednesday, they found all three victim's cell phones,

Frampton's wallet and eyeglasses and various prescription medications; the sole

newspaper was for Saturday, August 27th and a calendar was marked off daily

through August 27th. (TIV/91-92,106-108;TVII/229-239;TX/153-163).

On Monday afternoon, Hall told Rose Dawson that Glasser, "that guy," and

others had gone missing. (TVI/56,62,119-120). Hall described one at the

computer, one lying on the couch, and one sitting on the floor in front of the couch

playing video games. (TIII/105,108;TVI/120-121).

Several weeks earlier Hall had begun to hang out regularly with David

Chalue and Caius Veiovis. (TIV/211-212;TVI/33-36,110-111). The three men

were together continuously in the several days leading up to and, most importantly,

during the critical hours when the kidnappings and murders were committed:

The three were together at Sayer's Junk Yard on Potter Mountain Road in

Lanesborough shortly before the weekend of the storm. (TV/35-39).

On Wednesday, August 24th, Veiovis and another man asked about saws and

inspected hatchets at the Pittsfield Home Depot store. (TIV/235-244;TEx82).

Hall spent Friday afternoon and evening with Chalue, Veiovis, and Katelynn

Carmin, ending up at the Hell's Angels clubhouse in Lee. (TV/18). En route, Hall

said, "I'm going to kill that motherfucker [Glasser]… he ruined my life…it would

be worth it to go to jail to kill him," to which Chalue and Veiovis replied, "Don't

worry about it, you'll get him." (TV/19-23). Previously, Chalue told Alexandra Ely

not to worry about Hall's pending cases because "he just wasn't going,,,to jail."

(TVI/47-48,76). At the clubhouse, Hall told Carmin he needed them [Chalue and

Veiovis] for a job and didn't want them to get hurt. (TV/26-30).

Saturday afternoon and early Saturday evening, the three men attended a

Hell's Angels party in Springfield. (TV/60-66;TEx96-101). Later in the afternoon,

Hall left the Buick at the Madison Avenue residence of the Sutton family in

Pittsfield and returned later with Chalue to retrieve it. (TVI/42-43). On Saturday

evening they went to the Lee clubhouse, where they meet up with two women –

Alyson Scace and Kayla Sewell – and proceeded to Veiovis's apartment in

Pittsfield. (TV/90-93,122-124). Chalue, Veiovis and the two women drove in one

vehicle; Hall left separately in his gold Buick, stopping off on the way at Steven

Hinman's house in Lenox. (TV/92-93,103,142;TEx104). While at Hinman's, Hall

went outside and returned with a dog food bag containing several handguns and a

military-type semi-automatic weapon. (TIV/142-144,227-231).

At Veiovis's apartment, Hall laid the guns out on the living room table. He

and Chalue proceeded to clean them using latex gloves and brake cleaner provided

by Veiovis. (TV/94-96,110-114,125-126). The women left, leaving the men behind

at Veiovis's apartment. (TV/96-97,126).

20

At 1:30 a.m. on Sunday, Hall was driven in Veiovis's Jeep to the Sutton's, where he met with Rose Dawson. (TIV/44-45,111-112). He asked Dawson for her cell phone and then left with it. (TV/170-173,179,183-185). When he returned it later that morning, Hall instructed Dawson to delete all the calls and not to disclose that he had the phone. (TVI/116-118).

At 5:30 a.m. on Sunday, Hall, soaking wet and dirty, arrived in his gold Buick at the A-Mart convenience store in Pittsfield. He purchased three candy bars, Black And Mild cigars and Marlboro cigarettes with wet cash. (TV/201-2-8;TEx205). Hall did not smoke; Veiovis smoked Black And Mild cigars; Chalue smoked Marlboro cigarettes. (TIV/217-218;TVI/70,135;TIX/121,160-161;TX/353;TEx305-306). Shortly thereafter, Hall left the Buick at Madison Avenue and departed in Veiovis's Jeep. (TVII/120-122). At 9:30 a.m. on Sunday, Hall, Chalue and Veiovis returned to Madison Avenue in Veiovis's Jeep. (TVI/46-47). Hall instructed Rose Dawson and Alexandra Ely, another girlfriend, to purchase food for breakfast at Hall's house in Peru, giving them "wet and yucky", "soaking wet" cash and told them to wash their hands after handling it. (TVI/47-48,113). Dawson and Ely left in the Buick which looked and drove normally. (TVI/48-50,113). At Peru, all three were wet, and Chalue and Veiovis appeared "tired" while Hall looked "jumpy." (TVI/51-53). The two women returned to the Sutton home in the Buick. Hall, Chalue and Veiovis arrived

21

in Veiovis's Jeep and took the Buick with them. (TVI53-54). That afternoon, Hall

was seen talking with Chalue and Veiovis outside Veiovis's girlfriend's apartment

house in Pittsfield. (TV/222-226).

Around 2:00 p.m. Sunday Hall visited the home of David Casey in Canaan,

New York (just over the Massachusetts border), and described to Casey how he

and two others murdered and dismembered the three victims during the storm.

(TVI/223). When Hall asked for help with a car in Becket, Casey made a call to a

mutual friend, Al Pavoni, to arrange it. (TVI/158-159,224-226).

Hall sought Casey's help in hiding and then burying the victims' remains.

(TX139-141). Hall told Casey that he "ousted" Glasser, "the fat guy[Frampton]

and the black guy" [Chadwell][5] and that the three victims were tortured.

(TVI/226,231); Hall told Casey that his gun misfired when he went to shoot

Glasser in the head, that Glasser ran but "Davey was on him real quick" and

Glasser was shot and brought back; that Glasser had begged and pleaded for his

life; that before he shot Glasser he told him, "I warned you what would happen if

you witnessed against me." (TVI/223-231). After he killed Glasser, Hall said that

he "didn't mind killing the black guy" but he had a hard time cutting up "the fat

guy." (TVI/231-232).

---

[5] Trial testimony and exhibits supported the inference of the two victims'
identities.

Hall asked Casey if his excavator was still in Becket and if he could use it to dig a hole. (TVI/234-235). He told Casey that if he agreed, no harm would come to Casey's sister or her boyfriend [Teresa Cunigan and Scott Langdon], who were accomplices in the New York frame-up case. (TVI/235-236).

The three victims had each been shot multiple times - each at least once to the head - and suffered multiple stab wounds, cuts and lacerations. (TIX/23-63). Chadwell also had multiple rib fractures (TIX/33); Glasser had been beaten about the head (TIX/64-65); one of the stab wounds suffered by Frampton had penetrated deep enough to sever his spinal cord. (TIX/49-51). All three were beheaded and dismembered. (TIX/54-55). The torsos of Robert Chadwell and Edward Frampton had been cut from the pubic area up to the rib cage and had also been severed in half. (TIX/28-31,48). The various wounds suffered by the victims indicated the use of multiple sharp-edged weapons, (T), and the dismemberments involved multiple sharp, "hacking" or "chopping"-type tools and a "sawing" tool (TIX/72-73,79-98,102-104;TEx279-281). The victims' remains contained very little blood when examined during the autopsies. (TIX/55).

On Sunday evening, accompanied by two other men, Hall dropped off the Buick containing the dismembered remains of the victims at Pavoni's house in Becket and left in Veiovis's Jeep. (TVI/159-165,182-186). Hall, Chalue and

23

Veiovis spent the remainder of the evening together at the Hell's Angels clubhouse in Lee. (TV/99).

On Monday morning, Hall and Chalue returned to Pavoni's; they were joined eventually by Casey. (TVI/196-201,214-216,239-240). Hall introduced Chalue to Casey as, "Davey, a member of the Aryan Brotherhood." (TVI/242-243,258). While there, Hall opened the trunk to the Buick and commented that "they're beginning to smell." (TVI/244). Hall and Casey drove to Daniel Cole's house nearby, where Casey's excavator was located, to make sure that no one was around. (TVI/244-245). They returned to retrieve the Buick and drove back took to the Cole property. (T VI/245). Casey dug a hole with the excavator and Hall unloaded garbage bags from the trunk of the Buick into the excavator bucket, and they were dumped into the hole and buried. (TVI/245-249). Meanwhile, Chalue acted as look-out (TX/132-136,160-169) and texted Hall twice within 37 minutes: "Hey, what's going on?"; "Dude, I'm ready to leave, I don't know what to tell you." (TX/120-124;TEx301,373).

Police discovered plastic bags similar to those containing the remains of the victims at Hall's Peru residence and at the Hell's Angels clubhouse. (TVIII/38;TIX/161-162,206-208;TX/104-110;TEx168,176,354,362-365). Plastic gloves were found at Ocean Sutton's apartment where Chalue had been staying,Veiovis's apartment, Hall's Peru residence, the Hell's Angels clubhouse,

and in Hall's Elantra. (TVIII/38,134-138;TIX/160,162-164,203-206,208-210;TEx352,355-360,366-368).

On Monday afternoon, Hall drove the Buick, only recently purchased, reconditioned, and "running fine" (TVII/84-87,1099;TVIII/37;TEx166), to Sayer's salvage yard in Lanesborough and sold the car to be scrapped. Chalue accompanied him, driving Hall's Elantra. (TVII/92-103;TEx128). At this time, the Buick's dashboard was torn apart, and the rear seat, carpeting and lining in the rear of the car, including the trunk, had been removed down to bare metal and the interior was wet. (TVII/109-110). Hall and Chalue left the yard in the Elantra. (TVII/107-108;TEx128,130-136).

Later that day, Hall and Rose Dawson cleaned the Elantra - inside and out – using a hose and water, while Chalue watched. (TVI/54-56,118-119;TVII140-141). The water looked "nasty…." (TVI/119).

On Monday evening, Hall and Chalue celebrated at the Hell's Angels clubhouse, joking and laughing; Chalue chased Hall holding his hand out as if he had a gun as Hall cried "Help me, help me..." and "he had to watch." (TVI/62-67,122-134). According to Dawson, Hall referred to Veiovis as "Butch" and described him as "a crazy motherfucker" and "a real pro." (TVI/133-134).

On Tuesday night, Hall and Chalue stayed at the Hell's Angels clubhouse with Ocean Sutton. (TV/99-100;TVII/122-124). The following morning,

25

Wednesday, Hall burned some clothes at the clubhouse and, after Hall received a phone call, the three drove the Elantra to Pittsfield. (TVII/123-126;TVIII/139; TEx139). On the way, they stopped at a bridge in Lee. Hall handed items to Chalue, who threw them into the water. (TVII/126-128,136;TEx138,140-144,152-167). Hall commented "It should carry…the water should carry the items." (TVII/135).

On Monday evening, Hall and Chalue had purchased a pair of boots and socks at the Wal-Mart in Pittsfield. (TVII/190-202;TEx145-148,206-209). A piece of the boot box was later found in the river, downstream from the bridge. (TVII/213-226;TEx149).

On Sunday, September 4th, Hall drove Chalue and Veiovis in Veiovis's Jeep on Potter Mountain Road in Lanesborough, checking Sayer's junk yard to see whether the Buick had been crushed, ultimately fleeing when they spotted the police nearby. (TVIII/50-54,60-63;TEx169).

A later search of Veiovis's apartment yielded a machete, a cleaver and hatchets - items similar to those used to dismember the victim's bodies and knives comparable to those used to inflict the victims' wounds. (TIX/73-74,145-152,186-187;TEx319-320,327-328,333-335). Affixed to a wall of the apartment was a collage of anatomical illustrations, some of which depicted dismemberment similar to those suffered by the victims. (TIX/76-77,138-139,155-158;TEx319-320).

26

Before the three were arrested and charged with the murders, Chalue told Dawson not to speak to the police or she would be sorry and regret it. (TVI/138-139).

While being held in custody, well before any forensic testing or results or any mention about clothing evidence (TXII/18-19), Chalue had a telephone conversation with his girlfriend, Christina Pellegrino, in which he referred to no clothing being linked to anyone in the case, (TXI/197, 202-204;TXII/18-19;TEx387).

At the jail, Chalue had a confrontation with another inmate, Christopher Letalien, and "freaked out" (TX/208-211), and said, "We're going to rec together. I'm not going to fight you…I got a body. I not only got a body, I got three bodies. Not only do I got three bodies, I made them disappear. Not only did I make them disappear, fourteen days later they found them cut up into pieces at the bottom of a ditch." Chalue later told another inmate, Jason Limieux, that he wanted to kill Letalien. (TXI/144).

Chalue further confided in Lemieux. He "bragged about his case… thought it was funny…a joke." (TXI/139). Chalue said the victims were "tortured beyond torture" and "they cut them up and made then disappear." (TXI/141-142). Chalue also stated that he wanted to get in the "bubble" with Veiovis to "compare notes and know what was going on between the cases." (TXI/145-146).

