NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and are
bound volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12457

COMMONWEALTH  vs.  DAVID T. CHALUE.


Berkshire.     November 6, 2020. - February 23, 2021.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, & Kafker, JJ.


Homicide.  Practice, Criminal, Capital case, Instructions to
     jury, Deliberation of jury, Argument by prosecutor, Opening
     statement, Motion to suppress.  Evidence, Prior misconduct,
     Inflammatory evidence, Relevancy and materiality,
     Photograph, Hearsay, Joint venturer.  Search and Seizure,
     Threshold police inquiry, Reasonable suspicion.
     Constitutional Law, Search and seizure, Reasonable
     suspicion.  Threshold Police Inquiry.  Cellular Telephone.



     Indictments found and returned in the Superior Court
Department on October 6, 2011.

     A pretrial motion to suppress evidence was heard by C.
Jeffrey Kinder, J., and the cases were tried before him.


     Andrew S. Crouch for the defendant.
     David F. Capeless, Special Assistant District Attorney, for
the Commonwealth.

     LOWY, J.  As Tropical Storm Irene raged through western

Massachusetts during the late night and early morning hours of

August 27 and 28, 2011, David Glasser, Edward Frampton, and

Robert Chadwell were murdered.  Their dismembered bodies, each
with multiple gunshot and stab wounds, were found buried in
plastic bags.  Glasser was scheduled to testify against Adam Lee
Hall, a sergeant at arms in a local chapter of the Hells Angels
motorcycle club, regarding a previous altercation between Hall
and Glasser.  The Commonwealth's theory of the case was that
Hall and two of his acquaintances, Caius Veiovis and David
Chalue (the defendant), killed Glasser to prevent him from
testifying against Hall in two pending criminal cases.
Frampton, Glasser's roommate, and Chadwell, who was visiting
Glasser and Frampton's apartment at the time, were killed
because they were witnesses to Glasser's kidnapping.

Hall, Veiovis, and the defendant were tried separately, and
respective juries convicted each man of three counts of murder
in the first degree.[1]  We previously affirmed both Hall's and
Veiovis's convictions of murder in the first degree.  See

---

[1] The defendant and Veiovis were also each convicted of
three counts of kidnapping and three counts of witness
intimidation.  See Commonwealth v. Veiovis, 477 Mass. 472, 473
n.1 (2017).  In addition, Hall was convicted of armed robbery,
assault and battery by means of a dangerous weapon, four counts
of witness intimidation, four counts of kidnapping, possession
of a firearm during the commission of a felony, and conspiracy.
See Commonwealth v. Hall, 485 Mass. 145, 146 n.1 (2020).

Commonwealth v. Hall, 485 Mass. 145, 171 (2020); Commonwealth v. Veiovis, 477 Mass. 472, 490 (2017).[2]

On appeal, the defendant claims reversible error by the trial judge for (1) giving a charge in accordance with Commonwealth v. Rodriguez, 364 Mass. 87, 101-102 (1973) (Appendix A), and Commonwealth v. Tuey, 8 Cush. 1, 2-3 (1851) (Tuey-Rodriguez instruction), to an individual juror after the jury had been polled; (2) admitting various categories of unduly prejudicial character evidence; (3) admitting Hall's statements under the coventurer exemption to the rule against hearsay; and (4) denying the defendant's pretrial motion to suppress.  He also contends that he is entitled to a new trial because the prosecutor made numerous improper statements in his opening and closing remarks.  We affirm the convictions and conclude that the defendant is not entitled to relief under G. L. c. 278, § 33E.

1.  Background.  "We recite the evidence in the light most favorable to the Commonwealth, reserving certain details for later discussion."  Commonwealth v. Tavares, 484 Mass. 650, 651 (2020).  Because the defendant does not dispute that there was sufficient evidence of Hall's and Veiovis's culpability in the

---

[2] We also affirmed Hall's and Veiovis's convictions of the lesser counts, with the exception of one of the counts of kidnapping against Hall pertaining to a 2010 incident, which we vacated.  See Hall, 485 Mass. at 147; Veiovis, 477 Mass. at 474.

killings, we focus primarily on the evidence implicating the defendant in the joint venture.

The circumstances leading up to the killings began in July 2009, when Hall beat Glasser with a baseball bat because he believed that Glasser had stolen and sold motor vehicle parts that belonged to Hall.  Hall was later arrested for the assault. In July 2010, while the charge against Hall of assault and battery by means of a dangerous weapon was pending, Hall concocted a scheme to discredit Glasser by framing him on a false kidnapping charge.  The scheme backfired, and resulted in further charges being filed against Hall.[3]

The defendant entered the scene in the summer of 2011, when he started spending time with Hall.  At the time, Hall's trial for his charged conduct against Glasser was pending.

The timeline of events in the days before and after the killings is important in evaluating the evidence implicating the defendant's participation in the killings.  On the evening of Friday, August 26, Hall, Veiovis, the defendant, and Katelyn

---

[3] For a more thorough description of the 2009 and 2010 incidents, see Hall, 485 Mass. at 147-148, and Veiovis, 477 Mass. at 474.  Because the Commonwealth presented substantively the same evidence with respect to these prior incidents at each of the three trials, and this defendant was not involved in either incident, we need not detail them here.

Carmin (a friend of Hall) drove around in Hall's tan Buick[4] visiting several bars and eventually the Hells Angels clubhouse in Lee.  Hall ranted about Glasser, saying he was going to "kill that motherfucker" for ruining his life.  In response, Veiovis said things that "fuel[ed] up the fire," but the defendant only added, "You'll be all right, everything is going to be fine." At the clubhouse, the group rode all-terrain vehicles.  When Carmin was driving one of the vehicles with either Veiovis or the defendant on the back, Hall told her to be careful because he needed Veiovis and the defendant "for a job."

The next night, Hall, Veiovis, and the defendant again spent time at the Hells Angels clubhouse, where they met up with two women, Allyson Scace and Kayla Sewell.  Afterwards, the group decided to go to Veiovis's apartment in Pittsfield.  The defendant, Veiovis, and the two women traveled together in Sewell's car.  Hall drove separately, stopping at his friend Steven Hinman's house in Lenox, where he showed Hinman a .45 caliber semiautomatic pistol that he had tucked in his vest, as well as a bag that contained a .44 caliber Magnum revolver, a .22 caliber Derringer, and an M-16-type weapon.  When Hall arrived at Veiovis's apartment, he pulled the firearms out of a dog food bag and asked Veiovis where he could find gloves and

---

[4] At other times during the trial, witnesses described the same Buick as gold.

cleaning fluid.  Veiovis directed him to the kitchen, and then went upstairs with Sewell.  The defendant was sitting on the couch during this exchange.  While Veiovis and Sewell were upstairs, Hall and the defendant disassembled and cleaned the firearms.

Late that night or early Sunday morning, the three victims were kidnapped from Glasser's Pittsfield apartment.  The three men were last seen sometime after 10 P.M., when Glasser's upstairs neighbor came down and asked Glasser to move his truck. The last call made from Chadwell's cell phone was at 11:21 P.M. Sometime before 2 A.M. on Sunday, the upstairs neighbor heard banging on the front door of Glasser's apartment.

On Sunday at around 1:30 A.M., Hall arrived at the residence of his friends, the Sutton family, in Pittsfield.  He went upstairs and spoke briefly to Rose Dawson and her friend Alexandra Ely.  Ely was Hall's girlfriend and was staying overnight with Dawson at the Sutton residence.  Hall asked Dawson if he could borrow her cell phone.  She gave it to him, and he said he would be back soon.  Hall got into the passenger's side of a Jeep and left.  It was unclear whether there were other people in the Jeep.

Hall was next seen at a convenience store in Pittsfield at around 5:30 A.M. on Sunday, looking wet and dirty.  He purchased three candy bars and a pack of Marlboro cigarettes using cash

that was crumpled and wet.  He left the store, but returned a
couple minutes later and bought Black and Mild cigars.  Hall got
into the driver's side of his Buick and drove away; the store
operator could not see if anyone else was in the car with him.
Hall did not smoke.  Veiovis, however, smoked Black and Mild
cigars, and the defendant smoked Marlboro cigarettes.

Shortly thereafter, Hall returned to the Sutton residence
in the Buick, parked it on the front lawn, and then got picked
up by Veiovis driving his Jeep.  Nobody else was in the Jeep
with Veiovis.

Sometime after 9 A.M. on Sunday, Hall, Veiovis, and the
defendant arrived at the Sutton residence in Veiovis's Jeep.
Hall gave Dawson and Ely the keys to his Buick and a handful of
"wet and yucky" cash, and asked them to go to a grocery store in
Peru to purchase bleach and food for breakfast.  He told them to
wash their hands after touching the money, and also told them
not to look in a bag on the floor on the passenger's side of the
car.  Despite Hall's prohibition, Dawson looked in the bag and
saw a glove that looked like a batting glove.  While Ely and
Dawson were at the store, Hall called them and told them not to
buy the bleach after all.

Ely and Dawson then met the three men at Hall's house in
Peru to eat breakfast.  The three men looked tired and wet, and
the defendant was in bed.  Hall returned Dawson's cell phone to

her and told her to delete the call log and not tell anyone he
had borrowed it.  Dawson replied, "I'm not stupid."

At around 2 P.M. on that same Sunday, Hall went to the home
of his friend David Casey in Canaan, New York.  Hall told Casey
he was having trouble with a car in Becket and needed somewhere
to park it.  Casey called his friend Alan Pavoni.  Pavoni agreed
to let Hall park in his driveway in Becket.

Hall then told Casey that he had killed Glasser, as well as
a "fat guy" and a black man who were with Glasser.  He said that
when he tried to shoot Glasser, the gun misfired, and as he
tried to rechamber another round, Glasser ran into the woods.
Someone went after Glasser and shot but did not kill him,
instead bringing Glasser back to Hall so that Hall could kill
him.  Casey thought that Hall named the person who went after
Glasser as "Davey," but he was not sure.[5]  Hall went on to
describe the murders, saying that Glasser was "begging for his
life" and saying "please don't kill me" and "I won't testify."
In response, Hall told Glasser, "I told you what would happen if

---

[5] The defendant often went by "Davey."  In Casey's initial
statement to police, as well as in his testimony to the grand
jury, he did not say that Hall had mentioned any names.  In a
letter Casey wrote to the district attorney's office reporting
what happened, Casey wrote, "I did not get his name."  In
January 2014 -- three months prior to the defendant's trial --
Casey testified under oath that Hall did not name any of his
coventurers.  At the defendant's trial, Casey testified, "I
thought [Hall] said:  Davey was on him real quick," and added,
"[B]ut I'm not sure about that."

you witnessed against me." Hall told Casey that they had tortured and cut up the other victims. Hall said that it had been raining through all this and that he "really enjoyed it because he liked doing things in the rain."

Hall asked Casey to bury the men on his property. Casey refused. Hall then asked if Casey was still doing work with his excavator on Daniel Cole's property in Becket. Hall asked Casey to dig a hole there with the excavator. Casey agreed, and they arranged to go there the next morning, meeting beforehand at Pavoni's nearby home. Hall also told Casey that if he agreed, no harm would come to Casey's sister or her boyfriend. Casey was "numb, nervous, [and] scared," and agreed because he was afraid of repercussions.

