<pre>
 1                                    Volume: **III**
                                     Pages: 1-224
 2                                   Exhibits: 1-51

 3

 4
                         COMMONWEALTH OF MASSACHUSETTS
 5       BERKSHIRE, SS                    SUPERIOR COURT DEPARTMENT
                                          OF THE TRIAL COURT
 6

 7       *******************************
         COMMONWEALTH OF MASSACHUSETTS
 8
         vs.                                    Docket No:
 9                                              2011-0140
         DAVID T. CHALUE,
10       *******************************

11
              JURY TRIAL
12            BEFORE THE HONORABLE C. JEFFREY KINDER

13
         **APPEARANCES:**
14       For the **Commonwealth:**
         Berkshire County District Attorney's Office
15       7 North Street, P.O. Box 1969, Pittsfield, MA  01202
         By:  DAVID F. CAPELESS, ASSISTANT DISTRICT ATTORNEY
16            PAUL CACCAVIELLO, FIRST ASSISTANT DISTRICT ATTORNEY
              GREGORY BARRY, ASSISTANT DISTRICT ATTORNEY
17
         For the Defendant **DAVID T. CHALUE (2011-0140):**
18       By:  DONALD W. FRANK, ESQUIRE, FRANK LAW OFFICES, 95 State
         Street, Suite 918, Springfield, MA  01103
19            BONNIE G. ALLEN, ESQUIRE, 39 Main Street, Suite 8,
         Northampton, MA  01060
20            MEREDITH RYAN, ESQUIRE

21

22                                       Hampden Superior Court
                                              50 State Street
23                                       Springfield, Massachusetts
                                              April 25, 2014
24
                          ALICIA  CAYODE  KYLES
25                        Official Court Stenographer
                          Registered Merit Reporter
</pre>

```
1                         I N D E X

2    Witness              Direct    Cross    Redirect   Recross

3    Erin Forbush
     (By Mr. Capeless).......69
4
     Heather Ethier
5    (By Mr. Capeless)......102

6    Lester Chadwell
     (By Mr. Capeless)......112
7    (By Mr. Frank)..................122

8    Todd Briggs
     (By Mr. Capeless)......123
9
     Lisa Archambeault
10   (By Mr. Capeless)......136..................155
     (By Mr. Frank)..................145
11
     Andrew Johnston
12   (By Mr. Capeless)......157
     (By Mr. Frank)..................164
13
     Alan Catalano
14   (By Mr. Barry).........166
     (By Mr. Frank)..................172
15
     Brittany Beggs
16   (By Mr. Barry).........172
     (By Mr. Frank)..................185
17
     Earl Persip
18   (By Mr. Caccaviello)...188
     (By Mr. Frank)..................195
19
     Dale Gero
20   (By Mr. Barry).........197

21   William Scott
     (By Mr. Barry).........210
22

23

24

25
```

```
 1  EXHIBITS                                    PAGE
 2  Exhibit A-ID..stipulation........................12
 3  Exhibit B-ID..witness list.......................12
 4  Exhibit 1.....photo..............................71
 5  Exhibit 2.....photo..............................74
 6  Exhibit 3.....photo..............................75
 7  Exhibit 4.....photo..............................85
 8  Exhibit 5.....photo..............................85
 9  Exhibit 6.....photo..............................87
10  Exhibit 7.....photo..............................87
11  Exhibit 8.....photo..............................87
12  Exhibit 9.....photo..............................88
13  Exhibit 10.....photo.............................88
14  Exhibit 11.....photo.............................88
15  Exhibit 12.....photo.............................91
16  Exhibit 13.....photo.............................91
17  Exhibit 14.....photo.............................92
18  Exhibit 15.....photo.............................94
19  Exhibit 16.....photo.............................95
20  Exhibit 17.....photo.............................96
21  Exhibit 18.....photo.............................97
22  Exhibit 19.....photo.............................97
23  Exhibit 20.....photo.............................97
24  Exhibit 21.....photo............................107
25  Exhibit 22.....photo............................108
```

1   Exhibit 23....photo................................108
2   Exhibit 24....photo................................109
3   Exhibit 25....photo................................109
4   Exhibit 26....photo................................113
5   Exhibit 27....photo................................114
6   Exhibit 28....photo................................125
7   Exhibit 29....photo................................127
8   Exhibit 30....photo................................127
9   Exhibit 31....photo................................130
10  Exhibit 32....photo................................130
11  Exhibit 33....photo................................131
12  Exhibit 34....photo................................132
13  Exhibit 35....photo................................132
14  Exhibit 36....photo................................133
15  Exhibit 37....bank records/D. Glasser..............134
16  Exhibit 38....photo................................168
17  Exhibit 39....Pearlman's receipt...................169
18  Exhibit 40....photo................................177
19  Exhibit 41....photo................................178
20  Exhibit 42....photo................................178
21  Exhibit 43....BMC records/D. Glasser...............200
22  Exhibit 44....photo................................203
23  Exhibit 45....photo................................204
24  Exhibit 46....photo................................204
25  Exhibit 47....photo................................204

Exhibit 48....CD of Glasser/Hall conversation......213

Exhibit 49....photo............................216

Exhibit 50....photo............................217

Exhibit 51....cell phone........................218

1     (* * * * *)

2     (The Court entered at 9:02 a.m.)

3     (The defendant was present.)

4     THE COURT:  Thank you.  Please be seated.

5     Good morning.  Good morning, Counsel.

6     MR. CAPELESS:  Good morning, Your Honor.

7     THE COURT:  I have a couple of preliminary matters I

8  wanted to address before I hear any that you may wish to

9  raise.

10     Thank you for working at coming to some agreement on

11  the stipulations.  I have reviewed it.

12     Mr. Capeless, does the stipulation change in any way

13  your estimate of the length of the trial?

14     MR. CAPELESS:  No.  I think, Your Honor, or maybe a

15  number of them we had actually employed during the Hall

16  trial, but some of them will cut down to some extent.  We

17  are also looking to trim what we're doing and I'm saying --

18  I'm saying we should definitely be done probably three

19  weeks.

20     THE COURT:  All right.  So nothing that would require a

21  re-instruction of the jury on our estimate?

22     MR. CAPELESS:  No, Your Honor.

23     THE COURT:  All right.  Mr. Frank, have I assumed that

24  you have had an opportunity to speak with Mr. Chalue about

25  the stipulation?

1          MR. FRANK:  I have, Your Honor.

2          THE COURT:  All right.  Bear with me for just a moment.

3          Mr. Chalue, can I ask you to stand for just a moment.

4          THE DEFENDANT:  Yes.

5          THE COURT:  Mr. Chalue, we have been referring to this

6     three-page document which has -- is titled Stipulations.

7          THE DEFENDANT:  Okay.

8          THE COURT:  It bears Mr. Frank's signature and he

9     reports and I accept his statements that he has discussed it

10    with you.  I just want to make certain, for the record, that

11    you've had a chance to discuss it with him, you've seen it,

12    and you agree with the stipulations; is that a fair

13    statement?

14         THE DEFENDANT:  Yes.

15         MR. FRANK:  He hasn't seen the actual documents.  We

16    have discussed it, Your Honor.  I don't believe he has

17    actually seen the actual document.

18         THE COURT:  Why don't you take a moment while we are

19    discussing other matters and take a look at the

20    stipulations.

21         Can you do that?

22         THE DEFENDANT:  Thank you.

23         May I sit?

24         THE COURT:  You may.

25         THE DEFENDANT:  Thank you.

1    (Pause)

2    THE COURT:  I have a copy here.

3    MR. FRANK:  Thank you, Your Honor.

4    THE COURT:  Mr. Capeless, are you seeking a ruling on

5    your motion in limine to admit Mr. Chalue's statements as

6    part of your case in chief before opening?

7    MR. CAPELESS:  No, Your Honor.  I don't intend to get

8    into it in the opening.

9    THE COURT:  All right.  I also wanted to tell you that

10   it is my plan to -- and this has to do only with scheduling.

11   It is my plan to keep the jurors in the building and

12   provide lunch to them.  I mention that only because I think

13   it's important that we be ready to go at two o'clock,

14   because they will have been waiting for the lunch hour and I

15   don't want to keep them waiting any longer than is

16   absolutely necessary.  So, absent some alteration in the

17   schedule, I would ask you to be try to be prompt as will I

18   so that we can begin promptly at two o'clock.

19   Now, Mr. Capeless, any preliminary matters on behalf of

20   the Commonwealth?

21   MR. CAPELESS:  None that I can think of.

22   THE COURT:  Mr. Frank?

23   MR. FRANK:  Not exactly a preliminary matter, Your

24   Honor.  But I am going to be seeking additional records from

25   DOC based on the records that I currently have.  I would

1    like to reserve time on perhaps Wednesday after we're done
2    with court and get the people from DOC in on that date.
3         I raise this now because I'm concerned I will forget
4    later.  If I get the --
5         THE COURT:  When you say get the people in from DOC,
6    I'm not exactly sure what you are asking me.
7         MR. FRANK:  I intend to have, prepare over the weekend,
8    a Dwyer Lampron motion.  I will be also be subpoenaing the
9    records while we are at trial.  And I think that our
10   hearing -- may be required -- that will involve people from
11   the DOC.
12        THE COURT:  You mean counsel from DOC?
13        MR. FRANK:  Counsel from DOC.
14        THE COURT:  All right.  Well, I'm on notice of your
15   intention to file that.  Have you been in touch with anyone
16   at the Department of Correction?  Is there counsel regarding
17   whether these -- you might be able to facilitate this
18   without motion practice?
19        MR. FRANK:  I know that I will need to do this through
20   motion because some of them are for the mental health
21   records and I have not, only because I just haven't had the
22   time, quite frankly.
23        THE COURT:  I understand.  All right.
24        So when you say after we are finished on Wednesday, you
25   mean at four o'clock Wednesday?

1      MR. FRANK:  Yes.

2      THE COURT:  All right.  In light of the fact that we're

3   setting aside time each morning at nine o'clock before the

4   jury arrives at 9:30, is there perhaps a day that we could

5   address it in the morning that will fit within your

6   schedule?

7      MR. FRANK:  Whatever the Court's pleasure.

8      Wednesday morning will be fine too, if I can get them

9   filed on time.

10      THE COURT:  I would prefer to do it in the morning

11   rather than four o'clock in the afternoon.  All right?

12      MR. FRANK:  Thank you.

13      THE COURT:  Now, Mr. Chalue, could I address you again.

14      Did you have a chance to look at those stipulations?

15      THE DEFENDANT:  Yes, sir.

16      THE COURT:  All right.  And are you in agreement with

17   those stipulations?

18      THE DEFENDANT:  Yes, sir.

19      THE COURT:  One other thing I wanted to address with

20   you, as you probably know that there will come a time in the

21   trial of this case where you, together with counsel, will

22   have to make a decision about whether or not you wish to

23   testify yourself.  It is important for you to understand you

24   have a right to testify, if you want to.  You also have a

25   right not to testify.  That's a decision I know you will

1  make after consultation with your lawyers, but it's

2  important that you understand that it is your decision and

3  your decision alone.

4       Do you understand that?

5       THE DEFENDANT:  Yes, sir.

6       THE COURT:  You may be seated.

7       THE DEFENDANT:  Thank you.

8       THE COURT:  We are in recess until 9:30.

9       (The Court exited at 9:10 a.m.)

10      (* * * * *)

11      (The Court entered at 9:44 a.m.)

12      (The defendant was present.)

13      THE COURT:  Counsel, all of the jurors are here.  We

14  are ready to go.  They are lining up.

15      Have you discussed, Mr. Capeless and Mr. Frank, how you

16  wish to communicate the contents of the stipulation to the

17  jury and when?

18      MR. CAPELESS:  Judge, you may notice with a number of

19  them it isn't so much telling the jury, as just agreeing

20  that somebody would be able to testify to something that

21  some other witness might have been called in to do.  Most of

22  them are that way.  We may only get one or two where we are

23  actually going to have to communicate something to the jury

24  and I don't think there is going to be an issue.  I can talk

25  to the Court about it.

1          THE COURT:  I will defer to you as to when and how you

2     want to communicate that information, but we should mark the

3     stipulation at least for Identification.  I take it you're

4     not asking that it be marked as an exhibit; is that correct?

5          MR. CAPELESS:  No, Your Honor.

6          (Exhibit A, stipulation, marked for Identification)

7          THE COURT:  Have we also marked the list of potential

8     witnesses?

9          THE CLERK:  That will be B for Identification, Your

10    Honor.

11         THE COURT:  Very well.  As soon as the jury is ready.

12         (Exhibit B, list of witnesses, marked for

13    Identification)

14         MR. CAPELESS:  Your Honor, are we going to keep the

15    seventeenth juror?

16         THE COURT:  Well, since I announced that it was my plan

17    not to, I intend not to unless either of you would like to

18    be heard on it.

19         MR. CAPELESS:  Sixteen is fine; seventeen is better.

20         THE COURT:  My plan is to excuse the seventeenth juror

21    if the sixteen do not raise any issues.

22         (Pause)

23         (The jury entered at 9:46 a.m.)

24         THE COURT:  Ladies and gentlemen, good morning.

25         THE JURY:  Good morning.

1        THE COURT:  Two preliminary things.  First, thank you

2   for being prompt this morning.  We appreciate that very

3   much.

4        Second, thank you again for your patience in the jury

5   selection process earlier this week.

6        Before we actually begin the trial there are some

7   preliminary matters to address and the first is for me to

8   ask you a couple of questions, which I will ask you each

9   morning.  And the questions are related to my cautionary

10  instructions from the other day.

11       First, did any of you have any difficulty following my

12  instructions regarding not discussing the case with anyone

13  since you left here during the jury selection process?  In

14  other words, did any of you either overhear or participate

15  in any discussions regarding the case?

16       If so, please raise your hand.

17       (Pause)

18       THE COURT:  No hands have been raised.

19       And the second question is, did any of you either

20  intentionally or inadvertently gather any information

21  related to the case from any source outside the courtroom

22  since leaving here earlier this week, including any media

23  reports?

24       If you did, please raise your hand.

25       (Pause)

1       THE COURT:  Again, no hands have been raised.

2       Now, one additional question that I ask once I have the

3   jurors assembled, did any of you, upon reflection, fail to

4   bring to my attention anything about your own personal

5   experience that you think would have been material to the

6   jury selection process?

7       If so, please raise your hand.

8       (Pause)

9       THE COURT:  Again, no hands have been raised.

10      We selected seventeen of you, even though we only

11  needed sixteen.  I picked a seventeenth just in case the

12  answer to that last question might have caused some juror to

13  be excused.

14      So with that understanding, Ms. Beaudry, I am going to

15  thank you for your service.  And you may now be excused.

16      THE JUROR:  Okay.

17      THE COURT:  Thank you very much.

18      The next step, ladies and gentlemen, is to make

19  official your status as jurors.

20      Will you please stand and raise your right hand.

21      (The jurors were sworn.)

22      THE CLERK:  You may be seated.

23      Ladies and gentlemen of the jury, harken to the

24  Indictments:

25      Number 2011-140, Count 10, the Commonwealth of

Massachusetts, Berkshire SS, at the Superior Court holden at Pittsfield, within and for the County of Berkshire, for the transaction of criminal business on the first Tuesday of August, in the year of our Lord 2012, David T. Chalue of Springfield, in the County of Hampden, on or about the 28th day of August, in the year of our Lord 2011, in the County of Berkshire, did assault and beat David R. Glasser with intent to murder him, and by such assault and beating did kill and murder David R. Glasser in violation of Massachusetts General Laws, Chapter 265, Section 1.

Indictment 2011-140, Count 11, the Commonwealth of Massachusetts, Berkshire SS, at the Superior Court holden at Pittsfield, within and for the County of Berkshire, for the transaction of criminal business, on the first Tuesday of August, in the year of our Lord 2012, David T. Chalue of Springfield, in the County of Hampden, on or about the 28th day of August, in the year of our Lord 2011, in the County of Berkshire, did assault and beat Robert T. Chadwell with intent to murder him and by such assault and beating did kill and murder Robert T. Chadwell in violation of Massachusetts General Laws Chapter 265, Section 1.

Indictment 2011-140, Count 12, the Commonwealth of Massachusetts, Berkshire SS, at the Superior Court, holden at Pittsfield, within and for the County of Berkshire, for the transaction of criminal business, on the first Tuesday

of August, in the year of our Lord 2012, David T. Chalue of
Springfield, in the County of Hampden, on or about the 28th
day of August, in the year of our Lord 2011, in the County
of Berkshire, did assault and beat Edward S. Frampton with
intent to murder him, and by such assault and beating did
kill and murder Edward S. Frampton in violation of
Massachusetts General Laws, Chapter 265, Section 1.

Indictment 2011-140, Count 13, the Commonwealth of
Massachusetts, Berkshire SS, at the Superior Court, holden
at Pittsfield, within and for the County of Berkshire, for
the transaction of criminal business, on the first Tuesday
of August, in the year of our Lord 2012, David T. Chalue of
Springfield in the County of Hampden, on or about the 28th
day of August, in the year of our Lord 2011, at Pittsfield,
in the County of Berkshire, did without lawful authority
forcibly or secretly confine or imprison another person, to
wit:  David R. Glasser, within this Commonwealth, against
his will, in violation of Massachusetts General Laws,
Chapter 265, Section 26.

Indictments 2011-140, Count 14, the Commonwealth of
Massachusetts, Berkshire SS, at the Superior Court, holden
at Pittsfield within and for the County of Berkshire, for
the transaction of criminal business, on the first Tuesday
of August, in the year of our Lord 2012, David T. Chalue of
Springfield, in the County of Hampden, on or about the 28th

day of August, in the year of our Lord 2011, at Pittsfield,
in the County of Berkshire, did without lawful authority,
forcibly or secretly confine or imprison another person to
wit:  Robert T. Chadwell within this Commonwealth against
his will, in violation of Massachusetts General Laws,
Chapter 265, Section 26.

Indictments 2011-140, Count 15, the Commonwealth of
Massachusetts, Berkshire SS, at the Superior Court, holden
at Pittsfield, within and for the County of Berkshire, for
the transaction of criminal business, on the first Tuesday
of August, in the year of our Lord 2012, the jurors -- David
T. Chalue of Springfield, in the County of Hampden, on or
about the 28th day of August, in the year of our Lord 2011,
at Pittsfield, in the County of Berkshire, did without
lawful authority, forcibly or secretly confine, or imprison
another person, to wit:  Edward S. Frampton within this
Commonwealth, against his will, in violation of
Massachusetts General Laws Chapter 265, Section 26.

Indictment 2011-140 Count 16, the Commonwealth of
Massachusetts, Berkshire SS, at the Superior Court, holden
at Pittsfield, within and for the County of Berkshire, for
the transaction of criminal business, on the first Tuesday
of August, in the year of our Lord 2012, David T. Chalue of
Springfield, in the County of Hampden, on or about the 28th
day of August, in the year of our Lord 2011, at Pittsfield

in the County of Berkshire, did directly or indirectly willfully threaten or attempt or cause physical injury, economic injury, or property damage to David L. Glasser, a witness or potential witness at any stage of a criminal investigation, Grand Jury proceeding, trial, or other criminal proceeding of any type, with the intent to impede, obstruct, delay, harm, punish or otherwise interfere thereby with a criminal investigation, Grand Jury proceeding, trial, or other criminal proceeding of any type in violation of Massachusetts General Laws, Chapter 268, Section 13, capital B(1) small (A)I.

Indictment 2011-140 Count 17, the Commonwealth of Massachusetts, Berkshire SS, at the Superior Court holden at Pittsfield, within and for the County of Berkshire, for the transaction of criminal business on the first Tuesday of August, in the year of our Lord 2012, David T. Chalue of Springfield, in the County of Hampden, on or about the 28th day of August, in the year of our Lord 2011, at Pittsfield, in the County of Berkshire, did directly or indirectly willfully threaten, or attempt or cause physical injury, economic injury, or property damage to Robert T. Chadwell, a witness or potential witness at any stage of a criminal investigation, Grand Jury proceeding, trial, or other criminal proceeding of any type with the intent to impede, obstruct, delay, harm, punish or otherwise interfere thereby

with a criminal investigation, Grand Jury proceeding, trial,
or other criminal proceeding of any type in violation of
Massachusetts General Laws Chapter 268, Section 13, capital
B(1), small A(I).

Indictment 2011-140, Count 18, the Commonwealth of
Massachusetts, Berkshire SS, at the Superior Court holden at
Pittsfield, within and for the County of Berkshire, for the
transaction of criminal business, on the first Tuesday of
August, in the year of our Lord 2012, David T. Chalue of
Springfield, in the County of Hampden, on or about the 28th
day of August, in the year of our Lord 2011, at Pittsfield,
in the County of Berkshire, did directly or indirectly
willfully threaten or attempt or cause physical injury,
economic injury, or property damage, to Edward S. Frampton a
witness or potential witness at any stage of a criminal
investigation, Grand Jury proceeding, trial, or other
criminal proceeding of any type with the intent to impede,
obstruct, delay, harm, punish or otherwise interfere thereby
with a criminal investigation, Grand Jury proceeding, trial,
or other criminal proceeding of any type, in violation of
Massachusetts General Laws Chapter 268, Section 13, capital
B(1) small A(I).

To these indictments the defendant pleaded that he is
not guilty, and for trial thereof puts himself upon his
country which country you are.

1    You are now sworn to try the issues.  If he is guilty
2  you will say so, if he is not guilty you will say so and no
3  more.

4    Ladies and gentlemen of the jury, harken to your
5  evidence.

6    THE COURT:  Ladies and gentlemen, the documents that
7  Miss Capeless just read to you are called the indictments
8  and it's important that you understand that the indictments
9  are not evidence in and of themselves.  They are merely a
10  formal mechanism to begin the criminal process.

11    As I mentioned earlier, Mr. Chalue is presumed
12  innocent.  The Commonwealth has the burden of proving his
13  guilt beyond a reasonable doubt.

14    You should draw no adverse inference against Mr. Chalue
15  from the mere fact that he has been indicted.

16    Now, I want to taken just a few minutes and explain to
17  you the process of the trial so that as it unfolds before
18  you, you will understand its component parts.

19    The first thing you're going to hear will be the
20  opening statements of counsel.

21    Each side will have an opportunity to give you an
22  overview of what they anticipate the evidence will show.

23    Much like the indictments, the opening statements -- in
24  fact, any statement of counsel are not evidence in the case.
25  But it is an opportunity for each of the attorneys to give

1    you a preview of what they believe the evidence will
2    establish, so that as it comes in some small pieces you will
3    understand how it relates to the whole.

4        Because the Commonwealth has the burden of proof,
5    Mr. Capeless will have an opportunity to speak first on
6    behalf of the Commonwealth; then if he chooses to, Mr. Frank
7    will have an opportunity to provide an opening statement on
8    behalf of Mr. Chalue.

9        Because the defendant has no burden of proof, Mr. Frank
10   may make an opening statement or he may reserve his opening
11   statement at the close of Commonwealth's case or he may
12   choose to make an opening statement.  That's entirely his
13   decision.

14       After the opening statements have been made, we will
15   then proceed to the presentation of evidence.  And again,
16   because the Commonwealth has the burden of proof, they will
17   go first and Mr. Capeless will start by calling witnesses,
18   who will come into the courtroom, take an oath, sit in this
19   chair right over here, and respond to questions from
20   Mr. Capeless on what is known as direct examination.

21       After the direct examination is complete, then
22   Mr. Frank will have an opportunity to ask questions of the
23   same witness on cross-examination.

24       After cross-examination is complete, then I will turn
25   to Mr. Capeless for what is known as redirect examination,

1  limited to those areas that have been covered on

2  cross-examination.  And then, finally, I will come back to

3  Mr. Frank to see if he has any recross-examination, which is

4  a long way of saying that each attorney will have two and

5  only two rounds of questioning for each witness.

6       If this case is like most, from time to time there will

7  be objections posed by one lawyer when the other lawyer asks

8  a question.  It is their obligation to do so if they feel

9  that evidence is being presented which is contrary to the

10  Rules of Evidence.  I will then be called upon to make a

11  ruling regarding that evidence or the proposed question and

12  answer.  If I agree with the objection I will say

13  "sustained" which means, if any answer was given you should

14  disregard it.  If I disagree with the objection, I will say

15  "overruled" and the answer can be given, and you can

16  consider it in its entirety.

17       Now, there may be occasions where I need to hear more

18  than the simple word "objection" which is the lawyers will

19  do in the first instance.  They will stand and say,

20  objection.  If I understand it, I will rule in the manner I

21  have just described.  If I feel that I need to understand

22  more before I can make an educated decision, I will ask the

23  lawyers for the legal basis for their objection in which

24  case I'm simply asking them to give me a citation to the

25  Rule of Evidence that they are relying upon, in a word or

1    two; which they understand.

2         There may be still other occasions where I will need to

3    hear more in order to make a decision, that is I will need

4    to hear a little bit more about what the anticipated

5    response will be and I might need to hear some arguments

6    from counsel about the merits of their objection.

7         In those circumstances, which I hope will be limited, I

8    may ask the attorneys to see me at the sidebar, which during

9    the course of the trial, will be this corner of my bench

10   right here.  (Indicating)

11        And I will meet them there with the stenographer, and I

12   will hear argument from them on the nature of the objection

13   and the opposition to the objection.  We try to keep those

14   visits to a minimum because they have a way of delaying the

15   proceedings.

16        But I wanted you to know that sometimes will happen and

17   why it happens, not because we're trying to keep from you

18   important information that would be relevant to your

19   decision making in the case, but we're trying to make

20   certain that all you hear is permissible under the Rules of

21   Evidence.

22        We will proceed witness by witness in that fashion

23   through the case until the Commonwealth has rested.  That is

24   it has presented all of the evidence that it intends to.

25   And then I will turn to Mr. Frank to see whether or not he

1    wishes to present evidence.  Again, bear in mind he has no
2    obligation to do so.
3        If he chooses to present evidence, then we will proceed
4    in the same fashion except Mr. Frank will be asking the
5    questions on direct examination and Mr. Capeless or one of
6    his colleagues will have an opportunity to
7    cross-examination.  And we will follow the same procedure.
8        Then, assuming for the moment there is some defense
9    evidence presented, I would, at the close of that evidence,
10   turn to Mr. Capeless to ask whether or not he has any
11   evidence to present, rebuttal to the defense case that was
12   presented.
13       Now, let me talk for just a moment about the relative
14   roles of the participants in the trial.
15       Let me start with the lawyers.  As you probably
16   understand, they are advocates.  They represent a client,
17   and it is their ethical obligation to zealously represent
18   that client.  Our roles, meaning mine and yours are quite
19   different.  We are not advocates.  We are neutrals.  We are
20   all judges.  I will be the judge of the law and it will be
21   my responsibility to make decisions on what evidence you
22   hear, and what legal principles to instruct you on at the
23   end of the case, and sometimes during the course of the
24   evidence, I will interrupt and gave you legal instructions.
25       It's also my responsibility to manage the trial, to

1   make certain that it proceeds fairly and efficiently.

2        You will act as judges as well, but you will be judges

3   of the facts.  Collectively, you will consider the evidence,

4   and determine from that evidence what the facts in this case

5   are.

6        And to the extent that there are conflicts in the

7   testimony, or discrepancies in the evidence, you will be

8   called upon to resolve those conflicts and determine where

9   the truth lies.  And at the end of the trial, one of the

10  things I will explain to you, are the tools that you can

11  employ in determining the believability of the credibility

12  of certain evidence that comes before you.

13       But again, that will be your function and your function

14  alone to determine what the facts are in this case and then

15  to apply those facts to the law as I explain it to you.

16       My final responsibility in this case, at the very end,

17  will be to instruct you on the legal principles that apply

18  to the charges in this case and the evidence that has come

19  before you.

20       And I will do that in two ways.  First, I will do it as

21  I am doing it now, I will speak to you in open court, and

22  instruct you on those legal principles; but, by that time I

23  will have prepared a document which contains all of those

24  legal principles, and I will be referring to, and in some

25  instances, reading from that document, which I will then let

1    you take into the jury deliberation room with you, for your

2    guidance, if you find it will be helpful.

3         So, after the evidence is closed, there are two

4    important phases of the case that remain, one of which I

5    just touched upon, my instructions of law which comes at the

6    very end.  The other important phase of the case that will

7    remain after you've heard all of the evidence is the closing

8    arguments of counsel.

9         Again, the arguments of counsel are not evidence, but

10   it is an important opportunity for each lawyer to summarize

11   for you what they believe the evidence has established, how

12   it relates to the particular charges in this case and it

13   will be their opportunity to attempt to persuade you that

14   their theory of the case is the correct one.

15        After the closing arguments, I will instruct you as I

16   just described and then and only then will you begin your

17   deliberations in this case.

18        Now, let me pause now and comment again on some of the

19   cautionary instructions I gave you earlier when you were

20   selected as a juror.

21        It is very important during the course of this trial

22   that you keep an open mind.

23        You're going to hear weeks' worth of evidence, but it

24   will be inappropriate for you to draw a conclusion based on

25   what you've heard until you've heard it all, so I want you

1  to keep an open mind.  Don't draw any conclusions.  Don't
2  discuss the case among yourselves.  Don't observe any media
3  reports should there be any.  Don't conduct any independent
4  research, and by that I mean don't go to any locations you
5  might hear described.  Don't conduct any electronic research
6  of any legal concepts or names or phrases that you hear.
7       Don't talk to your neighbor who might be a lawyer about
8  what you're seeing and hearing in the courtroom.  Just keep
9  in mind that everything you need to do your job in this case
10  will be provided to you within these four walls.
11       And to go beyond these four walls to attempt to
12  independently gather information will be a violation of your
13  oath.  I am ordering you not to do so.
14       And I'm -- I say that only because when we cannot
15  control what information comes to you, that information
16  doesn't stand the test of cross-examination in the courtroom
17  and therefor will be completely inappropriate for you to
18  rely upon.
19       It's also important that you not -- not only that you
20  not discuss the case, but that you not post on any
21  electronic media your participation as a juror.  Not because
22  we believe that you would attempt to do anything
23  inappropriate, but posting in that way has a way of inviting
24  comment from other people that would be completely
25  inappropriate for you to consider.

