```
1                            Volume:  IV
                             Pages:  1-266
2                            Exhibits:  52-87

3                 COMMONWEALTH OF MASSACHUSETTS
   BERKSHIRE, SS                    SUPERIOR COURT DEPARTMENT
4                                   OF THE TRIAL COURT

5
   *******************************
6  COMMONWEALTH OF MASSACHUSETTS

7  vs.                               Docket No:
                                     2011-0140
8  DAVID T. CHALUE,
   *******************************
9

10     JURY TRIAL
       BEFORE THE HONORABLE C. JEFFREY KINDER
11
```

12  **APPEARANCES:**
For the **Commonwealth:**
13  Berkshire County District Attorney's Office
7 North Street, P.O. Box 1969, Pittsfield, MA  01202
14  By:  DAVID F. CAPELESS, ASSISTANT DISTRICT ATTORNEY
       PAUL CACCAVIELLO, FIRST ASSISTANT DISTRICT ATTORNEY
15       GREGORY BARRY, ASSISTANT DISTRICT ATTORNEY

16  For the Defendant **DAVID T. CHALUE (2011-0140):**
By:  DONALD W. FRANK, ESQUIRE, FRANK LAW OFFICES, 95 State
17  Street, Suite 918, Springfield, MA  01103
       BONNIE G. ALLEN, ESQUIRE, 39 Main Street, Suite 8,
18  Northampton, MA  01060
       MEREDITH RYAN, ESQUIRE

```
19

20

21                                 Hampden Superior Court
                                        50 State Street
22                               Springfield, Massachusetts
                                        April 28, 2014
23

24              ALICIA  CAYODE  KYLES
                Official Court Stenographer
25              Registered Merit Reporter
```

1                         I N D E X

2   Witness              Direct     Cross     Redirect   Recross

3   Nicole Brooks
     (By Mr. Barry).........8.....................60
4      (By Mr. Frank)..................68

5   Scott Langdon
     (By Mr. Barry)........74...................114
6      (By Mr. Frank)..................98...................116

7   Alexandra Ely
     (By Mr. Barry)......119...................143
8      (By Mr. Frank)..................136

9   George Byrd
     (By Mr. Caccaviello).144...................174
10      (By Mr. Frank)..................170

11   Gary Herland
     (By Mr. Caccaviello).175
12

13   William King
     (By Mr. Caccaviello).183

14   David Brian Foley
     (By Mr. Barry).......191
15

16   Justina Coe
     (By Mr. Barry).......208...................213
     (By Mr. Frank)..................218
17

18   Timothy Rondeau
     (By Mr. Barry).......219
     (By Mr. Frank)..................221
19

20   Bryan Johnson
     (By Mr. Caccaviello).226
     (By Mr. Frank)..................232
21

22   William Gregory
     (By Mr. Caccaviello).234
     (By Mr. Frank)..................244
23

24   Michael Carriveau
     (By Mr. Caccaviello).248
     (By Mr. Frank)..................258
25

| | EXHIBITS | PAGE |
|---|---|---|
| 1 | | |
| 2 | Exhibit 52.....Ruger gun | 15 |
| 3 | Exhibit 53.....photograph | 18 |
| 4 | Exhibit 54.....photograph | 18 |
| 5 | Exhibit 55.....photograph | 18 |
| 6 | Exhibit 56.....photograph | 18 |
| 7 | Exhibit 57.....Walmart surveillance video | 22 |
| 8 | Exhibit 58.....camera box | 25 |
| 9 | Exhibit 59.....Price Chopper video | 32 |
| 10 | Exhibit 60.....wallet | 35 |
| 11 | Exhibit 61.....license/Nicole Brooks | 35 |
| 12 | Exhibit 62.....Hess gas station video | 42 |
| 13 | Exhibit 63.....photograph | 44 |
| 14 | Exhibit 64.....photograph | 45 |
| 15 | Exhibit 65.....photograph | 45 |
| 16 | Exhibit 66.....photograph | 45 |
| 17 | Exhibit 67.....photograph | 45 |
| 18 | Exhibit 68.....statement/Nicole Brooks | 51 |
| 19 | Exhibit 69.....phone records/Scott Langdon | 87 |
| 20 | Exhibit 70.....statement/Scott Langdon | 95 |
| 21 | Exhibit 71.....tree trunk | 149 |
| 22 | Exhibit 72.....projectile | 160 |
| 23 | Exhibit 73.....receipts from wallet | 162 |
| 24 | Exhibit 74.....photograph of receipts | 162 |
| 25 | Exhibit 75.....white shirt | 178 |

1   Exhibit 76.....photograph.........................180
2   Exhibit 77.....photograph.........................180
3   Exhibit 78.....photograph.........................187
4   Exhibit 79.....MapQuest/documents from truck.......189
5   Exhibit C-ID...chart/S. Langdon cell records.......201
6   Exhibit D-ID...chart/N. Brooks cell records........201
7   Exhibit E-ID...chart/A. Hall cell records..........202
8   Exhibit 80.....photograph.........................228
9   Exhibit 81.....photograph.........................236
10  Exhibit 82.....Home Depot surveillance video.......238
11  Exhibit 83.....photograph.........................243
12  Exhibit 84.....photograph.........................243
13  Exhibit 85.....tag/folding star key set............256
14  Exhibit 86.....folding star key set................256
15  Exhibit 87.....Home Depot POS journal..............256

16
17
18
19
20
21
22
23
24
25

1   (The Court entered at 9:03 a.m.)

2   (The defendant was present.)

3   THE COURT:  Thank you.  Be seated, please.

4   Counsel, good morning.

5   ALL COUNSEL:  Good morning, Your Honor.

6   THE COURT:  I mentioned on Friday that I would like to

7 address at some time the Commonwealth's motion in limine to

8 admit the statements of Mr. Chalue at the suppression

9 hearing.

10   Mr. Frank, are you prepared to address those?

11   MR. FRANK:  Judge, I have to admit I came into the

12 office both Saturday to work and then came back on Sunday to

13 deal with that motion.  I was unable to locate it.  I am

14 going to have to make another copy.  I'd read it, but I

15 haven't read the cases underlying.  I don't think it will

16 take me long, but if we can go to tomorrow morning I will be

17 ready to argue it.  I am awfully sorry.

18   THE COURT:  All right.  I will give you until tomorrow

19 morning and we will address it then.

20   MR. FRANK:  Thank you.

21   THE COURT:  I also have just been handed an additional

22 motion for the issuance of a subpoena pursuant to Rule 17,

23 and this is to Keeper of Records at Souza-Baranowski.  I

24 have not yet read it.

25   Perhaps you can summarize your position, Mr. Frank, and

1    tell me whether or not counsel for the institution have been
2    notified.
3        MR. FRANK:  I drafted it and sent it out via email to
4    them on Saturday with the suggestion, per our discussion,
5    that it may be argued Wednesday morning to give them an
6    opportunity to appear.
7        I sent it to both Souza-Baranowski and the actual
8    Keeper of the Records at Massachusetts Partnership for
9    Correctional Health, Department of Corrections, that is
10   George Puddister who has previously filed documents in
11   regard to that.
12       THE COURT:  Have you had any response to that?
13       MR. FRANK:  No, but I wouldn't anticipate that, given
14   it was done on the weekend.
15       THE COURT:  All right.  Very well.  I will plan to
16   address that on Wednesday morning based on your
17   representation.
18       Anything further from you, Mr. Frank, in terms of
19   preliminary matters?
20       MR. FRANK:  I don't think so, Judge.
21       THE COURT:  Mr. Capeless?
22       MR. CAPELESS:  No, Your Honor.
23       THE COURT:  We are in recess.
24       We will see you at 9:30.
25       (The Court exited at 9:09 a.m.)

1          (* * * * *)

2          (The Court entered at 9:37 a.m.)

3          (The defendant was present.)

4          THE COURT:  Thank you.  Please be seated.

5      Bring the jury in, please.

6          (Pause)

7          (The jury entered at 9:37 a.m.)

8          THE COURT:  Ladies and gentlemen, good morning.

9          THE JURY:  Good morning.

10         THE COURT:  I hope you all had a nice weekend.  We are

11     ready to resume the trial, but first let me ask the same

12     questions I asked of you last Friday.  First, did any of you

13     discuss the case with anyone or overhear any discussions

14     about the case after leaving here Friday afternoon?

15         (Pause)

16         THE COURT:  If so, please raise your hands.

17         (Pause)

18         THE COURT:  No hands have been raised.

19     And did any of you gather any information regarding

20     this case regarding any source outside the courtroom

21     including media reports?

22     If you did, intentionally or inadvertently, please

23     raise your hand.

24         (Pause)

25         THE COURT:  Again, no hands have been raised.

1        You will recall we were in the beginning stages of the
2   presentation of the Commonwealth's case.
3        Mr. Barry, you may call your next witness.
4        MR. BARRY:  Thank you, Your Honor.
5        Commonwealth will call to the stand Nicole Brooks.
6        (Nicole Brooks, sworn)
7        THE COURT:  Good morning, Ms. Brooks.
8        THE WITNESS:  Good morning.
9        THE COURT:  If I could remind you to project and keep
10  your voice up so we can all hear you.  If you don't
11  understand the question, please let us know.  If you do,
12  please answer only that question, please.
13       Can you do that for me?
14       THE WITNESS:  Yes.
15       THE COURT:  You may proceed.
16       MR. BARRY:  Thank you, Your Honor.
17                        **(Nicole Brooks)**
18                **DIRECT EXAMINATION BY MR. BARRY**
19  Q.   First of all, ma'am, could you tell the jury your name?
20  A.   My name is Nicole Brooks.
21  Q.   How old are you, Ms. Brooks?
22  A.   I'm 24.
23  Q.   Just try to keep your voice as loud as possible.
24       Do you currently live in Massachusetts?
25  A.   I do not.

1   Q.   In terms of this case, do you know someone by the name

2   of Adam Hall?

3   A.   Yes.

4   Q.   And do you have a nickname that he went by?

5   A.   Yes.

6   Q.   And what would that be?

7   A.   Leo.

8   Q.   I'm going to show you what's been marked as Exhibit 38

9   and ask if you recognize this person?

10  A.   That's him.

11  Q.   When did you first meet Mr. Hall?

12  A.   It was the Summer of, I believe, 2010.

13  Q.   All right.  How did you meet him?

14  A.   At a social gathering.

15  Q.   All right.  And what state would that be?

16  A.   In New York, I'm sorry.

17  Q.   And how old were you when you met Leo?

18  A.   I was 20.

19  Q.   And after that first meet, did a relationship evolve

20  with Mr. Hall?

21  A.   Yes.

22  Q.   What kind of ever relationship?

23  A.   We began dating.

24  Q.   And in what month did you start dating?

25  A.   Pretty much right after I had met him.

1    Q.    Okay.  Are we talking spring, summer?

2    A.    It would have been the middle of the summer.

3    Q.    And did your relationship end at some point?

4    A.    Yes.

5    Q.    And when did it end?

6    A.    When I was incarcerated.

7    Q.    And when would that be?

8    A.    In August of that same year.

9    Q.    Okay.  Are we talking about 2010?

10   A.    Yes.

11   Q.    Okay.  So basically the relationship just lasted the

12   summer, would that be fair to say?

13   A.    Yes.

14   Q.    Is that fair to say?

15   A.    The man behind you is taking my photograph.  It's

16   upsetting.

17   Q.    Between May and August 2010, what state were you living

18   in?

19   A.    New York.

20   Q.    And while dating Mr. Hall, did you get a chance to meet

21   some of his friends?

22   A.    Yes.

23   Q.    Did you meet someone by the name of Scott Langdon?

24   A.    Yes.

25   Q.    And how did you meet Mr. Langdon?

1   A.   Through Adam.

2   Q.   All right.  Did you meet someone by the time of Theresa

3   Cunigan?

4   A.   I did.

5   Q.   How did you meet Ms. Cunigan?

6   A.   Through Adam and Scott Langdon.

7   Q.   Did you meet someone named Alexandra Ely?

8   A.   I did.

9   Q.   And did you become aware of the relationship between

10  Mr. Hall and Ms. Ely?

11  A.   Yes.

12  Q.   And what was that relationship?

13  A.   They were also dating.

14  Q.   Okay.  At the same time you were dating him?

15  A.   (Indicating)

16  Q.   At the time, did you know that?

17  A.   No.

18  Q.   Before the date of August 14, 2010, did you ever get a

19  chance to meet a David Glasser?

20  A.   I never met him.

21  Q.   All right.  Had you ever seen Mr. Glasser before August

22  of 2010 in person?

23  A.   No.

24  Q.   Turning your attention to June/July of 2010, did

25  Mr. Hall ever make mention of the name David Glasser to you?

1    A.    Yes.

2    Q.    And where were you the first time you remember Mr. Hall

3    talking about David Glasser to you?

4    A.    My home in New York.

5    Q.    All right.  And was anybody at the house besides you

6    and Mr. Hall?

7    A.    Yes, there was another girl there.

8    Q.    Do you remember her name?

9    A.    Starts with a T.  I always seem to forget her name.

10   Q.    Okay.  How was it Mr. Hall brought up David Glasser's

11   name?

12   A.    He said he had a court case that involved David

13   Glasser.

14   Q.    Did he say what the case was about?

15   A.    Yes.  He said -- he said that he had beat him up

16   because he broke into his house and stole some carburetors.

17   Q.    Okay.  And so he indicated the case was still pending

18   at that point?

19   A.    Yes.

20   Q.    During that conversation, in June/July of 2010, did

21   Mr. Hall make any mention of any plans he had involving

22   David Glasser?

23   A.    Yes.

24   Q.    And could you please explain -- first of all, did he

25   say why he had a plan against Mr. Glasser?

1    A.    He wanted to discredit him as a witness.

2    Q.    And did he tell you what the plan was at that point?

3    A.    He mentioned that he wanted me to come up to

4    Massachusetts to go over to his house, to say that my ride

5    home had failed, that I didn't have a way home and have him

6    take me to Vermont where I would run in and say that he had

7    abducted me; something along those lines.

8    Q.    What did you tell Mr. Hall what you thought about that

9    plan?

10   A.    I told him I thought it was stupid.

11   Q.    And what did you tell Hall about your willingness to go

12   along with that plan at that point?

13   A.    That I didn't want to.

14   Q.    What did Mr. Hall tell you?

15   A.    He said, Well, things are going to be happening soon.

16   You know, I need an answer.  Think on it real hard; stuff

17   like that.

18   Q.    Okay.  In terms of things happening soon, did he say

19   what was going to be happening soon?

20   A.    The court case.

21   Q.    And for the next couple of weeks, did Mr. Hall bring up

22   that plan at all?

23   A.    Not for the next couple weeks.

24   Q.    All right.  I now want to turn your attention to the

25   days leading up to August 14, 2010.  In those days, did he

1    bring up his plan in terms of discrediting David Glasser

2    again?

3    A.   Yes.

4    Q.   First, I want to ask you about August 11 or August 12.

5    During this time, was there a time that you were at

6    Mr. Hall's house in Peru?

7    A.   Yes.

8    Q.   And who were you with when you were at the house at

9    Peru during that time?

10   A.   I believe Alexandra Ely was there.

11   Q.   All right.  And what were you and Alexandra Ely doing

12   at the Peru house?

13   A.   We were moving boxes back and forth to an RV on the

14   property to the garage.

15   Q.   And was Mr. Hall also present at the Peru property?

16   A.   Yes.

17   Q.   Did there come a point in time when the three of you

18   were outside with each other?

19   A.   Yes.

20   Q.   Did Mr. Hall bring you anywhere to his property?

21   A.   He brought us up a road that led to a pond out back.

22   Q.   And what happened when he brought you to the pond in

23   the back?

24   A.   On the way he lifted up, I think it was a piece of

25   plywood, and he had a plastic bag underneath it with a gun

1  in it.

2  Q.   Okay.  Did he show you the gun in the plastic bag?

3  A.   Yes.

4  Q.   And can you explain the gun at all?

5  A.   It had a wooden handle.  It was a longer barrel on it,

6  a handgun.

7  Q.   I'm going to show you an object and I'm going to ask if

8  you recognize this object?

9  A.   That would be the gun he pulled.

10      MR. BARRY:  At this point, I would like to offer this

11  as Exhibit 52, Your Honor.

12      THE COURT:  Any objection?

13      MR. FRANK:  No, Your Honor.

14      THE COURT:  Admitted.

15      (Exhibit No. 52, Ruger handgun, marked)

16  Q.   (By Mr. Barry) After he showed you the gun, do you know

17  what he did with the gun right afterwards?

18  A.   I'm not positive.

19  Q.   After he got the gun, did he start talking about

20  Mr. Glasser again?

21  A.   Yes.

22  Q.   And what did he say about Mr. Glasser?

23  A.   He said that this was the time, that he wanted both of

24  mine and Alexandra's help, that he didn't want to go back to

25  jail.

1  Q.   Did he mentioned if anybody else was involved in terms
2  of a plan that he had formulated?
3  A.   Yes, Scott Langdon.
4  Q.   What did he say about Scott Langdon?
5  A.   He said he was going to have him drive or -- there was
6  a couple of instances where we spoke.  Give me a second.
7  Q.   That's okay.
8       (Pause)
9  Q.   (By Mr. Barry) Let me ask you this, did he get into
10  much more detail at that point?
11  A.   No.
12  Q.   All right.  Did he at least make mention of the name
13  Scott Langdon at all?
14  A.   Yes.
15  Q.   After generally talking about a plan involving you,
16  Alexandra Ely, and Scott Langdon against Mr. Glasser, what
17  happened to Ms. Ely?
18  A.   I believe she left.
19  Q.   Okay.  And what did you and Mr. Hall do at that point?
20  A.   I believe we went to Wells, I think that was the day we
21  went to Wells.
22  Q.   Okay.  First of all, when you say Wells, where is
23  Wells?
24  A.   It's in upstate New York.
25  Q.   And what kind of town is Wells, New York?  Is it a big

1   busy town or rural town?

2   A.   It's very rural.

3   Q.   Is there anything in Wells, New York that is of

4   interest to you?

5   A.   There's two gas stations and there's a rest stop and we

6   have our family camp up there.

7   Q.   And is your family campgrounds in Wells, New York

8   itself?

9   A.   Yes.

10  Q.   Before this day, had you and Mr. Hall previously

11  planned a day to do a trip, go up to your family campground

12  in Wells, New York?

13  A.   Yes.

14  Q.   Now, while in Wells, New York with Mr. Hall, did you

15  make any trips away from the campground?

16  A.   Yes.

17  Q.   And please explain to the jury where you went away from

18  the campground?

19  A.   We were supposed to be heading towards a place called

20  the Gorge, which is just like a creek.

21        He had me pull over at a rest stop along the side of

22  the road.  I had a power steering leak in my car, we were

23  going to fill the fluid.

24  Q.   Do -- in what town -- do you know what town that rest

25  stop would be?

1   A.    That would still be in Wells.

2   Q.    I'm going to show you four pictures, and ask if you

3   recognize what's depicted in these photographs?

4   A.    That's the rest stop that we stopped at.

5         MR. BARRY:  Your Honor, at this point, I ask that these

6   paragraphs be entered into evidence?

7         THE COURT:  All right.  Any objection?

8         MR. FRANK:  No objection.

9         MR. BARRY:  All right.  First 53.

10        (Exhibit No. 53, photograph, marked)

11        MR. BARRY:  Fifty-four.

12        (Exhibit No. 54, photograph, marked)

13        MR. BARRY:  Fifty-five.

14        (Exhibit No.  55, photograph, marked)

15        MR. BARRY:  Fifty-six.

16        (Exhibit No. 56, photograph, marked)

17  Q.    (By Mr. Barry) Okay.  So once you stopped at this rest

18  stop, showing you what's been marked as Exhibit 56, did you

19  pull over anywhere?

20  A.    Off to the right, yeah.

21  Q.    Okay.  After you stopped your car, what if anything

22  happened?

23  A.    I popped the hood to my -- I popped the hood of my car

24  and got the fluid out of my car to go put in and while I was

25  doing that he started messing with the air intake box

1    underneath my car.

2    Q.    Okay.  Then what happened?

3    A.    He opened it and retrieved that gun.

4    Q.    Okay.  When you say that gun, showing you what's been

5    marked as Exhibit 52, is that the gun that you're

6    referencing?

7    A.    Yes.

8    Q.    Did you know that Adam Hall had placed this handgun in

9    your car before driving up to Wells, New York?

10   A.    No.

11   Q.    After Adam Hall took this handgun out of your vehicle,

12   what happened next?

13   A.    He brought it over and he shot it into one of the

14   trees.  He asked if I saw where the bullets went.  He

15   started saying -- he started talking about David Glasser

16   again, and the court case.

17   Q.    Okay.  When -- you see how many times he fired into the

18   trees?

19   A.    I believe he fired -- I believe he fired three times.

20   Q.    Okay.  And when he asked you to look at the trees, did

21   you see any bullet holes in any of the trees?

22   A.    Just one I think.

23   Q.    All right.  And did he tell you why he wanted you to

24   see the tree with the bullet hole in it?

25   A.    He said that he wanted me to be able to point them out

1  to the detectives when I called them to that scene.  That's
2  when he got into more detail.
3  Q.   All right.  So when you say he got into more detail,
4  could you explain to the jury what Mr. Hall now told you was
5  his plan against Mr. Glasser?
6  A.   He wanted Scott Langdon to get him, to bring him up to
7  Wells for some sort of job, and I was to be at the rest
8  stop.  I was to say -- call the police and say that he tried
9  to abduct me, that he had robbed me of 800 dollars and that
10 when I fled he shot at me.
11 Q.   Did you tell Mr. Hall that you would partake of this
12 plan?
13 A.   I said I didn't want to.
14 Q.   All right.  And what did he say?
15 A.   He said, he basically didn't just give me -- just
16 didn't give me an option.
17 Q.   Okay.  After that, where did you go?
18 A.   We drove back to Massachusetts.  We canceled the trip.
19 Q.   Okay.  Now I'm going to turn your attention to
20 August 13, 2010.  Do you remember that day?
21 A.   Yes.
22 Q.   At some point do you remember going to Walmart?
23 A.   Yes.
24 Q.   And in what town was that Walmart located?
25 A.   I think it's in Pittsfield.

1    Q.    And did you go with anyone?

2    A.    Yes.

3    Q.    Who did you go with?

4    A.    Adam Hall and Scott Langdon and Tracy (sic) Cunigan.

5    Q.    And how did you meet up with Mr. Langdon and

6    Ms. Cunigan?

7    A.    We picked them up.

8    Q.    Okay.  And once at Walmart, did you meet anybody else?

9    A.    Alexandra Ely.

10   Q.    What happened once you once you got to Walmart?

11   A.    We met up with Alexandra and she gave him her credit

12   card.  Scott Langdon stayed outside and the three of us went

13   in.

14   Q.    All right.  And once you went into Walmart, what if

15   anything did you do?

16   A.    Went to the back of the store and made a few purchases.

17   Q.    Do you remember what you purchased?

18   A.    Adam Hall purchased a camera, I think some socks and a

19   minute card.

20   Q.    Okay.  At that point did you know why Adam was

21   purchasing a camera?

22   A.    I thought we were just going to the store.

23   Q.    Okay.  Okay.  And do you know why he purchased the

24   minutes, what kind of minutes?

25   A.    Phone minutes.

1    Q.   Did you know he was purchasing the minutes?

2    A.   I assumed he was buying it for his --

3         MR. FRANK:  Objection.

4         THE COURT:  Sustained.

5    Q.   (By Mr. Barry) Not asking you to assume anything.

6         Did you know at that point?

7    A.   Not really.

8    Q.   Okay.

9         MR. BARRY:  Your Honor, at this point in time I would

10   like to offer into evidence the Walmart surveillance tape

11   from August 13, 2010.

12        THE COURT:  Any objection?

13        MR. FRANK:  No.

14        THE COURT:  Admitted.

15        MR. BARRY:  Fifty-seven.

16        (Exhibit No. 57, Walmart surveillance video, marked)

17   Q.   (By Mr. Barry) Ma'am, I'm going to show you a video

18   clip from August 13, 2010.

19        (Whereupon, the video was viewed.)

20        MR. BARRY:  All right.  I'm going to pause this here.

21        Can we turn down the lights.

22        THE COURT:  We're actually having difficulty with the

23   lights.  I'm afraid we may lose them all together.

24        THE WITNESS:  I can see it.

25   Q.   (By Mr. Barry) Can you see it?

1        First of all, can you recognize who is depicted in that

2   photograph?

3   A.    That would be Tracy (sic) in the back, Adam, and me in

4   front.

5   Q.    Where are you?

6   A.    In Walmart.

7   Q.    Okay.  Do you recognize if you are coming in or

8   leaving?

9   A.    Think we are on our way in.

10  Q.    Okay.  I'm going to show you a second clip.

11        (Whereupon, the video was viewed.)

12  Q.    (By Mr. Barry) I'm going to pause it and ask you if you

13  recognize the three people leaving the Walmart?

14  A.    The same people as the last one.

15  Q.    I'm sorry.  I can't hear you.

16  A.    Myself, Adam, and Tracy.

17  Q.    Okay.  And I'm going to show you one final clip.

18        (Whereupon, the video was viewed.)

19  Q.    (By Mr. Barry) All right.  Do you recognize -- is that

20  you again in the black, the red hair?

21  A.    Yes.

22  Q.    At this point in time, you are looking at something.

23  Can you see what you are looking at?

24  A.    No.

25  Q.    No?  That's all right.

1        Do you appear to have something out of a box?

2        If you want to step down to make it easier.

3    A.   I think it might be the camera.

4    Q.   And who is next to you while you're looking at the

5    camera?

6    A.   That would be Adam.

7    Q.   All right.

8        (Whereupon, the video was viewed.)

9    Q.   (By Mr. Barry) And that yellow thing that was just

10   placed on the counter.  Do you recognize that?

11   A.   Those would be the phone minutes.

12   Q.   And lastly going -- who's signing the receipt right

13   there?

14   A.   That would be Tracy (sic) Cunigan.

15   Q.   Okay.  And who just got the credit card back?

16   A.   Could you rewind that?

17   Q.   Sure.

18       (Whereupon, the video was viewed.)

19       THE WITNESS:  Adam.

20   Q.   (By Mr. Barry) Okay.  And whose credit card did they

21   use.

22   A.   Alexandra's.

23   Q.   All right.  After -- well, I will show you one more

24   object before we move on.

25       Showing you an item, do you recognize that item?

1   A.   That would be the camera we purchased.

2        MR. BARRY:  I ask that be marked as an exhibit.

3        MR. FRANK:  No objection.

4        THE COURT:  Admitted.

5        MR. BARRY:  58.

6        (Exhibit No. 58, camera box, marked)

7        MR. BARRY:  I'm sorry, the camera box.

8   Q.   (By Mr. Barry) After you purchased the camera, the cell

9   phone minutes, what did you and Mr. Hall and Ms. Cunigan do?

10  A.   We left Walmart.

11  Q.   Okay.  Was there anybody outside Walmart?

12  A.   Alexandra.

13  Q.   All right.  And where was Mr. Langdon?

14  A.   Oh, Scott was outside Walmart.

15  Q.   Did he wait outside the whole time?

16  A.   Yes.

17  Q.   And once you guys get outside what, if anything,

18  happens in terms of Mr. Langdon?

19  A.   We regrouped and went to a gas station.

20  Q.   Okay.  And after that gas station, where did you go?

21  A.   Chinese restaurant.

22  Q.   All right.  And either at the Chinese restaurant or

23  outside the Walmart, did Mr. Hall have any conversations

24  with Mr. Langdon that was just bought?

25  A.   At Debbie Wong's.

1    Q.    Is that the Chinese restaurant you went to?

2    A.    Yes.

3    Q.    What is the conversation at Debbie Wong's?

4    A.    He said he wanted him to get a good picture of David

5    Glasser.

6    Q.    Did he say why he wanted Mr. Langdon to get a

7    photograph of Mr. Glasser?

8    A.    No.

9    Q.    Later on that same day did there come a point in time

10   that you went to the Crossroads bar in Pittsfield?

11   A.    The steps, yes.

12   Q.    And who was present at the Crossroads later on that

13   day?

14   A.    Scott Langdon, Adam, myself, and Alexandra.

15   Q.    And did you see Scott Langdon give Mr. Hall anything

16   when you guys met up at the Crossroads later on that day?

17   A.    The same camera.

18   Q.    And in terms of that camera, after Mr. Hall got it, did

19   he do anything with the camera with you?

20   A.    Yeah, went through the pictures that had been taken of

21   some cats and some of David Glasser, and he was showing all

22   of us.

23   Q.    Did Mr. Hall tell you why he was showing you

24   photographs of Mr. Glasser?

25         Did he say he had some purpose in showing you some

1   photographs of Mr. Glasser?

2   A.    I believe he said he wanted me to note what he looked

3   like, to memorize what he looked like.

4   Q.    For any particular reason?

5   A.    I can't remember his exact words.

6   Q.    Okay.  At any point did he make any reference as to why

7   you would need to know what David Glasser looks like?

8   A.    I mean he did, but I'm not sure if it was at that

9   particular moment.

10  Q.    Whenever he said something to you about Mr. Glasser,

11  what did he say.

12  A.    That it was all involving the pending court case --

13  Q.    All right.

14  A.    -- against him.

15  Q.    I'm going to show you what's been marked Exhibit 3.  Do

16  you recognize the person depicted in the photograph?

17  A.    That's David Glasser.

18  Q.    Before seeing the image of David Glasser on the camera,

19  did you know what David Glasser looked like?

20  A.    No.

21  Q.    At some point did you pick David Glasser out of a photo

22  lineup?

23  A.    Yes.

24  Q.    How were you able to pick Mr. Glasser out of a photo

25  lineup?

1    A.    Because of the pictures he showed me.

2    Q.    And did Mr. Hall indicate to you that was one of the

3    reasons, he was showing you the photographs?

4    A.    Yes.

5    Q.    And in addition to showing you a photo of David

6    Glasser, did Mr. Hall give you any more information about

7    David Glasser?

8    A.    Yeah.  He talked about how he spoke, he talked about

9    his stature, his size.

10   Q.    Okay.

11   A.    He described --

12   Q.    Anything about any vehicles he had?

13   A.    Yes, he described his vehicle that he had a back

14   taillight out, you know, it had tape over it.  He said --

15   gave me the license plate number, what color it was.

16   Q.    Did he tell you what kind of vehicle it was?

17   A.    It was a pickup truck.

18   Q.    Okay.  In terms of giving you this information, did he

19   tell you why he was telling you what kind of truck

20   Mr. Glasser was driving and the license plate number it was?

21   A.    He wanted me to tell the police this.

22   Q.    Okay.  Did he tell you more than once the type of

23   vehicle Mr. Glasser had and the license plate?

24   A.    Yes, he did.

25   Q.    Do you still remember the license plate?

1  A.   I do.

2  Q.   What was his license plate?

3  A.   3BP990.

4  Q.   How is it that you know Mr. Glasser's license plate?

5  A.   Because Adam told it to me and had me repeat it over

6  and over again.

7  Q.   And he eventually wanted you to tell who this

8  information?

9  A.   The police.

10  Q.   During this time while at the Crossroads bar, did he

11  talk about the plan again, about setting up Mr. Glasser?

12  A.   He did.

13  Q.   Can you explain to the jury what further information he

14  gave about the plan to both you and Mr. Langdon at that

15  point?

16  A.   He said that Scott was going to tell Glasser that he

17  had a job up in Wells, New York; could he take him up there.

18  And said that he was going to give him some money to pay him

19  with, and that I was going to be up in Wells already, and I

20  was going to wait at that rest stop.  And, basically, that

21  he was going to put the gun in David Glasser's vehicle,

22  along with my personal objects to frame him.

23  Q.   Okay.  Anything else?

24       (Pause)

25  Q.   (By Mr. Barry) Were you supposed to go to the rest stop

1   that you pointed out in Exhibit 56?  Were you supposed to go

2   there at some point?

3   A.   Yes.  Yes.

4   Q.   When were you supposed to go there?

5   A.   Once I saw that Scott and Glasser were in the town of

6   Wells at the gas station.

7   Q.   And what, if anything, were you to do once you got to

8   that rest stop?

9   A.   I was to put my hood up in my car like I was filling

10  the power steering fluid, and I was to wait a little while

11  and then I was to leave and call the police.

12  Q.   Okay.  And what were you supposed to tell the police?

13  A.   That I was filling my power steering fluid and that he

14  pulled up and --

15  Q.   When you say "he" who do you mean?

16  A.   I'm sorry, David Glasser.  And that David Glasser

17  pulled up, I was to be able to describe his vehicle, and I

18  was to -- I was to be able to describe his vehicle and say

19  that he stole $800 from me, and that he tried to grab my arm

20  and when he did, I pulled away, ran down the hill, and that

21  while my back was turned he had shot at me.

22  Q.   Okay.  And were you supposed to point out any trees in

23  the rest stop area?

24  A.   I was supposed to point out where he shot those bullets

25  into the tree.

1  Q.   And in terms of robbing you, did he tell you why he

2  wanted you to say $800?

3  A.   It would make it a more severe charge if he were to be

4  charged with it because it was over 500.

5  Q.   Okay.  And all of this was supposed to happen in New

6  York?

7  A.   All of this was to happen in New York.

8  Q.   And at this point, did you want to do this plan for

9  Mr. Hall?

10 A.   No.  No.

11 Q.   And did you tell Mr. Hall this?

12 A.   Yes.

13 Q.   And what did he tell you?

14 A.   Same thing he told me all along, that it wasn't really

15 an option.

16 Q.   Next, I want to draw your attention to August 14,

17 itself, the next day, August 14, 2010, at approximately

18 11:00 a.m.

19      Do you remember doing anything or going anywhere?

20 A.   On August 14 you said?

21 Q.   Yeah, August 14, the day of the actual incident with

22 Mr. Glasser.

23 A.   Alexandra and I drove to meet Scott Langdon at the

24 request of Adam.

25 Q.   Okay.  Before you did that, in the morning, did you

1   stop anywhere; any food stores or anything like that?

2   A.   I think that we went to Price Chopper because he didn't

3   have enough money to give Scott, so he asked for my

4   paycheck.

5   Q.   All right.  So did you go into Price Chopper on

6   August 14?

7   A.   Yes.

8   Q.   And was that at approximately 11 o'clock in the

9   morning?

10  A.   Yeah.

11      MR. BARRY:  At this point, Your Honor, I would like to

12  offer into evidence the Price Chopper video.

13      THE COURT:  Admitted.

14      MR. BARRY:  That would be 59.

15      MR. FRANK:  No objection.

16      (Exhibit No. 59, Price Chopper video, marked)

17  Q.   (By Mr. Barry) Ma'am, I'm going to show you what has

18  been marked into evidence as Exhibit 59 and draw your

19  attention to the screen.

20      (Whereupon, the video was viewed.)