27

After being transferred to a state prison, Chalue confided in two other inmates associated with the Aryan Brotherhood:

Chalue told Jethro Kempton that he could trust him and described what happened "in snippets." (TXI/232-234). Chalue said: "they went to get one guy – the one they were looking for – but he happened to have two friends over that night" (TXI/234); they told the other two guys, "Our beef is with this guy and we just got to go for a little ride. Everything will be all right. Our beefs not with you," and they complied (TXI/235); they made the victims leave their cell phones behind, and they used two cars, one of which was later crushed (TXI/235); The three were taken "remote, in the woods" and after one guy ran off into the woods, they shot him (TXI/237); Hall screamed at Glasser's severed head, "Rat on me now, you fucking snitch…" (TXI/238); after killing the victims, they let the bodies sit, "to cool a while," so that when they cut them up they wouldn't "squirt." (TXI/237); and, the bodies were buried with a backhoe in a different place from where they killed them. (TXI/244).

Hall also told Jeffrey Cashman what happened, not in a narrative but in "bits and pieces." (TXII/75). Chalue said: Someone was going to testify against Hall, and Hall threatened him and set him up for another crime with a girl involved, and Hall got caught for that (TXII/77); Chalue suggested that Hall "get rid of him, make him disappear...kidnap him at night so nobody could see, no witnesses, get

28

rid of him, kill him…" (TXII/77-78); they took the three victims in two cars, a Jeep and a blue compact (TXII/79-81); the killings were done with Hall and "Trash" during a hurricane (TXII/79-80); all three took part in beating, torturing, and killing the victims, and after they "chopped them up" (TXII/83); Chalue was at the foot of the driveway in the blue car, which was cleaned after to get rid of evidence (TXII/85-86); afterwards, Chalue and Hall threw a bag, shoe box, boots and a gun from a bridge. (TXII/87-88);

THE DEFENDANT'S CASE

Hall presented three witnesses, who testified to the following:

A corrections officer explained the protocol for the property of prisoners in the segregation unit. (TXII1/46-50)[6].

Peter Beaudoin described seeing Hall and Veiovis emerging from a wooded area off Barker Road on Sunday, September 4th. (TXII1/52-56).

Christina Pellegrino, Chalue's girlfriend, testified that she had learned from a local blog that the victims were dismembered, but learned nothing about clothing involved in the case. (TXIII/57-61).

---

[6] There are two trial transcripts titled Volume XIII; the transcript of May 9, 2014 will appear as (TXIII/Page) and that of May 12, 2014 will appear as (TXIIIA/Page).

## SUMMARY OF THE ARGUMENT

I.     When polling of the jury that revealed that the first juror polled did
not agree with the verdicts announced by the clerk, the trial judge instructed the
jurors to resume their deliberations. Upon learning that the dissenting juror refused
to return to the jury room to resume deliberations, the judge properly determined
whether the juror was willing and able to resume deliberations with an open mind
and without surrendering her feelings. The juror returned to the jury room, where
the jurors deliberated until the end of the day and returned to court the following
morning to resume their work. The judge, as part of his daily colloquy with the
jury, reminded the jurors that emotion, sympathy, passion, and prejudice play no
role in their deliberations.

Contrary to Chalue's claim, neither the questions posed by the judge to the
lone dissenting juror nor the judge's remarks to the entire jury constituted a
coercive, supplemental *Tuey-Rodriquez* charge. First, when addressing both the
entire jury and the lone dissenting juror, the judge made no mention of dissenting
jurors acquiescing to the conclusions of fellow jurors, of the Commonwealth's
burden of proof, or of any duty on the part of this jury to decide the case to a final
verdict. *Commonwealth v. Mascolo*, 6 Mass. App. Ct. 266, 273 (1978). (41-45).
Second, when questioning the lone juror at sidebar with counsel present, the judge
properly exercised his discretion when he determined that the dissenting juror was

30

able and willing to return to the jury room to participate in deliberations. *Commonwealth v. Torres*, 453 Mass. 722, 735 (2009). (46-49).

II.     The trial judge properly admitted evidence of Chalue's membership in the Aryan Brotherhood because it was highly relevant to the jury's assessment of the credibility of three witnesses who provided highly incriminating evidence proving that Chalue, together with Hall and Veiovis, kidnapped, tortured and murdered the three victims. Casey testified that Hall introduced Chalue to him as an Aryan Brotherhood member and to having concerns about repercussions from the Hell's Angels and the Aryan Brotherhood for revealing what he knew of the murders. Kempton and Cashman testified about their conversations with Chalue concerning their membership in the Aryan Brotherhood and Chalue's intention to assert dominance and control of the organization locally. Cashman also testified that Chalue gave him a discovery packet that had the term "no good rat" written next to the names of Hall and Casey, with an attached note stating that Cashman would be reinstated in the Brotherhood if he killed Hall and Casey.

In this context, the evidence provided the jury with reasonable explanations for Chalue confiding in Kempton and Cashman and for Casey joining Hall and Chalue to bury evidence of a most heinous crime. *Bennett v. Lewis*, 2013 U.S. Dist. LEXIS 109113 (E.D. Cal. 2013). Further, the judge gave a limiting instruction on five separate occasions, advising the jury each time that affiliation in that

31

organization is not illegal, and that it cannot be considered as evidence of Chalue's bad character or criminal personality or his having committed the crimes charged, but can only be considered as it relates to the relationship between Chalue and witnesses in the case. Credibility was crucial to the resolution of this case, and the jury, as finder of fact and judge of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness's testimony. *United States v. Keys*, 899 F.2d 983, 987 (10th Cir. 1990). *See also United States v. Abel*, 469 U.S. 45 (1984); *Commonwealth v. John*, 442 Mass. 329 (2004). (51-57).

Additionally, the trial judge properly admitted into evidence photographs of sharp-bladed instruments and of anatomical drawings depicting human dissection and dismemberment, all seized from Veiovis's apartment, which proved that Veiovis, in the joint venture with Hall and Chalue, had the means and state of mind to dismember the victims. *Commonwealth v. Veiovis*, 477 Mass. 472 (2017). This evidence was most prejudicial to Veiovis, and its prejudicial value to Chalue paled in comparison to the strength of the Commonwealth's case against him. *Commonwealth v. Evans*, 438 Mass. 142 (2002). Further, the Commonwealth was not required to present direct evidence of which joint venturer actually inflicted the fatal wounds upon the victims. *Commonwealth v. James*, 424 Mass. 770 (1997). (57-60).

III.    The trial judge properly admitted into evidence statements Adam Hall made to Alexandra Ely and Rose Dawson, less than two day after the disappearance of Glasser, Chadwell, and Frampton, and describing their activities immediately before their suspicious disappearance, revealing the fact that Hall knew the men were missing days before the police learned this information. Hall made these statements intending to prevent Ely and Dawson from reporting to the police their knowledge of the joint venture to silence Glasser and to conceal evidence of the murders. As such, Hall made these statements to silence Ely and Dawson and to further the conspiracy. *Commonwealth v. Wood*, 469 Mass. 266 (2014). (60-65).

IV.    Contrary to Chalue's argument, the prosecutor did not misstate in his opening statement the evidence that he expected to present at trial, nor did he unfairly argue facts and reasonable inferences from those facts in his closing argument wherein he stated that Chalue acted as a lookout during the burial of the victims' remains and participated in the destruction or concealment of evidence. *Commonwealth v. Auclair*, 444 Mass. 348 (2005). (65-68).

V.    The trial judge properly denied Chalue's motion to suppress evidence seized by the police on Sunday, September 4, 2011, including Veiovis's Jeep and its contents, Hall's boots and socks, and the cellular telephones belonging to Hall, Chalue, and Veivis. The police had probable cause to believe that Adam Hall and

33

his companions had kidnapped Glasser, Frampton, and Chadwell during the hurricane, killed them, and disposed of their bodies. Glasser was scheduled to testify against Hall on September 19th. Hall had previously tried to eliminate or discredit Glasser as a witness against him by framing him for the crimes in New York. Hall's co-defendants in that case had turned against him, thereby giving Hall the motive to make his past words come true: "If [this scheme] doesn't work, then I'll just have him disappear." Glasser, Frampton, and Chadwell disappeared under the most suspicious of circumstances. Hall and his co-defendants demonstrated consciousness of guilt immediately after they learned that the police had visited Glasser's empty apartment on Wednesday, August 31st by disposing of evidence, conducting counter-surveillance of the police, and, most significantly, by returning to the State Forest early Sunday morning and abruptly departing upon discovering the police presence there. Therefore, police had probable cause to seize the Jeep and its contents, including Chalue's cell phone, and exigent circumstances merited the impoundment of these items to preserve evidence pending the execution of search warrants. *Commonwealth v. Gentile*, 437 Mass. 569 (2002). (78-84).

The appearance of Hall, Chalue, and Veiovis at the State Forest, where Hall's cell phone had been electronically tracked immediately before the last known contact with one of the missing men, and where the odor of decomposition had been reported, reasonably suggested that Hall and his co-defendants had

hidden evidence of the men's disappearance at the State Forest and that they returned either to conceal additional evidence or to retrieve items they believed would be discovered by the police during their search of the Forest. In addition to the telephone records linking Chalue's phone to Hall's during the time when the crime most likely occurred, police also knew that Hall was being contacted via cell phone by associates alerting him to the police presence at Glasser's apartment on August 31st. Therefore, the use of cell phones to further the joint venture by coordinating the crime and by concealing evidence made the simple fact that Hall, Chalue, and Veiovis all had cell phones in their possession on September 4th highly relevant evidence providing a nexus to the crime. *Commonwealth v. Arthur*, 94 Mass. App. Ct. 161 (2018). (84-86).

VI.   The Commonwealth presented a compelling case against Chalue, based largely upon the testimony of people who heard his incriminating admissions and observed his inculpatory conduct. The trial judge made fair rulings of law and the jury returned verdicts of first degree murder, by reason of deliberate premeditation and extreme atrocity and cruelty, well-founded in the record evidence. This Court should decline to exercise its plenary powers pursuant to G.L. c. 278, § 33E, and affirm Chalue's convictions. (86-87).

35

## ARGUMENT

I. **WHEN THE POLLING OF THE JURY REVEALED THAT ITS FIRST VERDICT WAS NOT UNANIMOUS, THE TRIAL JUDGE PROPERLY DIRECTED THE JURY TO RESUME ITS DELIBERATIONS WITHOUT DELIVERING ANY PART OF A *TUEY-RODRIQUEZ* CHARGE TO EITHER THE LONE IDENTIFIED DISSENTING JUROR OR THE ENTIRE JURY.**

The Defendant argues that the trial judge twice erred subsequent to the polling of the jury that revealed that the first juror polled did not agree with the verdicts announced by the clerk. First, he claims that the judge, despite receiving no indication from the jurors that they were deadlocked, provided the jury with a "dynamite charge" that coerced the sole identified minority juror into reconsidering her dissenting vote. (DB46-47). The Commonwealth contends that the judge did not provide any such type of "supplemental *Tuey-Rodriquez* charge" to the jury, but that he simply reminded the jurors that emotion, sympathy, passion, and prejudice play no role in their deliberations. Second, the Defendant claims that the judge, "singled out [the] lone minority juror for individualized questioning," including the delivery of a partial *Tuey-Rodriquez* charge that "improperly placed the weight of the court on her in an inherently coercive manner." (DB48-50). The Commonwealth contends that the judge did not deliver a partial *Tuey-Rodriquez* charge to the dissenting juror, but instead properly determined whether the juror was willing and able to resume deliberations with an open mind and without surrendering her feelings.

36

The Jury's Deliberations

The trial judge instructed the jury on Monday, May 12, 2014, and excused the jurors to commence their deliberations at 1:17 p.m. that afternoon. (TXIII/134). Deliberations continued until Thursday, May 15, when the jury reported at 3:00 p.m. that it had reached unanimous verdicts. (TXVIB/2).[7] The jury found the defendant guilty on all nine indictments charging murder, kidnapping and intimidation of a witness.