Sometime later on Sunday afternoon or evening, Hall, Veiovis, and the defendant returned to the Sutton residence in the Jeep, and exchanged it for the Buick. At around 5 or 6 P.M., Hall dropped off the Buick at the Pavoni house in Becket. One or two other people arrived in the Buick with Hall, but the defendant was not among them. Nor was the defendant among the "about three people" who arrived in a Jeep a few minutes later to pick up Hall.

On Monday morning, Casey met Hall at the Pavoni house at around 10 A.M. The defendant was there, and Hall introduced the defendant to Casey as "Davey" and said that the defendant was in

the Aryan Brotherhood.[6]  Hall then had the defendant step out of earshot, and spoke to Casey about burying the bodies.  Hall opened the trunk of the Buick and said, "They're starting to smell."  Hall and Casey drove in Casey's truck to the Cole property, which was about three miles away.  They ascertained that Cole was not home and then returned to Pavoni's house to retrieve the Buick.  The defendant was still at Pavoni's house when they returned.  Hall then drove the Buick to the Cole property, following Casey in his truck.  Using the excavator at the Cole property, Hall and Casey dug a hole and buried the bodies.  After they finished, Hall said to Casey, "[R]emember, keep your mouth shut.  Even in jail, I can make things happen."

While Hall and Casey were burying the bodies, the defendant made four unanswered calls[7] to Hall's cell phone between 11:58 A.M. and 12:34 P.M., and sent text messages saying, "Hey, what's going on?" and "Dude, I'm ready to leave.  I don't know what to tell you."  Hall's cell phone was turned off.

---

[6] Casey did not mention the defendant's presence in his initial statements to police.  He explained that he did not do so given that he did not think the defendant had anything to do with the murders because Hall did not mention him when Hall described committing the crimes.

[7] The cell phone records indicated that the calls were of "extremely short durations" but did not show whether the calls went through.  We infer that given the number of calls, the calls' short duration, the fact that Hall's cell phone was off, and the content of the text messages, it was likely the calls were unanswered.

Later on Monday afternoon, Hall and Dawson used a hose to wash out the inside and outside of Hall's blue Hyundai[8] at the Sutton house.  The defendant was present, but he did not assist Hall.  Ely and Dawson both testified that Hall mentioned that a guy and two of his friends were missing.  Dawson testified that later Hall pulled her aside and said, "one of them was fixing the computer, one was laying on the couch, and one was sitting in front of the couch playing video games."

At around 4:30 P.M. on Monday, Hall and another man[9] brought the Buick to a salvage yard and sold it for scrap.  Much of the back seat was entirely ripped out, and the floors of the car were soaked.  The other man drove a purple Pontiac, and after leaving the Buick at the salvage yard, Hall left with the man in the purple car.  At 8:43 P.M. that evening, Hall and the defendant went to a department store, where Hall bought boots and socks, telling an employee that his old ones were wet.

On Monday night, Hall, Ely, Dawson, and the defendant went to the Hells Angels clubhouse in the blue Hyundai.  Hall and the defendant got drunk, and were joking, laughing, and having fun. The defendant pointed and laughed as Hall acted out a scene

---

[8] The color of Hall's Hyundai was variously referred to as blue and purple throughout the trial.

[9] The salvage yard proprietor declined to identify this man as the defendant at trial.

where he said, "Help me, help me," while being chased.  The
defendant did not act anything out and "didn't really say
anything."  Hall referenced someone whose new nickname was
"Butch" or "Butcher," and described him as "a crazy mother
fucker" and "a real pro."

Hall and the defendant spent Tuesday night at the Hells
Angels clubhouse with Ocean Sutton.[10]  On Wednesday morning,
while still at the clubhouse, Hall burned some of his clothing.
The defendant was at the clubhouse, but he did not burn his own
clothing and had "no part" in the burning of Hall's clothes.
Hall, Ocean, and the defendant then drove in Hall's Hyundai to
get something to eat.  On the way back, they stopped the car on
a bridge.  Hall threw an empty shoebox, empty bags, and socks
into the river.  Some of the items did not make it off the
bridge, so at Hall's direction, the defendant picked those items
up and threw them in the river.

On Sunday, August 28, and Monday, August 29, there had been
no response to Glasser's door or telephone, but his truck
remained in the driveway.  On Monday, Glasser did not appear to
bring a friend to work as planned, and Frampton missed a

---

[10] Because various members of the Sutton family testified at
trial, Ocean and Edward Sutton are referred to by their first
names.

doctor's appointment.  A missing person's report was filed on Glasser and Frampton on Wednesday, August 31.[11]

On Sunday, September 4, Hall, Veiovis, and the defendant were questioned by State police at a gasoline station in Pittsfield.  Police seized Veiovis's Jeep, Hall's socks and boots, and each man's cell phone.  Later that day, Hall was arrested on other charges.

On Monday, September 5, State police Lieutenant David Foley told the defendant he was going to be arrested.  The defendant remained in the area, staying at Ocean's apartment with her.

On Friday, September 9, after Casey revealed to police the location of the bodies, police began to search the property with Cole's consent.  When police eventually excavated the property, they recovered a severed arm and black plastic bags containing the dismembered remains of Glasser, Frampton, and Chadwell.  The autopsy of the body parts revealed that all of the victims had been shot and stabbed; their neck, arms, and legs had been removed, and two of the bodies had been cut through the torso. Most of the dismemberment had been accomplished by chopping or hacking with a sharp instrument, such as a butcher knife or meat cleaver.  Veiovis and the defendant were arrested on Saturday, September 10.  At some point after his arrest, the defendant

---

[11] A missing person's report had previously been filed for Chadwell on Monday, August 29.

called his girlfriend from jail and told her that the police had
no clothes that they could tie to the victims in the case.

On September 12, police executed search warrants at two
apartments in the same building in Pittsfield; one was Veiovis's
current apartment, and the other he had recently vacated.  In
one of them, police found various weapons and anatomical
illustrations, which we detail and discuss <u>infra</u>.

While in segregation at the Berkshire County house of
correction in September 2011, the defendant met a fellow inmate,
Christopher Letalien.  Letalien testified that the defendant
told him, "I got a body.  Not only do I got one body, I got
three bodies. . . .  Not only do I got three bodies, but I made
them disappear. . . .  Not only did I make them disappear, but
fourteen days later, they found them cut up into pieces at the
bottom of a ditch."  In several telephone calls from jail,
Letalien asked family and friends to lie to help him with his
pending case.  In one, he said that his "ace" was his testimony
against the defendant.

Subsequently, in October 2011, the defendant met another
inmate, Jason Lemieux, in the Berkshire County house of
correction.  The defendant spoke to Lemieux about his case,
which surprised Lemieux.  Lemieux interpreted the defendant's
willingness to discuss his case as both to brag as well as to
intimidate other inmates.  The defendant described to Lemieux

that the victims were "tortured beyond torture" and "cut up and made to disappear."  Leimeux also testified that the defendant referenced his involvement in the Aryan Brotherhood.

Two years later, in 2013, the defendant was held pretrial at Souza-Baranowski Correctional Center (SBCC), where he met Jethro Kempton, a fellow inmate and member of the Aryan Brotherhood.  Kempton testified that before they met in person, the defendant wrote him a letter, which stated in part:

> "Jethro, what's up, brother?  I send my salutation your
> way.  My name is David Chalue.  I was with Kurt.  I've
> heard a great deal about you, all good things, and I'm
> hoping to meet you when you get out.  I'm a 52(a), fighting
> a triple out of Pittsfield.  Things look good on that case.
> I'm to beat it and get back out there.  About another year
> to [eighteen] months before trial.  Anyways, was talking
> with Mark the other day, and he was saying you have two on
> deck.  He said you like them and thought they would make a
> good addition.  Keep them on deck, but right now, they
> [sic] just can't be any new additions until things are
> cleared up out west, et cetera.  I'm sure if [sic] you knew
> this, so I just wanted to know.  Also this is not for the
> two on deck to know about it.  It's in-house biz.  When
> things are cleared up everyone has to approve before those
> on deck are in.  But there will be a lot of time to talk
> about it when you get over here.  Hopefully, it won't be
> too long."

The letter was signed "David SS" and accompanied by lightning bolts that symbolized association with the Aryan Brotherhood. Kempton testified that when he and the defendant eventually met in person, the defendant noted that he had connections to the Aryan Brotherhood in the Federal penal system and California. After Kurt King, who was the former head of the Aryan

Brotherhood in Massachusetts, died, it was decided that Kempton would be the new head of the Aryan Brotherhood in Massachusetts and the defendant would "go along" with him.

Kempton testified that the defendant had said he felt like he could trust Kempton, and thus told Kempton about his case. The defendant described Hall to Kempton as a "Big Dummy," and said he was just using Hall to attain access to firearms. Kempton testified that the defendant described the kidnappings, saying that "he knocked on the door of the individual's home. He went to get one guy -- the guy they were looking for -- and they happened to have two friends over that night."  The defendant described the killings in a joking manner.  Kempton testified, describing the defendant's statements:  "[W]hile they were shooting them, one guy ran off in the woods naked.  He said he stripped naked and started shooting him.  He didn't say who shot who or who ran after who.  He just said we had to track him down in the woods."  Kempton further testified that the defendant "let the bodies, you know, sit for [a while] so the blood would coagulate, so that when they dismembered them, it wouldn't . . . squirt."

Also in 2013 while at SBCC, the defendant met another inmate, Jeffrey Cashman.  Cashman had previously become a member of the Aryan Brotherhood, but later learned his membership was in doubt.  Cashman spoke with the defendant about his issue with

his Aryan Brotherhood membership.  The defendant told Cashman, "[Y]ou're all set.  I'm putting you up.  You're in."  The defendant told Cashman he trusted him.  At one point, the defendant told Cashman that he wanted him to read a "novel."  The "novel" was sent down to Cashman's cell, and it turned out to be the defendant's discovery packet.  Inside the packet, there was a small note that stated:

> "Yeah, check out this novel on a bro's case.  A quick read, but enjoyable read.  Keep in mind the names of all of the rats in this case.  I'm sure they will all be making their way up this way.  And yes, they're all in the hat.  Listen, I'm willing to reinstate you, but I first have to know without a doubt, [one hundred] percent, are you willing to give your life for this thing, because once you're in, there's no way out.  That means making your bones when the time comes.  Are you willing to do that?  If so, let me know.  Respects, D."

Cashman testified that "in the hat" meant "a death contract on you and all members of the Aryan Brotherhood in that institution, names go in a hat and whatever name comes out, they're the one that kills him or hurts him, whichever."  Cashman testified, "'Making your bones' means you're on probation.  You're actually -- you're not a member.  You're an associate.  And then once you make your bones, you're -- you're directed to do a hit, either to hurt somebody or kill somebody -- very rarely just to hurt; usually it's death.  Death contract."