1      So please, don't do that.  Don't discuss the case.  And

2  remember to keep an open mind.

3      Now, after the opening statements are complete, I'm

4  going to ask the Court Officers to deliver to you notebooks

5  for your use, if you decide to use them.  It's not required.

6  These are blank pieces of paper.  We will give you a writing

7  instrument.  Some people find it's helpful to jot things

8  down at the time they hear them, if they think they are

9  important, so that they can perhaps more easily remember

10  them in the future.

11      Other people find that's not necessarily helpful to

12  them.  Whether or not you take notes is entirely up to you.

13  If you do take notes, please do not try to create a verbatim

14  record of everything that is happening here in the

15  courtroom.  We have someone else, Ms. Cayode Kyles, who will

16  do that for us.

17      Keep in mind that often the demeanor of a witness is as

18  important, sometimes more important, than the content of

19  what they are saying.  I would not want your note taking to

20  distract you from your own observations of the witnesses'

21  manner in responding to questions.

22      If you choose to take notes, they are for you and you

23  alone.  Do not share them with other jurors.  They are there

24  as an aid to your own memory and concentration, and the fact

25  that someone chooses to take notes or not does not

1    necessarily mean that their memory is any better or any

2    worse than someone who did.

3         To encourage candor in your note taking, ladies and

4    gentlemen, you should know at the end of every trial we are

5    going to collect those notebooks and keep them in a secure

6    place and at the end of the trial we will destroy them so no

7    one will see them or be exposed to them except you.

8         Now, let me make a very brief comment on the scheduling

9    of the trial.  As I think I told you when you were selected

10   as jurors, the lawyers and I are going to meet at nine

11   o'clock to discuss preliminary matters that might otherwise

12   arise during the trial day and might necessitate you leaving

13   the room if we were -- if we hadn't already addressed those

14   matters.  So we are going to plan to start each trial day in

15   the courtroom at 9:30.

16        The lawyers and I will meet in the courtroom at 9:00,

17   address those preliminary matters, so we are not wasting

18   your time and can move efficiently through the trial

19   throughout the day.

20        Now, having said that, I do need to forewarn you that

21   in most trials, especially one of this duration, there will

22   be times when we either have to have those sidebar

23   conversations where I need to ask you to leave the courtroom

24   because I need to hear argument from the lawyers outside of

25   your presence.

1     Again, that's done only to make certain that what you

2  hear will be admissible evidence in this case.

3     And we will try to keep those recesses to a minimum so

4  that we can efficiently use the time that you have very

5  graciously agreed to give us in this case.

6     Those are my preliminary instructions, ladies and

7  gentlemen.  We are now prepared to commence the trial.

8     As I said, the Commonwealth has the burden of proof, so

9  Mr. Capeless has an opportunity to speak to you first.

10     Mr. Capeless, you may make your opening statements.

11     MR. CAPELESS:  Thank you.  Your Honor.

12               **OPENING STATEMENT BY MR. CAPELESS**

13     MR. CAPELESS:  Your Honor, Counsel, ladies and

14  gentlemen of the jury, over 2 1/2 years ago when we charged

15  the Defendant and his two accomplices with kidnapping,

16  murder, and witness intimidation we well understood the very

17  serious nature of those accusations and we well understood

18  that one day the responsibility that comes with such

19  accusations would come due.  For this defendant, David

20  Chalue, that day has come and I stand here now to tell each

21  and all of you together as a jury, that we will prove each

22  and all of the charges against him and we will do so beyond

23  a reasonable doubt.

24     When this case is concluded, all the evidence has been

25  heard, you have heard the jury's instructions and you have

1  fully and fairly deliberated as jurors, you will return to
2  this courtroom somberly but confidently with verdicts of
3  guilty.
4      We will prove, ladies and gentlemen, that in the early
5  morning hours of Sunday, August 28, 2011, the Defendant and
6  two other men, Adam Hall and Caius Veiovis, went to the
7  first floor apartment of 254 Linden Street in Pittsfield,
8  and there they kidnapped David Glasser, his roommate Edward
9  Frampton, and their neighbor and friend Robert Chadwell.
10 They drove them to a remote location within Berkshire County
11 and killed them by cutting, stabbing and shooting them.
12     Then they cut up their bodies severing the heads, the
13 arms, the legs, and two of the torsos in half, put the
14 pieces in 15 plastic bags and the following morning, Monday,
15 dug a ditch on a private property in Becket -- unbeknownst
16 to the owner -- and tossed the bags into the ditch, covered
17 them over, and then went about the process of trying to
18 cover up the gruesome crimes that they committed.
19     We will prove that they did this because David Glasser
20 was a witness against Adam Hall in two cases that were
21 scheduled to go to trial in Berkshire Superior Court in
22 several weeks from that August weekend, and that Hall had
23 already tried unsuccessfully to intimidate and discredit
24 David Glasser to avoid convictions in those cases.
25     We will present that evidence, ladies and gentlemen, in

1   a number of ways, of course from witnesses, who will tell
2   you what they saw and what they heard, and in some instances
3   how they felt.

4        You will learn about the motive, the plan to
5   intimidate, discredit and ultimately to kill David Glasser
6   and tragically the two friends who were with him.

7        But you will also hear from the defendant's own words,
8   not just admitting that he did these horrible acts but
9   bragging about them, celebrating, mocking the pitiful pleas
10  of the victims and angrily threatening to do the same to
11  someone else.

12       There will be other evidence corroborating those
13  witnesses, surveillance videos as to what they did or just
14  when they did it, cellular telephone records corroborating
15  when events happened, the date the hour, and sometimes the
16  second.  And it will also be a cellular telephone analysis
17  by an FBI expert who will testify in this case corroborating
18  the testimony the night of the kidnapping and murders; Adam
19  Hall stopping on the way to get the guns that were used and
20  meeting up with his accomplices; corroborating his trip to
21  Canaan, New York to enlist a fourth man in helping to bury
22  the bodies, and then placing this Defendant and Adam Hall at
23  or near the burial site, the remains of those poor men --
24  when those remains of the poor men were dumped in the
25  trench.

1        You're also going to hear about the text messages from

2   the Defendant at the time of burial while he was acting as a

3   lookout for Adam Hall and the other man.

4        Now, in this case, ladies and gentlemen, we are

5   charging this Defendant as a joint venturer along with two

6   other men who I have mentioned.  Those are Adam Hall and

7   Caius Veiovis.  During the course of this trial, you will

8   hear them referred to by other names.  The Defendant at the

9   top, many people will call him Davey.  That's how they knew

10  him.  On the lower left, Adam Hall goes by the nickname of

11  Leo.  And on the lower right, Caius Veiovis, who many people

12  know of and will refer to in the course of their testimony

13  as Trash.  (Indicating)

14       The evidence in this case will focus much on Adam Hall,

15  but the actions of all three are to be considered together

16  as acting together as joint venturers, the acts of each and

17  all as if they are one person.

18       Now, there was also in this case an accessory, David

19  Casey, who you see his picture here, who Hall cajoled and

20  threatened to assist in the burial.  (Indicating)

21       But this case is not just about the four people

22  involved in the kidnapping, murder, and intimidation and

23  finally the burial of those three men.  It's about the

24  victims.  On the top, David Glasser; on the lower left,

25  Edward Frampton; and the lower right Robert T. Chadwell.

1   (Indicating)

2        You're going to learn about them as well as who they

3   were while they lived.

4        Now, the testimony in this case is also going to focus

5   on a number of locations here in Berkshire County.  First,

6   254 Linden Street where David Glasser lived with Edward

7   Frampton.  And as you will hear, that Robert Chadwell lived

8   across the street.

9        There will be much testimony about a location not very

10  far away at 122 Madison Avenue.  This was, at the time, the

11  home of the Sutton family -- Karen and Ed Sutton who had a

12  number of daughters who will come in and testify in this,

13  who were very much associated with Adam Hall and then

14  ultimately with this Defendant and Mr. Veiovis.

15       You are also going to hear about the Hells Angels

16  clubhouse where a number of events took place and will be

17  referenced by a number of witnesses.  This is located south

18  of Pittsfield in Lee, Massachusetts.  And on the -- and you

19  will hear testimony particularly on the night that this

20  happened, this is where they first gathered.  The Defendant

21  then stopped this location here in Lenox, to get the guns

22  that were used.  Finally going to the apartment over here of

23  Caius Veiovis back in Pittsfield.  (Indicating)

24       There are other locations here involved.  You will hear

25  talk about the defendant's own property in the rural town of

1    Peru, east of Pittsfield.  Also, of the home just over the
2    line in Canaan, New York of this estate here where the
3    fourth person, David Casey, worked as a kind of a caretaker
4    there.
5         And then, finally, you're going to hear about this
6    location here down in the rural Becket, south of Pittsfield.
7    This location where the bodies were stored overnight Sunday
8    night at the Pavoni residence in Becket, and then finally,
9    unbeknownst to the owner, the Cole property in Becket as
10   well, where the bodies were buried.
11        Now in this case, the Commonwealth accuses the
12   Defendant of murder and we will prove that he committed
13   first degree murder and we will ask you to return
14   indictments for that.
15        Now, as you will hear from the Judge there are two
16   prongs of deliberate -- of murder in the first degree.
17   First, deliberate premeditation and you will hear about
18   them, this Defendant and his accomplices talking about it,
19   planning it, and eventually executing that plan.  And also,
20   a separate prong of extreme atrocity or cruelty.
21        You will hear evidence that he didn't just kill them
22   but they tortured the three men before they did.  You'll
23   hear testimony about the defendant's own statements to
24   another man that they were tortured upon torture, cut up
25   alive and made to watch.  And Hall's statements about

1   gutting, cutting, torturing, making him watch.

2        And you will learn and hear about the injuries that

3   their bodies suffered that are consistent with that torture,

4   and we will ask you to return not just a guilty verdict of

5   first degree murder, but a guilty verdict on both prongs of

6   first degree murder.

7        Now, you will hear evidence in this case, ladies and

8   gentlemen, that the Defendant and Hall and Veiovis took

9   pains to cover up the crimes, some of those efforts worked

10  to a degree.  Despite a thorough ongoing investigation, the

11  crime and death scene have never been determined; the

12  weapons that were used have never been located; no DNA

13  evidence linking the Defendant to the victims or vice versa;

14  just as importantly, no DNA evidence linking anyone else to

15  the murders has been developed.

16       Now, some of those efforts were sloppy.  They did get

17  rid of forensic evidence in this case, but later their

18  efforts were uncovered by investigation.  You'll hear

19  testimony about them throwing clothing and a weapon off a

20  bridge in broad daylight in Lenox Dale, Massachusetts seen

21  by witnesses.  They crushed the car that was used to

22  transport the bags carrying the bodies at a local junkyard

23  in Lanesborough, Massachusetts.  And there are photographs

24  of them doing that.  The Defendant and Hall taking that car

25  in to have it crushed, that they burned clothes at the Hells

1    Angels clubhouse in Lee.  And then, eventually, after this

2    was over, they attempted countersurveillance on the

3    investigators on the case at a garage and lot nearby where

4    the State Police cars were parked, and also the State Forest

5    when investigators were out trying to determine where the

6    crimes had been committed.

7         There were other means of investigation which the

8    Defendant and his accomplices did not think about, but you

9    are going to hear testimony about.  Despite their efforts to

10   thwart cell phone tracking, they were still caught

11   electronically and that evidence, as you will hear,

12   corroborates their obtaining the guns used and placing the

13   Defendant and Hall at or near the scene of the burials.

14        And despite their efforts and their schemes, you will

15   also hear and will be proven to you that they never learned

16   that the most dangerous evidence comes from those that they

17   thought were too afraid or too loyal to turn and to testify

18   against them.  Because you're going to hear testimony from

19   an accomplice David Casey, a teenage girl, fellow inmates,

20   and fellow brothers in the Aryan Brotherhood with the

21   Defendant who will come in and testify about what he said

22   and his accomplices said in admitting that he committed

23   these crimes.

24        Now, a portion of the case will be devoted to testimony

25   demonstrating why all of this happened.  The motive for it.

1    As I said, David Glasser was a witness against Hall --
2    against Adam Hall in one and then in a second case and he
3    tried -- Hall tried to intimidate Glasser from testifying.
4    And you're going to learn about the various schemes to
5    discredit or frame him from crimes that he did not commit.
6        First, you're going to hear this starts back in July of
7    2009 over a few carburetors that belonged to the Defendant
8    that David Glasser took to a recycling yard to have them
9    scrapped to get a little bit of money.  The Defendant heard
10   about it, went down and identified and got them back and
11   decided that he was going to take recompense from Glasser.
12   And on July 21 of that year, he lured David Glasser up to
13   his home I talked to you about in Peru.
14       You're going to hear from his then girlfriend at the
15   time who also eventually became the mother of Adam Hall's
16   child, that she came to the house after she had been told by
17   Adam Hall that he was going to meet David Glasser up in
18   Peru.  And when she arrived there she found Glasser on his
19   knees, Hall yelling at him and eventually hitting him with a
20   baseball bat.  Told her to go get a pen and paper, she does
21   this.  And Hall, at that point forces David Glasser to sign
22   over the registration, the title to the truck that David
23   Glasser owned.  And you're going to learn from the people
24   who knew David Glasser that that truck was the most
25   important thing in his life.

1    Hall then drives -- makes Glasser drive the two of them

2    down to Berkshire Medical Center where he drops him off and

3    drives away.

4    Now, State Police detectives hear about this and they

5    invite David Glasser in to speak with them.  And you're

6    going to see a short video clip of that interview in which

7    during Adam Hall calls David Glasser, he puts him on speaker

8    phone and you hear him say:  So you decided to do it the

9    other way.

10    And, again, this is where it starts.  Now, he's going

11    to try to intimidate David Glasser, but Glasser puts him

12    off.  Officers investigate it, they arrest Hall, they find

13    the bat used in his Hummer, and you will later hear from

14    witnesses that he admits to it that he had beaten Glasser

15    because of the carburetors.

16    Now, while those charges are pending, Hall comes up --

17    you will hear from other witnesses -- with various schemes

18    with not only with women, but with men, trying to get them

19    to, either their girlfriend, and in one instance asking

20    somebody to have her sister testify variously that Glasser

21    had attacked them and attempted to rape them in an effort to

22    try to discredit them.  None of these people agreed to do

23    this, but you're going to hear about the growing

24    determination on the part of Adam Hall, the desperation on

25    his part to discredit David Glasser to try to stop him from

1    testifying.

2         Now, in August of 2010, when the first case is about to

3    come up for trial the following month of September, Hall

4    enlists three people -- Scott Langdon, Nicole Brooks, and

5    now his new girlfriend who is also pregnant with his child

6    Alexandra Ely in a far more elaborate scheme to try now to

7    frame David Glasser.

8         This scheme involves getting Glasser over to New York

9    on a ruse that he's driving Langdon over there for a job

10   over there, okay.  And that Nicole Brooks is then going to

11   go to the New York State Police and claim that she was

12   attacked by a man who shot at her and tried to rob her when

13   she was stopped at a roadside rest area.

14        And you will also hear, as part of this plan which they

15   carried out, that when Glasser takes Langdon over to drop

16   him off that, with a package provided by Adam Hall, in a bag

17   was a gun and also the wallet of Nicole Brooks.  That was

18   placed behind the seat of David Glasser so after Nicole

19   Brooks gets to State Police, New York State Police, they

20   investigate it, they alert the authorities in Pittsfield,

21   and eventually arrest Glasser and find the gun and the

22   wallet.

23        This is where that scheme begins to unravel because in

24   looking through the wallet they find a receipt for a local

25   grocery store in Pittsfield on the date that this attack is

1  supposed to happen and they wonder why this young woman from

2  New York is over in Pittsfield on the same day when this

3  happens.

4          And they go and look at the video and she see her there

5  in this and eventually talking to her, she admits what

6  happens, and Scott Langdon admits what happened, and

7  eventually you will hear Alexandra Ely admits what happened.

8  And the three of them together have agreed to cooperate and

9  they will testify here and tell you about that scheme and

10  what they did.

11          Now, they and others, cooperating witnesses in the

12  case -- some with pending charges, some who have actually

13  been convicted and are under sentence, you'll hear that each

14  one of them will tell you there were no promises.  They hope

15  that by cooperating that they will have some help to them in

16  some -- those who have charges against them, obviously have

17  Fifth Amendment privileges.  They can refuse to testify.

18  Some have been given immunity, but keep in mind, those

19  witnesses who have been given immunity, they are still

20  liable for perjury and they are not given immunity if they

21  lie here in court.

22          Now, with that scheme having unraveled, Hall being

23  charged with that in August of 2011, the two cases now

24  together are scheduled to go to trial in Berkshire Superior

25  Court in several weeks, and Hall urged on by the Defendant

1   David Chalue finally makes the decision that all these
2   schemes aren't going to work, he's just with going to have
3   to make him disappear.  And this is the weekend of Saturday,
4   August 27 into Sunday, August 28.  And this is the weekend
5   of Tropical Storm Irene that hit this whole area of New
6   England with an awful lot of rain and wind in Berkshire
7   County.  And this is how witnesses will recall and focus
8   upon the weekend of the storm.

9        Now, at that time David Glasser lived at 254 Linden
10  Street with Ed Frampton.  And is classified as
11  developmentally disabled.  He had a caseworker help him with
12  organizing his life.  And Glasser was receiving care from
13  the Brien Center, a mental health facility.  They were both
14  receiving SSI benefits.  They were not employed.

15       Glasser made some money driving people around in that
16  truck that he loved.

17       Their neighbor, Robert Chadwell, also lived across the
18  street and oftentimes stayed other places, whether it was
19  his daughter, other relatives, or his friends Ed and David.

20       Now, on Saturday afternoon, you'll hear from the
21  testimony that Robert Chadwell stops at the apartment and he
22  ends up staying there.  Now, Chadwell has a close friend,
23  his boyfriend, Willy Haywood.  And they stay in contact with
24  each other through cell phone throughout the day.  You're
25  going to see records showing numerous phone calls back and

1    forth between the two, and finally one last phone call.  The

2    last contact with those three men at is 11:21 on Saturday

3    night and then they are never heard from again.

4          The next day, Willy Haywood and Robert Chadwell's

5    brother trying to get ahold of him can't get ahold of him.

6    The upstairs neighbor comes down, she can't get out of their

7    driveway because David Glasser's truck is blocking it and

8    they knock on the door and there is no answer.  Then on

9    Monday, Ed Frampton doesn't respond to any calls from his

10   social worker.  He misses medical appointments.  And so,

11   people start going over there.  No answer.  The TV is on.

12   Ed Frampton's cat is there.  There is no sign of the three

13   of them.

14          Finally, on Wednesday, missing person report is made.

15   The State Police, Pittsfield Police Investigators converge

16   on the neighborhood and begin a search that ends 10 days

17   later when their dismembered remains are found buried in

18   that trench in Becket.

19          As I mentioned, several of the cites are located in

20   Pittsfield, but others are outside, in particular Becket, a

21   very rural town south; and Peru, very rural, away from

22   Pittsfield.

23          You're going to learn from the testimony that this

24   Defendant David Chalue knew Hall from before and saw him, as

25   he described, as a means to get access to guns and other

1    weapons because Hall was a member of the Hells Angels.  And

2    you're going to hear witnesses describe how he appears in

3    Pittsfield from Springfield about a week or so before the

4    storm and that he and Hall remain together throughout the

5    next several weeks leading up to and after.

6        And in most of that time, they are also accompanied by

7    the third man, Trash, Caius Veiovis.

8        You will hear that Hall knew Veiovis through the Hells

9    Angels, even described Veiovis as being a "prospect".  He

10   was not a full member.  They were not close, but you will

11   hear they started hanging out just before and after the

12   weekend of the storm.

13       You're going to hear about Veiovis, Trash, and another

14   friend Eric Fox going to the Home Depot on the Wednesday

15   before that weekend of the storm.  You'll see photos of them

16   at the Home Depot.  They ask about saws, but eventually

17   examine hatchets and axes there.

18       And on the Friday night, the night before, young woman

19   by the name of Katelyn Carmin will tell you she was at the

20   Hells Angels clubhouse in Lee with this Defendant, Hall and

21   Veiovis.  That she was riding ATVs with the other two and

22   Hall cautions her not to let them get injured because I need

23   them for something.

24       And that will be verified, the date of when that

25   happened, by phone calls that she made to get a ride to take

1    her back to New York from there.

2          Finally, on the afternoon of the 27th on Saturday,

3    you're going to see the three of them together in

4    photographs at a Hells Angels party being celebrated right

5    here in Springfield at the McKinney & Burbach Tavern.

6          Surveillance by the Springfield intelligence --

7    Springfield PD Intelligence Unit, show the three of them

8    together and eventually leaving the site of the party in a

9    gold Buick, which Hall had recently bought.

10         Finally, you'll learn about on Saturday evening, that

11   the Defendant, Adam Hall, and Veiovis agree to meet with

12   several women, Kayla Sewell and Allyson Scace down at the

13   Hells Angels clubhouse.  That they then plan to go from

14   there up to Veiovis' apartment, Cloverdale Street, up in

15   Pittsfield.  That the Defendant, Veiovis/Trash and the two

16   women go in the women's car and drive straight up to

17   Pittsfield, but that Adam Hall goes in a separate car, and

18   they noticed, as they get up to Lenox, he pulls off.  And

19   you're going to learn from Steven Hinman he stopped off

20   there.  And that's where he showed him he had one gun and he

21   got two more.

22         And you will learn about him finally showing up at the

23   apartment where the others are and that the young women see

24   guns that Adam Hall takes out of a dog food bag at that

25   apartment in Cloverdale Street, and that the Defendant and

1    Hall are examining what appears to be cleaning the guns in

2    preparation for the murders.

3        Now, at about 1:30 a.m. and now it's into Sunday

4    morning, you're going to hear testimony that Hall arrives at

5    that Sutton residence at 122 Madison Avenue with the

6    Defendant and Trash in Trash's Jeep.

7        And that he goes in -- Hall goes in and sees his then

8    girlfriend Alexandra Ely, but he also asks Rose Dawson, one

9    of the daughters who's there, for her cell phone.  Gets it

10   from her and tells her not to tell anyone that he has it.

11       And after then, and before 5:00 a.m. all of the

12   evidence together and the defendant's statements will

13   circumstantially tell you that David Glasser, Edward

14   Frampton, and Robert Chadwell were kidnapped from that

15   apartment and they were killed.

16       You're going to hear about the aftermath the immediate

17   aftermath at about 5:00 a.m. Hall goes into a convenience

18   store, the A-Mart in Pittsfield.  That he's driving the gold

19   Buick, that he comes in, he's soaking wet, and that he buys

20   three candy bars.  Goes out, but quickly comes back in and

21   makes another purchase, cigarettes and cigars.  And you're

22   going to hear Hall doesn't smoke, but the brands that he

23   purchased were those used by the Defendant and by

24   Veiovis/Trash.

25       Hall comes back to the Sutton residence shortly

thereafter.  He drops off the Buick.  Leaves in Veiovis'
Jeep, but comes back later in the morning and asks Alexandra
Ely and Rose Sutton to come up to the house in Peru to make
breakfast, but he cautions them.  He gives them money for
that -- they will describe the money was wet.  And then he
tells them to wash their hands after they use the money.
And he tells them:  Don't look in the bag that's in the
floor of front seat of the gold Buick.

But, of course, Rose decides she's going to do that.
And she will tell you about seeing a glove that was in
there.

That when the two young women come to the residence in
Peru, the Defendant and Veiovis looks exhausted, but Hall is
upbeat.  He's talking on the phone.  He's trying to get a
truck from whomever he is calling.  And you will learn about
the three of them are seen together later that afternoon in
Pittsfield on East Housatonic Street.  And you'll see
shortly thereafter a police surveillance photo that is taken
of that Jeep of Veiovis going back to his apartment.

Now, it's later on that afternoon, you will hear
testimony from David Casey, that Hall comes to recruit him
now because they need to bury the bodies.

You will hear from Casey, who is still being held in
jail on charges as an accessory.  He is cooperating and he
is testifying.  And he'll tell you that Hall came to that

1   compound there in Canaan, New York just over the border.  He
2   asked to talk to Casey and he got inside, he asked if he
3   knew a place he could leave his car overnight.  He was
4   having trouble with it and it was in Becket.  And so Casey
5   said, Yes, I have a friend, Al Pavoni.  And he makes a call
6   to him, Pavoni agrees to it, and he tells Hall this.
7       And at this point Casey will describe to you that Hall
8   says to him:  I finally got him.  I ousted him.
9       Casey will describe he knew he was talking about David
10  Glasser because he was aware of these charges.  Hall had
11  talked about it before.
12      And Hall told him about holding Glasser and a gun to
13  his head.  He pulled the trigger, it didn't go off, Glasser
14  took off.  He was chased by somebody else, shot, and brought
15  back.  Hall describes, saying, Well, why did you do that
16  he's mine.  I want him.
17      When they bring him back, that Glasser is pleading:
18  Please don't shoot me.  Don't.
19      Casey will tell you how Hall told him:  I told you what
20  would happen if you witnessed against me.
21      And then he shot him in the head.
22      He will tell you he described they had also stabbed
23  someone else.  They thought he was dead.  They came back a
24  short while later, he's sitting up on a log groaning and
25  then they had to kill him.

1      He also recalled mentioning -- Hall did, about they

2   had, quote, trouble cutting up the fat guy.  And also that

3   Hall said:  I didn't mind shooting the nigger.

4      And those were the words that Dave Casey will say Hall

5   used.  He said, quote, they gutted them.  He held up

6   Glasser's head after he cut it off and made fun of him

7   because he looked so ugly he thought.  He said it was

8   raining hard.  He said he enjoyed doing it in the rain.  He

9   was happy he killed him.  Even if he had to spend the rest

10  of his life in jail he didn't care.

11      Now, he asked Casey if he could help him to bury the

12  bodies.  Casey will tell you he didn't want to do this, but

13  eventually agreed to because Hall made some allusions about

14  Casey and also his sister who was the girlfriend of Scott

15  Langdon, that nothing would happen to them, their case or

16  their persons if he cooperated and went along with us.

17      He asked about the excavator that Hall knew that Casey

18  had and it was up in Becket.

19      And so, that night, Hall drives the gold Buick up to

20  the home on Johnson Road, the Pavoni home, there -- where

21  he's met by Pavoni and one of the residents there and leaves

22  the vehicle there.

23      You're going to hear about the following morning, the

24  Defendant and Hall arrive together, then later joined by

25  Casey.  And the two women who were there, Mr. Pavoni's

1   girlfriend and her daughter, who will identify all three of

2   them who were there and they will describe how she

3   identified for the police, not just this Defendant, but also

4   Hall, but also Casey who they knew.

5          And that after they pick up the car that David Casey

6   and Hall go in Casey's truck, they drive to the Cole

7   property, make sure that Cole is not home.  Come back, get

8   the gold Buick and drive it over to the Cole property and in

9   a separate car, a third car, is the Defendant.  And he waits

10  outside the property as a lookout.

11         And Casey will tell you how they went in there, used

12  the excavator, they dug this trench, they dumped the bags

13  that were in the trunk of the gold Buick, covered it over,

14  and then left.

15         Now, you're also going to see actual text messages were

16  taken from this defendant's phone at the time that the

17  burial occurred.  He's trying to get ahold of Hall who's at

18  the burial site.  And you will see this one there at

19  11:58 a.m.:  Hey, what's going on.

20         And then finally at 12:33:  Dude, I'm ready to leave.

21  I don't know what to tell you.

22         Now, you're going to hear that later on that afternoon

23  of Monday the 29th, that the gold Buick that was used to

24  transport the body -- containing the remains, was taken up

25  to that Sayers lot up in Lanesborough and there it was put

1    on the scale and sold to be crushed.  You're going to see

2    photos -- surveillance photos at the wrecking yard of the

3    Defendant and Hall arriving in separate cars.  Hall in the

4    gold Buick, this Defendant in a blue car.

5        Now, you're going to hear witnesses saying that that

6    gold Buick previously seemed to be in okay condition as late

7    as Sunday morning when the two young women took it up to

8    Peru to make breakfast.

9        The worker at Sayers will say, when it was turned in to

10   be scrapped, that there not only was no rear seat, but the

11   trunk had been striped down to bare metal, that it was

12   crushed, sent off to Rhode Island, but it was never

13   recovered by the police finding about it later.

14       And you're going to hear that later on that night, at

15   the clubhouse in Lee, that this Defendant and Hall are there

16   drinking.  You will hear it was very unusual for Adam Hall

17   to drink.  That while they're drinking they are celebrating

18   and they start to mimic and make fun of Glasser and the

19   other victims during course of the murder.

20       Hall running around mimicking:  Help me.  Help me.

21       And the Defendant holding up his hand like a gun to

22   shoot him and both laughing, talking about them clinking

23   glasses as if they are cheering each other about what

24   they've accomplished and about Hall making statements about

25   cutting and torturing the victims, about made him watch and

1   you should have seen the look on his face.

2       And two days later, trying to get rid of evidence,

3   because you will hear that on Wednesday after missing

4   persons report police converge on that apartment at 254

5   Linden Street and the whole neighborhood is abuzz.

6       Ocean Sutton who had started a relationship with the

7   Defendant, during the course of that week, just before and

8   just after the murders, will tell you she's with the

9   Defendant and Hall.  They had spent the night at the Hells

10  Angels clubhouse.  They went out for breakfast and Adam Hall

11  gets a phone call on that Wednesday.

12      They leave, they go back to the clubhouse, that the two

13  men burn some clothing there.  And they are driving up to

14  Pittsfield and on the way they stop, and you're going to see

15  photos of this and you're going hear about this from

16  witnesses.  They stop at the Memorial Bridge in Lenox Dale

17  and both the Defendant and Hall are seen throwing clothing

18  and a box.  You will later hear from the Defendant telling

19  somebody else that also a gun kicked under the railing that

20  went into the river.

21      Those witnesses will tell about it and the Defendant

22  describing to somebody else they were throwing those away

23  because they were evidence involved in it that potentially

24  had evidence on the clothing and in fact Hall's shoes were

25  bloody.  That's why he ends up buying some shoes later.