21  Q.   (By Mr. Barry)  I will pause this here and ask you if

22  you recognize the person walking in Price Chopper on

23  August 14 at approximately 11 o'clock?

24  A.   That's me.

25      MR. BARRY:  Okay.  And second clip.

1          (Whereupon, the video was viewed.)

2    Q.    (By Mr. Barry) Again, I ask you if you recognize who's

3    leaving the store a little after 11 o'clock?

4    A.    That's me.

5          (Whereupon, the video was viewed.)

6    Q.    (By Mr. Barry) Lastly, I ask you if you recognize the

7    person right there doing a transaction?

8    A.    That's me.

9    Q.    Okay.  And approximately, are you buying something

10   right now?

11   A.    A pack of cigarettes.

12   Q.    Okay.  And when you bought that pack of cigarettes, did

13   you get a receipt in return for purchasing those cigarettes?

14   A.    Yes.

15   Q.    Okay.  And does that occur to be happening right now on

16   the screen?

17         (Whereupon, the video was viewed.)

18   A.    Yes.

19   Q.    (By Mr. Barry) Okay.  After you purchased those

20   cigarettes, did you keep that receipt?

21   A.    I did.

22   Q.    After you left the Price Chopper, did you meet up with

23   anyone?

24   A.    Yes.

25   Q.    Who was outside the Price Chopper waiting for you?

1    A.    Adam.

2    Q.    Where, if anywhere, did you go after going to the Price

3    Chopper?

4    A.    I believe we went back to Peru.

5    Q.    Okay.  And did you get any items while you were at Peru

6    at that point that you would later give someone else?

7    A.    Yeah, GPS.

8    Q.    Okay.

9    A.    And my wallet.

10   Q.    All right.  After you went to Peru and retrieved the

11   GPS and you had the wallet, where did you go next?

12   A.    Down near the Crossroads bar in Pittsfield.

13   Q.    Did you meet up with anybody once you got to the

14   Crossroads in Pittsfield?

15   A.    Well, Alexandra had driven with me, but we met up with

16   Scott Langdon.

17   Q.    Okay.  When you met up with Scott Langdon, did you give

18   him anything?

19   A.    I believe it was a brown paper bag.

20   Q.    Okay.  What, if anything, was in the brown paper bag?

21   A.    It would have been my wallet and the GPS unit.

22   Q.    Okay.  In terms of your wallet, I'm going to show you

23   an item, ask if you recognize that item?

24   A.    That's my wallet.

25   Q.    And is this the same item you gave to Mr. Langdon?

1    A.    Yes.

2          MR. BARRY:  I ask this be marked as Exhibit 60.

3          MR. FRANK:  No objection.

4          THE COURT:  Admitted.

5          (Exhibit No. 60, wallet, marked)

6    Q.    (By Mr. Barry) And in that wallet, did you have any

7    identification?

8    A.    Yes.

9    Q.    I show you an item and ask if you recognize that item?

10   A.    It's my New York State driver's license.

11   Q.    And was that license inside the wallet you gave

12   Mr. Langdon?

13   A.    Yes.

14   Q.    I ask it be marked as Exhibit 61.

15         MR. FRANK:  No objection.

16         THE COURT:  Admitted.

17         (Exhibit No. 61, license/Nicole Brooks, marked)

18   Q.    (By Mr. Barry) Was it intentional for you to have your

19   license inside the wallet?

20   A.    Yes.

21   Q.    And whose idea was that?

22   A.    Adam's.

23   Q.    Why was it you needed your license inside the wallet?

24   A.    To show it was mine and that he had possession of my

25   things.

1   Q.   Okay.  And in terms of -- did you have a lot of money

2   in the wallet or no?

3   A.   I had no money in the wallet.

4   Q.   Was that intentional?

5   A.   Yes.

6   Q.   Whose idea was that?

7   A.   Adam's.

8   Q.   And what was his idea for not having money in the

9   wallet?

10  A.   That he had spent it on drugs.

11  Q.   After you gave those two items, the GPS and the brown

12  bag that -- containing the wallet and license to

13  Mr. Langdon, where did you go?

14  A.   Went back to the Peru property.

15  Q.   All right.  And after going to the Peru property, did

16  you go any place else?  Did you meet up with Mr. Hall at

17  all?

18  A.   Yes.  He was at a garage, a white garage in Pittsfield.

19  Q.   And when you met up with Mr. Hall, who was present at

20  that point?

21  A.   Alexandra was.

22  Q.   So was it you, Alexandra, and Mr. Hall?

23  A.   Yeah.

24  Q.   Did Mr. Hall start talking about the plan again?

25  A.   Yes.

1    Q.    Did he go over details with you?

2    A.    Yes.

3    Q.    What details did he go over with you?

4    A.    How the driving arrangement would be when we left, that

5    everything was all set.

6    Q.    Did I -- I'm sorry, did he check to see if you could

7    remember Mr. Glasser's vehicle?

8    A.    Yes.

9    Q.    Did he check to see if you could remember Mr. Glasser's

10   license plate?

11   A.    Yes.

12   Q.    What happened next?

13   A.    Alexandra and I had to drive back out to take care of

14   the dogs and we came back and then we all left and went to

15   Wells, New York.

16   Q.    And when you say "we all left" who went?

17   A.    I, in a separate vehicle.  Scott Langdon had enticed

18   David Glasser to bring him there, they had left first.  Then

19   it was --

20   Q.    Did you see Mr. Glasser and Mr. Langdon leave?

21   A.    I did not.

22   Q.    Okay.  What happened next?

23   A.    I left at the direction of Adam shortly after, and then

24   he was to follow me, I believe was the order.

25   Q.    What kind of vehicle were you driving, do you remember?

1   A.    I was driving a red Hyundai Elantra.

2   Q.    Do you remember what kind of vehicle Mr. Hall was in?

3   A.    That was silver SUV.  It was Alexandra's.

4   Q.    And was Mr. Hall with anyone as he drove?

5   A.    Alexandra.

6   Q.    Okay.  And where did you and Mr. Hall and Ms. Ely drive

7   to?

8   A.    We drove to Wells, New York.

9   Q.    And on your way to Wells, New York did you see

10  Mr. Glasser and Mr. Langdon at all or the vehicle they are

11  in?

12  A.    On the highway.

13  Q.    Okay.  They also were traveling in that direction?

14  A.    Yes.

15  Q.    And when you say the vehicle that they are in, showing

16  you what's been marked Exhibit 4, did do you recognize that

17  vehicle?

18  A.    That would be David Glasser's vehicle.

19  Q.    Okay.  And was this the vehicle that Mr. Glasser and

20  Mr. Langdon were driving up to Wells, New York in?

21  A.    Yes.

22  Q.    Now, as you drove up in separate vehicles, did you and

23  Mr. Hall have any contact with each other?

24  A.    Yes.

25  Q.    And how was that?

1  A.    By cell phone.

2  Q.    Okay.  And do you know if he was always using his phone

3  when he was calling you?

4  A.    He sometimes used Alexandra's to call me.

5  Q.    And in terms of cell phone you were using, at some

6  point did the police learn your cell phone number?

7  A.    They did.

8  Q.    And in terms of your cell phone, was this in your name?

9  A.    It was not.

10  Q.    And whose name was it?

11  A.    It was in my father's name.

12  Q.    I'm going to show you what's been marked as Exhibit 36.

13  And looking at Exhibit 36, does that appear to be a record

14  of the cell phone you were using at the time?

15  A.    Yes.

16  Q.    Okay.  And it was in -- I'm sorry, your dad's name was

17  what?

18  A.    Donald Brooks.

19  Q.    The number was 878-6170?

20  A.    Yes.

21  Q.    Do you remember any calls you had between Mr. Hall

22  and -- between Mr. Hall and yourself as you were driving up

23  to Wells, New York?

24  A.    Yes.

25  Q.    Can you explain that to the jury?

1    A.    He was trying to find out if I could see them, which at

2    the time I couldn't.  He eventually said they weren't sure

3    if they had gone too far, where they were, so Scott was

4    going to be calling me, and he pretended that I was his

5    boss' daughter to get directions.

6    Q.    Once you got further into New York did you receive

7    another phone call from Mr. Hall?

8    A.    Yes.

9    Q.    And what was this phone call about?

10   A.    He wanted me to pull over at a, I think it was a Hess

11   station on Rt. 30.

12   Q.    And did you pull over to that Hess station?

13   A.    Yes.

14   Q.    When you pulled over to that Hess station, did you see

15   any vehicles that you recognized?

16   A.    David Glasser's vehicle was at the back of the gas

17   station.

18   Q.    Now, in that phone conversation with Mr. Hall, where he

19   asked you to pull into that Hess station on Rt. 30, did he

20   give you any instructions?

21   A.    He told me to reach under my passenger seat.

22   Q.    Okay.  And did you -- once you pulled into the gas

23   station, reach under your passenger seat?

24   A.    Yes.

25   Q.    And what was present under your passenger seat once you

1  got there?

2  A.   That same gun.

3  Q.   Okay.  And when you say "that same gun", it's the same

4  gun I showed you earlier marked as Exhibit 52?

5  A.   Yes.

6  Q.   And was this gun by itself or with anything in terms of

7  packaging?

8  A.   It was in a plastic bag.

9  Q.   All right.  Was there anything else besides a plastic

10  bag?

11  A.   I didn't see what it was.

12  Q.   Was the gun -- was the gun wrapped in anything, I guess

13  is my question?

14  A.   Yeah, it would have been in some sort of fabric.  I

15  didn't open the bag.

16  Q.   Once with you stopped at the Hess gas station and

17  retrieved the gun, where did you put it?

18  A.   In a pink backpack.

19  Q.   Okay.  Did Hall give you any instructions what you were

20  supposed do with that gun?

21  A.   He told me that I was to give it to Scott, who was in

22  the store.

23  Q.   Did the Hess gas station have a convenience type store

24  connected to it?

25  A.   Yeah.

1    Q.    Did you put the gun in your backpack?

2    A.    I did.

3    Q.    Once you went inside the Hess, the gas station, what if

4    anything happened?

5    A.    Scott Langdon was in there, and he told me to put it

6    behind the garbage can in the bathroom out back.  It was a

7    unisex bathroom I believe.

8    Q.    Did you try to give him the gun inside the Hess gas

9    station at first?

10   A.    I -- yeah, I opened my bag too.  I don't know.

11   Q.    It was at that point Scott Langdon told you to do

12   something else?

13   A.    Yeah, that's when he told me to put it in the restroom

14   behind the garbage can.

15         MR. BARRY:  At this point, Your Honor, I would like to

16   offer in evidence the Hess gas station video.

17         MR. FRANK:  No objection.

18         THE COURT:  Admitted.

19         MR. BARRY:  Exhibit 62.

20         (Exhibit No. 62, Hess gas station video, marked)

21   Q.    (By Mr. Barry) Ma'am, I'm going to ask to draw your

22   attention to a surveillance video of the Hess gas station on

23   August 14, 2010 around 3 o'clock.

24         (Whereupon, the video was viewed.)

25   Q.    (By Mr. Barry) Do you recognize what's depicted there?

1    Is that an area of the Hess gas station?

2         (Whereupon, the video was viewed.)

3         THE WITNESS:  That's the back corner of the gas

4    station.

5    Q.   (By Mr. Barry) Is that you?

6    A.   Yeah.

7    Q.   And that red bag, is that your backpack?

8    A.   Yeah.

9    Q.   Right there, what are you doing?

10   A.   Opening the backpack.

11   Q.   Okay.  And what was your purpose in opening the

12   backpack?

13   A.   I was just going to give it to him.

14   Q.   When you say "it", what do you mean by it?

15   A.   The gun that was under my passenger seat.

16   Q.   Okay.  And the gun, was it inside that white fabric

17   material you earlier mentioned?

18   A.   It's in a bag, yeah.

19   Q.   Showing you a second clip from the Hess gas station.

20        (Whereupon, the video was viewed.)

21   Q.   (By Mr. Barry) It's a little choppy, but do you

22   recognize the person on the left?

23   A.   That would be me.

24   Q.   And who is this next to you?

25   A.   That would be Scott Langdon.

1    Q.    Okay.   In terms of Scott Langdon, showing you one final

2    video, the person at the counter there, in that greenish

3    shirt do you recognize that person?

4          (Whereupon, the video was viewed.)

5          THE WITNESS:   That's Scott Langdon.

6    Q.    (By Mr. Barry) In terms of that video footage was a

7    little choppy, I want to show you some still photographs.

8          First, I want to show you this photograph and ask you

9    if you recognize what's depicted in that photograph?

10   A.    It's me looking into my backpack.

11   Q.    Okay.

12         MR. BARRY:   I ask this be marked as an exhibit.

13         MR. FRANK:   No objection to the following exhibits,

14   Your Honor.

15         THE COURT:   All right.   All of them will be admitted

16   when offered.

17         (Exhibit No. 63, photograph, marked)

18   Q.    (By Mr. Barry) And earlier you mentioned a person in

19   the green shirt.   Do you recognize who's depicted in that

20   photograph?

21   A.    Scott Langdon.

22   Q.    Again, does this appear to be a still from the video

23   footage we saw earlier?

24   A.    Yes.

25         MR. BARRY:   I ask this to be marked as Exhibit 64.

1           (Exhibit No. 64, photograph, marked)

2    Q.    (By Mr. Barry) Does this appear to be you and

3    Mr. Langdon talking to each other inside the Hess gas

4    station on August 14th, on the video?

5    A.    Yes.

6           MR. BARRY:  All right.  This will be 65.

7           (Exhibit No. 65, photograph, marked)

8    Q.    (By Mr. Barry) This again appears to be Mr. Langdon

9    from the video?

10   A.    Yes.

11          MR. BARRY:  Sixty-six.

12          (Exhibit No. 66, photograph, marked)

13   Q.    (By Mr. Barry) And, lastly, does this appear to be you

14   from a video still inside the Hess gas station on August 14,

15   2010?

16   A.    Yes.

17          MR. FRANK:  I ask this be marked as Exhibit 67.

18          (Exhibit No. 67, photograph, marked)

19   Q.    (By Mr. Barry) After you leave out the Hess gas

20   station, do you go to the bathroom?

21   A.    Yes.

22   Q.    And what do you do there?

23   A.    I place the bag behind the garbage can as instructed.

24   Q.    Okay.  The bag that contained the gun?

25   A.    Yes.

1  Q.   And did it have anything else besides the gun?  Your

2  wallet?

3  A.   Yeah --

4  Q.   Or had you previously given that to Mr. Langdon?

5  A.   I -- I'm sorry.  I either gave it to him with the

6  GPS -- I had said earlier I gave it to him with the GPS but,

7  in fact, I had given it to him with the backpack, sorry.

8  Q.   Okay.  At some point you gave Mr. Langdon both the gun

9  and the wallet though?

10  A.   Yes.

11  Q.   What do you do after you leave that -- after you leave

12  the gun in the bathroom gas station?

13  A.   I drove off.

14  Q.   Where did you go?

15  A.   To finish the trip to Wells, New York.

16  Q.   And where did you go to in Wells, New York?

17  A.   I went to a laundromat parking lot which was across the

18  street from the gas station where Scott was directing David

19  Glasser to.

20  Q.   Okay.  And what happened next?

21  A.   I waited there until they pulled up.

22  Q.   And what happened -- when you say "they" who pulled up?

23  A.   David Glasser and Scott Langdon.

24  Q.   All right.  Then what happened?

25  A.   They talked for a little while and Scott Langdon got

1   out of the vehicle.  David Glasser turned around and went

2   back the way he came down Rt. 30.

3   Q.   What did you do then?

4   A.   I, as instructed, drove to the rest stop on Rt. 30,

5   that you showed me a picture of.

6   Q.   And once you got to the rest stop, what, if anything,

7   did you do?

8   A.   I opened my hood and put more power steering fluid in

9   it.

10  Q.   Did you go into the woods at all?

11  A.   Yes.

12  Q.   And what was the purpose of that?

13  A.   Adam had told me he wanted me to make sure there was a

14  trail in case the -- in case the New York State police were

15  to go down and look, they'd see where I had run.

16  Q.   Did you walk at all near towards the tree that he fired

17  into earlier?

18  A.   I did.

19  Q.   And while you were at the rest stop, did Mr. Hall stop

20  by at all?

21  A.   He did.

22  Q.   All right.  And when he stopped by, did you have any

23  conversations with him?

24  A.   Yes, I did.

25  Q.   And what was that?

1  A.    I told him again that I didn't want to be a part of any

2  of this, and he said that I am just as guilty as everyone

3  else now and that I better just do what I have to do.

4  Q.    Did he leave at that point?

5  A.    Him and Alexandra left.

6  Q.    And what were you supposed to do next?

7  A.    I -- that's actually when he had me run down into the

8  woods, but I was supposed to leave after doing that and go

9  to the gas station in town and call the New York State

10 Troopers.

11 Q.    Did you go to the gas station and call the police?

12 A.    I did not.

13 Q.    Where did you go?

14 A.    I went to the house of some people that used to be good

15 friends of ours.

16 Q.    And you got to your friend's house, did you act upset?

17 A.    I was upset, so yeah, I acted upset.

18 Q.    Okay.  And did you then contact the police?

19 A.    Yes.

20 Q.    And did you then tell the police the story that

21 Mr. Hall told to you tell the police involving what

22 Mr. Glasser allegedly did to you?

23 A.    Every detail he wanted me to.

24 Q.    And did the police then come to speak to you?

25 A.    They did.

1    Q.   And after the New York State Police spoke to you, did
2    they bring you anywhere?
3    A.   They brought me to the scene of the alleged crime.
4    Q.   Did they have you do anything at the rest stop area of
5    the scene?
6    A.   They had me do a walk through of the scene.
7    Q.   After explaining to the police the story that you
8    indicated, where did you go after talking to the police that
9    night?
10   A.   I went back to our friend's house.
11   Q.   That next day, did the police ask you to come to the
12   station at all?
13   A.   They did.
14   Q.   And for what purpose did they have you come to the
15   station?
16   A.   They wanted me to pick David Glasser out of a photo
17   array.
18   Q.   And were you able to pick out -- did you tell the
19   police you knew the name of the person who tried to -- who
20   robbed you and tried to abduct you?
21   A.   No.
22   Q.   Were -- did you give them a description, though, of the
23   pickup truck of the person who robbed and abducted you or
24   tried to abduct you?
25   A.   Yes, and the license plate.

1  Q.   And based upon that, the next day, they had you look at

2  a photo array?

3  A.   Yes.

4  Q.   And were you able to pick Mr. Glasser out of that photo

5  array?

6  A.   I was.

7  Q.   And how were you able to pick out Mr. Glasser from that

8  photo array if you had never seen him in person before?

9  A.   From the photos that Scott Langdon took with the camera

10  that Adam bought to take the pictures with.

11  Q.   And when you were at the police station that day, did

12  you give the police a written statement?

13  A.   I did.

14  Q.   Showing you a document.

15      (Pause)

16      MR. BARRY:  I will offer it after I show it to her.

17  Q.   (By Mr. Barry) Showing you a document, does this appear

18  to be your signature?

19  A.   Yes.

20  Q.   Does this appear to be the statement that you gave to

21  New York State Police on the day you went to pick out

22  Mr. Glasser from the photo array?

23  A.   Yes.

24      MR. BARRY:  I ask this be marked as an exhibit.

25      MR. FRANK:  No objection.

1      THE COURT:  Admitted.

2      MR. BARRY:  Sixty-eight.

3      (Exhibit No. 68, statement/Nicole Brooks, marked)

4  Q.   (By Mr. Barry) In terms of what's been marked Exhibit

5  68, in that statement you gave to New York Police on that

6  day, is any of that statement true?

7  A.   No.

8  Q.   Who gave you the information to give this type of

9  statement to the New York State Police?

10 A.   Adam Hall did.

11 Q.   And for what reason did Mr. Hall want you to give that

12 statement to New York State Police?

13 A.   So that David Glasser would be arrested and it would,

14 hopefully, discredit him as a witness and the upcoming court

15 case.

16 Q.   Now, the night of August 14, after you met with the

17 police and gave that statement and did the photo array, did

18 Mr. Hall talk to you again on the phone?

19 A.   Well, there was no cell service.  I believe I attempted

20 to call him.

21 Q.   Well, let me ask you this, at any point did Mr. Hall

22 give you any further instructions in terms of keeping in

23 contact within with the New York State Police?

24 A.   Oh, yes.  He said that he wanted me to continue calling

25 them, so that I could give him updates.  He wanted me to

1  have my family call the troopers and act appalled that this

2  man hadn't been arrested yet and what was going on and he

3  became frantic.

4  Q.   Did you do that over the next day or two?

5  A.   I did call and I kept checking in.

6  Q.   Finally on August 27, 2010, did a New York State Police

7  ask you to come to the station?

8  A.   Yes.

9  Q.   And for what reason did they ask you to come down to

10  the station?

11  A.   To identify my wallet.

12  Q.   At that point do you know whether or not Mr. Glasser

13  had been arrested?

14  A.   I think he had been arrested at that point.

15  Q.   Were you still maintaining your lie with the New York

16  State Police though about what occurred?

17  A.   Yeah.

18  Q.   And what happened once you got to the police station on

19  August 27?

20  A.   I was confronted with the truth of what actually

21  happened.

22  Q.   Who confronted you?

23  A.   Lieutenant Foley and an officer from, I don't remember

24  which department he was with, but his last name was Zanolli.

25  Q.   In terms of Mr. Foley, do you know in which state he

1  was a police officer?

2  A.   Massachusetts.

3  Q.   In terms of confronting you, with what did they

4  confront you with?

5  A.   Footage from -- no, it was a picture.  I believe they

6  had -- and they told me that they knew that I knew Adam,

7  that they had found that receipt and it was the picture from

8  Price Chopper that they showed me, they just basically knew

9  everything already.

10 Q.   At some point did they confront you with the cell phone

11 records?

12 A.   Yes.

13 Q.   And did those cell phone records show calls between you

14 and Adam Lee Hall as you drove up to Wells, New York?

15 A.   They did.

16 Q.   And even with the evidence they presented you with, did

17 you still maintain your lie?

18 A.   Yeah.

19 Q.   Would you even admit you knew Adam Hall at that point?

20 A.   No.

21 Q.   Would you admit that you knew Scott Langdon?

22 A.   I think I did.

23 Q.   Would you say if Hall and Ely were involved in any way?

24 A.   I did not.

25 Q.   Did the police end the interview at that point when you

1   wouldn't admit even knowing Mr. Hall?

2   A.   Yes.

3   Q.   Did you end up getting some criminal charges in New

4   York?

5   A.   Yes.

6   Q.   Do you know what for?

7   A.   Filing a false reporting of a record; there were quite

8   a few.

9   Q.   Were you, lack of better word, were you booked for

10  that?

11  A.   Yes.

12  Q.   Were you brought to a New York jail?

13  A.   Yes.

14  Q.   While going to that New York jail, did you tell the

15  police you wanted to change your story?

16  A.   Yes.

17  Q.   Did you tell the police some of the truth at that

18  point?

19  A.   Very little of the truth.

20  Q.   At some point, did you fully confess as to what had

21  occurred and what Adam Hall had told you to do?

22  A.   Yes.

23  Q.   And when was that?

24  A.   That was when I was incarcerated in Berkshire County

25  Correctional Facility.

1  Q.   Was that in Massachusetts, Berkshire County?

2  A.   Yes.

3  Q.   How did you get in New York to Massachusetts?

4  A.   I was extradited.

5  Q.   And despite -- did you fully confess in terms of

6  everything that had occurred?

7  A.   Yes.

8  Q.   And despite that confession, were you still charged and

9  indicted in Massachusetts for what had occurred?

10 A.   Yes.

11 Q.   And do you know -- do you still have charges pending

12 against you?

13 A.   I do.

14 Q.   Do you know what charges you have pending against you?

15 A.   Yes.

16 Q.   What would those be?

17 A.   Conspiracy, falsifying business records, intimidation

18 of a witness, and use of firearms in the commission of a

19 felony.

20 Q.   And did you actually testify at the Grand Jury about

21 those indictments?

22 A.   I did.

23 Q.   Despite having those open charges, have you willingly

24 testified today?

25 A.   Yes.

1    Q.    And have you been made any threats or promises by my

2    office or the police in terms of your testimony here today?

3    A.    No.

4    Q.    In other words, have you cut any deals?

5    A.    No.

6    Q.    Despite that, are you hoping by testifying today you

7    will be given some consideration in your open case?

8    A.    Anybody would, yes.

9    Q.    Two last things, ma'am.

10        Once with Mr. Hall, did he ever mention the name of

11   either David Chalue or Caius Trash Veiovis?

12   A.    He didn't mention their names.  He did mention, I guess

13   his name is Veiovis.

14   Q.    What did he mentioned about him?

15   A.    Something about a --

16        MR. FRANK:  Objection.

17        THE COURT:  Basis of your objection?

18        MR. FRANK:  I think we're going to hearsay.

19        THE COURT:  I will hear you at sidebar, please.

20        Bear with us, ladies and gentlemen.

21

22

23

24

25

1          (Beginning of Sidebar Discussion)

2          THE COURT:  Mr. Barry, what do you expect the answer

3     will be?

4          MR. BARRY:  She will essentially say, Your Honor, that

5     Mr. Hall told her that if he ever was in trouble and need

6     help he knew a guy with horns in his head or something like

7     that, and he was a guy to go to.  And this would be offered

8     for the state of mind of his plan, that he would use this

9     individual if he ever needed to do something further for his

10    plan.

11         THE COURT:  All right.  Mr. Frank?

12         MR. FRANK:  Two objections, one is there is some

13    hearsay involved in that.  Second part of this is it is not

14    further business of any conspiracy in relation to either

15    this plan nor the charge for which my client stands.

16         THE COURT:  Well, I don't hear it being offered as

17    joint venture hearsay.  What Mr. Barry has suggested was not

18    being offered for the truth of its content but to establish

19    Mr. Hall's state of mind, therefor would not be hearsay and

20    I accept that explanation and overrule the objection, but

21    your objection is noted.

22         MR. FRANK:  Judge, while we are up here, I think we

23    will have another opportunity, but Ms. Allen has a court

24    date -- court hearing at/about during the next witness or

25    so.  I would like to switch out Ms. Allen with Ms. Ryan at

1    counsel table.

2         THE COURT:  You may certainly do that.  Would it be

3    convenient to do it at break?  When do you have to be there?

4         MS. ALLEN:  That's fine, Judge.  I'm going to Boston.

5         (End of Sidebar Discussion)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        THE COURT:  You may proceed.

2        MR. BARRY:  Thank you, Your Honor.

3    Q.    (By Mr. Barry) In terms of this person Veiovis, what

4    did Mr. Hall tell you?

5    A.    He mentioned a guy that files his teeth and that he was

6    a bad ass mother fucker and he was the guy to call if you

7    were in a jam.

8    Q.    And getting back to the plan, when you met with the

9    police, did you actually point out the tree with the bullet

10   holes?

11   A.    Yes.

12   Q.    And in terms of the receipt that you indicated the

13   police confronted with you, was that in your wallet did you

14   indicate?

15   A.    Yes, they said it was in my wallet.

16   Q.    And in terms of Wells, New York and the rest stop that

17   we've talked about, is that rest stop on the way up to

18   Wells, New York?

19   A.    No.

20   Q.    Is it past Wells, New York?

21   A.    It's just past Wells, New York.

22   Q.    Lastly, when Mr. Hall was going through this plan that

23   he had about the New York set up of Mr. Glasser, did he ever

24   mention what he would do if the plan didn't work?

25   A.    Yes.

1    Q.   And can you explain to the jury what Mr. Hall told you

2    would happen if he -- this plan did not work?

3    A.   He said that he would have to make him disappear.

4    Q.   When you say "he", Mr. Glasser would have to disappear?

5    A.   David Glasser.

6         MR. BARRY:  Thank you.

7         No more questions, Your Honor.

8         THE COURT:  Mr. Frank, you may cross examine.

9         MR. FRANK:  Thank you very much.

10                **CROSS-EXAMINATION BY MR. FRANK**

11   Q.   Good morning.  My name is Attorney Don Frank and I

12   represent Mr. Chalue.

13        Ms. Brooks, a few questions.  You testified that

14   there's no deal between the Commonwealth and you in exchange

15   for your testimony; is that correct?

16   A.   That's correct.

17   Q.   And, of course, you're hoping that your cooperation

18   with the Commonwealth would be taken into so-called

19   consideration; is that right?

20   A.   Yeah.

21   Q.   And you don't want to go to jail for this activity,

22   right?

23   A.   I've already gone to jail.

24   Q.   I understand.  You don't want to go back to jail?

25   A.   Yes, I don't want to go back to jail.

1  Q.   And I am going to ask you that you keep your voice up.
2  I can't quite hear you.
3  A.   No, I don't want to go back to jail.
4  Q.   All right.  And you understand that the person who
5  determines whether or not you've cooperated is sitting at
6  counsel table next to me; is that right?
7  A.   I believe it also involves the judge.
8  Q.   I understand, but you understand that one of the people
9  certainly who make a determination as to whether or not you
10  go back to jail is at the -- is from the District Attorney's
11  Office, right?
12  A.   Yeah.
13  Q.   Okay.  And you understand that if your cooperation is
14  sufficient that the District Attorney has a role in
15  suggesting whether or not you go back to jail; is that
16  correct?
17  A.   I'm not fluent with the judicial system, so I'm not
18  sure how it works.
19  Q.   Well, when you went to jail -- you went to jail for a
20  period of time; is that correct?
21  A.   That's correct.
22  Q.   You were held on bail?
23  A.   That's correct.
24  Q.   Did the District Attorney's Office agree -- did the
25  District Attorney's Office ask that you be held on bail at

1   your arraignment when you were first brought to court?

2   A.   Yes.

3   Q.   And at some point you're released from jail?

4   A.   Yes.

5   Q.   And that's because your bail was lowered; is that

6   correct?

7   A.   We fought to have it lowered, yes.

8   Q.   And it was lowered?

9   A.   Yes.

10  Q.   Okay.  And the District Attorney, you understand, will

11  have -- by the way, this case is now almost -- it's 3 1/2

12  years old, right?

13  A.   Yup.

14  Q.   And there have been a number of continuances granted in

15  this matter; is that correct?

16  A.   Yes.

17  Q.   That means your trial has been postponed, right?

18  A.   Uh-huh.

19  Q.   And its been postponed, you understand some time after

20  your testimony in these cases; is that right?

21  A.   I don't know when it will be continued to.

22  Q.   When's the trial date?

23  A.   I haven't spoken to my lawyer.

24  Q.   Okay.  Your case is 3 1/2 years old years old and you

25  don't know when your trial date is; is that right?

1    A.   Yeah.

2    Q.   And you understand that the District Attorney's Office

3    has quit a bit to say in terms of whether or not you go back

4    to jail; is that right?

5    A.   I suppose, yeah.

6    Q.   Thank you.

7         It's a pretty complicated plan, you would agree with

8    that, correct?

9    A.   Yeah.

10   Q.   And you didn't come up with this plan, did you?

11   A.   No.

12   Q.   And as far as you could tell, Alexandra Ely did not

13   come up with that plan?

14   A.   I can't speculate about her.

15   Q.   Well, when you were there Alexandra Ely was not telling

16   you what to do, was she?

17   A.   Correct.

18   Q.   It was Adam Hall, right?

19   A.   Yes.

20   Q.   And Adam Hall told you, you listed a number of steps

21   including looking at pictures and taking a gun, and going

22   for a car ride, and shooting into a tree, all of those were

23   Adam Hall's suggestions; is that right?

24   A.   Yes.

25   Q.   And is it fair to say that every time you heard of a

1  suggestion, with one exception involving the gun inside the

2  store, that came from Adam Hall, right?

3  A.    Yeah.

4  Q.    It seemed to have a lot of moving parts in this plan,

5  as we said there are a lot of moving parts, a lot of

6  different things to do in this plan, right?

7  A.    Yeah.

8  Q.    And you didn't know at that time that Alexandra Ely and

9  Adam Hall were also, as you say, dating, did you?

10  A.    Right.

11  Q.    He held things from you, right?

12  A.    Uh-huh.

13  Q.    Is that a yes?

14  A.    Yes.

15  Q.    Okay.  And sometimes you knew what he was up to and

16  sometimes you didn't know what he was up to; is that fair to

17  say?

18  A.    Yes.

19  Q.    And he assigned you a role, some role, but he didn't

20  assign you all of the roles in this plan, he had other

21  people doing other things in this plan; is that also right?

22  A.    Yes.

23  Q.    And he didn't tell you what he told Scott Langdon to

24  do, did he?  He didn't say exactly what Scott was up to in

25  all aspects, did he?

1   A.   Right.

2   Q.   And there was Theresa Cunigan and she was part of this

3   in some aspect, you're not sure what; is that fair to say?

4   A.   Yes.

5   Q.   And because he didn't tell you what Theresa was up to,

6   did he?

7   A.   No.

8   Q.   Now, he -- Mr. Hall was a Hells Angels full member,

9   right?

10  A.   Yes.

11  Q.   That was part of the attraction about him, is that fair

12  to say in some aspect?

13  A.   No.

14  Q.   No?  Okay.  And you got to meet Scott Langdon, right?

15  A.   Yes.

16  Q.   And he was a prospect for the Hells Angels; is that

17  right?

18  A.   I have no idea.

19  Q.   You don't know one way or the other?  Okay.

20       And you told us that he talked to you about Caius

21  Veiovis also known as Trash, correct?

22  A.   He never said his name, but yeah.

23  Q.   The guy who filed his teeth, who you assume is Trash;

24  is that fair to say?

25  A.   Yes.

1  Q.   And you never met the guy?

2  A.   No.

3  Q.   And he never mentioned David Chalue or go to David

4  Chalue if you have any problems; never said the words David

5  Chalue as far as you know?

6  A.   No.

7  Q.   One last thing, when you tell -- each time -- there are

8  a number of times you testified that you sort of pushed back

9  against Mr. Hall, you said, I don't want to do this, right?

10  A.   Yeah.

11  Q.   And each time and every time you said that he got more

12  and more intense; is that fair to say?

13  A.   Yes.

14  Q.   And he started to get sort of weedily, needily, whiney;

15  is that right?

16  A.   Yes.

17  Q.   And he gets kind of loud and makes himself bigger and

18  all over you; is that also right?

19  A.   I suppose.

20  Q.   And he doesn't take the word no quietly, does he?

21  A.   No.

22  Q.   And he -- and every time you saw him, you got more and

23  more -- every time you talked about it he would get more

24  intense about this whole thing, correct?