The court excused the jury and defense counsel belatedly requested individual polling of the jurors, which the court allowed. (TXVIB/2-10). The very first juror polled, in seat number one, reported that the verdicts read aloud by the court were not her verdicts. The judge immediately ceased the polling and excused the jury. (TXVIB/11). After a brief recess the judge announced to counsel that he would instruct the jury to resume deliberating until it reached a unanimous verdict. Defense counsel moved for a mistrial, which the court denied. Upon the return of

---

[7] The transcript of the events of May 15, 2014, is contained in two separate volumes generated by two court reporters. The volume labeled "XVI-Partial" records the proceedings from the beginning of the day through 2:28 p.m., omits the first reported verdict, and resumes recording at 6:14 p.m. when the court excuses the jurors for the evening. This volume will be identified herein as "(TXVIA/Page)." The recording of the first verdict at 3:00 p.m., the polling of the jury, and the sidebar discussion between the court and the dissenting juror appears in a 16-page volume simply labeled "Pages 1-16", and will be identified herein as "(TXVIB/Page)."

the jury to the courtroom the judge instructed the jurors to resume their deliberations and excused them at 3:25 p.m. (TXVIB/12-13).

Five minutes later the court announced to the parties that the juror in seat number one "is refusing to go into the jury deliberation room." (TXVIB/13). The judge explained to counsel how he intended to address this issue:

> My plan is to bring her in here and have a conversation with her in your presence at sidebar to make clear to her that she should not surrender any honestly held opinions about the facts of this case, on the other hand she should listen with an open mind and continue to deliberate with her fellow jurors in an effort to reach a unanimous verdict.

(TXVIB/13). Defense counsel renewed his motion for a mistrial and noted that the court "may not have enough information regarding the individual poll since we stopped after the first person." (TXVIB/14). The judge again denied the motion for a mistrial and refused to poll the remainder of the jury. (TXVIB/14).

The juror in seat number one came to sidebar where the court conducted the following brief exchange with her in the presence of the attorneys:

The Court:   Ms. Smith,[8] good afternoon.

The Juror:   Good afternoon.

---

[8] A pseudonym.

> The Court: Come closer, please. I just want to say a couple of things to you. First of all, I just want you to listen, I don't need you to say anything, okay?
>
> The Juror: Okay.
>
> The Court: As I instructed you before, if you have any honestly held feelings about the facts of this case, no one is suggesting that you surrender those feelings. On the other hand, it is important that you listen to your fellow jurors with an open mind and see if you can come to a unanimous decision. I'm going to ask that you return to deliberate with them. I know it might be difficult but it is important that you keep an open mind and listen, and again, it's important that you not surrender your feelings if convinced.
>
> The Juror: Okay.
>
> The Court: Can you do that?
>
> The Juror: Yes, sir.
>
> The Court: Thank you very much. You may be excused.

(TXVIB/14-15).

After the juror departed the courtroom, defense counsel stated that the court gave the juror a "limited *Tuey-Rodriquez* instruction" that all members of the jury should have received. The judge overruled the objection and explained that he spoke to the individual juror because she "was refusing to go into the jury deliberation room and even have a discussion with her fellow jurors." (TXVIB/16). Given these circumstances, the judge reasoned that it was "important that I have some conversation with her." (TXVIB/16). The jurors resumed their deliberations

until 6:15 p.m. that evening, when, in response to an inquiry from the court, the jurors indicated that they preferred to resume deliberations in the morning rather than continue that evening. (TXVIB/16;TXVIA/13).

The following day, Friday, May 16, 2014, before the jury entered the courtroom, defense counsel renewed his motion for a mistrial based upon the observed behavior of certain jurors, including the Foreperson slamming a book on his chair once Ms. Smith stated that she did not agree with the reported verdicts. (TXVII/4-5). The judge again denied the motion for a mistrial, stating that the jurors' reactions were not "so extreme as to warrant a mistrial" and that it was not unusual for members of the jury to react with frustration upon learning that the jury's verdicts were not unanimous. (TXVII/6). In response, defense counsel asked the court to include at the end of the first sentence in its supplemental instruction the words: "And when you were ordered to return today." The judge denied the request and explained that his instruction was to "articulate that I have recognized frustration and emotion." (TXVII/8-9).

After asking the jury the standard preliminary questions, the court advised the jurors as follows:

> Ladies and gentlemen, I know from my own observations of you yesterday, that some of you had an emotional reaction when the verdict was announced, when you were ordered to resume your deliberations after I determined that the verdict was not unanimous, and then again at the end of the day when I ordered you to return here today for continued deliberations.

You will recall that I earlier instructed you that emotion or sympathy, passion or prejudice, should play no role in your deliberations.

I urge you to follow that instruction and remove emotion from your deliberations in an effort to reach a unanimous verdict, if you can do so in good conscience.

Please try to be patient and respectful of the views of your fellow jurors as you work toward that end.

I now excuse you to continue your deliberations.

(TXVII/10-11). The jury resumed its deliberations at 9:26 a.m. on May 16th and returned to the courtroom with unanimous verdicts that day at 2:37 p.m. (TXVII/11).

The Standard of Review

Defense counsel objected to the court's actions, hence the alleged errors are preserved. Accordingly, this Court reviews the matters under the prejudicial error standard to determine whether the judge erred and, if so, whether this Court can be certain that the improper instruction "did not influence the jury, or had but very slight effect." *Commonwealth v. Flebotte*, 417 Mass. 348, 353 (1994). (DB41).

A. The Judge's Remarks Reminding The Jurors That Emotion, Sympathy, Passion, And Prejudice Should Play No Role In Their Deliberations Did Not Constitute A Dynamite Charge.

The Defendant argues that the judge provided the jury with a "dynamite charge" that coerced the sole identified minority juror into reconsidering her dissenting vote. (DB46-47). The Commonwealth contends that the judge did not

41

provide any such type of "supplemental *Tuey-Rodriquez* charge" to the jury, but that he simply reminded the jurors that emotion, sympathy, passion, and prejudice play no role in their deliberations and he encouraged all the jurors to be patient and respectful of the views of their fellow jurors.

"When instructing the jury, a judge must avoid language that may coerce the jury into reaching a verdict. *See Commonwealth v. Diaz*, 19 Mass. App. Ct. 29, 34 (1984). A judge crosses the line between enlightening the jurors' understanding and coercing them when he overcomes the will by the weight of his authority. . . . One instance of such coercion is insistence by the judge that a verdict be reached. *See Jenkins v. United States*, 380 U.S. 445, 446, 85 S. Ct. 1059, 13 L. Ed. 2d 957 (1965) (judge's statement, 'You have got to reach a decision in this case,' held coercive)." *Commonwealth v. O'Brien*, 65 Mass. App. Ct. 291, 294-295 (2005) (internal quotations and citations omitted). "Whether the jury are deadlocked, and whether the *Tuey-Rodriquez* charge should be given at a particular time, are matters that are addressed to the discretion of the trial judge." *Id.* at 295.

Contrary to the defendant's claim, the brief words spoken by the judge to the jury on the morning of May 16th were not a coercive "supplemental *Tuey-Rodriquez* charge." (DB47). The model *Tuey-Rodriquez* charge crafted by the

Supreme Judicial Court is ten sentences in length.[9] *Commonwealth v. Rodriquez*,

364 Mass. 87, 101-102 (1973). The charge primarily encourages a deadlocked jury

to deliberate with "proper regard and deference to the opinions of each other,"

advises the jurors that it is their "duty to decide the case," reminds the jurors that

the defendant is entitled to the benefit of the doubt, and counsels them to respect

each other's opinions. *Id*. More particularly, the model charge concludes by

exhorting the deadlocked jurors to consider whether any doubt that exists in their

minds is a reasonable doubt:

> But, in conferring together, you ought to pay proper respect to each
> other's opinions, and listen, with a disposition to be convinced, to each
> other's arguments. Thus, where there is disagreement, jurors for
> acquittal should consider whether a doubt in their own minds is a
> reasonable one, which makes no impression upon the minds of others,
> equally honest, equally intelligent with themselves, and who have
> heard the same evidence, with the same attention, with an equal desire
> to arrive at the truth, and under the sanction of the same oath. And, on
> the other hand, jurors for conviction ought seriously to ask
> themselves, whether they may not reasonably doubt the correctness of
> a judgment, which is not concurred in by others with whom they are
> associated; and distrust the weight or sufficiency of that evidence
> which fails to carry conviction to the minds of their fellows.

*Id*.

Here, by comparison, the judge's statement to the jury was only five

sentences in length advising the jurors to resume their deliberations without

emotion and to reach a unanimous verdict only in good conscience:

---

[9] The *Tuey-Rodriquez* charge appears in the Commonwealth's Appendix at
page 42.

You will recall that I earlier instructed you that emotion or sympathy, passion or prejudice, should play no role in your deliberations.

I urge you to follow that instruction and remove emotion from your deliberations in an effort to reach a unanimous verdict, if you can do so in good conscience.

Please try to be patient and respectful of the views of your fellow jurors as you work toward that end.

(TXVII/10-11).

The judge's encouragement to all jurors to be patient and respectful of the views of their fellow jurors cannot fairly be characterized as coercing the jury to return a final verdict. The judge made no mention of dissenting jurors acquiescing to the conclusions of fellow jurors, of the Commonwealth's burden of proof, or of any duty on the part of this jury to decide the case to a final verdict. The judge's words compare favorably with a jury charge criticized on appeal in *Commonwealth v. Mascolo*, 6 Mass. App. Ct. 266, 273 (1978), where the defendant claimed that that the trial judge's original instruction to the jury was "a coercive, 'premature and partial *Tuey-Rodriquez* charge." The Appeals Court rejected the defendant's claim and found "no indication of any such coercive potential in the judge's charge." *Id*. at 274. Specifically, the Appeals Court noted that "several coercive elements in the *Tuey* charge [were] absent from the charge before [the Court]," *Id*., including no reference to jurors holding a minority view or to the undesirability of a mistrial. *Id*. The Court further noted that "Tuey-type language is far less coercive

44

when included in the original instructions as opposed to supplemental instructions given to a deadlocked jury." *Id.* at 275.

Here, as in *Mascolo*, the trial judge did not include any such coercive language from the *Tuey-Rodriquez* charge in his simple statement encouraging the jurors to resume their deliberations without emotion and with respect for the opposing views of fellow jurors. These "supplemental instructions" merely repeated portions of the original charge:

> You may not be influenced by any bias or prejudice for or against the Commonwealth or the defendant. You're not to be swayed by personal likes or dislikes. Emotion or sympathy, passion or prejudice have no role in your deliberations.

(TXIII/87). Significantly, the judge did not repeat that portion of his original charge that instructed the jurors "not [to] hesitate to reassess or reexamine your views in light of the views of your fellow jurors who have seen and heard exactly the same evidence that you have." (TXIII/127). Had the judge voiced these words to the jury, which was not deadlocked, they "may have [had] an impermissibly coercive effect" upon the only identified dissenting juror. *O'Brien, supra* at 296. Likewise, by refusing to poll the entire panel, the judge commendably prevented the identification and isolation of any additional dissenting jurors. Therefore, because the judge did not deliver a *Tuey-Rodriquez* charge, "the concern that a departure from approved *Tuey-Rodriquez* language could have [had] an unintentional coercive effect is not applicable." *Id.*

45

B. The Trial Judge Did Not Give The Only-Identified Dissenting Juror A
*Tuey-Rodriquez* Charge Nor Did He Coerce The Juror Into Returning A
Verdict.

The Defendant argues that the judge, immediately after learning that the

dissenting juror refused to return to the jury room to resume deliberations, "singled

out [the] lone minority juror for individualized questioning," including the delivery

of a partial *Tuey-Rodriquez* charge that "improperly placed the weight of the court

on her in an inherently coercive manner." (DB48-50). The Commonwealth

contends that the judge did not deliver a partial *Tuey-Rodriquez* charge to the

dissenting juror, but instead properly determined whether the juror was willing and

able to resume deliberations with an open mind and without surrendering her

feelings.

Similar to the defendant's prior claim that the judge gave the entire jury a

partial *Tuey-Rodriquez* charge, the present claim also fails because the judge's

brief words to the dissenting juror did not amount to a "dynamite charge." Instead,

the judge merely assessed whether the juror was able to join the jury and resume

deliberations:

> The Court:   As I instructed you before, if you have any honestly held
> feelings about the facts of this case, no one is suggesting
> that you surrender those feelings. On the other hand, it is
> important that you listen to your fellow jurors with an
> open mind and see if you can come to a unanimous
> decision. **I'm going to ask that you return to
> deliberate with them.** I know it might be difficult but **it
> is important that you keep an open mind and listen,**

46

and again, **it's important that you not surrender your feelings if convinced**.

The Juror:    Okay.

The Court:    **Can you do that?**

The Juror:    Yes, sir.

The Court:    Thank you very much.  You may be excused.

(TXVIB/14-15) (emphasis added). As he did with his words to the entire jury, the judge made no mention of the dissenting juror acquiescing to the conclusions of her fellow jurors, of the Commonwealth's burden of proof, or of any duty on the part of this jury to decide the case to a final verdict.