Cashman's testimony about the defendant's description of the killings differed slightly from the other evidence.  Cashman testified that the defendant had said that after kidnapping the victims, the defendant, Hall, and Veiovis went to Casey's house in New York.  Casey was upset because he expected one victim, not three.  After that, the group went to one of Hall's properties, where the killings took place.  Further, Cashman testified that the defendant had referenced a woman being present during the killings, saying "one of the girls" went to pick up a saw and Hall told her "you don't want to touch that." The defense attorney impeached Cashman with evidence that Cashman had read the 103-page "novel" of discovery from the case, and thus was already familiar with many of the details. On cross-examination, Cashman testified that he had read many of the details in the discovery packet, including the information about a woman picking up a saw.

The defendant was tried from April 22 to May 16, 2014, for murder in the first degree, kidnapping, and witness intimidation.[12]  After the defendant was convicted, he commenced this appeal.

---

[12] The defendant was the second to be tried, after Hall and before Veiovis.  All three cases were tried in front of the same judge.

2.  Discussion.  a.  Tuey-Rodriquez charge.  The defendant argues that the judge twice administered an impermissible Tuey-Rodriquez charge -- first to a lone juror, and then to the entire jury.  See Rodriquez, 364 Mass. at 101-102; Tuey, 8 Cush. at 2-3.  Because defense counsel timely objected to the charges, we apply the prejudicial error standard first to consider whether the judge erred and, if so, whether we can be certain that the improper instruction "did not influence the jury, or had but very slight effect" (citation omitted).  Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994).  We conclude that it was error for the judge to instruct an individual hold-out juror with certain elements of the Tuey-Rodriquez charge, but that it was not so coercive here as to require reversal of the defendant's convictions.[13]

i.  The instruction.  On the fourth day of deliberation, the jury sent a note saying that they had reached unanimous verdicts.  Guilty verdicts were announced, and the defendant asked the judge to poll the jury.  The clerk inquired of the juror in seat one (juror no. 1) if she agreed with the verdicts, and she said "no."  After a brief recess and the judge's denial

---

[13] We discern no error with the judge's instructions to the entire jury, as they did not contain any elements of the Tuey-Rodriquez charge.  Thus, our analysis is limited to the judge's sidebar colloquy with the individual juror.

of the defendant's oral motion for a mistrial, the judge ordered the jury to resume deliberations.

Five minutes later, the judge alerted counsel that juror no. 1 was refusing to reenter the deliberation room.  The judge informed counsel that he planned to call juror no. 1 to sidebar to speak with her.  The judge then had the following exchange with juror no. 1 at sidebar:

The judge:  "[Juror no. 1], good afternoon."

Juror no. 1:  "Good afternoon."

The judge:  "Come closer, please.  I just want to say a couple of things to you.  First of all, I just want you to listen, I don't need you to say anything, okay?"

Juror no. 1:  "Okay."

The judge:  "As I instructed you before, if you have any honestly held feelings about the facts of this case, no one is suggesting that you surrender those feelings.  On the other hand, it is important that you listen to your fellow jurors with an open mind and see if you can come to a unanimous decision.  I'm going to ask that you return to deliberate with them.  I know it might be difficult but it is important that you keep an open mind and listen, and again, it's important that you not surrender your feelings if convinced."

Juror no. 1:  "Okay."

The judge:  "Can you do that?"

Juror no. 1:  "Yes, sir."

The judge:  "Thank you very much.  You may be excused."

After the juror left the room, defense counsel objected to the discussion that had just taken place.  The jury resumed

deliberations, and they returned approximately two and one-half hours later asking to be excused for the evening.

The next morning, defense counsel renewed his motion for a mistrial, and noted that several jurors, including the foreperson, had "act[ed] out" when asked to return to deliberate further.  Specifically, he reported that the foreperson threw a pencil, slammed his book on a chair, and shook his head when juror no. 1 said that she did not agree with the verdicts. Counsel also noted that several other jurors were crying.

In response, the judge instructed the full jury:

"Ladies and gentlemen, I know from my own observations of you yesterday, that some of you had an emotional reaction when the verdict was announced, when you were ordered to resume your deliberations after I determined that the verdict was not unanimous, and then again at the end of the day when I ordered you to return here today for continued deliberations.

"You will recall that I earlier instructed you that emotion or sympathy, passion or prejudice, should play no role in your deliberations.  I urge you to follow that instruction and remove emotion from your deliberations in an effort to reach a unanimous verdict, if you can do so in good conscience.

"Please try to be patient and respectful of the views of your fellow jurors as you work toward that end.  I now excuse you to continue your deliberations."

The jury left the court room at 9:26 A.M. and returned at 2:35 P.M. with unanimous verdicts of guilty on all charges.  At defense counsel's request, the judge again ordered the clerk to

poll the jury, and all jurors affirmed that the verdicts were
theirs.

ii.  Analysis.  The Tuey-Rodriquez charge -- first outlined
in 1851 in Tuey, and later modified in 1973 in Rodriquez -- is a
model charge intended for a deadlocked jury to encourage them to
continue deliberating.  When used appropriately and after the
jury have engaged in due and thorough deliberation, the charge
is an important tool "designed to urge the jury to reach a
verdict by giving more serious consideration to opposing points
of view." Commonwealth v. Semedo, 456 Mass. 1, 20 (2010).  See
G. L. c. 234A, § 68C.  The trial judge is ordinarily in the best
position to determine whether giving such a charge is
appropriate, and thus "[t]he decision whether to provide the
Tuey-Rodriquez charge is . . . committed to [his or her] sound
discretion." Ray v. Commonwealth, 463 Mass. 1, 6 (2012).  The
Federal analog, known as the "Allen charge," borrows directly
from Tuey.  Commonwealth v. Mascolo, 6 Mass. App. Ct. 266, 273
n.6, cert. denied, 439 U.S. 899 (1978).  See Allen v. United
States, 164 U.S. 492, 501 (1896).

These charges have been criticized for their "tendency to
coerce jurors into returning verdicts." Mascolo, 6 Mass. App.
Ct. at 273-274.  See Ray, 463 Mass. at 6, quoting Rodriquez, 364
Mass. at 100 (charge carries "a 'sting'" and risks coercion when
used improperly).  The Allen (or Tuey-Rodriquez charge) has been

referred to as "the dynamite charge, the third degree instruction, the shotgun instruction, or the nitroglycerin charge" because of its ability to "blast a verdict out of a jury otherwise unable to agree that a person is guilty." United States v. Bailey, 468 F.2d 652, 666 (5th Cir. 1972).  The coercive impact of the charge is heightened if a juror interprets the instruction as being leveled directly at him or her.  See United States v. Sae-Chua, 725 F.2d 530, 532 (9th Cir. 1984).  To this end, many Federal courts have held that giving even a modified Allen charge to a lone juror -- or to the full jury when the judge knows the identity of a small number of hold-out jurors -- is reversible error.[14]

---

[14] Indeed, this appears to be a consensus among Federal courts.  See United States v. Ajiboye, 961 F.2d 892, 894 (9th Cir. 1992) ("Even when the judge does not inquire but is inadvertently told of the jury's division, reversal is necessary if the holdout jurors could interpret the charge as directed specifically at them -- that is, if the judge knew which jurors were the holdouts and each holdout juror knew that the judge knew he was a holdout"); Sae-Chua, 725 F.2d at 532 (giving modified Allen charge was reversible error where judge knew identity of sole dissenting juror and juror aware that judge possessed that knowledge); Cornell v. Iowa, 628 F.2d 1044, 1048 n.2 (8th Cir. 1980), cert. denied, 449 U.S. 1126 (1981) ("[C]oercive impact of even a modest Allen charge is heightened when preceded by any inquiry as to the jury's numerical division").  See also United States v. Vanvliet, 542 F.3d 259, 268 n.12 (1st Cir. 2008) (no abuse of discretion when judge gave Allen charge after jury volunteered that they were split six to five, given that there were not just one or two hold-out jurors who would feel isolated and outnumbered and interpret charge as leveled directly at them).  Cf. Lowenfield v. Phelps, 484 U.S. 231, 253 (1988) (Marshall, J., dissenting) ("Allen charge given on the heels of a jury poll poses special risks of coercion");

The instruction need not include every element of the <u>Tuey-Rodriquez</u> charge to be analyzed as one.  Various courts have analyzed modified <u>Allen</u> charges, which include some, but not all, of the language of the model charge.  See, e.g., <u>United States</u> v. <u>McElhiney</u>, <u>275 F.3d 928, 936</u> (10th Cir. 2001) ("An instruction that departs from the pure charge, whether by omission or embellishment, we call a 'modified' <u>Allen</u> instruction").  The ultimate inquiry is not how closely an instruction tracks the model language, but rather whether the instruction was "impermissibly coercive in a way that undermined the integrity of the deliberation process" (citation omitted).  <u>Id</u>. at 940.[15]

_____

<u>United States</u> v. <u>Brown</u>, <u>426 F.3d 32, 38-39</u> (1st Cir. 2005), cert. denied, <u>546 U.S. 1189</u> (2006) (no abuse of discretion when judge declared mistrial instead of singling out lone hold-out juror for questioning because proper to prioritize avoiding coercion of questioning juror in isolation).

[15] Indeed, one court has held:

"[E]ven if the [trial] court's comments did not constitute an instruction (<u>Allen</u> or otherwise), its remarks still had the potential to coerce the jury, and, as coercion is the primary concern with the giving of an <u>Allen</u> instruction, the overall <u>Allen</u> analysis would still be applicable.  In other words, the [trial] court's comments would be examined under all the circumstances to determine whether the verdict reached by the jury was a product of impermissible coercion. . . .  To summarize, the fact that [the trial] court's comments constituted a departure from the 'typical' <u>Allen</u> charge does not mean that they are subject to no critical inquiry whatsoever."

The defendant argues that this case is analogous to United States v. Zabriskie, 415 F.3d 1139 (10th Cir. 2005). There, the judge conducted an ex parte and in camera conversation with a hold-out juror, in which the judge questioned the juror about whether he could follow the judge's instructions with an open mind, asked whether he was willing to participate and deliberate, and told him not to sacrifice his personal beliefs if they were based on the evidence. Id. at 1141-1143. The United States Court of Appeals for the Tenth Circuit found that "the trial judge's admonitions interspersed throughout her conversation with [the juror] match[ed] the essential elements of a typical Allen charge." Id. at 1147 n.11. The court held that it was "impermissibly coercive to selectively and privately give what amounts to an Allen instruction to a hold out juror." Id. at 1148.

We agree with the defendant that the judge's sidebar colloquy with juror no. 1 was erroneous. The judge conducted an individual colloquy with a hold-out juror, at which time the judge knew that she was a hold-out. More importantly, the juror would have been aware that the judge knew her position when the jury were polled, a scenario that reasonably might lead a juror

McElhiney, 275 F.3d at 941. See United States v. Cheramie, 520 F.2d 325, 329 n.3 (5th Cir. 1975) ("the denomination of the charge is of only tangential importance").

to question even honestly held beliefs.  See Sae-Chua, 725 F.2d at 532 (giving modified Allen charge was reversible error where judge knew identity of sole dissenting juror and juror was aware that judge possessed that knowledge).  Finally, the judge instructed the juror to keep an open mind and see whether the jury could come to a unanimous decision -- a prototypical element of the Tuey-Rodriguez charge.[16]  Thus, the indicia of coercion present in the judge's language here rendered it improper for the judge to give the lone juror this instruction in isolation.  See Sae-Chua, supra.