1    You're going to hear that a week after that, the

2  police, when they find out about this, go down to the river.

3  They do a search, and eventually they recover two pieces of

4  cardboard that are stuck on an island in the middle of the

5  river and the State Police Investigator, Trooper Carol

6  Zullo, will tell you she noticed markings from Walmart that

7  were on the pieces of box.

8    She goes to Walmart.  Goes to the shoe department and

9  finds what appears to be identical boxes.  They use that to

10 link it up.  They go back and look and find the video.  And

11 you're going to see the video from Monday evening the 29th

12 of the Defendant and Hall in Walmart coming in, making a

13 purchase of a new pair of boots and then the two of them

14 walking out and Hall actually wearing the new boots with

15 tags still on them and being stopped by the greater at the

16 door to make sure she sees the receipt.

17    You're going to learn, ladies and gentlemen, about what

18 happened to these three men and about their bodies, about

19 the excavation that was done when the site was discovered in

20 Becket, the 15 bags containing the remains and the clothing,

21 and how the bodies were cut up.

22    You'll hear testimony from the pathologist who

23 conducted the autopsy that David Glasser suffered three

24 gunshot wounds to the head and stab wounds -- one to the

25 leg, and stab wounds and blunt force injuries.

1        That Edward Frampton suffered four gunshot wounds, one
2    to the head, one to the shoulder, and one to each -- to both
3    arms and a large gaping slice in the upper back, and that he
4    was sliced up the middle from the groin all the way up to
5    the sternum.

6        And that Robert Chadwell, three gunshot wounds -- one
7    to the head, two the shoulder, also suffered stab wounds and
8    superficial cuts, fractured ribs, and gaping defect which
9    could not be determined whether it was from a gun shot or
10   being from some blunt object; but he too was sliced up the
11   middle.

12       Four bullets were recovered.  One each from the heads
13   of the three men, one from the arm of Frampton, and all four
14   you're going to hear from testimony were consistent from
15   being a shot with a .45 caliber weapon.  One of the weapons
16   that Steven Hinman will say that he saw, in fact Adam Hall
17   had when he arrived at his house.

18       You're going to hear, unable to get any fingerprints
19   off the bags that were used in the burial, but bags
20   consistent with those used in the burial were found in
21   Hall's residence in Peru, at the Lee clubhouse, the North
22   Adams Apartment that was used by Chalue; and that latex
23   gloves were found at the residence in Peru, Veiovis'
24   apartment, and the apartment in North Adams as well as the
25   clubhouse.

1      And at the clubhouse there was a cleaning kit which

2  appeared to have just been recently used for a .45 caliber

3  including implements that had been used to clean a .45

4  caliber weapon.

5      You're also going to hear evidence, ladies and

6  gentlemen, that during a search of Veiovis' apartment in

7  Pittsfield that on a wall was a collage made of

8  illustrations, anatomical types of illustrations, which

9  depicted dismemberment.

10      And I told you also about the cell phone analysis, an

11  FBI expert Special Agent Eric Perry, who's on their special

12  Cellular Analysis Survey Team will tell you about going over

13  the records showing the -- not only show calls about when

14  they happened, but also the cell towers that were used.  And

15  doing an analysis of this, and also going out himself trying

16  to recreate will corroborate the description of Hall -- of

17  Hall stopping at Hinman's and then going up and meeting with

18  the others, and the others going directly up to Pittsfield

19  from the clubhouse, about Hall going over to meet with

20  Casey, and finally, about Hall being at the site of the

21  burial at the time the burial occurred.

22      Finally, to corroborate all of that testimony and

23  evidence and to assure that it will be very clear to you

24  about the defendant's participation in the kidnap and

25  murders, you will hear what he said to four fellow inmates.

1          All of them inmates with him while he's being held

2    awaiting trial, each recalling not just an admission, but

3    specific deals relating to this case.

4          First you will hear from Christopher Letalien who is

5    with the Defendant at Berkshire House of Correction shortly

6    after he's arrested in September of 2011.  They appear to be

7    friendly, but Letalien will tell you the Defendant became

8    angry.  That Letalien was making noise that might cause the

9    Defendant and Veiovis to lose some privileges they had as

10   special prisoners being held in Segregation Unit.

11         And when Letalien stops by his cell one day, the

12   Defendant says to him, Letalien is going to say:  I'm not

13   going to fight you.  Not only do I got three bodies, I made

14   them disappear.  Not only did I make them disappear,

15   fourteen days later they found them cut up into pieces in

16   the bottom of a ditch.

17         And Letalien will describe his eyes got black, he

18   looked crazy and evil, and he was scared.

19         And you're going to hear from an officer who was in the

20   unit at the time, could see the fear in Letalien's face, and

21   went over to him right afterwards and said, What happened?

22   Letalien didn't want to talk about, didn't tell him, but

23   later explained what had happened and he will come in and

24   testify about that.

25         You will also hear from another inmate from that same

1    unit at around the same time by the name of Jason Lemieux.

2         He became more friendly with the Defendant and they

3    would talk from time to time and he will tell you how the

4    Defendant talked about the victims were tortured upon

5    torture and, quote, cut up alive, the others made to watch.

6    And then he talked about it in a bragging way and made a

7    joke about it.  About how it was funny that Adam Hall's

8    cases fell apart and maybe we should send some bandages to

9    the DA to patch up his witnesses.

10        And he will corroborate that threat made to Chris

11   Letalien because he overheard it.

12        You're also going to hear from two inmates from State

13   Prison themselves serving serious sentences.  First from

14   Jeffrey Cashman.  He will tell you he knew the Defendant

15   through the Aryan Brotherhood.  That he had been put up for

16   membership but had been told he couldn't become a member

17   because, supposedly, the Defendant had said no.

18        When the two of them were together, housed in the same

19   unit, he went up and introduced himself and asked about that

20   and why and that over time they talked and the Defendant

21   appeared to come to trust him and said yes, he would put him

22   up.

23        And eventually he said to him, Look, I want you to read

24   this, quote, novel that I have.  And he has transported over

25   to Cashman's cell a package.  And inside it is a 93-page

1   affidavit, written by one of the investigators of the case

2   which gives an overall about the investigation at that point

3   plus probable cause reports relating to the arrest.  And he

4   says, I want you to read this because I want you to see who

5   the rats are in this case.

6       And Casey (sic) will describe it.  He opened up and you

7   will be able to see from that, that next to a picture of

8   Adam Hall is the word "rat" with an arrow pointing at it.

9       Next to picture of David Casey is the word "rat" with

10  an arrow pointing at it.

11      And there's a lot of things, but inside the note --

12  inside the package were those materials, there's a note

13  written by the Defendant to Cashman which says:  Jeff, check

14  out this novel on a bro's case.  A quick, but enjoyable

15  read.  Keep in mind the name of all of the rats in this

16  case.  I'm sure they will all be making their way up this

17  way and, yes, they will all be in the hat.  Listen, I'm

18  willing to reinstate you, but I first have to know without a

19  doubt, 100 percent, you're willing to give your life for

20  this thing, because once you're in, there's no way out.

21  That means making your bones when the times comes.  Are you

22  willing to do that?  If so, let me know.

23      And Cashman will explain that being "in the hat" means

24  being marked for death.

25      He will tell you that in addition to sending him that

note and letting him read that, showing him who the rats
were, Hall had told him he tried to intimidate the witness,
but he was unsuccessful and that the Defendant told Cashman
it was his idea eventually to tell Hall he's going to have
to get rid of him.  They got rid of the evidence, washed out
one car, crushed another, that they threw the clothes and
the gun from the bridge, and they were worried about some of
the witnesses, and the Defendant was particularly worried
about the cell phone evidence.

    You're also going to hear from a fourth inmate, Jethro
Kempton also a State Police -- State Prison inmate who knew
the Defendant as well through the Aryan Brotherhood.  He
will tell you he was the one who actually had questions
about Cashman being put up for membership.  He had received
a letter from the Defendant, which you'll see, identifying
himself about the business of the brotherhood and referring
to Cashman and one other man being on deck, about let's hold
him there, he shouldn't be in membership.  And when the
Defendant and Kempton were housed together and they finally
did meet, that at that point the Defendant had been made
aware that Cashman was cooperating, and he told Kempton
about it, and made a point about he didn't want this guy in.
And that Cashman himself was now in the hat.

    Now, Kempton will tell you he wasn't shown any reports,
but the Defendant did discuss with him specific details,

1    that it was disjointed, but there were bits and pieces.

2    That he used a .40 caliber gun with copper jacketed bullets,

3    that they let the bodies sit for awhile before cutting them

4    up so it wouldn't be all bloody; that one did run in the

5    woods, that he was shot and brought back and killed later;

6    They crushed one car because it contained evidence; that he

7    was concerned about the cell phone tracking evidence which

8    is part of the case at that point; and that he also says

9    that this fourth person, you will hear about this David

10   Casey, actually knew about it beforehand and he freaked out

11   when he learned about this burial didn't involve just one

12   but three of them.  And he talked about how abusing the

13   witness, not just cutting him up, but abusing his body

14   afterwards, and saying, You rat on me now you F-ing rat.

15        And all four of them will talk about -- they are

16   cooperating.  They are trying to do the right thing, but

17   they are scared and they expect protection as well as help

18   on cases that they have already had and in some instances

19   you will hear about them receiving help.  Relocation, one of

20   them being released from a sentence to be relocated.  And

21   they expect that in these cases, but that no other promises

22   have been made to them.

23        With all of that evidence, ladies and gentlemen, that

24   testimony, the physical evidence, statements the Defendant

25   himself has made about doing it and the details, all of that

1    together will make you comfortable that the Defendant is
2    guilty of all of the charges and you will return verdicts of
3    guilty.
4         Thank you.
5         THE COURT:  Thank you, Mr. Capeless.
6         Mr. Frank, do you wish to make an opening?
7         MR. FRANK:  I do.  Thank you, Your Honor.
8         THE COURT:  You may proceed.
9                     **OPENING STATEMENT BY MR. FRANK**
10        MR. FRANK:  Again, thank you, Your Honor.  To the
11   District Attorney's office to Mr. Chalue ladies and
12   gentlemen, you've heard a lot of stories from the District
13   Attorney's Office but we have a journey ahead of us, a
14   four-week journey, that's what we anticipate for this trial.
15   I think for all of us, we're experiencing, to some degree,
16   it as interesting and other times we may feel it is somewhat
17   tedious, but think for all of us it will be transforming.
18   And it's transformative on a trial like this because the
19   charges are so serious.  They're serious to everybody.
20   They're serious to you.  They're serious to Mr. Chalue.  And
21   we expect -- we look forward to presenting our defense
22   because much of what you've heard in this opening will not
23   be established.
24        I anticipate the trial will go somewhere along these
25   lines, the first part of the case you're going to hear about

1    Adam Hall.  You're going to hear how he chased and harassed

2    David Glasser, it turns out for years.  You're going to hear

3    how Adam Hall was a Hells Angels, a member of the Hells

4    Angels.

5         You're going to hear and you did hear, by the way in

6    the openings, some confusion David Chalue and Adam Hall on a

7    number of occasions as the prosecutor's opening at a time

8    when Mr. Chalue wasn't even around.

9         The second part of this case will be a set of

10   horrifying details about how the bodies of these three men

11   were found and how you can expect that they were treated

12   during the course of what must have been a terrible event.

13        You will hear the details, you'll see the pictures,

14   they will be disturbing.  You've had an instruction or a

15   question about that from the Judge about the fact that

16   you're going to be looking at some pictures regarding the

17   details of this.  That's just how disturbing they are.  The

18   that -- those pictures are disturbing.

19        The third part of this case will be an excruciating

20   recitation of the details of the investigation, the

21   investigation in this case is massive; massive.

22        And here's what you'll learn -- excuse me, at the end

23   of these parts of the case.

24        You are going to learn that the Defendant David Chalue

25   occasionally hung out with Adam Hall.  Other people hung out

1  with Adam Hall.

2      There are a lot of witnesses in this case who are going

3  to come forward who hung out with Adam Hall and they didn't

4  know Adam Hall -- excuse me -- they knew Adam Hall a lot

5  longer than the Defendant David Chalue.  You will hear that

6  the Defendant David Chalue has no connection to any one of

7  these witnesses -- excuse me, victims.

8      You're going to learn that David Chalue is not a member

9  nor a prospect of the Hells Angels.  You're going to learn

10  that David Chalue had the opportunity to flee, to leave the

11  Berkshire area where he'd only recently come.  And you're

12  going to learn that he stayed.

13      You're going to learn that there is no direct forensic

14  evidence to support the Commonwealth's claims against David

15  Chalue and his association or lack of association with this

16  crime.  There's no murder weapons.  There's no murder scene.

17  There's no eyewitnesses.  There's nothing objectively tying

18  the Defendant David Chalue to this crime.

19      Now, the District Attorney spent and returned to the

20  burial on a number of portions during his opening.  So let

21  me talk about that as well because here's what the burial

22  establishes.

23      That when David Chalue had a chance to help, and should

24  have helped were he guilty, he did not.  You're going to

25  learn that the Sunday after the killing, after the death or

1    perhaps the same day as the death, Adam Hall met

2    Commonwealth witness David Casey.  David Chalue is not

3    there.  They had a conversation where David Chalue -- excuse

4    me, where David Casey or Casey and Hall agree that Hall

5    would stash his car at the Pavoni property which is shown to

6    you.  The bodies were in the trunk.  You're going to learn

7    that Hall and Casey agreed to meet at Pavoni's the following

8    day to bury the bodies because Casey had an excavator parked

9    about five minutes away at a friend of his, Dan Cole.  You

10   saw that property.

11       The next day, Mr. Hall met Mr. Casey at Pavoni's and

12   Chalue arrived at Pavoni's with Hall, but you're going to

13   learn he did exactly nothing.

14       You're going to hear that the evidence will show that

15   while at Pavoni's Mr. Hall took Mr. Casey aside and they

16   talked about the plan to bury the body (sic), that Mr. Hall

17   opened up the trunk to the Buick where the bodies were

18   stored, and Mr. Chalue was excluded from that.

19       You're going to hear that Hall and Casey drove to the

20   excavator site, Dan Cole's property, to make sure the

21   property owner, Mr. Cole was not home, was a reconnaissance.

22       You're going to learn that David Chalue was excluded

23   from that reconnaissance, was excluded from that ride.

24       He was having a cup of coffee at the Pavoni residence.

25       You're going to learn that after they did the

1    reconnaissance, Hall and Casey returned back to the Pavoni's
2    residence to pick up the car and the bodies and to drive
3    them to the excavation site.
4         You're going to learn that Mr. Chalue was excluded from
5    this as well.
6         Mr. Casey and Mr. Hall then proceeded to use the
7    excavator to bury the bodies that they took from the trunk
8    of the car.  This took awhile.  They had trouble starting
9    the excavator.  They had trouble moving a big rock.
10        Mr. Chalue was excluded from this.  And I understand
11   that the District Attorney referred to a lookout, and
12   appropriately so, because a lookout would have been very,
13   very helpful.
14        You will learn that my client, David Chalue, was not
15   acting as a lookout.  He was at the Pavoni residence.  And
16   then you see the text, by the way saying:  Hey, dude, what's
17   happening?
18        Something along those lines.
19        I can't wait.  I want to leave.
20        Something along those lines.  Because he was stuck at
21   the Pavoni residence while Mr. Casey and Mr. Hall buried the
22   bodies.
23        The last part of the case is what happens after
24   Mr. Chalue is arrested.  And I'm not going to go through
25   each one of the four so-called jailhouse informants that

1    have been referenced by the prosecutor.  I'll just give a

2    taste.

3        Because we can see what happens when jailhouse inmates

4    see a potential for government handouts.  They don't get

5    cash, they get something more valuable, they get their

6    freedom.

7        And when complete freedom is not available we will

8    examine what the government has to do in exchange for

9    testimony or has to offer in exchange for testimony against

10   David Chalue.  You're going to see these prisoners

11   negotiating, needling and needling and manipulating to try

12   and get a deal and work something out, to get their freedom

13   and some of them, by the way, did succeed.  That's the cost.

14   That's their payment.

15       We're going to examine each of those informants who

16   tried to make their deal with the government.  Mr. Chalue as

17   one witness puts it, turns out to the ace in the hole, as

18   far as his defense is concerned.

19       We will examine how unlikely it is that Mr. Chalue is

20   yelling confessions to a prisoner across a large jail area

21   populated not only with other inmates, but with a guard,

22   because he didn't have access to Mr. Chalue's cell.

23       We're going to examine how another inmate, Mr. Cashman,

24   referenced by the prosecutor, will admit that he read

25   Mr. Chalue's initial police report, an early police report

1    authored by one of the investigators in this matter.  And

2    then we're going to hear how he pretended he heard those

3    same details from Mr. Chalue.

4         Except for, he runs into this problem, and we'll learn

5    this, the initial police report got all of the big so-called

6    facts wrong.  According to the government's own

7    investigation.  And Mr. Chalue would have had that

8    information at the time he would have been speaking to

9    Mr. Cashman.

10        The government will present a vast of Aryan Brotherhood

11   information that came after the defendant was arrested.

12   First of all, you have already sworn not to convict him on

13   that basis alone in the Court's questioning of you in order

14   to participate as a juror in this matter.  You will see that

15   it sheds absolutely no light on Mr. Chalue's participation

16   in this crime.  It may sound scary, it may sound concerning,

17   but you will see that it sheds no light.

18        We will come back at the end of this trial and ask that

19   you consider the jailhouse informants' desires to deal for

20   freedom and government handouts.  We will ask you to

21   consider whether this makes the jailhouse informants more

22   credible or less credible or incredible.

23        Add at the end of the trial, you will be left to

24   consider all of the evidence in this case, and then we will

25   ask that you find Mr. Chalue not guilty because Mr. Chalue

1    is not guilty.

2         Thank you very much.

3         THE COURT:  Thank you, Mr. Frank.

4         Ladies and gentlemen, we are going to take the

5    mid-morning recess.  Please bear in mind my cautionary

6    instructions during the break and do not discuss the case

7    with one another.  We will be back with you in 15 minutes

8    you are excused.

9         (The jury exited at 11:09 a.m.)

10        THE COURT:  We are in recess.

11        (The Court exited at 11:09 a.m.)

12        (* * * * *)

13        (The Court entered at 11:32 a.m.)

14        (The defendant was present.)

15        THE COURT:  Thank you.  Be seated, please.

16        Bring the jury in, please.

17        Mr. Capeless if your first witness is not in the

18   courtroom.  You may bring them in.

19        (Pause)

20        (The jury entered at 11:34 a.m.)

21        THE COURT:  Mr. Capeless, you may call your first

22   witness.

23        MR. CAPELESS:  Thank you, Your Honor.

24        Erin Forbush.

25        (Erin Forbush, sworn)

1      THE COURT:  Good morning, ma'am.

2      THE WITNESS:  Good morning.

3      THE COURT:  If I could remind you to keep your voice up

4  so everyone can hear you and answer only the question put to

5  you, please.

6      THE WITNESS:  Certainly.

7      THE COURT:  You may proceed.

8                      **(Erin Forbush)**

9              **DIRECT EXAMINATION BY MR. CAPELESS:**

10  Q.    In a clear voice, will you please tell His Honor and

11  the members of the jury your name and please spell your last

12  name, please.

13  A.    My name is Erin Forbush, F-O-R-B-U-S-H.

14  Q.    What do you for a for a living?

15  A.    I work for a human service agency, ServiceNet in

16  Pittsfield, Mass.

17  Q.    How long have you lived in Berkshire County?

18  A.    All of my life, so 45 years.

19  Q.    Can you tell the members of the jury what your

20  particular job is working for ServiceNet?

21  A.    So my actual job title at ServiceNet is Director of

22  Operations, but really what that means is that I supervise

23  residential programming for individuals with developmental

24  disabilities.  I also work in homeless shelters, supervise

25  the shelters in Berkshire County.

1   Q.    How long have you been working for ServiceNet?

2   A.    I've been working for ServiceNet going on over 12

3   years.

4   Q.    Turning back to the Summer of 2011, what was your

5   position at that time?

6   A.    My position at that time was Director of Operations,

7   primarily working with individuals with developmental

8   disabilities in an outreach residential setting.

9   Q.    And did you have individual clients?

10  A.    I did.  I had a caseload, yes.

11  Q.    And did you know a person by the name of Edward

12  Frampton?

13  A.    Yes, I did.

14  Q.    How did you know him?

15  A.    Edward Frampton was one of our outreach clients.  He

16  was on my caseload referred by the Department of

17  Developmental Services.

18  Q.    And up to August of 2011, how long had he been your

19  client?

20  A.    I had worked with him probably a little over three

21  years.

22  Q.    And I show you that photograph, and I'm going to ask

23  you if you recognize that person?

24  A.    Yes.  That's Edward Frampton.

25        MR. CAPELESS:  Your Honor, I'm going to ask that be

1   entered and marked as Exhibit Number 1.

2          MR. FRANK:  No objection, Your Honor.

3          THE COURT:  Admitted.

4          (Exhibit No. 1, photograph, marked)

5   Q.   (By Mr. Capeless) Now, can you give a description to

6   the members of the jury about Edward Frampton and why he was

7   receiving services through you as a client of ServiceNet?

8          MR. FRANK:  Objection.

9          THE COURT:  Overruled.

10         THE WITNESS:  Sure.  Edward was referred by the

11  Department of Developmental Services because he had received

12  services through the State, Department of Developmental

13  Services or previously Department of Mental Retardation,

14  since he was probably five years old.  So he was part of

15  that system.  And anybody that needs a little additional

16  assistance -- he did live independently, but he needed

17  additional assistance.  He was referred to our outreach

18  program and that was where my role came into play, was to

19  help him live independently as he was able to do.

20  Q.   (By Mr. Capeless) Were you aware, through your work, as

21  you worked with Mr. Frampton, about his history?

22  A.   I was, yes.

23  Q.   And can you tell the members of the jury how he had

24  spent his childhood?

25         MR. FRANK:  Objection.

1      THE COURT:  Sustained unless you can lay some

2  nonhearsay foundation.

3  Q.   (By Mr. Capeless) Were you made aware of the record

4  related to Mr. Frampton?

5  A.   I was.

6  Q.   Was this important in working with him?

7  A.   It provided a basis of understanding.

8  Q.   Did you also discuss his childhood and his history with

9  him?

10  A.   Yes.  He wanted to talk about that history.

11  Q.   Okay.  Did you come to learn how he had spent his

12  childhood up until early adulthood?

13  A.   I did.  I was able to learn that he was somebody --

14      MR. FRANK:  Objection.

15      THE COURT:  Sustained.

16  Q.   (By Mr. Capeless) Did Mr. Frampton work?

17  A.   He would do little odd things, but he wasn't employed

18  during the time that I worked with him.

19  Q.   Okay.  What kinds of things did you do with

20  Mr. Frampton to help him?

21  A.   Primarily I was there to support him to be able to

22  listen to him, talk to him.  Medical appointments was

23  another big piece of what I did with Ed.  So it was getting

24  him to doctor's appointments, making sure he was taking

25  medication he needed to take.  Sometimes I would help him

1   with finances, you know.  He was able to manage it, but

2   needed assistance at times -- grocery shopping.  Anything

3   that you and I need, just a little support and additional

4   stuff just to continue to live the way that we wish to live.

5   Q.   Over a course of a week, how often would you be in

6   direct contact with him?

7   A.   I would see him a couple times a week and we would

8   probably talk on the phone a few more times than that.  Ed

9   would have quite a bit of contact with me, so I saw Ed a

10  lot.

11  Q.   And over the course of the years that you spent with

12  him, did you ever meet any family of his?

13  A.   I was never able to meet any family.  He really didn't

14  have --

15       MR. FRANK:  Objection.

16       THE COURT:  Overruled.

17  Q.   (By Mr. Capeless) To your knowledge, did he have any

18  family?

19  A.   To my knowledge he had a son, which he did not really

20  have much contact with.  He had been married in the past and

21  his wife had since --

22       MR. FRANK:  Objection.  Objection.

23       THE COURT:  Overruled.

24       THE WITNESS:  His wife had since passed away.  The son

25  was not from the marriage, but he had not -- he felt very

1    bad not seeing his son for years.

2    Q.   (By Mr. Capeless) Now, where did he live?

3    A.   Ed lived in Pittsfield on Linden Street.

4    Q.   I'm going to show you this photograph.

5         Okay.  I'm going to ask you if you recognize what is

6    depicted there.

7    A.   That would be the apartment building that Ed lived in.

8    Q.   Do you know the address?

9    A.   254 -- I want to guess 254-252 Linden Street.

10        MR. CAPELESS:  I would asked that be entered and marked

11   as an exhibit, Your Honor.

12        MR. FRANK:  If it could just be held up.  I don't

13   believe there is an objection.

14        (Pause)

15        MR. FRANK:  No objection.  Thank you.

16        THE COURT:  Without objection, it is admitted.

17        (Exhibit No. 2, photograph, marked)

18   Q.   (By Mr. Capeless) Did he live there alone?

19   A.   He did not.  He had a roommate.

20   Q.   Did you come to know the roommate?

21   A.   I knew the roommate before I knew Ed.

22   Q.   How did you know -- what was the roommate's name?

23   A.   The roommate's name was David Glasser.

24   Q.   How did you know him?

25   A.   I knew David through my work at ServiceNet.  David was

1    part of another outreach program contracted through the

2    Department of Mental Health, same type of program that Ed

3    was in, but funded by the Department of Mental Health

4    instead of the Department of Developmental Services.

5    Q.   Was Edward Glasser still a client in August of 2011?

6    A.   He was not a client of ServiceNet in that time period.

7    Q.   I'm going to show you this photograph and ask you if

8    you recognize the person depicted there?

9    A.   I do recognize him as David Glasser.

10   Q.   Who is that?

11   A.   David Glasser.

12        MR. CAPELESS:  Your Honor, I am going to ask that be

13   entered and marked as Exhibit Number 3.

14        MR. FRANK:  No objection, Your Honor.

15        THE COURT:  Admitted.

16        (Exhibit Number 3, photograph, marked)

17   Q.   (By Mr. Capeless) Now, during the course of time, can

18   you describe how often you would spend time with

19   Mr. Frampton?  Did you spend time over at the apartment?

20   A.   I did, yes.

21   Q.   And when you would go over there, would it be for a few

22   minutes or would you spend more time than that?

23   A.   Oftentimes I would spend more time than that.  It could

24   be up to an hour, maybe a little more.  Other times it was a

25   short visit.

1  Q.   Did you come to see how the household operated between

2  the two of them?

3  A.   I did, yes.  I was very familiar.

4  Q.   Can you describe that to members of the jury?

5  A.   Sure.  The household was the two of them.  It was a

6  one-bedroom apartment.  So Ed had really secured the

7  apartment, so Ed had the bedroom.  The living room kind of

8  really was the living room but also David's room as well.

9       And Ed was definitely much more the

10  housekeeper/homemaker kind of individual.  He took a lot of

11  pride in the belongings he had and how he set his house up.

12  Did the cooking, most of that kind of stuff.

13  Q.   Were there occasions when you ate over?

14  A.   There were occasions that Ed would certainly attempt to

15  feed me when I was there.  Ed was a caretaker, so he cared

16  for me.

17       MR. FRANK:  Objection.

18       THE COURT:  Overruled.

19  Q.   (By Mr. Capeless) Now, did you come to learn whether or

20  not Mr. Frampton had any physical or mental limitations --

21  not mental, but medical limitations?

22  A.   He did.  We were actually, during this time frame he

23  was really looking at trying to correct or deal with a lot

24  of the medical issues he had.  So we had many appointments

25  scheduled for that.

1    Q.    Including what?

2    A.    One of the most troubling to him was some circulation

3    issues, so he wasn't able to walk as well.  So he really

4    wanted to have that addressed, to just to maintain his

5    independence.

6    Q.    Now, this issue relating circulation and walking, did

7    it effect what he did during the course of his day?

8          MR. FRANK:  Objection.

9          THE COURT:  Overruled.

10         THE WITNESS:  It did.  It certainly limited what he was

11   able to do, where he was able to go on his own.

12         You know, he would depend on me to get him from rides

13   to the appointments, that kind of thing; and it caused pain

14   for him.

15   Q.    (By Mr. Capeless) And did you come to know the kind of

16   routine that he normally had?

17   A.    I did, yeah.

18   Q.    Was he somebody who tended to go various places?

19   A.    He was not able to.  He didn't really go.  He would

20   have liked to have gone places, but he wasn't doing that as

21   frequently.

22   Q.    Did he own a vehicle?

23   A.    No.  Ed did not have a vehicle.

24   Q.    Was there a vehicle in the household?

25   A.    David owned a truck.

1    Q.   And did you, over the course of the time that you would

2    spend over at the apartment, would you interact with David

3    Glasser as well as with Edward Frampton?

4    A.   I would on occasion, yes.

5    Q.   And can you describe to the members of the jury the

6    relationship Mr. Glasser had with that truck?

7    A.   Oh, that was -- it was kind of his livelihood.  That

8    truck meant everything to David.  He used it to taxi

9    people --

10       MR. FRANK:  Objection.

11       THE COURT:  Sustained as to anything beyond what you

12   have already testified to.

13   Q.   (By Mr. Capeless) Now, you described that neither

14   Edward Frampton nor David Glasser had formal employment?

15   A.   Correct.

16   Q.   Did you, as part of your job, become aware of whether

17   or not they also they obtained income from elsewhere?

18   A.   Yeah.  I would -- they would certainly tell me stories.

19   I knew other individuals in the community that would utilize

20   David for moving-- I would utilize as an outreach program

21   for moving.

22   Q.   Did either of them have a formal source of money?

23   A.   They were both receiving social security.

24   Q.   Okay.  And did you work with Edward Frampton at least

25   regarding his -- the funds that he would get?

1    A.    At times I would, he would certainly ask me for

2    assistance.

3    Q.    Did he have a routine about getting his check and what

4    he did with it?

5    A.    Yes.

6    Q.    What would happen?

7    A.    The check would come on the first.

8          MR. FRANK:  Objection.

9          THE COURT:  Overruled.

10         THE WITNESS:  The check would come on the first and

11   third, because he would have two checks, a state check, a

12   federal check.  And he was at the bank on those mornings.