25  A.   Yes.

1    Q.    And there were times, even when you weren't thinking,
2    you were going -- there were times you were thinking you
3    weren't going to participate in this, right?
4    A.    Yes.
5    Q.    And at the times you thought you weren't really going
6    to go along with his plan, you were sort of saying, okay,
7    I'll do it, not really thinking you were actually going to
8    do that, right?
9    A.    Right.
10   Q.    And that was really just kind of to shut him up, right?
11   A.    Yes.
12   Q.    To stop him, from going on and on and on; is that
13   right?
14   A.    I suppose.
15   Q.    And it happened on more than a few occasions where you
16   weren't planning to really go through with this plan but you
17   said yes?
18   A.    I never actually said yes to anything anywhere.   In my
19   testimony I never said yes once.
20   Q.    You didn't tell him no because you didn't want him to
21   keep needling you; is that fair to say?
22   A.    No, it's not fair to say.
23   Q.    You told -- you never told him -- excuse me.   You told
24   him that he would -- that you would look at the picture of
25   Mr. Glasser, right?

1  A.    I never told him.  He put it in front of my face.

2  Q.    You looked at the picture of Mr. Glasser; is that

3  right?

4  A.    Yes.

5  Q.    And you understood that he was showing you that picture

6  of Mr. Glasser so that you could identify him to police in

7  New York?

8  A.    He said that afterwards, yes.

9  Q.    And when he said that afterward, you understood that he

10  thought that you were -- you understood that he was

11  anticipating that you could go along with the plan, right?

12  A.    I don't know what he was thinking.

13  Q.    But you didn't tell him you would not do it at that

14  time?

15  A.    I had told him numerous times didn't want anything to

16  do with it.

17  Q.    All right.  And every time you told him that he would

18  needle you?

19  A.    Yeah.

20        MR. FRANK:  Okay.  Thank you.

21        I have nothing.

22        THE COURT:  Mr. Barry, redirect examination?

23        MR. BARRY:  Thank you, Your Honor.

24                **REDIRECT EXAMINATION BY MR. BARRY**

25  Q.    Ma'am, in terms of -- this defense attorney mentioned

1   it -- complicated plan, did it appear that Mr. Hall needed

2   more than one person to successfully pull off this

3   complicated plan?

4   A.    Yes.

5   Q.    And did Mr. Hall involve more than one person in terms

6   of this complicated plan?

7   A.    Yes.

8   Q.    And was Mr. Hall -- did it appear he was able to

9   coordinate several people to help him in this plan that

10  would ultimately help him in a court case coming?

11        MR. FRANK:  Objection.  Leading.

12        THE COURT:  Sustained.

13  Q.    (By Mr. Barry) How many people, to your knowledge, was

14  involved in this plan?

15  A.    Counting myself -- counting myself and Adam probably

16  about five people that I know of.

17  Q.    And what was the purpose, the ultimate outcome for this

18  plan?

19  A.    For Adam not to go back to jail.

20  Q.    And in terms of the details of this plan, about how

21  much of the plan do you feel you know?

22        MR. FRANK:  Objection.

23        THE COURT:  Well --

24        MR. FRANK:  Judge, I'm going to withdraw that

25  objection.

1      THE COURT:  All right.  You may answer, if you are able
2   to.
3   Q.   (By Mr. Barry) If you're able to answer, did you seem
4   to know most of the plan?
5      MR. FRANK:  Objection as to the leading nature.
6      THE COURT:  Sustained.
7   Q.   (By Mr. Barry) I will ask again about how much of the
8   details did you feel you knew about the plan?
9   A.   Very minimal.
10  Q.   Okay.  Did you know you were going up to New York?
11     MR. FRANK:  Objection, leading.
12     THE COURT:  Well, I'll let you answer that question but
13  bear in mind this is your witness, Mr. Barry.
14     MR. BARRY:  Yes, Your Honor, sorry.
15  Q.   (By Mr. Barry) Did you know you were going up to New
16  York?
17  A.   Yes.
18  Q.   And in terms of your participation with the plan, did
19  you want to go through with the plan, want to do anything?
20  A.   No.
21  Q.   How old were you at the time when this was occurring?
22  A.   I was 20 years old.
23  Q.   And what was your relationship with Mr. Hall?
24  A.   I was under the impression that we were dating.
25  Q.   As -- and how old was Mr. Hall, roughly, when you were

1  dating him as a 20 year old?

2  A.   He told me he was 26, he was in fact 31.

3  Q.   Was he older than you in the relationship?

4  A.   Yes.

5  Q.   In terms of your relationship with Mr. Hall, not

6  including this plan, did you often feel pressured from

7  Mr. Hall?

8  A.   Yes.

9  Q.   Okay.  And did Mr. Hall, in your relationship with you

10  as a 20-year-old female did he feel like you could say no to

11  him often?

12  A.   No.

13       MR. BARRY:  One moment, Your Honor.

14       (Off the record discussion amongst The Commonwealth.)

15  Q.   (By Mr. Barry) When you indicated you didn't know a lot

16  of the plan, what part didn't you know?

17       MR. FRANK:  Objection.

18       THE COURT:  You're asking her now what part of the plan

19  she didn't know at the time?

20       MR. BARRY:  That's correct.

21       THE COURT:  That she now knows?

22       MR. BARRY:  That's correct, Your Honor.

23       THE COURT:  You may answer.

24       THE WITNESS:  Well, the main part is I didn't know the

25  truth about what Glasser really did.  He really never did

1    anything in the first place.

2    Q.   (By Mr. Barry) Okay.

3    A.   And I also didn't know all the other little parts, like

4    I didn't know who he really was.  He only showed me who he

5    wanted me to see who he was.  I also didn't know from one

6    day to the next what the actual plan was.  Things were

7    constantly being added in.  I didn't know a lot.  I knew

8    from day-to-day, things grew until it was so much that --

9    (Indicating)

10   Q.   On August 14, 2010, though, how much of the plan did

11   you know?

12   A.   August 14, I knew what immediately involved me.

13   Q.   And knowing that, did you still participate in the

14   plan?

15   A.   I didn't feel I had a choice.

16   Q.   Did you still participate in the plan?

17   A.   I did.

18        MR. BARRY:  Nothing further, Your Honor.

19        THE COURT:  Recross examination limited to those areas.

20        MR. FRANK:  No further questions.

21        THE COURT:  Ms. Brooks, you are excused.

22        THE WITNESS:  Thank you.

23        (The witness stepped down.)

24        THE COURT:  Ladies and gentlemen, we are going to take

25   the morning recess.  Please bear in mind my cautionary

1    instruction during the break.

2        Don't discuss the case with each other or make any

3    effort to gather information about the case.

4        You are now excused.

5        Thank you.

6        (The jury exited at 10:54 a.m.)

7        THE COURT:  We will reconvene in 15 minutes.

8        (The Court exited at 10:54 a.m.)

9        (* * * * *)

10       (The Court entered at 11:14 a.m.)

11       (The defendant was present.)

12       (Ms. Ryan is now seated at counsel table and Ms. Allen

13   is not present.)

14       (The jury entered at 11:14 a.m.)

15       THE COURT:  Mr. Barry, you may call your next witness.

16       MR. BARRY:  Yes, Your Honor.  The Commonwealth calls to

17   the stand Scott Langdon.

18       (Scott Langdon, sworn)

19       THE COURT:  Mr. Langdon, good morning.

20       THE WITNESS:  Good morning.

21       THE COURT:  If I can remind you that we all need to

22   hear you, so keep your voice up and make certain that your

23   answers are verbal rather than by gesture.

24       THE WITNESS:  Yes, Your Honor.

25       THE COURT:  And answer only the question put to you,

1   please.

2        THE WITNESS:  Yes, Your Honor.

3        THE COURT:  You may proceed.

4        MR. BARRY:  Thank you, Your Honor.

5                    **(Scott Langdon)**

6            **DIRECT EXAMINATION BY MR. BARRY**

7   Q.   First all, Mr. Langdon, could you tell the jury your

8   name?

9   A.   Scott Langdon.

10  Q.   How old are you, Mr. Langdon?

11  A.   Forty-eight.

12  Q.   Do you live in the Berkshires?

13  A.   Yes.

14  Q.   Did you grow up in the Berkshires?

15  A.   No.

16  Q.   Getting to this case, do you know someone by the name

17  of David Glasser?

18  A.   Yes, sir.

19  Q.   And how did you first meet Mr. Glasser?

20  A.   I met him at a rooming house on Linden Street in

21  Pittsfield, Mass.

22  Q.   And when was that, about what year?

23  A.   2005.

24  Q.   I'm going to show you what's been marked as Exhibit 3.

25  Ask if you recognize the person in that picture?

1    A.    Yes, sir.

2    Q.    And who is that?

3    A.    David Glasser.

4    Q.    I'm sorry.  You said that you first met him in, back in

5    2005?

6    A.    Yes, sir.

7    Q.    And after meeting him in 2005, did you have a

8    relationship with him?

9    A.    Yeah, we were friends.

10   Q.    And did you keep up that friendship as the years went

11   along?

12   A.    Yes, sir.

13   Q.    And by August of 2010 were you still friends?

14   A.    Yes.

15   Q.    In terms of a person, do you know anyone by the name of

16   Adam Hall?

17   A.    Yes, sir.

18   Q.    And did he have a nickname that he went by?

19   A.    Leo.

20   Q.    And is that what you called him?

21   A.    Yes, sir.

22   Q.    I want to show you what's been marked as Exhibit 38.

23         Ask if you recognize the person in that picture?

24   A.    Yes, sir.

25   Q.    And who is that?

1   A.   Adam Hall.

2   Q.   When did you first meet Mr. Hall?

3   A.   Around 2005.

4   Q.   And how did you meet him?

5   A.   I met him at Lobster Fest at the clubhouse.

6   Q.   And when you say "the clubhouse", what's that?

7   A.   The Hells Angels' clubhouse.

8   Q.   Where's that located?

9   A.   In Lee.

10  Q.   After that first meeting, did your paths cross again as

11  the years went along?

12  A.   Yes, sir.

13  Q.   Did you guys become friends?

14  A.   Yes.

15  Q.   Did you ever live with Mr. Hall?

16  A.   Yes.

17  Q.   And when was that?

18  A.   2008.

19  Q.   And how long did you live there?

20  A.   From March until September.

21  Q.   And after living with -- there, did you move out?

22  A.   Yes.

23  Q.   And where did you move to?

24  A.   Parker Road.

25  Q.   And after that, did you move around several places.

1   A.   Yes, a few times.

2   Q.   Ultimately, did you move to Linden Street in

3   Pittsfield?

4   A.   Yes.

5   Q.   And when you lived on Linden Street what year would

6   that be?

7   A.   End of 2008.

8   Q.   While living on Linden Street who was your neighbor?

9   A.   David Glasser.

10   Q.   And who did David Glasser live with?

11   A.   Ed Frampton.

12   Q.   And while living next to David Glasser and Ed Frampton,

13   did you continue your friendship with Mr. Glasser?

14   A.   Yes.

15   Q.   In terms of another person, did you know someone by

16   name of Nicole Brooks?

17   A.   Yes.

18   Q.   And how did you know her?

19   A.   I met her through Leo.

20   Q.   And did Leo have some type of relationship with her?

21   A.   Girlfriend/boyfriend.

22   Q.   Did you meet someone by the name of Alexandra Ely?

23   A.   Yes, sir.

24   Q.   How did you meet her?

25   A.   Through Adam.

1   Q.   Did he have some type of relationship with Alexandra

2   Ely?

3   A.   Yes.  Boyfriend/girlfriend.

4   Q.   Did you meet someone named Britney Beggs?

5   A.   Yes.

6   Q.   And how did you meet her?

7   A.   Through Leo.

8   Q.   What type of relationship did he have with Britney

9   Beggs?

10  A.   Boyfriend/girlfriend.

11  Q.   Turning to this case, I want to talk about the days

12  leading up to August 14, 2010, that day and the days later.

13       Do you remember that time period?

14  A.   Yes.

15  Q.   First I want to draw your attention to a month before

16  August 14, 2010, going into July of 2010.  Do you remember a

17  time that Leo approached you and asked you to convey a

18  message to David Glasser?

19  A.   Yes.

20  Q.   Can you explain that to the --

21  A.   He asked me to offer him 3,000 dollars not to testify.

22  Q.   And did do you that?

23  A.   Yes.

24  Q.   Did Mr. Glasser accept that 3,000 dollars?

25  A.   No.

1   Q.   When Hall asked you to offer Mr. Glasser 3,000 dollars
2   not to testify, did he indicate to you something occurred
3   between himself and Mr. Glasser?
4   A.   Yes.  He told me that the events leading up to the
5   beating and truck signing over.
6   Q.   Okay.  And did he say he had done something to
7   Mr. Glasser?
8   A.   He said David stole carburetor parts from him and that
9   he had -- he beat him with a baseball bat and had him sign
10  over his truck.
11  Q.   And at any point did you learn that whether or not that
12  was true that David stole from him?
13       THE WITNESS:  Later on he found out that it wasn't
14  true.
15       MR. FRANK:  Objection.
16       THE COURT:  Sustained.
17  Q.   (By Mr. Barry) Now I want to go forward.
18       Among August 2010, do you remember this period of time?
19  A.   Yes.
20  Q.   Was there a time in August of 2010 that Adam Hall again
21  talked about David Glasser?
22  A.   Yes.
23  Q.   Do you remember where you were during this
24  conversation?
25  A.   He called me to meet him at the Crossroads.

1  Q.    Okay.  And what is the Crossroads?

2  A.    It's a bar.

3  Q.    And where is that located?

4  A.    Two doors down from my house on Linden Street.

5  Q.    So would that be in Pittsfield?

6  A.    Yes.

7  Q.    And when you met at the Crossroads this first time, who

8  was with --

9  A.    At the beginning, just me and Leo.

10 Q.    And what was that conversation?

11 A.    Told me that he wanted me to ask David for a ride to

12 New York and offer him $150.  For me to get the gas receipts

13 and the toll tickets, and make sure they stayed in the

14 truck.

15 Q.    Did he tell you why he needed you to do this?

16 A.    He didn't really get too specific.  He just said he

17 wanted to discredit his testimony at the upcoming trial that

18 month.

19 Q.    Did you agree to do this plan for Mr. Hall?

20 A.    Yes, reluctantly.

21 Q.    Now, I want to draw your attention to the day before

22 August 14, August 13, 2010.  Again, do you remember this

23 day?

24 A.    Yes, sir.

25 Q.    Did you meet up with Mr. Hall at some point on

1    August 13?

2    A.    Yes.   There was a knock on my door and I opened it and

3    Nicole Brooks was standing there and said Leo wanted to talk

4    to me in the car.

5    Q.    Did you go talk to Leo?

6    A.    Yes.   I went out and got in the back seat.   She jumped

7    back in the front seat and Leo told me that he needed my

8    phone.   And I said why, I don't have no minutes for it.   And

9    he said, Come on.   Go grab your phone.   Let's go to Walmart

10   and I will get you the minutes for the phone.

11   Q.    Did you go to Walmart?

12   A.    Yes, I went inside and I told my girlfriend Theresa

13   Casey Cunigan that Leo wanted me to go to Walmart with him

14   and she said she wanted to go too because there were some

15   things she needed, so she came out and got in the car with

16   us.

17   Q.    And so who went to Walmart?

18   A.    The four of us -- me, Leo, Nicole, and Theresa.

19   Q.    And once you got to Walmart, did you meet anybody?

20   A.    On the way to the store, he told me to wait at the

21   benches for Alex and somebody else; I don't remember her

22   name.   And so I sat down and I waited and they came out

23   before Alex got there, and we sat there having a cigarette

24   and he handed me my phone card and handed me a camera.   And

25   he told me -- I said, What's this for?   He goes, Ill tell

1   you later.

2       So just as he was telling me that, Alex and her friend

3   walked up.  And they talked with Leo for a little while and

4   Leo handed her credit card back to her and we took off.  The

5   four of us in one car, Theresa, me, Nicole, and Leo.  And we

6   went to Cumberland Farms and we got out one side of the

7   pumps and Alex and her friend pulled up on the other side of

8   the pumps and Leo pumped gas into both vehicles and she went

9   in and paid by credit card.  When she came out he asked her

10  for her credit card back.

11  Q.   After going to the Cumberland Farms, did you go

12  anywhere?

13  A.   Yes.  Went a restaurant, Debbie Wong's.

14  Q.   Who went to Debbie Wong's.

15  A.   Me, Theresa, Nicole, and Leo.

16  Q.   Once at Debbie Wong's, did Mr. Hall make any mention

17  about the camera?

18  A.   That's when he went on explaining that he wanted me to

19  take pictures of David Glasser.

20  Q.   Did he tell you why he wanted to you take pictures?

21  A.   Not in front of Theresa.  When she got up to go get her

22  plate, it was a buffet.  He told me that he needed her

23  pictures so that he could show it to Nicole so Nicole could

24  identify him later.

25  Q.   And, in addition to giving you the camera and I think

1    you mentioned the phone minutes, did Mr. Hall make any other

2    mention of a plan he had against Mr. Glasser at that point?

3    A.    He -- he lightly touched on the subject about making

4    sure I leave the receipts in the car, the gas receipts, the

5    toll tickets, and he didn't really talk a lot around

6    Theresa.  He didn't want her to hear, so he was pretty vague

7    at Debbie Wong's.

8    Q.    Did he tell you where you were going to go?

9    A.    Yes; Wells, New York.

10   Q.    Did -- again, did you agree with Mr. Hall to go along

11   with the plan?

12   A.    Yes.

13   Q.    And that day, after getting the camera from Mr. Hall,

14   did you do anything?

15   A.    Yes, we went back to our house and I went down the

16   street and got a 10-dollar bag of marijuana and went up to

17   the house and knocked on the door.  David answered and I

18   told him we'd smoke and I went in and just sitting there

19   smoking and I took -- I had Theresa take pictures of, like,

20   the cat and stuff, just so, you know, so he didn't think

21   anything weird was going on.  I told him I just got a brand

22   new camera and so I took it from her and I took a picture of

23   David and that's --

24   Q.    Did you ask or tell David while you were taking a

25   picture of him?

1   A.   I was kidding around.  I said, Mug for the camera.

2       It was just playing around, you know, act.

3   Q.   Okay.  And now I want to turn your attention to

4   August 14, 2010, that morning.  Did you meet up with

5   anybody?

6   A.   Yes, Leo called me in the morning and told me to meet

7   him down at Crossroads so David wouldn't see him.  And I got

8   in the vehicle and we went up the street a couple of streets

9   up the road, a couple of streets, and turned in and he hand

10   me $100 cash and $50 in quarters and he asked for the camera

11   back.

12   Q.   Did you give him the camera back?

13   A.   Yes, I did.

14   Q.   And by then had you taken pictures of Mr. Glasser?

15   A.   Yes.

16   Q.   And in terms of the money that he gave you, how much

17   money did he give you?

18   A.   One hundred dollars in cash and fifty dollars in

19   quarters.

20   Q.   And what was the reason in giving you money?

21   A.   To pay David Glasser for the ride to Wells.

22   Q.   And did you give all of that money to Mr. Glasser?

23   A.   No.  I kept $40 of it.

24   Q.   What happened next?

25   A.   He didn't bring the GPS unit with him so he called --

1    before he dropped me back off to Crossroads, he called the

2    two girls, Alexandra and Nicole up, and told them to get

3    there with the GPS as soon as possible.  So just before they

4    got to the Crossroads they called me and said they were down

5    parked on the other side of the Crossroads.  So I walked

6    down and got the camera from them -- or got, I'm sorry.

7    Q.    That's okay.

8    A.    Walked down and got the GPS unit from them.

9          She tried to hand me a wallet at the same time.  I said

10   no, this wasn't part of the plan and I took just the GPS

11   unit and walked back up and got in David's truck.

12   Q.    In terms of that GPS unit, did it end up working?

13   A.    No, I couldn't figure it out.

14   Q.    Once you got back to Mr. Glasser's pickup truck, and in

15   terms of the truck, let me show you what's been marked

16   Exhibit 42.  Do you recognize the vehicle depicted in this

17   photograph?

18   A.    Yes I do.

19   Q.    And what is that?

20   A.    David Glasser's Ram truck.

21   Q.    Okay.  Is this the pickup truck that you walked back

22   to?

23   A.    Yes.

24   Q.    Okay.  Once you got in Mr. Glasser's pickup truck, what

25   happened next?

1  A.   I tried to work the GPS, couldn't figure it out.  He

2  said, Don't worry about it.  The night before he downloaded

3  MapQuest instructions on how to get to Wells and that's what

4  we were -- started to follow out of town.

5  Q.   What did you tell Mr. Glasser as your reason for

6  wanting to go to New York, Wells, New York?

7  A.   That I had a job up there with a guy.

8  Q.   Did you have a job up there?

9  A.   No.

10  Q.   Whose idea was it to come up with that story?

11  A.   Leo.

12  Q.   As you were driving up to Wells, New York, did you talk

13  to anyone beside Mr. Glasser?

14  A.   Yeah, Leo called me.  I called him -- I called him

15  first.  And then I told him, I said, the numbers on the

16  interstate are going the wrong way.  I said something is

17  wrong.  And he told me that there was nothing wrong just to

18  keep going, but as we kept going the numbers kept going

19  down.  So I called him again and he said that he would have

20  one of the girls call me.

21       And about five minutes later Nicole called me and she

22  told me that not to pay any attention to the numbers, that

23  you're going the right way and then I didn't talk to him

24  again for about half hour.

25  Q.   If I could stop you there.  Did you have more than one

1  phone conversation with Mr. Hall on the phone?

2  A.   Oh, yes.

3  Q.   In terms of your phone, do you remember your phone

4  number?

5  A.   281-4464.

6  Q.   I'm showing you a document.  Ask you if this appears to

7  be your cell phone from this period time?

8  A.   Yes.

9       MR. BARRY:  I ask this be marked as an exhibit.

10      THE COURT:  Any objection?

11      MR. BARRY:  Sixty-nine.

12      MR. FRANK:  No objection, Judge.

13      THE COURT:  Admitted.

14      (Exhibit No. 69, cell phone records/Scott Langdon,

15  marked)

16  Q.   (By Mr. Barry) As you got towards Wells, New York, in

17  one of your phone conversations with Mr. Hall, did he give

18  you some instructions?

19  A.   Yes.  We were in Amsterdam and we got off the

20  interstate and he told me, he said, at the next gas station,

21  the Hess Station, Pull over.  He says Nicole needs to talk

22  to you.

23      So I had David pull out back and I walked into the

24  store.  And where he was parked out back, he couldn't see

25  the front of the store?

1    Q.    Did Mr. Glasser go inside the store with you?

2    A.    No.  I told him I was going in to buy him a Coke.  I

3    get in the store and Nicole says -- I says, What's up

4    Nicole.  She goes -- starts to open up her backpack.  She

5    says, Here, take this.

6         I said, I don't want that.  That ain't part of the

7    deal.

8         She says Leo wants you to put it in his truck.

9         I said, I don't want it.

10        I walked up to the counter and paid for my soda and as

11   we were walking out she goes, I'm not taking it back.  I

12   said, Well, put it in the bathroom.  It gave me a few

13   minutes to think about what to do.  This wasn't what I was

14   on board for, didn't want to make Leo mad either.

15   Q.    Okay.  If I could stop you there.  In terms of what

16   occurred in the Hess gas station I'm going to show you

17   what's been marked Exhibit 63.  Do you recognize the still

18   photo?

19   A.    Yes, that's when she tried to hand it to me.

20   Q.    Okay.  This was inside the Hess gas station?

21   A.    Yes.

22   Q.    When you say "she" who is this?

23   A.    Nicole.

24   Q.    Okay.  And showing you Exhibit 64, who is that in the

25   photograph?

1  A.    Me.

2  Q.    Okay.  And Exhibit 65, is that you talking with

3  someone?

4  A.    Let me see.

5        Yes.

6  Q.    And who are you talking to?

7  A.    Nicole.  That was on the way out when I said -- told

8  her to put it in the bathroom.

9  Q.    So, at some point did you go to the bathroom?

10 A.    Yes.  I decided I better.  So I went in the bathroom

11 and grabbed it, grabbed the package.  It was -- it was a

12 square package wrapped up in a bunch of like Price Chopper

13 bags and you couldn't see what was inside it, and it had a

14 white tank top T-shirt wrapped around that and it was inside

15 of a Big Y bag or Price Chopper bag.

16 Q.    Did you look inside the bag?

17 A.    Just to glance on it.  I didn't open it up or --

18 Q.    Did you know what was inside the bag?

19 A.    No.

20 Q.    And, I'm sorry, did Nicole tell you something to do

21 with the bag?

22 A.    She said put it in his truck.  Leo wants you to put it

23 in his truck.

24 Q.    Did you do that?

25 A.    Yes.

1   Q.   Where was Mr. Glasser when you put it in his truck?

2   A.   When I came out of the bathroom, in the back, he jumped

3   out as soon as I jumped in and went to the bathroom.  So as

4   soon as he got in the bathroom I lifted his seat up a little

5   bit and put it behind his seat.

6   Q.   And in terms of this pickup truck, was this a two seat

7   or four seat?

8   A.   Two.

9   Q.   Okay.  And you placed the bag where?

10  A.   Right behind his seat.

11  Q.   What happened next?

12  A.   We pull out of the gas station and we started down, I

13  believe it was Rt. 30, about 25 miles to Wells.

14       And when we got into Wells there's a little gas station

15  after the bridge, and they pulled over.  And Dave let me

16  out.  I grabbed my bag of tools and I put them by an old

17  telephone booth and I went inside and bought a couple of

18  beers and came back out and sat there and drank them waiting

19  for Leo to pick me up.

20  Q.   Did Leo come and pick you up at some point?

21  A.   Yes.

22  Q.   And was Leo alone or with someone?

23  A.   Alexandra Ely.

24  Q.   Once you got into Leo's car, did Leo start talking at

25  all about what had just occurred?

1  A.    Yeah, he started -- I said, Leo, what was in that bag.
2  He starts laughing and he went on to tell me the whole
3  story, that it was a gun, the wallet that she tried to hand
4  me earlier in the day, and was in there and wrapped up.
5       He seemed really proud about it, what he, you know,
6  what he'd done.
7  Q.    Did he say he and Nicole had done anything the night
8  before?
9  A.    Yeah, he said they drove to Wells the night before and
10  pulled into that pullout spot, walked into the woods, and he
11  shot into the tree three times.  And he showed Nicole
12  exactly where it was so that she could point it out to the
13  police.
14  Q.    And did he say what he was going to have Nicole do?
15  A.    He was going to have her tell the police that he tried
16  to rape her and kill her.
17  Q.    And, again, how was Mr. Hall's demeanor during this
18  conversation?
19  A.    He was all proud about it until we started getting
20  closer to Amsterdam and he didn't see no police.  And then
21  just as he started to talk about that two went by us real
22  fast, and then he was proud again; Oh, yeah, he goes, they
23  must be on their way.
24       But then as we were getting closer and closer to the
25  thruway he was getting agitated.  The cops hadn't pulled him

1   over yet, he figured he would be pulled over and he would go

2   by him and see it.

3   Q.   Did he give any indication to you if he wanted

4   Mr. Glasser pulled over in New York?

5   A.   He said he needed him pulled over in New York because

6   if he got pulled over in Massachusetts they would put two

7   and two together and they would think he did it.  So he

8   didn't want him to make it to New York -- or to Mass.

9   Q.   Did you and Ms. Ely and Mr. Hall stop anywhere on the

10  way back to Massachusetts?

11  A.   Yes, we stopped at KFC.

12       Before that though, he had me try calling him and

13  saying, asking him to turn around and come back, say that

14  you forgot something in the truck or he said tell him

15  anything just to get him to turn around.

16  Q.   Would Mr. Glasser turn around?

17  A.   No, he would not.  And we got to KFC and he -- they got

18  food and he acted like nothing -- you know, like it was just

19  another day.

20  Q.   And how was Mr. Hall's demeanor as you got into

21  Massachusetts?

22  A.   He started getting agitated as we got closer to the

23  Mass. border and he wasn't pulled over yet.  And he had me

24  call him again and he was already in Mass. and that really

25  made him mad.

1    Q.    Did you drive all the way back to Pittsfield or

2    Massachusetts with them?

3    A.    No.  I got off in Canaan, New York at a campsite.  Me

4    and Theresa were staying overnight with friends that have a

5    trailer in the park and that was the -- that was the plan

6    for about a week.

7    Q.    Did you meet Theresa there?

8    A.    Yes.

9    Q.    And when did you come back to Pittsfield?

10   A.    Sunday afternoon.

11   Q.    And what happened next?

12   A.    I was working for her brother over in New York.  So he

13   came over and picked me up because it was too far for him to

14   come back in Pittsfield to get me and then drive all the way

15   to job site, so I stayed with him during the week so I could

16   work.

17   Q.    And at some point did you find out something about the

18   police wanting to talk to you?

19   A.    Yes.  I was -- at this point I had -- we started a

20   different job in Connecticut and I was on that job and when

21   Theresa called me and said that Officer Meybaum and Byrd

22   from the New York detective agency wanted to talk to me.

23   Q.    I'm sorry.  You mentioned Theresa, who is Theresa's

24   brother?

25   A.    Dave Casey.

1   Q.    When you found out the police wanted to talk to you,
2   did you go talk to them?
3   A.    I called them up and they wanted me to -- they were
4   going to meet me in Pittsfield on Wednesday.  So I came back
5   from work the night before, Tuesday.  And Wednesday
6   afternoon they came in to pick me up at my house.
7   Q.    If I could stop you there.  Before you spoke to the
8   police, did you speak to Mr. Hall at all?
9   A.    Yes.  He told me -- he told me -- he came up with this
10  elaborate story to tell the police that Dave and I were
11  drinking all the way to New York and smoking weed and doing
12  coke and that me and him got in an argument and he had a gun
13  and I had to get out of the vehicle.
14        That was the story he wanted me to tell the police.  He
15  drilled in my head for three or four days because he kept
16  coming over to New York saying -- because he had talked to
17  Nicole and they said they she couldn't move forward with the
18  case until they talked to me because they didn't know if I
19  was a victim or a co-conspirator.  So he came over and kept
20  drilling that into my head and Wednesday when I met them,
21  that's the story I told them.
22  Q.    This story you told the New York Police?
23  A.    Yes.
24  Q.    Let me show you a document.
25        (Pause)

1    Q.   (By Mr. Barry) I show you a document with a signature.

2    A.   Yes, that's my signature.

3    Q.   Does that appear to be the statement you gave to New

4    York State Police.

5         Yes, I gave them the statement, they transcribed it,

6    and I signed it at the end.

7         MR. BARRY:  I ask this be marked as an exhibit?

8         THE COURT:  Any objection.

9         MR. FRANK:  No objection.

10        THE COURT:  Admitted.

11        MR. BARRY:  Seventy.

12        (Exhibit No. 70, statement of Scott Langdon, marked)

13   Q.   (By Mr. Barry) What you told the New York State Police,

14   was that true?

15   A.   No.

16   Q.   Whose idea was it to tell that story to New York State

17   Police?

18   A.   Leo.

19   Q.   Ultimately, did you confess to the police?

20   A.   Yes.

21   Q.   When was that?

22   A.   My house got raided on a Friday.  I was at work.  I

23   came home Saturday and nobody came to see me.  Monday got

24   around and Monday Officer Todd Briggs, and I'm not sure who

25   the other one was, came and said they needed to talk to me.

1   They got me out front and they asked me again was I going to

2   cooperate.  I said that I would, and we went down to the

3   police station.  I told them the truth.

4   Q.   And why did you cooperate at that paint?

5   A.   It was time.  The lies weren't going to, you know, were

6   going to catch up to me anyways.  You know, Leo -- I should

7   have never told him that in first place, but Leo drilled it

8   into my head.

9   Q.   Why did you agree to this plan with Leo?

10  A.   To help Dave.  I was friends with Dave.  I knew he was

11  going to get hurt.  I knew that Leo was going to do

12  something.  He talked about it all summer.  And I tried to

13  get him to not testify by the, you know, with the three

14  thousand dollars.  I talked to him a few other times, but he

15  was adamant that he wanted to testify.

16  Q.   (By Mr. Barry) Based upon what you did with Leo, were

17  you charged in Massachusetts?

18  A.   Yes, I was.

19  Q.   And do you currently have charges?

20  A.   Yes.

21  Q.   Do you know what your charges currently are pending

22  against you?

23  A.   Yes, I do.

24  Q.   And what would those be?

25  A.   Gun used in commission of a felony, kidnapping, witness

1    intimidation, and conspiracy to intimidate.

2    Q.   Despite having those open charges, have you willingly

3    testified in front of this jury today?

4    A.   Yes.

5    Q.   And have you been made any promises or threats for your

6    testimony here today?

7    A.   No.

8    Q.   Despite that, are you hoping that by testifying you

9    would be given some consideration in your case?

10   A.   I hope so.

11        MR. BARRY:   One moment, Your Honor.

12        (Off the record discussion amongst The Commonwealth.)

13        MR. BARRY:   Sorry.   I have two further things.

14   Q.   (By Mr. Barry)   One thing I failed to mention earlier,

15   but I apologize, but in terms of Theresa Cunigan, what

16   happened to her?

17   A.   She passed away.

18   Q.   Was that somewhat recently?

19   A.   Yes.

20   Q.   Secondly, you made some mention in terms of your fears

21   of what Mr. Hall said he was going to do to Mr. Glasser.

22   What exactly did he say he was going to do to Mr. Glasser?

23   A.   Over the summer it was a bunch of different things.   I

24   mean, leading from beating him up to planting drugs on him,

25   to -- it was always different.   Every week it was something

1    different that I would hear him talking about.  And I knew

2    that if David would testify, he was going to get hurt.

3         MR. BARRY:  Thank you.

4         No more questions, Your Honor.

5         THE COURT:  Mr. Frank, you may cross examine.

6         MR. FRANK:  Thank you.

7                    **CROSS EXAMINATION BY MR. FRANK**

8    Q.   Good morning.  I'm attorney Don Frank and I represent

9    Mr. Chalue.

10   A.   Good morning.

11   Q.   You stated that you are testifying -- you have open

12   cases against you; is that correct?

13   A.   Yes, sir.

14   Q.   Most serious of which is probably the kidnapping case,

15   would you agree with that?

16   A.   Yes, sir.

17   Q.   And that carries about a 20 year maximum; is that

18   right?

19   A.   Yes, sir.

20   Q.   And you went to jail for a period of time, correct?

21   A.   Two years in jail, two years house arrest.

22   Q.   Okay.  And those cases are still open, however, right?

23   A.   (Indicating)

24   Q.   I'm sorry.  You have to say yes.

25   A.   Yes.

1   Q.   That's okay.
2        You don't know when your trial date is; is that right?
3   A.   No.
4   Q.   But you know some time after you finish cooperating
5   with the District Attorney's Office those cases will go to
6   court and your cases will be resolved one way or another,
7   right?
8   A.   Yes.
9   Q.   And you're doing this for so-called, you said the word,
10  I think you were asked, you are doing this for
11  consideration?
12  A.   Yes, sir.
13  Q.   And the consideration that we're talking about is
14  consideration in assisting the District Attorney's Office;
15  is that right?
16  A.   Yes, sir.
17  Q.   And the consideration you're talking about is
18  consideration in terms of how much you testify in these
19  killings; is that right?
20  A.   Just to tell the truth.
21  Q.   And it talks about how much -- the consideration -- you
22  understand the consideration is how helpful you can be to
23  the District Attorney's office; is that right?
24  A.   Yes, I think.
25  Q.   Okay.  And you're hoping that the District Attorney's

1   Office will make a recommendation that you don't go back to

2   jail, right?