"The judge was in the unique position to note the juror's demeanor, and nothing in the record leads us to conclude that his decision to retain her was clearly erroneous or an abuse of discretion." *Commonwealth v. Torres*, <u>453 Mass. 722, 735</u> (2009). In *Torres*, the trial judge received notes from the foreperson of the jury reporting that one of the jurors was unable to deliberate upon the evidence in a coherent or logical fashion. *Id.* at 725. The judge first addressed the full jury and, in part, urged each juror to state their opinion and listen to other jurors' opinions. *Id.* at 726, n.9. An hour after deliberations resumed, the judge received another note from the foreperson as well as a note from juror no. 14 that caused the judge to question the juror's ability to be impartial. *Id.* at 728. The judge conducted a sidebar colloquy with juror no. 14 regarding her ability to be impartial towards

47

police witnesses and her desire to leave the deliberations and go home. The prosecutor asked the court to remove the juror, and the judge declined to do so.

The judge in *Torres* instructed the jury to resume its deliberations, which soon resulted in the announcement of a guilty verdict. When polled by the court, juror no. 14 stated that her verdict was "not guilty." *Id.* at 730. The judge ordered the jury to resume deliberations and 30 minutes later the jury returned verdicts of guilty. The defendant claimed on appeal that by ordering the jury to continue deliberations, the judge likely caused juror no. 14 to vote "guilty" only to be able to go home. *Id.* at 736. The Supreme Judicial Court held that "the judge had questioned juror no. 14 specifically on whether her desire to go home would prevent her from deliberating fairly, and she confirmed that it would not. The judge was entitled to accept her representation." *Id.*

> That juror no. 14 eventually changed her vote from "not guilty" to "guilty" does not show that she "likely" did so merely to go home. We do not know what occurred in the jury room after the jury were sent back to resume their deliberations, nor did the judge make any post-verdict findings regarding juror no. 14. All we know about that final period of deliberations is that the judge was careful to avoid influencing the jurors' judgment . . . and that the jury deliberated for an additional one-half hour before returning with a unanimous verdict. The record thus reveals no facts regarding the jury's final one-half hour of deliberations to alter our conclusion that the judge properly exercised his discretion in denying the defendant's motion for a mistrial.

*Id.* at 737.

Here, as in *Torres*, the trial judge properly exercised his discretion when he determined that the dissenting juror was able and willing to return to the jury room to participate in deliberations. *See also Commonwealth v. Francis*, 432 Mass. 353, 369 (2000) (affirming trial judge's decision discharging juror for good cause based upon judge's "superior position to observe and assess the juror's demeanor on voir dire"). The judge properly admonished the juror not to disclose any content of the jury's deliberations and he strictly limited his inquiry to determine whether the juror was willing to resume deliberating upon the evidence. Further, unlike the faulty voir dire conducted by the Federal court in chambers without the presence of counsel in *United States v. Zabriskie*, 415 F.3d 1139 (10th Cir. 2005), here the superior court judge questioned the juror with counsel present at sidebar. *Cf. United States v. Collins*, 665 F.3d 454, 462 (2nd Cir. 2012) ("when a supplemental instruction is given ex parte, without first consulting counsel, it violates a defendant's right to be present"). Therefore, the defendant has failed to demonstrate any evidence that the judge coerced the dissenting juror into changing her verdict.

II.  **THE TRIAL COURT PROPERLY ADMITTED EVIDENCE OF CHALUE'S MEMBERSHIP IN THE ARYAN BROTHERHOOD TO SHOW THE CONTEXT OF HIS RELATIONSHIP WITH WITNESSES WHO WERE FELLOW MEMBERS OF THE BROTHERHOOD; AND OF VEIOVIS'S SHARP BLADED INSTRUMENTS AND ANATOMICAL DRAWINGS DEPICTING HUMAN DISSECTION AND AMPUTATION.**

Chalue argues that that trial court erroneously admitted (a) "substantial evidence" that he was a member of the Aryan Brotherhood, and (b) weapons and anatomical drawings seized from Veiovis's apartment. (DB56,63). Specifically, Chalue claims that his affiliation with the Brotherhood served no relevant purpose, but instead depicted him as having a propensity for violent crimes, including murder. (DB61). He further claims that Veiovis's weapons and drawings "constituted other bad act evidence" that impermissibly prejudiced him. (DB63,68). The Commonwealth contends that the court properly admitted evidence of Chalue's membership in the Aryan Brotherhood for the limited purpose of establishing the relationship Chalue had with witnesses who acted with him or in whom Chalue confided. Likewise, the court properly admitted into evidence photographs of the weapons and anatomical drawings seized from Veiovis's apartment to show that Chalue, acting together with Hall and Veiovis, had access to sharp-edged instruments consistent with the type used to torture and dismember the three victims.

The Standard of Review

Chalue objected to this evidence in pre-trial motions and at trial. Therefore,

the prejudicial error standard applies. "As with the substantial risk of a miscarriage

of justice test, the prejudicial error test calls for a comparative analysis of the

circumstances in a particular case." *Commonwealth v. Alphas*, 430 Mass. 8, 23

(1999). The Commonwealth bears the burden of showing the absence of error, and

the Commonwealth also bears the risk of doubt when any exists as to the error

being non-prejudicial. *Id.* The defendant, however, "assumes a heavy burden"

when challenging the trial court's evidentiary rulings:

> Evidentiary rulings on a motion in limine are "left to the sound
> discretion of the trial judge, and we review only for abuse of that
> discretion." … A party who "claims an abuse of that discretion
> assumes a heavy burden. That burden is not met by merely arguing
> that on a debatable question of admissibility the judge ruled against
> the defendant while another judge could and might have ruled in his
> favor."…Rather, the party must show that "no conscientious judge,
> acting intelligently, could honestly have taken the view expressed by
> him."

*Commonwealth v. Spencer*, 465 Mass. 32, 48 (2013) (internal citations omitted).

> A. Evidence of Chalue's Membership in the Aryan Brotherhood was Highly
> Relevant to the Jury's Assessment of the Credibility of Three Witnesses
> who Provided Highly Incriminating Evidence Against Chalue.

The Commonwealth offered evidence of Chalue's affiliation with the Aryan

Brotherhood "to support and corroborate the testimony of Cashman and Kempton,"

(TII/54), and to explain how Hall, when recruiting Casey to aid in burying the

51

victims' remains, used Chalue's membership in the Brotherhood to scare Casey
into completing his task and to assure him that if he did indeed cooperate
"everything will be okay." (TII/65). In this context, the evidence provided the jury
with reasonable explanations for Chalue confiding in Kempton and Cashman and
for Casey joining Hall and Chalue to bury evidence of a most heinous crime. *See*,
e.g., *Bennett v. Lewis*, 2013 U.S. Dist. LEXIS 109113 (E.D. Cal. 2013) ("such
evidence may be relevant to a witness's credibility by showing a fear of testifying
…or fear of retaliation").

Contrary to Chalue's claim that the Commonwealth introduced "substantial
evidence" that "pervaded the trial from start to finish," (DB56,61), that he was a
member of the Aryan Brotherhood, the jury heard only four witnesses - David
Casey, Jethro Kempton, Jeffrey Cashman and Detective Lieutenant David Foley -
mention his affiliation with the Brotherhood on less than two dozen occasions
during the trial. Casey testified only to Hall's introduction of Chalue as an Aryan
Brotherhood member[10] and to having concerns about repercussions from the Hell's

---

[10] In contrast to Hall's trial, the court here ruled that Casey was not permitted to
testify to the full introduction, which added, "You have to kill someone to become
a member. He's OK. You can trust him." (TII/64-67). The witnesses never
described what type of organization the Aryan Brotherhood was, nor, contrary to
the impression stated in the defendant's brief, did the jury hear any evidence that it
was a "notorious neo-Nazi prison gang and national crime syndicate known for its
white-supremacist ideology and for being responsible for a large percentage of
prison murders." (DB56).

Angels and the Aryan Brotherhood for revealing what he knew. (TVI/243,252).

Foley merely identified writings and symbols on items seized from the cells of

Chalue, Kempton and Cashman as related to the Aryan Brotherhood. (T5-9-

14PM/6-17).

Both Kempton and Cashman testified about their conversations with Chalue

concerning their membership in the Aryan Brotherhood and Chalue's intention to

assert dominance and control of the organization locally. (TXI/212-225; XII/56-

59). Cashman also testified about having been given a discovery packet from

Chalue that had the term "no good rat" written next to the names of Hall and

Casey, and attached a note which read:

> "Yeah, check out this novel on a bro's case. A quick read, but
> enjoyable read. Keep in mind the names of all of the rats in this case.
> I'm sure they will all be making their way up this way. And yes,
> they're all in the hat.

> "Listen, I'm willing to reinstate you, but I first have to know without a
> doubt, 100 percent, are you willing to give your life for this thing,
> because once you're in, there's no way out. That means making your
> bones when the time comes. Are you willing to do that? If so, let me
> know."

(TXIIAM/65). Cashman testified that "in the hat" meant chosen for mortal danger

by the Aryan Brotherhood, and "making your bones" signified full membership

entry into the Aryan Brotherhood by killing someone. (TXIIAM/63-68,70-72;

TEx389). The trial court properly ruled that this testimony was independently

53

relevant as evidence of Chalue's consciousness of guilt and intended witness intimidation. (TXIIAM/64-67).

"The judge took steps to minimize the prejudicial impact of this testimony." *Commonwealth v. Maldonado*, 429 Mass. 502, 505 (1999) (affirming the admissibility of gang affiliation evidence where the trial judge questioned prospective jurors as to whether evidence of gang involvement or affiliation would prevent them from rendering an impartial verdict and gave the jurors a lengthy limiting instruction regarding the use of evidence of gang affiliation). Here the trial court went to great lengths to ensure that any evidence the jury heard regarding the Aryan Brotherhood was limited in scope and kept to topics appropriately ruled relevant by the court. The court conducted an individual voir dire of the jurors, in which it asked: "There may be evidence in this case that one of the co-defendants, Mr. Hall, had some affiliation with the Hells Angels Motorcycle Club and that this defendant, Mr. Chalue, had some affiliation with an organization known as the Aryan Brotherhood. If you were to hear evidence of that type, would that prevent you from acting fairly and impartially?" (TI/28). Only jurors answering in the negative were declared impartial.

Additionally, the Court gave a limiting instruction on five separate occasions, advising the jury each time that affiliation in that organization is not illegal, and that it cannot be considered as evidence of Chalue's bad character or

criminal personality or his having committed the crimes charged, but can only be considered as it relates to the relationship between Chalue and witnesses in the case.[11] (TVI/243;TXI/213-214;TXI/246;T5/9PM/4;TXIII/4). The Court further reminded the jury of those instructions another six times. (TVI/269;XI/246; XII/41,53,146;XIII/16).

The trial court's limiting instruction compare favorably with one given by a federal district court judge presiding over a trial in which the defendant, a prison inmate, was charged with possessing a knife. *United States v. Keys*, 899 F.2d 983 (10th Cir. 1990). The government's theory was that the defendant had packed an envelope containing the knife into a pillowcase with his personal belongings. The defense countered that the defendant did not knowingly possess the weapon because another inmate had placed the knife in the envelope and left the envelope on his side of the jail cell. *Id.* at 985-986. Two inmates' testimony supported this defense. On cross-examination, the government asked the defendant about statements he had made to corrections officers boasting that he was a leading

---

[11] "Ladies and gentlemen, you have heard a limited amount of information about the so-called Aryan Brotherhood, and you are going to hear more from this witness. Please bear in mind that affiliation with any -- with that organization is not against the law, and you should not consider it as evidence of this defendant's criminal personality or bad character. You may consider it for a limited reason and that reason alone. That is, you may consider it to establish the relationship or as it relates to the relationship between this defendant and other witnesses in this case, including Mr. Kempton." (TXI/213-214).

member of a prison gang with sixty soldiers who would break the law for him. The

defendant denied making the statement, and the government called the officers as

rebuttal witnesses to testify that the defendant did make the statement. *Id*. The

Circuit Court of Appeals, noting that "credibility was crucial to resolution of this

case," ruled that the evidence of the defendant's gang affiliation was relevant to

show bias on the part of the defense witnesses, who may have fabricated their

testimony due to fear of the defendant. *Id*. at 987. The Circuit Court cited the

Supreme Court's holding that "'proof of bias is almost always relevant because ***the***

***jury***, ***as finder of fact and weigher of credibility***, has historically been entitled to

assess all evidence which might bear on the accuracy and truth of a witness'

testimony.'" *Id*., quoting *United States v. Abel*, 469 U.S. 45, 52 (1984) (holding

that evidence of gang affiliation is relevant to show bias). (emphasis added). The

Circuit Court further noted that the district court properly limited the jury's

consideration of the evidence for the purpose of evaluating the credibility of the

other witnesses.[12] *Id*. at 988.