However, although this was error, we are confident that it "did not influence the jury, or had but very slight effect" for two reasons.  Flebotte, 417 Mass. at 353.  First, when considered together, the exchange here was less coercive than what took place in Zabriskie.  Although not dispositive, the conversation in Zabriskie occurred both ex parte and in camera -- certainly a more coercive atmosphere than sidebar.[17]  See

_____

[16] The court in Zabriskie, 415 F.3d at 1147 n.11, held that the colloquy "match[ed] the essential elements of a typical Allen charge," although the judge did not actually recite the most coercive elements:  the judge did not reference the undesirability of a mistrial or jurors in the minority reconsidering their views in light of the majority.  See Allen, 164 U.S. at 501.  That the colloquy did not contain every element of the Allen charge was immaterial.

[17] The Commonwealth distinguishes Zabriskie on this point alone, noting that giving a supplemental instruction ex parte without first consulting counsel violates a defendant's right to

Zabriskie, 415 F.3d at 1142.  Although the judge here and the
judge in Zabriskie encouraged the juror to reach a consensus
with other jurors, the language the judge used in Zabriskie was
heavy-handed.[18]  Id. at 1143.  Further, in Zabriskie, the
conversation was much longer and the judge asked the juror the
same questions over and over again.[19]  See id. at 1142-1143.

---

be present.  See United States v. Collins, 665 F.3d 454, 462 (2d
Cir. 2012).  While it is true that such a conversation may
violate a defendant's right to be present, that was not part of
the court's analysis in Zabriskie.  Zabriskie addressed whether
the conversation was coercive, although the fact that the
instruction was given "selectively and privately" was an
important element of the analysis.  Zabriskie, 415 F.3d at 1148
(raising concern that Allen charge "especially [coercive] when
it is done in private").

[18] For example, in Zabriskie, 415 F.3d at 1143, the judge
told the juror, "It's your duty as jurors to consult with one
another and deliberate with a view to reaching an agreement
. . . ," whereas here the judge merely said, "[I]t is important
that you listen to your fellow jurors with an open mind and see
if you can come to a unanimous decision."

[19] For example, the judge in Zabriskie essentially asked the
juror if he was participating and if he had an open mind five
times in a row:

     The judge:  "But I understand that you have come into a
     block, and your fellow jurors say that some of that block
     is due to you.  Are you participating in jury
     deliberations" (emphasis added)?

     The juror:  "Yes, ma'am."

     . . .

     The judge:  "Are you participating in the jury
     deliberations (emphasis added)?"

     The juror:  "Yes, ma'am."

Indeed, when the juror was asked whether he was attempting to base his decision on the evidence, he revealed part of his thought processes, mentioning lying awake at night thinking about the case.  Id. at 1143.  Even then, the judge in Zabriskie did not relent, but rather continued to question the juror about whether he could follow the instructions, whether he could reexamine his own views, and again whether he could participate with an open mind.  See id.  In comparison, here, the judge's significantly shorter colloquy with juror no. 1 was more

---

. . .

The judge:  "All right.  You know, I've given several instructions when this problem started coming up, which it did early, saying that it was the obligation of each juror to reexamine his or her own views.  In other words, you didn't go in there -- did you go -- you had to go in with an open mind" (emphasis added).

The juror:  "Yes, ma'am.  I did."

The judge:  "And then you have to look at the evidence and listen to the arguments and keep an open mind to what others are saying, but meanwhile you do not sacrifice your own firm convictions" (emphasis added).

The juror:  "Yes, ma'am."

The judge:  "You must at all times be open and be willing to participate and deliberate.  Do you believe you have followed that?"  (Emphasis added.)

The juror:  "Yes, ma'am.  I'll follow it even more if need be."

Zabriskie, 415 F.3d at 1142-1143.

restrained, emphasized twice that the juror not surrender her
feelings, and thus contained fewer indicia of coercion.

The second reason for concluding that the improper
instruction was not prejudicial is that the jury here continued
to deliberate for a substantial amount of time following the
judge's exchange with juror no. 1.  The colloquy with juror no.
1 took place around 3:30 P.M. on the fourth day of
deliberations.  The jury then resumed deliberations for another
two and one-half hours that afternoon, and returned the
following day and deliberated another five hours before
returning verdicts.  The amount of time the jury continue to
deliberate is probative of how coercive the instruction was.
See Lowenfield v. Phelps, 484 U.S. 231, 240 (1988) (verdict soon
after supplemental instruction suggests possibility of
coercion); United States v. Webb, 816 F.2d 1263, 1267 (8th Cir.
1987) (that jury deliberated only fifteen minutes after
receiving Allen charge went to coercive effect).  But see Smalls
v. Batista, 191 F.3d 272, 281 (2d Cir. 1999) (length of
deliberation did not diminish coerciveness of supplemental
charge).

Finally, we must consider the difficult position in which
the judge found himself when juror no. 1 refused to reenter the
jury room after the jury were polled, revealing nonunanimous
verdicts.  The jury had not previously indicated that they were

deadlocked, and thus it would have been inappropriate to deliver the traditional Tuey-Rodriquez charge to the full jury.[20]  See Commonwealth v. Torres, 453 Mass. 722, 736 n.17 (2009) (judge correctly did not administer Tuey-Rodriquez after jury returned with nonunanimous verdict after polling).  Dismissing juror no. 1 would have raised a host of other issues.  See, e.g., Commonwealth v. Connor, 392 Mass. 838, 846 (1984) (reversible error when judge dismissed deliberating juror without holding hearing to determine if there was good cause for dismissal). There was not at that point any evidence concerning an issue personal to juror no. 1 about which it would have been appropriate for the judge to conduct a voir dire of the juror to determine if she was able to be impartial.  See, e.g., Torres, supra at 727, 733 (juror's potential bias against police officers and wish to go home not "mere euphemism" for assertion of minority position, and thus proper for judge to question individual juror).

---

[20] The judge noted that the jury had not stated that they were deadlocked:

"[W]e have not heard, once, from this jury that they are at an impasse of any kind.  They have continued their deliberations after having been sent out yesterday for well over two hours, and when told that they had an option to continue yesterday evening or come back today and resume their deliberations they elected to come back today without suggesting that they were at an impasse."

The judge was in a difficult situation.  He made a
concerted effort to blunt the coercive aspect of his instruction
-- "it is important that you listen to your fellow jurors with
an open mind and see if you can come to a unanimous decision" --
by sandwiching it between two admonitions that juror no. 1 not
surrender her honestly held beliefs.  While this approach
certainly lessened the coercive effect, it did not eliminate it
entirely, given the "risk of coercion inherent in questioning
jurors, particularly in individual colloquies."  Ray, 463 Mass.
at 5 n.5.  We recognize that "trial judge[s], 'unlike us,'
interact[] with jurors while presiding at the trial" (citation
omitted).  Id. at 6.  Situations arise during a jury trial that
simply cannot be anticipated, and judges must respond to these
situations with agility and leeway.  "It is not always clear at
the outset whether a juror's problem is of a personal nature,"
Commonwealth v. Williams, 486 Mass. 646, 656 (2021), and here
the judge needed to address why juror no. 1 refused to reenter
the jury deliberation room.  "It is no easy task for a judge to
discuss the juror's concerns generally, and do so without
delving into deliberations" (quotations and citation omitted).
Id.  Here, the judge was able to do so.  That he went too far
with the juror in referencing aspects of the Tuey-Rodriquez
charge at sidebar is an example of the type of error that may
arise even in the pursuit of the most perfect trial.  In

recognition of the precarious position the trial judge was in, we set out guidance for speaking with jurors in similar situations in the Appendix.  Ultimately, we hold that the charge -- although erroneous -- did not have such a coercive effect as to require reversal.  See Flebotte, 417 Mass. at 353 (error not prejudicial if it "did not influence the jury, or had but very slight effect").

b.  Prior bad acts evidence.  The defendant next contends that the judge's rulings admitting evidence concerning the Aryan Brotherhood, anatomical drawings, and photographs of weapons amounted to an abuse of discretion.  The defendant argues that this evidence served no purpose other than to impugn his character as violent and lawless so as to suggest improperly that his actions here conformed to that more general criminal propensity.

Although the prosecution may not introduce so-called prior bad act evidence to illustrate a defendant's bad character, such evidence may be admissible if relevant for a nonpropensity purpose.  See Commonwealth v. Crayton, 470 Mass. 228, 249 (2014); Commonwealth v. Drew, 397 Mass. 65, 79 (1986), S.C., 447 Mass. 635 (2006), citing Commonwealth v. Bradshaw, 385 Mass. 244, 269 (1982).  See generally Mass. G. Evid. § 404(b) (2020). Even if the evidence is relevant for a proper purpose, it will not be admitted if the judge determines that its probative value

is outweighed by risk of unfair prejudice to the defendant, taking into account the effectiveness of any limiting instruction.  Commonwealth v. Caruso, 476 Mass. 275, 292 n.11 (2017) ("We generally presume that a jury understand and follow limiting instructions . . .").  The defendant both moved in limine to bar these items from evidence and objected contemporaneously at trial, and thus we review the judge's decisions to determine whether there was an abuse of discretion and, if so, whether it amounted to prejudicial error.  See Commonwealth v. Cruz, 445 Mass. 589, 591 (2005).

   i.  Aryan Brotherhood evidence.  The defendant argues that evidence of his Aryan Brotherhood membership was not admissible for any proper purpose and carried a risk of unfair prejudice so substantial that it outweighed any perceived probative value. We conclude that most of the Aryan Brotherhood evidence was properly admitted, and to the extent that any of it crossed a line, the admission was not prejudicial.

   The Commonwealth argues that the Aryan Brotherhood evidence was both relevant and admissible for two nonpropensity purposes: to show how Hall induced Casey to help bury the remains and to establish the credibility of testimony from several jailhouse informants.  We examine each of these purposes in turn.

   With respect to the first purpose, Casey testified that Hall told him that the defendant was a member of the Aryan

Brotherhood when Hall introduced them to each other.  Casey
stated that he was worried about repercussions if someone were
to testify, "[f]rom either the Hells Angels or the Aryans."  We
conclude that Casey's testimony was probative to explain why he
cooperated with Hall and why he did not initially go to the
police or tell anyone else about what he had done.  See Mass. G.
Evid. § 401.  Moreover, given that this reference to the Aryan
Brotherhood was so limited, its probative value was not
outweighed by risk of unfair prejudice.  See Crayton, 470 Mass.
at 249.

    With respect to the second purpose, evidence of the
defendant's affiliation with the Aryan Brotherhood was admitted
through multiple jailhouse informants.  Lemieux testified that
the defendant told him that he (the defendant) was a member of
the Aryan Brotherhood.  Kempton testified that he and the
defendant were both members of the Aryan Brotherhood, and that
the defendant talked about the hierarchy of the local Aryan
Brotherhood and who might be the leader of it in the future.
Kempton also testified that the defendant had said that he felt
like he could trust Kempton.  Cashman, who was also affiliated
with the Aryan Brotherhood, similarly testified that the
defendant had indicated he trusted Cashman.