13   He withdrew the money.  You know, paid some bills, did what

14   he needed to do with it, but it was always first and third.

15   That's how he did it.

16   Q.    (By Mr. Capeless) Now, over the course of the time that

17   you spent working with him, can you describe the kind of

18   relationship that you had with Edward Frampton?

19   A.    I had -- it was a different relationship I had with Ed.

20   A lot of that was from just the way Ed felt about me.  Ed

21   was somebody that really took a liking to me; would

22   oftentimes try to say, you know, We could have a perfect

23   life together.  Kind of that girlfriend/boyfriend kind of

24   thing.  You know, he would often call me to kind of say

25   thinking about you, leaving a voice mail, that kind of

1    thing.
2         So he pushed the boundaries, which is not the way you
3    want to do it professionally, but I was able to tolerate
4    that and remind him of that.  We were able to have a good
5    relationship in that manner.
6    Q.   How often would he call you?
7    A.   I would probably -- I mean, there's probably six days
8    out of the week he made a phone call to me.  And that
9    includes weekends, because he would leave a voice mail.  So
10   I had voice mail, so I would always have my voice mails to
11   look forward to after a weekend.
12   Q.   At least as far as there, did you come to know the
13   relative ages of the two?
14   A.   Yes; relatively, yes.
15   Q.   Relatively, can you tell the members of the jury?
16   A.   Ed was in his late 50s.  David was probably in his mid,
17   mid 40s.
18   Q.   Were there any pets in the household?
19   A.   There was a pet.
20   Q.   And what was that?
21   A.   The pet was a cat, that was Ed's cat Princess.
22   Q.   Okay.  Did you see the relationship that Ed had with
23   that cat, Mr. Frampton?
24   A.   Oh, yes.  That cat -- that cat meant everything to Ed.
25   You know, he made sure that cat was well taken care of.

1   Q.   I'd like you to turn your attention back to the Summer

2   of 2011, specifically Friday, August 26.  At that time were

3   you working with Ed Frampton?

4   A.   Yes, I was.

5   Q.   Did you happen to speak with him that day?

6   A.   I did speak with him.

7   Q.   How?

8   A.   I spoke to him by phone at the end of the day.

9   Q.   What was the -- what was the conversation about?

10  A.   It was really just kind of recapping what we had done

11  that week and really making plans for the following week

12  because he had many medical appointments that we needed to

13  attend to.

14  Q.   You told the members of the jury earlier that there

15  were issues, particular issues that Mr. Frampton was working

16  on at that time?

17  A.   Uh-huh.

18  Q.   Can you describe, at least particularly in that

19  conversation, how he expressed himself going forward and how

20  things seemed to be going for him?

21       MR. FRANK:  Objection.

22       THE COURT:  Are you offering this for its truth,

23  Mr. Capeless?

24       MR. CAPELESS:  State of mind, Your Honor.

25       THE COURT:  Is that your objection?

1       MR. FRANK:  One of my objections.  My other is
2    relevance.
3       THE COURT:  Overruled.  You may answer.
4       THE WITNESS:  Ed's state of mind was very positive.  He
5    was really on a road to let's-take-care-of-himself.  He
6    hadn't always done that and he really wanted to do that with
7    multiple types of doctors appointments.
8    Q.   (By Mr. Capeless) Now, did you discuss appointments
9    that were coming up that following week, the week starting
10   on the 29th and going forward, Monday, the 29th going
11   forward?
12   A.   Yes, because he had an appointment on Monday morning,
13   so I was making sure -- Friday is my last day of work, I
14   want to make sure that Monday is set up.
15   Q.   Turning your attention to Monday morning, did you go to
16   work that day?
17   A.   I did go to work that day.
18   Q.   When you got there, can you tell the members of the
19   jury, was there any phone message from Mr. Frampton?
20   A.   There was not, which was very unusual.
21   Q.   Okay.  Did you try to contact him?
22   A.   I did start calling him that morning.
23   Q.   About what time?
24   A.   About 10 o'clock I called probably the first time.
25   Q.   Why were you calling him?

1  A.    I was calling him to remind him of the appointments and

2  set up a time on picking him up and that kind of thing.

3  Q.    When you called, did you get an answer?

4  A.    I did not get an answer.

5  Q.    Okay.  So what did you do?

6  A.    I waited a little bit and I called again.

7  Q.    Okay.  Now, when you say you got no answer, when you

8  called, what happened?

9  A.    His answering machine picked up.

10  Q.    Okay.  Did you leave a message?

11  A.    I believe I did leave a message.

12  Q.    Okay.  The second time when you called, did you get an

13  answer then?

14  A.    I did not get an answer.

15  Q.    Okay.  So what did you do?

16  A.    Then I was slightly concerned.  It wasn't typical for

17  me not to get an answer, and he had an appointment coming

18  up, so I decided to go to his apartment to see if he

19  overslept or that kind of thing.

20  Q.    Tell the members of the jury when you arrived at the

21  apartment at 254 Linden Street what happened.

22  A.    You know, I arrived there.  I parked as I normally

23  would.  The first thing that I noticed was that there's an

24  outside door to the building, and it's a storm door and a

25  regular door and they were both closed.  And it was just

1    unusual to me because it was still nice, it was summer, it
2    was warm.   Almost always the main door was open and the
3    screen door was the only thing that was there.
4    Q.   So you -- just can you just explain to the members of
5    the jury when you proceed through that main door, what are
6    you coming into?
7    A.   You're coming into a common hall, stairway.
8    Q.   All right.   And what's directly in front of you?
9    A.   When you go right in, the stairway is right in front of
10   you.
11   Q.   And what's to your right?
12   A.   To the right is Ed's door, Ed and David's door to their
13   apartment.
14   Q.   Did you go through into the door?
15   A.   I did go through into the door.
16   Q.   What did you do?
17   A.   I knocked on Ed's door repeatedly.   I checked -- I got
18   no answer, checked to see if it was unlocked.   The door was
19   locked.
20   Q.   Okay.   Could you hear anything inside?
21   A.   I could hear noise that sounded like a TV.
22   Q.   So then what did you do when you got no answer?
23   A.   You know, I stayed there for a minute to keep knocking
24   on the door and then went back outside and I walked around
25   to the other side of the house.   And I assumed somebody was

1   home when I got there because there was -- David's truck was

2   still there, so typically if the truck was there so was

3   David.

4   Q.   I'm going to show you this next photograph.

5   A.   Okay.

6   Q.   Do you recognize what's shown there?

7   A.   Yes.

8   Q.   Was that now a different view of the exterior from the

9   street of 254 Linden Street?

10  A.   Yes, that's a different view and you can see David's

11  truck in that view.

12  Q.   And this next photograph, what is that a close-up view

13  of?

14  A.   Of David Glasser's truck.

15       MR. CAPELESS:  Your Honor, I'm going to ask these be

16  entered and marked as Exhibits 4 and 5.

17       THE COURT:  Any objection?

18       MR. FRANK:  If I could just be shown them, I don't

19  think so.

20       No objection.

21       THE COURT:  Admitted.

22       (Exhibit No. 4, photograph, marked)

23       (Exhibit No. 5, photograph, marked)

24  Q.   (By Mr. Capeless) At least as shown as on the screen

25  there, can you see only a portion of the truck?

1    A.    Yes.

2    Q.    And that is now a close-up?

3    A.    Yes.

4    Q.    And as you proceeded by the truck, where did you go to?

5    A.    I went to the back of the house.  It was a back porch

6    on the house, so I went to see if -- one, I went to see if

7    there was anyone out in the back and then I checked the door

8    on the back of the house.

9    Q.    And what did you find?

10   A.    I found that there was, like, a little piece of paper

11   in the door and I knocked again and I couldn't see anything

12   through the windows and I couldn't hear anymore than what I

13   had already heard.

14   Q.    I'm going to show you this photograph.  What is

15   depicted there?

16   A.    That's the back of the house.

17   Q.    And this photograph, is that a more close-up view of

18   the rear?

19   A.    Yes.  Yes.

20   Q.    And, finally, this third photograph.  What does that

21   show?

22   A.    Of the back door itself.

23   Q.    Okay.

24         MR. CAPELESS:  Your Honor, I'm going to ask that these

25   three paragraphs be entered and marked as Exhibits 6, 7, and

1  8.

2      THE COURT:  Any objection?

3      MR. CAPELESS:  As they are identified.

4      MR. FRANK:  No objection.

5      THE COURT:  Admitted.

6      (Exhibit No. 6, photograph, marked)

7      (Exhibit No. 7, photograph, marked)

8      (Exhibit No. 8, photograph, marked)

9  Q.  (By Mr. Capeless) Showing you Exhibit 6.

10  A.  Yes.

11  Q.  Exhibit 7?

12  A.  Yup.

13  Q.  And then Exhibit 8?

14  A.  Yes.

15  Q.  Now, you described earlier you saw something in the

16  door.  Was it after you opened it up?

17  A.  I opened the screen door, that's what I knocked on.

18  Q.  What is it you --

19  A.  It was a piece of white tissue paper.

20  Q.  I'm going to show you that photograph.  Does that show

21  that tissue?

22  A.  Slightly, but not any -- the tissue was really there

23  just kind of jammed or wedged between the door jamb.

24  Q.  This next photograph, is that a more close-up view?

25  A.  Yes, it is.

1   Q.   And finally, that third photograph, is that a close-up

2   of -- showing what it looked like?

3   A.   Correct.

4        MR. CAPELESS:  Your Honor, I'm going to ask that these

5   be entered and marked as Exhibits 9, 10, and 11.

6        THE COURT:  Any objection?

7        MR. FRANK:  No objection.

8        THE COURT:  Admitted.

9        MR. FRANK:  We do need to be shown them for our own

10  record keeping.  We don't know which order.

11       THE COURT:  Had you seen them before?

12       MR. FRANK:  I have seen them.

13       I have no objection, but because I don't know which

14  order they are being entered --

15       THE COURT:  We will try to accommodate your request.

16       MR. FRANK:  Thank you.

17       (Exhibit No. 9, photograph, marked)

18       (Exhibit No. 10, photograph, marked)

19       (Exhibit No. 11, photograph, marked)

20  Q.   (By Mr. Capeless) This is Exhibit 9?

21  A.   Yes.

22  Q.   Exhibit 10?

23  A.   Yes.

24  Q.   Exhibit 11?

25  A.   Yes.

1   Q.    Can you tell the members of the jury had you seen

2   something like that before?

3   A.    I had not seen it before, I had only heard that that's

4   what Ed would do occasionally to make sure no one was coming

5   in.

6   Q.    Okay.  Now, did you go into the apartment?

7   A.    On that occasion I did not.  I went back to the

8   apartment with a co-worker.

9   Q.    Okay.  So after you had -- when you had gone there,

10  you'd open up and you saw the doorway that way --

11  A.    Uh-huh.

12  Q.    -- did you do anything?  Did you call out?

13  A.    I -- I probably didn't really call out.  I probably was

14  just knocking and banging on the windows and looking through

15  the windows to see if I could see anything.

16  Q.    Did you see or hear anything?

17  A.    I didn't see or hear anybody.

18  Q.    So you went back in the office?

19  A.    Correct.

20  Q.    And who did you meet with back there?

21  A.    My co-worker Heather Ethier.

22  Q.    Did you talk with her about the situation?

23  A.    I did.  I let her know what I had done, the phone

24  calls, that kind of thing, and then we decided to go back up

25  there.

1    Q.    Okay.  Did you go back?

2    A.    We did.

3    Q.    It's now approximately what time on Monday?

4    A.    It's probably about one o'clock or so.

5    Q.    Okay.

6    A.    Early afternoon.

7    Q.    Now, when the two of you got back there at one o'clock,

8    what did you do?

9    A.    We started, again, going to the front door.  Still

10   nothing.  Went around the back of the house.

11         I had known that Ed, in the past, had locked himself

12   out of the apartment and he would use the bathroom window to

13   gain access, so with that information we were in the back,

14   the bathroom window is in the back of the house next to the

15   back door.  So while I was kind of poking around, looking in

16   the glass on the door, knocking, Heather was trying to kind

17   of see if we could get the window out of the bathroom.

18         While she was doing that, I realized that the door was

19   actually unlocked and was able to then gain access through

20   the door.

21   Q.    Okay.  And did you go into the apartment?

22   A.    We went into the apartment building.

23   Q.    What's the first room you come into?

24   A.    First room when you walk into the apartment from the

25   back is the kitchen.

1    Q.    Showing you that photograph, what does that depict?

2    A.    That would be the kitchen in the apartment.

3    Q.    Is that how it looked when you went in there that day?

4    A.    Yes.

5    Q.    This next photograph, is that another photograph just a

6    different view?

7    A.    It's just a different view, more of the table, the

8    kitchen table in that kitchen.

9          MR. CAPELESS:  Your Honor, I'm going to ask these two

10   be entered and marked as Exhibits 12 and 13.

11         THE COURT:  Any objection?

12         MR. FRANK:  No objection.

13         (Exhibit No. 12, photograph, marked)

14         (Exhibit No. 13, photograph, marked)

15   Q.    (By Mr. Capeless) Is that Exhibit 12?

16   A.    Correct.

17   Q.    And then Exhibit 13?

18   A.    Correct.

19   Q.    Now, in Exhibit 13, on the right-hand side there, what

20   can you see in that cabinet?

21   A.    There are what we call pill planners and medication,

22   the boxes of medication, bottles, and then the front there,

23   the pill planners.

24   Q.    And who are these prescriptions for?

25   A.    They are probably both for David and Ed on that side.

1    That's where they kept their medications.

2    Q.   Showing you that photograph, is that a close-up view of

3    the cabinet?

4    A.   It is a much closer view.

5    Q.   And is that how it looked --

6    A.   It is how it looked.

7    Q.   -- that now afternoon?

8    A.   On that day I went, yes.

9        MR. CAPELESS:  I'm going to ask that this be entered

10   and marked as Exhibit 14.

11       MR. FRANK:  No objection.

12       THE COURT:  Admitted.

13       (Exhibit No. 14, photograph, marked)

14   Q.   (By Mr. Capeless) Does that show the pill planner

15   there?

16   A.   Yes.

17   Q.   Now, did you move from the kitchen to other rooms?

18   A.   We did.  I -- you can see -- you can, from the kitchen,

19   you can see the bedroom and the bathroom.  I did walk

20   further into the living room, which is the room right after

21   the kitchen and from there, kind of looked around to see if

22   there was anything out of place.

23   Q.   Did you notice anything when you got into the living

24   room?

25   A.   Nothing other than the TV being on.  It looked like it

1    would normally look when I would be there.

2    Q.   Did you hear or see anybody?

3    A.   Nobody was there.

4    Q.   I show you that photograph.  Do you recognize what room

5    that is?

6    A.   That's -- this would be the living room.

7    Q.   And what is shown directly in the middle of the

8    photograph?

9    A.   The TV.

10   Q.   Okay.  Does it show the television on?

11   A.   It is.  It's currently on.

12   Q.   Is that the way you saw it when went in there?

13   A.   Yes.  Yes, the TV was on.

14        MR. CAPELESS:  Your Honor, I'm going to ask that be

15   entered and marked as Exhibit 15.

16        MR. FRANK:  I would be object to this, if we could go

17   sidebar please?

18        THE COURT:  You may.

19        (End of Sidebar Discussion)

20        THE COURT:  Your objection?

21        MR. FRANK:  Your Honor, the -- I object to the picture

22   that's on the frame inside the TV, what's being shown there.

23   Is think it's unduly prejudicial, unnecessary.  They have

24   multiple pictures of the same scene and there is no reason

25   to put that in.

1          THE COURT:  Well, the record should reflect it appears

2     to be a -- on the TV, a picture of a man laying face down.

3     It's difficult to tell beyond that what exactly it is.

4          Mr. Capeless.

5          MR. CAPELESS:  It's what was on the television when

6     they took the photograph.  It has nothing to do with the

7     case in a sense.

8          THE COURT:  I find the relevance, that it is relevant

9     that the television was on, what was on the TV is not so

10    prejudicial as to outweighs its probative effect.

11         The objection is overruled.

12         (End of Sidebar Discussion)

13         THE COURT:  Admitted.  Just to make a record, it is

14    admitted.

15         (Exhibit No. 15, photograph, marked)

16    Q.   (By Mr. Capeless) Is that Exhibit 15 I just showed you?

17    A.   Yes.

18    Q.   That shows what was on the screen?

19    A.   That shows the TV was on in the living room.

20    Q.   It may not be what you actually saw?

21    A.   No, that is probably not what I saw.

22    Q.   Okay.  Now you described a living arrangement earlier.

23    You said that Mr. Frampton had a bedroom?

24    A.   Yes.

25    Q.   And where did David Glasser sleep?

1    A.    In the living room.

2    Q.    Showing you this photograph, what does that show?

3    A.    That is the living room and the couch in the living

4    room which also doubled as a bed for David.

5    Q.    Is that the way it looked that afternoon?

6    A.    Yes.

7          MR. CAPELESS:  Your Honor, I'm going to ask that be

8    entered and marked as Exhibit 16.

9          MR. FRANK:  No objection.

10         THE COURT:  Admitted.

11         (Exhibit No. 16, photograph, marked)

12   Q.    (By Mr. Capeless) Does that show Exhibit 16?

13   A.    Yes.

14   Q.    Showing you this photograph, do you recognize what's

15   shown there?

16   A.    Yes.

17   Q.    Is that also another photo of the paragraph?

18   A.    That is another photo of David and Ed's apartment and

19   it's the room that's off of the living room which Ed had

20   always called the computer room, so it's kind of an alcove

21   off of the living room.

22   Q.    If you come into the kitchen, okay, and then turn into

23   the living room --

24   A.    Yes.

25   Q.    Where would the alcove be?

1    A.   The alcove would be to my left; yes, thank you.

2    Q.   Is that the way it looked on that afternoon?

3    A.   Yes.

4         MR. CAPELESS:  I'm going to ask that be entered and

5    marked as Exhibit 17, Your Honor.

6         THE COURT:  No objection.

7         Admitted.

8         (Exhibit No. 17, photograph, marked)

9    Q.   (By Mr. Capeless) Does that show 17 in the alcove?

10   A.   Yes.

11   Q.   What is there on top of the desk?

12   A.   Computer monitor.

13   Q.   I'm going to show you several photographs.  First, do

14   you recognize what area of the apartment that is in?

15   A.   That picture was taken from the computer room, alcove

16   into Ed's bedroom.

17   Q.   Okay.  Great.  And this next photograph, is that a more

18   close-up view?

19   A.   Of the bedroom, yes.

20   Q.   And then, finally, this third photograph.  What does

21   that show?

22   A.   The closet that's in the bedroom.

23   Q.   Do all three of those depict how those locations looked

24   that afternoon?

25   A.   Yes, they did.

1        MR. CAPELESS:  Your Honor, I'm going to ask that these

2   three, in the order in which they're identified, be entered

3   and marked as Exhibits 18 and 19 and 20.

4        MR. FRANK:  No objection.

5        THE COURT:  Admitted.

6        (Exhibit No. 18, photograph, marked)

7        (Exhibit No. 19, photograph, marked)

8        (Exhibit No. 20, photograph, marked)

9   Q.   (By Mr. Capeless) And this is 18?

10  A.   Yes.

11  Q.   Exhibit 19?

12  A.   Yes.

13  Q.   And Exhibit 20?

14  A.   Correct.

15  Q.   Going back to Exhibit 19, first off, in general, when

16  you saw the condition of the apartment, did it look any

17  different from other times that you had been there?

18  A.   No.  For that time of day, didn't look any different.

19  And I say that time of day because the bed is made, so

20  typically -- Ed would typically sleep in the evening, get

21  up, make his bed, do whatever kind of tidying up of his

22  house, but that would be the way he keeps his apartment.

23  Q.   Okay.  And, on the lower shelf there --

24  A.   Yes.

25  Q.   -- what do you notice there?

1    A.    Ed's cowboy boots.

2    Q.    Okay.  Did he often wear his cowboy boots?

3    A.    He wouldn't often, but he would wear them for special

4    occasions or to impress somebody such as myself.  He would

5    have the whole kind of cowboy shirt, boots, the whole kind

6    of thing -- hat.

7    Q.    Did you notice anything out of place in the apartment?

8    A.    Ultimately other than them not being there, there was

9    nothing really out of place.

10   Q.    I'm going to show you that photograph.  Do you

11   recognize what's depicted there?

12   A.    I do.  It's a calendar.

13   Q.    Did you notice that calendar when you went into the

14   apartment?

15   A.    I didn't.  I wasn't looking for the calendar.  I was

16   really looking for them or his cat actually.  That is what I

17   was looking for.  I wasn't looking at that time for that.

18   Q.    Okay.  How long did you and Ms. Ethier spend at the

19   apartment at that time?

20   A.    Probably about fifteen minutes.

21   Q.    What did you do after?

22   A.    After we went back to the office, I continued to make

23   some phone calls, you know, trying to figure out where they

24   might be.  We did see a neighbor in the neighborhood that we

25   knew from our work that said that they were looking for Ed

1    too and they hadn't seen him.  But we just kind of took it

2    as that day, maybe they were helping with storm cleanup.

3    That was kind of our thought.

4    Q.    Okay.  The following day on Tuesday, did you try to

5    contact Mr. Frampton?

6    A.    Yes.

7    Q.    Were you able to contact him?

8    A.    I was not able to contact him.  I had no phone messages

9    and when I went to his apartment myself, I found the same

10   thing that I had found the day before.

11   Q.    Did you continue to try to contact him?

12   A.    I did.

13   Q.    Did you go back to the apartment now on Tuesday?

14   A.    I did go back to the apartment.

15   Q.    When did you go back the second time?

16   A.    Probably mid day.

17   Q.    And when you went back those times, can you tell us did

18   you hear anything?

19   A.    The same thing as the TV was the only thing that I was

20   hearing.

21   Q.    All right.  But did you see or hear any people?

22   A.    No.

23   Q.    Did you speak with anybody at work about it?

24   A.    I did.  My supervisor was aware of it.  On that day, I

25   also made the service coordinator through the Department of

1    Developmental Services aware of what I wasn't finding, to

2    see if he had heard anything.

3    Q.    Did you -- you testified earlier that Mr. Frampton had

4    medical appointments.  Did you contact those offices to see

5    if he had shown up?

6    A.    I didn't contact those offices only because I just --

7    he would have gone with me, so I knew he wasn't there.  And

8    they were calling my office to reschedule things, so --

9    Q.    Okay.  Now, finally, on Thursday, had you heard from

10   him?

11   A.    No.

12   Q.    Had you been able to make any contact with

13   Mr. Frampton?

14   A.    No, not at all.

15   Q.    Did anybody go back to the apartment?

16   A.    Probably as of Wednesday we did not go back to the

17   apartment.  On Wednesday was the day that I filed the

18   missing person's report.

19   Q.    And when you did, do you remember speaking to the

20   police about what you had learned or not learned?

21   A.    I do recall that.  I'd actually tried talking to the

22   police the first time, or I did talk to the police the first

23   time on Tuesday and I was really going there just to find

24   out if something had happened and they were possibly

25   incarcerated from the weekend.  And on Tuesday the police

1    department was able to tell me they weren't --

2         MR. FRANK:  Objection.

3         THE COURT:  Overruled.

4         THE WITNESS:  -- that they weren't there and then on

5    Wednesday went back to make the missing persons.

6    Q.   (By Mr. Capeless) Besides Mr. Frampton did you mention

7    to the police about Mr. Glasser?

8    A.   I did.  On Tuesday I mentioned both of their names and

9    then I was much stronger about it on Wednesday when I went

10   back.

11   Q.   Okay.  Can you tell the members of the jury, you said

12   you were much stronger about mentioning Mr. Glasser.  Why

13   was that?

14   A.   I was aware of other legal issues that Mr. Glasser had.

15   I was aware that he was a witness in a --

16        MR. FRANK:  Objection.

17        THE COURT:  Sustained.

18   Q.   (By Mr. Capeless) Now, on Wednesday, what did you

19   formally do?

20   A.   I formally made two missing person reports out, one for

21   Ed and one for David.

22        MR. CAPELESS:  I have no other questions.  Thank you.

23        THE COURT:  Mr. Frank, you may cross-examine.

24        MR. FRANK:  No questions, Your Honor.

25        THE COURT:  Thank you, ma'am.  You are excused.

1        THE WITNESS:  Thank you.

2        (The witness stepped down.)

3        THE COURT:  You may call your next witness, please.

4        MR. CAPELESS:  Heather Ethier, please.

5        (Heather Ethier, sworn)

6        THE COURT:  Good morning, ma'am.

7        THE WITNESS:  Good morning.

8        THE COURT:  If I could remind you to focus on the

9    question.  Answer only the question put to you, please.

10       THE WITNESS:  Yes.

11       THE COURT:  And keep your voice up.

12                      **(Heather Ethier)**

13            **DIRECT EXAMINATION BY MR. CAPELESS:**

14   Q.   Please tell His Honor, the members of the jury, your

15   name and please spell your last name.

16   A.   Heather Ethier, E-T-H-I-E-R.

17   Q.   Where do you live?

18   A.   I live in Adams, Massachusetts.

19   Q.   All right.  How long you have lived in Berkshire

20   County?

21   A.   I've lived here for all of my life 28 years.

22   Q.   What do you presently do for work?

23   A.   I currently work at Greylock Animal Hospital.

24   Q.   Okay.  Turning your attention back to August of 2011,

25   where were you working then?

1    A.    I was working at ServiceNet.

2    Q.    Okay.  And at that time, about how long had you been

3    working there?

4    A.    Fourteen years.

5    Q.    All right.  Were you a co-worker with Erin Forbush who

6    had preceded you as a witness?

7    A.    Yes, I was.

8    Q.    Now, in your work at the ServiceNet, did you become

9    familiar with a person by the name of Edward Frampton?

10   A.    Yes, I --

11   Q.    How did you know him?

12   A.    He was Erin's client, but when she was out of the

13   office or had things to do, I would also take care of him.

14   Q.    And as a result of that, did you have occasion,

15   yourself, to speak to him on the phone much?

16   A.    Yes, many occasions.

17   Q.    Okay.  Did Ms. Forbush discuss him with you?

18   A.    Yes.

19   Q.    Besides Mr. Frampton, did you become familiar with or

20   know his roommate David Glasser?

21   A.    I did, yes.

22   Q.    How did you know him?

23   A.    David was also one of our clients when we were Meridian

24   prior to ServiceNet taking over.

25   Q.    Just showing you what's been marked as Exhibit No. 1,

1    do you recognize who that is?

2    A.    Yes.

3    Q.    And who's that?

4    A.    That is Ed.

5    Q.    And do you recognize, this is Exhibit Number 3.  Do you

6    recognize who that is?

7    A.    That's David.

8    Q.    Now, on Monday, August 29 of 2011, did Ms. Forbush

9    discuss with you, situation regarding Mr. Frampton?

10   A.    Yes, she did.

11   Q.    What did that involve?

12   A.    Well, Ed had a lot of appointments coming up that week

13   and she hadn't heard anything from Ed over the weekend and

14   that was unlike him because he would always followup and

15   find out what time she was going to be picking him up and

16   plan the week.

17   Q.    Did she talk to you about this over the course of the

18   day?

19   A.    Yes, she did.

20   Q.    Now, on Tuesday, the 30th, was this still a topic of

21   conversation between the two of you?

22   A.    Yes, it was.

23   Q.    Okay.  And at this point on Tuesday, did the two of you

24   do something?

25   A.    Yes, we did.

1   Q.   What did you do?

2   A.   Went to the apartment.

3   Q.   Okay.  And when you got there, what did you find?

4   A.   Well, we had gone to the front door, and the screen

5   door was there and then we entered the screen door and

6   walked into the hallway which led to the living room, that

7   door was locked and we couldn't get in.  We heard the TV on,

8   but nobody would answer.  We would knock and knock.  So then

9   went around to the side and went to the back door and tried

10  to get in that way.

11  Q.   Did you get in?

12  A.   We did, to do a wellness check.

13  Q.   All right.  Did you find any people in the apartment?

14  A.   No, we did not.

15  Q.   Had you been to the apartment before?

16  A.   Yes.

17  Q.   How many occasions?

18  A.   Oh, I -- many occasions.  I would help Ed with his

19  medication.

20  Q.   Can you tell the members of the jury, did it seem any

21  different from other occasions you had been there?

22  A.   No.  It was just that there was dishes in the sink and

23  Ed usually was a relatively clean -- they were both

24  relatively clean and they'd also left the cat and that was

25  Ed's baby.

1    Q.    Okay.  Did you notice -- did you take notice of

2    anything, in particular, the appliances there?

3    A.    Not at that time, not the appliances, no.

4    Q.    Turning your attention to the living room --

5    A.    Yes.

6    Q.    -- what, if anything, did you notice about the living

7    room?

8    A.    I noticed in the living room there was a cushion on the

9    floor next to the computer and also I noticed a wallet on

10   the computer, because that's where Ed would spend a lot of

11   his time.  And I opened it up and that was Ed's wallet, but

12   it just seemed out of place, the cushion on the floor.

13   Q.    Okay.  I'm going to show you this photograph, and ask

14   you if you recognize what's depicted there?

15   A.    It's a calendar.

16   Q.    Did you notice the calendar when you went in that

17   Tuesday?

18   A.    I don't.

19   Q.    Do you recall if you saw it subsequent to that?

20   A.    I did, yes.

21   Q.    And what did you notice about the calendar?

22   A.    That he hadn't marked off any -- like that was the last

23   day that he marked off was that Saturday and he was always

24   good about marking it off.

25         MR. FRANK:  Objection.

1        THE COURT:  Overruled.

2    Q.   (By Mr. Capeless) Well, had you noticed somebody in the

3    household typically marking that off?

4    A.   Yes.

5    Q.   Who did that?

6    A.   Ed.

7    Q.   And the last day marked off on that calender?

8    A.   Was Saturday.

9    Q.   To your recollection, this calendar was located where?

10   A.   In the kitchen.

11       MR. CAPELESS:  Your Honor, I ask that this be entered

12   and marked as Exhibit 21.