3   A.   Yes, sir.

4   Q.   And you understand that the District Attorney's Office

5   has a lot of power in terms of whether or not you go back to

6   jail; is that right?

7   A.   Yes, sir.

8   Q.   Okay.  Now, you were a -- this happened in 2010,

9   correct?

10   A.   Yes, sir.

11   Q.   And you haven't been back to the clubhouse since your

12   arrest; is that right?

13   A.   I haven't been allowed to.

14   Q.   All right.  And, by the way, by the clubhouse I'm

15   talking about the Hells Angels clubhouse, correct?

16   A.   Yes, sir.

17   Q.   And you were a Hells Angels prospect?

18   A.   No, sir.

19   Q.   You were not a prospect?

20   A.   I was a friend.

21   Q.   A friend that is an official title of the Hells Angels?

22   A.   No.  I just helped out at all events and had fun with

23   everybody there.

24   Q.   Okay.  And you met a number of people at the Hells

25   Angels, including Leo Hall, correct?

1   A.   Yes, sir.

2   Q.   And he was a full member; is that right?

3   A.   Yes, sir.

4   Q.   And he had -- he was like a Sergeant at Arms or

5   something like that; is that correct?

6   A.   Yes, sir.

7   Q.   And that's an officer there?

8   A.   Yes, sir.

9   Q.   And there's a president there by the name of Joe

10  Williams; is that right?

11  A.   Yes.

12  Q.   And it's -- it's a real organization, they have

13  meetings, right?

14  A.   Yes, sir.

15  Q.   And you're not allowed to attend the meetings as a

16  friend?

17  A.   No, sir.

18  Q.   I'm sorry.  Just so we don't keep doing this, just wait

19  until I finish the question, if you don't mind, so that the

20  stenographer can finish typing, okay?

21  A.   Yes, sir.

22  Q.   Thank you.

23       Now, Joe Williams -- you had a -- you worked for Leo

24  Hall on a number of his projects; is that right?

25  A.   Yes, sir.

1   Q.   And before all of this happened, you had been working

2   for Leo Hall; is that right?

3   A.   Yes, sir.

4   Q.   And it's fair to say that Leo Hall always had stuff

5   going on?  He had a bunch of different projects going on at

6   the same time; that is fair to say?

7   A.   Yes, sir.

8   Q.   And some of them were legitimate, like working on his

9   house in Peru, correct?

10  A.   Yes, sir.

11  Q.   And you understood that some of them were not quite as

12  legitimate, that were not above board; is that right?

13  A.   Yes, sir.

14  Q.   He always kept a -- a few -- may balls in the air in

15  terms of his activities; is that right?

16  A.   Yes, sir.

17  Q.   And when you did work for him, sometimes you didn't

18  know what was going on; is that right?

19  A.   Yes, sir.

20  Q.   And you didn't know which project you were necessarily

21  working on; is that right?

22  A.   Yes, sir.

23  Q.   So like in this particular instance, you testified, I

24  believe, that -- well, let's start off with the fact that

25  you went to Mr. Glasser to offer him $3,000 not to testify?

1    A.    Yes, sir.

2    Q.    That's correct?

3    A.    Yes.

4    Q.    And you told him you were sort of representing the

5    Hells Angels or you made it clear you were representing the

6    Hells Angels, didn't you?

7    A.    No, sir.

8    Q.    But you understood in that instance, for instance, that

9    you were trying to get Mr. Glasser to not testify against

10   Mr. Hall?

11   A.    Yes, sir.

12   Q.    All right.  And you were doing that on Mr. Hall's

13   behalf?

14   A.    Yes, sir.

15   Q.    But the beginning of this, for instance, you testified

16   you went to Walmart, right?

17   A.    Yes.

18   Q.    And when you went to Walmart and you made some

19   purchases or you assisted other people with making

20   purchases, right?

21   A.    No, sir.  I stood outside.

22   Q.    While you were standing outside -- by the way, that's

23   when Alex and Nicole were inside, right?

24   A.    No.

25   Q.    Who went inside?

1   A.   Nicole, Leo, and my girlfriend.

2   Q.   Theresa?

3   A.   Theresa.

4   Q.   Okay.  And you didn't know why -- what this going to

5   Walmart had anything to do, ultimately, with what ultimately

6   happened in terms of setting Mr. Glasser up?

7   A.   Yes, I knew that was the reason we were going there.

8   He was giving me phone minutes to my phone so we could call

9   back and forth on the way there.

10  Q.   So you knew from the point you were at Walmart that you

11  were going to be setting Mr. Glasser up with a rape charge?

12  A.   No.  That, I didn't know.

13  Q.   Okay.  And when you went to -- I think you said you

14  went to Cumberland Farms to get some gas, right?

15  A.   Yes.

16  Q.   And filled up the cars, right?

17  A.   Yes.

18  Q.   And you didn't know that he was setting Mr. Glasser up

19  with a rape charge at that time, did you?

20  A.   No.  A rape charge, no, sir.

21  Q.   Okay.  And same thing, I think that in fact you didn't

22  know about the whole rape charge thing until after the event

23  sort of happened on the ride, right?

24  A.   Yes, sir.

25  Q.   And now, when you heard that, when Mr. Hall told you

1  what was going on for the first time after, the gun was

2  already planted, right?

3  A.   Yes, sir.

4  Q.   And you didn't even know there was a gun being passed

5  until you went to the gas station, right?

6  A.   Yes, sir.

7  Q.   Mr. Hall didn't tell you what was planted -- he was

8  having you plant a gun, right?

9  A.   I didn't know about the gun until after I was in the

10  car on the way back home with the Leo.

11  Q.   You didn't even know what was in the package?

12  A.   No, sir.

13  Q.   Because Mr. Hall handed it to you, said, Give this to

14  Nicole.

15      That was it?

16  A.   No.  No.  Nicole tried to hand it to me, and I -- she

17  left it in the bathroom and I took it from the bathroom.

18  Q.   Okay.  And then you planted it in the car?

19  A.   Yes, sir.

20  Q.   But you didn't know it was a gun?

21  A.   No, sir.

22  Q.   You thought it might have been some drugs or something?

23  A.   It was the shape of what you would think drugs would

24  be, yes.

25  Q.   All right.  And you wouldn't have done it if it were a

1    gun, because a gun is much more serious, right?

2    A.   I told him in the car, if I had known that it was a gun

3    I wouldn't have did it.  He said that's why you didn't know.

4    Q.   Right.  And, also, you didn't know that there was a

5    whole rape scenario being planned or you wouldn't have

6    helped, right?

7    A.   Right.  I didn't know about that until I was on my way

8    home.

9    Q.   So when you were trying to do this, you were, in some

10   respects, concerned about Mr. Glasser, right?

11   A.   Yes, sir.

12   Q.   And so, Mr. Hall was simply lying to you about what it

13   was you were doing to get you to do so stuff, correct?

14   A.   Not lying.  He wasn't telling me the whole thing until

15   after the fact.  He just -- he gave me enough information to

16   get me to do it.

17   Q.   Okay.  And no more until after the event is

18   accomplished, right?

19   A.   Yes.

20   Q.   All right.  And when he told you this, he was excited

21   after the gun was already planted?

22   A.   Yes.

23   Q.   And that's the first time you heard about it, right?

24   A.   Yes.

25   Q.   And it's not quite that it's too late, but it had

1  already been done, there was nothing more you could do about

2  it, so you thought, at least that day; is that fair to say?

3  A.    Yes.

4  Q.    And then a few days later, Mr. Hall comes to you and

5  says, I think we're in some sort of trouble.  You need to

6  corroborate Nicole Brooks in some fashion, correct?

7  A.    Yes, sir.

8  Q.    And he's all excited when he tells you this, right?

9  A.    Not really excited.  He was more about -- more

10  determined to make sure that I told them what he wanted me

11  to tell them -- so I wouldn't really say excited at that

12  point.

13  Q.    Okay.  So he's a hard man to say no to?

14  A.    You don't say no to.

15  Q.    Why not?

16  A.    Because he will hurt you.

17  Q.    Okay.  And does he keep needling you even if he doesn't

18  hurt you?

19  A.    Oh, yes.

20  Q.    And he yells?

21  A.    Yes.

22  Q.    And he says the same thing over and over again?

23  A.    Yes.

24  Q.    And sometimes when you're (sic) saying the same thing

25  over and over again, it's fair to say sometimes you would

1  just say yes to him just to get him to shut up?

2  A.   Yes.

3  Q.   Even if you don't mean it when you say yes one way or

4  the other; is that fair to say?

5  A.   I was hoping that morning that he wouldn't come, and I

6  said yes, just to shut him up.

7  Q.   Yeah.  And you've done that on more than a few

8  occasions with Mr. Hall and his various plans; is that

9  right?

10  A.   Yes.

11  Q.   Because he just goes on and on and on?

12  A.   Yes.

13  Q.   Correct?

14  A.   And if it goes too far, he hurts you.

15  Q.   Okay.  Now, I am -- at some point while -- you went to

16  a lot of events at the Hells Angels' clubhouse, correct?

17  A.   Yes, sir.

18  Q.   And you saw that Mr. Hall had a number of close

19  associates who were also Hells Angels at the Hells Angels

20  club; is that right?

21  A.   Yes.

22  Q.   And one of those was Milo Campbell; is that right?

23  A.   Yes.

24  Q.   And you understood that Mr. Hall and Milo Campbell were

25  very close at one point?

1   A.   Yes.  I worked for Milo.  I knew they were close.

2   Q.   And when he worked for -- excuse me.

3        And Milo Campbell was a full-fledged member of the

4   Hells Angels?

5        I'm not sure if I asked that.

6   A.   Not in the beginning when I was first up there working

7   and stuff, he was just a prospect.  But while I was hanging

8   around them, up there, he became a full patch.

9   Q.   Okay.  And you've come to hear -- at some point you

10   came to hear that after Mr. Hall was arrested for these

11   charges, he was thrown out of the Club?

12   A.   Yes.

13   Q.   Out of the Hells Angels, correct?

14   A.   Yes.

15   Q.   And the person who threw him out of the Hells Angels is

16   Joe Williams, the president of the Hells Angels?

17   A.   All of the officers have to agree.

18   Q.   And that only happened after, at some point after Mr.

19   Hall was arrested for this case --

20   A.   Yes.

21   Q.   -- that we're here for today?

22        Yes?

23   A.   Yes.

24   Q.   Okay.  And you understood that the person who replaced

25   Mr. Hall when he was thrown out was Milo Campbell?

1    A.    Yes.

2    Q.    Well, and so Milo Campbell became the Sergeant at Arms,

3    correct?

4    A.    Yes, and then moved up to the Vice President.

5    Q.    And do you know whether or not he remains Vice

6    President today?

7    A.    I'm not sure today.  Joe Williams is not the president

8    anymore either.  He's out.

9    Q.    Okay.  And one of the things about being part of the

10   friends and the associates and the Hells Angels is you, by

11   the way -- you, after you gave a statement and cooperated

12   with the police against the Hells Angels -- against

13   Mr. Hall, you were no longer an associate or a friend of the

14   Hells Angels, correct?

15   A.    Yes.

16   Q.    And, in fact, you're not supposed to give evidence

17   against a Hells Angels members according to the Hells

18   Angels, correct?

19        MR. BARRY:  Objection, Your Honor.

20        THE COURT:  Overruled.

21        THE WITNESS:  Right.

22   Q.    (By Mr. Frank) And it is for that reason when you gave

23   evidence against Mr. Hall, that you were now no longer a

24   so-called friend, associate of the Hells Angels, correct?

25   A.    As far as I know, I'm still a friend.

```
 1   Q.   You are?  Well, but you know that you're not supposed
 2   give evidence against Hells Angels generally?
 3   A.   He wasn't a Hells Angel when I gave evidence.
 4   Q.   He had already been thrown out, Mr. Hall?
 5   A.   Yes.  Yes.
 6   Q.   And that -- that is a yes?
 7   A.   Yes.
 8   Q.   And that would be some time in 2011?
 9   A.   I believe so.
10   Q.   All right.  And you gave, and started cooperating with
11   this case after he was thrown out, correct?
12   A.   No.  I gave testimony after he was thrown out.
13   Q.   After he was thrown out.
14        And that's because you were freed up to give testimony
15   against Mr. Hall because he was no longer a Hells Angels,
16   correct?
17   A.   Yes.
18   Q.   All right.  And, were he a Hells Angels, it would have
19   a lot more different implications for you --
20   A.   Yes.
21   Q.   -- to testify against him?
22   A.   Yeah.
23   Q.   Okay.  Because you know you're not supposed to give up
24   a Hells Angels, correct.
25        MR. BARRY:  Objection, Your Honor.
```

1        THE COURT:  Sustained.  He's answered that question.

2        THE WITNESS:  Yes.

3        THE COURT:  That will be stricken, ladies and

4   gentlemen.

5   Q.   (By Mr. Frank) And were there other -- were you aware

6   of other members of the Hells Angels who --

7   A.   I don't --

8   Q.   -- strike that.

9        Just a moment, please.

10       Before this occurred in 2010, were you aware of other

11  Hells Angels who also approached Mr. Glasser?

12  A.   Oh, no.  It wasn't a club-sanctioned thing.

13       (Pause)

14  Q.   (By Mr. Frank) Just one other thing, you had at one

15  point -- at some point, you started working for Mr. Casey,

16  correct?

17  A.   Yes, sir.

18  Q.   And that's David Casey, correct?

19  A.   Yes, sir.

20  Q.   And you understand him to be the sort of fourth

21  defendant in the case we're here for today?

22  A.   Yes.

23  Q.   And David Casey, at some point you started -- David

24  Casey is, by the way, Theresa's brother right?

25  A.   Yes.  Yes.

1   Q.   And when you started working for David Casey, Adam Hall
2   indicated that you owed Adam money for something or other,
3   right?
4   A.   No.
5   Q.   Did Adam Hall say that David Casey should pay him for
6   your work?
7   A.   Oh, yes.  When I first -- when David first got me
8   starting to work for him he told David he had to give him my
9   paycheck and then he would give me whatever he wanted.  And
10  David said he wasn't doing that.
11  Q.   And he did that after -- you understood he did that
12  after conferring with Joe Williams the Hells Angels
13  president; is that correct?
14       MR. BARRY:  Objection, Your Honor.
15       THE COURT:  Overruled.  You may answer, if you know the
16  answer.
17       THE WITNESS:  David went to them before he got me away
18  from Leo.  I was living in Leo's cellar in a tent, where he
19  made me live.  And David came -- when Leo was in California
20  and Dave went and got permission for me to leave.
21  Q.   (By Mr. Frank) From Joe Williams?
22  A.   Yeah; well, yes.
23  Q.   And you understand that David Casey and Joe Williams
24  certainly at that time were close; is that right?
25  A.   Yes.

1    MR. FRANK:  Okay.  Thank you very much.

2    THE COURT:  Mr. Barry redirect?

3    MR. BARRY:  Thank you, Your Honor.

4                **REDIRECT EXAMINATION BY MR. BARRY**

5    Q.   When you were talking about the payment you owe Leo,

6    what year are we talking about?

7    A.   2008.

8    Q.   So you're going back a quite a number of years?

9    A.   Yes.

10   Q.   What did you owe him money for?

11   A.   I don't owe him money.  Leo wanted my paychecks.

12   Q.   And he just took it?

13   A.   He told David he wanted them and David went to Joe and

14   told Joe what was going on and Joe said that David could

15   pull me out of there, out of his house.  And he pulled me

16   out of his house and week later Leo found me and it wasn't

17   nice.

18   Q.   You were asked about your knowledge and your friendship

19   with Mr. Joe Williams and Adam Hall.  Do you know what your

20   friendship is like now?

21   A.   Nonexistent.

22   Q.   And was that as the basis of this case?

23   A.   Yes.

24   Q.   Okay.  And do you know the reason behind it?

25   A.   Not fully, no.

1   Q.   You were asked also on cross examination, just to clear

2   something up, if Mr. Hall is kicked out of the Hells Angels,

3   do you know the reason he was kicked out of Hells Angels?

4   A.   Because he was going to -- he went to the FBI to wear a

5   wire in the clubhouse and bring down the Club.

6   Q.   And in terms of what we're talking about in

7   August 2010, Mr. Glasser; when you drove up to New York with

8   Mr. Glasser, what did you believe you were driving up to New

9   York for?

10  A.   Just to leave the receipts in the car so that at a

11  later time they would be found, so he can discredit Dave.

12  That's what I was told.

13       And then, obviously, I was told the whole story after

14  the --

15  Q.   And even though Mr. Glasser was your friend, you still

16  drove up to New York, knowing that you were, for lack of a

17  better word, you were setting him up?

18  A.   Because I figured a little time in jail was a lot

19  better than what Leo was going to do to him.

20  Q.   When you drove up to New York, did you know if there

21  was more than just you involved in the plan?

22  A.   I knew that Nicole was, because, the cabin was

23  supposedly where I was going to work was her relative's.  So

24  I -- I figured I was meeting Nicole and she was going to

25  pick me up.

1    But then when they got to the Hess Station it was
2 Alexandra and Leo and that's when he -- I said, Well, what
3 happened to Nicole.  That's when he went on telling me about
4 the whole story.
5 Q.  So Mr. Hall had a plan involving more than just you?
6 A.  Yes.
7 Q.  And in this plan having more than just you, what was
8 the purpose of the end of this plan?
9 A.  He didn't say the end of it.  He said he wanted the
10 receipts left in the vehicle so he can discredit him at a
11 later time.  He said, like, hide them under the seat.  He
12 said hide them under the seat so somebody can find them.
13 Q.  So he had a plan to help him out in his court case?
14 A.  Yes.
15 Q.  And this involved you?
16 A.  Yes.
17 Q.  And you agreed to help him out in that plan?
18 A.  Yes.
19    MR. BARRY:  Thank you.  No more questions.
20    THE COURT:  Mr. Frank, recross examination limited to
21 those areas?
22    MR. FRANK:  Yes.
23              **RECROSS-EXAMINATION BY MR. FRANK**
24 Q.  You learned that Mr. Hall was kicked of the Club for
25 offering to cooperate with the FBI and wear a wire against

1  the Hells Angels, correct?

2  A.   Yes, sir.

3  Q.   And that information came out some time after the

4  killings and event underlying this case, that we're here for

5  today, correct?

6  A.   Right around the same -- right around the same time, a

7  few days afterwards.

8  Q.   Okay.  How many days?

9  A.   A few days.

10  Q.   Like three or four or two or three?

11  A.   I don't remember.

12  Q.   And you understand that it was police investigators who

13  gave that information to somebody in the Hells Angels; is

14  that correct?

15  A.   I don't know how they got it.  I didn't get asked.

16  Q.   But the Hells Angels had that information two, three,

17  four days after the event?

18  A.   I'm not sure.  I was in jail.

19  Q.   You came to hear however, that a few days after the

20  event underlying this prosecution, that Mr. Hall had agreed

21  to cooperate and work against the Hells Angels with the FBI?

22  A.   Yes, I heard he was going to cooperate.

23  Q.   And that was spreading more or less, is it fair to say?

24  I mean, you heard it third hand, secondhand --

25  A.   In jail.

1    Q.    In jail.

2          Were you at Berkshire County?

3    A.    Yes, I was.

4    Q.    And it's fair to say that everybody, that many people

5    in Berkshire County was sort of talking about that; is that

6    right?

7    A.    It was topic of conversation.

8    Q.    Okay.  And it's certainly of interest that he was

9    offering -- was thrown out of the Hells Angels, it perked

10   your ears up; is that right?

11   A.    Yes.

12         MR. BARRY:  Objection, Your Honor.

13         THE COURT:  Sustained.

14         MR. FRANK:  May I go sidebar, Your Honor?

15         THE COURT:  You may not.  Ask your next question.

16   Q.    (By Mr. Frank) Now, when you learned that he had

17   offered to cooperate against the FBI -- excuse me, when you

18   learned that he offered to cooperate against the FBI, at

19   that point you felt free to testify against Mr. Hall,

20   correct?

21   A.    I felt easier in my mind because I rather have one

22   person mad at me than a whole country full of them.

23         MR. FRANK:  Thank you very much.  Thank you.

24         THE COURT:  Mr. Langdon, you're excused.

25         Thank you.

1          (The witness stepped down.)

2          THE COURT:  You may call your next witness.

3          MR. BARRY:  Commonwealth will call to the stand

4     Alexandra Ely.

5          (Alexandra Ely, sworn)

6          THE COURT:  Ms. Ely, good afternoon.

7          THE WITNESS:  Good afternoon.

8          THE COURT:  If I could remind you that it's important

9     that we all hear you so please keep your voice up and let us

10    know if you don't understand the question.

11         If you do understand it, please limit your response to

12    that question.

13         THE WITNESS:  Okay.

14         THE COURT:  You may proceed.

15         MR. BARRY:  Thank you, Your Honor.

16                        **(Alexandra Ely)**

17              **DIRECT EXAMINATION BY MR. BARRY**

18    Q.   Good afternoon, ma'am.

19         First of all, could you tell the jury your name?

20    A.   Alexandra Ely.

21    Q.   How old are you?

22    A.   Twenty-five.

23    Q.   And do you know someone -- do you have any children

24    first of all?

25    A.   Yes, I do.

1  Q.   And a what's your child's name?

2  A.   Ella.

3  Q.   And how old is Ella?

4  A.   She's two.

5  Q.   Do you know someone by the name of Adam Hall?

6  A.   I do.

7  Q.   How do you know Mr. Hall?

8  A.   I had a relationship with him.

9  Q.   Is he the father of your child?

10 A.   Yes.

11 Q.   I show you what's been marked Exhibit 38, do you

12 recognize the person in that picture?

13 A.   Yes.

14 Q.   And who is that?

15 A.   That's Adam Hall.

16 Q.   In terms of your relationship with Mr. Hall, when did

17 you start dating him?

18 A.   2009.

19 Q.   Okay.  And were you dating him during the Summer of

20 2010?

21 A.   We were on and off.

22 Q.   Okay.  And during the Summer of 2010, did you find out

23 whether or not Mr. Hall's dating somebody else?

24 A.   Yes.

25 Q.   Okay.  And who was that?

1   A.   Brittany Beggs.

2   Q.   Okay.  In 2010?

3   A.   No, Nicole Brooks in 2010, Brittany Beggs was before

4   that, I'm sorry.

5   Q.   Okay.  Were you dating Mr. Hall while he was dating

6   Mr. Britney Beggs too?

7   A.   No.

8   Q.   In terms of the Summer of 2010, first of all, how did

9   you find out he was dating Nicole Brooks?

10   A.   I found out with everything that had happened, it

11   was -- didn't know they were dating until I met her and then

12   put it together.

13   Q.   But in the Summer of 2010, you were both dating at the

14   same time, would that be fair to say?

15   A.   Yes.

16   Q.   Was there a time in the Summer of 2010 that you got a

17   chance to meet Nicole Brooks?

18   A.   Yes.

19   Q.   And where was that?

20   A.   It was at his house in Peru.

21   Q.   And how did Mr. Hall introduce Ms. Brooks?  Just a

22   friend?

23   A.   Yes, as a friend.

24   Q.   While the three of you were at the house in Peru, what

25   were you doing?

1   A.   We were cleaning out the trailer.

2   Q.   And before this date, did you ever hear the name David

3   Glasser from Mr. Hall?

4   A.   Yes.

5   Q.   How did Mr. Hall bring up Mr. Glasser's name?

6   A.   He had pending charges with David Glasser.

7   Q.   Did he seem happy about those pending charges?

8   A.   No.

9   Q.   When Mr. Hall brought up David Glasser's name, did he

10  say anything about what he intended to do about Mr. Glasser?

11  A.   Not until that day.

12  Q.   On that day, did he make mention of David Glasser and a

13  plan he had?

14  A.   Yes.

15  Q.   And could you tell the jury what he said about the plan

16  he had involving Mr. Glasser?

17  A.   He was going to plan to set up David Glasser like it

18  looked like he kidnapped and -- tried to kidnap and rob

19  Nicole Brooks.

20  Q.   And did he say why he wanted to do this?

21  A.   Because of the pending charges and didn't want him to

22  testify.

23  Q.   And did he say who was involved in this plan?

24  A.   Yes.

25  Q.   Who did he say was involved?

1  A.    Nicole and him and Scott Glasser -- Scott Langdon,

2  sorry.

3  Q.    Did you know Mr. Langdon?

4  A.    Yes.

5  Q.    And who was present for this conversation?

6  A.    Me, Nicole, and Adam.

7  Q.    While present, after this conversation, did you guys go

8  somewhere on the property?

9  A.    Yes.

10 Q.    Where did you go?

11 A.    To the pond.

12 Q.    And what happened once you got near the pond?

13 A.    Showed -- he picked up a gun.

14 Q.    Where was that gun?

15 A.    It was placed somewhere near, around.  It was around

16 the pond, near the pond.

17 Q.    Was the gun in anything?

18 A.    Yes.

19 Q.    What was it in?

20 A.    A plastic bag.

21 Q.    And I'm going to show you what has been marked as

22 Exhibit 52 and ask if you recognize this object?

23 A.    Yes.

24 Q.    And what is this?

25 A.    The gun.

1   Q.   That he retrieved on that day?

2   A.   Yes.

3   Q.   And did he say what he was going to do with that gun

4   after he retrieved it?

5   A.   Yes.

6   Q.   What did he say he was going to do with it?

7   A.   He said he was going to use that gun to look like David

8   Glasser used the gun to try to rob Nicole with.

9   Q.   And what happened next?  Did you stay on the property?

10  A.   I do not remember.

11  Q.   Well, next I want to turn your attention to August 13,

12  the day before August 14.  Did you meet up with Mr. Hall at

13  all on that day?

14  A.   Yes.

15  Q.   Where did you meet up with him?

16  A.   I have all of my days mixed up.

17  Q.   This is before you guys actually went up to New York,

18  the day before, did you go to any stores?

19  A.   Yes.

20  Q.   Where did you go?

21  A.   Price Chopper or Walmart, I don't remember.

22  Q.   Okay.  Well, was it fair to say that the morning of --

23  did you go to the Price Chopper?

24  A.   Yes.

25  Q.   So the day before, what store did you go to?

1  A.    Walmart.

2  Q.    When -- and when you went to Walmart, why did you go

3  there?

4  A.    I went there to pick up my credit card or give him my

5  credit card.  I don't remember which way it went.

6  Q.    Did you, at some point, get that credit card back from

7  him?

8  A.    Yes.

9  Q.    After going to Walmart, where did you go?

10 A.    Cumberland Farms.

11 Q.    Did you see Mr. Hall there again?

12 A.    Yes.

13 Q.    And did you leave him at that point?

14 A.    Yes.

15 Q.    Did you end up going to Debbie Wong's or not?

16 A.    I don't think I went to Debbie Wong's I went to Target

17 with Brittany and guy friends of mine.

18 Q.    Later that day, did you happen to go to the Crossroads

19 bar?

20 A.    Yes.

21 Q.    And who was present at the Crossroads bar when you

22 went?

23 A.    I believe Scott and maybe it was Nicole and Adam or it

24 was Scott and Adam or maybe it was all three of them, don't

25 remember.

1   Q.   I next want to bring your attention to August 14, 2010.

2   You indicated that morning you went some place?

3   A.   Yes.

4   Q.   Where did you go?

5   A.   Price Chopper.

6   Q.   Who did you go to Price Chopper with?

7   A.   Adam, I believe.

8   Q.   Was Nicole Brooks ever at the Price Chopper?

9   A.   Yes.

10  Q.   Do you know whether or not she went inside the Price

11  Chopper?

12  A.   I believe she did.

13  Q.   When she came out of Price Chopper, did you meet her

14  again?

15  A.   Yes.

16  Q.   And when she came out of the Price Chopper, did you and

17  Nicole Brooks go somewhere?

18  A.   Yes.

19  Q.   Where did you two go?

20  A.   The Crossroads.

21  Q.   After going to Crossroads, did you see anybody at the

22  Crossroads?

23  A.   Scott.

24  Q.   After going to the Crossroads, did you go someplace

25  else?

1    A.    Yes.

2    Q.    Where did you go?

3    A.    Madison Avenue.

4    Q.    All right.  And did you also go to Peru at some point?

5    A.    I believe so.

6    Q.    Did you get anything when went up to the Peru property?

7    A.    A GPS.

8    Q.    And, by the way, whose property is in Peru?

9    A.    Adam's.

10   Q.    And what was your purpose in getting that GPS?

11   A.    To give to Scott, I believe.

12   Q.    And after getting that GPS, did you at some point give

13   that to Scott?

14   A.    Yes.

15   Q.    Now, you mentioned you also went to Madison at some

16   point too?

17   A.    Yes.

18   Q.    When you went to Madison, do you see Mr. Hall at all?

19   A.    Yes.

20   Q.    And was Nicole Brooks there?

21   A.    Yes.

22   Q.    And did you see anything occur when you went to Madison

23   between Mr. Hall and Ms. Brooks?

24   A.    They either took or put in something into Nicole's hood

25   or took it out of -- I think they took it out of.

1  Q.   Okay.  And, when you say "something"?

2  A.   I believe it was the gun.

3  Q.   You saw them either take it or put it into what?

4  A.   Nicole's hood.

5  Q.   Do you remember what kind or color of the car she had?

6  A.   I believe it was red.

7  Q.   After you gave Mr. Langdon the GPS, was he -- who were

8  you with?

9  A.   I was with Nicole.

10  Q.   All right.  Do you know if she gave him anything else?

11  A.   She tried to give him her wallet.

12  Q.   And what happened?

13  A.   He said no.

14  Q.   After you gave him the GPS, what happened?

15  A.   We went -- I believe went to Madison Avenue, I went to

16  Madison Avenue.

17  Q.   And that's when you saw the placing, either placing or

18  taking out the gun into the vehicle?

19  A.   Yes.

20  Q.   What happened after that?

21  A.   We drove up to New York.

22  Q.   Okay.  And when you say "we" who did you drive to New

23  York with?

24  A.   Me and Adam.

25  Q.   And did you know the purpose of going to New York?

1    A.    Yes.

2    Q.    And what was that?

3    A.    I believe it was to set up David Glasser.

4    Q.    All right.  Did you see anybody else driving to New

5    York besides you and Mr. Hall?

6    A.    Yes.

7    Q.    Who did you see drive up there?

8    A.    Nicole and Scott and David Glasser.

9    Q.    All right.  And in terms of the vehicle that David

10   Glasser and Scott Langdon were driving in, what kind of

11   vehicle was it?

12   A.    A dark-colored truck.

13   Q.    All right.  I'm going to show you what's been marked as

14   Exhibit 42, and ask you, if you recognize the vehicle in

15   that exhibit?

16   A.    Yes.

17   Q.    And what is that?

18   A.    That is the truck.

19   Q.    While you were driving up to Wells, New York, did you

20   see Mr. Hall use the phone at all?

21   A.    Yes.

22   Q.    And from his conversation from when you -- what you

23   could hear from what he was saying, could you tell who he

24   was talking to?

25   A.    It was either Scott or Nicole.

1  Q.   And in terms of cell phone usage, did he use your cell

2  phone at all?

3  A.   Yes.

4  Q.   And did he use his cell phone at all?

5  A.   Yes.

6  Q.   Showing you what's been marked as Exhibit 34 -- I'm

7  sorry.

8  A.   That's okay.

9  Q.   Do you recognize this is your cell phone records?

10 A.   Yes.

11 Q.   Okay.  And in terms of Adam Hall -- first of all, how

12 did you know Adam Hall's phone number?

13 A.   It was on the back of his tow truck.

14 Q.   And in looking at the cell phone records, these appear

15 to be Mr. Hall's records?

16 A.   It's the 347 number.

17 Q.   347-7528?

18 A.   Yes.

19 Q.   That's Mr. Hall's number?

20 A.   Yes.

21 Q.   That was Exhibit 29.

22      What was the conversation you heard Mr. Hall having?

23 A.   About them following, where they were, how it's going.

24 Q.   At some point, once you got into New York, did you see

25 either Mr. Brooks or Mr. Glasser or Mr. Langdon go

1    somewhere?

2    A.    Yes.

3    Q.    Where did they go?

4    A.    Gas station I believe.

5    Q.    What happened next?

6    A.    We stopped at Stewart's, parked up the street.

7    Q.    And what did do you at Stewart's?

8    A.    Got something to eat and then waited for Nicole and

9    Scott to drive by.

10   Q.    And after they drove by, what did you do?

11   A.    We got in the car and continued to follow them.

12   Q.    And what happened next?

13   A.    We picked up Scott, I believe.

14   Q.    When you picked up Scott Langdon, was there any

15   discussion between Mr. Langdon and Mr. Hall once he was

16   picked up?

17   A.    Yes.

18   Q.    Could you explain to the jury what that statement was?

19   A.    They talked about how David Glasser was, what happened,

20   what they just did.

21   Q.    How did they both appear?

22   A.    Excited, nervous; it was a bunch of emotions in one.

23   Q.    And were they specific about what they had just done?

24   A.    Yes.

25   Q.    What, specifically, did they talk about?

1  A.   Where they talked about placing the gun in the car, in
2  his truck, how David Glasser felt.
3  Q.   And did they continue to have conversations as you guys
4  continued to drive?
5  A.   Yes.
6  Q.   And in which direction were you driving?
7  A.   Back towards Pittsfield.
8  Q.   And how was Mr. Hall as you guys drove in this
9  conversation?
10 A.   He was a little jumpy, he was --
11 Q.   What was he jumpy about?
12 A.   What was happening, if David Glasser was getting pulled
13 over, if he was going to get arrested.
14 Q.   At some point did you go to the rest stop at all?
15 A.   Yes.
16 Q.   And why did you go to the rest stop?
17      Or did you know why you went to the rest stop?
18 A.   I don't remember.
19 Q.   Did Mr. Hall have a conversation with Ms. Brooks at a
20 rest stop?
21 A.   I don't -- possibly, I don't remember.
22 Q.   Was she there?
23 A.   Yes.
24 Q.   In addition to the rest stop, did you stop any place
25 else?

1   A.   We dropped Scott off on our way back to Pittsfield --

2   or Kentucky Fried Chicken.   We all stopped at Kentucky Fried

3   Chicken.

4   Q.   And you dropped Scott off where?

5   A.   Somewhere in New York.

6   Q.   At some point, where did you go after you dropped Scott

7   off?

8   A.   Back to Peru.

9   Q.   At some point, once you're back in the Berkshires, did

10  you ever learn that if Mr. Glasser was indeed arrested?

11  A.   Not until a couple of days after I believe.

12  Q.   After you learn that Mr. Glasser was arrested, did you

13  go anywhere?