---

[12] The district court instructed the jury as follows: "Ladies and Gentlemen, in regard to [officer Eisenhour's] testimony, it is only being admitted -- [Keys is] not on trial for being a member of a gang. As you know, he's on trial in regard to possession of a weapon. But, this testimony is admitted only so far as you may consider it relevant as to the credibility of other witnesses that have testified in the case." *United States v. Keys*, 899 F.2d at 986.

Here, where credibility was also crucial to resolution of the case, the jury

was entitled to hear and assess the limited evidence of Chalue's affiliation with the

Aryan Brotherhood that largely explained his relationship with Kempton and

Cashman and explained why he would trust them enough to confide the details of

his heinous crimes. The trial judge, after great consideration of the parties'

arguments in support of and against the admissibility of the evidence, properly

limited the Commonwealth's use of the evidence. Therefore, the "instruction and

the voir dire questioning that preceded it satisfactorily fulfilled the judge's

responsibility to minimize the prejudicial effect that gang evidence might have had

on the jury." *Commonwealth v. John*, 442 Mass. 329, 337-338 (2004).

    B. Chalue Did Not Suffer Substantial Prejudice as a Result of The
       Admission of Photographs of Sharp Bladed Instruments and of
       Anatomical Drawings Depicting Human Dismemberment, All Seized
       from Veiovis's Apartment, that Proved that Veiovis, in a Joint Venture
       with Hall and Chalue, Had the Means and State of Mind to Dismember
       the Victims.

Chalue argues that evidence seized from Veiovis's apartment, consisting of

photographs of a machete, a meat cleaver, hatchets, and various knives, and

anatomical drawings depicting human dismemberment, despite being relevant and

admissible against Veiovis at Veiovis's trial, *see Commonwealth v. Veiovis*, 477

Mass. 472 (2017), was not relevant and unfairly prejudicial at Chalue's trial.

Specifically, Chalue claims that because some of the weapons "could not have

been used" to injure and dismember the victims, (DB65), and because he did not

share or have knowledge of Veiovis's fascination with amputation and human dissection, (DB67), the court erred by admitting the evidence that only showed that Chalue had a propensity to violence. The Commonwealth contends that this evidence not only identified Veiovis as being a joint venturer with Hall and Chalue in the murder and dismemberment of the victims, which the Supreme Judicial Court described as "one of the extraordinary features of these killings," *id.* at 484, but also demonstrated that Chalue had access to the type of weapons used to torture and dismember the victims. This evidence was most prejudicial to Veiovis, not to Chalue, and its prejudicial value to Chalue paled in comparison to the strength of the Commonwealth's case against him.[13]

The sharp implements seized from Veiovis's apartment were highly relevant evidence of Veiovis's, - and, via the Commonwealth's theory of joint venture, of Hall's and Chalue's – possession of the means to commit the "extraordinary" violence upon the three victims. "Evidence of a defendant's possession of the means to commit a crime within a reasonable time of the crime charged is admissible without proof that that particular means was in fact the one used." *Commonwealth v. Evans*, 438 Mass. 142, 151 (2002). *See also Commonwealth v. O'Toole*, 326 Mass. 35, 39 (1950) ("[I]t is commonly competent to show the

---

[13] The Commonwealth notes that the prosecutor did not mention the weapons or the drawings in his opening statement or closing argument, thereby further diminishing the risk of unfair prejudice to Chalue.

possession by a defendant of an instrument capable of being used in the commission of the crime, without direct proof that that particular instrument was in fact the one used.").

In *Evans*, the Supreme Judicial Court upheld the admission into evidence of a mask seized from the co-defendant ("Ware") that had no connection to the armed robbery and murder of one man and the armed assault with the intent to rob of another committed by Evans and Ware together. Evans claimed that the mask "created unfair prejudice that spilled over into his case." *Id.* at 152. The Court held that the mask showed that Ware had the intent and means to commit robbery, and that "a claim of spillover prejudice from the evidence offered against a codefendant requires a showing of substantial prejudice." *Id.* Evans failed to sustain his burden because "any prejudice from the mask paled in comparison to the strength of the Commonwealth's case against Evans." *Id.*

Here, as in *Evans*, Chalue has failed to sustain his burden to prove that he suffered substantial prejudice from the admission into evidence of the weapons and drawings discovered in Veiovis's apartment. The Commonwealth's case against Chalue was compelling and based in no small part upon Chalue's jailhouse conversations describing specific facts of the abduction, torture, murder, dismemberment, and burial of the victims. The fact that the sharp implements were all found in Veiovis's apartment and that the Commonwealth could not prove that

59

any one of them was actually used to kill or maim the victims did not diminish their relevancy at Chalue's trial. In addition to proving that Veiovis possessed the means of committing the crimes, the weapons also proved Chalue's culpability in these crimes. "The Commonwealth proceeded against [Chalue] on a theory of joint venture. To establish his culpability, the Commonwealth was not required to present direct evidence of who actually inflicted the fatal wounds." *Commonwealth v. James*, 424 Mass. 770, 779 n.17 (1997). Likewise, the anatomical drawings depicting dismemberment and human dissection served the same relevant function in Chalue's trial as in Veiovis's trial:  Veiovis's "apparent fascination with amputation and human dismemberment offer[ed] an explanation for what would otherwise be inexplicable." *Veiovis, supra* at 485.

III. THE TRIAL COURT PROPERLY ADMITTED HALL'S REMARKS TO ALEXANDRA ELY AND ROSE DAWSON, MADE LESS THAN TWO DAYS AFTER THE MURDERS, REVEALING THE FACT THAT GLASSER, CHADWELL, AND FRAMPTON WERE MISSING AND DESCRIBING THEIR ACTIVITIES WHEN HALL, VEIOVIS AND CHALUE KIDNAPPED THEM, BECAUSE THEY WERE STATEMENTS MADE IN FURTHERANCE OF THE CONSPIRACY.

Chalue argues that the trial court erred by admitting into evidence Hall's statements to Alexandra Ely and Rose Dawson, made on August 29, 2011, remarking that Glasser and two of his friends had gone missing and describing the men's' activities immediately prior to their disappearance. (DB68-69). Specifically, Chalue claims that these statements were inadmissible hearsay

because they were not made in furtherance of the joint venture. The

Commonwealth contends that Hall made these remarks to Ely and Dawson to

prevent them from reporting to the police their knowledge of the joint venture to

silence Glasser and to conceal evidence of the murders. Therefore, Hall made the

statements intending to silence Ely and Dawson to further the conspiracy.

The Standard of Review

Chalue objected to this evidence in pre-trial motions and at trial. Therefore,

the prejudicial error standard applies. "As with the substantial risk of a miscarriage

of justice test, the prejudicial error test calls for a comparative analysis of the

circumstances in a particular case." *See Commonwealth v. Alphas*, *supra*.

"A hearsay statement by one codefendant is admissible against another,

absent testimony by the codefendant, if there is independent evidence of the

existence of a joint venture and the statement was made during and in furtherance

of that joint venture. … Statements made to conceal a joint venture are considered

to be in furtherance of the joint venture and, therefore, are admissible against all of

the joint venturers." *Commonwealth v. DePina*, 476 Mass. 614, 625 (2017).

Hall made the incriminating statements to Ely and Dawson on Monday,

August 29, 2011, prior to the time when the police discovered that Glasser and his

friends were missing. Ely testified that Hall and Dawson used a hose to clean the

interior and exterior of Hall's purple Hyundai at the Madison Avenue residence.

Chalue was present, together with Karen Sutton and others. (TVI/55-56). Hall

mentioned that Glasser was missing. (TVI/56, 62). Dawson testified that the water

used to clean the car was "nasty." (TVI/119). Afterwards, Hall stated to several

people on the porch of the residence that "that guy and two of his friends were

missing." (TVI/120). Hall then told Dawson what the men were doing when they

disappeared: "one of them was fixing the computer, one was laying on the couch,

and one was sitting in front of the couch playing video games." (TVI/121). Later

that evening Ely and Dawson accompanied Hall and Chalue to the Hell's Angels

clubhouse. (TVI/121-122). Hall and Chalue joked and laughed and Chalue chased

Hall, holding his hand out as if he had a gun, as Hall cried "Help me, help me…"

and "he had to watch." (TVI/62-67,122-134).

Hall's remarks to Ely and Dawson revealing that he knew not only Glasser

and his friends were missing, but also what the men were doing immediately prior

to their disappearance was highly relevant and admissible at Chalue's trial. The

statements were highly incriminating because at the time Hall uttered them the fact

that Glasser, Chadwell, and Frampton were missing was not public knowledge.

Hall made these statements shortly after he and Dawson, in view of Ely, scoured

the purple Hyundai, inside and out. Hall and Chalue later at the clubhouse, in front

of Ely and Dawson, re-enacted what can be reasonably inferred was a portion of

the violence they inflicted upon Glasser and his friends. Given this context, Hall's

remarks to Ely and Dawson, revealing highly incriminating information about both himself and Chalue, were, as the Commonwealth argued at sidebar, delivered as a tactic to draw Ely and Dawson into the conspiracy in an attempt to "buy [their] silence." (TVI/58).

The Supreme Judicial Court found this same type of evidence admissible in a murder trial wherein two men – Wood and Butler – fatally slit the throat of one victim ("Tripp") and shot another victim ("Thompson") in the face during a "botched kidnapping and robbery attempt." *Commonwealth v. Wood*, 469 Mass. 266, 268 (2014). In *Wood*, the Commonwealth tried the co-defendants together in a cased based largely upon the testimony of the surviving victim Thompson and of Butler's former roommate and girlfriend ("DaSilva"). *Id.* On appeal, Wood argued that the judge erred by allowing DaSilva to testify about statements Wood made to Butler, which Butler repeated to DaSilva, and statements made by Butler to DaSilva days later. *Id.* at 278-279. Specifically, DaSilva testified that Butler told her that Wood took Tripp's ATM card and threatened to slit her throat if he did not get any money from her bank account. Butler said that Wood did indeed slit Tripp's throat when he failed to obtain money. Later, Butler told DaSilva that he and Wood burned Thompson's automobile. *Id.* at 279. The Supreme Judicial Court observed that "what Butler told DaSilva may have been part of his effort to frighten her into silence." *Id.* at 272 n.12. The Court, noting that Wood and Butler

63

had concealed evidence immediately before Butler made the statements, rejected Wood's claim that "the joint venture had ended before Butler's statements were made." *Id*. at 280. Further, the Court found that "the jury could have concluded that Butler was attempting to frighten DaSilva and ensure that she did not speak to the police, given that she was one of only two people who could implicate him in the murder." *Id*. at 281.

Here, as in *Wood*, the trial judge "was warranted in ruling that [Hall's] statement[s] [were] made to protect, and hence to further, the purpose of the conspiracy." *Commonwealth v. Beckett*, 373 Mass. 329, 340 (1977) (one joint venturer making statement to encourage another not to speak to police supports a finding that the statement was made in furtherance of the joint venture). In fact, Hall later cautioned Dawson "not to talk to the police or [you]'ll regret it," but instead used Dawson funnel misleading information to investigators. (TVI/150-152). The trial judge reasonably concluded that Hall, as argued by the Commonwealth, shared the incriminating statements with Ely and Dawson with the intent to involve them in the conspiracy so that if the police asked questions of them, they would deny any knowledge out of fear of being charged with being members of the conspiracy. (TVI/60). As such, Hall did indeed make his statements to Ely and Dawson revealing the facts and circumstances of the

64

disappearance of Glasser and his two friends with the intent to further the joint venture.

IV.   IN HIS OPENING STATEMENT, THE PROSECUTOR PROPERLY
       SUMMARIZED THE EVIDENCE HE REASONABLY
       ANTICIPATED TO PROVE AT TRIAL, AND IN HIS CLOSING
       ARGUMENT HE ARGUED FACTS IN THE TRIAL RECORD AND
       FAIR INFERENCES FROM THOSE FACTS.

Chalue argues that the prosecutor improperly misstated evidence, implied

that Chalue intended to kill a witness, and used bad act evidence to argue that he

had a criminal propensity, thereby necessitating a new trial. (DB73). The

Commonwealth contends that the prosecutor relied upon facts established in the

trial and reasonable inferences drawn from those facts, and that any misstatement

of the evidence was minor and did not prejudice Chalue.