    Evidence that the defendant was a member of the Aryan
Brotherhood makes it more likely that the defendant truthfully

confided the details of his case to some of these particular
inmates and thereby enhanced the credibility of their
testimony.[21]  Because it is not common to share inculpatory
details about one's case with fellow inmates, the shared

_____

[21] Typically, a party must wait to bolster its own witness's
credibility until the witness has been impeached and thereby
requires rehabilitation.  There are a limited number of
circumstances, however, where one can bolster before
impeachment, such as first complaint witnesses, prior statements
of identification, and plea agreements.  See P.C. Giannelli,
Understanding Evidence § 22.02 (5th ed. 2018).

The situation here is akin to a prosecutor introducing
evidence of a cooperating witness's statements in a plea bargain
concerning the obligation to give truthful testimony.
Generally, "any attempts to bolster the witness by questions
concerning his obligation to tell the truth should await
redirect examination, and are appropriate only after the
defendant has attempted to impeach the witness's credibility by
showing the witness struck a deal with the prosecution to obtain
favorable treatment." Commonwealth v. Washington, 459 Mass. 32,
44 n.21 (2011), citing Commonwealth v. Ciampa, 406 Mass. 257,
264 (1989).

And yet this is not an "absolute prohibition that prevents
any and all direct examination reference to the agreement's
terms concerning 'truthful' testimony." Commonwealth v. Rolon,
438 Mass. 808, 813 (2003).  We have held that where defense
counsel questions a Commonwealth witness's credibility in the
defense's opening statement, it is not improper for the
prosecutor to bolster the witness on direct examination by
eliciting testimony regarding the plea agreement's requirement
to tell the truth.  See, e.g., Commonwealth v. Webb, 468 Mass.
26, 32-34 (2014); Rolon, supra at 814.

Here, defense counsel extensively attacked the credibility
of the jailhouse informants in his opening statement.  Thus, it
was clear from the outset the jailhouse informants were going to
be impeached.  It was therefore unnecessary for the Commonwealth
to wait until redirect to elicit the Aryan Brotherhood evidence
to enhance their credibility.

membership in a secret gang showed why the defendant would have trusted inmates who were also members.  Thus, all of the Aryan Brotherhood testimony was relevant.

Further, we hold that with one exception discussed infra, the judge's determination that the probative value of the relevant evidence was not outweighed by prejudicial effect did not amount to a clear error of judgment outside the range of reasonable outcomes, and there was no abuse of discretion in admitting the evidence.  See L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).  The judge took multiple steps to minimize the prejudicial impact of the testimony.  During individual voir dire, he asked each prospective juror whether evidence of the defendant's affiliation with the Aryan Brotherhood would affect his or her ability to be fair and impartial, and excused multiple potential jurors who answered yes.  Moreover, the judge gave repeated limiting instructions, telling the jury they could only consider evidence of affiliation with the Aryan Brotherhood -- which was not illegal -- as it related to the relationship between the defendant and the witnesses in the case, and not as evidence of the defendant's bad character.[22]  Additionally,

_____

[22] A judge seeking to blunt the prejudicial effect of this type of group membership evidence may also consider allowing reference to "a secret type of prison organization" instead of the more specific term "Aryan Brotherhood."  This was the approach the trial judge took in United States v. Abel, 469 U.S. 45, 48-49 (1984), and here it may have been able to achieve the

despite mention of the defendant's affiliation with the Aryan Brotherhood, the jury heard very little detail about the group's status as the largest and deadliest prison gang in the United States or that it is known for its white supremacist ideology.[23]

"'[W]e afford trial judges great latitude and discretion' with respect to the probative-unfairly prejudicial analysis, and 'we uphold a judge's decision in this area unless it is palpably wrong.'" Commonwealth v. Facella, 478 Mass. 393, 401 (2017), citing Commonwealth v. Sicari, 434 Mass. 732, 752 (2001), cert. denied, 534 U.S. 1142 (2002).  Here, we hold that it was well within the judge's discretion to admit most of the Aryan Brotherhood evidence.

However, there was a portion of Cashman's testimony about the definition of "making your bones" that crossed the line into being unduly prejudicial.  Cashman testified that the defendant sent him a package of discovery materials from his case along with a note that referenced Cashman's need to "mak[e] [his] bones."  Cashman explained that "making your bones" meant killing someone -- a prerequisite to becoming a full member of

---

same effect of explaining why the defendant confided in Kempton, Cashman, and Lemieux, while avoiding other prejudicial associations of the Aryan Brotherhood.

[23] Southern Poverty Law Center, Aryan Brotherhood, https://www.splcenter.org/fighting-hate/extremist-files/group /aryan-brotherhood [https://perma.cc/F5BB-BCPC].

the Aryan Brotherhood.  This statement was not necessary to explain why the defendant confided in Cashman, and instead implied that the defendant's affiliation with the Aryan Brotherhood meant that he had committed murder.  Thus, the judge abused his discretion in allowing this statement to be admitted. We conclude, however, that because this aspect of the Aryan Brotherhood was only mentioned once, and given the evidence that the defendant made statements glorifying the killings and dismemberments of the victims, the error was not prejudicial. See Commonwealth v. Graham, 431 Mass. 282, 288, cert. denied, 531 U.S. 1020 (2000), quoting Flebotte, 417 Mass. at 353 (error not prejudicial "if we are sure that the error did not influence the jury, or had but very slight effect").

ii.  Anatomical drawings.  The defendant also argues that the anatomical drawings found in Veiovis's home were inadmissible against the defendant.  We disagree.[24]

The drawings depicted images of human dissections and amputations of body parts.  We held that the same drawings were

---

[24] This opinion's author dissented in Veiovis, arguing that it required impermissible propensity evidence to infer from Veiovis's possession of illustrations of dismemberment that he would have "seize[d] the opportunity" to commit real-life dismemberments.  Veiovis, 477 Mass. at 494 (Lowy, J., dissenting).  Nonetheless, this court has twice found the drawings admissible for that purpose, and thus it now constitutes stare decisis.  See Hall, 485 Mass. at 163; Veiovis, supra at 484.

admissible in both Veiovis and Hall for three purposes:
identity, state of mind, and motive.  Hall, 485 Mass. at 162-
163; Veiovis, 477 Mass. at 483-485.  Consider identity first.
In the codefendants' cases, there was evidence that Hall had
said that "one of the guys really enjoyed torturing and cutting
[the victims] up."  Hall, supra at 162.  Veiovis, supra at 482.
In those cases, then, the drawings were probative of identity
because they tended to show that Veiovis was the person to whom
Hall was referring.  See Hall, supra; Veiovis, supra.  Here, in
contrast, no such statement was admitted, and thus the drawings
are not admissible to show identity.  See Veiovis, supra at 484
("the anatomical drawings would not be admissible as identity
evidence if Hall had not identified the third assailant as
someone who enjoyed 'cutting [the victims] up'").

     The drawings are, nonetheless, admissible to show both
state of mind and motive.  With respect to state of mind, close
analysis is required to show how the drawings are relevant to
the defendant, and not just to Veiovis.  The drawings tend to
show Veiovis's "state of mind as a person fascinated by
amputation and human dissection, and of an intent to seize the
opportunity of these killings to engage in actual amputations
and human dissection."  Veiovis, 477 Mass. at 484.  There is no
evidence that the defendant approved of the drawings in any way,
and thus we cannot impute Veiovis's state of mind to the

defendant.  See Commonwealth v. Keo, 467 Mass. 25, 33 (2014)
(improper to impute codefendant's wall decoration saying "crip
killer" to defendant where no evidence that defendant had seen
words and affirmed that he too wished to be "a 'crip killer'").

Veiovis's state of mind remains relevant, however, in a
more general manner.  In Commonwealth v. Fernandes, 427 Mass.
90, 95 (1998), we found that evidence of a coventurer's state of
mind was admissible not because it could be imputed to the
defendant, but because it "put the killing into the context of a
narrative that was comprehensible to the jury and was relevant
to the purpose of the joint venture."  The same is true here.
Although the jury could not impute Veiovis's state of mind to
the defendant, it was nonetheless relevant to the circumstances
of the crimes and helped explain why the victims were
dismembered.  Given the crimes' gruesome nature, information
about one of the coventurers' state of mind would no doubt have
helped the jury attempt to comprehend what precipitated the
event.

Finally, the evidence is admissible to show motive for the
same reasons explained in Hall and in Veiovis.  Although the
motive for the killings was to silence Glasser and the two men
who would have been witnesses to Glasser's kidnapping, that does
not explain why the victims were dismembered.  Veiovis, 477
Mass. at 484.  The drawings tend to show Veiovis's fascination

with amputation and human dismemberment, offering "an explanation for what would otherwise be inexplicable." Id. at 485.  Because Veiovis was a coventurer with the defendant, Veiovis's potential motive is relevant to the defendant.  See Commonwealth v. Carroll, 439 Mass. 547, 553 (2003) ("There is no requirement that joint venturers share a motive for the success of the venture").  Thus, here the drawings are relevant both for state of mind and for motive of a coventurer.

Turning from relevance to weighing of probative value, we hold that the judge here did not abuse his discretion in admitting the drawings.  In Veiovis, we found that the judge did not abuse his discretion in ruling that the probative value of this evidence was not outweighed by prejudicial effect because there were three relevant, noncharacter purposes for admitting the drawings.  Veiovis, 477 Mass. at 485.  See Hall, 485 Mass. at 163 (no abuse of discretion in admitting drawings).  What exacerbated the drawings' prejudicial effect in Hall and Veiovis was the admission of Hall's statement that "one of the guys" liked chopping people up.  That statement gave the jury a light in which to view the anatomical drawings, and all but cemented the drawings' meaning in the jury's mind as signs of Veiovis's inclination to chop people up.

Here, even though there were only two relevant, noncharacter purposes, on the other side of the scale there was

also less prejudice than in the codefendants' cases:  Hall's statement that "one of the guys really enjoyed torturing and cutting [the victims] up" was not admitted.  Hall, 485 Mass. at 162.  Veiovis, 477 Mass. at 482.  The jury could have made an inference that Veiovis had a passion for dismemberment, but such an inference was much weaker without the context supplied by Hall's statement.  Further, given that there was no direct connection between the defendant here and the drawings, there is less prejudice than there was in Veiovis, where the jury could have inferred that Veiovis himself had a peculiar interest in dismemberment and thus the propensity to commit the crimes.  Thus, the judge did not abuse his discretion in finding that the probative value of the drawings was not outweighed by unfair prejudice.

     iii.  Photographs of weapons.  The defendant argues that the judge erred in admitting photographs of certain weapons found in Veiovis's apartment.  The jury saw photographs of numerous knives, cleavers, hatchets, a machete, a sickle, and a bat with nails.  We hold that the judge properly admitted most of the photographs of weapons, although it was error to admit both the bat with nails and the hatchet.  This error, however, was not prejudicial.