13       MR. FRANK:  No objection.

14       THE COURT:  Admitted.

15       (Exhibit No. 21, photograph, marked)

16   Q.   (By Mr. Capeless) You also mentioned -- I'm going to

17   show you this photograph.  You recognize what's depicted

18   there?

19   A.   Yes.

20   Q.   What is that?

21   A.   That's the front door of the apartment.

22   Q.   And is this the outer door that you referred to that

23   goes in -- you then go inside?

24   A.   Yes, it is.

25   Q.   And can you see through the bottom pane what's directly

1   in front of you after you enter through the door?

2   A.   Stairs.

3      MR. CAPELESS:  Your Honor, I'm going to ask this be

4   entered and marked as Exhibit 22.

5      MR. FRANK:  No, objection.

6      THE COURT:  Admitted.

7      (Exhibit No. 22, photograph, marked)

8   Q.   (By Mr. Capeless) Now, showing you that photograph, do

9   you recognize -- first off, is that an area in the living

10  room as it appeared when you went in on the Tuesday?

11  A.   Yes, it is.

12  Q.   Now, sir, and what in particular did you note there?

13  A.   That there was a cushion on the floor and I just was

14  wondering who was staying there with them because it was

15  never there in the past.

16     MR. CAPELESS:  Your Honor, I'm going to ask that be

17  entered and marked as Exhibit 23.

18     THE COURT:  Any objection?

19     MR. FRANK:  No objection.

20     THE COURT:  Admitted.

21     (Exhibit No. 23, photograph, marked)

22  Q.   (By Mr. Capeless) And on the screen now does that show

23  Exhibit 23?

24  A.   Yes, it does.

25  Q.   And where is the cushion that you're referring to?

1    A.    It is on the floor.

2    Q.    Okay.  And what's on top of it?

3    A.    Blanket.

4    Q.    Okay.  Now, showing you first this photograph.

5    A.    Yes.

6    Q.    Do you recognize what that is?

7    A.    Yes.

8    Q.    What's that?

9    A.    That's Ed's wallet.

10   Q.    And does that photograph appear to show Ed's wallet as

11   you saw it there on Tuesday?

12   A.    Yes, it does.

13   Q.    Okay.  And then this next photograph, do you recognize

14   what's shown there?

15   A.    Yes.  That's Ed's bus pass, his transportation pass.

16   Q.    Inside what?

17   A.    His wallet.

18   Q.    All right.  Opened up?

19   A.    Yes.

20        MR. CAPELESS:  Your Honor, I'm going to ask that those

21   two be entered and marked as Exhibits 24 and 25.

22        MR. FRANK:  No objection.

23        THE COURT:  Admitted.

24        (Exhibit No. 24, photograph, marked)

25        (Exhibit No. 25, photograph, marked)

1       MR. CAPELESS:  Can we have the lights just for a

2  moment.

3       This is very dark.

4  Q.   (By Mr. Capeless) Can you see the wallet there?

5  A.   Yes.

6  Q.   What symbol is on the top of it?

7  A.   It's a star.

8  Q.   And is this what you are referring to as his

9  transportation pass?

10 A.   Yes.

11      MR. CAPELESS:  Thank you.

12 Q.   (By Mr. Capeless) Now, when you went over there on

13 Tuesday and went -- you said you couldn't get in front, so

14 you went around to back.  As you went around the side, what

15 did you notice on the side?

16 A.   Ed's -- I'm sorry, David's truck.

17 Q.   Did you check the condition of it?

18 A.   I did.  It was locked and I also looked inside and

19 nothing was out of place.  There was some belongings in

20 there, just some things in there.

21 Q.   Now, the following day, Wednesday, this is now the

22 31st, did you go back to the house?

23 A.   I did.  I went by myself.

24 Q.   And when was this?

25 A.   It was in the morning.

1   Q.    Okay.  Any answer this time?

2   A.    No.

3   Q.    Could you still hear the TV?

4   A.    I could.

5   Q.    Did you see the cat?

6   A.    I did.

7   Q.    Okay.  Did you do anything for the cat?

8   A.    I fed it and gave it some water.

9   Q.    Okay.  Did you happen to notice anything particular in

10  the kitchen regarding prescriptions?

11  A.    All of Ed's meds were still there because I was --

12  didn't know what was going on and curious to see if Ed had

13  at least taken some medication in the meantime?

14        MR. FRANK:  Objection, nonresponsive.

15        THE COURT:  Sustained.

16  Q.    (By Mr. Capeless) Well, what did you notice about the

17  daily medication containers that were still there?

18  A.    It was still there and everything was left where it

19  was.  He hadn't touched anything.

20  Q.    Eventually, what did you and Ms. Forbush do regarding

21  what you had learned?

22  A.    I had gone back to the office after I left his

23  apartment and we then reported the two of them missing.

24        I just wanted to verify that morning that we still

25  hadn't seen them, so then went back and we then reported

1   them missing.

2        MR. CAPELESS:  Okay.  Thank you.  I have no other

3   questions, Judge.

4        THE COURT:  Mr. Frank, cross-examination.

5        MR. FRANK:  No questions.

6        THE COURT:  Ms. Ethier, you are excused.  Thank you.

7        THE WITNESS:  Thank you.

8        (The witness stepped down.)

9        THE COURT:  You may call your next witness.

10        MR. CAPELESS:  Thank you, Ms. Ethier.

11        Lester Chadwell.

12        (Lester Chadwell, sworn)

13        THE COURT:  Good afternoon, Mr. Chadwell.

14        THE WITNESS:  Good afternoon.

15        THE COURT:  If I could remind you to speak up so we can

16   all hear you and answer only the question put to you,

17   please.

18        You may proceed.

19                        **(Lester Chadwell)**

20            **DIRECT EXAMINATION BY MR. CAPELESS**

21   Q.   In a clear voice, can you please tell the members of

22   the jury your name?

23   A.   Lester Arthur Chadwell.

24   Q.   Mr. Caldwell, how old are you?

25   A.   Fifty-seven.

1    Q.    Where do you live?

2    A.    247 Linden Street in Pittsfield.

3    Q.    How long have you lived in Pittsfield?

4    A.    Practically all of my life.

5    Q.    Okay.  How long have you lived at an address in Linden

6    Street?

7    A.    About 15 years.

8    Q.    Did you have a brother named Robert?

9    A.    Yes.

10   Q.    And where is Robert in relationship to you, younger or

11   older brother?

12   A.    Younger.

13   Q.    Okay.  And showing you this photograph, I ask you if

14   you recognize who that is?

15   A.    Yes.

16   Q.    Who's that?

17   A.    Robert.

18        MR. CAPELESS:  Your Honor, I'm going to ask that be

19   entered and marked as Exhibit Number 34.

20        MR. FRANK:  No objection.

21        THE COURT:  Admitted.

22        MR. CACCAVIELLO:  Twenty-six.

23        MR. CAPELESS:  What is next?

24        THE CLERK:  Twenty-six.

25        (Exhibit No. 26, photograph, marked)

1    Q.   (By Mr. Capeless) Did you come to know a friend of

2    Robert's by the name of Willie Haywood?

3    A.   Yes.

4    Q.   And how long did you know Willie Haywood?

5    A.   My whole life.

6    Q.   Okay.  And what kind of relationship did he have with

7    your brother Robert?

8    A.   They were close.

9    Q.   Okay.  I'm going to show you this photograph.  Do you

10   recognize who's shown there?

11   A.   Yes, Willie and Robert.

12   Q.   Okay.  And Willie is shown on which side?

13   A.   On my left.

14   Q.   Okay.  And he's got which color shovel?

15   A.   Red.

16        MR. CAPELESS:  Your Honor, I'm going to ask this be

17   entered and marked as Exhibit 27.

18        THE COURT:  Any objection?

19        MR. FRANK:  No objection.

20        THE COURT:  Admitted.

21        (Exhibit No. 27, photograph, marked)

22   Q.   (By Mr. Capeless) Now, looking at the screen, does that

23   show, Exhibit 26, the photo of your brother?

24   A.   Yes.

25   Q.   And does this now show Exhibit Number 27 showing your

1  brother Robert on the right and Willie Haywood on the left?

2  A.   Yes.

3  Q.   Now, back in August of 2011, where did your brother

4  Robert live?

5  A.   With me.

6  Q.   Okay.  And when you say with you, was it in the same

7  apartment with you or the same building?

8  A.   Same apartment.

9  Q.   Okay.  How long had he been living with you?

10  A.   Close to a year.

11  Q.   All right.  Did you have other family that lived in the

12  apartment?

13  A.   My nephews lived -- not in the apartment, they lived in

14  the same building.

15  Q.   Okay.  Did your brother Robert work at that time?

16  A.   No.

17  Q.   Okay.  Had he had jobs in the past?

18  A.   Yes.

19  Q.   At some point had Robert moved out of the Pittsfield

20  area to somewhere else in Massachusetts?

21  A.   Yes.

22  Q.   Where had he gone?

23  A.   Worcester.

24  Q.   Okay.  And was there a reason why went there?

25  A.   Alcohol program.

1  Q.   Okay.  Was issues with alcohol something that Robert

2  struggled with?

3  A.   I can't really call it struggling.  He drank a lot.

4  Q.   Now, I'd like you to turn your attention back to the

5  weekend of Friday, August 26, going into Sunday, August 28.

6  The weekend in which the Tropical Storm Irene came through

7  New England.  Do you remember that weekend?

8  A.   Yes.

9  Q.   Do you remember whether or not you saw your brother

10  Robert on Friday the 26th?

11  A.   I seen him Friday, yes.

12  Q.   Okay.  Did you spend much time with him?

13  A.   Yes.

14  Q.   Okay.  On that day, did you see, also see somebody by

15  the name of Edward Frampton?

16  A.   Yes.

17  Q.   Who is he?

18  A.   He's a friend of mine and across the street -- he lives

19  across the street.  He was a friend.

20  Q.   Okay.  I'm showing you Exhibit No. 1 and who is that?

21  A.   Eddie Frampton.

22  Q.   And did he live with somebody?

23  A.   Yes.  He lived with David Glasser.

24  Q.   Okay.  I'm showing you Exhibit Number 3.  Who's that?

25  A.   Dave.

1    Q.    How long had they been neighbors of yours?

2    A.    Probably about a year and a half.

3    Q.    Okay.  Now, on Friday evening, do you recall whether or

4    not your brother Robert Chadwell left to go somewhere?

5    A.    Yes.

6    Q.    To your understanding, where he was he going?

7    A.    To his daughter's house.

8    Q.    Okay.  Did he often spend time there?

9    A.    Yes.

10   Q.    When I ask you about spending time, were there

11   occasions when he would stay over there?

12   A.    Yes.

13   Q.    Can you tell the members of the jury, did you see

14   Robert at all on Saturday the 27th?

15   A.    No.

16   Q.    Now, on Sunday the 28th, did you get a phone call that

17   day?

18   A.    Yes, I did.

19   Q.    Who was it from?

20   A.    Willie.

21   Q.    Willie Haywood?

22   A.    Yes.

23   Q.    And what did he ask you about?

24   A.    He asked me --

25         MR. FRANK:  Objection.  Hearsay.

1    THE COURT:  Well, is it a question or statement,
2  Mr. Capeless?
3    MR. CAPELESS:  I asked him what he asked him about.
4    THE COURT:  What I thought the question was,
5  Mr. Capeless, so the objection is overruled.
6  Q.   (By Mr. Capeless) What did he ask you about?
7  A.   He asked me if I had seen Robert.
8  Q.   And had you?
9  A.   No.
10 Q.   And so what did you tell him?
11 A.   I hadn't seen him.
12 Q.   Did you have any contact with Robert at all on Sunday?
13 A.   No.
14 Q.   Okay.  Did you try to contact him?
15 A.   Yes.
16 Q.   Okay.  How?
17 A.   I blew up his telephone, you know, went all over the
18 place, his daughter's, family members.
19 Q.   Okay.  Did you see him at all?
20 A.   No.
21 Q.   Did you come in contact with anybody who had seen him?
22 A.   No.
23 Q.   Okay.  Now, the following day, Monday the 29th, did
24 somebody come to your house?
25 A.   Yes.

1    Q.    And who was that?

2    A.    The Pittsfield Police.

3    Q.    Okay.  And did they ask you about something?

4    A.    Yes.

5    Q.    What did they ask you about?

6    A.    They asked me if I had seen him.

7    Q.    All right.  And what did you tell them?

8    A.    Not since Friday.

9    Q.    Okay.  So after the police had been there on Monday did

10   you in turn contact somebody else?

11   A.    I filed a missing persons report on Monday.

12   Q.    All right.  Did you also call somebody?

13   A.    I just talked to Willie.

14   Q.    Okay.  And what did you talk to Willie about?

15   A.    About Rob.

16   Q.    Just so the ladies and gentlemen of the jury

17   understand, to your understanding, was Willie in the

18   Pittsfield area?

19   A.    No.

20   Q.    All right.  Where was he?

21   A.    He was in New York, Plattsburgh.

22   Q.    After you spoke with Willie, did you go somewhere?

23   A.    Just looking for Rob.

24   Q.    Okay.  Do you remember going over to his apartment?

25   A.    To Eddie's?

1   Q.   I'm sorry, to Ed's apartment.

2   A.   Right.

3   Q.   And can you tell the members of the jury what did you

4   find when you got there?

5   A.   Just the door was locked, TV on, nobody there.

6   Q.   Did you knock?

7   A.   Yes.

8   Q.   Did you go inside?

9   A.   No.

10  Q.   You said earlier that on Sunday you said you blew up

11  his phone trying to get ahold of him.  Do you recall his

12  number?

13  A.   No, not now.

14  Q.   If I showed you something, might it help you refresh

15  your memory?

16  A.   Yes.

17  Q.   I ask you to just look at this number here.  Does that

18  refresh your memory as to his number?

19       You can take your time.

20       Can you see it clearly?

21  A.   I believe that is it.

22  Q.   And so what is the number?

23  A.   358 --

24       MR. FRANK:  Objection.

25       THE WITNESS:  -- 2972.

1        MR. FRANK:  He's reading.

2        THE COURT:  I will let you lay a further foundation.

3   Q.   (By Mr. Capeless) Does that refresh your recollection

4   as to what the number was?

5   A.   Yes.

6   Q.   To your memory, what's the number?

7   A.   Excuse me?

8   Q.   To your memory, what is the number?

9   A.   325-7972.

10  Q.   Are you sure about that?

11  A.   Not really.

12  Q.   Okay.  After speaking with the police, you filed a

13  report.  You talked to Willie, you go to the apartment, did

14  you still try to keep -- try to find Robert?

15  A.   Yes.

16  Q.   Were you able to get in touch with him at all?

17  A.   No.

18  Q.   On Wednesday the 31st, around mid day, do you recall

19  seeing the police?

20  A.   Yes.

21  Q.   Okay.  In the neighborhood?

22  A.   Yes.

23  Q.   Can you tell the members of the jury, what kind of

24  police presence was there in the neighborhood around your

25  house and on Linden Street and near where Ed Frampton's

1    house was?

2    A.    It was pretty thick.

3          THE COURT:  I'm sorry.  I couldn't hear you.

4          THE WITNESS:  Pretty thick.

5    Q.    (By Mr. Capeless) Did this include uniform officers?

6    A.    Yes.

7    Q.    What about plainclothes detective?

8    A.    There were more plainclothes than uniform.

9    Q.    Did those officers talk to you?

10   A.    Yes.

11   Q.    Did they talk to other members of your family?

12   A.    They talked to my girlfriend.

13   Q.    Okay.

14         (Pause)

15         MR. CAPELESS:  I have no other questions, Your Honor.

16         THE COURT:  Mr. Frank, you may cross-examine.

17         MR. FRANK:  Thank you.

18

19                 **CROSS EXAMINATION BY MR. FRANK**

20   Q.    Good morning.

21         Sir, you live at 247 Linden Street; is that correct?

22   A.    Yes.

23   Q.    And is that -- I'm sorry.  I represent David Chalue.

24   We have never spoken; is that also correct?

25   A.    No.

1    Q.   Okay.  That is across the street from the Glasser

2    household; is that correct?

3    A.   Diagonally, yes.

4    Q.   Diagonally across.

5         Were you there on Saturday afternoon before the storm?

6    A.   Yes.

7    Q.   And did you hear a loud argument occur in the afternoon

8    right around the Glasser apartment area?

9    A.   No.

10        MR. FRANK:  Okay.  Thank you.

11        THE COURT:  Redirect examination.

12        MR. CAPELESS:  No, Your Honor.

13        THE COURT:  Mr. Chadwell, you are excused.  Thank you.

14        MR. CAPELESS:  Thank you.

15        (The witness stepped down.)

16        THE COURT:  You may call your next witness.

17        (Todd Briggs, sworn)

18        THE COURT:  Mr. Briggs, good afternoon.  If I could ask

19   you to keep -- to focus on the question and answer only that

20   question, please.

21        THE WITNESS:  Yes.

22        THE COURT:  You may proceed.

23                          **(Todd Briggs)**

24            **DIRECT EXAMINATION BY MR. CAPELESS**

25   Q.   In a clear voice can you tell the members of the jury

1    your name, please.

2    A.    Todd Briggs.

3    Q.    All right.  What do you do for living, sir?

4    A.    I'm an investigator for Berkshire County Sheriff's

5    office.

6    Q.    How long have you had that position?

7    A.    Since end of last year, November of last year.

8    Q.    And you've been in law enforcement for how long?

9    A.    Twenty years.

10   Q.    And previously, you worked in what agency?

11   A.    Lee Police Department.

12   Q.    Now, back in early September of 2011, and going

13   forward, were you involved in an investigation into the

14   disappearance of David Glasser, Edward Frampton, and Robert

15   Chadwell?

16   A.    Yes.

17   Q.    Now, as part of that investigation, did you and other

18   investigators execute search warrants to get cell phone

19   records for people related to the investigation?

20   A.    Yes.

21         (Pause)

22   Q.    (By Mr. Capeless) I'm going to show you that.  Do you

23   recognize that multipage document?

24   A.    Yes.

25   Q.    Is this one of the cell phone records that were

1    received via the search warrant?

2    A.    Yes.

3    Q.    And it is for what number?

4    A.    (413)329-1737.

5    Q.    And over the course of your investigation you

6    determined and had the search warrant executed for the phone

7    because it related to what person?

8    A.    Willie Haywood.

9          MR. CAPELESS:  Your Honor I'm going to ask that be

10   entered and marked as Exhibit 28.

11         THE COURT:  Any objection?

12         MR. FRANK:  No objection.

13         THE COURT:  Admitted.

14         (Exhibit No. 28, cell phone record/Willie Haywood,

15   marked)

16   Q.    (By Mr. Capeless) I'm going to hand you back Exhibit

17   Number 28, in case you need to refer to it.  Did you have

18   occasion, once it was received, to go through those records?

19   A.    Yes, I did.

20   Q.    And, particularly, did you look through what record or

21   phone calls were transpiring on the evening of Saturday

22   August 27, 2011 into the early morning hours of Sunday the

23   28?

24   A.    Calls between Mr. Haywood and Mr. Chadwell.

25   Q.    All right.  And at least regarding that Saturday, do

1    the records indicate that there were phone calls between the
2    two of them?
3    A.    Yes.
4    Q.    Approximately how many?
5    A.    Approximately 8 to 10.  I can -- if you give me a
6    second.
7         (Pause)
8         THE WITNESS:  Approximately 12.
9    Q.    (By Mr. Capeless) And the last phone call is at what
10   time?
11   A.    I'm sorry, 11:21 p.m.
12   Q.    And that went from which phone to which phone?
13   A.    Mr. Chadwell called Mr. Haywood.
14   Q.    Okay.  Now, showing you that document, is that another
15   of the cell phone records that were received via those
16   search warrants?
17   A.    Yes.
18   Q.    And this is for what number?
19   A.    (431)347-7258.
20   Q.    And this is related to what person?
21   A.    Adam Hall.
22        MR. CAPELESS:  Your Honor, I'm going to ask that be
23   entered and marked as Exhibit 29.
24        THE COURT:  Any objection?
25        MR. FRANK:  No objection.

1         THE COURT:  Admitted.

2         (Exhibit No. 29, cell phone records/Adam Hall, marked)

3    Q.   (By Mr. Capeless) Showing you this multipage document,

4    is that another set of cell phone records received?

5    A.   Yes.

6    Q.   And this is for what number?

7    A.   (413)770-4036.

8    Q.   And this is related to what person?

9    A.   Adam Hall.

10        MR. CAPELESS:  Okay.  I'm going to ask that be entered

11   and marked as Exhibit 30, Your Honor.

12        THE COURT:  Any objection?

13        MR. FRANK:  No objection.

14        THE COURT:  Admitted.

15        (Exhibit No. 30, cell phone records/Adam Hall, marked)

16   Q.   (By Mr. Capeless) Showing you that multipage document,

17   is that another one of the cell phone records received via

18   the search warrants?

19   A.   Yes.

20   Q.   For what number?

21   A.   (516)712-8141.

22   Q.   And that's related to what person?

23   A.   David Chalue.

24        MR. CAPELESS:  Your Honor, I am going to ask that be

25   entered and marked as Exhibit 31.

1          THE COURT:  Any objection?

2          MR. FRANK:  Yes, may we go sidebar.

3          THE COURT:  You may.

1      (Beginning of Sidebar Discussion)

2      THE COURT:  Mr. Frank.

3      MR. FRANK:  Yes, Your Honor, I understand you've made a

4  ruling on this, this is -- this is obtained as the search

5  warrant which was based, in part, upon information that has

6  been obtained, been redacted from the search warrant.

7      THE COURT:  So you're simply preserving your appellate

8  rights by raising an objection now?

9      MR. FRANK:  At a minimum, yes.  I would encourage you

10  to revisit that ruling however.

11      THE COURT:  I'm not going to revisit it unless there is

12  something new and different to bring in sidebar.  You can

13  just note your objection, I will make sure your rights are

14  preserved.

15      MR. FRANK:  Okay.  Thank you.

16      (End of Sidebar Discussion)

17

18

19

20

21

22

23

24

25

1      (Exhibit Number 31, cell phone records/David Chalue,
2  marked)
3      THE COURT:  Objection is overruled and admitted.
4  Q.   (By Mr. Capeless) Showing you this much larger
5  document, is that another set of cell phone records that
6  were received via the search warrants.
7  A.   Yes.
8  Q.   This is for what number?
9  A.   (413)358-1655.
10  Q.   And that is for a phone related to what person?
11  A.   Kayla Sewell.
12  Q.   Okay.  Is (sic) the records actually in her name?
13  A.   They are not.
14  Q.   Okay.  But you determined, in the course of the
15  investigation, that it was hers?
16  A.   They that was her phone, yes.
17      MR. CAPELESS:  Your Honor, I'm going to ask that be
18  marked as Exhibit 32.
19      THE COURT:  Any objection.
20      MR. FRANK:  No objection.
21      THE COURT:  Admitted.
22      (Exhibit Number 32, cell phone records/Kayla Sewell,
23  marked)
24  Q.   (By Mr. Capeless) Showing you that document, are those
25  cell phone records also among those obtained via the search

1  warrant?

2  A.   Yes.

3  Q.   And this is for what number?

4  A.   (413)358-5966.

5  Q.   And this is for a phone related to what person?

6  A.   Allyson Scace.

7       MR. CAPELESS:  Your Honor, I'm going to ask that be

8  entered and marked as Exhibit 33?

9       MR. FRANK:  No objection.

10      THE COURT:  Admitted.

11      (Exhibit Number 33, cell phone records/Allyson Scace,

12  marked)

13  Q.   (By Mr. Capeless) And handing you that multipage

14  document, is that another set of cell records received via

15  the search warrant?

16  A.   Yes, it is.

17  Q.   Now, sir, and that is for what number?

18  A.   (413)212-6638.

19  Q.   And this was for a phone associated with what person?

20  A.   Alexandra Ely.

21  Q.   Just so it's clear to the members of the jury, the

22  first name is?

23  A.   Alexandra.

24  Q.   Dra?

25  A.   Yes.

1        MR. CAPELESS:  Your Honor, I'm going to ask that be

2   entered and marked as Exhibit 34.

3        THE COURT:  Any objection?

4        MR. FRANK:  No objection.

5        THE COURT:  Admitted.

6        (Exhibit No. 34, cell phone records/Alexandra Ely,

7   marked)

8   Q.   (By Mr. Capeless) Handing you that document, is that

9   another set of cell phone records received via the search

10  warrant?

11  A.   Yes, it is.

12  Q.   For what number?

13  A.   (419)559-6450.

14  Q.   And that's associated with what person's phone?

15  A.   Katelyn Carmin.

16       MR. CAPELESS:  I ask that be entered and marked as

17  Exhibit 35, Your Honor?

18       MR. FRANK:  No objection.

19       THE COURT:  Admitted.

20       (Exhibit No. 35, cell phone record/Kaitlyn Carmen,

21  marked)

22  Q.   (By Mr. Capeless) Finally, showing you that set of

23  documents, was that the last or another of the cell phone

24  records that were received via the search warrant?

25  A.   Yes.

1   Q.   And that is for what number?

2   A.   (518)878-6170.

3   Q.   And this is for a cell phone associated with what

4   person?

5   A.   Nicole Brooks.

6   Q.   All right.  And the records themselves, are they

7   actually in her name?

8   A.   They're her dad's name, Donald Brooks.

9        MR. CAPELESS:  Your Honor, I ask that be entered and

10   marked as Exhibit 36.

11       MR. FRANK:  No objection.

12       THE COURT:  Admitted.

13       (Exhibit No. 36, cell phone records/Nicole Brooks,

14   marked)

15   Q.   (By Mr. Capeless) Can you tell the members of the jury,

16   Investigator Briggs, at the beginning of the investigation

17   and early September of 2011, while the three men were still

18   missing, were attempts made to contact various agencies to

19   determine whether or not there had been official contact

20   with any of the three?

21   A.   Yes.

22   Q.   Were the banks contacted?

23   A.   Yes.

24   Q.   In particular, was the Pittsfield Cooperative Bank

25   contacted regarding David Glasser?

1    A.    Yes.

2    Q.    Showing you this one-page document, do you recognize

3    what's depicted there?

4    A.    Yes.

5    Q.    Does that show the banking records for an account of

6    David Glasser for the year of 2011 from January to December?

7    A.    Yes.

8         MR. CAPELESS:  Your Honor, I'm going to ask that be

9    entered and marked as Exhibit 37.

10        THE COURT:  Any objection?

11        MR. FRANK:  No objection.

12        THE COURT:  Admitted.

13        (Exhibit No. 37, bank records for David Glasser,

14    marked)

15    Q.    (By Mr. Capeless) Handing you back Exhibit 37,

16    Investigator Briggs, did you have an occasion to go through

17    and look at the records?

18    A.    Yes, I did.

19    Q.    Can you tell the members of the jury, did you notice a

20    pattern regarding deposits and withdrawals?

21    A.    Well, the deposits were made at the beginning of each

22    month and that day the deposits were withdrawn, same day,

23    each month.

24    Q.    Okay.  So does that start in January?

25    A.    Starts in January.

1    Q.    Does the pattern change at some point?

2    A.    September.

3    Q.    What happened?

4    A.    There was no withdrawal.  The deposit went in, there

5    was no withdrawal.

6    Q.    No withdrawal in October?

7    A.    No withdrawal.

8    Q.    Any withdrawal in November?

9    A.    Not until the federal government withdrew the money

10   that they were putting in that wasn't being withdrawn.

11        MR. CAPELESS:  I have no other questions at this time,

12   Your Honor.  This is a witness that I would elect to recall

13   later as to other matters.

14        THE COURT:  All right.  Do you wish to cross-examine,

15   Mr. Frank?

16        MR. FRANK:  No cross-examination at this time, subject

17   to the agreement we've made.

18        THE COURT:  Thank you, very well.

19        Mr. Briggs, you are excused.

20        THE WITNESS:  Thank you, Your Honor.

21        (The witness stepped down.)

22        THE COURT:  You may call your next witness.

23        MR. CAPELESS:  Lisa Archambeault, please.

24        (Lisa Archambeault, sworn)

25        THE COURT:  Good afternoon, ma'am.

1    THE WITNESS:  Good afternoon.

2    THE COURT:  I've observed that you're a little bit soft

3    spoken, so I want to remind you to keep your voice up so we

4    can all hear you and answer only the question put to you

5    please.

6    Can you do that for me?

7    THE WITNESS:  Yes.

8    THE COURT:  Thank you.

9    Ladies and gentlemen, should you, during any witness

10   not hear something, if you raise your hand we will have the

11   response repeated for you.

12                        **(Lisa Archambeault)**

13              **DIRECT EXAMINATION BY MR. CAPELESS**

14   Q.   In a clear voice, will you please tell His Honor and

15   members of the jury your name and spell your last name,

16   please?

17   A.   Lisa Archambeault, A-R-C-H-A-M-B-E-A-U-L-T.

18   Q.   And where do you live, ma'am?

19   A.   254 Linden Street.

20   Q.   How long have you lived there?

21   A.   About four years now.

22   Q.   Who do you live there with?

23   A.   Myself, my husband, and my two grandchildren.

24   Q.   Okay.  I'm going to show you what's marked as Exhibit

25   Number 2.  Do you recognize that?

1    A.    Yes.

2    Q.    And what does that show?

3    A.    The front of my house.

4    Q.    Okay.  Where do you live in the building?

5    A.    The windows on the second floor, that's my apartment.

6    Q.    Okay.  Back in August of 2011 do you recall who lived

7    on the first floor?

8    A.    Dave and Eddie.

9    Q.    Okay.  And at that point, 2 1/2 years ago, August of

10   2011, how long had you lived there?

11   A.    I moved in in March.

12   Q.    Okay.  Were David and Eddie already there when you

13   moved in?

14   A.    Yes.

15   Q.    Okay.  Did you come to know them while you lived --

16   while they lived there and you lived there together?