14  A.   Yes.

15  Q.   Where did you go?

16  A.   I had a vacation planned with my father to Virginia.

17  Q.   And when did you get back from Virginia?

18  A.   I took a bus back, it was about a week.   I was there

19  for about a week.

20  Q.   And once you got back to the Berkshires, anything

21  happen to you?

22  A.   Yes.

23  Q.   What happened to you?

24  A.   I got arrested.

25  Q.   And at some point did the police want to speak to you

1  after you were arrested?

2  A.    Yes.

3  Q.    And when you first spoke to the police, were you

4  completely honest with them?

5  A.    No.

6  Q.    How come?

7  A.    I was scared.  I was jealous.  I was nervous.  I was a

8  lot of emotions in one.

9  Q.    When you first spoke to the police, who did you say was

10 to blame?

11 A.    Nicole.

12 Q.    And that would be Nicole Brooks?

13 A.    Yes.

14 Q.    And how come you told the police it was Nicole Brooks'

15 fault?

16 A.    I was jealous.  I was hurt.  I was scared.

17 Q.    Because of her relationship with Mr. Hall?

18 A.    Yes.

19 Q.    After you were arrested, did you get a chance to speak

20 to Mr. Hall at all?

21 A.    Yes.

22 Q.    Okay.  Do you remember anything about that

23 conversation?

24 A.    No, not much.

25 Q.    After you're arrested, were charges brought against

1   you?

2   A.   Yes.

3   Q.   And do you still have those same charges pending

4   against you?

5   A.   Yes.

6   Q.   Do you know what those charges are for?

7   A.   Yes.

8   Q.   What would that be?

9   A.   Exact charges.

10   Q.   Well, to the best of your memory or knowledge?

11   A.   I believe kidnapping, I believe use of a firearm,

12   conspiracy.  I don't remember the last one.

13   Q.   Were they charges similar to what Mr. Hall has?

14   A.   Yes.

15   Q.   And others?

16       Despite having those charges that are opened, are you

17   still testifying here today?

18   A.   Yes.

19   Q.   And have you been -- made any threats or promises in

20   order to get you to testify here today?

21   A.   No.

22   Q.   Despite that, are you hoping by testifying today that

23   you will be given some consideration for your testimony?

24   A.   Yes.

25       MR. BARRY:  Thank you.

1         No more questions.

2         THE COURT:  Mr. Frank, you may.

3         MR. FRANK:  Thank you.

4         I just want to be clear, there's an agreement regarding

5    bifurcation, Your Honor?

6         MR. BARRY:  That's true.

7         MR. FRANK:  There is.  Okay.

8         THE COURT:  So I would expect in light of that, your

9    cross-examination would be limited to this testimony?

10        MR. FRANK:  Yes, thank you.

11                   **CROSS EXAMINATION BY MR. FRANK:**

12   Q.   Good afternoon.

13   A.   Good afternoon.

14   Q.   I'm Attorney Don Frank.  You may know Dave Chalue.

15        Let me ask you a couple of questions just about this

16   incident.

17   A.   Okay.

18   Q.   Starting off with the charges against you, most serious

19   which is, I think there is a kidnapping in there, right?

20   A.   Yes.

21   Q.   And that carries a 20 potential max, right?

22   A.   Yes.

23   Q.   And then you have a son with Mr. Hall who is now two

24   years old?

25   A.   I have a daughter with him.

1  Q.   I apologize, a daughter.

2  A.   That's okay, yes.

3  Q.   And she -- and you obviously care for your daughter?

4  A.   Yes.

5  Q.   And you don't want to go back to jail, correct?

6  A.   Correct.

7  Q.   And you, you didn't give a statement against Mr. Hall

8  until after he was arrested for the charges for which we are

9  here today, correct?

10 A.   I'm -- I'm not sure -- believe so, maybe.  I don't know

11 -- yes, no, possibly.

12 Q.   All right.  All right.  At some point you gave a

13 statement against Mr. Hall in regard to, let's just talk now

14 about the New York incident, right?

15 A.   Yes.

16 Q.   And you didn't do that for about a year; is that right?

17 A.   It was a while, I believe so.

18 Q.   Okay.  And it is after Mr. Hall was under arrest,

19 correct?

20 A.   Yes.

21 Q.   And you did it -- and you have -- your cases are still

22 open, right?

23 A.   Yes.

24 Q.   And you don't want to go back to jail?

25 A.   Correct.

1    Q.    Did you spend any time in jail?

2    A.    Four days.

3    Q.    And was there an agreement to have you released?

4    A.    On bail.

5    Q.    On bail.  Okay.

6          And the that agreement was with the prosecutor's

7    office, right, the District Attorney's Office?

8    A.    It was.  I was released on bail.  My mom paid the bail.

9    Q.    And when you -- and your case is still open, I just

10   want to be clear about that, right?

11   A.    Yes.

12   Q.    And you know that your cooperation with the District

13   Attorney and your -- that prosecution, the New York

14   prosecution, all of that, the prosecutions will be taken

15   into consideration, correct?

16   A.    Correct.

17   Q.    And the people who give you that consideration are the

18   District Attorney's Office, correct?

19   A.    I believe so.

20   Q.    You don't have a deal with a judge for anything to be

21   taken into consideration, right?

22   A.    Right.

23   Q.    All right.  And your hope is that if you are a good

24   cooperator you will not go back to jail on these New York

25   cases?

1    A.    I am hopeful.

2    Q.    Now, going back to the New York incident, no longer

3    talking about your jail situation, you had some contact with

4    Scott Langdon around this incident, right?

5    A.    Yes.

6    Q.    And Scott was helping, it appeared that Scott was

7    helping Nicole and Adam on this matter, right?

8    A.    Yes.

9    Q.    And it seemed like when you were talking to him he

10   seemed excited about the matter, correct?

11   A.    He was excited and jumpy and he was a bunch of things.

12   Q.    And he never told you that he didn't want to do this,

13   did he?

14   A.    I don't remember.

15   Q.    Had he told you he didn't want to do this, might that

16   be something you'd remember?

17   A.    Probably.

18   Q.    Okay.  And you don't remember him saying, Let's not do

19   this; or, I don't want to do this; Do you?

20   A.    I don't remember.

21   Q.    Okay.  Now, you knew that Scott Langdon -- your Adam

22   Hall was a Hells Angels member, correct?

23   A.    Yes.

24   Q.    And he was a Hells Angels member with a title of

25   Sergeant at Arms, right?

1  A.    That's correct.

2  Q.    And that's pretty high up in the Hells Angels, right?

3  A.    I believe so.

4  Q.    And Scott Langdon, you knew Scott from the Hells

5  Angels?

6  A.    Yes.

7  Q.    And was it your understanding that he was a prospect of

8  the Hells Angels?

9  A.    I don't ever remember Scott being a prospect.

10  Q.    You understood that he was a friend of the Hells

11  Angels?

12  A.    Yes.

13  Q.    Okay.  And you -- and you also had some contact with a

14  number of car rides with Nicole Brooks?

15  A.    Yes.

16  Q.    And you came to realize that she and your boyfriend

17  were also together?

18  A.    Yes.

19  Q.    And you didn't stop your participation in this project

20  after you learned that, did you?

21  A.    No.

22  Q.    And you kept going in this project after you learned

23  that he was cheating on you because it's kind of an ordeal

24  in a certain way dealing with Adam Hall; that is fair to

25  say?

1    A.    Yes.

2    Q.    And to confront Adam Hall takes a lot of energy, right?

3    A.    Yes.

4    Q.    And when he's onto something, sometimes it's easier to

5    just say yes even when you don't mean yes; is that correct?

6    A.    Correct.

7    Q.    And he has -- he always has stuff going on, he has

8    different projects, right?

9    A.    Yes.

10   Q.    And he can have more than one project going on at the

11   same time, correct?

12   A.    Correct.

13   Q.    And some of those are legitimate, like repair of his

14   house and some of those are illegitimate like setting up?

15   A.    Correct.

16   Q.    When he has all of those projects going on, it's fair

17   to say you don't really know what he's doing, correct?

18   A.    Correct.

19   Q.    And you had many experiences where it turned out you

20   later learned that he had you do one thing and it turned out

21   he really had another thing in mind?

22   A.    Correct.

23   Q.    And he lies to you, correct?

24   A.    Yes.

25   Q.    And even after you were pregnant with his child,

1  correct?

2  A.   Yes.

3  Q.   And he would lie to you when you were pregnant with his

4  child?

5  A.   Yes.

6  Q.   And he manipulates?

7  A.   Yes.

8  Q.   And this plan is not your plan, correct?

9  A.   Correct.

10  Q.   Now, talking about the New York plan.

11  A.   Yes.

12  Q.   And it's Adam Hall who came up with the plan, correct?

13  A.   Yes.

14  Q.   And it's Adam Hall who assigned all of the parts,

15  correct?

16  A.   I believe so.

17  Q.   He was -- assigned the different roles to different

18  people; is that right?

19  A.   Yes.

20  Q.   And at least as far as what you're concerned, you

21  didn't know what other people were doing when he had you to

22  do certain things?

23  A.   Correct.

24  Q.   Perhaps later you learned what was going on, while it

25  was going on you didn't really know what was going on?

1    A.    Exactly.

2          (Pause)

3          MR. FRANK:  One moment.

4          (Off the record discussion with Defense Counsel and The

5    Defendant.)

6          MR. FRANK:  That's all I have.  Thank you.

7          THE COURT:  Redirect examination?

8          MR. BARRY:  Yes, Your Honor.

9                  **REDIRECT EXAMINATION BY MR. BARRY**

10   Q.    Just one thing, defense counsel started off by asking

11   you about your cooperation.  In terms of your cooperation,

12   has anyone ever told you what to tell the jury?

13   A.    No.

14         MR. BARRY:  Thank you.

15         THE COURT:  Recross examination.

16         MR. FRANK:  Nothing.

17         THE COURT:  You are excused, Ms. Ely.

18         THE WITNESS:  Thank you, Your Honor.

19         (The witness stepped down.)

20         THE COURT:  Ladies and gentlemen, before we go further,

21   earlier you heard mention of the word bifurcation in

22   connection with Ms. Ely's testimony.  I want to explain to

23   you, by agreement, the attorneys have agreed to bifurcate

24   her testimony, which means she will be recalled at a later

25   time regarding a different portion of this case.  And I

1    wanted you to understand why we had been talking about
2    bifurcation.
3         You may call your next witness.
4         MR. CACCAVIELLO:  Commonwealth will call George Byrd.
5         (George Byrd, sworn)
6         THE COURT:  Mr. Byrd, good afternoon.
7         THE WITNESS:  Good afternoon, Your Honor.
8         May I be seated?
9         THE COURT:  You may.
10        If I can just remind you to keep your voice up.
11        Mr. Caccaviello, you may proceed.
12        MR. CACCAVIELLO:  Thank your, Your Honor.
13                      **(George Byrd)**
14            **DIRECT EXAMINATION BY MR. CACCAVIELLO**
15   Q.   Good afternoon, sir.
16   A.   Good afternoon.
17   Q.   Would you start by introducing yourself to the jury?
18   A.   My name is George Byrd.  I'm an investigator with the
19   New York State Police.
20   Q.   Sir, how long have you been employed by the New York
21   State Police?
22   A.   Since September 22 of 1986.
23   Q.   What is your current assignment?
24   A.   My current assignment, I am assigned to the community
25   narcotics enforcement team for the State Police.

1   Q.   And how long you have been assigned to that division?

2   A.   December 6 of 2012.

3   Q.   So prior to that, had you been assigned to another

4   division or department within the New York State Police?

5   A.   Yes.

6   Q.   And what was that?

7   A.   I was an investigator out of the State Police barracks

8   in Fonda, New York in Montgomery County.

9   Q.   And how long did you have that position?

10  A.   Approximately three years.

11  Q.   And what is the -- just describe, generally, what those

12  duties entail.

13  A.   Responsible for the investigation of all serious

14  crimes, felonies, and certain misdemeanors.

15  Q.   Now, I want to direct your attention back to August of

16  2010, particularly August 14 of 2010, did you become part of

17  an investigation in an alleged assault upon an individual

18  named Nicole Brooks?

19  A.   A reported assault, yes.

20  Q.   Who was the initial responding officer?

21  A.   Trooper Samuel Thompson.

22  Q.   And did you -- as the lead investigator in the case,

23  were you made privy to and briefed by various law

24  enforcement personnel involved in the investigation?

25  A.   Yes.

1   Q.   Can you tell us where the location of the reported

2   assault was?

3   A.   It was approximately 9/10 of a mile north of the hamlet

4   of Wells, located Rt. 30 in Hamilton County, New York which

5   is in Central New York.  It's the foothills of the

6   Adirondack Mountains.

7   Q.   And is that a -- would you describe it as a rural area?

8   A.   A very rural area; yes, sir.

9   Q.   And, sir, I'm going to just direct your attention to

10  the screen and ask you to -- do you recognize what that is

11  depicted on the screen?

12  A.   May I get up, take a look?

13       MR. CACCAVIELLO:  With your permission?

14       THE WITNESS:  Your Honor?

15       THE COURT:  You may.

16       MR. FRANK:  Judge, if I may, I don't believe this is an

17  exhibit, if it is, could it be identified?

18       MR. CAPELESS:  Your Honor, this actually -- these were

19  previously admitted as exhibits, just not displayed to the

20  jury.

21       THE COURT:  Your objection is it is not an exhibit and

22  Mr. Caccaviello tells me it is; is that correct?

23       MR. CACCAVIELLO:  Yes, Your Honor.

24       THE COURT:  Do you have the exhibit number of the item

25  on the screen?

1          MR. CACCAVIELLO:  Yes, Your Honor.

2          THE COURT:  Objection is overruled.

3     Q.   (By Mr. Caccaviello) I'm going to direct your attention

4     to the screen and actually these are, for the record,

5     Exhibits 53, 56, 55, and 54.

6          So, now, directing your attention to the screen, can

7     you tell us what that is depicting?

8     A.   That is an area adjacent to the parking area where the

9     alleged or reported attempted abduction, attempted

10    murder/robbery occurred in Hamilton County, New York.

11    Q.   And showing you just again for the record, Exhibit

12    Number 53, is that the same image that's on the screen?

13    A.   It is.

14    Q.   Okay.

15         MR. CACCAVIELLO:  We can go to the next image.

16    Q.   (By Mr. Caccaviello) And, sir, showing you for the

17    record what's been marked as Number 56, is that the same

18    image that's on the screen?

19    A.   Yes, sir; it is.

20    Q.   And would you describe what we're looking at here?

21    A.   That is the parking area, picnic area in which the

22    alleged incident occurred.

23    Q.   Okay.

24         MR. CACCAVIELLO:  And if -- can you go to the next?

25    Q.   (By Mr. Caccaviello) Showing you, for the record, what

1  has been marked as Exhibit Number 54, is that the same image

2  that's on the screen?

3  A.   It is.

4  Q.   And what's the view here, and is there anything in

5  particular of interest in this photo?

6  A.   That is the tree stump, the remains of the tree that we

7  cut, the State Police cut in order to retrieve the area of

8  the tree that was struck by projectiles that was reported

9  fired from a gun.

10  Q.   And, in fact, had Nicole Brooks directed either your

11  attention or another member of the investigation's attention

12  to that tree trunk?

13  A.   Yes, she directed my attention as well as other members

14  of the investigative team.

15  Q.   And for the record, Exhibit Number 55, is that the same

16  image that is on the screen?

17  A.   It is.

18  Q.   And what are we looking at here?

19  A.   We're looking at the area that Nicole Brooks claimed to

20  have run past as she was escaping the alleged perpetrator or

21  her alleged reported abductor which is between the tree and

22  the picnic table.

23  Q.   Now, sir, you mentioned in the -- one of those images

24  that the tree trunk that Ms. Brooks had directed your

25  attention to, once that -- your attention was directed

1  there, did you secure -- have that part of the tree secured

2  in any way?

3  A.   Yes.

4  Q.   And how so?

5  A.   It was cut down, delivered to me at SP Fonda.

6  Ultimately I delivered it to our forensic investigation unit

7  actually on August 16.

8  Q.   Sir, I'm going to direct your attention to an item.  Do

9  you recognize what that is?

10  A.   I do.

11  Q.   And what is that?

12  A.   That is the area of the tree that was removed in order

13  to secure or attempt to secure the projectile that was

14  inside the tree.

15  Q.   And does that tree trunk actually have a defect in it

16  that caught your attention?

17  A.   Had a bullet hole in it.

18  Q.   Okay.

19       MR. CACCAVIELLO:  Commonwealth will ask that this be

20  marked as Exhibit No. 71.

21       THE COURT:  Any objection?

22       MR. FRANK:  I'm sorry.  No objection.

23       THE COURT:  Admitted.

24       (Exhibit No. 71, tree trunk, marked)

25       MR. FRANK:  Judge, may I reserve the right to examine

1    that later regarding the evidence tag?

2         THE COURT:  You can examine any admitted piece of

3    evidence at any time.

4         MR. FRANK:  And object if there's a portion of that --

5         THE COURT:  Your rights are preserved.

6    Q.   (By Mr. Caccaviello) Now, Investigator Byrd, did you

7    receive or review any information gathered by Trooper Sam

8    Thompson in this case?

9    A.   Yes.

10   Q.   In particular, was that -- was that a supporting

11   deposition?

12   A.   Yes, sir.

13   Q.   And of who?

14   A.   Of Nicole Brooks.

15   Q.   And as the lead investigator then, did you peruse it

16   and then make arrangements to meet with her?

17   A.   Once I reviewed the supporting deposition, I requested

18   that she be returned to the scene so I could interview her

19   myself.

20   Q.   And so did that meeting actually take place?

21   A.   Yeah, shortly after having read the supporting

22   deposition, and she did return to the scene so I could

23   interview her at the location of the reported incident.

24   Q.   And, actually, did she return alone or did she have

25   someone with her?

1  A.   She returned with a person she described as her aunt.

2  Q.   And once there, did she recount to you her allegations?

3  A.   She did.

4  Q.   Was it at that point that she directed your attention

5  to what had been marked the exhibit that is the tree trunk?

6  A.   Yes.

7  Q.   Now, did you also have any additional questions for

8  Ms. Brooks?

9  A.   I did.

10  Q.   And what were the -- I'm sorry.  Did you document those

11  in any particular way?

12  A.   I did in a Q and A form.  It was a supplemental form to

13  the original statement.

14  Q.   So that was -- you had the original supporting

15  deposition, correct?

16  A.   Yes.

17  Q.   So what -- do you, just mechanically then, what do you

18  do?

19  A.   You take a piece of paper and you say Q denotes

20  questions asked by Investigator Byrd of the New York State

21  Police; A denotes answers of Nicole Brooks; and then

22  document those questions and her answers.

23  Q.   Okay.  Showing you what's been previously marked as

24  Number 68, is this the document that you're referring to?

25  A.   Yes, both documents.

1          The original supporting deposition and then my

2    subsequent questions and answers.

3    Q.   Now, were you also, in the course of the investigation,

4    as the investigation was ongoing, receiving other

5    information from law enforcement personnel?

6    A.   Regarding?

7    Q.   In particular, Pittsfield Police.

8    A.   We notified Pittsfield Police at approximately 9:21 we

9    were looking for the suspect, at that time David Glasser.

10   We notified the Pittsfield Police and they advised us that

11   his vehicle --

12        MR. FRANK:  Objection.

13        THE COURT:  Basis of your objection.

14        MR. FRANK:  From here forward, they advised us,

15   hearsay.

16        THE COURT:  Are you offering this for its truth, Mr.

17   Caccaviello?

18        MR. CACCAVIELLO:  No, Your Honor.  This is to explain

19   the further actions of investigators.

20        THE COURT:  Objection is overruled.  You may answer.

21        THE WITNESS:  At approximately 9:20 that same evening,

22   I contacted the Pittsfield Police Department.  Inquired as

23   to whether or not the vehicle of the suspect returned to his

24   residence to 254 Linden Avenue.  I believe in the City of

25   Pittsfield.  It had not yet returned, and later at

1   approximately 11:00 p.m. I was advised that --

2       MR. FRANK:  Objection.

3       THE COURT:  Overruled.

4       THE WITNESS:  -- that the vehicle, the suspect vehicle

5   was at the residence of the suspect.

6   Q.   (By Mr. Caccaviello) Okay.  And by the way, again, you

7   may have said this, but the information you provided to the

8   to the Pittsfield Police, in terms of information that

9   Ms. Brooks gave you, was what, just a typed deposition?

10  A.   She provided very detailed description of the suspect

11  vehicle, the plate number of the suspect vehicle as well as

12  description of the rear driver side taillight, that it was

13  broken.  And based on that, we were able to identify the

14  suspect vehicle based on the license plate.

15  Q.   Now, when you were contacted by the Pittsfield Police

16  Department, that the suspect vehicle had been located, did

17  you make a request of them to do anything at that point?

18  A.   Yes.

19  Q.   And what was that?

20  A.   Periodically checked the residence to see if the

21  vehicle was still there and advise us if it had been moved

22  throughout the evening and early morning hours of the 16th

23  or the 15th, rather.

24  Q.   Directing your attention then to the next day in

25  August, did you make arrangements to go to Pittsfield?

1    A.   I did.

2    Q.   And, in particular, what was the purpose of going and

3    did you go with anyone?

4    A.   I traveled with my boss, Senior Investigator Carl

5    Meybaum to Pittsfield.  And en route to Pittsfield we were

6    notified that the vehicle, the suspect vehicle had been

7    moved.

8    Q.   And where -- and where did you actually end up when you

9    got to Pittsfield?

10   A.   The Pittsfield Police Department.

11   Q.   Now, once in Pittsfield then were you apprised of

12   whether or not Mr. Glasser's vehicle had been stopped

13   pursuant to investigation?

14   A.   En route to Pittsfield, we were advised that a traffic

15   stop had been conducted and Mr. Glasser's vehicle, that

16   Mr. Glasser was in custody as he had been in possession of a

17   handgun, and that they secured the Glasser vehicle pending

18   application for a search warrant to do a thorough search of

19   the Glasser vehicle.

20   Q.   And once you were notified Mr. Glasser was arrested,

21   then you ended up, you made your way to this police station,

22   correct?

23   A.   That's correct.

24   Q.   And once there, did you end up meeting Mr. Glasser?

25   A.   I did.

1   Q.   And at the station, did you have some business with

2   him?

3   A.   Yes.  I interviewed him.  I conducted an interview of

4   Mr. Glasser with, Senior Investigator Meybaum.

5   Q.   Now, prior to the interview, had he been apprised of

6   his Miranda rights?

7   A.   He had been verbally and in writing.

8   Q.   Overall, without telling me what he actually said, tell

9   the jury what was his demeanor.

10  A.   Very comfortable, very confident, relaxed.

11  Q.   How would you describe his level of being cooperative?

12  A.   He was very cooperative.

13  Q.   And did you actually, without telling me the results,

14  did you engage in any sort of photo arrays or business of

15  that sort with Mr. Glasser?

16  A.   Yes.

17  Q.   Okay.  And, again, was he cooperative in those efforts?

18  A.   Yes, he was cooperative throughout, answering all

19  questions directly and without hesitation.

20  Q.   Now, did you have occasion to see whether there was a

21  truck that Mr. Glasser was in?

22  A.   Yes, sir.

23  Q.   And was that -- was it in custody at the police

24  station?

25  A.   It was.

1   Q.    And did you happen to notice anything in terms of its

2   license plate number -- let me re-trace that.

3         Did you note the registration and license number of the

4   truck?

5   A.    I did.

6   Q.    Did how did it compare with the information you had

7   from Ms. Brooks?

8   A.    It was identical.

9   Q.    And were you aware of whether or not that truck was

10  processed by Pittsfield Police personnel?

11  A.    Yes, I watched them process the vehicle.

12  Q.    Did you see -- could you see whether or not anything

13  was actually taken from the truck?

14  A.    Yes.

15  Q.    And what did you see?

16  A.    Removed a purse, some receipts from the purse, and

17  other evidentiary items.

18  Q.    And that was actually conducted by -- did you know who

19  actually conducted it?

20  A.    I believe it was a CI Investigator King.

21  Q.    Was this Investigator William King?

22  A.    I don't recall his first name.

23  Q.    Now, did you have occasion to examine the gun?

24  A.    I did.

25  Q.    And was there anything of note in it?  Did you look

1    inside?

2    A.   It was a Sturm and Ruger .22 caliber revolver.

3    Q.   I will show you what has been previously marked as

4    Number 52, and does that appear to be the gun that you're

5    referring to?

6    A.   Yes.

7    Q.   And I'm going to show you what's been previously marked

8    as Number 42.  And does that appear to be the truck of Mr.

9    Glasser that you watched being processed at the police

10   station?

11   A.   It is the truck.

12   Q.   Now, from the police station, did you also -- did you

13   also go to an apartment in Pittsfield?

14   A.   I did.

15   Q.   And do you recall where that was?

16   A.   That was the residence of Mr. Glasser, which I believe

17   was 254 Linden Avenue or street in the City of Pittsfield,

18   Massachusetts.

19   Q.   And while there, was -- besides law enforcement

20   personnel, was there a civilian as well in the apartment?

21   A.   Yes, sir.

22   Q.   And who was that?

23   A.   Edward Frampton, Mr. Glasser's housemate.

24   Q.   And did you, again, observe anything recovered actually

25   from the apartment?

1  A.    Yes.

2  Q.    And what kind of things did you see recovered from the

3  apartment?

4  A.    Latex gloves which was the most significant -- from our

5  prospective, was the most significant find there as it was

6  reported that Mr. Glasser used latex gloves when he --

7  Q.    Was that information Ms. Brooks had provided to you?

8  A.    That's correct.

9  Q.    And just did you notice anything else, any paperwork?

10  A.    Yes, direction to Wells, New York, MapQuest directions

11  or computer-generated directions for travel from Pittsfield

12  to Wells, New York.

13  Q.    And, again, in terms of Pittsfield Police Department

14  personnel with the same investigator, also at this scene?

15  A.    Yes.

16  Q.    And collecting the evidence?

17  A.    Yes.

18  Q.    Now, sir, I'm going to direct your attention back to

19  the tree trunk that was marked, I believe it's 71.  Did you

20  have some forensic investigative work with respect to that

21  tree trunk?

22  A.    Yes.

23  Q.    And, in particular, what did you --

24  A.    Requested that there be an attempt to remove the

25  projectile from the tree trunk, an effort to match it to the

1  handgun that was recovered.

2  Q.   Okay.  And who does that for the New York State Police,

3  or who did that in this case?

4  A.   In this case it was Investigator now Senior

5  Investigator Drew McDonald.

6  Q.   And was he able to retrieve anything from that, what

7  you described as a bullet hole in Exhibit 71?

8  A.   Yes.

9  Q.   And showing you an item here, can you tell us, do you

10  recognize what that is?

11  A.   I don't.

12  Q.   Did you learn, during the course of this, about -- can

13  you tell us what is that item?

14  A.   A projectile from what appears to be a .22 caliber, a

15  small caliber bullet.

16  Q.   And did you learn through the investigation that was,

17  is it Investigator McDonald, took from Number 71?

18  A.   Yes, absolutely.

19  Q.   And did he do some further forensic testing with

20  respect to that?

21  A.   He did not, but there was an attempt to --

22  Q.   Let me rephrase that.

23       Was there some more forensics done with respect to that

24  bullet?

25  A.   Yes.

1    Q.    And would you describe what that is?

2    A.    Once he retrieved the projectile from the tree and then

3    that is forwarded to our crime lab in an attempt to match

4    this projectile to the weapon, that was recovered.

5    Q.    And so showing you what's been, again, marked as Number

6    52, that weapon, can you tell us what the results of the

7    efforts to match whether that bullet came from that gun?

8    A.    It was inconclusive.

9    Q.    In particular, what did the actual results say about

10   it?

11   A.    That the markings on the projectile could not be

12   definitively linked to that weapon.

13   Q.    And in terms of whether or not that gun had -- could

14   fire that projectile, what did it say?

15   A.    Yes, it could.

16   Q.    But that it could not definitively say that it came

17   from that gun?

18   A.    That's correct.

19        MR. CACCAVIELLO:  Commonwealth would ask that the

20   projectile be marked as Exhibit 72.

21        THE COURT:  Any objection?

22        MR. FRANK:  No objection.

23        THE COURT:  Admitted.

24        (Exhibit No. 72, projectile, marked)

25   Q.    (By Mr. Caccaviello) Now, was there also some testing

1    done by the New York State forensic testing authorities with

2    regard to a wallet and some receipts?

3    A.    Yes.

4    Q.    And, in particular, I'm going to show you what has been

5    marked as Number 60.  Is that the wallet that you recovered

6    in this part of the evidence in this case?

7    A.    Yes, the Pittsfield Police Department recovered this

8    from the Glasser vehicle.

9    Q.    And showing you another item, there was also some

10   receipts recovered from that wallet?

11   A.    Yes.

12   Q.    Okay.  Do those appear to be those receipts?

13   A.    The receipts that I'm viewing now are blank because the

14   chemical process used to test them actually removed the ink

15   from the original receipts, so these particular receipts

16   were photocopied and then tested.  So they don't appear to

17   be the same receipts, however, they are.

18   Q.    Okay.  In fact, do you know whether or not they were

19   memorialized by photograph?

20   A.    Yes.

21   Q.    And I will show you a photograph, and is that the

22   memorialization of those receipts?

23   A.    It is.

24   Q.    Okay.  So let me ask you, first of all, in terms of

25   processing of the physical items that you have with the

1   wallet and the receipt, was there some fingerprint testing
2   done by the New York Authorities?
3   A.   Yes.
4   Q.   And who is that done by?
5   A.   Our Forensic Investigation Unit.
6   Q.   And can you tell the results of that?
7   A.   It was negative.
8   Q.   And that there were no identifiable prints found?
9   A.   Correct, sir.
10  Q.   All right.  And in terms of these receipts that are now
11  blank because of that processing, what's in the
12  photograph -- well, let me ask, first of all, the
13  photograph -- well --
14       MR. CACCAVIELLO:  Can the receipts be marked, Your
15  Honor, as Exhibit No. 73?
16       THE COURT:  Any objection?
17       MR. FRANK:  No objection.
18       MR. CACCAVIELLO:  And the photo as 74?
19       MR. FRANK:  No objection.
20       THE COURT:  So ordered.
21       (Exhibit No. 73, receipts from wallet, marked)
22       (Exhibit No. 74, photograph of receipts, marked)
23  Q.   (By Mr. Caccaviello) Showing you what's been marked as
24  74, can you just tell the jury what it is that those
25  receipts had said?  What was printed on them?

1    A.    Three receipts, the most significant of the three being

2    a Price Chopper receipt, Pittsfield Store Number 140, dated

3    August 14, 2010, at 11:42 a.m.

4          There is a CVS pharmacy receipt, from August 6, and

5    then there is a Price Chopper receipt from Altamont Avenue

6    in the Town of Rotterdam, again August 5.  It's dated

7    August 5.

8    Q.    Now, sir, directing you to another topic on August 16,

9    2010, did you also meet with and work in conjunction with

10   Massachusetts law enforcement?

11   A.    Yes.

12   Q.    And had you been provided with some surveillance video

13   from Price Chopper in Pittsfield?

14   A.    Yes.

15   Q.    And that footage was from August 14 of 2010?

16   A.    Yes.

17   Q.    And had you been also provided some video footage from

18   Hess station in Perth, New York?

19   A.    I believe the video was retrieved from the Hess was

20   retrieved on the 16th.

21   Q.    Did you have occasion on the 16th to watch both of

22   these videos?

23   A.    I had the opportunity to, however, what I viewed were

24   stills.

25   Q.    And those are stills from those videos?

1    A.    Correct.

2    Q.    Was there anything in significance that you observed in

3    those videos -- in those stills I should say?

4    A.    Yes.

5    Q.    And what was that?

6    A.    In the case of the receipt, I was able to identify

7    Nicole Brooks as having made a purchase from the Price

8    Chopper on August 14 at 11:42 a.m., the same day that she

9    reports an attempted abduction, attempted murder/robbery in

10   Wells, New York, Hamilton County at approximately 3:30 in

11   the afternoon.

12        And the case of the Hess surveillance, there is a

13   meeting between herself and another subject, or at least she

14   is pictured with another subject in that Hess station in

15   Amsterdam, New York which is a city in between Pittsfield,

16   Massachusetts and Wells, New York.

17   Q.    And based upon your observations, did this cause the

18   investigation to take a turn?

19   A.    Yes.

20   Q.    In particular, in which direction was it headed now?

21   A.    It was becoming more apparent that the information

22   provided by Mr. Glasser and his initial interview was

23   becoming -- it was -- he was giving an honest representation

24   of what he believed happened, which was he framed for -- he

25   was framed for this attempted abduction/attempted murder.

1   Q.   In the Hess station stills with Ms. Brooks, who was the

2   other individual that you saw?

3   A.   Scott Langdon.

4   Q.   Now, I want to direct your attention to August 25.  Did

5   you hear from Nicole Brooks asking about the progress of the

6   investigation?

7   A.   Yes.

8   Q.   And at that point, did you convey some information to

9   her?

10  A.   Yes.

11  Q.   And, in particular, what did you convey to her and what

12  was your purpose?

13  A.   When I spoke to Nicole, the purpose of my conversation

14  with her was an attempt to get Mr. Langdon to make himself

15  available to law enforcement for an interview.  We attempted

16  to identify where he could be located to interview him in

17  regards to the case.  We couldn't find him.

18       So during that call, Ms. Brooks was trying to move the

19  process along, she wanted to know why Mr. Glasser was yet to

20  be charged with the incident in Wells.

21       During that conversation, I communicated to Nicole that

22  Mr. Glasser would never be charged until such time as we had

23  an opportunity to talk to Mr. Langdon, telling her he could

24  be a victim of a crime himself, or he could be involved in

25  the attempted robbery that took place or reportedly took

1    place up in Wells.

2         The only reason for that communication was to get

3    Mr. Langdon to get in touch with us.  We told her if we had

4    not heard from him then we would have to take a closer look

5    at the case, and maybe make a more thorough investigation as

6    to the facts of the reported crime.

7    Q.   So then next day did you hear from Mr. Scott Langdon?

8    A.   We did.

9    Q.   And did Mr. Langdon come to New York to provide a

10   statement?

11   A.   No.

12   Q.   How did that statement -- did he -- I'm sorry.

13        Did he give you a statement?

14   A.   He did.

15   Q.   And where did that take place?

16   A.   That took place in the Pittsfield Police Department.

17        THE COURT:  Mr. Caccaviello, would this be a convenient

18   time to break for the lunch recess?

19        MR. CACCAVIELLO:  Yes, Your Honor, I probably have

20   another five minutes, so it makes some sense.

21        THE COURT:  All right.  Ladies and gentlemen, we are

22   going to take the luncheon recess.