"The proper function of an opening is to outline in a general way the nature

of the case which the counsel expects to be able to prove or support by evidence.

The prosecutor's expectation must be reasonable and grounded in good faith.

Absent a showing of bad faith or prejudice . . . the fact that certain evidence fails to

materialize is not a ground for reversal. Where, as here, defense counsel did not

object to the statements, we review to determine whether any misconduct created a

substantial likelihood of a miscarriage of justice." *Commonwealth v. Sylvia*, 456

Mass. 182, 188 (2010) (internal quotations and citations omitted).

Remarks made during closing arguments are considered on appeal in the context of the entire argument, in light of the judge's instructions to the jury, and in view of the evidence presented at trial. *Commonwealth v. Whitman*, 453 Mass. 331, 343 (2009). "The prosecutor has a particular obligation not only to argue the Commonwealth's case forcefully and aggressively, but also to do so in a way that states the evidence clearly and fairly and inspires confidence that the verdict was reached based on the evidence rather than sympathy for the victim . . . ." *Commonwealth v. Santiago*, 425 Mass. 491, 494 (1997). Prosecutors are entitled to argue theories supported by the evidence and the reasonable and possible inferences from the evidence. *Commonwealth v. Auclair*, 444 Mass. 348, 359 (2005), citing *Commonwealth v. Kozec*, 399 Mass. 514, 516 (1987). The inferences drawn from the evidence need not be necessary and inescapable, only reasonable and possible. *Commonwealth v. Jones*, 432 Mass. 623, 629 (2000). Where counsel objects to the prosecutor's closing argument, the standard of review is prejudicial error. *Commonwealth v. Brown*, 477 Mass. 805, 818 (2017).

Contrary to the defendant's argument, the prosecutor did not misstate the expected evidence in his opening statement to the jury or the elicited evidence in closing. It was a fair inference to state that Chalue acted as a lookout during the burial of the victims' remains, (DB75), since Chalue told Jeffrey Cashman that he waited at the foot of Cole's driveway, (TXII/85-86), and his location was

66

corroborated by FBI Special Agent Perry. (TX/160-169). It was a further fair inference that Chalue was on the alert for the return of Cole, since Hall and Casey had already checked to see whether he was home, which Casey testified was out of a concern for Cole's safety. (TVI/244).

It was also a fair inference to claim that Chalue and Hall had burned clothing at the Hell's Angel's clubhouse, (DB76), when, shortly thereafter, both participated in further disposing of evidence at the bridge in Lee. (TVII/126-128,136;XII/87-88;TEx138,140-144,152-167).

Although the prosecutor mistakenly indicated in his opening statement that Chalue, rather than Hall, had procured guns in Lenox, (DB77;TIII/34), the prosecutor correctly identified Hall as getting the guns shortly before the mistake, (TIII/32), and promptly corrected himself with a more detailed and accurate description of the circumstances. (TIII/46). Defense counsel clearly pointed out this mistake in his own opening statement. (TIII/62).

The prosecutor's isolated mention of the Aryan Brotherhood in his closing argument was fairly based upon evidence demonstrating that Chalue had made clear his intentions to run the Aryan Brotherhood locally, (TXI/56-59,64-65; XII/212-230), and had told Cashman that he considered Hall to be a "big dummy, goofball, idiot…" and that "he was just using [Hall…]," (TXII/76-77), thereby

67

raising the clear inference that Chalue was far more than a mere accomplice in the murders.

Not only were these statements fair inferences based upon expected and elicited evidence, they were but pieces of a strong case demonstrating Chalue's guilt, especially his own admissions to his participation in the heinous crimes. (TXI/232-244;XII/75-88).

## V.   THE TRIAL JUDGE PROPERLY DENIED CHALUE'S MOTION TO SUPPRESS EVIDENCE.

Chalue argues that the trial judge erred by denying his motion to suppress his cellular telephone seized by police at the BP gas station on Sunday morning, September 4th, when officers impounded Veiovis's Jeep and its contents, Hall's boots and socks, and the cellular telephones belonging to Hall, Chalue, and Veiovis. Chalue specifically claims that the police lacked reasonable suspicion to detain him, probable cause to seize him, and probable cause to seize his phone. (DB87). The Commonwealth contends that the trial judge properly found that the police had compelling evidence linking Hall, Chalue, and Veiovis to the highly-suspicious disappearance of Glasser, Chadwell, and Frampton, and that the events on the morning of Sunday, September 4th - including Hall abruptly reversing direction upon driving into the scene of the search of the State Forest and the three suspects' subsequent evasive answers to simple questions asked by investigators - provided probable cause to impound the evidence, including Chalue's cell phone

that had been contacted by Hall's cell phone the morning of the 28th, for preservation prior to obtaining search warrants.

1. The Standard of Review

"In reviewing a ruling on a motion to suppress evidence, we accept the judge's subsidiary findings of fact absent clear error. The weight and credibility to be given testimony is for the judge. *See Commonwealth v. Yesilciman*, 406 Mass. 736, 743 (1990), and cases cited. 'We give substantial deference to the judge's ultimate findings and conclusions of law, "but independently review[] the correctness of the judge's application of constitutional principles to the facts found."' *Commonwealth v. Eckert*, 431 Mass. 591, 593 (2000), quoting *Commonwealth v. Magee*, 423 Mass. 381, 384 (1996)." *Commonwealth v. Gentile*, 437 Mass. 569, 573 (2002).

2. Facts Found By The Court At The Motion To Suppress Evidence.

The trial judge made the following factual findings that he included in his written decision denying Chalue's motion to suppress evidence. (R.67-77).[14] These

---

[14] The full text of the judge's memorandum and decision on Chalue's motion to suppress evidence seized on September 4, 2011, appears in the Commonwealth's Appendix at page 31.

facts, and others established at the evidentiary hearing,[15] support the impoundment
of Veiovis's Jeep and its contents, including Chalue's cell phone:

### A. Hall's relationship to David Glasser:

1. Glasser was scheduled to testify against Hall in a kidnapping case
   scheduled for trial in Berkshire Superior Court on September 19, 2011.

2. The 2010 kidnapping was orchestrated by Hall to discredit Glasser as a
   witness against him in a 2009 case scheduled for trial in which Hall was
   charged with beating Glasser with a baseball bat. If the scheme did not
   work, Hall told Nicole Brooks that "I'll just have him disappear."

3. In the 2009 case, Hall threatened to have Glasser killed in jail if he
   implicated Hall.

### B. The Disappearance of Glasser, Frampton and Chadwell:

- Lisa Archambeault last saw Glasser outside his apartment at 254 Linden
  Street, Pittsfield, at 10:00 PM on Saturday, August 27, 2011.

- Chadwell, a friend staying with Glasser, made a phone call to Willie
  Haywood at 11:30 PM. This was the last time that Haywood heard from
  Chadwell. (10/11/2013,122).

- Archambeault noted that Glasser's pickup truck was blocking the
  driveway Sunday morning, nobody was inside the apartment, and the TV
  was on.

- John Barton, a friend of Frampton, entered Glasser's apartment through
  an unlocked door Sunday afternoon and found no one present, which he
  thought was unusual. Using an address book he found on the kitchen
  table, Barton made a phone call and one of the cell phones in the living
  room rang. (10/11/2013,126-127).

---

[15] Additional facts not specifically included in the judge's findings, but established
by the Commonwealth at the hearing, will be followed by citations to the Date and
Page of the hearing transcript as "(10/11/2013,page)."

- Frampton, Glasser's roommate, missed an appointment on Monday. A social worker knocked on door and received no answer. The social worker visited the apartment again on Tuesday, entered through an unlocked door, and noted nothing awry, but thought it odd that Frampton would leave without arranging care for his cat. The worker filed a missing person report with Pittsfield police.

- Pittsfield police officers visited the apartment on Wednesday, August 31, and find wallets, cell phones, and medications.

## C. The Development of Hall, Chalue and Veiovis as Suspects in the Disappearance of Glasser, Chadwell, and Frampton.

- Hall told Edward Sutton on Tuesday, August 30, that the "witness" had disappeared and that it was "too bad."

- Brittany Breault reported that Hall asked her if Chalue could shower at her house the day after the storm.

- Hall received cell phone messages or calls from Rose Dawson and Steven Hinman shortly after police arrived at Glasser's apartment on August 31.

- Shortly thereafter, a vehicle matching Hall's Hyundai was observed driving into Lenoxdale from the direction of the Hell's Angels clubhouse in Lee and parking on the Mill Street Bridge. A man fitting Hall's description threw shoes, socks, other clothing, a bag and a box into the river.

- State police officers identified Hall, Chalue, and Ocean Sutton when responding at the Blandford Toll Plaza on the Massachusetts Turnpike at 12:30 AM on September 2, 2011. Chalue produced a Florida driver's license. A fourth person in Hall's party was not identified. (10/11/2013,202-203).

- The Hampden County Sheriff's Department discovered that Chalue had been incarcerated at the Ludlow facility the same time Hall was an inmate there. Frank Ott of the Sheriff's Department forwarded

information concerning Chalue's identity to Officer Todd Briggs on
September 2.

- A search of the river on September 3 revealed a portion of a Wal-Mart
  box for a pair of size 11 camouflage Herman Survivor boots. Video
  surveillance revealed Hall purchasing a pair of boots on Monday, August
  29, while accompanied by Chalue.

- Edward Sutton reported that Hall had been "hanging out" in the past
  week with a man named "Davey," who was in the Aryan Brotherhood,
  and a man called "Trash," who drove a Jeep.

- Sutton also said that Hall had a gold Buick and a purple Hyundai Elantra,
  both with Vermont license plates. Breault reported that Hall was at the
  house on September 1 with the Hyundai and that Hall had scrapped the
  Buick.

- On Friday, September 2, State Police detectives discovered Veiovis and
  Eric Fox, both wearing Hell's Angels support gear, conducting counter-
  surveillance of the parking lot containing vehicles for the District
  Attorney's Office and the State Police Detective Unit investigating the
  disappearance of Glasser, Frampton, and Chadwell. Two days earlier,
  Marcia Disbrow had observed similar conduct in a parking garage across
  the street from the District Attorney's parking lot by two men driving a
  purple Elantra registered in Vermont to Hall, but to a different vehicle, a
  gold Buick.

- Leslie Chadwell reported that A.J. Johnston, a friend of Glasser, told him
  that he had been approached several weeks earlier by someone wearing
  Hell's Angels clothing. This person told Johnston to tell Glasser that
  Glasser needed to change his story.

- The FBI, using an emergency subpoena to obtain location information for
  Hall's cellular telephone, obtained records showing that calls involving
  Hall's phone emanated from the area of the Pittsfield State Forest
  between 10:41 PM on Saturday, August 27, and 1:12 AM on Sunday,
  August 28.

- These records showed that there was a "three-way call" involving Hall and Chalue's phone on the morning of Sunday, August 28.

- On Saturday, September 3, State Forest rangers reported detecting the smell of decomposition in the State Forest in an area off of Potter Mountain Road near the Pittsfield-Lanesborough line.

## D. The appearance of Hall, Veiovis, and Chalue at the Pittsfield State Forest on Sunday morning, September 4.

- Police officers conducting a search of the Pittsfield State Forest on the morning of Sunday, September 4, observed a black Jeep drive up Potter Mountain Road to a point within sight of the search area. The Jeep abruptly turned around and drove away.

- Shortly thereafter, Lanesborough Police Officer Timothy Sorrell reported that while he was at Sayers' Junk Yard viewing surveillance video of vehicular traffic on Potter Mountain Road, an employee of Sayers' alerted him to the fact that Hall just drove by the junkyard in a black Jeep Wrangler. Surveillance video recorded the Jeep going up Potter Mountain Road at 11:07 AM, and coming down the road at 11:08 AM.

- State Police Trooper Michael Goonan and Pittsfield Police Officer John Mazzeo left the State Forest to locate the Jeep.

- At 11:25 AM the officers observed the Jeep near the intersection of Pecks Road and Wahconah Street headed towards downtown Pittsfield. The officers followed the Jeep into a BP gas station where the Jeep parked at the gas pumps.

- State Police Captain Richard Smith ordered Goonan not to block the Jeep or use any emergency lights or sirens to stop the vehicle. Smith testified that he wanted the officers to make a "soft contact" with the occupants of the Jeep and have a conversation with them. (10/11/13,185).

- The officers immediately identified Hall as the driver of the Jeep. The front seat passenger –Veiovis - fit the description of a man named "Trash" who was a suspect in the kidnapping and disappearance of the three men. The third person – Chalue – fit either Edward Sutton's or

Britney Breault's description of the man named "Davey," was in the rear well of the Jeep where there rear seat had been removed. Veiovis left the Jeep to go to the gas station's store and he returned to the Jeep to pump gas.