     In both Veiovis and Hall, there was evidence that the machete, cleaver, hatchets, and knives were consistent with the

tools used to dismember the victims, and could have served as the means to accomplish the dismemberment.  See Hall, 485 Mass. at 161-162; Veiovis, 477 Mass. at 485-486.  Although they tested negative for blood at the time the apartment was searched -- approximately two weeks after the killing -- they could not be excluded as the weapons used in the killings.  Veiovis, supra. Thus, we held that they were admissible to show Veiovis and Hall had the means to dismember the victims' bodies.  See Hall, supra at 162; Veiovis, supra at 486.  Further, in those cases we held that it was error to admit the photograph of the spiked baseball bat because there was no evidence that it could have been used in the commission of the crimes.  See Hall, supra; Veiovis, supra.  We held that the error was not prejudicial, however, given the other admissible evidence depicting what was found in Veiovis's apartment.  See Hall, supra; Veiovis, supra, citing Graham, 431 Mass. at 288.

Here, the same photographs of weapons were admitted, yet the forensic testimony differed slightly.  The forensic anthropologist testified that the machete and the cleaver shown in the photographs could have been used in the commission of the crimes.  But, unlike in Veiovis, the forensic anthropologist testified that the injuries were not consistent with cuts from a hatchet.  See Veiovis, 477 Mass. at 485.  Thus, photographs of the machete and cleavers were admissible because these weapons

could have been used in the commission of the crimes.  See id.
See also Commonwealth v. Pierre, 486 Mass. 418, 424 (2020)
("Evidence regarding a weapon that could have been used in the
course of a crime is admissible, in the judge's discretion, even
without direct proof that the particular weapon was in fact used
in the commission of the crime" (quotation and citation
omitted).  In contrast, it was error to introduce the
photographs of not only the spiked baseball bat,[25] but also the
hatchet because these weapons could not have been used to commit
the crimes.  See id at 425 ("Where a weapon definitively could
not have been used in the commission of the crime, [this court
has] generally cautioned against admission of evidence related
to it" [citation omitted]).  However, as in Hall and Veiovis, we
conclude that this error was not prejudicial given "the other
admissible evidence, particularly the testimony regarding the
injuries inflicted, the weapons consistent with those injuries,
and the weapons that were ultimately found at Veiovis's
apartment." Hall, 485 Mass. at 162.  In other words, the jury
had ample evidence to find that the defendant had access to
potential tools of dismemberment.

---

[25] The forensic anthropologist did not specifically exclude
the spiked bat as a possible weapon, although he did not include
it -- or any similar spiked instrument -- when describing
possible weapons used.

c.  Admission of coventurer statements.  The defendant
argues that the judge erred in admitting Hall's statements to
Ely and Dawson under the statements of a coventurer exemption to
the rule against hearsay. See Mass. G. Evid. § 801(d)(2)(E).[26]
Because the defendant objected at trial, we review the judge's
admission of these statements for prejudicial error.  See
Flebotte, 417 Mass. at 353.  We hold that the judge did not
abuse his discretion in admitting the statements.

i.  The testimony.  Ely and Dawson both testified to
statements that incriminated Hall because they showed Hall knew
that Glasser and two men had gone missing before it was public
knowledge, as well as that he knew what the victims were doing
before they were abducted.  On Monday, August 29, Hall and
Dawson washed Hall's Hyundai, inside and out, at the Sutton
residence.  Ely testified that after washing the car, Hall was
on the porch of the Sutton house with Karen Sutton and Ely.
Hall mentioned that "people were missing," and mentioned
Glasser's name specifically.  Because this statement was made on
Monday, and all three victims were not reported missing until
Wednesday, Hall's statement was probative of his guilt because
it showed his knowledge that the victims were missing.  The

---

[26] Exemptions to the rule against hearsay are statements
that are defined as "not hearsay" under Mass. G. Evid. § 801(d).
In contrast, exceptions to the rule against hearsay are outlined
by Mass. G. Evid. §§ 803 and 804.

judge allowed this testimony as a statement of a coventurer,
over the defendant's objection.

Dawson testified describing the same conversation that took
place on the porch of the Sutton residence. She testified that
Hall said that "that guy and two of his friends were missing,"
although he did not say who "that guy" was. She went on to say
that Hall pulled her aside and spoke further about the three men
who had gone missing. She testified that Hall said that "one of
them was fixing the computer, one was laying on the couch, and
one was sitting in front of the couch playing video games."
Again, the judge allowed this testimony over the defendant's
objection. Two days later, Dawson heard that police were on
Linden Street (where Glasser and Frampton had lived) and
contacted Hall. At some point in that period of time, Hall told
Dawson that if she were ever stopped by police, she should tell
them that a man named "Whitey" was involved in the disappearance
of the victims. On September 1, Dawson was stopped by police
and told them the story involving Whitey. When she relayed this
to Hall, he was pleased. Dawson further testified that at the
time she told this information to police, she believed it was
true.

ii. Analysis. A statement of a coventurer is admissible
against the others involved in the joint venture if it is made
"during the pendency of the cooperative effort and in

furtherance of its goal." Commonwealth v. Bongarzone, 390 Mass.
326, 340 (1983).  See Mass. G. Evid. § 801(d)(2)(E).  Before
admitting such evidence, a judge "must find, by a preponderance
of the evidence, the existence of a joint venture independent of
the statement being offered." Commonwealth v. Holley, 478
Mass. 508, 534 (2017).  Further, "[b]efore considering the
statement as bearing on the defendant's guilt, . . . the jury
must make their own independent determination, again based on a
preponderance of the evidence other than the statement itself,
that a joint venture existed and that the statement was made in
furtherance thereof" (quotation and citation omitted).  Id.
This exemption to the rule against hearsay "is premised on a
belief that '[t]he community of activities and interests which
exists among the coventurers during the enterprise tends in some
degree to assure that their statements about one another will be
minimally reliable.'" Bongarzone, supra, quoting Commonwealth
v. White, 370 Mass. 703, 712 (1976).

　　"It is well established that the joint venture [exemption]
to the hearsay rule does not apply to statements made after the
joint venture has ended." Commonwealth v. Winquist, 474 Mass.
517, 522 (2016).  "However, '[s]tatements made in an effort to
conceal a crime, made after the crime has been completed, may be
admissible under the joint venture [exemption] because the joint
venture [remains] ongoing, with a purpose to ensure that the

joint venture itself remains concealed." Id., quoting
Commonwealth v. Carriere, 470 Mass. 1, 11 (2014).  "In essence,
the inquiry to determine whether a statement was made during the
pendency of a criminal enterprise and in furtherance of it
'focuses not on whether the crime has been completed, but on
whether a joint venture was continuing.'" Winquist, supra at
522-523, quoting Commonwealth v. Stewart, 454 Mass. 527, 537
(2009).

Here, the joint venture was clearly ongoing:  the bodies
had yet to be found, and Hall was washing one of the cars likely
used in the crimes -- presumably in an attempt to conceal
evidence -- moments before making the statements.  The more
difficult issue is whether the statements were made in
furtherance of the crimes.  The defendant argues that the
statements objectively served to thwart the joint venture by
unnecessarily disclosing incriminating information to people who
were not members of it.  In response, the Commonwealth argues
that by intimating his involvement in the crimes to Ely and
Dawson, Hall was trying to enlist their loyalty by giving them
enough information that they would feel complicit in the crimes,
and therefore not speak up.  See Commonwealth v. Wood, 469 Mass.
266, 272 n.12, 280-281 (2014) (codefendant's statement to third
party describing crimes admissible under hearsay exemption
because it may have been intended to "frighten her to silence").

That Hall later attempted to use Dawson to funnel misinformation to investigators buttresses the Commonwealth's theory that he was trying to implicate her in furtherance of the plot. Although it is a close call, we agree with the Commonwealth and hold that the judge did not abuse his discretion in admitting these statements on the basis that they were in furtherance of the conspiracy.  See L.L., 470 Mass. at 185 n.27 (abuse of discretion only where judge makes "clear error of judgment in weighing the [relevant] factors" and "decision falls outside the range of reasonable alternatives" [quotation and citation omitted]).

     d.  Commonwealth's opening and closing.  The defendant argues that the prosecutor made numerous statements in his opening and closing remarks that misstated the evidence, argued inferences with no basis in the record, suggested he had knowledge of facts not in evidence, and attempted to excite the jury's passion and prejudice.  We analyze each in turn.

     i.  Opening.  "The proper function of an opening is to outline in a general way the nature of the case which the counsel expects to be able to prove or support by evidence" (citation omitted).  Commonwealth v. Fazio, 375 Mass. 451, 454 (1978).  See Mass. G. Evid. § 1113(a).  The prosecutor's expectation must be "reasonable and grounded in good faith." Fazio, supra at 456.  Where defense counsel did not object to

the opening, we review to determine whether there was misconduct and, if so, whether it created a substantial likelihood of a miscarriage of justice.  See <u>Commonwealth</u> v. <u>Silva</u>, <u>455 Mass. 503, 514</u> (2009).

In his opening statement, the prosecutor contended the underlying dispute began in July of 2009 when Glasser took carburetors that belonged to <u>the defendant</u>.  Further, the prosecutor contended that <u>the defendant</u> stopped in Lenox to procure the guns used in the murders.  It appears that in both of these instances, the prosecutor meant to refer to Hall, not the defendant.[27]  These mistakes seem more akin to a slip of the tongue than bad faith.  Moreover, defense counsel pointed out the mistakes immediately afterwards in his own opening statement, and thus the jury were unlikely to give much credence to them -- especially where there was no evidence presented at trial to substantiate them.  Thus, we hold that the misstatements did not give rise to a substantial likelihood of miscarriage of justice.

Also in his opening, the prosecutor referred to the defendant burning clothing and argued that the defendant was a lookout while Hall and Casey buried the bodies.  Because the

----

[27] The Commonwealth concedes this, at least with regard to the second statement about procuring guns in Lenox.

prosecutor repeated these same remarks in his closing -- where they were objected to -- we conduct the relevant analysis infra.

ii.  Closing.  Remarks made during closing argument are considered in the context of the entire argument, in light of the judge's instructions to the jury, and in view of the evidence presented at trial.  Commonwealth v. Whitman, 453 Mass. 331, 343-345 (2009).  See Mass. G. Evid. § 1113(b). "Prosecutors are entitled to argue theories supported by evidence and reasonable, possible inferences from the evidence." Commonwealth v. Auclair, 444 Mass. 348, 359 (2005).  "We consider four factors in determining whether an error made during closing argument is prejudicial:  '(1) whether the defendant seasonably objected; (2) whether the error was limited to collateral issues or went to the heart of the case; (3) what specific or general instructions the judge gave the jury which may have mitigated the mistake; and (4) whether the error, in the circumstances, possibly made a difference in the jury's conclusions.'"  Commonwealth v. Alvarez, 480 Mass. 299, 306 (2018), quoting Commonwealth v. Silva-Santiago, 453 Mass. 782, 807 (2009).  Here, defense counsel timely objected to the relevant portions of the closing argument.