17   A.    Yes.

18   Q.    Okay.  Did you get along with them?

19   A.    Yeah.

20   Q.    Did you know either one of them to have a job?

21   A.    No.

22   Q.    Okay.  Would you see them come and go?

23   A.    Dave, I would.  He would come and go a lot.

24   Q.    What about Ed?

25   A.    He was more a homebody.

1  Q.    Okay.  And when you saw Dave come and go, how would he
2  come and go?
3  A.    His truck.
4  Q.    Okay.  And, showing you Exhibit Number 4, is the truck
5  depicted there?
6  A.    Yes.
7  Q.    I'm just going to hold it up.  And can you point?
8  A.    Right there in the driveway.
9  Q.    Okay.  Did you come to know some of their habits as far
10 as how they lived and took care of their apartment?
11 A.    Yes.
12 Q.    In particular, did you know come to know how they were
13 about locking and unlocking their doors?
14       Well --
15 A.    (No response)
16 Q.    Well, did you come to learn a habit about them locking
17 or unlocking the doors at night?
18       MR. FRANK:  Objection.
19       THE COURT:  Nature of your objection.
20       MR. FRANK:  First of all, leading; second of all, asked
21 and answered.
22       THE COURT:  I don't think it has been asked and
23 answered.
24       I will allow you to rephrase the question.
25 Q.    (By Mr. Capeless) Did you come to know what their

1    habits were regarding the doors at night?

2    A.   I know that entry door that comes into the building was

3    always shut and locked because I lived upstairs.

4    Q.   And what about the back door, going into the first

5    floor apartment at night?

6    A.   It was shut.

7    Q.   Okay.  I'd like you to turn your attention to the

8    weekend of Friday, Saturday, and Sunday, the 26, 27 and 28

9    of 2011, the weekend of Tropical Storm Irene, do you recall

10   that weekend?

11   A.   I do.

12   Q.   On that Saturday, did you see Dave and Ed?

13   A.   Yes.

14   Q.   Where did you see them?

15   A.   I seen Eddie on the porch and Dave just coming and

16   going.

17   Q.   Okay.  And did you see somebody else there at the

18   apartment?

19   A.   Later on that night I did.

20   Q.   Okay.  And was this somebody you recognized?

21   A.   Yeah, the man from across the street.

22   Q.   Do you remember his name?

23   A.   Chadwell.

24   Q.   I'm showing you Exhibit Number 26.  Who's depicted

25   there?

1    A.    That's Chadwell.

2    Q.    And is that the person you just referred to?

3    A.    Yup.

4    Q.    About what time during the evening did you see Robert

5    Chadwell at the apartment?

6    A.    The last time I seen him it was late because I -- I had

7    to go downstairs and ask Dave to move his truck so that my

8    mother could get her car in the driveway because of the

9    storm, so it was pretty late.

10   Q.    Okay.  And about what time was it, to your

11   recollection, you asked Mr. Glasser to do that?

12   A.    It was after 10:00.

13   Q.    Okay.  Now, tell the members of the jury when he went

14   down to move his truck so your mother's car could get in --

15   A.    Right.

16   Q.    After that was done, how were the vehicles positioned?

17   A.    My aunt Teresa's car was up almost -- there's a fence

18   that runs right here on the side of the house.  There's a

19   fence that runs in the back here that separates the two

20   yards.  My aunt Teresa's car and then my mother's car and

21   then my car and then Dave's truck.

22   Q.    All right.  And so that Dave's truck was located where

23   relative to the street?

24   A.    He was at the end, the very end of the driveway.

25   Q.    Now, late Saturday evening do you recall hearing

1    anything downstairs?

2    A.    We could hear the people talking down there.

3    Q.    At some point did it stop?

4    A.    Yeah.

5    Q.    Okay.  Did you hear something else besides people

6    talking?

7    A.    Banging, there was somebody banging.

8    Q.    And it sounded like someone banging where?  On what?

9    A.    On the front door.

10   Q.    Okay.  Did you hear anything after that?

11   A.    No.

12   Q.    Do you recall about what time you went to bed Saturday

13   night?

14   A.    I don't know, between 1:00 and 2:00.

15   Q.    Now, the following day Sunday --

16   A.    Uh-huh.

17   Q.    -- do you recall what you did in the morning?

18   A.    I went downstairs to ask Dave to move his truck so we

19   could get our vehicles out so we could go back to camp.

20   Q.    When you went downstairs, what did you actually do?

21   A.    I knocked on the door.

22   Q.    Would this be the front door or the back door?

23   A.    Front door.

24   Q.    Did you get any answer?

25   A.    No.

1    Q.    Okay.  Did you knock loudly?

2    A.    Yeah.

3    Q.    Okay.  Did you hear anything from inside the apartment?

4    A.    Just the TV.

5    Q.    Okay.  Did you go back again to try to get

6    Mr. Glasser --

7    A.    I went down quite a few times to get him to move his

8    vehicle because without him moving it none of us could get

9    our vehicles out.

10   Q.    Over the course of the day did you have any contact

11   with anybody down in that apartment?

12   A.    No.

13   Q.    All right.  Now, the following day on Monday the 29,

14   did you go back again to try to get him to move it?

15   A.    I think at that point I might have already had my car

16   out of there, but they still weren't home.

17   Q.    Okay.  At some point, were you able to get somebody

18   else to move their car --

19   A.    Yeah.

20   Q.    -- so your mother could get out?

21   A.    The neighbor that lives across from this building.

22   Q.    Did you ever go inside the apartment?

23   A.    No.

24   Q.    The downstairs apartment?

25   A.    No.

1    Q.    On Monday, can you tell the members of the jury did you

2    still hear the television?

3    A.    I don't know if it was Monday, but I know the

4    television did shut off at some point because we didn't hear

5    it anymore.

6    Q.    Okay.  Did you see anybody other than Dave or Ed or

7    Mr. Chadwell go approach the apartment or appear to go in?

8    A.    Yes.

9    Q.    Did some people come around looking for them?

10   A.    Yes.

11   Q.    Okay.  Now, come Wednesday, the 31st, do you recall

12   police coming?

13   A.    Yes.

14   Q.    Can you tell the members of the jury, how many police

15   officers were there?

16   A.    That came to the house on Wednesday?

17   Q.    Yes, or into the neighborhood.

18   A.    A lot.

19   Q.    Okay.  Did they talk to you?

20   A.    Yup.  They asked if we had seen them downstairs.

21   Q.    Okay.  When you say "we", who else did they talk to

22   beside yourself?

23   A.    He -- oh, they talked to everybody in the neighborhood.

24   Q.    Okay.  Now, Miss Archambeault, tell the members of the

25   jury, did you have a lounge chair?

1    A.    Pardon me?

2    Q.    Did you have a lounge chair at the apartment?

3    A.    Outside, yes.

4    Q.    And can you describe it, what was it like?

5    A.    It was a metal outdoor chair with the -- they have

6    leather straps and they had two cushions on it.

7    Q.    What did the cushions look like?

8    A.    One of them was like a print and the other one, I think

9    it was striped.

10   Q.    Now, can you tell the members of the jury at some point

11   did you notice one of those cushions missing?

12   A.    Yes.

13   Q.    When did you notice it?  Was it over that weekend of

14   the storm?

15   A.    Yeah.

16   Q.    How did you notice it was missing?

17   A.    Because we were going to take the chair back to camp

18   with us.

19   Q.    Okay.  I'm going to show you what's marked as Exhibit

20   Number 23 and tell you, do you see one of those cushions

21   there in photograph?

22   A.    Yeah, it's this one.  (Indicating)

23   Q.    Okay.  I'm just going to hold that up, and ask you to

24   point out.

25   A.    This one right here.  (Indicating)

1    Q.    Okay.

2          MR. CAPELESS:  I've no other questions of this witness.

3          THE COURT:  Mr. Frank, cross-examination?

4                    **CROSS EXAMINATION BY MR. FRANK**

5    Q.    Good afternoon, Ms. Archambeault.  I am Attorney Donald

6    Frank and I represent Mr. Chalue.

7          We've never spoken, is that right?

8    A.    No.

9    Q.    I just have a few areas of questioning.

10         You had a neighbor by the name of Christina Valley; is

11   that correct?

12   A.    Yes.

13   Q.    And she lived next door to you?

14   A.    Yes.

15   Q.    And you knew her to be the daughter of Joe Williams; is

16   that correct?

17   A.    Yes.

18   Q.    And Joe Williams is the president of the Hells Angels,

19   did you have that information?

20   A.    I didn't until after this started.

21   Q.    And at the time around the hurricane and a little

22   before the hurricane, there were two males living with her

23   or staying with her I should say; is that right?

24   A.    Yes.

25   Q.    And those two males, you don't know, they came in a

1   week before or two days before the hurricane; is that fair
2   to say.
3   A.   I don't know because I wasn't there.
4   Q.   But you saw them coming in and out; is that fair to
5   say?
6   A.   I think Friday was the day of the storm, so I came home
7   that morning.
8   Q.   Okay.  And did you know one of them to be named Whitey?
9   A.   I didn't know any of them.
10  Q.   You didn't know either of their names; is that correct?
11  A.   No.
12  Q.   Okay.  Now, on Saturday, that is Saturday before the
13  storm, which is Saturday night?
14  A.   Okay.
15  Q.   You heard a loud argument in the neighborhood; that is
16  fair to say?
17  A.   Yeah, that afternoon.
18  Q.   That afternoon.  And the argument was between
19  Mr. Frampton who you knew; is that right?
20  A.   Uh-huh.
21  Q.   You need to say yes or no, I'm sorry.
22  A.   Yes, I'm sorry.
23  Q.   And between one or both of the males who resided with
24  Christina Valley; is that correct?
25  A.   Yes, there -- he was arguing with the man outside.

1    Q.    Just one of the men?

2    A.    Yeah.

3    Q.    Okay.  And what race was he?  Was he Afro American?

4    Was he White?

5    A.    I don't know.  I'm not sure.

6    Q.    If I show you a document indicating his race, would

7    that refresh your recollection?

8    A.    Yup.

9    Q.    I will come back to that in just a moment so we don't

10   have to wait.

11   A.    Okay.

12   Q.    And, Ms. Archambeault, the argument, it was loud,

13   right?

14   A.    Uh-huh -- yes, I'm sorry.

15   Q.    And it was between Mr. -- it was loud enough so that

16   the whole neighborhood could hear it; is that right?

17   A.    Right.

18   Q.    And you heard that the argument -- and you heard that

19   the argument was about money, you could hear that the

20   argument had something to do with money; is that correct?

21   A.    Right.

22   Q.    And that's a yes, I'm sorry?

23   A.    Yes, I'm sorry.

24   Q.    That's okay.

25         And you also heard that the money was about drugs; is

1    that also correct?

2    A.   I assumed it was, yeah.

3    Q.   Well, did you hear that it was or did you assume that

4    it --

5    A.   I assumed it, was.

6    Q.   Why did you make that assumption?

7         MR. CAPELESS:  Objection.

8         THE COURT:  Sustained.

9    Q.   (By Mr. Frank) All right.  Did you hear it was about

10   crack cocaine?

11        MR. CAPELESS:  Objection, Your Honor.

12        THE COURT:  Overruled.

13        THE WITNESS:  No.

14        THE COURT:  The answer was no.

15        MR. FRANK:  Okay.

16   Q.   (By Mr. Frank) And were -- there were threats being

17   made; is that fair to say?

18   A.   Just that he wanted his money.

19   Q.   And Mr. Frampton was yelling at him back; is that also

20   right?

21   A.   Telling him that he knew he was going to get his check

22   on the first.

23   Q.   Okay.  And that didn't seem to satisfy the person who

24   was yelling at him; is that right?

25   A.   I don't know.

1   Q.   Okay.  Now, you had, after that argument, after that

2   day, that is Saturday before the storm, did you ever see

3   either of those gentlemen who were living with Christina

4   Valley again?

5   A.   Yeah.

6   Q.   And you saw them on the Sunday of the storm?

7   A.   Yes.

8   Q.   And Monday?

9   A.   I don't know.

10  Q.   Okay.  After Monday or Tuesday, they were no longer

11  there; is that fair to say as far as you knew?

12  A.   I honestly don't know.

13  Q.   Okay.  You didn't see them again though; is that right?

14  A.   No.

15  Q.   Okay.  And I asked you a question regarding the --

16  okay.  Now, that night you testified for the District

17  Attorney that you heard knocking on the door some time

18  before you went to bed; is that right?

19  A.   Yes.

20  Q.   And you went to bed some time before two o'clock; is

21  that right?

22  A.   Yeah, probably.

23  Q.   All right.

24  A.   It was late.

25  Q.   You stayed up very late that night?

1    A.    Yeah, my mother and I were talking at the table.

2    Q.    All right.  And the windows were open that night; is

3    that fair to say?

4    A.    No.  They were closed because we were supposed to have

5    a storm.

6    Q.    I see.  And you share a -- you share a hallway with the

7    Glasser residence; is that right?

8    A.    Yes.

9    Q.    And so people on the -- the main entrance anyways, you

10   share that door; is that -- is that right?

11   A.    The hallway door.

12   Q.    The hallway door?

13   A.    Yes.

14   Q.    Okay.  And it's fair to say that at some point you

15   heard loud knocks in the front or sometime between

16   10:00 p.m. and midnight?

17   A.    No, it was between midnight and 1:00.

18   Q.    Well, do you remember giving a statement to the police

19   on August 31, 2011?

20   A.    Uh-huh.

21   Q.    And when you gave that to police, that statement to the

22   police, your memory was fresh; is that correct?

23   A.    Uh-huh.

24   Q.    And it was a Wednesday, I think the date you gave that

25   statement; is that right?

1    A.    Maybe, I don't remember what day it was.

2    Q.    Okay.  And I'm going to ask you to look at the

3    statement, if you will.

4    A.    Okay.

5    Q.    Then I'm going to ask you a series of questions.

6    A.    Okay.

7    Q.    Do you see the highlighted portion?

8    A.    Yup.

9          (Pause)

10         THE COURT:  Mr. Frank, just to be clear, are you

11   seeking to have her refresh her memory?

12         MR. FRANK:  Yes, I am, Your Honor.

13         THE COURT:  All right.  Why don't you make that clear.

14         MR. FRANK:  Yes.

15   Q.    (By Mr. Frank) Do you remember what it is you told the

16   police on August 31, 2011 regarding the knocks?

17   A.    I don't recall, but that's saying between 10:00 and

18   midnight.

19   Q.    Okay.  So and let me ask you, this is your signature --

20   excuse me, your signature appears on the back of the

21   document?

22   A.    Yup.

23   Q.    And this is your -- on the front of the document

24   appears your initials; is that also correct?

25   A.    Yes.

1    Q.   And it's fair to say that as far as this document is

2    concerned you told the police on August 31, 2011 that you

3    did hear a series of loud knocks at the front door some time

4    between 10:00 p.m. and midnight?

5    A.   Yes.

6         MR. CAPELESS:  Objection, Your Honor.

7         THE COURT:  Mr. Frank, you're asking her what the

8    document says or what her memory says?

9         MR. FRANK:  I'm asking her what the document says.

10        THE COURT:  The objection is overruled.

11   Q.   (By Mr. Frank) I'm sorry.  And your answer is?

12   A.   Yes.

13   Q.   Okay.  And now, does that refresh your recollection as

14   to what you told police regarding the series of loud

15   knocking?

16   A.   Well, it says it on that paper.

17   Q.   All right.  And when you gave this statement, you

18   were -- you didn't have any other information about the

19   case, the missing men, the alleged murders or anything like

20   that, you were just trying to help the police; is that fair

21   to say?

22   A.   Yes.

23   Q.   And you were -- when you were trying to help the

24   police, you were trying to give the best information

25   possible to the police so that they could figure out what

1    was going on with these three men or at least two of the

2    men; is that right?

3    A.   Yes.

4    Q.   And it is at that point that you told the police that

5    you heard the loud knock sometime between 10:00 p.m. and

6    midnight, correct?

7    A.   I guess, yes.

8    Q.   I'm sorry, didn't hear your answer.

9    A.   Yes.

10   Q.   Okay.  Now, when you heard the knocking, it seemed

11   quiet downstairs otherwise except for the knocking; is that

12   fair to say?

13   A.   Yeah, it was fairly quiet, you could hear the guys

14   talking downstairs.

15   Q.   Well, you -- there were no voices to go along with the

16   knocking; is that right?

17   A.   Right.

18   Q.   And you were -- and after the knocking, it was quiet,

19   is that also right?

20   A.   Uh-huh.

21   Q.   And nothing seemed out of the ordinary that night; is

22   that also right?

23   A.   No.

24   Q.   That's incorrect?

25   A.   Pardon me.

1    Q.   That's wrong?  Nothing seemed --

2    A.   No, that's right.  It was quiet.

3    Q.   Okay.  So when the voices -- when somebody was banging

4    on the door you -- just to be clear, you didn't hear anybody

5    saying, Hello, let me in, or anything like that?

6    A.   No, just banging.

7    Q.   Just banging on the door and then after you heard the

8    banging on the door you -- it was quiet in the apartment,

9    right?

10   A.   Right.

11   Q.   And you stated and you were up until 1:30, two o'clock

12   that night and didn't hear any other knocking on the door,

13   right?

14   A.   Right.

15   Q.   You didn't hear any arguments, you didn't hear any

16   yelling?

17   A.   No.

18        THE COURT:  Mr. Frank, do you expect to be awhile with

19   this witness?

20        MR. FRANK:  No.  No.  I have --

21   Q.   (By Mr. Frank)  You've never met Mr. Chalue before and

22   never seen him before; is that correct?

23   A.   No.

24        MR. FRANK:  Thank you.  I have nothing further.

25        THE COURT:  Redirect examination?

1          **REDIRECT EXAMINATION BY MR. CAPELESS**

2     Q.    You said earlier that just before the storm you came

3     home?

4     A.    Right.

5     Q.    From where?

6     A.    Camp.

7     Q.    Okay.  And you've been spending summer there at the

8     camp?

9     A.    Yes.

10         MR. CAPELESS:  I have no other questions, Your Honor.

11         THE COURT:  Recross examination, Your Honor.

12         MR. FRANK:  No recross.

13         THE COURT:  Ms. Archambeault, you are excused.

14         THE WITNESS:  Thank you.

15         (The witness stepped down.)

16         THE COURT:  Ladies and gentlemen, we're going to take

17    the luncheon recess.  It's a little after 1:00.  I want to

18    make sure you get a full hour for your lunch break so we're

19    going to reconvene at 10 after 2:00.

20         While I'm thinking about it, just for scheduling

21    purposes, so I don't forget later today, there are two days

22    that we are not going to be in session.  I want you to know

23    what they are for your own scheduling purposes —— May 2,

24    which is a Friday.  And May 16, which is also a Friday.

25         So for your own scheduling purposes you can plan you

1   will not be here on those days.

2        Bear in mind my cautionary instructions over the lunch

3   break, please don't discuss the case.  We will see you at

4   2:10.

5        (The jury exited at 1:10 p.m.)

6        THE COURT:  We are in recess.

7        (The Court exited at 1:10 p.m.)

8        (* * * * *)

9        (The Court entered at 2:15 p.m.)

10       THE COURT:  Good afternoon.  Bring the jury in.

11       (The Court entered at 2:15 p.m.)

12       (The defendant was present.)

13       (The jury entered at 2:11 p.m.)

14       THE COURT:  Mr. Capeless, you may call your next

15   witness.

16       MR. CAPELESS:  Andrew Johnston, please.

17       (Andrew Johnston, sworn)

18       THE COURT:  Good afternoon, sir.

19       THE WITNESS:  Hi, how are you.

20       THE COURT:  If I could remind you to keep your voice up

21   so everyone can hear you and answer only the question put to

22   you, please.

23       THE JUROR:  Thank you.

24

25

1                    **(Andrew Johnston)**

2          **DIRECT EXAMINATION BY MR. CAPELESS**

3    Q.   In a clear voice, can you tell at the Court and the

4    jury your name, please.

5    A.   Andrew Johnston.

6    Q.   What do you your friends and family call you?

7    A.   AJ.

8    Q.   Where do live?

9    A.   247 Linden.

10   Q.   How long you have lived in Pittsfield?

11   A.   Since I was two and I am 52 now.

12   Q.   What do you do for a living?

13   A.   Construction, I'm a carpenter.

14   Q.   Who do you work for?

15   A.   Johnston Builders.

16   Q.   Okay.  And who do you work with?

17   A.   With my brothers and some other co-workers.

18   Q.   Now, do you know or did you know Robert Chadwell?

19   A.   Yes, I do.

20   Q.   How?

21   A.   I grew up with him and I have a daughter with his

22   sister.

23   Q.   I'm going to show you what's marked as Exhibit 26.  Do

24   you recognize who that is?

25   A.   That's Robert Chadwell.

1    Q.    Now, did you also know somebody by the name of David
2    Glasser?
3    A.    Yes, I did.
4    Q.    How did you come to now him?
5    A.    I was working on a job and he lived next door to the
6    job and he was playing his drums, and I like drums so he let
7    me come in and he played for me, let me play his drums and
8    he was nice.
9    Q.    Did he eventually end up working along side with you?
10   A.    Yeah.
11   Q.    So about how far back was that?  How long did you know
12   him for, roughly?
13   A.    Since probably late '90s.
14   Q.    I'm going to show you Exhibit Number 3.  Do you
15   recognize who that is?
16   A.    That's David Glasser.
17   Q.    Did he go by any nicknames?
18   A.    Drummer Dave.
19   Q.    At some point, did David Glasser have a civil injury
20   case -- do you understand what I mean?
21   A.    A civil -- yes; yes.  Which he got a settlement?
22        MR. FRANK:  Objection.  Objection.
23        THE COURT:  Sustained as nonresponsive.  You may ask
24   your next question.
25   Q.    (By Mr. Capeless) At some point did he get some sort of

1    insurance settlement?

2    A.    Yes, he did.

3    Q.    Do you have any idea about how much money it was?

4          MR. FRANK:  Objection.

5          THE COURT:  Basis of objection?

6          MR. FRANK:  Hearsay foundation.

7          THE COURT:  Is there a non-hearsay foundation,

8    Mr. Capeless?

9          MR. CAPELESS:  Well, all right.

10   Q.    (By Mr. Capeless) Did you talk with David Glasser about

11   what he should do with the money?

12   A.    Yes, I did.

13   Q.    Did you make a suggestion to him?

14   A.    Yes.  I recommended he get a truck and start doing yard

15   work and doing odd jobs.

16   Q.    Did he take your advice?

17   A.    Yes, he did.

18   Q.    I'm going to show you what's marked as Exhibit Number

19   5.  Do you recognize that vehicle?

20   A.    Yes, that's David's truck.

21   Q.    Can you tell the members of the jury how David Glasser

22   felt about that truck?

23         MR. FRANK:  Objection.

24         THE COURT:  Overruled.

25         THE WITNESS:  He loved it.  It was his life.  It was

1    the best thing that he did with his money.

2    Q.    (By Mr. Capeless) And what did he do with the truck?

3    A.    He did odd jobs, he did dump runs, and garbage removal,

4    and things like that.

5    Q.    Okay.  Now, back in August of 2011, where did David

6    Glasser live?

7    A.    On Linden Street in Pittsfield.

8    Q.    And did you live in the same address on Linden Street

9    at that time?

10   A.    No.

11   Q.    Where were you living then?

12   A.    Then I was living with my brother John on Egremont in

13   Pittsfield.

14   Q.    Okay.  But you knew where David Glasser lived?

15   A.    Right.

16   Q.    Did you know who he lived with?

17   A.    With Eddie Frampton.

18   Q.    Showing you Exhibit No. 1, do you -- do you recognize

19   who that is?

20   A.    It's Dave's roommate Eddie.

21   Q.    Now, I'd like you to turn Your Honor's attention to the

22   weekend of Friday, August 26, through Saturday and then

23   Sunday, August 28 of 2011.  The weekend of Hurricane Irene

24   or Tropical Storm Irene came through New England, do you

25   recall that weekend?

1  A.    Yes, I do.

2  Q.    On Saturday evening, do you recall seeing David

3  Glasser?

4  A.    Yes.  He picked me up, and took me shopping so I could

5  get things so -- the store was coming.

6  Q.    Now, while you were with him, did he talk to you about

7  what he was thinking and how felt about the upcoming days?

8  A.    He was afraid of a --

9        MR. FRANK:  Objection.

10       THE COURT:  Basis of the objection?

11       MR. FRANK:  First of all, it's nonresponsive; it's a

12  yes or no, and it's going into hearsay.

13       THE COURT:  Well, are you offering this for its truth?

14       MR. CAPELESS:  Yes, state of mind, Your Honor.

15       THE COURT:  Objection is overruled.

16  Q.    (By Mr. Capeless) What did he say to you?

17  A.    He was worried about the trial that was coming up over

18  him getting beat up and his truck getting taken and he was

19  afraid of that and he had seen Adam Hall and he told me that

20  I --

21  Q.    All right.  I'm just going to just stop you for a

22  second.

23        He said he was concerned about the truck?

24  A.    Right.

25  Q.    Did he say what plans he had for the weekend, what he

1   was going to do?

2   A.   He told me not to call him the next day, he was going

3   to stay in and not do anything and hide out for the weekend.

4   Q.   Okay.  Now, can you tell the members of the jury had

5   Mr. Glasser expressed to you concern about this trial coming

6   up in the past?

7   A.   Yes, he did.

8   Q.   Now, the following day, Sunday, did you try to get

9   ahold of him.

10  A.   I tried anyways and he didn't answer.

11  Q.   Okay.  The next day, Monday the 29th, had you had any

12  arrangements with David Glasser about him giving you a ride?

13  A.   He was going to pick me up for working.  He gave me a

14  ride to work pretty much every day.

15  Q.   About what time was he supposed to get you?

16  A.   7:00, 7:30.

17  Q.   Did he show up?

18  A.   He didn't show up.

19  Q.   Were you able to otherwise get a ride the to work?

20  A.   Yes.

21  Q.   After working, did you go by the apartment on Linden

22  Street?

23  A.   Right.  I texted him and I went and I seen his truck in

24  the driveway and I tried his phone again several times and

25  he didn't answer.

1  Q.   Now, a couple of days later, Wednesday the 31st, did

2  you happen to go over to the apartment on Linden Street?

3  A.   Yes.

4  Q.   Okay.  And when you got there, what did you see?

5  A.   It was police everywhere.

6  Q.   Okay.  And did you talk with any of Robert's family

7  members?

8  A.   Yes, I did, Leslie Chadwell.

9  Q.   Now, now one other thing, Mr. Johnston, do you know a

10  person by the name of Willie Haywood?

11  A.   Yes, I do.

12  Q.   How did you know him?  How long have you known him?

13  A.   I've known him -- his sister is married to my brother.

14  Q.   Okay.

15  A.   So I can never not remember not knowing Willie.

16  Q.   Okay.  And did he have a special relationship with

17  Robert Chadwell?

18  A.   Yes, they did.  They were partners.

19  Q.   Okay.  I'm going to show you what's marked as Exhibit

20  Number 27.  Do you recognize who is shown in that

21  photograph?

22  A.   That's Robert T. and Willie.

23  Q.   Did something happen to Willie Haywood recently?

24  A.   Yeah, he was stricken with cancer.

25       MR. FRANK:  Objection.

1        THE COURT:  Basis of the objection?

2        MR. FRANK:  Basis of knowledge.

3        THE COURT:  Overruled.  You may answer.

4   Q.   (By Mr. Capeless) What happened with Willie?

5   A.   He was stricken with cancer and he got sick and he

6   passed away recently.

7   Q.   When did he pass away?

8   A.   The 19th.

9        MR. CAPELESS:  I have no other questions, Your Honor.

10       THE COURT:  Mr. Frank, you may cross-examine.

11       MR. FRANK:  Thank you.

12                 **CROSS EXAMINATION BY MR. FRANK**

13  Q.   When Mr. Glasser spoke to you about his feelings about

14  worried about the trials coming up, he told you about a

15  conversation he had regarding the Hells Angels; is that

16  correct?

17  A.   Can you say that again?

18  Q.   Yes.  When he was telling you about him being nervous

19  about the upcoming trial, he told you something about the

20  Hells Angels; is that correct?

21  A.   Yes.

22  Q.   And he told you that there had been -- that

23  Mr. Frampton had been visited by Hells Angels members; is

24  that correct?

25  A.   That's what he told me.

1    Q.   And he didn't say anything about Mr. Chalue; is that

2    right?

3    A.   No.

4    Q.   And he didn't say anything about Aryan Brothers; is

5    that right?

6    A.   No.

7    Q.   And he told you that Mr. Frampton had been warned off

8    by the Hells Angels; is that right?

9    A.   He told me that a guy came and said he could tell Dave

10   he better change his story.

11   Q.   Okay.  And that was a Hells Angels, somebody in Hells

12   Angels?

13   A.   Someone that Eddie said he had never seen him before.

14   Q.   But he was outfitted as a Hells Angels?

15   A.   Correct.

16        MR. FRANK:  Thank you very much.

17        THE COURT:  Redirect examination?

18        MR. CAPELESS:  No questions.  Thank you.

19        THE COURT:  Mr. Johnston, you are excused.

20        Thank you.

21        (The witness stepped down.)

22        THE COURT:  You may call your next witness.

23        MR. BARRY:  Alan Catalano.

24        (Alan Catalano, sworn)

25        THE COURT:  Good afternoon, Mr. Catalano, if I could

1    remind you to keep your recognize up and answer only the

2    question put to you, please.

3         Can you do that?

4         THE WITNESS:  Yes, sir.

5         THE COURT:  Thank you.  You may proceed.

6         MR. BARRY:  Thank you, Your Honor.

7                        **(Alan Catalano)**

8                **DIRECT EXAMINATION BY MR. BARRY**

9    Q.   First of all, could you tell the jury your name,

10   spelling your last name?

11   A.   Alan Catalano, C-A-T-A-L-A-N-O.

12   Q.   Do you currently work, Mr. Catalano?

13   A.   Not right now.

14   Q.   Have you worked in the past?

15   A.   Yes, I have.

16   Q.   Approximately three years ago where did you work?

17   A.   Pearlman's scrapyard.

18   Q.   How long did you work at Pearlman's?

19   A.   A few years.

20   Q.   Can you explain to us what kind of business is

21   Pearlman's scrap yard?

22   A.   Basically a metal recycling place, people bring in old

23   metals and people get paid for them.