23        Please bear in mind my cautionary instructions.

24        During lunch, don't discuss the case among yourselves

25   or make any efforts to gather information related to the

1   case.

2       You are now excused.

3       We will see you at two o'clock.

4       (The jury exited at 12:59 p.m.)

5       THE COURT:  Mr. Byrd, you may step down.

6       We are in recess.

7       (The Court exited.)

8       (* * * * *)

9       (The Court entered at 1:58 p.m.)

10      (The defendant was present.)

11      THE COURT:  Counsel, are we ready to bring the jury

12  back in.

13      MR. CACCAVIELLO:  Yes, Your Honor.

14      THE COURT:  Bring Mr. Byrd back in, please.

15      (The jury entered at 2:03 p.m.)

16      THE COURT:  Mr. Caccaviello, when you are ready you may

17  resume your direct examination of Mr. Byrd.

18      MR. CACCAVIELLO:  Thank you, Your Honor.

19                  **(George Byrd, continued)**

20              **DIRECT EXAMINATION BY MR. CACCAVIELLO**

21  Q.  Good afternoon, again.

22      I will direct you again to conversation with Scott

23  Langdon and again orienting yourself, you had called -- I am

24  sorry, he had called in and ultimately made arrangements to

25  meet in Pittsfield to take a statement; is that right?

1    A.    Yes, sir.

2    Q.    And did he provide you with a written statement?

3    A.    He did.

4    Q.    And, in general, does he describe that New York trip?

5    A.    He does.

6    Q.    And does he indicate he never met Nicole Brooks in the

7    first statement?

8    A.    Yes.

9    Q.    Now, at this point, Investigator Byrd, can you tell the

10   jury what was the focus of this investigation?

11   A.    Initially the focus was to investigate the report of

12   Nicole Brooks.  When it became apparent there may be some

13   truth to Mr. Glasser's defense or his explanation of what

14   had occurred, then the focus became proving that there was a

15   conspiracy to frame Mr. Glasser and falsely report that he

16   attempted to abduct, murder, and rob Nicole Brooks.

17   Q.    So on August 27 of this investigation, did you again

18   meet with Ms. Brooks?

19   A.    I did.

20   Q.    And where did that encounter take place?

21   A.    That was at the State Police barracks in Fonda, New

22   York.

23   Q.    And at the barracks, did you show her some items?

24   A.    I did.

25   Q.    And what items did you show her?

1  A.   The purse, wanted her to identify the purse as her own.

2  Q.   And did she do that?

3  A.   She did.

4  Q.   And what about anything in terms of the statement that

5  she had earlier provided, the deposition and your original

6  question?

7  A.   Yes.  I wanted her to review the deposition that she

8  provided to make sure it was accurate, to make whatever

9  changes she would like to make.  In regard to her

10  deposition, if there was something inaccurate or false, she

11  had the opportunity to correct that.

12       There was a number -- two or three corrections she

13  made, all insignificant.

14  Q.   And did you also show her a picture of an individual?

15  A.   Yes.

16  Q.   Who did you show her?

17  A.   She was shown a picture of Scott Langdon.

18  Q.   And did she indicate to you whether or not she was

19  familiar with Scott Langdon?

20  A.   She said she had never saw Scott Langdon, never met

21  him.  Didn't know him.

22  Q.   Now, at that point, Investigator, was she confronted

23  with the results of your now refocused investigation?

24  A.   Yes.

25  Q.   And was she provided Miranda warnings?

1   A.   She was.

2   Q.   And at that point did she provide an interview?

3   A.   Yes, she did.

4   Q.   And, ultimately, was she charged within the State of

5   New York with a series of offenses?

6   A.   She was.

7   Q.   What were the offenses?

8   A.   Falsifying business records, first degree felony, and

9   falsely reporting an incident, third degree.

10      MR. CACCAVIELLO:  May I have a moment, Judge?

11      THE COURT:  You may.

12      (Off the record discussion amongst The Commonwealth.)

13      MR. CACCAVIELLO:  No further questions.

14      THE COURT:  Mr. Frank, you may cross examine.

15      MR. FRANK:  Thank you.

16              **CROSS EXAMINATION BY MR. FRANK**

17   Q.   Trooper, I'm Attorney Don Frank.  I represent

18   Mr. Chalue.

19      It is Trooper, correct?

20   A.   Yeah.

21   Q.   Trooper or investigator?

22   A.   My current ranker is investigator, but we're all

23   troopers.

24   Q.   Okay.  Investigator, you found some latex gloves at

25   Mr. Glasser's property, correct?

1    A.    I didn't find them, but yes, I saw them being

2    recovered.

3    Q.    Okay.  And it's not necessarily unusual to find latex

4    gloves in a residence; is that right?

5    A.    Not at all.

6    Q.    And in regard to the tactics involving getting

7    Ms. Brooks and others to give you a -- to tell you something

8    or to give you a different story, it's -- one of the tactics

9    is to advise them that if District Attorney and the

10   prosecutors will look kindly on their cooperation; is that

11   fair to say?

12        MR. CACCAVIELLO:  Objection Your, Honor.

13        THE COURT:  Overruled.  You may answer.

14        THE WITNESS:  I would say that there would be some

15   consideration for the cooperation.

16   Q.    (By Mr. Frank) Okay.  And, in fact, what you told at

17   least Ms. Brooks is the criminal justice system can be very

18   forgiving.

19        Do you recall telling her that?

20   A.    Yes, I did.

21   Q.    And you told her that if she cooperated, the likelihood

22   that whatever would happen to her in New York would run

23   concurrent, which means that it happens at the same time;

24   you did tell her that as well, correct?

25   A.    I think that is partially what was said in the

1   conversation with Ms. Brooks.  Ultimately, I believe, that I
2   concluded that with any decision regarding what would happen
3   to her would be made by the District Attorney in that
4   county.
5   Q.   Okay.
6   A.   Which makes all decisions, ultimately, as it deals with
7   defendants.
8   Q.   All right.  And it's your understanding that's true for
9   Massachusetts District Attorney's as well, correct?
10  A.   I don't know how Massachusetts criminal justice system
11  works.
12  Q.   Well, you did tell -- there are charges in New York and
13  there are charges in Massachusetts that you were considering
14  filing against Ms. Brooks at the time you talked to her; is
15  that correct?
16  A.   I could not bring any charges against Ms. Brooks in
17  Massachusetts.
18  Q.   But you were in touch with detectives -- Trooper Foley,
19  correct?
20  A.   That would be Lieutenant Foley, yes.
21  Q.   Excuse me, Lieutenant Foley.
22       And, in fact, he was present with at least one of the
23  interviews with Ms. Brooks, correct?
24  A.   He was.
25  Q.   And at the one that he was -- and he was there because

1  he was interested in investigating charges against Nicole
2  Brooks and Adam Hall, correct?
3  A.   Correct.
4  Q.   Okay.  And you understand that there are charges
5  ultimately filed against Ms. Brooks in New York, correct?
6  A.   Yes, I brought those charges.
7  Q.   And you understood that Lieutenant Foley was
8  considering bringing charges against Ms. Brooks in
9  Massachusetts, correct?
10  A.   Correct.
11  Q.   And you told Miss Brooks that they say that they can
12  keep you in New York initially and your cooperation from
13  that point on is going to set the tone for what happens
14  after tonight.  Do you recall telling her that?
15  A.   I don't recall telling her that, but that would be a
16  likelihood that yes, I would have.
17  Q.   Okay. All right.  And, basically, what you're saying,
18  it's likely you would have told her if she cooperates it
19  sets the tone for what happens to her later in both New York
20  and in Massachusetts?
21  A.   I'm not necessarily -- I mean, in this instance, the
22  Hamilton County Jail in Upstate New York is not the worse
23  place to be.  It's literally jail space for two or three
24  prisoners, sometimes there's only one inmate in the Hamilton
25  County Jail.  Her being a female, she might be transferred

1   down to Fulton County Jail, which again, is an upstate
2   prison.  It's not the worse prison to be in or the worst
3   jail to be in, and so there would be some question as to
4   whether or not she could stay in New York pending charges
5   being placed against her in Massachusetts or there's --
6   there was a number of options available to the District
7   Attorneys' Offices in both New York and Massachusetts.  So,
8   it would -- could be some consideration based on her
9   cooperation.
10  Q.   Okay.  So thank you.
11       One of the considerations, when you make that
12  statement, is to let her know if she cooperates there could
13  be some quote/unquote consideration offered by the District
14  Attorney?
15  A.   That's correct.
16  Q.   And that's true both of a District Attorney in Hamilton
17  County, New York and Berkshire County, New York -- excuse me
18  Massachusetts, correct?
19  A.   I don't know.  Again, Massachusetts I'm unfamiliar
20  with.  Okay, and how it works.
21       MR. FRANK:  Thank you.
22       THE COURT:  Redirect examination?
23       MR. CACCAVIELLO:  Just for clarification.
24            **REDIRECT EXAMINATION BY MR. CACCAVIELLO**
25  Q.   So you made her no specific promises?

1  A.   No, there were no promises made to Nicole Brooks for

2  her cooperation.

3       THE COURT:  Recross examination based on those

4  questions?

5       MR. FRANK:  No.

6       THE COURT:  Mr. Byrd, you are excused.

7       You may step down.

8       Thank you.

9       You may call your next witness.

10      MR. CACCAVIELLO:  Commonwealth will call Gary Herland.

11      (Gary Herland, sworn)

12      THE COURT:  Mr. Herland, good afternoon.

13      THE WITNESS:  Good afternoon, sir.

14      THE COURT:  If I could remind you to keep your voice up

15  and answer only the question put to you, sir, please.

16      THE WITNESS:  Yes.

17                    **(Gary Herland)**

18           **DIRECT EXAMINATION BY MR. CACCAVIELLO**

19  Q.   Would you start by introducing yourself to the jury?

20  A.   Gary Herland, Pittsfield Police Officer.

21  Q.   How long have you been employed by the Pittsfield

22  Police Department?

23  A.   Eighteen years.

24  Q.   And which department or division are you assigned to?

25  A.   Patrol.

1  Q.   And have you been in patrol for the tenure of your

2  career?

3  A.   Yes, sir.

4  Q.   Now, I want to direct your attention back to August 15,

5  2010.  Did you happen to be working that day?

6  A.   I was.

7  Q.   And what shift did you have?

8  A.   That would be the day shift.

9  Q.   Day shift runs from what to what?

10 A.   Eight o'clock in the morning to 4:30 in the afternoon.

11 Q.   To report for that shift, are you in full dress

12 uniform?

13 A.   Yes.

14 Q.   Do you have equipment such as a gun belt and other

15 equipment associated with law enforcement?

16 A.   Yes, sir.

17 Q.   And are you assigned to a marked patrol cruiser?

18 A.   I am, sir.

19 Q.   Around 10:30 in the morning on that shift, did you

20 respond to the location of Pittsfield?

21 A.   I did.

22 Q.   And what was the purpose of your response?

23 A.   I was -- responded to area of Linden Street and Center

24 Street to assist Lieutenant Bradford in a motor vehicle

25 stop.

1  Q.    And beside yourself, did other officers respond as

2  well?

3  A.    Yes, sir.

4  Q.    And how -- approximately, how many, if you recall?

5  A.    I believe there was two other units.

6  Q.    And upon arrival, did you see, at that location,

7  besides law enforcement personnel, did you see someone else?

8  A.    There was a vehicle that Lieutenant Bradford stopped

9  with an occupant.

10  Q.    And what kind of vehicle was that?

11  A.    It was a black Dodge pickup truck.

12  Q.    And was there an occupant in the vehicle?

13  A.    There was.

14  Q.    And did you recognize who that was?

15  A.    I did.

16  Q.    And who was that?

17  A.    That was David Glasser.

18  Q.    And at the scene, was there any interaction with

19  Mr. Glasser?

20  A.    Mr. Glasser was removed from the vehicle, he was pat

21  frisked and handcuffed.

22  Q.    And at this juncture can you describe for the jury what

23  his demeanor was?

24  A.    He was cooperative with the process.

25  Q.    And did officers have weapons drawn?

1   A.   In that situation we would of either been ready with

2   our firearms or had them out.   I can't recall which we did

3   at that point.   We were in a thick heavy area.

4   Q.   You say, you've testified "in that situation".   What

5   was the situation as you understood it when you responded

6   there?

7   A.   We were briefed during roll call that day to Be On the

8   Look Out for this vehicle and the operator based on an

9   incident that happened in New York the day before where a

10  firearm was used.

11  Q.   And when Mr. Glasser was pat frisked and handcuffed,

12  was he taken away from the immediate area?

13  A.   He was moved back away from his truck, yes.

14  Q.   And with respect to the truck, did you have some

15  responsibility or were you assigned to a particular task?

16  A.   I did.

17  Q.   And what was that?

18  A.   Myself and Officer Wendling began a protective sweep of

19  the cab of the truck.

20  Q.   And during the course of that protective sweep, did you

21  come across anything?

22  A.   I did.

23  Q.   And first of all, where did you come across an item?

24  A.   Behind the driver's seat, located directly behind it.

25  Q.   Okay.   And what -- and, actually, what did you come

1  across?

2  A.    I found a black revolver that was in a light-colored

3  plastic bag with a T-shirt.

4  Q.    Showing you first, previously marked as Number 52, do

5  you recognize that to be the item that just described?

6  A.    Yes.

7  Q.    And was located behind the seat?

8  A.    Yes, it was.

9  Q.    And you described it was -- it didn't -- it didn't

10 appear to you as it appears today, correct?

11 A.    That's correct.

12 Q.    What was it contained in?

13 A.    It was inside of a light-colored plastic bag and inside

14 that bag was then wrapped in a white shirt.

15 Q.    First, let me show you an item, ask you to just take a

16 look at that for a moment and is that -- do you recognize

17 what that appears to be?

18 A.    That was the shirt that was wrapped around the plastic

19 bag.

20 Q.    I'm sorry.  Was that wrapped around the gun?

21 A.    No, the gun was inside of the plastic bag and this was

22 wrapped outside of the -- so the bag was wrapped inside of

23 the shirt.

24 Q.    Okay.

25        MR. CAPELESS:  Commonwealth would ask that the shirt be

1    marked as Exhibit No. 75.

2        MR. FRANK:  No objection.

3        THE COURT:  Admitted.

4        (Exhibit No. 75, white shirt, marked)

5    Q.   (By Mr. Caccaviello) And showing you this item, do you

6    recognize what that appears to be?

7    A.   That appears to be the bag that the gun was in, yes.

8        MR. CACCAVIELLO:  Commonwealth would ask that this be

9    marked as Exhibit 76.

10       MR. FRANK:  No objection.

11       THE COURT:  Admitted.

12       (Exhibit No. 76, plastic bag, marked)

13   Q.   (By Mr. Caccaviello) I'm going to place a photo in

14   front of you and ask you, do you recognize what that appears

15   to depict?

16   A.   It appears to be the area this was behind the driver's

17   seat in Mr. Glasser's truck.

18   Q.   Is that the area in which was previously been --

19   described as the gun, that's where that was located?

20   A.   Yes, sir.

21       MR. CACCAVIELLO:  Commonwealth will ask this be marked

22   as 77.

23       MR. FRANK:  No objection.

24       THE COURT:  Admitted.

25       (Exhibit No. 77, photograph, marked)

1      MR. CACCAVIELLO:  If I could have one moment, Judge?

2      THE COURT:  You may.

3      (Pause)

4  Q.  (By Mr. Caccaviello) Now, sir, after you recovered the

5  firearm from the back of that truck, what did you do?

6  A.  I advised Lieutenant Bradford of my findings and I

7  believe Captain Barry was then called to the scene.

8  Q.  And did you, yourself, do any further examination of

9  that firearm?

10  A.  I did.

11  Q.  And what did you do?

12  A.  I just needed to verify that it was an actual real gun,

13  which I did.

14  Q.  How did you do that?

15  A.  Just by removing the bag out, out of the bag a little

16  bit and just looking at it making sure that it was a real

17  gun.

18  Q.  And did you replace the bag, did you replace firearm?

19  A.  I did.

20  Q.  Also, did you, you know, were you aware whether or not

21  a check was done whether or not Mr. Glasser had proper

22  licensing?

23  A.  A check was done, yes.

24  Q.  And you determine he did not have a proper license?

25  A.  He did not have a license, correct.

1    Q.    Now, what -- was he arrested at the scene?

2    A.    He was.

3    Q.    With respect to the truck itself, what happened to the

4    truck?

5    A.    The truck was towed to the police station.

6    Q.    And at the station was a -- do you know whether or not

7    further inventory search was done of that truck?

8    A.    I believe a further search was done, yes.

9    Q.    And beyond what you already described as the gun and

10   the shirt and the bag, was there anything else of

11   significance, evidentiary wise, that was recovered at least

12   from your point of view?

13   A.    No, sir.

14         (Off the record discussion amongst The Commonwealth.)

15   Q.    (By Mr. Caccaviello) A couple further questions,

16   Officer Herland.

17         During this entire encounter with the law enforcement,

18   at the scene, Mr. Glasser's demeanor you described as being

19   cooperative; is that correct?

20   A.    Yes, sir.

21   Q.    How -- would you have any other description of how he

22   appeared when interacting with law enforcement?

23   A.    He appeared confused as to why we were dealing with him

24   and the reason for the stop.

25         MR. CACCAVIELLO:  No further questions.

1      THE COURT:  Mr. Frank, you may cross examine.

2      MR. FRANK:  No questions.

3      THE COURT:  You're excused, Officer, thank you.

4      THE WITNESS:  Thank you.

5      (The witness stepped down.)

6      THE COURT:  You may call your next witness.

7      MR. CACCAVIELLO:  Commonwealth will call William King.

8      (William King, sworn)

9      THE COURT:  Officer, good afternoon.

10     THE WITNESS:  Good afternoon, Your Honor.

11     THE COURT:  If I could remind you to keep your voice up

12  and answer only the question put to you, please.

13     THE WITNESS:  Yes.

14     THE COURT:  You may proceed, Mr. Caccaviello.

15     MR. CAPELESS:  Thank you, Your Honor.

16                        **(William King)**

17            **DIRECT EXAMINATION BY MR. CACCAVIELLO**

18  Q.   Sir, will you start by introducing yourself to the

19  jury?

20  A.   Investigator William King, Pittsfield Police.

21  Q.   And how long have you been with the Pittsfield Police

22  Department?

23  A.   Approaching 14 years.

24  Q.   And your current assignment is what?

25  A.   Crime Scene Investigator.

1   Q.    How long have you held that position?

2   A.    Almost six years.

3   Q.    What does a Crime Scene Investigator do?

4   A.    Well, primarily I'm trained in fingerprint recovery

5   techniques, fingerprint comparison, crime scene photography,

6   crime scene management, evidence collection, DNA collection.

7   Q.    I want to direct your attention back to August 15,

8   2010.  Were you scheduled to work that day?

9   A.    I was the on-call Crime Scene Investigator covering

10  that weekend.

11  Q.    And around 3 o'clock that afternoon, were you called in

12  to work?

13  A.    Yes, I was.

14  Q.    And were you apprised of the reason you were called in

15  to work?

16  A.    Yes, I was.

17  Q.    And, in general, what was the reason you were called

18  in?

19  A.    Captain Barry called me in to work to assist New York

20  State Police with an ongoing investigation and possibly a

21  search of a motor vehicle that we had secured in our garage.

22  Q.    And were you apprised of any of the basis of the

23  investigation?

24  A.    Yes.

25  Q.    And in general terms, what was your understanding?

1    A.    It was an investigation took place previous night in

2    Wells, New York involving a pickup truck that was later

3    located in Pittsfield Sunday morning.

4    Q.    Now, did you, as part of when you came in, part of your

5    work, did you have occasion to see a truck that was seized

6    pursuant to the investigation?

7    A.    Yes, I did.

8    Q.    And what kind of truck was it?

9    A.    It was a 2002, it was a black Dodge Ram pickup truck.

10   Q.    And did you learn whose truck that was?

11   A.    Yes.

12   Q.    Whose truck was that.

13   A.    It was -- it belonged to David Glasser.

14   Q.    I'm going to show you what has previously been marked

15   as Exhibit Number 42.

16   A.    That's correct.  That's the truck.

17   Q.    That's the truck you are referring to?

18   A.    Yes, it is.

19   Q.    And did you begin to process that truck?

20   A.    Yes.  I photographed the exterior and interior and I

21   conducted a search of the interior.

22   Q.    And during the course of that search, had you, prior to

23   making the search, actually been made privy to whether or

24   not there was an item in there of any note?

25   A.    Previously, yes.  It was recovered earlier.

1   Q.    And that was what?

2   A.    That was a Ruger .22 caliber revolver.

3   Q.    And so, in the course of your search, did you recover

4   that item from the truck?

5   A.    That item had already been recovered.

6   Q.    And provided to you in your capacity as the evidence

7   officer?

8   A.    Yes, it was.

9   Q.    And that item, does that appear to be what has already

10  been marked as Number 52?

11  A.    That would be the Ruger revolver, yes.

12  Q.    And was it also accompanied by a white shirt as well as

13  a plastic bag?

14  A.    The plastic bag was with the revolver and the white

15  shirt was still in the pickup truck.

16  Q.    And showing you what's been marked as 75, does this

17  appear to be the shirt that you were just referring to?

18  A.    Yes, it is.

19  Q.    Showing you what's marked as 76, does this appear to be

20  the bag that you're referring to?

21  A.    Yes.

22  Q.    Now, focusing your attention on what's been marked as

23  Number 52, the firearm, did you have occasion to further

24  examine its interior?

25  A.    I photographed the firearm.

1    Q.   And what did you notice about whether or not it was

2    loaded?

3    A.   It was loaded.

4    Q.   And did you, can you tell the jury how many bullets

5    were in it?

6    A.   Well, there are four shell casings in the cylinder that

7    were spent.  They were fired already and there were two live

8    rounds in the cylinder.

9    Q.   And did you memorialize that in -- by paragraph?

10   A.   Yes, I did.

11   Q.   And I'm going to show you what's a photograph.  And can

12   you tell the jurors what that is?

13   A.   That's the photograph of the cylinder that's been

14   removed from the revolver, and it shows four rounds that had

15   been fired, two live rounds.

16        MR. CACCAVIELLO:  Commonwealth will ask that be marked

17   as 78?

18        MR. FRANK:  No objection.

19        THE COURT:  Admitted.

20        (Exhibit No. 78, photograph, marked)

21   Q.   (By Mr. Capeless) And, sir, I direct your attention to

22   the screen.

23   A.   Okay.

24   Q.   And is that what -- is that Exhibit No. 78 that you

25   just referred to?

1    A.    Yes, it is.

2    Q.    And can you tell the jury -- you can use this pointer.

3    A.    Sure.

4    Q.    How are you able to determine what's a live round and

5    what is a spent round?

6    A.    Okay.  If you look at 12 o'clock here, you see a firing

7    pin mark, a little indentation at the top of the round right

8    there.  That indicates it's been fired.  You have one here,

9    here, and here.  And these two rounds are live, they haven't

10   been fired yet.

11        MR. CACCAVIELLO:  You can take that down.

12   Q.    (By Mr. Caccaviello) Now, sir, did you also have some

13   duties in regard to evidence collection from Mr. Glasser's

14   residence?

15   A.    Yes.

16   Q.    And did you go there yourself or with other law

17   enforcement?

18   A.    No, I went with Captain Barry, Pittsfield Police

19   Detective Koenig Pittsfield Police, and Trooper Byrd, and

20   Trooper Meybaum from the New York State Police.

21   Q.    And at that residence, besides the law enforcement, as

22   you've just described, was there a civilian on site?

23   A.    Yes.

24   Q.    And who was that?

25   A.    Ed Frampton.

1    Q.    And did you undertake a search of that apartment?

2    A.    Yes.

3    Q.    And part of the items recovered, did you find some

4    directions?

5    A.    Yes, we did.

6    Q.    And showing you that item, can you describe for the

7    jury what it is that you --

8    A.    Yes.  He had written directions to Wells, New York.

9          It's going to be this folder right here.  (Indicating)

10   Q.    And is there another item there as well?

11   A.    Yeah.

12   Q.    An envelope?

13   A.    Yes.  These two MapQuest directions; is that what

14   you're referring to?

15   Q.    Yes.

16   A.    They were actually recovered from the pickup truck.

17         MR. CACCAVIELLO:  Commonwealth will ask that those be

18   marked as 79.

19         THE COURT:  Any objection?

20         MR. FRANK:  No objection.

21         THE COURT:  Admitted.

22         (Exhibit No. 79, MapQuest/documents recovered from

23   pickup truck, marked)

24   Q.    (By Mr. Caccaviello) Now, just referring back to the

25   truck search again, just to finish that chart up, do you,

1  besides the gun, recover some other items?

2  A.   Yes.

3  Q.   And what were they?

4  A.   The white T-shirt was collected from the behind the

5  storage area behind the driver seat, a black woman's wallet

6  was collected from the storage area behind the driver's

7  seat.  It was actually wrapped in the white T-shirt.  Two

8  cell phones were recovered from the driver seat and center

9  console.  MapQuest direction from Pittsfield, Mass. to

10 Wells, New York was recovered from the front passenger

11 floor.  Another set of MapQuest directions from Wells, New

12 York to Pittsfield was collected underneath the center

13 console arm rest.

14 Q.   Was there also contained in the wallet some receipts?

15 A.   Yes.

16 Q.   I'm sorry, what were they?

17 A.   Yes, three receipts.

18 Q.   And were those items ultimately turned over to, as well

19 as the firearm, and the shirt in the bag, and turned over to

20 New York, the authorities, to process?

21 A.   That's correct.

22     MR. CACCAVIELLO:  Could I have one moment, Judge?

23     (Pause)

24     (Off the record discussion amongst The Commonwealth.)

25     MR. CACCAVIELLO:  I have nothing else.

1        THE COURT:  Mr. Frank, you may cross examine.

2        MR. FRANK:  Nothing.

3        THE COURT:  All right.  Mr. King, you are excused.

4     Thank you.

5        THE WITNESS:  Thank you, Your Honor.

6        (The witness stepped down.)

7        THE COURT:  You may call your next witness.

8        MR. CAPELESS:  Commonwealth calls to the stand David

9     Foley.

10       MR. FRANK:  Judge, perhaps we could remove the exhibit.

11       THE COURT:  Yes.

12       (David Foley, sworn)

13       THE COURT:  Mr. Foley, good afternoon.

14       THE WITNESS:  Good afternoon.

15       THE COURT:  You have been in the courtroom to hear my

16    instructions to other witnesses, have you not?

17       THE WITNESS:  Yes, I have.

18       THE COURT:  Please bear my instructions in mind.

19    You may proceed.

20       MR. BARRY:  Thank you, Your Honor.

21                        **(David Brian Foley)**

22                **DIRECT EXAMINATION BY MR. BARRY**

23    Q.   First of all, please tell the jury your name.

24    A.   It's Lieutenant David Brian Foley.

25    Q.   And you're a lieutenant with what force?

1   A.    The Massachusetts State Police.

2   Q.    How long have you been with the Massachusetts State

3   Police?

4   A.    Twenty-nine years this July.

5   Q.    What's your current assignment for the Mass. State

6   Police?

7   A.    I'm assigned to Berkshire Detective Unit, which is

8   attached to Berkshire County District Attorney's Office.

9   Q.    How long have you been at the detective unit?

10   A.    About 26 years.

11   Q.    In terms of this case, were you involved both in the

12   investigation of Adam Hall for the July 2009 case involving

13   David Glasser, the taking of his pickup truck; and the 2010

14   case for the alleged frame in New York?

15   A.    Yes.

16   Q.    And were you the lead investigator in both the 2009

17   case and the 2010 case?

18   A.    Yes.

19   Q.    First, what I want to do is ask about the July 2009

20   case and then we will move on to the 2010 case.

21         In July 23, 2009 were you present for the interview

22   that the State Police had with Dave David Glasser?

23   A.    I was in the office, yes.

24   Q.    And do you know if, during that interview, Mr. Glasser

25   received a phone call?

1    A.   Yes.

2    Q.   And while at the interview, did you get a chance to see

3    Mr. Glasser?

4    A.   Yes, I did.

5    Q.   And did he -- did you get a chance to see certain parts

6    of his body at some point during the interview?

7    A.   Yes, sir.

8    Q.   I'm going to show you what's been marked Exhibit 44

9    through 47.

10        In terms of Exhibit 44, 45, 46 and 47, do you recognize

11   what's depicted in those photographs?

12   A.   Yes, sir.

13   Q.   And what was that, what are those depictions of?

14   A.   They were the injuries that David Glasser showed us on

15   his elbow, on the upper portion of his lower right leg and

16   ankle.

17   Q.   Did they appear to be fresh injuries?

18   A.   There was bruising and some swelling.

19   Q.   After hearing from Mr. Glasser and after the phone

20   call, what if anything, did State Police do when the

21   interview was completed?

22   A.   Well, a little bit later that evening Adam Hall was

23   arrested.

24   Q.   So did you go out looking for Mr. Hall?

25   A.   I sent people out to do that, yes.

1   Q.   And when he was arrested, what happened to the car that

2   he was in?

3   A.   His car was secured and then we applied for a search

4   warrant.

5   Q.   Okay.  In addition to search warrant for his car, did

6   the police apply for a search warrant for anything else?

7   A.   Yes.

8   Q.   What would that be?

9   A.   It would be 40 East Main Road in Peru, his residence.

10  Q.   In terms of 40 East Main Road in Peru, showing you

11  what's been marked as Exhibit 40, could you just describe

12  what kind of property this is?

13  A.   It's a very rural area in Peru.

14  Q.   When the police applied for and received a search

15  warrant for that residence, was there one specific item the

16  police were looking for?

17  A.   Mr. Glasser's pickup truck.

18  Q.   And did the police find the pickup truck on July 23?

19  A.   No.

20  Q.   And going forward just a couple days to August 1, 2009,

21  did the police find anything on this day?

22  A.   Yes.

23  Q.   And what would that be?

24  A.   Mr. Glasser's truck.

25  Q.   And where did the police find Mr. Glasser's pickup

1   truck?

2   A.    It was at a local taxi company in the parking lot.

3   Q.    Police have any idea how the pickup truck arrived

4   there?

5   A.    No.

6   Q.    Now, I want to bring your attention to a year later to

7   August of 2010.

8         To your knowledge, is Mr. Hall's case with Mr. Glasser

9   as a victim, in terms of the pickup truck still pending.

10  A.    Yes, it was.

11  Q.    And in which court was that case pending?

12  A.    Berkshire Superior Court.

13  Q.    And, to your knowledge, was that case getting close to

14  be called for trial?

15  A.    It was on the Fall list, so it was on, like, the

16  September trial list.

17  Q.    On August 14, 2010, right before that September trial

18  list, did you receive some information about David Glasser

19  and something occurring in New York?

20  A.    I believe I first heard about it on the 15th.

21  Q.    Okay.  And what did you hear?

22  A.    That Mr. Glasser was involved in an attempted

23  abduction/robbery and potential murder of a female out in

24  the Adirondacks in New York.

25  Q.    And did you find out the police found -- did you find

1    out if Mr. Glasser was arrested?

2    A.    Yes.

3    Q.    And did the police find anything in his pickup truck

4    when he was arrested?

5    A.    Yes, a handgun and a woman's purse or wallet.

6    Q.    After you found this information out, did you get a

7    chance to either speak to or look at some New York State

8    Police reports?

9    A.    I did both.

10   Q.    And after doing that, did you find out if there was

11   anything that caught the police's attention in terms of what

12   was found specifically in terms of the wallet that was found

13   in Mr. Glasser's truck?

14   A.    Yes, sir.

15   Q.    And what would that be?

16   A.    Specifically, what was --

17   Q.    What caught the police's attention, yes.

18   A.    My attention was a receipt for the Price Chopper in

19   Pittsfield.

20   Q.    All right.  I'm going to show you what's been marked as

21   Exhibit 74.  And I'm going to put an image --

22         Is this the exhibit in front of you -- is the exhibit

23   in front of you and the item and the image on the screen the

24   same thing?

25   A.    Yes, it is.

1   Q.   Now, sir, there's a pointer in front of you.  Was there
2   a particular receipt that caught your attention?
3   A.   This one over here on the left-hand side which is the
4   Price Chopper receipt -- excuse me -- for the Pittsfield
5   store on the date in question, which is 8/14/2010 and then I
6   think it was 11:42 a.m. down here where the purchase was.
7   Q.   And why did that catch your attention?
8   A.   Well, the alleged crime was supposedly a -- for lack of
9   a better term, a stranger danger involving Nicole Brooks.
10  Some guy tried to abduct her, so why would Ms. Brooks be in
11  Pittsfield on the same date in question of David Glasser
12  attempting to abduct her.  Of course, David Glasser being a
13  witness in my trial that we have.
14  Q.   So did the police do any further investigation of the
15  Price Chopper receipt?
16  A.   Yes.
17  Q.   And can you explain to the jury what that was?
18  A.   Price Chopper also has security video, and there's
19  security video for that transaction was able to show a woman
20  making a transaction, turns out to be Nicole Brooks.  So we
21  sent a still shot of the woman to the investigators in New
22  York, Investigator Byrd and Meybaum and say, Is this the
23  woman; they said yes.
24  Q.   And what did police do next in terms of the
25  investigation?

1    A.   Well, we really wanted to check into this Nicole Brooks

2    to see if there was any connection with her and Mr. Adam

3    Hall.

4    Q.   And how did you do that?

5    A.   One way we did it was on social media, so like Myspace.

6    Back then it was still being used.

7    Q.   Okay.  And did you find out if they were friends?

8    A.   Yes, there was a Nicole NB -- Nicole on his Myspace.

9    And Nicole's page she referenced a deceased brother.

10        We then did a new search of the area and saw that there

11   was a boy by the name of Donald, the Third, that died in an

12   accident.  And he left behind, you know, named family

13   members.  And one of those family members being Nicole

14   Brooks.

15   Q.   So you found a connection between Mr. Hall and

16   Miss Brooks through that?

17   A.   Yes.

18   Q.   And did you, as a result of that, did you subpoena

19   anything?

20   A.   Well, I didn't.  I requested the DA's Office to

21   subpoena telephone records.  Of course, by this time we knew

22   from Mr. Glasser he was with Scott Langdon, so we went --

23   Mr. Langdon and Ms. Brooks, Adam Hall, Alex Ely.

24   Q.   I'm going to show you what's been marked as -- I'm

25   going to show you several phone records.