**E. Hall, Chalue, and Veiovis provide evasive answers to officers' initial questions**.

- Officers engaged Hall and Chalue in conversation, asking what they were doing. When asked his name, Chalue pointed to Hall and said, "just his friend."

- When asked who owned the Jeep, Chalue shrugged his shoulders and Hall said it was his friend's. When asked who his friend was, Hall just smiled.

- Hall asked the officers if he and his friends were free to go. The officers told him to stay because a couple of other officers were on their way to the gas station to speak with them.

- When advised that the other officers would be asking him questions, Hall replied that "whatever they wanted to know, [I] already forgot."

- When Veiovis arrived back at the Jeep, officers asked him his name. He pointed to Hall and said, "I'm with him."

- Additional officers arrived at the gas station and asked Hall, Chalue, and Veiovis to get out of the Jeep. A pat-frisk of the three men revealed nothing other than a large folding knife on Veiovis.

**F. Captain Smith's impoundment of Veiovis's Jeep and its contents, Hall's boots, and the three men's cell phones at the gas station**.

- At 11:40 AM, investigators obtained and delivered to the officers at the gas station surveillance photographs from Wal-Mart showing Hall and Chalue purchasing size 11 Herman Survivor boots on Monday, August 29, at 9:06 PM. (10/11/2013,164-167).

- Captain Smith advised Hall at approximately 12:10 PM that he was not under arrest and was free to leave. Hall indicated that he understood.

- Smith noticed that Hall was wearing boots that appeared to be new. He asked Hall what size they were and Hall replied "eleven."

- Smith decided to seize Hall's boots and socks, the Jeep and its contents, and the three men's cell phones in anticipation of obtaining search warrants. Hall removed his boots and socks.

- Police obtained search warrants on September 7th and 10th for the items seized by the police, including the Jeep and Chalue's cell phone

## G. Hall's Statements.

- Captain Smith asked Hall where he was the night of the hurricane and Hall replied "If you want to know who I was with, you can call my lawyer."

- Hall continued speaking without being questioned. He stated, among other things, that he knows what the whole thing is all about, that everyone does, it was obvious to him what had happened and what was going on, the police know about it and "even the kid across the street on the bike knows it."

- Smith asked Hall who "everyone" was and Hall replied that it was not his job to help the police figure it out.

- Smith again asked Hall who he was talking about, and Hall replied: "you know who I am and what we do."

## 3. Discussion

Chalue initially argues that the police lacked probable cause to stop and seize him. (DB89). This argument is flawed in two respects. First, reasonable suspicion, not probable cause, is required to conduct a threshold inquiry. Second,

75

the police never stopped the Jeep in any sense of the word. Instead, Trooper Goonan and Officer Mazzeo merely followed the Jeep, without signaling it to pull over, into the gas station on Wahconah Street where Hall stopped the Jeep at the gas pumps to get gas. The officers parked their vehicle on the opposite side of the gas pumps from the Jeep. (10/28/2013,127). As such, the officers did not stop or seize the Jeep and its occupants, but they merely encountered it and they need not justify their actions based upon reasonable suspicion.

It is well-settled that "not every encounter between a law enforcement official and a member of the public constitutes an intrusion of constitutional dimensions requiring justification." *Commonwealth v. Stoute*, 422 Mass. 782, 789 (1996). "[T]he police do not effect a seizure merely by asking questions unless the circumstances of the encounter are sufficiently intimidating that a reasonable person would believe he was not free to turn his back on his interrogator and walk away." *Commonwealth v. Fraser*, 410 Mass. 541, 544 (1991). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Commonwealth v. Thinh Van Cao*, 419 Mass. 383, 388 n.7, cert. denied, 515 U.S. 1146, 115 S. Ct. 2588, 132 L. Ed. 2d 836 (1995), quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). *See Commonwealth v. Lopez*, 451 Mass. 608, 611 (2008).

Recently, the Supreme Judicial Court reexamined how the Commonwealth

determines whether a person has been stopped in the constitutional sense.

> A review of our case law reveals that rather than focusing primarily
> on whether a reasonable person would have believed that he or she
> was free to leave, we look at the totality of the circumstances to
> determine whether a member of law enforcement has "engaged in
> some show of authority" that a reasonable person would consider
> coercive; that is, behavior "which could be expected to command
> compliance, beyond simply identifying [him-or herself] as police." ...

> Thus, rather than attempting to determine whether a reasonable person
> would believe he or she was free to leave, in our view, *the more
> pertinent question is whether an officer has, through words or
> conduct, objectively communicated that the officer would use his or
> her police power to coerce that person to stay*. ...

> The question whether one believes he or she is free to walk away from
> a police encounter, as compared to whether one believes he or she
> would be coerced to stay, is not a distinction without a difference.
> Police officers are free to make noncoercive inquiries of anyone they
> wish. ... [A]lthough not legally obligated, few civilians feel as if they
> could discontinue an encounter with a law enforcement officer, let
> alone ignore an inquiry from one. Indeed, the police depend on a
> degree of civilian compliance to maintain public safety and carry out
> criminal investigations. ... In short, because, in most situations, a
> reasonable person would not believe that he or she was free to leave
> during a police encounter, using that standard does not produce the
> information necessary to determine whether a seizure has occurred.
> *Rather, the inquiry must be whether, in the circumstances, a
> reasonable person would believe that an officer would compel him
> or her to stay*. (emphasis added, internal citations omitted).

*Commonwealth v. Matta*, 483 Mass. 357, 362-363 (2019) (holding that police

officer's initial statement to defendant, "Hey, come here for a second," did not

seize the defendant).

Here, the totality of the circumstances reveal that a reasonable person would not have believed that Trooper Goonan and Officer Mazzeo would have compelled Hall, Chalue, and Veiovis to remain at the gas station had they attempted to leave. Although Goonan and Mazzeo advised Hall to remain until additional officers arrived to question them, nothing suggested that Goonan and Mazzeo would have compelled the suspects to stay. First, Hall and his friends were in public view putting gasoline into their Jeep when the officers parked their vehicle on the opposite side of the gas pumps and approached the Jeep without displaying their weapons, thereby not displaying any show of force. Second, when Captain Smith arrived he immediately told Hall that he was not under arrest and was free to leave. Third, the evasive behavior of Hall, Chalue, and Veiovis demonstrated that they felt at ease challenging the officers' simple questions that merely sought to identify the men. Therefore, the encounter between the police and the three suspects did not violate any constitutional protections.

Chalue next argues that the police lacked probable cause to seize his cell phone because the police did not have the requisite particularized information that his phone contained any evidence of a crime. (DB94-95). He claims that the fact that the FBI detected a call between Hall and him on the morning of Sunday, August 28, did not provide probable cause to believe that he participated in the crimes. (DB95). The Commonwealth contends that the police properly seized

Chalue's phone for two reasons: first, the police found Chalue's phone in Veiovis's

Jeep and impounded it together with all the other contents of the Jeep; and, second,

because Chalue and Veiovis had been identified as being with Hall near in time to

the suspicious disappearance of Glasser and his friends, and because the phone

records showed that Hall's phone was near the location of the reported odor of

decomposition in the State Forest at the time of the men's disappearance and had

communicated with Chalue's phone during that time, police acted prudently in

seizing, but not searching, Chalue's telephone as evidence of the crime.

Police may seize evidence without a search warrant based upon probable

cause and exigent circumstances, which include the immediate need to preserve

evidence while awaiting the issuance of a search warrant to thoroughly inspect the

evidence.

> With probable cause, the police may seize property to prevent
> destruction or removal of evidence during the relatively short period
> of time needed . . . to obtain a search warrant. ... In dealing with
> probable cause . . . as the very name implies, we deal with
> probabilities. These are not technical; they are the factual and
> practical considerations of everyday life on which reasonable and
> prudent men, not legal technicians, act. The officers must have
> entertained rationally more than a suspicion of criminal involvement,
> something definite and substantial, but not a prima facie case of the
> commission of a crime, let alone a case beyond a reasonable doubt.
> The test is an objective one. (internal quotations and citations
> omitted).

*Commonwealth v. Gentile*, 437 Mass. 569, 573 (2002).

In *Gentile,* the Supreme Judicial Court affirmed the denial of the defendant's motion to suppress the seizure of his clothing and pickup truck by State police investigating the suspicious disappearance of a young woman on Cape Cod on July 11, 1999. The victim experienced car trouble and contacted her mother via cellular telephone to arrange to meet her in Brockton at 9:00 PM that evening. The victim never appeared. Police identified the owner ("Shaw") of the cell phone used by the victim and Shaw told investigators that the defendant, one of his employees, was using his phone. The defendant had telephoned Shaw at approximately 9:00 PM on the 11th and told him his vehicle had broken down in Boston and that he was unable to report for work. The defendant had previously been accused of stalking and making obscene phone calls to a woman. *Id.* at 571.

The defendant voluntarily appeared at the Bourne State police barracks at 7:00 a.m. on July 12th, approximately twelve hours after the victim made her first telephone call to her parents reporting that she had car trouble, that a man who came to her assistance called a friend, who unsuccessfully tried to repair her vehicle, and that the man offered the victim a ride to Brockton. *Id.* at 570-571. The defendant knew that the police were looking for him and he told troopers that he had agreed to drive the victim to Brockton, but became lost and dropped her off in Kingston between 8:00 and 10:00 p.m. that evening. The defendant claimed that he spent the night sleeping at the Plymouth bus station. *Id.* at 571.

When asked by troopers if they could look inside his truck, the defendant first agreed, but quickly opened and closed the driver's side door and rear hatch covering the truck, saying, "See, look." *Id.* at 572. The troopers asked permission to search the truck, but the defendant refused, saying that he had a marijuana pipe inside it. The defendant asked if he could leave the barracks. The troopers told him he was free to leave, but the truck would have to be left behind. Hearing this, the defendant locked the truck and called his lawyer. Although free to leave, the defendant remained at the barracks once he learned that the troopers were applying for a search warrant for the truck. The defendant, in response to officers' statements that they wanted to learn if anything bad happened to the victim in the truck, "closed his eyes and dropped his head." *Id.* Troopers observed discoloration on the defendant's pants, a scabbed gouge on his bicep, and a fresh scratch on his skin. At 5:00 p.m., ten hours after first appearing at the barracks, the defendant announced that he was leaving. Police seized his clothing and later obtained search warrants for both the truck and the clothes, and found evidence linking the defendant to the victim's murder. *Id.*

The Supreme Judicial Court found the following factors to be evidence supporting "probable cause to believe that evidence that the defendant kidnapped or otherwise harmed the victim might be found in the truck." *Id.* at 573. First, the victim, who had been in continuous telephone contact with her family immediately

prior to her disappearance and who habitually called her mother at least twice each

day, had not contacted her family since 9:00 p.m., twelve hours prior to the seizure

of the truck. Second, the defendant, who had a criminal record and had been

suspected of stalking a woman, was the last person to see the victim. Third, the

defendant made statements that were "inconsistent, false, or implausible." *Id.* at

574. These statements included an alibi that State police quickly proved false,

thereby leaving an eight-hour period of time in which the defendant's whereabouts

were unaccounted for, thereby providing him with ample opportunity to harm the

victim and dispose of her body. *Id.*

Here, as in *Gentile*, the police had probable cause to believe that Adam Hall

and his companions had kidnapped Glasser, Frampton, and Chadwell during the

hurricane, killed them, and disposed of their bodies. First, Glasser was scheduled

to testify against Hall on September 19th. Hall had previously tried to eliminate or

discredit Glasser as a witness against him by framing him for the crimes in New

York. Hall's co-defendants in that case had turned against him, thereby giving Hall

the motive to make his past words come true: "If [this scheme] doesn't work, then

I'll just have him disappear." Second, Glasser, Frampton, and Chadwell

disappeared under the most suspicious of circumstances. They left the Linden

Street apartment without taking their wallets or medications, and without turning

off the television or the computer. They failed to cash checks directly deposited in

their bank accounts, as was their habit. No arrangements had been made for the care of Frampton's cat. Third, Hall and his co-defendants demonstrated consciousness of guilt immediately after they learned that the police had visited Glasser's empty apartment on Wednesday, August 31st by disposing of evidence, conducting counter-surveillance of the police, and, most significantly, by returning to the State Forest early Sunday morning and abruptly departing upon discovering the police presence there. Their appearance at the State Forest, where Hall's cell phone had been electronically tracked immediately before the last known contact with one of the missing men, and where the odor of decomposition had been reported, reasonably suggested that Hall and his co-defendants had hidden evidence of the men's disappearance at the State Forest and that they returned either to conceal additional evidence or to retrieve items they believed would be discovered by the police during their search of the Forest. Fourth, the conduct of Hall and his co-defendants at the BP gas station further demonstrated their intent to evade the police. Hall stated to investigators that "whatever they wanted to know, [I] already forgot." Both Chalue and Veiovis, when asked to provide their names, replied by saying that they were "with him." Accordingly, this Court can conclude that this information provided the police with probable cause to seize the Jeep and Chalue's cell phone. *See Commonwealth v. Donahue*, 430 Mass. 710, 712 (2000),

quoting *Commonwealth v. Cinelli*, 389 Mass. 197, 213, cert. denied, 464 U.S. 860,
78 L. Ed. 2d 165, 104 S. Ct. 186 (1983) ("The nexus between the items to be
seized and the place to be searched need not be based on direct observation . . .
[but] . . . the nexus may be found in 'the type of crime, the nature of the missing
items, the extent of the suspect's opportunity for concealment, and normal
inferences as to where a criminal would be likely to hide [evidence of the
crime]'"); *Commonwealth v. Beldotti*, 409 Mass. 553, 557-558 (1991) (where
defendant was last person known to be with victim and he had driven his vehicle
day of murder, probable cause existed to believe that evidence concerning crime
would be found in his house where vehicle was parked). *Gentile*, *supra* at 575.