A.  Statements that the defendant burned clothing with Hall.  In closing, the prosecutor stated that the defendant,

along with Hall, burned clothing at the Hells Angels clubhouse
after the murders.[28]

The evidence did not support this remark.  Ocean testified
that Hall alone burned clothing.  She testified that she was
holding the clothing for Hall and that the clothes, which bore
the Hells Angels insignia, belonged to Hall, not the defendant.
She stated explicitly that the defendant "had no part in the
burning of the clothes."  State police Trooper Michael Scott
testified that he observed the scorched metal plate, and said
that he received no indication that the defendant burned any
clothing, only that Hall had.

The Commonwealth argues that a fair inference could be
drawn from this evidence that the defendant, in addition to
Hall, burned the clothing because there was evidence that,
later, the defendant and Hall together threw other pieces of
evidence off a bridge.  We disagree.  Ocean clearly stated that
Hall, not the defendant, burned the clothing, and Scott did not
contradict her.  Inferences that run contrary to the evidence
are by definition unreasonable.  See Auclair, 444 Mass. at 359
(in closing, prosecutors may only argue reasonable and possible
inferences from evidence).

---

[28] The prosecutor made similar statements in his opening
remarks.

Nevertheless, we hold that these remarks were not prejudicial error.  Insofar as the prosecutor relied on the remarks to show that the defendant's destruction of evidence indicated a consciousness of guilt, it is unlikely that it made a difference in the jury's conclusions, because there was other testimony that the defendant actually had helped Hall destroy other pieces of evidence, thus similarly indicating a consciousness of guilt.[29]  See Alvarez, 480 Mass. at 306.

B.  Statements that defendant was a lookout.  In his closing, the prosecutor asserted multiple times that the defendant had acted as a lookout outside the Cole property while Hall and Casey buried the bodies.[30]  Casey testified that on Monday, August 29, he met Hall and the defendant at the Pavoni residence where the Buick was parked with the bodies inside. Casey and Hall then drove to the Cole property, approximately three miles away in Becket, with the intention of burying the bodies.  The two of them checked the Cole house to make sure no one was home, and then returned to the Pavoni house, where Hall got out of the car and spoke with the defendant, who was still there.  Hall then followed Casey in the Buick back to the Cole

---

[29] Ocean testified that she saw the defendant and Hall throwing items from a bridge.

[30] The prosecutor made similar remarks in his opening statement as well.

residence, where the two of them used the excavator to dig a hole to bury the bodies.  Hall and Casey then returned to the Pavoni house, where the defendant was still "hanging around."

The defendant's cell phone records indicated that he called and sent text messages to Hall multiple times while Hall and Casey were at the Cole house.  At 11:58 A.M., the defendant sent Hall a text message saying, "Hey, what's going on?"  At 12:33 P.M., the defendant sent Hall a text message saying, "Dude, I'm ready to leave.  I don't know what to tell you."  Special Agent Eric Perry of the Federal Bureau of Investigation testified that the defendant's cell phone records indicated that, during the time he made these calls and text messages to Hall, he was closer to the Pavoni property than to the Cole property.  But in the agent's opinion, the towers that the cell phone was utilizing showed it was likely the cell phone was not stationary at the Pavoni home during that whole time period; more likely, it was traveling.  The Commonwealth further points to Cashman's testimony to show that the defendant was a lookout.  Cashman testified that the defendant told him that the defendant was "in the car parked in the driveway" during the burial.

It was up to the jury to decide whether the defendant was truly a lookout.  But the evidence of the defendant's cell phone's location, coupled with Cashman's testimony that the defendant was parked in the driveway during the burial, support

a reasonable and possible inference that the defendant was indeed a lookout at the Cole property during the burial.  See Commonwealth v. Jones, 432 Mass. 623, 628 (2000) ("inferences drawn from the evidence need not be necessary and inescapable, only reasonable and possible").  Thus, we discern no error in the prosecutor's statements.

C.  Statements that the defendant intended to kill a witness.  The defendant argues that in the Commonwealth's closing, the prosecutor insinuated that the defendant planned to kill a witness.  The prosecutor stated:

> "And as his being a lookout, the idea that can't possibly happen because Hall's phone is out, what do you think the plan was going to be, that if Mr. Cole decided to come home during the middle of the day he's going to call him? They're going to drop what they are doing and leave all of the evidence there?  No, unfortunately, ladies and gentlemen, he was just simply going to follow Hall until he got there.  And at that point Mr. Cole would just be another witness."

The defendant argues that because the Commonwealth's theory of the case was that Frampton and Chadwell were killed because they were witnesses to Glasser's kidnapping, the meaning of the prosecutor's statement that "Mr. Cole would just be another witness" was to imply that if Cole had returned home, he, too, would have been killed.

We agree with the defendant that, in this context, the phrase "would just be another witness" implies that the defendant would have at the very least harmed Cole if he had

returned home.  Although we think it reasonable to infer that

the defendant was a lookout, the further inference that his role

as a lookout meant he would have hurt or killed potential

witnesses is not a reasonable and fair inference based on the

evidence.  However, we hold that this improper statement was not

prejudicial error in light of the judge's instructions that the

opening and closing are not evidence,[31] and because the

implication of this statement was subtle and limited to a

collateral issue.  See Alvarez, 480 Mass. at 306.

D.  Statements regarding the Aryan Brotherhood.  In his

closing argument, the prosecutor referenced the Aryan

Brotherhood evidence and stated:

> "Well, you have to ask yourself, did the Defendant take
> orders from The Big Dummy [(Hall)]?  Without knowing
> beforehand or even asking afterwards?  The guy who strolls
> in and takes over the local Aryan Brotherhood, he's the one
> unknowingly taking orders?  Ask yourselves, really?"

The defendant had previously told Cashman that he considered

Hall to be a "[b]ig dummy, goofball, idiot," and explained that

he (the defendant) "was just using [Hall]" to obtain access to

guns.  Thus, in its closing, the Commonwealth was implying that

the defendant was culpable because he was not merely taking

---

[31] In the jury charge, the judge instructed the jury that
the "closing arguments of counsel are not evidence" and told
them that their "collective memory of the evidence controls, not
the memory of the attorneys."

orders from Hall, but rather had some amount of control over him.

The defendant argues that this reference in the closing statement exceeded the permissible uses of the Aryan Brotherhood evidence.  At sidebar, in response to the defendant's objection, the judge stated that the Aryan Brotherhood evidence was admitted in large part to establish the nature of the relationship between the defendant and the three jailhouse informants, but that it was not specifically limited to the informants because the language of the instruction referred to "any witnesses in the case."

As discussed supra, the Aryan Brotherhood evidence was properly admitted to show the relationship between the defendant and the jailhouse informants, as well as to show why Casey did not initially come forward.  But we do not agree with the judge that the Aryan Brotherhood evidence was permissible to establish the relationship of the defendant with any witnesses in the case -- especially here, where the prosecutor used it to imply that the defendant's association with the Aryan Brotherhood meant he would not be "unknowingly taking orders" and instead had an active role in plotting the murders.  Where in other contexts the Aryan Brotherhood evidence was properly used, here it crossed the line into being used as impermissible propensity evidence.

This error, however, was not prejudicial.  As discussed _supra_, the judge asked during individual voir dire whether evidence that the defendant was a member of the Aryan Brotherhood would impair jurors' impartiality, and repeatedly instructed that the Aryan Brotherhood evidence could not be used as evidence of the defendant's bad character or criminal propensity.  Thus, this statement by the prosecutor does not amount to prejudicial error.

e.  _Motion to suppress_.  Next, the defendant argues that the judge erred by denying his motion to suppress the fruits of the September 4 search of his person and seizure of his cell phone.  We disagree.

"[I]n reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error but conduct an independent review of his [or her] ultimate findings and conclusions of law" (citation omitted).  _Commonwealth_ v. _Tremblay_, 480 Mass. 645, 652 (2018).  Because the defendant moved to suppress before trial, we review for harmless error. See _Commonwealth_ v. _Tavares_, 482 Mass. 694, 709 (2019).

i.  _Facts_.  We provide a brief summary of the facts that the judge, following an evidentiary hearing, found were known to the officers on September 4.  The facts are supplemented with uncontroverted facts in the record.  _Commonwealth_ v. _Jones-Pannell_, 472 Mass. 429, 431 (2015).

Glasser was scheduled to testify in a kidnapping case against Hall regarding the August 2010 scheme to discredit Glasser, and that trial was scheduled to begin three weeks after the weekend of the storm.  Glasser, Frampton, and Chadwell were last seen at around 10 P.M. on Saturday, August 27, 2011, and despite repeated attempts to contact them, no one had heard from them since.  Hall, Veiovis, and the defendant were suspects in the disappearances:  Edward Sutton had reported that Hall had stated that the "witness" had "disappeared" and that it was "too bad."  Brittany Breault, one of the Sutton daughters, informed police that on the day after the storm, Hall asked if the defendant could shower at the Sutton house.  Moreover, after police started inquiring into the victims' disappearance, a man fitting Hall's description was seen discarding items off a bridge.  A later search of the river below the bridge uncovered pieces of a shoebox from a store where the defendant, with Hall, had been shopping a few days earlier.  Further, in reviewing Hall's cell phone records, officers noticed what appeared to be a three-way call involving Hall and the defendant on the morning of Sunday, August 28, 2011.

On Sunday, September 4, officers were conducting a field search of the Pittsfield State Forest when they saw a black Jeep that had been driving towards them abruptly turn around.  The officers learned that Hall was driving the Jeep, and they

proceeded to follow it towards Pittsfield.  The Jeep eventually
pulled into a gasoline station, and officers followed but did
not signal for the Jeep to pull over.  Hall was driving, Veiovis
was in the passenger's seat, and the defendant was in the back
seat.  The officers recognized Hall and noted that Veiovis and
the defendant fit the descriptions of suspects in the victims'
disappearance.

At the gasoline station, officers engaged the three men in
conversation and, when Hall asked if they were free to leave,
officers told him to stay because other officers were on their
way to talk to them.  Eventually, officers gave the three men an
exit order, pat frisked them, and took their photographs.  The
officers then seized the Jeep, each man's cell phone, and Hall's
boots and socks.[32]

---

[32] The defendant argues that, in deciding the motion to
suppress, many of the trial judge's findings of fact were
clearly erroneous, including the judge's findings that police
had knowledge that the defendant was at a Hells Angels party
with Hall and Veiovis on August 27, that "Hall and his co-
defendants" demonstrated consciousness of guilt by destroying
evidence, and that Veiovis and the defendant's presence with
Hall in that vicinity on September 4 "'reasonably suggested that
Hall and his co-defendants had hidden evidence of the men's
disappearance' there and 'returned' on September 4 to either
retrieve or conceal evidence."  Because we think that none of
these facts was necessary to support the finding that the stop
and seizure were proper, we do not address whether they were
clearly erroneous.

ii.  Analysis.  We hold that the officers had reasonable suspicion to conduct a threshold inquiry of the defendant and probable cause to seize the defendant's cell phone.