24   Q.   Where is that business located?

25   A.   On Merriam Street in Pittsfield.

1  Q.    And when you worked there, what did you do at
2  Pearlman's?
3  A.    I pretty much ran the office.  I took the metals in and
4  weighed them and then filled out the receipts and paid the
5  people for what they brought in.
6  Q.    Getting to this case, do you know someone by the name
7  of David Glasser?
8  A.    Yes.
9  Q.    And how did you know Mr. Glasser?
10 A.    He's in there at least once or twice a week.
11 Q.    He was a customer of Pearlman's?
12 A.    Yes.
13 Q.    Showing you what's been marked as Exhibit 3.
14        Showing you what's marked as Exhibit 3, do you
15 recognize that person?
16 A.    That's Mr. Glasser.
17 Q.    Do you also know someone by the name of Richie Stansen?
18 A.    Yes.
19 Q.    How did you know Mr. Stansen?
20 A.    He came in with him on occasion.
21 Q.    And, lastly, do you know someone by the name of Adam
22 Hall or Leo Hall?
23 A.    Yes.
24 Q.    Did you know him as Adam Hall or Leo?
25 A.    I knew him as Leo.

1    Q.    How did you know Leo?

2    A.    He came in once in awhile, I seen him around.

3    Q.    I'm showing going to show you a picture and ask you if

4    you recognize the person in that picture?

5    A.    That's Leo.

6          MR. BARRY:  I ask it be it to be marked as an exhibit.

7          THE COURT:  Any objection?

8          MR. FRANK:  No objection, I apologize.

9          THE COURT:  Admitted.

10         THE CLERK:  Exhibit 38.

11         (Exhibit No. 38, photograph, marked)

12         MR. BARRY:  Thank you.

13   Q.    (By Mr. Barry) I want to turn your attention now back

14   several years back to July of 2009 going back to 2009.  Are

15   you aware during July of 2009 David Glasser had a business

16   with Pearlman related to this case?

17   A.    Yes, sir.

18   Q.    Can you explain to the jury what that business was?

19   A.    He brought in some metals, some old carburetors,

20   alternators, wires, things like that.  Brought them in and

21   got paid for them.

22   Q.    And when he came in, was he alone or was he with

23   someone?

24   A.    I believe he was alone.

25   Q.    All right.  And when Glasser came in, did you give him

1  money for what he brought in?

2  A.   Yes.

3  Q.   And when Pearlman buys items from the customer, was it

4  the company's regular course of business to make a receipt

5  for the transaction?

6  A.   Yes.

7  Q.   And when you made the receipt, was it made in good

8  faith?

9  A.   Yes.

10 Q.   I'm going to show you a document and ask you if you

11 recognize the document?

12 A.   Yes, one of the receipts.

13 Q.   Whose handwriting is on the receipt?

14 A.   Mine.

15 Q.   And who did you make the receipt out to?

16 A.   David Glasser.

17 Q.   Okay.  And was this for the items that he brought in in

18 July of 2009 that you just mentioned?

19 A.   Yes.

20     MR. BARRY:  I ask it be marked as an exhibit?

21     THE COURT:  Any objection?

22     MR. FRANK:  No objection.

23     THE COURT:  Admitted.

24     THE CLERK:  Exhibit 39.

25     (Exhibit No. 39, Pearlman's receipt, marked)

1  Q.    (By Mr. Barry)  I'm going to hand you back what has
2  been marked as Exhibit 39.  I will just ask if you can
3  explain to the jury what exactly did Mr. Glasser bring in
4  July 2009?
5  A.    He brought in a pound of copper, 31 pounds of aluminum,
6  52 pounds of dirty aluminum, batteries, an alternator, and
7  some wire.
8  Q.    All right.  And are you aware whether or not he brought
9  in a carburetor?
10  A.    Yes.
11  Q.    And how is that noted on the receipt?
12  A.    It's under 52 pounds that says dirty aluminum.  I
13  actually wrote what it was right above it.  It says carbs.
14  Q.    Short for carburetor?
15  A.    Yes.
16  Q.    And how much did you give Mr. Glasser for all of the
17  items he brought in?
18  A.    For everything, 18.65.
19  Q.    Now, when Mr. Glasser brought in these items, including
20  the carburetor, what did you do with the items after you
21  bought them from Mr. Glasser?
22  A.    With the condition of the stuff he brought in, it was
23  in working order, I put it off to the side.  A lot of times
24  people will come in there and people will buy things, if
25  they worked.  It's a lot cheaper than buying them new.

1   Q.    Okay.  When you put these items aside did anybody come
2   and look at them?
3   A.    A few people did.
4   Q.    All right.  And what happened after a couple of people
5   came and looked at them?
6   A.    Few people looked, one of them told me he thought he
7   knew who they belonged to.
8         It happens, on occasion there.  And he made a phone
9   call to who he thought they belonged to.
10  Q.    Did someone then come to the shop?
11  A.    And Leo came down and looked at the parts.
12  Q.    Okay.  And after Mr. Hall looked at the parts, what did
13  he do?
14  A.    He told me they were his.  He asked what I paid for
15  them.  I told him the 18.65 he gave me a 20; those are his
16  parts.  And he left with them.
17  Q.    And how long was it after Mr. Glasser sold you the
18  items that Mr. Hall came down and bought those items
19  including the carburetor back?
20  A.    I believe it was within a few days.
21        MR. BARRY:  Thank you, I have no more questions, Your
22  Honor.
23        THE COURT:  Cross examination?
24        MR. FRANK:  Thank you.
25

1        **CROSS EXAMINATION BY MR. FRANK**

2    Q.   Richie Stansen, that's Mr. Hall's brother, correct?

3    A.   I have no idea.

4         MR. FRANK:  Okay.  Thank you.

5         THE COURT:  Redirect examination?

6         MR. BARRY:  Nothing further, Your Honor.

7         THE COURT:  You're excused, Mr. Catalano.  You may step

8    down.  Thank you.

9         You may call your next witness.

10        MR. BARRY:  Commonwealth calls Brittany Beggs.

11        (Brittany Beggs, sworn)

12        THE COURT:  Ms. Beggs, good afternoon.

13        THE WITNESS:  Hello.

14        THE COURT:  You may be seated.  Thank you.

15        If I could remind you to keep your voice up and answer

16   only the question put to you, please.

17        You may proceed.

18        MR. BARRY:  Thank you, Your Honor.

19                        **(Brittany Beggs)**

20             **DIRECT EXAMINATION BY MR. BARRY**

21   Q.   First of all, can you just introduce yourself to the

22   jury?

23   A.   Hello, I'm Brittany Beggs.

24   Q.   Where do you live, Ms. Beggs?

25   A.   I live in California, in Placerville, California.

1    Q.    Are you originally from California?

2    A.    Yes.

3    Q.    Do you have any children?

4    A.    I have an almost six-year-old son.

5    Q.    And what is his name?

6    A.    Thor.

7    Q.    Do you know someone by the name of Adam Leo Hall?

8    A.    Yes, he's the father of my son.

9    Q.    Did he have a nickname he went by?

10   A.    Leo.

11   Q.    And I'm just showing you exhibit -- marked as Exhibit

12   38.  Do you recognize that person?

13   A.    Yup, that's him.

14   Q.    In terms of Mr. Hall, when did you first meet Mr. Hall?

15   A.    I met him in July of '07.

16   Q.    Okay.  And where did you meet him?

17   A.    At the restaurant.  I worked at the Fremont Bistro at

18   that time.

19   Q.    And where was that, what state?

20   A.    In California, Lake Tahoe.

21   Q.    After you met him, did you are start to date shortly

22   after that?

23   A.    Yes.

24   Q.    And did you move somewhere?

25   A.    I moved to Pittsfield to be with him.

1    Q.   And once you moved to Pittsfield, where did you live?

2    A.   We lived a number of different places.  We stayed at

3    the clubhouse and then we bought property in Peru,

4    Massachusetts, and then we got a house in Pittsfield, 122

5    Madison.

6    Q.   And when you say "clubhouse" what clubhouse is that?

7    A.   The Hells Angels clubhouse in Lee.

8    Q.   And in terms of the Peru property, do you remember the

9    address that you bought property?

10   A.   48 East Main, Peru.

11   Q.   Okay.  And while you dated Mr. Hall, did you continue

12   to live with him or be with him?

13   A.   I moved back and forth to California I think in a

14   two-year span.  I spent half of that time in California.

15   Q.   And do you still currently date Mr. Hall?

16   A.   No.

17   Q.   All right.  In terms of this case, I want to go back

18   several years back to the year 2009, specifically around

19   July 21, 2009.  Do you remember that time period?

20   A.   Yes.

21   Q.   Were you dating Mr. Hall back in July of 21, 2009?

22   A.   Yes, I was.

23   Q.   And on the dates leading up to July the 1, 2009, did

24   Mr. Hall mention the name David Glasser to you at all?

25   A.   Yes.

1   Q.   And did you know David Glasser?

2   A.   Yes, I did.

3   Q.   And how did you know Mr. Glasser?

4   A.   He did odd jobs for us on the Peru property or whatever

5   odd jobs Leo needed done.

6   Q.   And what, exactly, did Mr. Hall mention to you about

7   David Glasser on the dates leading up to July 21, 2009?

8   A.   He was upset for him for stealing carburetors out of

9   the garage at our Madison property.

10  Q.   Do you remember if Mr. Hall said he was going to do

11  anything because of that?

12  A.   He was going to question him.

13       MR. FRANK:   Objection.

14       THE COURT:   Are you offering this for Mr. Hall's state

15  of mind?

16       MR. BARRY:   I am, Your Honor.

17       THE COURT:   The objection, assuming it's hearsay, is

18  overruled.

19  Q.   (By Mr. Barry) I will ask the question again.

20       Do you remember if Mr. Hall said he was going to do

21  anything once he -- because he found out this situation with

22  the carburetors?

23  A.   He was going to question him about them.

24  Q.   Okay.  Did he indicate how he was going to question

25  him?

1  A.   He was going to beat him up and find out what happened.

2  Q.   And did he say where he was going to beat up Mr.

3  Glasser?

4  A.   He was going to take him to the Peru property.

5  Q.   I will now want to talk about July 21, 2009 that day.

6  Do you remember where you woke up that day?

7  A.   We woke up at the clubhouse.

8  Q.   Okay.  And what did you do after -- when you say "we"

9  who do you mean, "we"?

10  A.   Me and Leo and my son.

11  Q.   After you guys wake up, what did you do?  What

12  happened?

13  A.   We went to town and I dropped off Leo at Hamlin Street.

14  Q.   And did Leo tell you why he wanted to be dropped off

15  there?

16  A.   He was meeting David Glasser there to pick up a motor

17  vehicle and transport it to Peru.

18  Q.   Okay.  After you dropped off Leo to do that, at some

19  point in time did you meet him back up at Peru?

20  A.   Yes.

21  Q.   All right.  And when you got -- in terms of Peru and

22  the property we are talking about, I will show you a

23  photograph.  I will ask you if you recognize what's depicted

24  in that photograph?

25  A.   Yes, that's the Peru property.

1        MR. BARRY:  I ask this be marked as an exhibit.

2        MR. FRANK:  No objection.

3        THE COURT:  Admitted.

4        THE CLERK:  Exhibit.

5        (Exhibit No. 40, photograph, marked)

6   Q.   (By Mr. Barry) All right.  I will hand you back what

7   has been marked as Exhibit 40.  I am going to put an image

8   on the screen.  Is that image on the screen the same -- oh

9   it was -- is the image on the screen the same as the exhibit

10  in front of you?

11  A.   Yes, it is.

12  Q.   Okay.  And in terms of Peru property, can you just

13  explain this property to the jury in terms of its location

14  to other places?

15  A.   It is in this, the woods.  I believe it's forest

16  service land all around it.  And there is a neighbor

17  directly across the street.  Other than that, there's no

18  neighbors.

19  Q.   Okay.  Would you say it's a secluded area?

20  A.   Yes.

21  Q.   When you got to the peru property, what was the first

22  thing that you saw?

23  A.   The Hummer and David Glasser's truck were parked in the

24  driveway.

25  Q.   Okay.  If I can stop you there.

1        Did you see two vehicles?

2   A.   Yes.

3   Q.   I'm going to show you two paragraphs and ask you if you

4   recognize what's depicted in both of those photographs?

5   A.   Yes.

6   Q.   And what would that photograph be?

7   A.   This is Leo's Hummer.

8   Q.   Okay.  And what would that photograph be?

9   A.   That is David Glasser's truck.

10       MR. BARRY:  I ask that be marked as the next Exhibit.

11       THE COURT:  First of all, any objection?

12       MR. FRANK:  No objection.

13       THE COURT:  Let us know which one you are asking to be

14   marked first.

15       MR. BARRY:  First I ask the Hummer be marked.

16       THE COURT:  Very well.

17       THE CLERK:  Exhibit 41.

18       (Exhibit No. 41, photograph, marked)

19       MR. BARRY:  And then for 42 the pickup truck.

20       (Exhibit No. 42, photograph, marked)

21   Q.   (By Mr. Barry) I'm going to hand you back what's marked

22   as Exhibit 41, 42.  I'm going to put two images on the

23   screen.

24       First, in terms of the pickup truck in front of you,

25   that is the same as depicted on the screen?

1  A.   Yes, it is David Glasser's truck.

2  Q.   All right.  Next, in terms of the Hummer picture that's

3  in front of you, is that the same that's on the screen?

4  A.   Yes, it is.

5  Q.   Okay.  Now, when you arrived, you indicated turning

6  back to the exhibit of the Peru property which is Exhibit

7  40.  Could you explain to the jury where exactly you saw

8  those two cars parked?

9        THE COURT:  If it would be easier, you can step down

10  and point to the screen if --

11       MR. BARRY:  If you want to point or use the pointer,

12  whatever is easy for you.

13       THE WITNESS:  The truck was like here and the Hummer

14  was right there, and this bus was not there.  And I pulled

15  in behind the truck, the bus --

16  Q.   (By Mr. Barry) Now, in addition to seeing those two

17  vehicles, did you see anybody on the property when you

18  drove?

19  A.   David Glasser and Leo were in front of David Glasser's

20  truck to the driver's front corner.

21  Q.   Okay.  And what was going on when you first arrived?

22  A.   David Glasser was crouched down and Leo was standing

23  over him with a bat in his hand.

24  Q.   And was he doing anything with that bat?

25  A.   He was tapping his boots.

1   Q.   When you say Mr. Glasser was crouched down, can you

2   just explain to the jury what you mean by crouched down?

3   A.   I don't think he was sitting.  I think he was just

4   hunkered down on his -- squatting.

5   Q.   Okay.  And without what was being said, were there

6   words going back and between Mr. Hall and Mr. Glasser?

7   A.   I couldn't hear them, but it appeared to be aggressive.

8        MR. FRANK:  Objection.

9        THE COURT:  Basis of your objection?

10        MR. FRANK:  Sure.  She couldn't hear anything beyond

11   that.

12        THE COURT:  I don't think she said what it was that was

13   said.  Your objection is overruled.

14        MR. BARRY:  I'm sorry.  You can answer.

15        THE WITNESS:  It appeared to be an aggressive

16   interlude.

17   Q.   (By Mr. Barry)  Who was aggressive towards the other?

18   A.   Leo.

19   Q.   What happened next?

20   A.   I got out of the car and walked up towards them, and

21   Leo told me to get a pen and paper out of my car.

22   Q.   Before you got out and approached, did you see Leo do

23   anything?

24   A.   Oh, yeah, I saw him hit him with the baseball bat.

25   Q.   Hit who?

1    A.    I saw Leo hit David Glasser with the baseball bat.

2    Q.    Okay.  And how did he hit him?

3    A.    He swung back handed at his arm.

4    Q.    Okay.  And when -- did he hit him in the arm?

5    A.    Yes.

6    Q.    Okay.

7    A.    Tinged.  Tinged.

8    Q.    Tinged?  Okay.

9         Can you explain how Mr. Glasser's arms were positioned

10   when he was struck by the baseball bat?

11   A.    He was trying to protect himself.  His hands were above

12   his head.

13   Q.    And how many times did you see Mr. Hall hit

14   Mr. Glasser?

15   A.    Once.

16   Q.    And at any point did Mr. Hall mention to you if he hit

17   Mr. Glasser before you arrived?

18   A.    Later he told me he had hit him in the barn before I

19   got there.

20        MR. FRANK:  Objection.  Move to strike -- actually,

21   objection withdrawn.

22        THE COURT:  All right.  That makes it easy.

23   Q.    (By Mr. Barry) Did he tell you how many times he hit

24   him in the barn?

25   A.    No.

1  Q.   So after that occurred, you indicated you got out of
2  your truck and you went towards them?
3  A.   Yeah.
4  Q.   And what happened once you got towards, went towards
5  Mr. Glasser and Mr. Hall?
6  A.   Leo told me to go back into the car and get a piece of
7  paper and a pen.
8  Q.   Did you do that?
9  A.   Yes.
10 Q.   And when you returned with that paper and pen, did you
11 hear Mr. Hall say anything to Mr. Glasser?
12 A.   He was telling him that he needed to pay for the stolen
13 carburetors.
14 Q.   Did you see -- did you give the paper and pen to
15 Mr. Hall?
16 A.   I did.
17 Q.   And did you see what he did with that paper and pen?
18 A.   He had David Glasser write on the page.
19 Q.   Okay.  Could you tell what he was having Mr. Glasser
20 write?
21 A.   No.
22 Q.   While he was writing down on the piece of paper,
23 Mr. Glasser -- did Mr. Hall still have that baseball bat in
24 his hand?
25 A.   Yes.

1   Q.   And after Mr. Glasser signed that piece of paper, what

2   happened next?

3   A.   He told me I had to move my car out of the way, that he

4   was going to take David Glasser to the hospital.  They were

5   going to go to the hospital.

6   Q.   And did you move your car?

7   A.   Yes.

8   Q.   And did you see them leave?

9   A.   Yes.

10   Q.   In which vehicle did they leave?

11   A.   They left in Leo's Hummer and David Glasser was

12   driving.

13   Q.   All right.  Was Mr. Glasser's pickup truck still on the

14   property when they left?

15   A.   Yeah.

16   Q.   Did Mr. Hall give you any instructions in terms of that

17   pickup truck before he left with Mr. Glasser to the

18   hospital?

19   A.   Yes.  He told me to move the truck down the road to a

20   neighbor's house, a friend of his.  I can't remember his

21   name, but it was about two miles down the road.  I moved the

22   truck, drove the truck there.

23   Q.   How did you get back to the Peru property?

24   A.   I walked back.

25   Q.   Did you see Mr. Hall at some point after this incident?

1    A.    Yes.

2    Q.    And did he tell you anything about what occurred on the

3    property with Mr. Glasser?

4    A.    That -- yeah, he told me that he had confronted him

5    about the stolen carburetors in the barn and after they

6    moved the motor vehicle in there, and that he admitted to

7    taking the carburetors but that Leo's brother Richie had

8    told him it was okay to take the carburetors out of our

9    garage.

10   Q.    After this event happened, did anything happen to

11   Mr. Hall?

12   A.    He was arrested about a week later.

13   Q.    And what did you do at that point?

14   A.    I drove to California.

15   Q.    After you left the area, did you learn you were facing

16   some criminal charges?

17   A.    Yes.

18   Q.    And was that for things that occurred on July 21?

19   A.    I was charged with all of the same counts as Leo was

20   charged with.

21   Q.    Okay.  As a joint venturer?

22   A.    Right.

23   Q.    And do you have an attorney on those charges?

24   A.    I do.

25   Q.    Did you ever give the police statements with your

1  version of events that occurred before you were charged?

2  A.   No, I did not.

3  Q.   Okay.  Had you since talked to the police about what

4  had occurred on July 21st after you were charged?

5  A.   Yes.

6  Q.   And when was the first time you did that?

7  A.   December, this last December.

8  Q.   And to your knowledge, have you been granted immunity

9  after telling the police your version of the events of what

10  occurred?

11  A.   Yes, I have.

12      (Pause)

13      (Off the record discussion amongst The Commonwealth.)

14      MR. BARRY:  No further questions, Your Honor.

15      Mr. Frank, you may cross examine.

16      MR. FRANK:  Thank you.

17               **CROSS EXAMINATION BY MR. FRANK**

18  Q.   Good afternoon.  I'm attorney Don Frank and I represent

19  David Chalue.

20  A.   Hello.

21  Q.   You have never met David Chalue?

22  A.   I have not.

23  Q.   There was a plan that Mr. Hall devised in regard to the

24  carburetor; is that right?

25  A.   Right.

1    Q.    And Mr. Hall came up with that plan, right?

2    A.    Right.

3    Q.    You didn't have any part of making any plan in terms of

4    what to do regarding the carburetors and Mr. Glasser, right?

5    A.    No.

6    Q.    And the plan kind of had a few different moving parts

7    to it, would you agree with that characterization?

8    A.    Sure.

9    Q.    And part of it included getting Mr. Glasser to the

10   house, right?

11   A.    Right.

12   Q.    And you didn't anything to do with that, did you?

13   A.    No.

14   Q.    And it involved threatening Mr. Glasser, right?

15   A.    Right.

16   Q.    And you didn't have anything to do with that, right?

17   A.    Right.

18   Q.    It is really Mr. Hall doing that?

19   A.    Yes.

20   Q.    And in terms of thinking about how to get the car and

21   the title to the car, that was all Mr. Hall's thinking,

22   right?

23   A.    Yes.

24   Q.    That wasn't your thinking?

25   A.    No, he wouldn't have listened.

1    Q.   All right.  And that was, Mr. Hall -- Mr. Hall operated

2    that way in general; is that right?

3         MR. BARRY:  Object, Your Honor.

4         THE COURT:  Overruled.  You may answer.

5         THE WITNESS:  Yes.

6    Q.   (By Mr. Frank) He often had a lot of things going on

7    with different people?

8    A.   Right.

9    Q.   And he would involve people in various plans, right?

10   A.   Right.

11   Q.   And the people didn't know some people involved in the

12   same plan, what the other plan -- what the other people were

13   doing?

14        MR. BARRY:  Objection, Your Honor.

15        THE COURT:  Basis of the objection?

16        MR. BARRY:  It's asking what someone else may know.

17        THE COURT:  Overruled.  You may answer.

18        THE WITNESS:  I think he saw people as ways he could

19   get whatever he wanted from people.  That's how he operated

20   with everybody constantly.

21   Q.   (By Mr. Frank) And sometimes he would have people do

22   things and wouldn't tell them why he was having people do

23   things; is that right?

24   A.   Right.

25   Q.   And that was kind of his modus operandi?

1  A.    Yeah.

2        MR. FRANK:  Thank you very much.  I have nothing

3  further.

4        THE COURT:  Redirect examination?

5        MR. BARRY:  Nothing further, Your Honor.

6        THE COURT:  You're excused, Ms. Beggs.

7  Thank you.

8        THE WITNESS:  Thank you.

9        THE COURT:  You may call your next witness.

10       MR. CACCAVIELLO:  Commonwealth will call Earl Persip.

11       (Earl Persip, sworn)

12       THE COURT:  Mr. Persip, good afternoon.

13       THE WITNESS:  Good afternoon.

14       THE COURT:  Can I remind you to keep your voice up so

15 that we can all hear you and answer only the question put to

16 you, please.

17       Can you do that?

18       THE WITNESS:  Yes, sir.

19       THE COURT:  Thank you.  You may proceed.

20       MR. CACCAVIELLO:  Thank you Your Honor.

21                         **(Earl Persip)**

22            **DIRECT EXAMINATION BY MR. CACCAVIELLO**

23 Q.    Sir, will you start by introducing yourself to the

24 jury, please.

25 A.    My name is Earl G. Persip, Jr.

1   Q.   And, sir, where do you live?

2   A.   Pittsfield, Mass.

3   Q.   And do you work, sir?

4   A.   Yes.

5   Q.   What sort of work do you do or what sort of business do

6   you have?

7   A.   I'm a car salesman at RBS Automotive.

8   Q.   How long have you been in that business?

9   A.   Twenty plus years.

10  Q.   Now, sir, before I start asking you questions, I'm

11  going to ask you, do you have an understanding that you have

12  been granted immunity by this Court in order to come here

13  and testify?

14  A.   Yes.

15  Q.   And that you're, in effect, compelled to testify?

16  A.   Yes.

17  Q.   Now, sir, this business that you've been in, can you

18  tell us where in Pittsfield the street that it's on?

19  A.   North Street near -- down by Berkshire Medical Center.

20  Q.   And has it always been at that location?

21  A.   Yes.

22  Q.   Now, sir, do you know a person or did you know a person

23  by the name of David Glasser?

24  A.   Yes, sir.

25  Q.   And how long had you known David Glasser?

1    A.    Probably approximately 10 to 12 years probably.

2    Q.    What kind of relationship, if anything, did you have

3    with him?

4    A.    Not really a relationship.  I know him, though, from --

5    he's a taxi driver and I just know him.

6    Q.    And I'm going to show you what's previously been marked

7    as Number 3, and who is that?  Is that David Glasser?

8    A.    Yes.

9    Q.    And, sir, I will ask you about another person.  Did you

10   know someone by the name of Adam Leo Hall?

11   A.    Yes, sir.

12   Q.    And how long have you known Mr. Adam Leo Hall?

13   A.    Approximately six, seven years.

14   Q.    And, again, what kind of relationship, if anything, did

15   you have with Mr. Hall?

16   A.    No kind of relationship, but I do know him.  And the

17   guy that does bodywork for me, I used to see him over his

18   house a lot.

19   Q.    All right.  Showing you what's been previously marked

20   as 38.

21   A.    That's Mr. Hall.

22   Q.    That's Mr. Hall.

23         Now, sir, I'm going to direct your attention back to

24   July of 2009, specifically the 29th or, I'm sorry, the 22nd

25   of July.  Did you know David Glasser to own a truck?

1   A.   Yes, sir.

2   Q.   And what kind of truck was it?

3   A.   Black Dodge.

4   Q.   I'm going to show you what's previously been marked as

5   Exhibit Number 42.  And do you recognize that truck?

6   A.   Yes.

7   Q.   And what is that?

8   A.   That looks like David's truck.

9   Q.   And back on July 22 of 2009, did you engage in a

10  transaction, a business transaction with Leo Hall?

11  A.   Yeah.

12  Q.   Okay.  And can you tell us, first of all, where did it

13  take place?

14  A.   Well, I told you I met him through a body guy of mine

15  named Joe.  He did call me up.  I was at the auction, and

16  tried to sell me a truck.  I told him when I got back I

17  would come and look at it and I went and looked at it.

18  Q.   So let me stop you there, sir.  Did you get a call from

19  someone by the name of Joe?

20  A.   Yes.

21  Q.   And as a result of that call, did you then do

22  something?  Where did you go?

23  A.   I went to Hamlin Street when I got back to Pittsfield,

24  though, I was in Connecticut.

25  Q.   Let me just stop you again.  You went to Hamlin Street

1   in Pittsfield?

2   A.   Yes.

3   Q.   And at the Hamlin Street address, did you see that

4   truck?

5   A.   Yes.

6   Q.   And who was with the truck?

7   A.   Joe and Mr. Hall, okay, and the redhead girl.

8   Q.   And did you engage in a transaction with regard to that

9   truck?

10  A.   Yes, I purchased the truck from him.  I asked him to

11  see the title and he showed me the title and the title was

12  signed.  I purchased the truck for $2,000 from him.

13  Q.   And just so we're clear, Mr. Persip, who did you engage

14  in the transaction with?

15  A.   The girl.

16  Q.   Okay.  And who is the -- who was the girl with?

17  A.   Well, Mr. Hall sent her out.

18  Q.   All right.  And so did you then -- did you hand over

19  money at that point?

20  A.   Yeah, I handed it to her when she gave me the receipt

21  and the title.

22  Q.   Okay.  And did you then -- what did you do at that

23  point?  Did you take immediate possession of the truck?

24  A.   Yeah, and I brought it over to the -- over to my

25  business where I worked.

1   Q.   Okay.  Now, sir, did you -- after that transaction, did

2   you have plans that day to leave town?

3   A.   Yes, I was going to Lake George for the weekend.

4   Q.   Were you going with yourself?

5   A.   No, with my girlfriend Carol Farrelly.

6   Q.   And, sir, did you happen to see David Glasser as you

7   made your way out of town?

8   A.   Yeah, it was at the O'Connell's Convenience Plus out on

9   Linden Street.

10  Q.   And when you saw Mr. Glasser did you have a

11  conversation with him?

12  A.   Well, what happened is -- it kind of come back to me.

13  The truck, that we were looking at, I asked him, you know,

14  did he give the truck to this guy to sell and he told me

15  yes, he did.

16  Q.   Okay.  And did he say anything else to you?  Did you

17  have further conversation about that?

18  A.   Yeah, I kind of -- I didn't like the way he was, he was

19  kind of acting like he was a little scared and I didn't feel

20  comfortable with it, so I brought the truck back and I put

21  it back where I found it -- where I bought it from.

22  Q.   So what were you intending to do after that

23  conversation with Mr. Glasser?

24  A.   Go back and get my money.

25  Q.   From whom?

1    A.    From Mr. Hall.

2    Q.    So what did you do?

3    A.    I went over to the corner of Daniels and Madison Avenue

4    where I know Mr. Hall's house to be.

5    Q.    And what were you doing there?

6    A.    Looking for Mr. Hall.

7    Q.    Okay.  And did you see Mr. Hall there?

8    A.    No.  He was not present.

9    Q.    Now, let me just stop you for a moment.  Before you got

10   there, Mr. Persip, did you see Mr. Glasser after you had the

11   conversation with him, did you see him get into any

12   particular car?

13   A.    Personally, no.

14   Q.    Was your attention drawn to that fact?

15   A.    Miss Farrelly told me he just got in the car with the

16   State Trooper.

17   Q.    Now, sir, when you went to find Mr. Hall -- I'm sorry,

18   what address is that again?

19   A.    Corner of Madison and Daniels.

20   Q.    So when you got there, did you see Mr. Hall?

21   A.    No.

22   Q.    Who did you see?

23   A.    Some guys hanging out in front of his house, I think --

24   I believe.  I'm not sure.  I think one of them might be his

25   brother or something.