1       First, I want to show you Exhibit 69, which has been
2  identified as Mr. Langdon's cell phone records.  Did you get
3  a chance to analyze that?
4  A.   Yes, we did.
5  Q.   All right.  I will show you what has been marked as
6  Exhibit 36.  It's been identified as Ms. Brooks' cell phone
7  records.  Did you get a chance to review that in your
8  investigation?
9  A.   Yes, we did.
10  Q.   And I will show you what's been marked as Exhibit 34.
11  What has been identified as Ms. Alexandra Ely's phone
12  records.  Did you get a chance to analyze that at some point
13  in your investigation?
14  A.   Yes, we did.
15  Q.   And lastly, I'm going to show you what's been
16  identified as Exhibit 29.  What has been identified as
17  Mr. Hall's cell phone records.  Did you get a chance to look
18  and review that at some point in your investigation?
19  A.   Yes, we did.
20  Q.   In terms of -- first of all, Mr. Langdon's cell phone
21  records of 281-4464, did you, at some point, make a chart
22  about those cell phone records?
23  A.   Yes, sir.
24  Q.   Okay.  And how did you create such a chart?
25  A.   The telephone records don't come in paper form.  They

1  come in on a disk, so they're electronic.  So all I did was

2  open those up, and it's like an Excel spreadsheet.  And then

3  I open up a Microsoft Word document and all you do is copy

4  those, bring them over to the Word document, create a table.

5  I just added one additional column.

6  Q.   And beside that one additional column, did you make any

7  other alterations to the phone records?

8  A.   No.

9  Q.   And what was that one additional column that you made?

10  A.   One additional column, I put the name of the person.

11  So if I had Scott Langdon's telephone calls, the person that

12  was having contact with Scott Langdon's phone, I put that

13  name in red in the column.

14  Q.   Okay.  I'm going to show you a three-page document and

15  ask you to look at that.  And ask you, is that a chart you

16  created in terms of Mr. Langdon's phone calls?

17  A.   Yes, sir.

18  Q.   Is that a true representation of his cell phone records

19  from August 13, 2010 to August 14, 2010 that you would

20  subpoena in prior?

21  A.   Yes, sir.

22      MR. BARRY:  At this point, Your Honor, I would like to

23  mark this for Identification to use as a chalk.

24      THE COURT:  You may do so.

25      MR. FRANK:  No objection.

1        THE CLERK:  It will be C for Identification.

2        (Exhibit C, cell phone chalk/S. Langdon, marked for

3   Identification)

4   Q.   (By Mr. Barry)  Did you do the same type of chart for

5   Ms. Brooks' phone calls and Mr. Hall's phone calls?

6   A.   With all four, yes.

7   Q.   In terms of Ms. Brooks, Mr. Hall -- first off, I'm

8   going to show you a document and ask you, does that appear

9   to be the chart you made for Ms. Brooks' phone number of

10  518-878-6170?

11  A.   Yes, sir.

12  Q.   And, again, I'm going to show you a separate document

13  of what appears to Mr. Halls being number 347-7258.

14  A.   Yes, sir.

15  Q.   And again, this is a true representation of their phone

16  calls?

17  A.   Yes, sir.

18       MR. BARRY:  I ask these be marked for Identification as

19  a chalk?

20       MR. FRANK:  No objection.

21       MR. CACCAVIELLO:  First, Ms. Brooks.

22       THE CLERK:  D for Identification.

23       (Exhibit D, cell phone chalk/N. Brooks, marked for

24  Identification)

25       MR. BARRY:  Then Mr. Hall will be E.

1        (Exhibit E, cell phone chalk/A. Hall, marked For

2    Identification)

3        THE COURT:  Ladies and gentlemen, let me just explain

4    the difference for marking something for Identification and

5    marking something as an exhibit.  If it is marked as an

6    exhibit, that means it is evidence you can consider.  If

7    it's marked for Identification only, it means for purpose of

8    the record we have identified it in a way, but it is not yet

9    evidence.  And it has been suggested that it will be used,

10   these documents will be used as a chalk, in other words,

11   something to illustrate testimony but not necessarily

12   admitted as evidence.

13       You may proceed.

14       MR. BARRY:  Thank you, Your Honor.

15   Q.   (By Mr. Barry) I am going to place first what was been

16   marked for Identification C in front of you.

17       I place an image on the screen.

18       Does the image on the screen appear to be similar or

19   the same as the document in front of you?

20   A.   That's the same.

21   Q.   Okay.  I'm going refer you down to page two, and what's

22   referenced as Number 618 in the far left column, if you

23   could see that?

24   A.   Yes, sir.

25   Q.   Okay.  In making this chart, can you just explain to

1   the jury what that line references?

2   A.   What this line shows me is that -- right here, so you

3   have Scott Langdon's phone is contacting Nicole Brooks'

4   phone with about a 49 seconds -- contact.

5   Q.   Is this on August 14, 2010?

6   A.   This is on August 14, yes.

7        The time is roughly about 13:41 which he's 1:41 in the

8   afternoon.

9   Q.   Okay.  So that's just military time?

10  A.   Yes, 24 hour o'clock.

11  Q.   Going up a little bit in terms of timing, do you see

12  613 in the far left column?

13  A.   Yes, sir.

14  Q.   And what does that show?

15  A.   Right here we have Adam Hall contacting, this is

16  Mr. Langdon's phone.  And it's also an outgoing, so

17  Mr. Langdon is contacting Mr. Hall with about seven seconds.

18  Q.   And the next couple of records on the chart, are all

19  those phone calls between Mr. Hall and Mr. Langdon, except

20  for Ms. Brooks' phone call?

21  A.   Yes, you can see them right here.  Phone calls, a

22  couple of phone calls from Ms. Brooks, that comes to

23  Mr. Hall.

24  Q.   And lastly, one more thing, on 636, can you tell us

25  what that refers to?

1    A.    At 14:32 -- 2:32 in the afternoon -- we have, again a

2    phone conversation about a minute and half with

3    Ms. Brooks/Scott Langdon.

4    Q.    And that would be 2:32 in the afternoon?

5    A.    Yes, sir.

6    Q.    And are you aware about what time Ms. Brooks reported

7    being robbed by David Glasser?

8    A.    Ms. Brooks reported time roughly about 3:15 to 3:30 in

9    the afternoon.

10   Q.    So it's called shortly before that?

11   A.    Shortly before that.

12   Q.    And creating the chart and these two days, was there

13   numerous phone calls between Ms. Brooks and -- I mean

14   between Mr. Langdon and Mr. Hall and Ms. Brooks?

15   A.    Yes, there were.

16   Q.    Next I want to show you what's been marked for

17   Identification, I believe for D, which would be Ms. Brooks'

18   phone calls.

19   A.    Yes, sir.

20   Q.    I'm showing you and I'm putting an image on the screen

21   and I ask you the image on the screen appears to be similar

22   to the documents in front of you?

23   A.    Yes, it is, sir.

24   Q.    And starting on page three, going to there and to the

25   beginning of four, can you tell us, you know, generally what

1   this chart shows?

2   A.   Well, we have -- this is Ms. Brooks' phone and we have

3   contact, as can you see in the date in question, 13:23, so

4   1:23 in the afternoon she is contacting Adam Hall, shortly

5   thereafter Alexandra Ely, and back to Mr. Hall, shortly

6   thereafter Mr. Langdon, and it repeats.

7        So she's speaking to all these people, one right after

8   the other.

9   Q.   And, again, did there appear to be numerous phone calls

10  between these parties?

11  A.   Yes, there were.

12  Q.   And is this chart similar to the chart you had made for

13  Mr. Langdon and his phone call pattern?

14  A.   Yes, sir.

15  Q.   Lastly, I'm going to reference what has been identified

16  for Identification E, I believe, which refers to Mr. Hall's

17  phone calls.

18       I will put an image on the screen and ask you is the

19  image on the screen similar to the document that is in front

20  of you?

21  A.   Yes, it is, sir.

22  Q.   And I will go down to page five.

23       (Pause)

24  Q.   (By Mr. Barry)  And turning to page five, can you

25  briefly explain what this shows?

1    A.    This is similar call pattern from Mr. Langdon and

2    Alexandra Ely's calls and this is --

3         THE COURT:  Lieutenant, can I interrupt you for just a

4    moment?

5         THE WITNESS:  Yes, sir.

6         THE COURT:  If you could just push the microphone away,

7    that way it wouldn't be rubbing against the back of your

8    jacket.

9         THE WITNESS:  Okay.

10        THE COURT:  Thank you.

11   Q.    (By Mr. Barry) Please.

12   A.    So if we start getting around to the time frame here,

13   seeing at 12 o'clock we've got Mr. Hall call's.  That's a

14   phone call to Miss Brooks, Alex Ely, Alex Ely, Scott

15   Langdon.

16        This continues to right up around the time shortly, you

17   know, before, and then it picks up before the crime -- I'm

18   sorry.  The alleged crime was committed at 3:15, 3:30 and

19   then afterwards we start seeing another call, 18:16 and

20   about 6 o'clock.

21        And there was a contact, whether it was a text or

22   attempted call.

23   Q.    And, again, in creating this chart, how is the call

24   pattern in comparison with the charts you provided for both

25   Mr. Langdon and Ms. Brooks?

1   A.   Similar.  All of these people were talking.

2   Q.   Now, after the police subpoenaed the cell phone records

3   in and found the Price Chopper document and the other items

4   that you mentioned, police started making some arrests?

5   A.   Yes, sir.

6   Q.   And who did the police arrest?

7   A.   Initially it was Ms. Brooks, and then Ms. Ely,

8   Mr. Langdon, finally Mr. Hall.

9   Q.   And when the police arrested Ms. Brooks, Ms. Ely, and

10  Mr. Langdon, at some point did police get the chance to

11  speak to each of those individuals?

12  A.   Yes, sir.

13  Q.   And in speaking to each of those individuals, at any

14  point did police make any threats or promises in getting

15  them to speak back to the police?

16  A.   No.

17  Q.   After speaking to them, were charges brought against

18  Mr. Hall?

19  A.   Yes.

20  Q.   Did -- and in terms of the August of 2010 case, was

21  there a trial set in Berkshire Superior Court for that case?

22  A.   Yes, there was.

23  Q.   And when was that trial set for?

24  A.   The trial was sit for that next Fall.  The --

25       MR. BARRY:  Thank you.

1          (Off the record discussion amongst The Commonwealth.)

2          MR. BARRY:  No more questions, Your Honor.

3          THE COURT:  Mr. Frank, you may cross examine.

4          MR. FRANK:  I understand this too, is a bifurcated

5     witness?

6          MR. BARRY:  That's correct, yes.

7          MR. FRANK:  I have no questions.

8          THE COURT:  Lieutenant, you may step down.

9          You may call your next witness.

10          MR. BARRY:  Commonwealth will call to the stand Justina

11     Coe.

12          (Justina Coe, sworn)

13          THE COURT:  Ms. Coe, good afternoon.

14          THE WITNESS:  Good afternoon.

15          THE COURT:  If I could remind to you keep your voice up

16     so we can all hear you and answer only the question put to

17     you.  Please.

18          THE WITNESS:  Okay.

19          THE COURT:  You may proceed.

20          MR. BARRY:  Thank you, Your Honor.

21                          **(Justina Coe)**

22                 **DIRECT EXAMINATION BY MR. BARRY**

23     Q.   Good afternoon, ma'am.

24          First of all, can you tell the jury your name?

25     A.   Justina Coe.

1    Q.    How old are you, Ms. Coe?

2    A.    Twenty-seven.

3    Q.    Do you know someone by the name of Richie Stansen?

4    A.    Yes.

5    Q.    How did you know Richie Stansen?

6    A.    He's the father of my child.

7    Q.    And you also know someone by the name of Adam Lee Hall?

8    A.    Yes.

9    Q.    And did he have a nickname that he went by?

10   A.    Leo.

11   Q.    I will show you what's been marked as Exhibit 38.

12         Do you recognize the person depicted in that

13   photograph?

14   A.    Yes.

15   Q.    And who's that?

16   A.    Leo.  Adam Lee Hall.

17   Q.    And how long have you known Mr. Hall?

18   A.    Since I was 19.

19   Q.    So for a number of years?

20   A.    Yes.

21   Q.    And did you know a person by the name of David Glasser?

22   A.    Yes.

23   Q.    And how did you know David Glasser?

24   A.    I only knew him from seeking drugs from my baby's

25   father, Richard Stansen.

1  Q.   I am going to ask you to go back several years to the

2  year 2009, back in 2009.  First of all, do you remember

3  where he lived?

4  A.   Yes.

5  Q.   Where did he live?

6  A.   122 Madison Avenue.

7  Q.   Do you remember a time in 2009 when Adam Hall showed up

8  at 122 Madison Ave. and mentioned Mr. David Glasser's name?

9  A.   Yes.

10 Q.   Please explain to the jury what Mr. Hall is talking

11 about.

12 A.   Me, Richard Stansen, and Gary Hall -- Leo's father,

13 were all standing on the front porch.  It was in the summer,

14 and Leo drove up in his Hummer, and he got out and he

15 started bragging about how he beat up David Glasser with a

16 bat, and he took him to the hospital.  He was a nice guy.

17 And Leo wasn't saying much afterwards.

18 Q.   Okay.  And how about forward a little bit of time to

19 December, Wintertime of 2009.  Do you remember around this

20 period of time being with Mr. Hall and having him mention

21 David Glasser's name again?

22 A.   Yes.

23 Q.   And where did this conversation place?

24 A.   In his Hummer.

25 Q.   All right.  Can you explain to the jury what this

1    conversation was with you and Mr. Hall about Mr. Glasser?

2    A.    Leo wanted me to go up to Mr. Glasser's apartment and

3    give him a blow job and get cum on a pair of panties, frame

4    him for rape.

5    Q.    What did you say to Mr. Hall when he asked you to do

6    this?

7    A.    No.

8    Q.    Lastly, I want to bring your attention to August of

9    2011, do you remember a tropical storm happening around that

10   period of time?

11   A.    Yes.

12   Q.    And about a week before that storm, did you have any

13   contact with Mr. Hall?

14   A.    Yes.

15   Q.    About how much contact did you have with Mr. Hall?

16   A.    He was in my apartment almost every day of the week.

17   Q.    Was that unusual?

18   A.    Yes.

19   Q.    And did he ever come over with anybody?

20   A.    Yes.

21   Q.    Who did he come over with?

22   A.    He came over once David Chalue.

23   Q.    And do you see Mr. Chalue in the courtroom today?

24   A.    Yes.

25   Q.    Can you point to him and describe something he's

1   wearing?

2         MR. FRANK:  Stipulate identification, Your Honor.

3         THE COURT:  Very well, the defendant has agreed this

4   witness can identify the defendant, and the record will so

5   reflect.

6   Q.   (By Mr. Barry) Had you met Mr. Chalue before?

7   A.   No, only that one time.

8   Q.   And in terms of the number of years you meet with

9   Mr. Hall, had you ever seen Mr. Chalue with Mr. Hall before

10  that day?

11  A.   No.

12  Q.   In one of these visits, did Mr. Hall ever ask you to do

13  something the week before the storm?

14  A.   Yes.

15  Q.   And can you explain to the jury what he asked you to

16  do?

17  A.   He wanted to pick me up and have me get a pack of

18  cigarettes from the store, for him.

19       He gave me $10 to go in the Cumberland Farms and get a

20  pack of Newport 100s, get them in a bag and give them back

21  to him with his change.

22  Q.   Did you end up doing that?

23  A.   Yes.

24  Q.   And in all the years you had seen Mr. Hall, had you

25  ever seen him smoke before?

1   A.   No.

2   Q.   Did you ask him why he specifically wanted Newport 100

3   cigarettes?

4   A.   No.

5   Q.   What happened after you bought him the cigarettes?

6   A.   He just brought me home.

7        MR. BARRY:   Thank you.

8        One moment, Your Honor.

9        Thank you.   One moment, Your Honor.

10       (Pause)

11   Q.   (By Mr. Barry) Well, ma'am, first of all, is there any

12   type of relationship between Mr. Stansen and Mr. Hall?

13   A.   Not blood, they considered each other brothers because

14   they grew up together.

15   Q.   And it lasted -- earlier, when you referenced when

16   Mr. Hall drove in the Hummer, in reference that someone was

17   a good guy for the breakfast sandwiches, who was he

18   referring to?

19   A.   Himself.

20       MR. BARRY:   Thank you.   No more questions, Your Honor.

21       THE COURT:   Mr. Frank, you may cross examine.

22       MR. FRANK:   Thank you.

23                **CROSS EXAMINATION BY MR. FRANK**

24   Q.   Good afternoon.

25   A.   Good afternoon.

1  Q.   I'm Attorney Don Frank.  I represent David Chalue.

2       Ms. Coe, a few things, you met the defendant David

3  Chalue one time, correct?

4  A.   Yes.

5  Q.   At your house with Adam Hall, correct?

6  A.   Yes.

7  Q.   But a week before the storm, Adam Hall had come to your

8  house almost every day; is that fair to say?

9  A.   Yes.

10 Q.   And when he came to your house, he came to your house

11 sometimes by himself; is that right?

12 A.   Yes.

13 Q.   And sometimes he came with other people as well?

14 A.   Yes.

15 Q.   And some of those other people he came with -- you knew

16 that Adam has was a Hells Angels, correct?

17 A.   Yes.

18 Q.   And sometimes when he came by he came by with other

19 Hells Angels; is that also correct?

20 A.   No, not to my house.

21 Q.   Did you meet Adam Hall that week at other places?

22 A.   No.

23 Q.   Just at your house, during the week before the storm?

24 A.   Yes.

25 Q.   Okay.  Now, the people who he brought over, were there

1  a lot of people he brought over or a few, do you recall?

2  A.   There was only a couple.

3  Q.   Do you remember who he brought over outside of David

4  Chalue?

5  A.   One I remember as Ocean Sutton.

6  Q.   Okay.  And who else?

7  A.   I don't remember, like, names or anything.

8  Q.   So then when he would come over, would he be just

9  hanging around for the most part?

10  A.   Yes.

11  Q.   Chilling, spending time talking, that kind of thing?

12  A.   Uh-huh.

13  Q.   Now, by the way, David -- excuse me, Leo is about

14  6-foot-2, right?

15  A.   Yes.

16  Q.   He's taller than I am?  He is a big guy, right?

17  A.   Yes.

18  Q.   And David Chalue is about 5-foot-10, correct?

19  A.   I don't -- wouldn't know.

20  Q.   You don't recall one way or the other his height?

21  A.   No.

22  Q.   When the two them came together, do you recall David

23  Chalue being significantly shorter than Adam Hall?

24  A.   Maybe a little bit because we were all sitting on my

25  couch together.  And like, Leo's head was up here and his

1  was down here.  Chalue's was down here.

2  Q.   Are you a showing us a difference of about maybe

3  eight inches?

4  A.   Well maybe not that much -- like I said, I don't know

5  for sure.

6  Q.   All right.  But you, even with sitting down, you could

7  tell that David Chalue was shorter by inches, correct?

8  A.   Yeah.

9  Q.   All right.  Now Leo came to your house and had you buy

10  some Newport cigarettes, right?

11  A.   Yes.

12  Q.   He was alone when he did that?

13  A.   Yes.

14  Q.   You don't know why he did that?

15  A.   No.

16  Q.   Leo is not above asking you for favors, correct?  He'd

17  ask you to do things?

18  A.   Yes.

19  Q.   And sometimes you didn't know why he was asking you to

20  do them; is that right?

21  A.   Yeah.

22  Q.   And you didn't know why he was asking to by Newport

23  cigarettes, did you?

24  A.   No.

25  Q.   You just did it?

1   A.   Yes.

2   Q.   Because to not do it would be to would mean you would

3   have to deal with Leo, correct?

4   A.   I guess.

5   Q.   All right.

6   A.   But he never put me in any harm, so I wasn't like

7   afraid of him like that.

8   Q.   You weren't afraid of Leo?

9   A.   Yes.  No.

10  Q.   Okay.  But to say no to Leo involved a lot of

11  complaining from Leo, correct?

12  A.   Uh-huh.

13  Q.   And a lot of needling?

14  A.   Correct.

15  Q.   And he kept going at it and going at it until you would

16  say yes; that is fair for the most part?

17  A.   Yes.

18  Q.   Now, and when you bought the cigarettes, did you ask

19  him what he was doing with those cigarettes?

20  A.   No.

21  Q.   You just did it?

22  A.   Yeah.

23  Q.   He doesn't smoke Newports?

24  A.   No.

25  Q.   He doesn't even smoke?

1  A.    No.

2  Q.    He gave you the money for that?

3  A.    Yes.

4        MR. FRANK:  Thank you very much.

5        THE COURT:  Redirect examination.

6                **REDIRECT EXAMINATION BY BARRY**

7  Q.    When you asked -- when Mr. Hall asked you to frame

8  Mr. Glasser of something of a sexual charge, did you say

9  yes?

10 A.    No.

11       MR. FRANK:  Objection.

12       THE COURT:  Basis of your objection?

13       THE WITNESS:  Exceeds.

14       THE COURT:  Overruled.

15 Q.    (By Mr. Barry) I'm sorry.  Can you answer?

16 A.    No.

17       MR. BARRY:  No more questions.

18       MR. FRANK:  No more questions.

19       THE COURT:  You are excused, Ms. Coe.

20       THE WITNESS:  Thank you.

21       (The witness stepped down.)

22       THE COURT:  You may call your next witness.

23       MR. BARRY:  The commonwealth calls Timothy Rondeau.

24       (Pause)

25       (Timothy Rondeau, sworn)

1      THE COURT:  Good afternoon, sir.

2      THE WITNESS:  Hi.

3      THE COURT:  If I could remind you to keep your voice up

4  so we can all hear you and answer only the question put to

5  you, please.

**(Timothy Rondeau)**

**DIRECT EXAMINATION BY MR. BARRY**

8  Q.   Sir, can you tell the jury your name?

9  A.   Timothy Rondeau.

10  Q.   How old are you, Mr. Rondeau?

11  A.   Forty-four.

12  Q.   Mr. Rondeau in terms of this case, do you know someone

13  by name of Adam Hall or Leo Hall?

14  A.   Yes, I do.

15  Q.   How did you know, him as Leo or Adam?

16  A.   Leo.

17  Q.   I'm showing what you has been marked as Exhibit 38.  Do

18  you recognize that person?

19  A.   Yes, I do?

20  Q.   And who is that?

21  A.   Leo Adam Hall.

22  Q.   For how long did you know Mr. Hall?

23  A.   Six or seven years.

24  Q.   Did you ever work for him?

25  A.   Yeah, I did.

1   Q.   Where did you work for him?

2   A.   Up in Peru.

3   Q.   Who did you work with up in Peru?

4   A.   David Glasser and Scott Langdon.

5   Q.   Did you know Scott Langdon?

6   A.   Yeah, he was married to my sister for like 20 years.

7   Q.   And did you know Mr. Glasser?

8   A.   Just working with him a little bit.

9   Q.   I want to draw your attention to August of 2009.

10  During this period of time, did Hall ever make mention of

11  the name David Glasser to you?

12  A.   Yes, he did.

13  Q.   And can you explain to the jury what Mr. Hall said to

14  you about David Glasser in August of 2009?

15  A.   He wanted me to just get this girl, Alicia Tatro, to

16  set him up somehow to discredit him.

17  Q.   How did you know this Alicia Tatro?

18  A.   She has got kids with my son.

19  Q.   And did he specifically tell you how he wanted Ms.

20  Tatro to set up Mr. Glasser?

21  A.   Like, bring them over the state line and try to get him

22  on some rape charges or something like that.

23  Q.   And did you pass this message along?

24  A.   Yeah, I told her that if -- that's what he wanted her

25  to do.

1    Q.    And, to your knowledge, did Ms. Tatro go along with the
2    plan?
3    A.    Not the that I know of.
4          MR. CAPELESS:   Thank you.   No further questions, Your
5    Honor.
6          THE COURT:   Mr. Frank, you may cross examine.
7                    **CROSS EXAMINATION BY MR. FRANK**
8    Q.    Good afternoon.
9          Do you know Mr. Hall to be a Hells Angels, correct?
10   A.    Yes.
11   Q.    And you also knew a gentleman by the name of Milo; that
12   is also correct?
13   A.    Yeah, I met him.
14   Q.    All right.   And Milo is a Hells Angels?
15   A.    Yes.
16   Q.    And at one point, within a year or so of -- within a
17   year or so of the incident, Milo and Hall came by to talk to
18   you about being a witness; do you recall that?
19   A.    No, they never come by to be a witness.
20   Q.    And some sort of -- do you recall them talking to you
21   about a furniture deal, some sort of furniture scam?
22   A.    Yeah.
23   Q.    And they had some sort of operation going in a
24   furniture scam, something along those lines?
25         MR. BARRY:   Objection, Your Honor.

1          THE COURT:  I will see you at sidebar, please.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (Beginning of Sidebar Discussion)

2        THE COURT:  Nature of your objection?

3        MR. BARRY:  It seems to be going out of scope.  I would

4    say relevance to these questions.

5        THE COURT:  It seems to be a fair question.

6        What is the relevance of this line of questioning,

7    Mr. Frank?

8        MR. FRANK:  Well, in terms of scope, Your Honor, I am

9    not sure that is an objection; but in terms of relevance,

10   Your Honor, in 2009, 2010 right around this relative time,

11   Mr. Hall and Mr. Milo -- and his last name is just escaping

12   me for a moment.

13       MR. BARRY:  Campbell.

14       MR. FRANK:  Campbell came to his residence and asked

15   him if he were in a witness in a -- he were a witness in

16   some sort of scam involving a furniture deal.  I assume

17   Mr. Hall was involved, and I don't have full discovery of

18   that.

19       THE COURT:  How is that relevant to this case?

20       MR. FRANK:  It's relevant to this case because there

21   are alternative suspects who are available to Mr. Hall

22   outside of my client, one of those is Milo Campbell.

23       THE COURT:  All right.  So your purpose in asking these

24   questions is to point out that Mr. Hall was engaged with

25   other people in other scams?

1          MR. FRANK:  Yes.

2          THE COURT:  Objection is overruled.

3          (End of Sidebar Discussion)

1      THE COURT:  If you could re-ask your question, please,
2  Mr. Frank.
3      MR. FRANK:  Certainly.
4  Q.  (By Mr. Frank) Drawing your attention back to 2009,
5  2010, so you had a conversation with Adam Hall and Milo
6  Campbell; is that correct?
7  A.  They stopped by my house.
8  Q.  All right.  And when they stopped by your house, and
9  you understood Milo Campbell to be a Hells Angels; is that
10  correct?
11  A.  Yes.
12  Q.  And they asked you whether or not they -- you had been
13  some sort of witness to a furniture entrepreneurial thing;
14  do you recall that, sir?
15  A.  No, I don't.
16      MR. FRANK:  If I could have just one moment?
17      (Pause)
18      MR. FRANK:  Okay.  Thank you.  I have nothing further.
19      THE COURT:  Mr. Barry, redirect examination?
20      MR. BARRY:  Nothing further.
21      THE COURT:  Mr. Rondeau, you are excused thank you.
22      (The witness stepped down.)
23      THE COURT:  You may call your next witness.
24      MR. CACCAVIELLO:  Commonwealth will call Bryan Johnson.
25      (Bryan Johnson, sworn)

 1          THE COURT:  Mr. Johnson, good afternoon.

 2          If I could remind you to keep your voice up and answer

 3     only the question put to you, please.

 4          THE WITNESS:  Yes.

 5          THE COURT:  You may proceed.

 6                          **(Bryan Johnson)**

 7              **DIRECT EXAMINATION BY MR. CACCAVIELLO**

 8     Q.   Good afternoon, sir.

 9          Please start by telling the jury your name, please.

10     A.   Bryan Johnson.

11     Q.   In what state do you live?

12     A.   I live in Connecticut.

13     Q.   What type of work do you do?

14     A.   I'm a welder fabricator.

15     Q.   And, sir, you are here today under summons to testify;

16     is that correct?

17     A.   Yes.

18     Q.   And your understanding, you have been granted immunity

19     to testify; is that correct?

20     A.   Yes.

21     Q.   And you understand that that order compels you to

22     testify truthfully, correct?

23     A.   Yes, it does.

24     Q.   And you're still under oath in order to testify,

25     correct?

1  A.   Yes.

2  Q.   Now, sir, do you know a person named Adam Leo Hall?

3  A.   Yes.

4  Q.   How long you have known Mr. Hall?

5  A.   About 10 years, a little over 10 years.

6  Q.   How would you describe your relationship with him?

7  A.   We were friends.

8  Q.   And have you ever done any sort of work for Mr. Hall?

9  A.   Yeah, I repaired motorcycles, motorcycle parts for him.

10 Q.   Did you do that on a fairly regular basis?

11 A.   Every now and again, yeah.

12 Q.   And, sir, directing your attention back to the Summer

13 of 2011, and were you asked by Mr. Hall to repair a certain

14 item?

15 A.   Yes.

16 Q.   And how did that -- first of all, what was the item?

17 A.   It was a gun.

18 Q.   And how did the conversation take place?  First of all,

19 was it in person or on the phone?

20 A.   He called me and asked me if I could fix something for

21 him.

22 Q.   Okay.  And what did you say?  What did you say to him?

23 A.   I said I would try.

24 Q.   And he told you what the item was?

25 A.   No, he brought it to me.

1  Q.   Okay.  And then did he bring it to you in your home in

2  Connecticut?

3  A.   Yes.

4  Q.   And what was the item again?

5  A.   It was a gun a PLR-16.

6  Q.   And do you have some familiarity with guns?

7  A.   Little bit.

8  Q.   I'm going to show you an item -- I show you that

9  photograph.  And do you recognize what's in that paragraph?

10  A.   Yes.

11  Q.   And does that appear similar to the item that Mr. Hall

12  brought to you?

13  A.   Yes.

14  Q.   Okay.

15      MR. CACCAVIELLO:  Commonwealth would ask this be marked

16  as 80.

17      MR. FRANK:  No objection.

18      THE COURT:  Admitted.

19      (Exhibit No. 80, photograph, marked)

20  Q.   (By Mr. Caccaviello) Sir, directing your attention to

21  the screen, is that what you just saw marked as Exhibit

22  Number 80; is that the same item?

23  A.   Yes.

24  Q.   So, when -- how long after the initial conversation

25  with Mr. Hall about repairing that item, did he actually get

1   it to you?

2   A.   About a week -- about a week.

3   Q.   About a week or so?

4   A.   Uh-huh.

5   Q.   And did you take some steps to try to repair it?

6   A.   Yeah, I tried to.  I couldn't figure it out.

7   Q.   Did you have to order any items?

8   A.   Yeah.

9   Q.   And, in particular, directing your attention to

10  August 9 of 2011, did you order a part for that gun?

11  A.   Yes, I did.

12  Q.   And how did you go about doing that?

13  A.   I ordered it online.

14  Q.   What was the part?

15  A.   It was a trigger.

16  Q.   And were you able to get that item?

17  A.   Yes.

18  Q.   How long after you ordered it, did it come?

19  A.   Three days.

20  Q.   How much was it?

21  A.   $2.97 cents.

22  Q.   And this was a trigger you said?

23  A.   Yes.

24  Q.   And when the part came three days later, how did you go

25  about trying to fix it?

1   A.   Looked at the weapon, tried to disassemble it and
2   figure it out.
3   Q.   Okay.  And are you aware of other actually assembly
4   directions on the internet?
5   A.   Yeah.
6   Q.   Okay.  Did you view any of those in an effort to fix
7   it?
8   A.   No.  No.
9   Q.   So after you couldn't fixed it, what did you do?
10  A.   He called and I called him and told him I couldn't fix
11  it.
12  Q.   I'm sorry.  Just to make sure I got the sequence down,
13  who called who?
14  A.   I called him and told him I couldn't fix it.
15  Q.   Okay.  And what did he say to you?
16  A.   He said bring it back.
17  Q.   Okay.  And so what did you do?
18  A.   I bought it back to him.
19  Q.   Where did you -- well, let me ask you, when did you
20  bring it back to him?
21  A.   At the week and a half later.
22  Q.   And where did you bring it to him?
23  A.   I brought it outside to him, outside the clubhouse.
24  Q.   When you say "the clubhouse" what do you mean by that?
25  A.   Lee, Mass.

1    Q.    And when you went to the clubhouse, did you see
2    Mr. Hall?
3    A.    Yes.
4    Q.    And was he there with anyone?
5    A.    He was there with two girls.
6    Q.    Did you know who they were?
7    A.    No.
8    Q.    When you returned the gun to Mr. Hall, did you also
9    give him that trigger part?
10   A.    Yes.
11         MR. CACCAVIELLO:  One moment, Judge?
12         THE COURT:  You may.
13         (Off the record discussion amongst The Commonwealth.)
14   Q.    (By Mr. Caccaviello) This weapon that's shown on the
15   screen, Mr. Johnson, how did you refer to it?  How did you
16   refer to it?  What did you call it?
17   A.    It was a PL 16 or PLR-16.  It's Kel-Tec.
18   Q.    And do you know if its referred to as a TEC-9?
19   A.    No.
20   Q.    You just don't know?
21   A.    No.
22         MR. CACCAVIELLO:  Okay.  No further questions.
23         THE COURT:  Mr. Frank, you may cross examine.
24         MR. FRANK:  Thank you.
25         Leave that on the screen for just one moment, please.

1      **CROSS EXAMINATION BY MR. FRANK**

2 Q.  Good afternoon.

3    Sir, the item on the screen there is a PLR or PL-16,

4 correct?

5 A.  Yes.

6 Q.  But that's not the gun, that's not the picture of the

7 gun that you and Adam were dealing with, is it?

8 A.  No.

9 Q.  Because the one you had didn't have a trigger?

10 A.  Correct.

11 Q.  So you know that can't be the same gun?

12 A.  Yes.

13 Q.  And the one that he gave you, was it all, like, rusty

14 and messy or was it clean?

15 A.  It was a little dirty, a little rusty.

16 Q.  Is there a cartridge in that gun that we're looking at?

17 A.  Yes.

18 Q.  Okay.  And did he give -- did the gun he gave you have

19 a cartridge?

20 A.  No.

21 Q.  So Adam called -- initially, in regard to the PLR, Adam

22 initially -- Adam Hall initially called you, correct?

23 A.  Yes.

24 Q.  Spoke to you about the gun?

25 A.  Yes.

1    Q.   And you didn't hear -- you don't know David Chalue, do
2    you?
3    A.   Never met him.
4    Q.   And he didn't reference David Chalue when he first
5    called you, correct?
6    A.   No.
7    Q.   And when he called to drop it off at your house, he was
8    not with David Chalue?
9    A.   No.
10   Q.   And, by the way, David Chalue is seated over to my
11   right.
12        And when you dropped it off to the clubhouse in Lee,
13   David Chalue, as far as you know, certainly wasn't outside;
14   is that right?
15   A.   No, there was no one there.
16   Q.   Okay.  So it's just Adam Hall and two women, correct?
17   A.   Correct.
18        MR. FRANK:  Thank you very much.
19        THE COURT:  Redirect examination?
20        MR. CACCAVIELLO:  Nothing else, Judge.
21        THE COURT:  Mr. Johnson, you're excused.  Thank you.
22        THE WITNESS:  Thank you.
23        (The witness stepped down.)
24        THE COURT:  You may call your next witness.
25        MR. CACCAVIELLO:  Commonwealth will call William

1  Gregory.

2       (William Gregory, sworn)

3       THE COURT:  Mr. Gregory, good afternoon.

4       THE WITNESS:  Hi, how are you?

5       THE COURT:  Please keep your voice up so we can all

6  hear you and answer only the question put to you, please.