In response to Chalue's argument that the police lacked information
establishing the existence of some "particularized evidence" related to the crime,
(DB95), the Commonwealth contends that the fact that the telephone records
linked Hall's phone to Chalue's phone during the period of time when Glasser and
his friends suspiciously disappeared merited the impoundment of Chalue's phone
to preserve evidence while a search warrant was timely obtained. As such,
Chalue's cell phone – as well as Hall's phone – constituted "evidence of the crime
independent of [its] content." *Commonwealth v. Arthur*, 94 Mass. App. Ct. 161,
165 (2018).

In *Arthur*, the Appeals Court affirmed the impoundment and subsequent search of five cell phones found by police within two motor vehicles used in a coordinated armed home invasion. The police impounded the vehicles (and the phones) and, three days later, obtained a search warrant authorizing the search of the cars and the seizure (but not the search) of the phones. Nearly three months later, the police obtained a second search warrant authorizing the search of the electronic data of the phones. *Id.* at 163.

The defendant in *Arthur,* citing *Commonwealth v. White*, 475 Mass. 583 (2016), moved to suppress the evidence gleaned from the phones, claiming that the police waited too long to search the phones after they initially impounded them and that the second search warrant failed to show a sufficient nexus between the phones and the criminal activity. *Id.* at 163-164. The Appeals Court distinguished *White*, in relevant part, on the basis that there was "particularized evidence that the cell phones were used in the commission of the crime." *Id.* at 165. Specifically, the Court found that because the home invasion appeared to be a coordinated attack using separate vehicles, it could be readily inferred that the occupants of the vehicles had been in communication using the cell phones. *Id.* The Court also agreed with the Commonwealth that the cell phones had evidentiary value beyond their digital content because in its effort to prove joint venture, the introduction of

the cell phones, where they were located and how they were found all made for relevant evidence. *Id.*

Here, as in *Arthur*, Chalue's cell phone – as well as Hall's and Veiovis's cell phones –constituted relevant evidence of the joint venture responsible for the suspicious disappearance of Glasser, Chadwell, and Frampton. In addition to the telephone records linking Chalue's phone to Hall's during the time when the crime most likely occurred, police also knew that Hall was being contacted via cell phone by associates alerting him to the police presence at Glasser's apartment on August 31st. Therefore, the use of cell phones to further the joint venture by coordinating the crime and by concealing evidence of the crime made the simple fact that Hall, Chalue, and Veiovis all had cell phones in their possession on September 4th highly relevant evidence providing a nexus to the crime.

VI.   THIS COURT SHOULD DECLINE TO EXERCISE ITS PLENARY AUTHORITY PURSUANT TO G.L. C. 278, § 33E.

Chalue requests that this Court conduct plenary review of his case and grant him such relief as he may be entitled.

Under G.L. c. 278, § 33E this Court has the obligation to review the whole case to determine whether there has been any miscarriage of justice in convicting the defendant of murder in the first degree. *Commonwealth v. Kilburn*, 426 Mass. 31, 38 (1997), quoting *Commonwealth v. Marquetty*, 416 Mass. 445, 452 (1993).

This Court exercises "with restraint" its power under G. L. c. 278, § 33E to disturb a verdict reached by the jurors who received the evidence free from legal error. *Commonwealth v. Pina*, 430 Mass. 66, 80 (1999). It does not "sit as a second jury," *Commonwealth v. Coonan*, 428 Mass. 823, 831 (1999), but rather, will reduce a verdict only where "justice . . . require[s]."

The Commonwealth presented a compelling case against Chalue, based largely upon the testimony of people who heard his incriminating admissions and observed his inculpatory conduct. The trial judge made fair rulings of law and the jury returned verdicts well-founded in the record evidence. This Court should decline to exercise its plenary powers and affirm Chalue's convictions.

## CONCLUSION

For the reasons stated above, the Commonwealth respectfully requests that

this Honorable Court affirm the defendant's convictions.


RESPECTFULLY SUBMITTED,
COMMONWEALTH OF MASSACHUSETTS


By:

David F. Capeless
Special Assistant District Attorney
Berkshire District
7 North Street, P.O. Box 1969
Pittsfield, MA  01202-1969
Tel. (413) 443-5951
BBO #072570


Dated: November 4, 2019

# ADDENDUM

## TABLE OF CONTENTS

### Statutory and Other Authority

G.L. c. 265, § 1 ...................................................................................90

G.L. c. 265, § 26 .................................................................................90

G.L. c. 268, § 13B, *as appearing in St. 2010, c. 92 § 11* ...................91

G.L. c. 278, § 33E ..............................................................................92

## ADDENDUM

## Massachusetts General Laws

## G.L. c. 265, § 1

Murder.

Murder committed with deliberately premeditated malice aforethought, or with extreme atrocity or cruelty, or in the commission or attempted commission of a crime punishable with death or imprisonment for life, is murder in the first degree. Murder which does not appear to be in the first degree is murder in the second degree. Petit treason shall be prosecuted and punished as murder. The degree of murder shall be found by the jury.

## G.L. c. 265, § 26

Kidnapping.

Whoever, without lawful authority, forcibly or secretly confines or imprisons another person within this commonwealth against his will, or forcibly carries or sends such person out of this commonwealth, or forcibly seizes and confines or inveigles or kidnaps another person, with intent either to cause him to be secretly confined or imprisoned in this commonwealth against his will, or to cause him to be sent out of this commonwealth against his will or in any way held to service against his will, shall be punished by imprisonment in the state prison for not more than ten years or by a fine of not more than one thousand dollars and imprisonment in jail for not more than two years. Whoever commits any offence described in this section with the intent to extort money or other valuable thing thereby shall be punished by imprisonment in the state prison for life or for any term of years.

Whoever commits any offense described in this section while armed with a firearm, rifle, shotgun, machine gun or assault weapon shall be punished by imprisonment in the state prison for not less than ten years or in the house of correction for not more than two and one–half years. The provisions of the preceding sentence shall not apply to the parent of a child under 18 years of age who takes custody of such child. Whoever commits such offense described in this section while being armed with a firearm, rifle, shotgun, machine gun or assault weapon with the intent to extort money or other valuable thing thereby shall be

punished by imprisonment in the state prison for life or for any term of years but not less than 20 years.

Whoever commits any offense described in this section while armed with a dangerous weapon and inflicts serious bodily injury thereby upon another person or who sexually assaults such person shall be punished by imprisonment in the state prison for not less than 25 years. For purposes of this paragraph the term "serious bodily injury" shall mean bodily injury which results in a permanent disfigurement, protracted loss or impairment of a bodily function, limb or organ or substantial risk of death. For purposes of this paragraph, the term "sexual assault" shall mean the commission of any act set forth in sections 13B, 13B½, 13B¾, 13F, 13H, 22, 22A, 22B, 22C, 23, 23A, 23B, 24 or 24B.

Whoever, without lawful authority, forcibly or secretly confines or imprisons a child under the age of 16 within the commonwealth against his will or forcibly carries or sends such person out of the commonwealth or forcibly seizes and confines or inveigles or kidnaps a child under the age of 16 with the intent either to cause him to be secretly confined or imprisoned in the commonwealth against his will or to cause him to be sent out of the commonwealth against his will or in any way held to service against his will, shall be punished by imprisonment in the state prison for not more than 15 years. The provisions of the preceding sentence shall not apply to the parent of a child under 16 years of age who takes custody of such child.

### G. L. c. 268, § 13B, *as appearing in St. 2010, c. 92, § 11*

Court Proceedings — Intimidation of Witnesses or Jurors.

(1) Whoever, directly or indirectly, willfully

(a) threatens, or attempts or causes physical injury, emotional injury, economic injury or property damage to;

(b) conveys a gift, offer or promise of anything of value to; or

(c) misleads, intimidates or harasses another person who is:

(i) a witness or potential witness at any stage of a criminal investigation, grand jury proceeding, trial or other criminal proceeding of any type;

(ii) a person who is or was aware of information, records, documents or objects that relate to a violation of a criminal statute, or a violation of conditions of probation, parole or bail;

(iii) a judge, juror, grand juror, prosecutor, police officer, federal agent, investigator, defense attorney, clerk, court officer, probation officer or parole officer;

(iv) a person who is furthering a civil or criminal proceeding, including criminal investigation, grand jury proceeding, trial, other criminal proceeding of any type, probate and family proceeding, juvenile proceeding, housing proceeding, land proceeding, clerk's hearing, court ordered mediation, any other civil proceeding of any type; or

(v) a person who is or was attending or had made known his intention to attend a civil or criminal proceeding, including criminal investigation, grand jury proceeding, trial, other criminal proceeding of any type, probate and family proceeding, juvenile proceeding, housing proceeding, land proceeding, clerk's hearing, court-ordered mediation, any other civil proceeding of any type with the intent to impede, obstruct, delay, harm, punish or otherwise interfere thereby, or do so with reckless disregard, with such a proceeding shall be punished by imprisonment in a jail or house of correction for not more than two and one-half years or by imprisonment in a state prison for not more than ten years, or by a fine of not less than $1,000 nor more than $5,000, or by both such fine and imprisonment.

### G.L. c. 278, § 33E

Capital Cases — Appeals.

In a capital case as hereinafter defined the entry in the supreme judicial court shall transfer to that court the whole case for its consideration of the law and the evidence. Upon such consideration the court may, if satisfied that the verdict was against the law or the weight of the evidence, or because of newly discovered evidence, or for any other reason that justice may require (a) order a new trial or (b) direct the entry of a verdict of a lesser degree of guilt, and remand the case to the superior court for the imposition of sentence. For the purpose of such review a capital case shall mean: (i) a case in which the defendant was tried on an indictment for murder in the first degree and was convicted of murder in the first degree; or (ii) the third conviction of a habitual offender under subsection (b) of section 25 of chapter 279. After the entry of the appeal in a capital case and until

the filing of the rescript by the supreme judicial court motions for a new trial shall be presented to that court and shall be dealt with by the full court, which may itself hear and determine such motions or remit the same to the trial judge for hearing and determination. If any motion is filed in the superior court after rescript, no appeal shall lie from the decision of that court upon such motion unless the appeal is allowed by a single justice of the supreme judicial court on the ground that it presents a new and substantial question which ought to be determined by the full court.

## CERTIFICATE OF COMPLIANCE

I, David F. Capeless, do hereby certify pursuant to

Mass. R. App. P. 16(k), that I have complied with the Rules of Court that

pertain to the filing of briefs as set forth in Rules 16(a)(13), 16(e), 18, 20,

and 21 of the Massachusetts Rules of Appellate Procedure. This brief contains

18,445 non-excludable words in Times New Roman 14 pt proportionally spaced

type. Microsoft Word Version 2010 was used to prepare this brief.

Signed under the pains and penalties of perjury, this 14ᵗʰ day of

November, 2019.

David F. Capeless
Special Assistant District Attorney

## CERTIFICATE OF SERVICE

I, David F. Capeless, hereby certify that I have this day served a copy of the

Commonwealth's brief, appendix, and this certificate of service upon Andrew S.

Crouch, Esq. (acrouch@andrewcrouch.com) via the Massachusetts Odyssey

e-filing system.

Signed under the pains and penalties of perjury this 19th day of

November, 2019.

David F. Capeless
Special Assistant District Attorney