First, when officers pulled up near the defendant, Hall, and Veiovis at the gasoline station and asked their names and who owned the Jeep, that was not a stop but more akin to a field interrogation observation.  See Commonwealth v. Narcisse, 457 Mass. 1, 2 n.1 (2010) ("A 'field interrogation observation' has been described as an interaction in which a police officer identifies an individual and finds out that person's business for being in a particular area").  Thus, no justification was required.  See Commonwealth v. Murdough, 428 Mass. 760, 763 (1999) (no level of justification required for police to approach parked vehicle at rest area and make noncoercive inquiry).

The interaction became a stop in the constitutional sense when, after Hall asked if he was free to go, officers told him to "stay because a couple of other officers were on their way to talk to them."  See Commonwealth v. Matta, 483 Mass. 357, 362 (2019) (stop occurs when officer communicates that he or she would use police power to coerce person to stay).  Because the defendant was a passenger in Hall's vehicle, this effectively stopped the defendant as well.  See Commonwealth v. Buckley, 478 Mass. 861, 865 (2018) ("A passenger in a vehicle may challenge

the constitutionality of a stop").  To justify this stop (and
the subsequent exit order and frisk), police needed reasonable
suspicion both that criminal activity was afoot and that the
suspects were armed and dangerous.  Narcisse, 457 Mass. at 7.
See Commonwealth v. Torres-Pagan, 484 Mass. 34, 38-39 (2020)
(outlining level of justification needed for each level of
intrusion).  Officers met both prongs of this test based on
their knowledge of Hall's history with Glasser and statements
that a "witness" had "disappeared"; Hall's and the defendant's
association with the Hells Angels and the Aryan Brotherhood,
respectively; the Jeep's abrupt turn-around when it encountered
the police; the fact that the defendant and Veiovis matched the
descriptions of the other suspects in the victims'
disappearance; and the violent nature of the crimes under
investigation.

Finally, officers had probable cause to seize the
defendant's cell phone.  In order to seize the cell phone,
police needed a substantial basis for concluding that it
contained "evidence connected to the crime" under investigation
(citation omitted).  Commonwealth v. White, 475 Mass. 583, 588
(2016).  In other words, the government must demonstrate a
"'nexus' between the alleged crime and the article to be
searched or seized."  Commonwealth v. Snow, 486 Mass. 582, 586
(2021).  Here, police had the proper nexus to the defendant's

cell phone because cell phone records reflected that the cell phone had been involved in a three-way call with Hall and an unknown party on the morning of Sunday, August 28.  Because Hall was a suspect in the case thanks to his extensive history with Glasser, his statements to Edward and Breault, and his destruction of evidence, and given the fact that this call took place mere hours after the victims were last heard from, there was a substantial basis to conclude that the cell phone would contain evidence related to the victims' disappearance.  Therefore, it was proper for officers to seize the defendant's cell phone.

f.  Review under G. L. c. 278, § 33E.  As part of our plenary review of the case, we note that the judge omitted a critical part of the reasonable doubt instructions and allowed the prosecutor to quote a statement using a racial slur.

i.  Beyond a reasonable doubt jury instruction.  In his final jury instructions, the judge told the jury that "the evidence must convince you of the defendant's guilt to a reasonable and moral certainty," but omitted the phrase from the reasonable doubt instruction in Commonwealth v. Webster, 5 Cush. 295, 320 (1850),[33] that clarified the meaning of that phrase:  "a certainty that convinces and directs the understanding, and

_____

[33] We recently modified the traditional Webster charge in Commonwealth v. Russell, 470 Mass. 464, 468-479 (2015).

satisfies the reason and judgment, of those who are bound to act conscientiously upon it."[34]  Because the defendant did not object, we review to determine whether the judge's deviation created a substantial likelihood of a miscarriage of justice. See Commonwealth v. Figueroa, 468 Mass. 204, 220 (2014).

This part of the judge's instructions were identical to those given in Veiovis.  There, we found that the "judge's use of the phrase 'abiding conviction' in conjunction with 'moral

---

[34] The judge instructed the jury:

"I have said that the burden -- it's on the Commonwealth to prove beyond a reasonable doubt that the defendant is guilty of the charges against him.  What is proof beyond a reasonable doubt?  The term is often used but not easily defined.

"Proof beyond a reasonable doubt does not mean proof beyond all possible doubt, for everything in the lives of human beings is open to some possible or imaginary doubt.

"A charge is proved beyond a reasonable doubt if, after you've considered all of the evidence, you have in your minds an abiding conviction to a moral certainty that the charge is true.

"I've told you that every person is presumed to be innocent until he is proved guilty and that the burden of proof is on the prosecutor.  If you evaluate all of the evidence and you still have a reasonable doubt remaining, the defendant is entitled to the benefit of that doubt and must be acquitted.

"It is not enough for the Commonwealth to establish a probability, even a strong probability, that the defendant is more likely to be guilty than not guilty.  Instead, the evidence must convince you of the defendant's guilt to a reasonable and moral certainty.  That is what we mean by proof beyond a reasonable doubt."

certainty,' coupled with his fidelity to the Webster instruction in every respect except for the noted omission, convince[d] us that the omission did not create a risk that the jury failed adequately to understand the reasonable doubt standard, and therefore did not create a substantial likelihood of a miscarriage of justice." Veiovis, 477 Mass. at 490.  We reach the same conclusion here, and hold that there was no substantial likelihood of a miscarriage of justice.

ii.  Racial profanity.  Lastly, we comment on the judge's allowance of a racial slur in both the Commonwealth's opening and closing statements, as well as in a statement by Hall. Casey testified that when Hall was describing the killings to him, Hall indicated that he had killed Glasser and that "the fat guy and the nigger" were with him.  The Commonwealth referenced this statement in both its opening and closing.  In opening, the prosecutor inaccurately forecasted that Casey would quote Hall's statement as "I didn't mind shooting the nigger."  In closing, the prosecutor again referenced Hall's statement to Casey, stating, "I finally got him.  I ousted him.  That he killed Dave, the Fat Guy, as he referred to -- Hall did, The nigger."

Any probative value of the word was substantially outweighed by a risk of unfair prejudice, and the references in both the Commonwealth's opening and closing served to exacerbate the prejudice.  See Mass. G. Evid. § 403.  The word -- combined

with the substantial Aryan Brotherhood evidence -- implied that the murder was in some way racially motivated, despite the fact that the Commonwealth was not prosecuting the case on such a theory.  Contrast Commonwealth v. Cruzado, 480 Mass. 275, 279 (2018) (no error to allow admission of interview in which defendant referred to victim as "a nigger," where racial animus was partial motive for killing and judge asked jurors during voir dire whether use of word would affect their ability to be impartial).  Thus, it was error to allow use of the word in this context.  This inclusion, however, did not give rise to a substantial likelihood of miscarriage of justice, given its limited instances and the strength of the Commonwealth's case against the defendant.

3.  Conclusion.  Given the foregoing, and upon review of the entire record, we conclude that the verdicts of murder in the first degree are consonant with justice, and we decline to exercise our authority under G. L. c. 278, § 33E, to order a new trial or direct the entry of verdicts of a lesser degree of guilt.

                              Judgments affirmed.

Appendix.

While every circumstance is different, where, as in this case, a judge is faced with a juror who indicated a verdict at odds with the verdict slip when polled, and who refused to reenter the jury room to deliberate, the judge might consider the following approach:

First, inform the juror that he or she should not disclose to the court the substance of the jury's deliberations or where they stand numerically or otherwise in their deliberations. Then inquire of the juror whether he or she is willing to maintain his or her oath to conscientiously try the charges and decide them according to the evidence.  Should the juror respond "yes," ask the juror if the juror believes that he or she is able to review the evidence impartially based upon a fair consideration of the evidence and discuss the issues with his or her fellow jurors.  If the juror responds "yes," instruct the juror, "With those answers to my questions in mind, please return to your deliberations.  Please do not discuss either my questions or your responses with your fellow jurors."

Next, bring the entire jury back into the court room and inform them that your conversation with their fellow juror has nothing to do with their role as the sole and exclusive judges of the facts of this case and instruct them that the jury are

not to speculate on that discussion.  Then, further instruct the jury, "You should find the facts from a fair consideration of the evidence and apply those facts to the law as I have instructed you in order to seek to reach a fair and a just verdict.  In order to return a verdict of guilty or not guilty, the verdict must be unanimous.  You may return to your deliberations."

Of course, things rarely go so smoothly.  If the juror responds "no" to either of the questions above, the judge must proceed with a steady hand and the utmost caution.  Cf. Commonwealth v. Torres, 453 Mass. 722, 736 (2009).  First, the judge should remind the juror not to reveal any details of the jury's deliberations.  Then the judge should ask the juror whether the reason he or she responded "no" to the court's inquiry was personal to the juror, as opposed to reasons involving issues in the case or with the juror's relationship with his or her fellow jurors.[1]  If it is a personal matter, the

---

[1] In Commonwealth v. Connor, 392 Mass. 838, 845 (1984), we stated that if a "'problem' juror is questioned, the judge should preliminarily inform him that he cannot be discharged unless he has a personal problem, unrelated to his relationship to his fellow jurors or his views on the case."  However, we have also upheld determinations by a judge where such a preliminary communication was not provided.  See Commonwealth v. Holley, 478 Mass. 508, 529-530 (2017) (defendants' argument that judge was required to preliminarily inform visibly ill juror according to Connor "elevate[d] form over substance").  The spirit of Connor is aimed at ascertaining whether the juror's issue is personal, not at informing the juror about the criteria

judge should then inquire as to what the personal matter is that
is interfering with the juror's ability to be fair and
impartial, and ascertain whether it is a "mere euphemism[]" for
the assertion of a minority view.  See Commonwealth v. Connor,
392 Mass. 838, 846 (1984).  If the juror attempts to disclose
the content of jury deliberations, the judge will need to
interrupt the juror and caution him or her yet again not to
disclose anything about the substance or course of jury
deliberations.  If the juror's reason for indicating his or her
inability to deliberate are personal to the juror and divorced
from the juror's views of the merits of the case -- and the
juror confirms that it will prevent him or her from deliberating
fairly -- the juror may be excused.  See id.

If, on the other hand, the juror states that the reason he
or she cannot continue deliberating is not a personal matter,
the judge must simply inform the juror that the judge cannot
discuss the issue, and send the juror back to continue
deliberating.  If the juror continues to refuse, the judge could
consider whether there has been due and thorough deliberation
and whether it would be appropriate to give the traditional
Tuey-Rodriquez charge to the entire jury.  See Commonwealth v.

--------

for discharge or continuing to deliberate.  Indeed, a judge may,
in certain circumstances, be wary of instructions that
implicitly give a juror a roadmap of how -- or how not to -- be
discharged.

Rodriquez, 364 Mass. 87, 101-102 (1973) (Appendix A);

Commonwealth v. Tuey, 8 Cush. 1, 2-3 (1851).

We recognize, of course, that such questions are often not amenable to following a script, despite the best efforts of the judge.  We also recognize that matters personal to the juror and those having to do with the merits of the case are not always easily compartmentalized.  Ultimately, in reviewing such matters, we must recognize that the judge needs to respond to such situations with leeway and agility, and that no script can contemplate every contingency.