1   Q.   And so what did you say?

2   A.   I was kind of mad and I just said to him, Tell -- I

3   call him Leo.  Okay.  I know him by Leo.

4        I just said, Tell him I'm looking for him and I want my

5   money back because there is something funny with this truck

6   deal and I just want my money back.

7   Q.   Okay.  And did you say anything else to the people that

8   were there, particularly about anything your girlfriend had

9   said to you?

10  A.   Yeah, because it was nothing funny about this; Why is

11  this guy getting in the car with the state troopers.

12  Q.   And you said that to this --

13  A.   Yeah, I said it to the people that was out front there.

14  Q.   Sir, did you ever get your money back?

15  A.   No, sir.

16       MR. CACCAVIELLO:  One moment please, Judge.

17       (Off the record discussion amongst The Commonwealth.)

18       MR. CACCAVIELLO:  No further questions.

19       THE COURT:  Mr. Frank, you may cross examine.

20                   **CROSS EXAMINATION BY MR. FRANK**

21  Q.   I had a little trouble understanding -- excuse me.

22       First of all, I'm Attorney Don Frank and I represent

23  Mr. Chalue.

24       Good afternoon.

25  A.   Okay.  All right.

1   Q.   I had a little bit of trouble understanding you.  Did

2   you say that Mr. Hall, when he arrived at your location, was

3   with a woman and a guy named Joe?

4   A.   Yeah, a woman -- the woman that just left out of here.

5   Q.   The woman who just left?

6   A.   The woman that was just in front of me, that was her.

7   Q.   Okay.  And he was also with a guy named Joe?

8   A.   Yeah.

9   Q.   And was that Joe Williams?

10  A.   No, its a body guy, Joe Bouchard.

11  Q.   Joe who?

12  A.   Bouchard.

13  Q.   Okay.  I apologize.

14       When he sold you the truck, he sold it to you without

15  letting you know how he obtained title to the truck?

16  A.   No.  He told me the guy gave him the truck for money

17  that he owed him.

18       MR. FRANK:  Okay.  Thank you.  I have nothing further.

19       THE WITNESS:  Okay.

20       THE COURT:  Redirect examination?

21       MR. BARRY:  Nothing further.

22       THE COURT:  Mr. Persip, you are excused.

23  You may step down.

24  You may call your next witness.

25       MR. BARRY:  Commonwealth calls Trooper Dale Gero.

1      (Dale Gero, sworn)

2      THE COURT:  Trooper, good afternoon.

3      THE WITNESS:  Good afternoon, Your Honor.

4      THE COURT:  If I could remind you to focus on the

5  question and answer only that question, please.

6      THE WITNESS:  Yes, sir.

7      THE COURT:  You may proceed.

8      MR. BARRY:  Thank you, Your Honor.

9                        **(Dale Gero)**

10               **DIRECT EXAMINATION BY MR. BARRY**

11  Q.   First of all, could you tell us your name?

12  A.   Trooper Dale Gero.

13  Q.   I assume you are a trooper then?

14  A.   Yes.

15  Q.   How long have you been a trooper here in Massachusetts?

16  A.   Yes.

17  Q.   How long you have been a Massachusetts State Trooper?

18  A.   Approximately eight years.

19  Q.   And what's your current assignment right now with the

20  Mass. State Police?

21  A.   I work for the State Police Detective Unit, Berkshire

22  County.

23  Q.   How long you have been doing that?

24  A.   Approximately two years.

25  Q.   Do you know someone by name of Adam Leo Hall?

1    A.    Yes, I do.

2    Q.    Showing you a picture, do you recognize what I'm

3    showing you, what's been marked as Exhibit 38, do you

4    recognize that person?

5    A.    Yes.

6    Q.    And who's that?

7    A.    Adam Lee Hall.

8    Q.    Getting to this case, do you remember if you were

9    working on July 21, 2009?

10   A.    Yes, I was.

11   Q.    And what shift were you working?

12   A.    I was working the evening shift which is 3:00 p.m. to

13   11:00 p.m.

14   Q.    And approximately 4:00 p.m. do you recall if you

15   received a dispatch?

16   A.    Yes, sir.

17   Q.    What was the nature of that dispatch?

18   A.    Report of assault and battery.

19   Q.    All right.  And based upon that, did you go somewhere?

20   A.    Yes, I did.

21   Q.    Where did you go?

22   A.    Berkshire Medical Center.  It's the local hospital in

23   Pittsfield, Massachusetts.

24   Q.    And once you got there, did you see someone?

25   A.    Yes, I did.

1    Q.    And who did you see?

2    A.    I saw David Glasser.

3    Q.    All right.  Showing you what's been marked as Exhibit

4    3, and ask you if you recognize that person?

5    A.    Yes, I do.

6    Q.    And who is that?

7    A.    That is David Glasser.

8    Q.    Okay.  When you saw Mr. Glasser, at the Berkshire

9    Medical hospital, how did he appear to you?

10   A.    Shook up and nervous.

11   Q.    Now, when you first -- did you go and talk to him?

12   A.    Yes, I did.

13   Q.    And when you talked to him, did he show you anything?

14   A.    Yes.

15   Q.    Okay.  Did he show you certain areas of his body?

16   A.    Yes, he did.

17        MR. BARRY:  At this point, Your Honor, I would offer in

18   Mr. Glasser's medical records as Exhibit 42 --

19        THE COURT:  Any objection, Mr. Frank?

20        MR. BARRY:  -- 43.

21        MR. FRANK:  Judge, I may have a portion of an objection

22   as to matters that can be redacted, if we can address those

23   later.  The general records, I have no objection to.

24   Perhaps we can address that after.

25        THE COURT:  The document is admitted subject to later

1    argument regarding any possible redactions.

2         MR. BARRY:  Thank you.

3         Thank you, Your Honor.

4         Forty-three, I apologize.

5         (Exhibit No. 43, medical records of David Glasser,

6    marked)

7    Q.   (By Mr. Barry) Now, when you talked to Mr. Glasser,

8    where in the hospital did you talk to him?

9    A.   The lobby of the emergency room.

10   Q.   Without telling us what he said, did he explain

11   something that happened to him?

12   A.   Yes.

13   Q.   And based upon what he told you, did you ask him to do

14   anything?

15   A.   Yes, I did.

16   Q.   What did you ask him to do?

17   A.   I asked him to come up to Cheshire State Police

18   barracks for a video and a written statement.

19   Q.   And did he do that that day?

20   A.   Yes, he did.

21   Q.   Was it later on that day?

22   A.   Yes.

23   Q.   And after that first statement, did you have

24   Mr. Glasser come in to give a second statement?

25   A.   Yes, I did.

1    Q.    And on what day did you have Mr. Glasser come in for

2    that second statement?

3    A.    That was July 23, 2009.

4    Q.    All right.  And where was that second statement taken?

5    A.    That was at the Berkshire County State Police Detective

6    Unit, Pittsfield, Massachusetts.

7    Q.    And what was the purpose of getting a second statement

8    from Mr. Glasser?

9    A.    To gather more information.

10   Q.    And how was it that Mr. Glasser got to that second

11   statement at, where was it located again?

12   A.    State Police Detective Unit.

13   Q.    I'm -- where is that located, that office?

14   A.    Pittsfield, Massachusetts on North Street.

15   Q.    Okay.  How was it that Mr. Glasser got there?

16   A.    I drove him there.

17   Q.    Okay.  And when you picked him up, where did you pick

18   him up?

19   A.    Shell Gas Station on Linden Street, Pittsfield,

20   Massachusetts.

21   Q.    And when you picked him up, what kind of vehicle were

22   you in?

23   A.    I was in my State Police cruiser.

24   Q.    Is that marked or unmarked?

25   A.    Marked.

1  Q.   When did you -- approximately, what time did you pick

2  him up?

3  A.   Approximately 6:00 p.m.

4  Q.   When you picked up Mr. Glasser, in your marked cruiser,

5  did you notice if there were other people around when you

6  picked him up?

7  A.   Yes, there was.

8  Q.   Once you picked him up, did you bring him then to an

9  interview?

10  A.   Yes, I did.

11  Q.   And in terms of this interview, was it longer than your

12  first interview?

13  A.   Yes.

14  Q.   And the second interview, was that also taped?

15  A.   Yes, it was.

16  Q.   And during that interview, are you aware or did

17  Mr. Glasser show police areas of his body again?

18  A.   Yes, he did.

19  Q.   And was this the same areas of the body that he had

20  showed you on July 21st, at the hospital?

21  A.   Yes, it was.

22  Q.   And were photos taken of Mr. Glasser of the areas of

23  the body that he was showing you and other police members?

24  A.   Yes.

25  Q.   I'm going to show you four photographs and ask you if

1   you recognize what's depicted in those photographs?

2   A.   Yes, I do.

3   Q.   And what's depicted in each of those photographs?

4   A.   This would be the lower right shin area; lower ankle

5   area on the right foot; left elbow; left wrist of Mr.

6   Glasser.

7   Q.   Okay.  Is that a fair and accurate representation of

8   the way Mr. Glasser looked on July 23rd?

9   A.   Yes.

10  Q.   Now, there is a time stamp on those photographs; does

11  that indicate July 23rd?

12  A.   No, it does not.

13  Q.   What dates are reflected?

14  A.   July 24th.

15  Q.   Are these accurate?

16  A.   No.

17  Q.   Those -- okay.  These photos were taken on July 23rd,

18  during an interview?

19  A.   Yes.

20      MR. BARRY:  Your Honor, I ask these be entered into

21  evidence in the order they were taken.

22      THE COURT:  Any objection?

23      MR. FRANK:  No objection.

24      MR. BARRY:  Forty-four for the shin.

25      (Exhibit No. 44, photograph, marked)

1        MR. BARRY:  Forty-five for the foot.

2        (Exhibit No.  45, photograph, marked)

3        MR. BARRY:  Forty-six for the elbow.

4        (Exhibit No. 46, photograph, marked)

5        MR. BARRY:  And 47 for this.

6        (Exhibit No. 47, photograph, marked)

7    Q.   (By Mr. Barry) Trooper, I'm going to give you back

8    what's been marked as Exhibits 44 through 47.

9        I'm just going to put some images on the screen.

10       In Exhibit 44, does that appear to be the same image

11   that's in front of you?

12   A.   Yes.

13   Q.   And when you saw Mr. Glasser's ankle on this day, what

14   did you notice, if anything, about his ankle?

15   A.   Bruising and swelling.

16   Q.   Next, I'm going to show you 45.  Does that appear to be

17   the same that's in front of you?

18   A.   Yes.

19   Q.   And what, if anything, did you notice about this area

20   of his body when you saw him?

21   A.   It appeared to be bruised and swollen as well.

22   Q.   Exhibit 46, in front of you, is that the same as what's

23   on the screen or is it the other one?

24   A.   I think -- I think that's 47.

25   Q.   I apologize.  And what area of the body is that?

1  A.   The left forearm.

2  Q.   And what, if anything, did you notice about his body?

3  A.   It was bruised and swollen.

4  Q.   And lastly, the last exhibit in front of you, what area

5  of the body is that?

6  A.   Left elbow.

7  Q.   What, if anything, did you notice about Mr. Glasser's

8  elbow when you saw him?

9  A.   That it was bruised and swollen as well.

10  Q.   In terms of that interview, approximately how long did

11  that last, that second interview?

12  A.   Approximately 30, 60 minutes, in that time frame.

13  Q.   Who was present beside yourself for that second

14  interview in terms of police personnel?

15  A.   Lieutenant David Foley, Trooper Steven Jones, Trooper

16  William Scott, and Trooper John Stec.

17  Q.   And who was actually in charge of that interview, that

18  second one?

19  A.   Trooper William Scott.

20  Q.   And during that interview, are you aware whether or not

21  David Glasser received any phone calls?

22  A.   Yes.

23  Q.   After Mr. Glasser gave a statement, what, if anything,

24  did the police do in terms of Mr. Hall?

25  A.   Went looking for Mr. Hall.

1  Q.   All right.  Were the police able to find Mr. Hall?

2       MR. FRANK:  Objection.

3       THE COURT:  Were the police able to find Mr. Hall?

4       MR. FRANK:  Hearsay.

5       THE COURT:  Overruled.

6  Q.   (By Mr. Barry) Were the police and you able to find

7  Mr. Hall?

8  A.   Yes, they were.

9  Q.   Would -- where did you find him?

10 A.   We were on Seymour Street --

11      MR. FRANK:  Objection.

12      THE COURT:  Overruled.

13      THE WITNESS:  We were in Seymour Street in Pittsfield.

14 Q.   (By Mr. Barry) Just so we are clear, are you one of the

15 officers that found Mr. Hall?

16 A.   Yes, I was.

17 Q.   Were you the officer that actually pulled him over?

18 A.   Yes, I was.

19 Q.   And after you pulled over Mr. Hall, what kind of car

20 was he in?

21 A.   It was a Hummer.

22 Q.   Who was present in the Hummer with Mr. Hall, anybody?

23 A.   There was a female driver.

24 Q.   After you found Mr. Hall, what if anything did you do

25 with him?

1   A.   We took him into custody.

2        MR. BARRY:  Thank you.  No more questions, Your Honor.

3        THE COURT:  Mr. Frank.

4        MR. BARRY:  Wait -- I apologize, Your Honor.

5        (Off the record discussion amongst The Commonwealth.)

6        MR. BARRY:  May I go sidebar for a moment with counsel?

7        THE COURT:  You may.

1        (Beginning of Sidebar Discussion)

2        MR. BARRY:  Your Honor, we didn't introduce the --

3   introduce the medical records.  We were going to have them

4   read to the jury.  These were the same medical records that

5   were redacted the same way as they were in the last trial,

6   so any mention of the word assault is taken out.  This is

7   the same exact exhibit.

8        I am not sure --

9        THE COURT:  Let me interrupt before the two of you have

10  a conversation.

11       MR. BARRY:  I'm sorry, Your Honor.

12       THE COURT:  You want to have someone read them now?

13       MR. BARRY:  This Trooper, read them to the jury.

14       THE COURT:  And you have not had a chance to look at

15  them?

16       MR. FRANK:  I looked at them awhile ago back.  I know

17  my issues will be the same as the prior trial.

18       THE COURT:  Well, I want you to have an opportunity to

19  look at them before I make a decision as to whether or not

20  they should be read to the jury.  I don't know why it's

21  important this witness read them now.

22       MR. BARRY:  It's not, Your Honor.  It was just

23  continuity.

24       THE COURT:  We can have it done at later time once

25  you're satisfied with the exhibit, I will allow them to be

1    read to the jury.

2         MR. BARRY:  Okay.  Thank very much, Your Honor.

3         (End of Sidebar Discussion)

1    MR. BARRY:  No more questions.

2    MR. FRANK:  No questions, Your Honor.

3    THE COURT:  And with that, Trooper, you are excused.

4    THE WITNESS:  Thank you, Your Honor.

5    (The witness stepped down.)

6    MR. BARRY:  Next, Your Honor, the Commonwealth will

7 call to the stand Trooper William Scott.

8    THE WITNESS:  Good morning, Your Honor -- good

9 afternoon.

10    THE COURT:  Good afternoon.

11    If I could remind you to focus on the question and only

12 the question and answer only that question, please.

13    THE WITNESS:  Yes, sir.

14    THE COURT:  You may proceed.

15    MR. BARRY:  Thank you, Your Honor.

16                    **(William Scott)**

17             **DIRECT EXAMINATION BY MR. BARRY**

18 Q.  First of all, sir, could you just tell the jury your

19 name?

20 A.  Yes, my name is William Scott, S-C-O-T-T.

21 Q.  What do you do for living?

22 A.  I'm a Trooper with Massachusetts State Police.

23 Q.  How long have you been with the Massachusetts State

24 Police?

25 A.  Fifteen years.

1    Q.    What is your current assignment with the Massachusetts

2    State Police?

3    A.    I am currently assigned to the Berkshire County

4    District Attorney's Office, State Police Detective Unit.

5    Q.    Getting to this case, at some point did you become

6    involved in an investigation against Adam Lee Hall for the

7    beating and robbing of David Glasser for his pickup truck?

8    A.    Yes.

9    Q.    And were you present for the interview that David

10   Glasser gave to State Police on July 23, 2009?

11   A.    Yes.

12   Q.    Were you actually in charge of that interview?

13   A.    Yes.

14   Q.    And was that interview videotaped?

15   A.    Yes, it was.

16   Q.    During that interview, did Mr. Glasser receive a phone

17   call?

18   A.    Yes.

19   Q.    And when he received that phone call, did -- at some

20   point, did Mr. Glasser place that phone call on speaker

21   phone?

22   A.    Yes, he did.

23   Q.    And did you hear the person that was calling

24   Mr. Glasser and what he said to Mr. Glasser?

25   A.    I did.

1   Q.   And now do you know someone by name of Adam Lee Hall?

2   A.   I do.

3   Q.   And in terms of Mr. Hall, have you heard Mr. Hall

4   speaking before?

5   A.   Yes.

6   Q.   Okay.  I'm showing you Exhibit 38.  Do you recognize

7   the person in that picture?

8   A.   Yes, I do.

9   Q.   And who is that?

10  A.   That is Adam Lee Hall.

11  Q.   Now, when you've heard Mr. Hall speak before, have you

12  heard him speak more than once?

13  A.   Yes, I did.

14  Q.   And on one of the occasions you heard him speak, did he

15  make mention of the phone call to David Glasser while he is

16  being interviewed?

17  A.   Yes.

18  Q.   Okay.

19  A.   I wasn't in the interview, but I did hear him speaking.

20  Q.   Oh, I'm sorry.  What did he say about whether or not he

21  called David Glasser during the police interview?

22  A.   He admitted he called Mr. Glasser while he was in the

23  presence of a police officer.

24  Q.   And in addition to that admission, the interview or the

25  portion of the interview I will show you, do you recognize

1    the voice of the person calling Mr. Glasser?

2    A.    Yes.

3    Q.    And that is Mr. Hall?

4    A.    Yes.

5    Q.    And in terms of the interview, videotape, is that a

6    fair and accurate representation of a portion of the

7    interview you had of Mr. Glasser on July 23rd?

8    A.    A short portion, but yes, it is.

9          MR. BARRY:  At this point, Your Honor I, would like to

10   offer that video clip as the next exhibit.

11         THE COURT:  Any objection?

12         MR. FRANK:  No objection.

13         THE CLERK:  Exhibit.

14         THE COURT:  May be admitted.

15         THE CLERK:  Exhibit 48.

16         (Exhibit No. 48, CD from police interview of

17   Mr. Glasser/Glasser-Hall conversation, marked)

18         MR. BARRY:  I would ask if the -- dim the lights a

19   little bit, if that would be okay.

20         (Pause)

21         MR. BARRY:  Thank you very much.

22   Q.    (By Mr. Barry) First of all, before I play this video

23   clip, can you identify who this person is in the red hat?

24   A.    That is me.

25   Q.    And who is this individual?

1   A.    David Glasser?

2   Q.    Is there another person here?

3   A.    Yes, I believe it's Trooper Jones.

4   Q.    And in terms of your interview with Mr. Glasser, on

5   July 23, about how far into the interview are we when we

6   first start to see this clip?

7   A.    I believe we are at least 30 minutes or so more into

8   the interview.

9   Q.    All right.  And at this point, did Mr. Glasser, while

10  you are interviewing him about what had happened with his

11  pickup truck and Mr. Hall, did he receive a phone call?

12  A.    Yes, he did.

13  Q.    All right.  At this point I'm going to play that

14  portion.

15        (Whereupon, the video was viewed.)

16        MR. BARRY:  All right.  Can we have the lights again,

17  please.

18  Q.    (By Mr. Barry) Sir, after the police finished that

19  interview with Mr. Glasser and hearing that phone call,

20  what, if anything, did police do in terms of Mr. Hall?

21  A.    We went back -- we were actively seeking Mr. Hall to

22  arrest him.

23  Q.    Were the police able to find him?

24  A.    Yes, sir.

25  Q.    And what happened after the police found him?

1    A.    He was arrested.

2    Q.    Okay.  And what kind of vehicle was he in?

3    A.    He was driving his registered GMC Hummer.

4    Q.    And what, if anything, did the police do in terms of

5    that Hummer?

6    A.    Towed it to the Pittsfield Police Department.

7    Q.    Okay.  After towing his vehicle and arresting Mr. Hall,

8    did the police apply for a search warrant, search warrant

9    for the Hummer?

10   A.    Yes.

11   Q.    And did it receive one?

12   A.    Yes.

13   Q.    And did the police then search the Hummer?

14   A.    Yes.

15   Q.    Were you present for such search?

16   A.    I was.

17   Q.    And while searching the Hummer, did police find one

18   particular item in the back seat of note?

19   A.    Yes.

20   Q.    And what would that be?

21   A.    A wooden baseball bat.

22   Q.    I'm going to show you an item and ask you if you

23   recognize this item?

24         If you need to look at the packaging?

25   A.    Yes.

1    Q.   And what is that?

2    A.   That is the wooden baseball bat that was recovered from

3    Mr. Hall's Hummer.

4         MR. BARRY:  I ask this be marked as an exhibit.

5         MR. FRANK:  No objection.

6         THE COURT:  Admitted.

7         THE CLERK:  Exhibit 49.

8         (Exhibit No. 49, baseball bat, marked)

9    Q.   (By Mr. Barry) In terms of where that baseball bat was

10   found, the police take a picture of the location of where

11   the baseball bat was found?

12   A.   Yes.

13        MR. FRANK:  If I may see that one moment?

14        (Pause)

15   Q.   (By Mr. Barry) Showing you a photograph, ask if you

16   recognize that photograph?

17   A.   Yes.

18   Q.   And what is that?

19   A.   That is a photograph depicting where the wooden

20   baseball bat was located in the Hummer.

21        MR. BARRY:  I ask this be marked as the next exhibit.

22        THE COURT:  Any objection?

23        MR. FRANK:  No objection.

24        THE COURT:  Admitted.

25        THE CLERK:  Exhibit 50.

1          (Exhibit No. 50, photograph, marked)

2     Q.    (By Mr. Barry) Trooper, I'm going to hand you back what

3     has been marked as Exhibit 50, and we will put an image on

4     the screen, and ask I you the image on the screen is the

5     same as located in front of you?

6     A.    Yes.

7     Q.    Is that where the baseball bat was found?

8     A.    Yes.

9     Q.    In addition -- was there any blood found on that

10    baseball bat?

11    A.    No.

12    Q.    In addition to the baseball bat, did police find any

13    other items of interest?

14    A.    Yes.

15    Q.    And would that be in the front passenger seat where

16    Mr. Hall had been located?

17    A.    A cellular telephone was located.

18    Q.    All right.  I'm going to show you an object and ask you

19    if you recognize that object?

20    A.    Yes.

21    Q.    And what would that be?

22    A.    This is the cellular telephone that was located on the

23    front seat of the passenger side of the vehicle.

24          MR. BARRY:  Thank you.  I ask that be marked as the

25    next exhibit.

1       THE COURT:  Any objection?

2       MR. FRANK:  If I could just check the bag for one

3  point?

4       THE COURT:  You may.

5       MR. FRANK:  No objection to either the phone or the

6  bag.

7       THE COURT:  Admitted.

8       THE CLERK:  Exhibit 51.

9       (Exhibit No. 51, cell phone, marked)

10 Q.   (By Mr. Barry) Now, did the police get a chance to look

11 at the outgoing phone logs of that phone?

12 A.   Yes.  I did a passive search of incoming/outgoing phone

13 calls on that phone.

14 Q.   Were there any phone calls in particular that caught

15 your attention?

16 A.   Yes.

17 Q.   What would that be?

18 A.   At 7:29 p.m. a telephone call was made to a contact on

19 the phone as Dave Nig and it lasted 2 minutes and 15

20 seconds.

21 Q.   And what time was it that Mr. Glasser got his call from

22 Mr. Hall on July 23rd?

23 A.   7:29 p.m.

24 Q.   And in terms of the length of the conversation, about

25 how long was that conversation?

1   A.    About 2 minutes and 15 seconds.

2   Q.    And, sir --

3         MR. BARRY:  With the Court's permission, I would just

4   have the witness read from what's been marked as Exhibit 43,

5   I believe without objection from defense counsel.

6         THE COURT:  All right.  Without objection you may do

7   so.

8         Let me see if I correctly recall, Exhibit 43 are the

9   medical records of Mr. Glasser; is that correct?

10        MR. BARRY:  That's correct, Your Honor.

11        THE COURT:  All right.  You may have the witness read a

12  portion thereof without objection.

13  Q.    (By Mr. Barry) Sir, I'm going to show you the medical

14  records of Mr. Glasser.  I'm going to ask if you could just

15  read this line up to, I guess there.

16  A.    Sure.  It says:

17        Chief complaint:  Description, PT -- which I know is

18  short for patient -- states he was (sic) prior to coming in,

19  with a bat, has pain in right lower leg and left lower

20  elbow.  Patients denies LOC -- which I'm not sure what that

21  stands for -- or other pain.

22  Q.    Thank you very much.

23  A.    I believe --

24  Q.    No.  That's okay.  I don't want you to speculate.

25        MR. BARRY:  I don't have any further questions, Your

1    Honor.

2         THE COURT:  Mr. Frank, when you're ready you may

3    cross-examination.

4         MR. FRANK:  No questions, Your Honor.

5         THE COURT:  Mr. Scott, you are excused.  Thank you.

6         THE WITNESS:  Thank you.

7         (The witness stepped down.)

8         MR. CAPELESS:  May we approach sidebar, Your Honor?

9         THE COURT:  You may.

10        (Beginning of Sidebar Discussion)

11        MR. CAPELESS:  We're through our witnesses for the day.

12        THE COURT:  All right.

13        MR. CAPELESS:  And that's a good sign we moved quickly.

14        THE COURT:  That's progress.

15        I will excuse the jury and we can take up whatever

16   other logistical matters after I've done that.

17        (End of Sidebar Discussion)

18        THE COURT:  Ladies and gentlemen, we have exhausted the

19   available witnesses for today which means I'm going to let

20   you go a little bit earlier than anticipated.

21        I do, before you leave, want to remind you of my

22   earlier cautionary instructions.  Over the weekend, please

23   don't discuss the case with anyone or expose yourselves to

24   any media reports of the case and don't conduct any

25   independent research of any kind regarding the case.  I want

1    to thank you on behalf of the parties for your time and

2    attention today.

3        We will see you Monday morning.

4        As I said, counsel and I will meet at nine o'clock so

5    that we will be ready to proceed at 9:30 with you in the

6    courtroom.

7        Have a nice weekend.

8        (The jury exit at 3:29 p.m.)

9        THE COURT:  Please be seated.

10       Mr. Capeless, can you give me an overview of what you

11   anticipate on Monday?

12       MR. CAPELESS:  We just completed the presentation

13   regarding the first Glasser case.  We would -- we anticipate

14   we are going to present the New York caper as it were with

15   witnesses from that, get into as well the prior attempts by

16   Hall with Coe and Rondeau.  And also to bring in Brian

17   Johnston and the incident at the Home Depot with Veiovis and

18   Fox.

19       We anticipate that will probably get us to the end of

20   the day on Monday.  And then move from there now getting

21   into that weekend.

22       THE COURT:  From your vantage point, are there

23   evidentiary issues that will need to be addressed early

24   Monday before we get into that portion of your presentation?

25       MR. CAPELESS:  I don't Your Honor.

1          THE COURT:  Mr. Frank, from your side, are there

2     matters that you think we will need to address on Monday

3     morning?

4          MR. FRANK:  I don't believe so, Your Honor.  I think

5     those witnesses, as long as they on the New York caper, as

6     it was, I don't see a problem.

7          THE COURT:  I am a mindful of the fact that the

8     Commonwealth's motion in limine is unresolved and we have

9     some time before we get to that point, but, I would be

10    prepared to hear argument on that on Monday if the two of

11    you are prepared.

12         MR. CAPELESS:  You mean as to the statements at the

13    hearing?

14         THE COURT:  Correct.

15         MR. FRANK:  Judge, I'm hoping to -- I have two

16    assignments for myself over the Sunday.  I am hoping to take

17    one day off and I may be ready.  I would like to think it's

18    an easy type thing I can do it, but if I can't, I would like

19    to ask if we put it over until Tuesday.

20         THE COURT:  I don't want to force you to argue

21    something that you're not prepared to argue.  Why don't you

22    just bear in mind I have it on my agenda for Monday morning.

23    If we can't get it to it, we can't get to it.

24         With that, Counsel, I will see you Monday morning at

25    nine o'clock.

1        Have a nice weekend.

2        (The Court exited at break 3:31 p.m.)

3        (* * * * *)

1          **C E R T I F I C A T I O N**

2          I, ALICIA CAYODE KYLES, REGISTERED PROFESSIONAL

3    REPORTER, REGISTERED MERIT REPORTER, OFFICIAL COURT

4    STENOGRAPHER, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE

5    AND ACCURATE TRANSCRIPT FROM THE RECORD OF THE COURT

6    PROCEEDINGS IN THE ABOVE ENTITLED MATTER.

7          I, ALICIA CAYODE KYLES, FURTHER CERTIFY THAT THE

8    FOREGOING IS IN COMPLIANCE WITH THE ADMINISTRATIVE OFFICE OF

9    THE TRIAL COURT DIRECTIVE ON TRANSCRIPT FORMAT, RESERVING MY

10   RIGHT TO PROVIDE AN ELECTRONIC COPY, WHEN REQUESTED, AT THE

11   COPY RATE AS PROVIDED BY THE STATUTE IN CHAPTER 221: SECTION

12   88, AS AMENDED.

13         I, ALICIA CAYODE KYLES, FURTHER CERTIFY THAT I NEITHER

14   AM COUNSEL FOR, RELATED TO, NOR EMPLOYED BY ANY OF THE

15   PARTIES TO THE ACTION IN WHICH THIS HEARING WAS TAKEN, AND

16   FURTHER THAT I AM NOT FINANCIALLY NOR OTHERWISE INTERESTED

17   IN THE OUTCOME OF THE ACTION.

18

19

20   ALICIA CAYODE KYLES, RPR, RMR, OCR

21   Dated:  December 15, 2014

22   50 State Street

23   Springfield, Massachusetts  01103

24   413-748-7624

25