7       THE WITNESS:  Yes.

8       THE COURT:  You may proceed.

9       MR. CACCAVIELLO:  Thank you, Your Honor.

10                    **(William Gregory)**

11          **DIRECT EXAMINATION BY MR. CACCAVIELLO**

12  Q.   Sir, will you please tell the jury your name, please?

13  A.   William Gregory.

14  Q.   What town do you live?

15  A.   Pittsfield, Massachusetts.

16  Q.   What do you do for work, sir?

17  A.   Presently I work at Home Depot part-time.

18  Q.   I'm sorry?

19  A.   Part-time.

20  Q.   How long have you worked there?

21  A.   Just about a little over three years.

22  Q.   What do you do at Home Depot?

23  A.   Presently I work for the merchandise execution team

24  before that I was a sales associate.

25  Q.   As a sales associate, what were your responsibilities?

1  A.   Customer service, stocking shelves basically.

2  Q.   You would be a person on the floor that would offer

3  help to a customer?

4  A.   Yes.

5  Q.   Now, sir, I'm going to direct your attention back to

6  late August of 2011.  Do you recall was there a big weather

7  event in the forecast at the end of August?

8  A.   Yeah, it was Hurricane Irene maybe.  I am not sure the

9  name of it.

10 Q.   And for the Home Depot, did that have some significance

11 in terms of preparation?

12 A.   Well, it was any big storm that, you know, people are

13 looking for generators.  It was pretty chaotic that day, you

14 know, we were out of generators.  We got a shipment in and

15 people were basically fighting over to get generators.  It

16 was mass chaos in the store.

17 Q.   And, in fact, had -- was there an extra shipment of

18 generators that came in?

19 A.   It came in late afternoon, I guess.

20 Q.   Now, directing your attention to that week, sir, do you

21 recall encountering some specific customers about whom you

22 ultimately provided information to the police?

23 A.   Yeah, the one day, Wednesday or Thursday, two gentleman

24 come in, and one that really stuck out was his facial

25 features, his hair, piercings, tattoos, just horns on his

1    head.

2    Q.   And, sir -- okay.  And so did you -- what was the most

3    distinctive feature to you?

4    A.   The horns on his head.

5    Q.   I'm going to show you a photograph, sir.  Do you

6    recognize who's depicted in the photograph?

7    A.   Yes.

8    Q.   And who is that, sir?

9    A.   I'm not sure how to say -- Caius.

10   Q.   Well --

11   A.   He was one of the gentleman that came.

12   Q.   Was this individual that you are referring to that most

13   caught your attention?

14   A.   Yes.

15       MR. CACCAVIELLO:  Commonwealth will ask that this be

16   marked as Commonwealth Number Exhibit 81.

17       THE COURT:  Any objection?

18       MR. FRANK:  No objection.

19       THE COURT:  Admitted.

20       (Exhibit No. 81, photograph, marked)

21   Q.   (By Mr. Caccaviello) And, sir, directing your attention

22   to the screen, is that the same image on the screen that has

23   just been marked as Number 81, a photo in front of you?

24   A.   Yes, it is.

25   Q.   That's the individual you are referring to that came

1  into the store?

2  A.    Yup; yes, it is.

3  Q.    Now, sir, when these -- the other person that was with

4  the person that's on the screen, and is there anything --

5  can you recall about him?

6  A.    He was more dressed, neater, more cut short hair.

7  Q.    And anything about the color of his clothing?

8  A.    I believe he had a light-colored shirt on.

9  Q.    Now, what's -- what part of the store were you working?

10  A.    I work in -- at that time, I was working in hardware.

11  Q.    And did these two individuals come into your section of

12  the store?

13  A.    Yes, they did.

14  Q.    And as they walked into that section, did either one of

15  them ask you any questions?

16  A.    They just asked me where the saws were.

17  Q.    Did you help them out?

18  A.    I pointed them in a direction.  I said in the tool crib

19  in Aisle 8, a little ways, half-way down on your left-hand

20  side.

21  Q.    Was there some more conversation or more requests of

22  you?

23  A.    They asked me if that -- excuse me, was that the only

24  saws we had, do we have any other saws.  I said there's

25  power saws, skill saws over in Aisle 10.  I said we have

1    chainsaws, but they are over in Garden, in Aisle 2.

2    Q.   So separate area from where you were?

3    A.   Yes.

4    Q.   So did you then -- did they continue down the aisle?

5    A.   I met them at the beginning of the tool crib and they

6    went down Aisle 8, yes.

7    Q.   Sir, are you familiar with whether or not the Home

8    Depot has surveillance cameras in place?

9    A.   They are all over the store.

10   Q.   All over the store.  And does those surveillance

11   cameras capture the activity that is in front of it on an

12   actual recorded footage?

13   A.   Yes.

14   Q.   And, sir, does that -- pursuant to this investigation,

15   have you had occasion to view some footage of the Home

16   Depot, capturing what you just described to the jury?

17   A.   Yes, I have.

18        MR. CACCAVIELLO:  Your Honor, at this point the

19   Commonwealth would ask that the Home Depot video be marked

20   as Exhibit Number 82?

21        THE COURT:  Any objection, Mr. Frank?

22        MR. FRANK:  No objection.

23        THE COURT:  Admitted.

24        (Exhibit No. 82, Home Depot surveillance video, marked)

25   Q.   (By Mr. Caccaviello) Sir, I'm going to ask to you look

1    at the screen and I'm going to ask you some questions, okay?
2    A.    Yup.
3          (Whereupon, the video was viewed.)
4    Q.    (By Mr. Caccaviello) First of all, what are we looking
5    at here?  What section of Home Depot?
6    A.    These are the three aisles inside of the tool crib in
7    the hardware department.
8    Q.    And if I can, if we can stop the screen right there.
9          Sir, I'm going to show you, on the screen, these two
10   individuals here, sir.  Are these the two individuals you
11   are referring to in your testimony?
12   A.    Yes, I am.
13         MR. CACCAVIELLO:  Would you start that portion?
14         (Whereupon, the video was viewed.)
15   Q.    (By Mr. Caccaviello) Where is it that they are walking
16   towards and ultimately stop?
17   A.    Right now they are heading towards the end of Aisle 8,
18   I believe down by the screwdrivers and wrenches are.
19   Q.    Okay.
20         (Whereupon, the video was viewed.)
21   Q.    (By Mr. Caccaviello) I'm going to ask you to keep
22   watching the screen.
23         (Whereupon, the video was viewed.)
24   Q.    (By Mr. Caccaviello) And, sir, this person here is who?
25   A.    That's me.

```
 1   Q.   Okay.  And are you looking to approach them, ask if
 2   they need some assistance?
 3   A.   Yeah.  We were taught to give people customer service,
 4   to see if they need any help or at the time I believe
 5   that's -- they called me and asked me where the saws were.
 6   Q.   And do you make your way over?
 7        (Whereupon, the video was viewed.)
 8   Q.   (By Mr. Caccaviello) And, sir, you are walking over to,
 9   pursuant to that request?
10   A.   Yes.
11        (Whereupon, the video was viewed.)
12   Q.   (By Mr. Caccaviello) Sir, as they are leaving that
13   area, which area is -- have they stopped here?
14   A.   Right now they're where hammers and hatchets are and
15   the saws are the next bay up.
16   Q.   And I'll actually give you the pointer to start
17   behavior where that bay is.  And if you can -- of course
18   with Court's permission, step off the bench.
19        THE COURT:  You may step down, if it's easier.
20        THE WITNESS:  This bay right here.  It's hard to see.
21   The hammers and hatchets, the saws would be in this bay
22   here.
23   Q.   (By Mr. Caccaviello) Thank you.
24        MR. CACCAVIELLO:  Press play.
25        (Whereupon, the video was viewed.)
```

1      MR. CACCAVIELLO:  Pause right there.

2   Q.   (By Mr. Caccaviello) Mr. Gregory, did you just see some

3   activity between two individuals?

4   A.   It seemed like where the hatchets would be.

5   Q.   And did you see one of the individuals, particularly

6   the one you described --

7   A.   Take the hatchets.

8   Q.   What did he do with it?

9   A.   Seemed like he was just (Indicating) moving it with

10  his --

11      MR. FRANK:  Objection.  Objection.

12      THE COURT:  Basis of your objection?

13      MR. FRANK:  There is no reason he needs to describe

14  what we have all just seen.

15      THE COURT:  Well, the objection is overruled.

16      You may describe what you saw on the surveillance

17  video.

18      THE WITNESS:  It seemed like he was, you know, just --

19  (Indicating)

20      You know, seeing how light, you know, how it would be

21  to chop, I guess.

22  Q.   (By Mr. Caccaviello) Did -- may the record reflect the

23  witness is essentially moving his arm up and down in an up

24  and down fashion?

25      THE COURT:  All right.  The record will so reflect.

1    Q.   (By Mr. Caccaviello) Continue on.

2         (Whereupon, the video was viewed.)

3         (Pause)

4    Q.   (By Mr. Caccaviello) Sir, just for clarification in

5    terms of what you saw on the screen.  The person holding

6    that hatchet, which of the two individuals did you see, just

7    a moment ago, sir?

8    A.   The one with the facial features.

9    Q.   Okay.  Would that be the person exhibited in Number 81,

10   Mr. Veiovis?

11   A.   Yes.

12   Q.   And showing you two photographs there, sir, did you

13   recognize what they depict?

14   A.   Yes, what I just described on this screen.

15   Q.   As to the first photograph that you see, where is that

16   depicted on the screen?

17   A.   That was the first, what I pointed to with the

18   hatchets.

19   Q.   So would that be, if you look at the screen, sir, would

20   that be in this area?

21   A.   Yes, it is.

22   Q.   Okay.  And that's what you have in your hand?

23   A.   Yes, I believe so.

24   Q.   Okay.

25        MR. CAPELESS:  Commonwealth would ask that be marked as

1   83.

2       THE COURT:  Any objection?

3       MR. FRANK:  No objection.

4       THE COURT:  Admitted.

5       (Exhibit No. 83, photograph, marked)

6   Q.   (By Mr. Caccaviello) And, sir, as to the second

7   paragraph, what are we looking at there?

8   A.   I have got to put my glasses on for a minute.

9       (Pause)

10      THE WITNESS:  Same picture of the same, where the

11  hatchets and hammers are and the crowbars and chisels and

12  screwdrivers.

13  Q.   (By Mr. Caccaviello) And that's just a different view?

14  A.   Yes.

15      MR. CACCAVIELLO:  And the Commonwealth asks that it be

16  marked as 84.

17      THE COURT:  Any objection?

18      MR. FRANK:  No objection.

19      THE COURT:  Admitted.

20      (Exhibit No. 84, photograph, marked)

21  Q.   (By Mr. Caccaviello) Now, sir, did you, a few weeks

22  after this particular day at Home Depot, did you have

23  occasion to see a photograph in local newspaper that caught

24  your attention?

25  A.   Yes, it was a picture -- it was after, there were

1    people arrested for a murder.

2    Q.   And was there any photo in that paper that caught your

3    attention and caused this to come to mind?

4    A.   Same one as this one.

5    Q.   Same one as the one that is in front of you right now?

6    A.   Yes.

7    Q.   That's Mr. Veiovis?

8    A.   Yes.

9         MR. CACCAVIELLO:  No further questions.

10        THE COURT:  Mr. Frank, you may cross examine.

11        MR. FRANK:  Thank you.

12        If we could put that back up on the screen, please.

13             **CROSS EXAMINATION BY MR. FRANK**

14   Q.   Good afternoon.  I'm attorney Don Frank I represent

15   Mr. Chalue.

16        Sir, what called your attention, initially, was the

17   newspaper article displaying the three people who were

18   arrested in this case; is that correct?

19   A.   What caught -- what do you mean?  Initially?

20   Q.   Well, at some point you saw a newspaper article that I

21   think we just referred to it?

22   A.   Well, I recognized the photograph from the person in

23   the store.

24   Q.   Okay.  That was Mr. Veiovis, right?

25   A.   Yes.  Yes.

1   Q.   And you didn't know his name or his nickname at that
2   point that you saw him?
3   A.   No.
4   Q.   And there were two other people along on either side or
5   at least in the same picture along with Mr. Veiovis, in that
6   same newspaper article; is that right?
7   A.   Yes.
8   Q.   And one of them is Mr. Chalue, correct?
9   A.   Correct.
10   Q.   And that's not the person you saw with Mr. Veiovis?
11   A.   No.
12   Q.   And I'd ask you to watch.
13       MR. FRANK:  If we could finish the rest of this, in
14   slow motion, please.
15       (Whereupon, the video was viewed.)
16   Q.   (By Mr. Frank) You see where they are walking through,
17   sir?
18       MR. FRANK:  Stop it now, please.
19   Q.   (By Mr. Frank) Did you see where they walked down to?
20   A.   The first aisle you mean?
21   Q.   Yeah.
22   A.   I didn't come out of the tool crib.
23   Q.   Okay.  But you know that then they came out of the tool
24   crib there's a checkout area, correct?
25   A.   Yes.

1    Q.    Right at the end of the aisle?

2    A.    Just about to the end, just to the right, yes.

3    Q.    And you didn't see them go to the left or to the right;

4    is that right?

5    A.    I didn't see them going either way, no.

6    Q.    And you didn't see them go to the garden area; is that

7    right?

8    A.    No.

9    Q.    The garden area is way out to side of the store; is

10   that right?

11   A.    It's way off to the left if you're entering the store.

12   Q.    So as you're facing the store, it's way off to the

13   left?

14   A.    Yeah, it would be to the right from there.

15   Q.    And when they asked you where the saws were, you told

16   them that was in the garden area; is that right?

17   A.    The chainsaws were in the garden area.

18   Q.    And you didn't see them go off into the garden area,

19   correct?

20   A.    No.  I work in hardware.

21   Q.    And when you viewed the video, they didn't go to the

22   garden area, did you?

23   A.    I wouldn't be able to tell where they went from this

24   video.

25   Q.    Did you review a second video at the request of the

1   police from Home Depot?

2   A.   I believe so.

3   Q.   All right.  And in the second video that the police

4   showed you, you recognize these two people, that is

5   Mr. Veiovis and another person not Mr. Chalue, correct?

6   A.   Yes.

7   Q.   And you saw them go from the area that they are, that

8   we just saw them exit to, right to the self-checkout area;

9   is that correct?

10  A.   I believe so, yes.

11  Q.   You didn't see them take a left over to the garden

12  area, did you?

13  A.   No, they would have had to take a right.

14  Q.   You -- okay.  You didn't see them a take a right to the

15  garden area?

16  A.   No.  No.

17       MR. FRANK:  Thank you very much -- oh, one moment.

18       (Pause)

19       MR. FRANK:  Thank you very much.

20       THE COURT:  Redirect examination?

21       MR. CACCAVIELLO:  Nothing else, Your Honor.

22       THE COURT:  Mr. Gregory, you are excused.

23       Thank you.

24       (The witness stepped down.)

25       THE COURT:  You may call your next witness.

1        MR. CACCAVIELLO:  Commonwealth will call Michael

2   Carriveau.

3        (Michael Carriveau, sworn)

4        THE COURT:  Good afternoon, sir.

5        THE WITNESS:  Good afternoon.

6        THE COURT:  If I could remind you to keep your voice up

7   so we can all hear you and answer only the question put to

8   you please.

9        THE WITNESS:  Okay.

10       THE COURT:  You may proceed.

11       MR. CACCAVIELLO:  Thank you, Your Honor.

12                      **(Michael Carriveau)**

13            **DIRECT EXAMINATION BY MR. CACCAVIELLO**

14  Q.   Sir, would you start by telling the jury your name.

15  A.   Okay.  Michael Carriveau.

16  Q.   What do you do for a living?

17  A.   I work for Home Depot Asset Protection Division.

18  Q.   How long have you worked for Home Depot?

19  A.   This November will be eight years.

20  Q.   Prior to working for Home Depot, what did you do for a

21  living?

22  A.   I retired from the United States military, 20 years

23  active duty.

24  Q.   And with your position with the Home Depot -- I'm sorry

25  your title was?

1   A.    Asset protection.

2   Q.    What's a person who is in that division do?

3   A.    We monitor all types of threats, both internal and

4   external.  We investigate credit card fraud.  We investigate

5   counterfeits, all types of -- any type of theft or any type

6   of activity that would be considered criminal in a case like

7   that.

8   Q.    And what stores do you cover?

9   A.    We cover -- right now, I cover three stores.  I cover

10  Greenfield, Leominster, and Chicopee.

11  Q.    And you, on occasion, also cover other stores?

12  A.    That's correct.

13  Q.    And would those include the Pittsfield, Massachusetts

14  Home Depot?

15  A.    Yes.  I covered Pittsfield at the timing of this.

16  Q.    And in terms of a security system, what is it that Home

17  Depot employs?

18  A.    Closed-circuit television, sensormatic, all forms of

19  it.  I'm sure people have gone outside with something and

20  beeped, sounded the alarm.

21  Q.    Now, in terms of the surveillance system in the

22  Pittsfield store, did it have various cameras posted?

23  A.    Yes.

24  Q.    And do you know, besides surveilling and monitoring, do

25  they also record?

1   A.   Yes.

2   Q.   And do they -- are they placed within different areas

3   within the Pittsfield store?

4   A.   Yes.

5   Q.   And do those include various aisles?

6   A.   Yes.

7   Q.   Including the register area?

8   A.   Yes, all registers, yes.

9   Q.   As well as the entrance area of the Home Depot?

10   A.   Yes.

11   Q.   And as well as the parking lot?

12   A.   That's correct.

13   Q.   And that is footage caught on that surveillance system;

14   is it time and date stamped?

15   A.   It is.

16   Q.   Does that need to be accurate for Home Depot services?

17   A.   Yes.

18   Q.   And in your experience, is it?

19   A.   Yes, in most cases.

20   Q.   Now, I want to direct your attention to September 13 of

21   2011.  Have you been contacted by the Pittsfield Police

22   Department to assist in an investigation?

23   A.   Yes, I was.

24   Q.   Had you been provided with that department, with some

25   information?

1  A.    Yes.

2  Q.    What kind of information were you provided with?

3  A.    They were looking for individuals arriving at the Home

4  Depot, basically gave me some time frames, some dates.

5  Q.    Were you provided any type of descriptors?

6  A.    Yes.

7  Q.    And what kind of descriptors were you provided?

8  A.    The main descriptor was a white male with a mohawk.

9  Q.    Now, with that information, are you able to undertake

10  certain tasks?

11  A.    Yes.

12  Q.    What was that task?

13  A.    Basically monitor our checkout cameras, check all

14  entrances and exits.  They are one in the same.  Looking for

15  someone who would match that description.

16  Q.    Did you then review tape for the period of time from

17  August 22 to August 24?

18  A.    Yes.

19  Q.    Did any portions of those tapes capture your attention?

20  A.    Yes.

21  Q.    And in particular, why did they capture your attention?

22  A.    A male matching the description that was requested came

23  into view.

24  Q.    Now, as a result of that, did you -- what did you do

25  with that footage?

1   A.   Saved it to the system.

2   Q.   And did you automatically create a DVD which was turned

3   over to the law enforcement?

4   A.   That is correct.

5   Q.   Now, sir, I want to direct your attention to the

6   screen --

7       MR. CACCAVIELLO:  And ask if you could just play --

8       (Whereupon, the video was viewed.)

9   Q.   (By Mr. Caccaviello)  And, sir, do you recognize what

10  area we are starting to look at here?

11  A.   Yes, I do.

12  Q.   And what that is?

13  A.   That's self-checkout and that would be register six.

14  Q.   And keeping your eye on the film, are the two

15  individuals -- the two individuals in that scene that

16  captured your attention?

17  A.   That's correct.

18  Q.   Those were the two you were looking for?

19  A.   That's correct.

20  Q.   What do they appear to be doing in that particular

21  footage?

22  A.   Making a purchase.

23      (Whereupon, the video was viewed.)

24  Q.   (By Mr. Caccaviello) Now, sir, using this footage, do

25  you have the ability to actually track that transaction?

1   A.    Yes.

2   Q.    Do you have the ability to also track those individuals

3   throughout the store?

4   A.    Yes.

5   Q.    How do you do that?

6   A.    Basically from time, the time stamp and with the

7   information there you can backtrack and find the evidence,

8   whatever camera footage you're looking for.

9   Q.    Okay.  And so when you say backtrack, what -- just

10  again, just be a little more specific as to what you mean by

11  that.

12  A.    From the time frame you're looking for when they may

13  have entered or also when they exit, based on the time of

14  the transaction.

15        MR. CACCAVIELLO:  One moment, Judge.  I am just looking

16  for one item here.

17        (Pause)

18  Q.    (By Mr. Caccaviello) Now, sir, I'm going to show you an

19  item and ask you --

20        MR. CACCAVIELLO:  First co-counsel.

21        (Pause)

22  Q.    (By Mr. Caccaviello) Do you recognize what this item

23  is?

24  A.    Yes.  Basically the sleeve for a particular item at the

25  Home Depot.

1   Q.   And what kind of item is it?

2   A.   It's —— this is, as it says, an eight-piece folding

3   star key set.

4   Q.   And that is an item that Home Depot carried at the

5   time?

6   A.   Yes.

7   Q.   You can put that back on the envelope.

8        I show you this item here, and do you're recognize what

9   that is?

10  A.   Yes, that item would go with that.

11  Q.   Well, this item would correspond to that tag?

12  A.   That's correct.

13  Q.   And, sir, from the —— did you undertake a task in

14  determining what the purchase was that was made that we're

15  looking at in the footage there?

16  A.   Yes.

17  Q.   What did you determine?

18  A.   Basically that these two individuals purchased this

19  item at that register.

20  Q.   And are there some documents that you generate in order

21  to support that position?

22  A.   Yes.  Every transaction at any register is logged in

23  what we call a POS journal, POS being Point of Sale.

24       And so each register, in this particular case 56, 57,

25  58, 59, so based on the information you can pull up every

1  transaction that happened at that particular register at

2  that particular time, and it will give you all of the

3  information as to what was purchased, how it was purchased.

4  Q.   So showing you this document, sir, can you describe

5  what that is?

6  A.   One of two things, it's a POS journal receipt.  It's a

7  receipt.  Customer gets a longer piece of paper, but similar

8  to just a receipt report.

9  Q.   And how does that correspond to what we're looking at

10 at the screen?

11 A.   Well, this is Register 59.  Tells you what register,

12 tells you what transaction number, tells you the time, and

13 also it tells you the date, and how they paid for it -- in

14 this particular, paid cash.

15 Q.   And so that information, how does that then correspond

16 to the other two items that are in front of you?

17 A.   Well, it also tells you what was purchased.  It tells

18 you by the UPC on the back of this, tells -- you have a UPC

19 that would match the transaction.

20 Q.   And does that UPC number on the back of that tag

21 correspond to the journal report you have in front of you?

22 A.   Yes, it does.

23      MR. CACCAVIELLO:  The Commonwealth will ask that the

24 tag be marked as Exhibit Number 95 -- 85.

25      MR. FRANK:  No objection.

1    THE COURT:  Admitted.

2    (Exhibit No. 85, tag/folding star key set, marked)

3    MR. CACCAVIELLO:  That the tool be marked as Exhibit

4    96 -- 86.

5    MR. FRANK:  No objection.

6    THE COURT:  Admitted.

7    (Exhibit No. 86, folding star key set, marked)

8    Q.    (By Mr. Caccaviello) That the journal be marked as

9    Exhibit 87.

10    (Exhibit No. 87, Home Depot POS journal, marked)

11    THE COURT:  Without objection, it is admitted.

12    Q.    (By Mr. Caccaviello) Now, sir, you had described you

13    were able to actually from this footage, you can actually

14    track when those two customers came into the store, correct?

15    A.    That's correct.

16    Q.    (By Mr. Caccaviello) Directing your attention to the

17    screen, sir, how does this footage correspond to the prior

18    image concerning that transaction?

19    A.    This is the outside parking lot, time down below, 6:45.

20    Q.    Is there something happening in the footage, over the

21    seconds, particularly in this area?

22    A.    Yes.

23    (Pause)

24    Q.    (By Mr. Caccaviello) Can you tell what kind of vehicle

25    that appears to be?

1   A.    It appears to be a Jeep.

2         (Whereupon, the video was viewed.)

3   Q.    (By Mr. Caccaviello) And these two individuals here --

4   A.    Yes.

5   Q.    -- are those the -- do they appear to be the same

6   individuals that we just previously saw with that

7   transaction?

8   A.    Yes, they are.

9   Q.    Taking you to the next footage, sir, what is this area

10  you are looking at?

11  A.    This area here is returns and that would be entrance.

12  Q.    And how does that correspond to the previous image that

13  we just saw?

14  A.    The two individuals from the parking lot are entering

15  through that entrance.

16  Q.    Is that that right here?

17  A.    That is that.

18  Q.    Showing you -- and noting the time, what is this video

19  detecting?

20  A.    Again, the Jeep, that would be when they arrived.

21        And this will be them departing, after completing the

22  transaction, and then going back to the Jeep.

23  Q.    I just ask you to keep your eyes on the screen for a

24  few seconds.

25        (Pause)

1    Q.   (By Mr. Caccaviello) And there, sir, are these the same

2    two individuals referred to earlier?

3    A.   That's correct.

4    Q.   And keeping your eye on the screen.

5         For the record, do they appear to be entering that same

6    Jeep?

7    A.   They are.

8         MR. CACCAVIELLO:  One moment, Judge.

9         (Pause)

10        MR. CACCAVIELLO:  No further questions.

11        THE COURT:  Mr. Frank, you may cross examine.

12        MR. FRANK:  Thank you.

13                   **CROSS EXAMINATION BY MR. FRANK:**

14   Q.   Good afternoon.  My name is Attorney Don Frank.

15   A.   Hello.

16   Q.   Sir, you've reviewed these tapes a number of times; is

17   that correct?

18   A.   I reviewed them when I saved them and I reviewed them

19   to make sure, I try to -- and make sure everything is there.

20   Q.   You collected them, you reviewed them then?

21   A.   That's correct.

22   Q.   You selected the tapes?

23   A.   That's correct.

24   Q.   And then you displayed them for investigators at least

25   once; is that correct?

1  A.   I gave the disk to the police officer, told him what I

2  had, and then basically burned this and gave it to them,

3  yes.

4  Q.   And you viewed them recently before testifying?

5  A.   Today, yes.

6  Q.   Did you --

7       MR. FRANK:  If you could put up, please, the original

8  tape that you played.

9  Q.   (By Mr. Frank) First of all, while that's getting set

10  up, sir, if I could just ask you at any point did you review

11  the tapes and did you see Mr. Veiovis and the other person,

12  go to the garden center?

13  A.   No.

14  Q.   And you didn't see them stop at any circular saw area

15  where power tools were sold, did you?

16  A.   Did I see them stop at a power tool?

17  Q.   Yes.

18  A.   They were in the tool corral, which has power tools.

19  Q.   They stopped at the tool corral where they have hand

20  saws; is that correct?

21       MR. FRANK:  Excuse me.  If we could stop there for one

22  moment.

23       (Whereupon, the video was viewed.)

24  Q.   (By Mr. Frank) Those are hand saws that they are

25  looking at; is that correct or hatchets?

1    A.    Yes, some.

2    Q.    Okay.

3          MR. FRANK:  And if we could continue, please.

4          (Whereupon, the video was viewed.)

5    Q.    (By Mr. Frank) The person in the yellow (sic) as we're

6    watching this, that is not Mr. Veiovis; that is the other

7    person; is that correct?

8    A.    Pardon?

9    Q.    The person in green, that's not Mr. Veiovis.  The

10   person in green is with Mr. Veiovis, correct?

11   A.    Yes.

12         MR. FRANK:  If we can stop it for just one moment.

13         (Whereupon, the video was viewed.)

14   Q.    (By Mr. Frank) And the person, did you see him moving

15   his arm up and down?  Could you see the person in the green

16   moving his arm up and down?

17         MR. FRANK:  If we could go backward just to two

18   seconds, please.

19         (Whereupon, the video was viewed.)

20   Q.    (By Mr. Frank) All right.  Start it again, please, keep

21   your eye on the person in green.

22         You see him bending down, correct?

23   A.    Yes.

24   Q.    All right.  And that's the hand tool corral, that's

25   where hand tools are; is that correct?

1   A.   Well, the tool corral has all types of tools, power

2   tools, hand tools, chisels.

3   Q.   All right.  And the area that they are at --

4        MR. FRANK:  If we could stop for just one moment.

5        (Pause)

6   Q.   (By Mr. Frank) You don't know really what the setup is

7   at this particular Home Depot, do you?

8   A.   Most tool corrals are set up similar.  Again, trying to

9   remember what it was at that time --

10  Q.   I'm showing you Exhibits 83 and 84.  Do you see those

11  exhibits, sir?

12       All right.  And these exhibits correspond with the

13  location of these two gentlemen, as best you can tell?

14  A.   As best I could tell.

15  Q.   And there doesn't appear to be any circular saws or

16  hand saws -- circular saws, excuse me.

17  A.   No.

18  Q.   It's all hammers and hatchets and things like that?

19  A.   That's correct.

20  Q.   Okay.  Thank you.

21       MR. FRANK:  If you could continue playing, please.

22       (Whereupon, the video was viewed.)

23  Q.   (By Mr. Frank) You see the person in the green reaching

24  towards the corral?

25  A.   Yes.

1   Q.   And he picks something up; is that correct?

2   A.   Looks like he may have.

3   Q.   Okay.  Well, I'm asking about the person in the green.

4   A.   Right.

5   Q.   You can't see what the person who is not in the green

6   is doing, right?

7   A.   Yes, that's right.

8        He reaches in, he grabs something.  I'm assuming he

9   did?

10  Q.   By "he" we're referring to the person in green; is that

11  correct?

12  A.   That's right.

13       (Whereupon, the video was viewed.)

14  Q.   (By Mr. Frank) And, again, that's the person in the

15  green who seems to be reaching into the corral; is that

16  correct?

17  A.   That's correct.

18  Q.   And he's near the other person who you've identified as

19  Mr. Veiovis; is that correct?

20  A.   I don't know their names.

21  Q.   The other person who you identified as having had the

22  mohawk?

23  A.   That's correct.

24       (Whereupon, the video was viewed.)

25       MR. FRANK:  Thank you.  That's all I need.

1          One moment.  I'm sorry.  If we can continue playing

2    just one moment.

3          (Whereupon, the video was viewed.)

4    Q.   (By Mr. Frank) And, again, directing your attention,

5    they are over at the hand tool area.  Do you see the guy in

6    the green picking something up?

7    A.   Yes.

8    Q.   And do you see him making some sort of chopping motion;

9    is that right?

10   A.   Yes.

11   Q.   And do you see Mr. Veiovis picking up some or the guy

12   in the mohawk picking something up and making a chopping

13   motion?

14   A.   I do not.

15   Q.   Just the person in the green?

16   A.   That is correct.

17        MR. FRANK:  Thank you very much.  I have nothing

18   further

19        THE COURT:  Redirect examination?

20        MR. CACCAVIELLO:  Nothing further, Judge.

21        THE COURT:  You are excused, Mr. Carriveau.

22   Thank you very much.

23        THE WITNESS:  You're welcome.

24        (The witness stepped down.)

25        THE COURT:  Ladies and gentlemen, we are going to break

1    for the day and I'm going to remind you of my cautionary

2    instructions.  Don't discuss the case with anyone, including

3    among yourselves when you arrive here early in the morning.

4        Second, don't make any effort to gather any information

5    about the case, including any media reports, should there be

6    any.

7        Thank you for your patience and attention today.

8        You are excused.

9        (The jury exited at 3:59 p.m.)

10       THE COURT:  Please be seated.

11       Mr. Frank, while I'm thinking of it, I am prepared to

12   give the jury an instruction regarding the limited purpose

13   for which they can use evidence of any affiliation with the

14   Hells Angels, either by Mr. Hall or your client.  I assume

15   there will be some evidence forthcoming, at least his

16   attendance at the clubhouse on certain occasions.

17       Are you requesting that instruction?

18       MR. FRANK:  Judge, I'm -- the answer is no, I'm not.  I

19   am confident of the way the information will come in.  I am

20   not requesting that instruction.

21       THE COURT:  I assume at some point in time you will be

22   asking for a limiting instruction regarding your client's --

23   any evidence of your client's affiliation with the Aryan

24   Brotherhood, should I allow that evidence.

25       MR. FRANK:  Yes.

1        THE COURT:  All right.

2        MR. FRANK:  I will just alert the Court I will be ready

3   tomorrow to argue the motion that we've been discussing, the

4   motion to suppress.

5        THE COURT:  All right.  Very well.

6        Anything on behalf of the Commonwealth, Mr. Capeless?

7        MR. CAPELESS:  I'm sorry, Your Honor?

8        THE COURT:  Anything on behalf of the Commonwealth,

9   scheduling or logistical in nature?

10       MR. CAPELESS:  No, Your Honor.

11       THE COURT:  All right.  We are in recess.

12       (The Court exited at 4:00 p.m.)

13       (* * * * *)

14

15

16

17

18

19

20

21

22

23

24

25

1    **C E R T I F I C A T I O N**

2        I, ALICIA CAYODE KYLES, REGISTERED PROFESSIONAL

3    REPORTER, REGISTERED MERIT REPORTER, OFFICIAL COURT

4    STENOGRAPHER, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE

5    AND ACCURATE TRANSCRIPT FROM THE RECORD OF THE COURT

6    PROCEEDINGS IN THE ABOVE ENTITLED MATTER.

7        I, ALICIA CAYODE KYLES, FURTHER CERTIFY THAT THE

8    FOREGOING IS IN COMPLIANCE WITH THE ADMINISTRATIVE OFFICE OF

9    THE TRIAL COURT DIRECTIVE ON TRANSCRIPT FORMAT, RESERVING MY

10   RIGHT TO PROVIDE AN ELECTRONIC COPY, WHEN REQUESTED, AT THE

11   COPY RATE AS PROVIDED BY THE STATUTE IN CHAPTER 221: SECTION

12   88, AS AMENDED.

13       I, ALICIA CAYODE KYLES, FURTHER CERTIFY THAT I NEITHER

14   AM COUNSEL FOR, RELATED TO, NOR EMPLOYED BY ANY OF THE

15   PARTIES TO THE ACTION IN WHICH THIS HEARING WAS TAKEN, AND

16   FURTHER THAT I AM NOT FINANCIALLY NOR OTHERWISE INTERESTED

17   IN THE OUTCOME OF THE ACTION.

18

19

20   ALICIA CAYODE KYLES, RPR, RMR, OCR

21   Dated:  December 19, 2014

22   50 State Street

23   Springfield, Massachusetts  01103

24   413-748-7624

25