UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DAVID CHALUE,

                    Petitioner

           v.

RAYMOND ROYCE,

                 Respondent.

CIVIL ACTION
NO. 22-30030-MGM

**<u>RESPONDENT'S MEMORANDUM OF LAW IN OPPOSITION TO
PETITION FOR WRIT OF HABEAS CORPUS</u>**

ANDREA JOY CAMPBELL
ATTORNEY GENERAL

Nicole Nixon (BBO# 688255)
Assistant Attorney General
Office of the Attorney General
One Ashburton Place
Boston, MA  02108
617-963-2852
Nicole.M.Nixon@state.ma.us

Dated:  February 6, 2023

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND.....................................................................2

    I.      The Charged Conduct. ............................................................................... 3

    II.     Procedural Posture. ................................................................................. 10

ARGUMENT ....................................................................................................................11

    I.      The Legal Standard Governing Review Of Habeas Corpus Petitions Sets A High Bar For Relief. ............................................................................... 11

          A.      Federal Collateral Review Is Highly Deferential To State-Court Decisions................................................................................... 11

          B.      A Federal Habeas Petitioner Is Not Entitled To Relief Unless He Demonstrates That Any Trial Error Had A Substantial And Injurious Effect On The Jury's Verdict. ..................................... 13

          C.      A Petitioner Cannot Obtain Relief On Any Claim That Was Rejected By The State Courts Of Massachusetts On The Basis Of An Adequate And Independent State-Law Ground. ................................ 14

    II.     The Petitioner Is Not Entitled To Federal Habeas Corpus Relief........................ 15

          A.      The Petitioner Is Not Entitled To Relief On His Claim That The Trial Judge Incorrectly Instructed A Lone Juror Regarding The Need For A Unanimous Verdict, Thereby Coercing A Verdict. .............. 16

          B.      The Petitioner Is Not Entitled To Relief On His Claim That The Trial Judge Impermissibly Permitted Prior-Bad-Act Evidence To Be Admitted. .......................................................................... 29

          C.      The Petitioner Is Not Entitled To Relief On His Claim That The Prosecutor Engaged In Misconduct During His Opening Statement And Closing Argument. ........................................................... 44

## INTRODUCTION

The respondent hereby opposes the habeas corpus petition filed by the petitioner, David Chalue.[1]  The petitioner challenges his Massachusetts state convictions on three counts each of first-degree murder (on a theory of deliberate premeditation), kidnapping, and intimidation of a witness.  A jury convicted him after hearing evidence that he participated in the kidnapping and killing of David Glasser, Edward Frampton, and Robert Chadwell of Pittsfield in August of 2011, in an effort to prevent Glasser from testifying at the upcoming trial of a co-venturer, Adam Hall.

The petitioner claims that he is entitled to federal habeas relief on three grounds: (1) the trial judge gave an erroneous instruction to a lone juror and then to the rest of the jurors concerning the reaching of a unanimous verdict; (2) the trial judge repeatedly allowed admission of irrelevant and prejudicial bad-act evidence; and (3) the prosecutor made several misstatements

---

[1] Pursuant to a transfer under the Interstate Corrections Compact, the petitioner is serving his Massachusetts sentence for first-degree murder in New Jersey.  He has named a New Jersey correctional official, Raymond Royce, as the respondent.  Where the petitioner is challenging his Massachusetts conviction in the District of Massachusetts, a Massachusetts official is the real party in interest.  Therefore, the Massachusetts Commissioner of Correction, Carol Mici, should be substituted—or at least added—as the respondent.  See, e.g., Gustafson v. Williams, No. 2:09-CV-01225KJDLRL, 2010 WL 1904518, at *4 (D. Nev. May 10, 2010) (unpublished) (where inmate was serving a Minnesota sentence in Nevada pursuant to an interstate compact, federal district court in Nevada ordered transfer of petition to Minnesota and directed that Minnesota Commissioner of Corrections be substituted for Nevada corrections official as the proper respondent).  Alternatively, the Massachusetts Attorney General, Andrea Campbell, should be substituted—or at least added—as the respondent.  See, e.g., Dkt. Entry No. 4 at p.1, n.1, Yahtues v. Warden, No. 21-cv-533-SE (D.N.H. Nov. 9, 2022) (unpublished) (adding New Hampshire Attorney General as respondent where inmate was serving a New Hampshire sentence in Massachusetts pursuant to an interstate compact, inmate was challenging the New Hampshire conviction that gave rise to the sentence he was serving, and inmate had named a Massachusetts prison official as the sole respondent).

during opening statement and closing argument.  Doc. No. 1 at 6-9.[2]  The Massachusetts

Supreme Judicial Court ("SJC") reasonably and correctly rejected each of those claims in a

thorough opinion.  <u>Commonwealth v. Chalue</u>, 486 Mass. 847 (2021).  Habeas relief is not

appropriate.

## **FACTUAL AND PROCEDURAL BACKGROUND**

On review of a petition for habeas corpus relief, "a determination of a factual issue made

by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  Under this

presumption, "the term 'facts' refers to 'basic, primary, or historical facts,' such as witness

credibility and recitals of external events."  <u>Sleeper v. Spencer</u>, 510 F.3d 32, 38 (1st Cir. 2007),

quoting <u>Sanna v. Dipaolo</u>, 265 F.3d 1, 7 (1st Cir. 2001).  This presumption also extends to

factual findings not expressly articulated but that are implicit in the state court's rulings.  <u>See</u>

<u>Teti v. Bender</u>, 507 F.3d 50, 58-59 (1st Cir. 2007) ("[I]mplicit credibility determinations . . .  are

exactly the type of factual determinations to which we defer, at least short of any indication of

serious error."); <u>Valdez v. Cockrell</u>, 274 F.3d 941, 948 & n.11 (5th Cir. 2001) ("[t]he

presumption of correctness not only applies to explicit findings of fact, but it also applies to

those unarticulated findings which are necessary to the state court's conclusions of mixed law

and fact").  It applies equally whether factual determinations are made by a state appellate court

or a state trial court.  <u>Norton v. Spencer</u>, 351 F.3d 1, 6 (1st Cir. 2003).

The petitioner bears the burden of rebutting the presumption of correctness by clear and

convincing evidence.  28 U.S.C. § 2254(e)(1).  Unless the petitioner overcomes this hurdle, the

---

[2] Documents filed in this court are cited as (Doc. No. __ at [page(s)]).  The respondent's
Supplemental Answer, filed on June 30, 2022, is cited as (SA ex.[number]/[page(s)]).  The Trial
Transcripts, which were filed as exhibits to the supplemental answer, are cited as
(T[volume]/[page(s)]).

reviewing court must accept the state court's findings of fact.  See Linton v. Saba, 812 F.3d 112, 116 (1st Cir. 2016).  See, e.g., Torres v. Dennehy, 615 F.3d 1, 5 (1st Cir. 2010) (concluding that petitioner's arguable interpretation of facts, where SJC had found otherwise and provided adequate support for its conclusion, did not warrant habeas relief).

## I.    The Charged Conduct.

The SJC described the facts underlying the crime in the following terms:

The circumstances leading up to the killings began in July 2009, when Hall beat Glasser with a baseball bat because he believed that Glasser had stolen and sold motor vehicle parts that belonged to Hall.  Hall was later arrested for the assault. In July 2010, while the charge against Hall of assault and battery by means of a dangerous weapon was pending, Hall concocted a scheme to discredit Glasser by framing him on a false kidnapping charge.  The scheme backfired and resulted in further charges being filed against Hall. [FN 3].

> [FN 3]. For a more thorough description of the 2009 and 2010 incidents, see [Commonwealth v.] Hall, 485 Mass. [145] 147-148 [(2020)], and [Commonwealth v.] Veiovis, 477 Mass. [472,] 474 [(2017)]. Because the Commonwealth presented substantively the same evidence with respect to these prior incidents at each of the three trials, and [the petitioner] was not involved in either incident, we need not detail them here.

The [petitioner] entered the scene in the summer of 2011, when he started spending time with Hall.  At the time, Hall's trial for his charged conduct against Glasser was pending.

The timeline of events in the days before and after the killings is important in evaluating the evidence implicating the [petitioner's] participation in the killings. On the evening of Friday, August 26, Hall, Veiovis, the [petitioner], and Katelyn Carmin (a friend of Hall) drove around in Hall's tan Buick visiting several bars and eventually the Hells Angels clubhouse in Lee.  [FN 4].  Hall ranted about Glasser, saying he was going to "kill that motherfucker" for ruining his life.  In response, Veiovis said things that "fuel[ed] up the fire," but the [petitioner] only added, "You'll be all right, everything is going to be fine."  At the clubhouse, the group rode all-terrain vehicles.  When Carmin was driving one of the vehicles with either Veiovis or the [petitioner] on the back, Hall told her to be careful because he needed Veiovis and the [petitioner] "for a job."

> [FN 4]. At other times during the trial, witnesses described the same Buick as gold.

The next night, Hall, Veiovis, and the [petitioner] again spent time at the Hells Angels clubhouse, where they met up with two women, Allyson Scace and Kayla

Sewell. Afterwards, the group decided to go to Veiovis's apartment in Pittsfield. The [petitioner], Veiovis, and the two women traveled together in Sewell's car. Hall drove separately, stopping at his friend Steven Hinman's house in Lenox, where he showed Hinman a .45 caliber semiautomatic pistol that he had tucked in his vest, as well as a bag that contained a .44 caliber Magnum revolver, a .22 caliber Derringer, and an M-16-type weapon. When Hall arrived at Veiovis's apartment, he pulled the firearms out of a dog food bag and asked Veiovis where he could find gloves and cleaning fluid. Veiovis directed him to the kitchen and then went upstairs with Sewell. The [petitioner] was sitting on the couch during this exchange. While Veiovis and Sewell were upstairs, Hall and the [petitioner] disassembled and cleaned the firearms.

Late that night or early Sunday morning, the three victims were kidnapped from Glasser's Pittsfield apartment. The three men were last seen sometime after 10 P.M., when Glasser's upstairs neighbor came down and asked Glasser to move his truck. The last call made from Chadwell's cell phone was at 11:21 P.M. Sometime before 2 A.M. on Sunday, the upstairs neighbor heard banging on the front door of Glasser's apartment.

On Sunday at around 1:30 A.M., Hall arrived at the residence of his friends, the Sutton family, in Pittsfield. He went upstairs and spoke briefly to Rose Dawson and her friend Alexandra Ely. Ely was Hall's girlfriend and was staying overnight with Dawson at the Sutton residence. Hall asked Dawson if he could borrow her cell phone. She gave it to him, and he said he would be back soon. Hall got into the passenger's side of a Jeep and left. It was unclear whether there were other people in the Jeep.

Hall was next seen at a convenience store in Pittsfield at around 5:30 A.M. on Sunday, looking wet and dirty. He purchased three candy bars and a pack of Marlboro cigarettes using cash that was crumpled and wet. He left the store, but he returned a couple of minutes later and bought Black and Mild cigars. Hall got into the driver's side of his Buick and drove away; the store operator could not see if anyone else was in the car with him. Hall did not smoke. Veiovis, however, smoked Black and Mild cigars, and the [petitioner] smoked Marlboro cigarettes.

Shortly thereafter, Hall returned to the Sutton residence in the Buick, parked it on the front lawn, and then got picked up by Veiovis driving his Jeep. Nobody else was in the Jeep with Veiovis.

Sometime after 9 A.M. on Sunday, Hall, Veiovis, and the [petitioner] arrived at the Sutton residence in Veiovis's Jeep. Hall gave Dawson and Ely the keys to his Buick and a handful of "wet and yucky" cash, and he asked them to go to a grocery store in Peru to purchase bleach and food for breakfast. He told them to wash their hands after touching the money, and he also told them not to look in a bag on the floor on the passenger's side of the car. Despite Hall's prohibition, Dawson looked in the bag and saw a glove that looked like a batting glove. While Ely and Dawson were at the store, Hall called them and told them not to buy the

4

bleach after all.

Ely and Dawson then met the three men at Hall's house in Peru to eat breakfast. The three men looked tired and wet, and the [petitioner] was in bed.  Hall returned Dawson's cell phone to her and told her to delete the call log and not tell anyone he had borrowed it.  Dawson replied, "I'm not stupid."

At around 2 P.M. on that same Sunday, Hall went to the home of his friend David Casey in Canaan, New York.  Hall told Casey he was having trouble with a car in Becket and needed somewhere to park it.  Casey called his friend Alan Pavoni. Pavoni agreed to let Hall park in his driveway in Becket.

Hall then told Casey that he had killed Glasser, as well as a "fat guy" and a Black man who were with Glasser.  He said that when he tried to shoot Glasser, the gun misfired, and as he tried to rechamber another round, Glasser ran into the woods. Someone went after Glasser and shot but did not kill him, instead bringing Glasser back to Hall so that Hall could kill him.  Casey thought that Hall named the person who went after Glasser as "Davey," but he was not sure. [FN 5].

> [FN 5]. The [petitioner] often went by "Davey."  In Casey's initial statement to police, as well as in his testimony to the grand jury, he did not say that Hall had mentioned any names.  In a letter Casey wrote to the district attorney's office reporting what happened, Casey wrote, "I did not get his name."  In January 2014 — three months prior to the [petitioner's] trial — Casey testified under oath that Hall did not name any of his coventurers.  At the [petitioner's] trial, Casey testified, "I thought [Hall] said: Davey was on him real quick," and added, "[B]ut I'm not sure about that."

Hall went on to describe the murders, saying that Glasser was "begging for his life" and saying "please don't kill me" and "I won't testify."  In response, Hall told Glasser, "I told you what would happen if you witnessed against me."  Hall told Casey that they had tortured and cut up the other victims.  Hall said that it had been raining through all this and that he "really enjoyed it because he liked doing things in the rain."

Hall asked Casey to bury the men on his property.  Casey refused.  Hall then asked if Casey was still doing work with his excavator on Daniel Cole's property in Becket.  Hall asked Casey to dig a hole there with the excavator.  Casey agreed, and they arranged to go there the next morning, meeting beforehand at Pavoni's nearby home.  Hall also told Casey that if he agreed, no harm would come to Casey's sister or her boyfriend.  Casey was "numb, nervous, [and] scared," and agreed because he was afraid of repercussions.

Sometime later on Sunday afternoon or evening, Hall, Veiovis, and the [petitioner] returned to the Sutton residence in the Jeep and exchanged it for the Buick.  At around 5 or 6 P.M., Hall dropped off the Buick at the Pavoni house in Becket.  One or two other people arrived in the Buick with Hall, but the

[petitioner] was not among them.  Nor was the [petitioner] among the "about three people" who arrived in a Jeep a few minutes later to pick up Hall.

On Monday morning, Casey met Hall at the Pavoni house at around 10 A.M.  The [petitioner] was there, and Hall introduced the [petitioner] to Casey as "Davey" and said that the [petitioner] was in the Aryan Brotherhood. [FN 6].

> [FN 6].  Casey did not mention the [petitioner's] presence in his initial statements to police.  He explained that he did not do so given that he did not think the [petitioner] had anything to do with the murders because Hall did not mention him when Hall described committing the crimes.

Hall then had the [petitioner] step out of earshot, and spoke to Casey about burying the bodies.  Hall opened the trunk of the Buick and said, "They're starting to smell."  Hall and Casey drove in Casey's truck to the Cole property, which was about three miles away.  They ascertained that Cole was not home and then returned to Pavoni's house to retrieve the Buick.  The [petitioner] was still at Pavoni's house when they returned.  Hall then drove the Buick to the Cole property, following Casey in his truck.  Using the excavator at the Cole property, Hall and Casey dug a hole and buried the bodies.  After they finished, Hall said to Casey, "[R]emember, keep your mouth shut.  Even in jail, I can make things happen."

While Hall and Casey were burying the bodies, the [petitioner] made four unanswered calls [FN 7] to Hall's cell phone between 11:58 A.M. and 12:34 P.M. and sent text messages saying, "Hey, what's going on?" and "Dude, I'm ready to leave.  I don't know what to tell you."  Hall's cell phone was turned off.

> [FN 7].  The cell phone records indicated that the calls were of "extremely short durations" but did not show whether the calls went through.  We infer that given the number of calls, the calls' short duration, the fact that Hall's cell phone was off, and the content of the text messages, it was likely the calls were unanswered.

Later on Monday afternoon, Hall and Dawson used a hose to wash out the inside and outside of Hall's blue Hyundai [FN 8] at the Sutton house.

> [FN 8].  The color of Hall's Hyundai was variously referred to as blue and purple throughout the trial.

The [petitioner] was present, but he did not assist Hall.  Ely and Dawson both testified that Hall mentioned that a guy and two of his friends were missing.  Dawson testified that later Hall pulled her aside and said, "[O]ne of them was fixing the computer, one was laying on the couch, and one was sitting in front of the couch playing video games."

At around 4:30 P.M. on Monday, Hall and another man [FN 9] brought the Buick to a salvage yard and sold it for scrap.  Much of the back seat was entirely ripped out, and the floors of the car were soaked.  The other man drove a purple Pontiac, and after leaving the Buick at the salvage yard, Hall left with the man in the

purple car.

> [FN 9]. The salvage yard proprietor declined to identify this man as the [petitioner] at trial.

At 8:43 P.M. that evening, Hall and the [petitioner] went to a department store, where Hall bought boots and socks, telling an employee that his old ones were wet.

On Monday night, Hall, Ely, Dawson, and the [petitioner] went to the Hells Angels clubhouse in the blue Hyundai. Hall and the [petitioner] got drunk and were joking, laughing, and having fun. The [petitioner] pointed and laughed as Hall acted out a scene where he said, "Help me, help me," while being chased. The [petitioner] did not act anything out and "didn't really say anything." Hall referenced someone whose new nickname was "Butch" or "Butcher," and described him as "a crazy mother fucker" and "a real pro."

Hall and the [petitioner] spent Tuesday night at the Hells Angels clubhouse with Ocean Sutton. [FN 10].

> [FN 10]. Because various members of the Sutton family testified at trial, Ocean and Edward Sutton are referred to by their first names.

On Wednesday morning, while still at the clubhouse, Hall burned some of his clothing. The [petitioner] was at the clubhouse, but he did not burn his own clothing and had "no part" in the burning of Hall's clothes. Hall, Ocean, and the [petitioner] then drove in Hall's Hyundai to get something to eat. On the way back, they stopped the car on a bridge. Hall threw an empty shoebox, empty bags, and socks into the river. Some of the items did not make it off the bridge, so at Hall's direction, the [petitioner] picked those items up and threw them in the river.

On Sunday, August 28, and Monday, August 29, there had been no response to Glasser's door or telephone, but his truck remained in the driveway. On Monday, Glasser did not appear to bring a friend to work as planned, and Frampton missed a doctor's appointment. A missing person's report was filed on Glasser and Frampton on Wednesday, August 31. [FN 11].

> [FN 11]. A missing person's report had previously been filed for Chadwell on Monday, August 29.

On Sunday, September 4, Hall, Veiovis, and the [petitioner] were questioned by State police at a gasoline station in Pittsfield. Police seized Veiovis's Jeep, Hall's socks and boots, and each man's cell phone. Later that day, Hall was arrested on other charges.

On Monday, September 5, State police Lieutenant David Foley told the [petitioner] he was going to be arrested. The [petitioner] remained in the area, staying at Ocean's apartment with her.

On Friday, September 9, after Casey revealed to police the location of the bodies, police began to search the property with Cole's consent.  When police eventually excavated the property, they recovered a severed arm and black plastic bags containing the dismembered remains of Glasser, Frampton, and Chadwell.  The autopsy of the body parts revealed that all of the victims had been shot and stabbed; their neck, arms, and legs had been removed, and two of the bodies had been cut through the torso.  Most of the dismemberment had been accomplished by chopping or hacking with a sharp instrument, such as a butcher knife or meat cleaver.  Veiovis and the [petitioner] were arrested on Saturday, September 10.  At some point after his arrest, the [petitioner] called his girlfriend from jail and told her that the police had no clothes that they could tie to the victims in the case.

On September 12, police executed search warrants at two apartments in the same building in Pittsfield: one was Veiovis's current apartment, and the other he had recently vacated.  In one of them, police found various weapons and anatomical illustrations, which we detail and discuss infra.

While in segregation at the Berkshire County house of correction in September 2011, the [petitioner] met a fellow inmate, Christopher Letalien.  Letalien testified that the [petitioner] told him, "I got a body.  Not only do I got one body, I got three bodies… .  Not only do I got three bodies, but I made them disappear… .  Not only did I make them disappear, but fourteen days later, they found them cut up into pieces at the bottom of a ditch."  In several telephone calls from jail, Letalien asked family and friends to lie to help him with his pending case.  In one, he said that his "ace" was his testimony against the [petitioner].

Subsequently, in October 2011, the [petitioner] met another inmate, Jason Lemieux, in the Berkshire County house of correction.  The [petitioner] spoke to Lemieux about his case, which surprised Lemieux.  Lemieux interpreted the [petitioner's] willingness to discuss his case as both to brag as well as to intimidate other inmates.  The [petitioner] described to Lemieux that the victims were "tortured beyond torture" and "cut up and made to disappear."  Lemieux also testified that the [petitioner] referenced his involvement in the Aryan Brotherhood.

Two years later, in 2013, the [petitioner] was held pretrial at Souza-Baranowski Correctional Center (SBCC), where he met Jethro Kempton, a fellow inmate and member of the Aryan Brotherhood.  Kempton testified that before they met in person, the [petitioner] wrote him a letter, which stated in part:

"Jethro, what's up, brother?  I send my salutation your way.  My name is David Chalue.  I was with Kurt.  I've heard a great deal about you, all good things, and I'm hoping to meet you when you get out.  I'm a 52(a), fighting a triple out of Pittsfield.  Things look good on that case.  I'm to beat it and get back out there.  About another year to [eighteen] months before trial.  Anyways, was talking with Mark the other day, and he was saying you have two on deck.  He said you like them and thought they would make a good addition.  Keep them on deck, but right now, they [sic] just can't be any new additions until things are cleared up out

west, et cetera.  I'm sure if [*sic*] you knew this, so I just wanted to know.  Also this is not for the two on deck to know about it.  It's in-house biz.  When things are cleared up everyone has to approve before those on deck are in.  But there will be a lot of time to talk about it when you get over here.  Hopefully, it won't be too long."

The letter was signed "David SS" and accompanied by lightning bolts that symbolized association with the Aryan Brotherhood.  Kempton testified that when he and the [petitioner] eventually met in person, the [petitioner] noted that he had connections to the Aryan Brotherhood in the Federal penal system and California.  After Kurt King, who was the former head of the Aryan Brotherhood in Massachusetts, died, it was decided that Kempton would be the new head of the Aryan Brotherhood in Massachusetts and the [petitioner] would "go along" with him.

Kempton testified that the [petitioner] had said he felt like he could trust Kempton, and thus told Kempton about his case.  The [petitioner] described Hall to Kempton as a "Big Dummy," and said he was just using Hall to attain access to firearms.  Kempton testified that the [petitioner] described the kidnappings, saying that "he knocked on the door of the individual's home.  He went to get one guy — the guy they were looking for — and they happened to have two friends over that night."  The [petitioner] described the killings in a joking manner.  Kempton testified, describing the [petitioner's] statements:  "[W]hile they were shooting them, one guy ran off in the woods naked.  He said he stripped naked and started shooting him.  He didn't say who shot who or who ran after who.  He just said we had to track him down in the woods."  Kempton further testified that the [petitioner] "let the bodies, you know, sit for [a while] so the blood would coagulate, so that when they dismembered them, it wouldn't … squirt."

Also in 2013 while at SBCC, the [petitioner] met another inmate, Jeffrey Cashman.  Cashman had previously become a member of the Aryan Brotherhood but later learned his membership was in doubt.  Cashman spoke with the [petitioner] about his issue with his Aryan Brotherhood membership.  The [petitioner] told Cashman, "[Y]ou're all set.  I'm putting you up.  You're in."  The [petitioner] told Cashman he trusted him.  At one point, the [petitioner] told Cashman that he wanted him to read a "novel."  The "novel" was sent down to Cashman's cell, and it turned out to be the [petitioner's] discovery packet.  Inside the packet, there was a small note that stated:
"Yeah, check out this novel on a bro's case.  A quick read, but enjoyable read.  Keep in mind the names of all of the rats in this case.  I'm sure they will all be making their way up this way.  And yes, they're all in the hat.  Listen, I'm willing to reinstate you, but I first have to know without a doubt, [one hundred] percent, are you willing to give your life for this thing, because once you're in, there's no way out.  That means making your bones when the time comes.  Are you willing to do that?  If so, let me know.  Respects, D."

Cashman testified that "in the hat" meant "a death contract on you and all members of the Aryan Brotherhood in that institution, names go in a hat and

whatever name comes out, they're the one that kills him or hurts him, whichever."
Cashman testified, "'Making your bones' means you're on probation.  You're
actually — you're not a member.  You're an associate.  And then once you make
your bones, you're — you're directed to do a hit, either to hurt somebody or kill
somebody — very rarely just to hurt; usually it's death.  Death contract."

Cashman's testimony about the [petitioner's] description of the killings differed
slightly from the other evidence.  Cashman testified that the [petitioner] had said
that after kidnapping the victims, the [petitioner], Hall, and Veiovis went to
Casey's house in New York.  Casey was upset because he expected one victim,
not three.  After that, the group went to one of Hall's properties, where the
killings took place.  Further, Cashman testified that the [petitioner] had referenced
a woman being present during the killings, saying "one of the girls" went to pick
up a saw and Hall told her, "[Y]ou don't want to touch that."  The defense
attorney impeached Cashman with evidence that Cashman had read the 103-page
"novel" of discovery from the case and, thus, was already familiar with many of the
details.  On cross-examination, Cashman testified that he had read many of the
details in the discovery packet, including the information about a woman picking
up a saw.

Chalue, 486 Mass. at 849-859.

## II.    Procedural Posture.

On October 6, 2011, a grand jury in Berkshire County, Massachusetts indicted the

petitioner on three counts each of murder, kidnapping and intimidation of a witness arising from

the events described above.  SA Ex.1/11.  Trial began in the Superior Court (Kinder, J.) on April

25, 2014, and continued for twelve days.  After deliberating for five days, the jury found the

petitioner guilty of all charges.  Id. at 31-32.  On May 16, 2014, the Superior Court sentenced

him to the statutorily mandated term of life in prison without possibility of parole.  Id. at 16.  See

Mass. Gen. Laws ch. 265, § 2(a).

The petitioner unsuccessfully appealed.  On February 23, 2021, after conducting plenary

review pursuant to Mass. Gen. Laws ch. 278, § 33E, the SJC upheld the petitioner's convictions

and refused to exercise its authority to set aside or reduce the verdicts.[3]  <u>Chalue</u>, 486 Mass. at

885.  He then filed the habeas petition at issue here on March 15, 2022, asserting an entitlement

to relief on the grounds described earlier.  Doc. No. 1.

## ARGUMENT

I.    **The Legal Standard Governing Review Of Habeas Corpus Petitions Sets A High Bar For Relief.**

A.    **Federal Collateral Review Is Highly Deferential To State-Court Decisions.**

According to 28 U.S.C. § 2254(d), federal habeas corpus relief may not be granted on a

properly exhausted claim that was adjudicated on its merits by a state court unless the state

court's "decision was contrary to, or involved an unreasonable application of, . . . clearly

established precedents [of the Supreme Court of the United States], or was based upon an

unreasonable determination of the facts."  <u>Price v. Vincent</u>, 538 U.S. 634, 639 (2003).  "In this

context, clearly established law signifies the holdings, as opposed to the dicta, of th[e] [Supreme]

Court's decisions."  <u>Howes v. Fields</u>, 565 U.S. 499, 505 (2012) (quotations omitted).

A state court's decision is "contrary to" clearly established Supreme Court precedent

when it arrives at a conclusion of law opposite to that reached by the Supreme Court or when it

resolves a case differently than the Supreme Court on materially indistinguishable facts.  <u>Price</u>,

---

[3] Under Massachusetts law, defendants appealing first-degree murder convictions bypass the Massachusetts Appeals Court and receive broad, plenary review directly by the SJC.  <u>See</u> Mass. Gen. Laws ch. 278, § 33E ("[T]he entry in the [SJC] shall transfer to that court the whole case for its consideration of the law and the evidence.  Upon such consideration the court may, if satisfied that the verdict was against the law or the weight of the evidence, or because of newly discovered evidence, or for any other reason that justice may require (a) order a new trial or (b) direct the entry of a verdict of a lesser degree of guilt . . . ."); Mass. Gen. Laws ch. 211A, § 10 (carving out exception for first-degree murder cases in establishing appellate jurisdiction of Massachusetts Appeals Court); <u>see also</u> <u>Commonwealth v. Gunter</u>, 459 Mass. 480, 485-486 (2011) (explaining the "uniquely thorough review of first degree murder convictions" (quotation omitted)).

538 U.S. at 640.  Yet, even when a state court applies a standard that is contrary to clearly established federal law, a petitioner still is not automatically entitled to relief.  Instead, he must demonstrate that he "is in custody in violation of the Constitution or laws or treaties of the United States."  Aspen v. Bissonnette, 480 F.3d 571, 576 (1st Cir. 2007) (quotation omitted).  "This means that a petitioner must show that his underlying detention is unlawful and not just that the state court employed faulty reasoning in his case."  Id.  Ultimately, "[w]hether habeas review is under the deferential standard provided in § 2254(d)(1) or under the de novo standard . . . , state habeas petitioners may not seek release on federal law grounds which have yet to be clearly established."  Kater v. Maloney, 459 F.3d 56, 63-64 (1st Cir. 2006).

A state court unreasonably applies clearly established Supreme Court precedent "if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case."  White v. Woodall, 572 U.S. 415, 426 (2014).  A state court does not, however, unreasonably apply clearly established Supreme Court precedent by simply failing to extend that precedent to some new area.  Id.  When a federal court is assessing whether a state-court decision is unreasonable within the meaning of Section 2254(d)(1), it must bear in mind that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  Harrington v. Richter, 562 U.S. 86, 102 (2011).  "Rather, as a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  White, 572 U.S. at 419-420 (brackets and quotation omitted).  The federal court must also be mindful of the specificity of the controlling rule, as set forth in the Supreme Court's case law.  "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  Richter, 562 U.S. at 101 (quotation omitted).

Finally, a state court's decision is "based upon an unreasonable determination of the

facts" if the court's resolution of a determinative factual question is "objectively unreasonable in

light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S.

322, 340 (2003); see Teti, 507 F.3d at 57-58.

"If th[ese] standard[s] [are] difficult to meet, that is because [they] w[ere] meant to be."

Richter, 562 U.S. at 102.  They "reflect[ ] the view that habeas corpus is a guard against extreme

malfunctions in the state criminal justice systems, not a substitute for ordinary error correction

through appeal." Id.

**B.     A Federal Habeas Petitioner Is Not Entitled To Relief Unless He
         Demonstrates That Any Trial Error Had A Substantial And Injurious Effect
         On The Jury's Verdict.**

A federal habeas petitioner is not entitled to a writ of habeas corpus based on a non-

structural constitutional error, unless the error "had substantial and injurious effect or influence

in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 631 (1993); see Fry v.

Pliler, 551 U.S. 112, 121 (2007) (constitutional errors in state-court proceedings are reviewed for

harmlessness under the Brecht standard).  The burden of demonstrating that an error had a

substantial and injurious effect should rest with the petitioner.  Davis v. Ayala, 576 U.S. 257,

269-270 (2015) (noting that "a prisoner who seeks federal habeas corpus relief must satisfy

Brecht" and "must show that he was actually prejudiced"); Brecht, 507 U.S. at 637 ("habeas

petitioners may obtain plenary review of their constitutional claims, but they are not entitled to

habeas relief based on trial error unless they can establish that it resulted in actual prejudice"

(emphasis added; quotation omitted)).[4]

---

[4] When a state court has found an error of constitutional magnitude but deemed the error
harmless, a habeas petitioner must show both that the state court's harmlessness determination
was unreasonable and that the error created a substantial and injurious effect on the verdict under
Brecht.  Brown v. Davenport, 142 S. Ct. 1510, 1520 (2022).

### C.    A Petitioner Cannot Obtain Relief On Any Claim That Was Rejected By The State Courts Of Massachusetts On The Basis Of An Adequate And Independent State-Law Ground.

Subject to certain, limited exceptions described below, federal habeas review of a claim is precluded when a state court has decided that claim on the basis of an adequate and independent state-law ground that is firmly established and regularly followed.  Johnson v. Lee, 578 U.S. 605, 606 (2016) (per curiam); Coleman v. Thompson, 501 U.S. 722, 729 (1991); Harris v. Reed, 489 U.S. 255, 262 (1989).

For the adequate-and-independent-state-law-ground rule to apply, the state courts must have "consistently applied" the state-law ground at issue, and must not have waived it in the particular case.  Simpson v. Matesanz, 175 F.3d 200, 206-209 (1st Cir. 1999).  Importantly, however, a state court does not waive an adequate and independent state-law basis for its decision by merely offering an alternative, federal-law-based ground to reject any given claim.  See Harris, 489 U.S. at 264 n.10 ("[A] state court need not fear reaching the merits of a federal claim in an alternative holding.  By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.").  One common example of an adequate and independent state-law ground for a decision is when "a state court decline[s] to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement."  Coleman, 501 U.S. at 729-730.

In cases where the adequate-and-independent-state-law-ground rule applies based on a procedural default, federal habeas review of the claim is barred "unless the petitioner can demonstrate cause for the default and prejudice stemming therefrom, or, alternatively, unless the petitioner can show that a refusal to consider the merits of the constitutional claim will work a miscarriage of justice."  Barbosa v. Mitchell, 812 F.3d 62, 67 (1st Cir. 2016) (quotation omitted).

14

In this context, "cause must relate to an objective factor, external to the defense, that thwarted (or at least substantially obstructed) the efforts of the defendant or his counsel to obey the state's procedural rule.  Mere attorney error, not amounting to ineffective assistance in a constitutionally significant sense is insufficient to constitute cause." Burks v. DuBois, 55 F.3d 712, 717 (1st Cir. 1995) (citations omitted).  Attorney error that does amount to ineffective assistance, on the other hand, can constitute cause to cure a default, but only if it is offered to cure the default of a different claim.  See generally Edwards v. Carpenter, 529 U.S. 446, 451 (2000).  And even then, any claim of ineffective assistance must itself have been exhausted before it may be used to excuse a procedural default of another federal claim.  Yeboah-Sefah v. Ficco, 556 F.3d 53, 76 (1st Cir. 2009).  "To scale th[e] [prejudice] wall, a petitioner must demonstrate not merely that the errors . . . created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Ortiz v. DuBois, 19 F.3d 708, 714 (1st Cir. 1994) (quotation and ellipsis omitted).  And, the miscarriage-of-justice exception "is a narrow exception to the cause-and-prejudice imperative, seldom to be used, and explicitly tied to a showing of actual innocence." Burks, 55 F.3d at 717.

The First Circuit has suggested that there is no basis for a court to find cause, prejudice, or a fundamental miscarriage of justice where a petitioner has made no effort to establish its existence.  See Hodge v. Mendonsa, 739 F.3d 34, 43 (1st Cir. 2013) (finding procedural default bar applicable where petitioner "ma[de] no attempt to show 'cause' and 'actual prejudice' on appeal" and did not "specifically argue that 'failure to consider the claim[ ] will result in a fundamental miscarriage of justice'").

## II.    The Petitioner Is Not Entitled To Federal Habeas Corpus Relief.

As noted, the petitioner advances three grounds for relief: (1) the trial judge gave an erroneous instruction to a lone juror and then to the rest of the jurors concerning the reaching of a

unanimous verdict; (2) the trial judge repeatedly allowed admission of irrelevant and prejudicial

bad-act evidence; and (3) the prosecutor made several misstatements during opening statement

and closing argument.  Doc. No. 1 at 6-9.  For the reasons stated below, none provides a valid

basis for federal habeas corpus relief. [5]   The petition ought to be denied.

### A.    The Petitioner Is Not Entitled To Relief On Hhe Claim That The Trial Judge Incorrectly Instructed A Lone Juror Regarding The Need For A Unanimous Verdict, Thereby Coercing A Verdict.

The petitioner first argues that the Superior Court "erred in giving a private <u>Allen</u> charge

to a lone minority juror in circumstances that were inherently coercive."  <u>See</u> Doc. No. 20 at 26-

46.  The SJC reasonably and correctly rejected that claim. <u>See</u> Chalue, 486 Mass. at 858-866.

### 1.    The SJC's Decision.

The SJC addressed the petitioner's jury coercion claim in the following terms:

> The [petitioner] argues that the judge twice administered an impermissible <u>Tuey</u>-<u>Rodriquez</u> charge[6] — first to a lone juror, and then to the entire jury. <u>See Rodriquez</u>, 364 Mass. at 101-102; <u>Tuey</u>, 8 Cush. at 2-3.  Because defense counsel timely objected to the charges, we apply the prejudicial error standard first to consider whether the judge erred and, if so, whether we can be certain that the improper instruction "did not influence the jury, or had but very slight effect (citation omitted)."  <u>Commonwealth v. Flebotte</u>, 417 Mass. 348, 353 (1994). We conclude that it was error for the judge to instruct an individual hold-out juror with certain elements of the <u>Tuey</u>-<u>Rodriquez</u> charge, but that it was not so coercive here as to require reversal of the [petitioner's] convictions. [FN 13].
>
> > [FN 13]. We discern no error with the judge's instructions to the entire jury, as they did not contain any elements of the <u>Tuey</u>-<u>Rodriquez</u> charge. Thus, our analysis is limited to the judge's sidebar colloquy with the

---

[5] In his memorandum, the petitioner rightly does not contest that any of the claims he has raised must be resolved under the highly deferential Section 2254 standard.  Yet, even if this Court were to review these claims <u>de novo</u>, relief should not be granted for the reasons set forth herein.

[6] As explained later in the SJC's decision (the SJC's analysis of the jury coercion claim is quoted in full below), under Massachusetts law, a so-called <u>Tuey</u>-<u>Rodriquez</u> charge "is intended for use either as part of the original instructions to the jury or as a supplemental instruction when the jurors appear to be running into difficulty reaching a verdict."  <u>Commonwealth v. Rodriquez</u>, 364 Mass. 87, 101 (1973) (setting forth language of model charge).  A so-called "<u>Allen</u> charge" is similar.  <u>See Allen v. United States</u>, 164 U.S. 492, 501 (1896).

individual juror. [7]

i. *The instruction*. On the fourth day of deliberation, the jury sent a note saying that they had reached unanimous verdicts. Guilty verdicts were announced, and the [petitioner] asked the judge to poll the jury. The clerk inquired of the juror in seat one (juror no. 1) if she agreed with the verdicts, and she said, "[N]o." After a brief recess and the judge's denial of the [petitioner's] oral motion for a mistrial, the judge ordered the jury to resume deliberations.

Five minutes later, the judge alerted counsel that juror no. 1 was refusing to reenter the deliberation room. The judge informed counsel that he planned to call juror no. 1 to sidebar to speak with her. The judge then had the following exchange with juror no. 1 at sidebar:

THE JUDGE: "[Juror no. 1], good afternoon."

JUROR NO. 1: "Good afternoon."

THE JUDGE: "Come closer, please. I just want to say a couple of things to you. First of all, I just want you to listen, I don't need you to say anything, okay?"

JUROR NO. 1: "Okay."

THE JUDGE: "As I instructed you before, if you have any honestly held feelings about the facts of this case, no one is suggesting that you surrender those feelings. On the other hand, it is important that you listen to your fellow jurors with an open mind and see if you can come to a unanimous decision. I'm going to ask that you return to deliberate with them. I know it might be difficult but it is important that you keep an open mind and listen, and again, it's important that you not surrender your feelings if convinced."

JUROR NO. 1: "Okay."

THE JUDGE: "Can you do that?"

JUROR NO. 1: "Yes, sir."

THE JUDGE: "Thank you very much. You may be excused."
After the juror left the room, defense counsel objected to the discussion that had just taken place. The jury resumed deliberations, and they returned approximately two and one-half hours later asking to be excused for the evening.

The next morning, defense counsel renewed his motion for a mistrial and noted

---

[7] The petitioner, in his memorandum, does not appear to claim that the SJC's rejection of his jury coercion claim as it related to the trial judge's instruction to the full jury was contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Doc No. 20 at 26-46. Rather, his arguments focus entirely on the trial judge's exchange with juror no. 1. Given that no argument in that regard has been fully developed in his memorandum, to the extent he is making such a claim, it is waived.

that several jurors, including the foreperson, had "act[ed] out" when asked to return to deliberate further.  Specifically, he reported that the foreperson threw a pencil, slammed his book on a chair, and shook his head when juror no. 1 said that she did not agree with the verdicts.  Counsel also noted that several other jurors were crying.

In response, the judge instructed the full jury:

"Ladies and gentlemen, I know from my own observations of you yesterday, that some of you had an emotional reaction when the verdict was announced, when you were ordered to resume your deliberations after I determined that the verdict was not unanimous, and then again at the end of the day when I ordered you to return here today for continued deliberations."
"You will recall that I earlier instructed you that emotion or sympathy, passion or prejudice, should play no role in your deliberations.  I urge you to follow that instruction and remove emotion from your deliberations in an effort to reach a unanimous verdict, if you can do so in good conscience."
"Please try to be patient and respectful of the views of your fellow jurors as you work toward that end.  I now excuse you to continue your deliberations."

The jury left the court room at 9:26 A.M. and returned at 2:35 P.M. with unanimous verdicts of guilty on all charges.  At defense counsel's request, the judge again ordered the clerk to poll the jury, and all jurors affirmed that the verdicts were theirs.

ii. *Analysis.* The Tuey-Rodriquez charge — first outlined in 1851 in Tuey, and later modified in 1973 in Rodriquez — is a model charge intended for a deadlocked jury to encourage them to continue deliberating.  When used appropriately and after the jury have engaged in due and thorough deliberation, the charge is an important tool "designed to urge the jury to reach a verdict by giving more serious consideration to opposing points of view."  Commonwealth v. Semedo, 456 Mass. 1, 20 (2010). See G. L. c. 234A, § 68C. The trial judge is ordinarily in the best position to determine whether giving such a charge is appropriate, and thus "[t]he decision whether to provide the Tuey-Rodriquez charge is … committed to [his or her] sound discretion." Ray v. Commonwealth, 463 Mass. 1, 6 (2012).  The Federal analog, known as the "Allen charge," borrows directly from Tuey. Commonwealth v. Mascolo, 6 Mass. App. Ct. 266, 273 n.6, cert. denied, 439 U.S. 899 (1978). See Allen v. United States, 164 U.S. 492, 501 (1896).

These charges have been criticized for their "tendency to coerce jurors into returning verdicts."  Mascolo, 6 Mass. App. Ct. at 273-274. See Ray, 463 Mass. at 6, quoting Rodriquez, 364 Mass. at 100 (charge carries "a 'sting' " and risks coercion when used improperly). The Allen (or Tuey-Rodriquez charge) has been referred to as "the dynamite charge, the third degree instruction, the shotgun instruction, or the nitroglycerin charge" because of its ability to "blast a verdict out of a jury otherwise unable to agree that a person is guilty."  United States v. Bailey, 468 F.2d 652, 666 (5th Cir. 1972).  The coercive impact of the charge is heightened if a juror interprets the instruction as being leveled directly at him or her.  See United States v. Sae-Chua, 725 F.2d 530, 532 (9th Cir. 1984). To this end, many Federal courts have held that giving even a modified Allen

18

charge to a lone juror — or to the full jury when the judge knows the identity of a small number of hold-out jurors — is reversible error.  [FN 14].

> [FN 14]. Indeed, this appears to be a consensus among Federal courts.  See United States v. Ajiboye, 961 F.2d 892, 894 (9th Cir. 1992) ("Even when the judge does not inquire but is inadvertently told of the jury's division, reversal is necessary if the holdout jurors could interpret the charge as directed specifically at them — that is, if the judge knew which jurors were the holdouts and each holdout juror knew that the judge knew he was a holdout"); Sae-Chua, 725 F.2d at 532 (giving modified Allen charge was reversible error where judge knew identity of sole dissenting juror and juror was aware that judge possessed that knowledge); Cornell v. Iowa, 628 F.2d 1044, 1048 n.2 (8th Cir. 1980), cert. denied, 449 U.S. 1126 (1981) ("[C]oercive impact of even a modest Allen charge is heightened when preceded by any inquiry as to the jury's numerical division"). See also United States v. Vanvliet, 542 F.3d 259, 268 n.12 (1st Cir. 2008) (no abuse of discretion when judge gave Allen charge after jury volunteered that they were split six to five, given that there were not just one or two hold-out jurors who would feel isolated and outnumbered and interpret charge as leveled directly at them). Cf. Lowenfield v. Phelps, 484 U.S. 231, 253 (1988) (Marshall, J., dissenting) ("Allen charge given on the heels of a jury poll poses special risks of coercion"); United States v. Brown, 426 F.3d 32, 38-39 (1st Cir. 2005), cert. denied, 546 U.S. 1189 (2006) (no abuse of discretion when judge declared mistrial instead of singling out lone hold-out juror for questioning because proper to prioritize avoiding coercion of questioning juror in isolation).

The instruction need not include every element of the Tuey-Rodriguez charge to be analyzed as one.  Various courts have analyzed modified Allen charges, which include some, but not all, of the language of the model charge.  See, e.g., United States v. McElhiney, 275 F.3d 928, 936 (10th Cir. 2001) ("An instruction that departs from the pure charge, whether by omission or embellishment, we call a 'modified' Allen instruction"). The ultimate inquiry is not how closely an instruction tracks the model language but, rather, whether the instruction was "impermissibly coercive in a way that undermined the integrity of the deliberation process" (citation omitted).  Id. at 940.  [FN 15].

> [FN 15]. Indeed, one court has held: "[E]ven if the [trial] court's comments did not constitute an instruction (Allen or otherwise), its remarks still had the potential to coerce the jury, and, as coercion is the primary concern with the giving of an Allen instruction, the overall Allen analysis would still be applicable.  In other words, the [trial] court's comments would be examined under all the circumstances to determine whether the verdict reached by the jury was a product of impermissible coercion.  … To summarize, the fact that [the trial] court's comments constituted a departure from the 'typical' Allen charge does not mean that they are subject to no critical inquiry whatsoever."  McElhiney, 275 F.3d at 941.  See United States v. Cheramie, 520 F.2d 325, 329 n.3 (5th Cir.

19

1975) ("the denomination of the charge is of only tangential importance").

The [petitioner] argues that this case is analogous to United States v. Zabriskie, 415 F.3d 1139 (10th Cir. 2005).  There, the judge conducted an ex parte and in camera conversation with a hold-out juror, in which the judge questioned the juror about whether he could follow the judge's instructions with an open mind, asked whether he was willing to participate and deliberate, and told him not to sacrifice his personal beliefs if they were based on the evidence.  Id. at 1141-1143.  The United States Court of Appeals for the Tenth Circuit found that "the trial judge's admonitions interspersed throughout her conversation with [the juror] match[ed] the essential elements of a typical Allen charge."  Id. at 1147 n.11.  The court held that it was "impermissibly coercive to selectively and privately give what amounts to an Allen instruction to a hold out juror."  Id. at 1148.

We agree with the [petitioner] that the judge's sidebar colloquy with juror no. 1 was erroneous.  The judge conducted an individual colloquy with a hold-out juror, at which time the judge knew that she was one.  More importantly, the juror would have been aware that the judge knew her position when the jury were polled, a scenario that reasonably might lead a juror to question even honestly held beliefs.  See Sae-Chua, 725 F.2d at 532 (giving modified Allen charge was reversible error where judge knew identity of sole dissenting juror and juror was aware that judge possessed that knowledge).  Finally, the judge instructed the juror to keep an open mind and see whether the jury could come to a unanimous decision — a prototypical element of the Tuey-Rodriquez charge.  [FN 16].

> [FN 16].  The court in Zabriskie held that the colloquy "match[ed] the essential elements of a typical Allen charge," although the judge did not actually recite the most coercive elements: the judge did not reference the undesirability of a mistrial or jurors in the minority reconsidering their views in light of the majority.  That the colloquy did not contain every element of the Allen charge was immaterial.

Thus, the indicia of coercion present in the judge's language here rendered it improper for the judge to give the lone juror this instruction in isolation.  See Sae-Chua, supra.

However, although this was error, we are confident that it "did not influence the jury, or had but very slight effect" for two reasons.  Flebotte, 417 Mass. at 353.  First, when considered together, the exchange here was less coercive than what took place in Zabriskie.  Although not dispositive, the conversation in Zabriskie occurred both ex parte and in camera — certainly a more coercive atmosphere than sidebar.  See Zabriskie, 415 F.3d at 1142.  [FN 17].

> [FN 17].  The Commonwealth distinguishes Zabriskie on this point alone, noting that giving a supplemental instruction ex parte without first consulting counsel violates a defendant's right to be present.  While it is true that such a conversation may violate a defendant's right to be present, that was not part of the court's analysis in Zabriskie.  Zabriskie addressed

whether the conversation was coercive, although the fact that the
instruction was given "selectively and privately" was an important
element of the analysis.

Although the judge here and the judge in <u>Zabriskie</u> encouraged the juror to reach
a consensus with other jurors, the language the judge used in <u>Zabriskie</u> was
heavy-handed.  <u>Id.</u> at 1143.  [FN 18].

[FN 18]. For example, in <u>Zabriskie</u> the judge told the juror, "It's your duty
as jurors to consult with one another and deliberate with a view to
reaching an agreement … ," whereas here the judge merely said, "[I]t is
important that you listen to your fellow jurors with an open mind and see
if you can come to a unanimous decision."

Further, in <u>Zabriskie</u>, the conversation was much longer and the judge asked the
juror the same questions over and over again.  <u>See id.</u> at 1142-1143.  [FN 19].

[FN 19]. For example, the judge in <u>Zabriskie</u> essentially asked the juror if
he was participating and if he had an open mind five times in a row:

THE JUDGE: "But I understand that you have come into a block, and your
fellow jurors say that some of that block is due to you.  *Are you
participating in jury deliberations*?"  (Emphasis added.)

THE JUROR: "Yes, ma'am."

…

THE JUDGE: "*Are you participating in the jury deliberations?* (Emphasis
added.)"

THE JUROR: "Yes, ma'am."

…

THE JUDGE: "All right.  You know, I've given several instructions when
this problem started coming up, which it did early, saying that it was the
obligation of each juror to reexamine his or her own views.  In other
words, you didn't go in there — *did you go — you had to go in with an
open mind*" (emphasis added).

THE JUROR: "Yes, ma'am. I did."

THE JUDGE: "And then you have to look at the evidence and listen to the
arguments and *keep an open mind to what others are saying, but
meanwhile you do not sacrifice your own firm convictions*" (emphasis
added).

THE JUROR: "Yes, ma'am."

THE JUDGE: "You must at all times *be open and be willing to participate*

*and deliberate.*

THE JUROR: "Yes, ma'am."

THE JUDGE: "You must at all times *be open and be willing to participate and deliberate.*  Do you believe you have followed that?" (Emphasis added.)

THE JUROR: "Yes, ma'am.  I'll follow it even more if need be."

Indeed, when the juror was asked whether he was attempting to base his decision on the evidence, he revealed part of his thought processes, mentioning lying awake at night thinking about the case.  Id. at 1143.  Even then, the judge in Zabriskie did not relent but, rather, continued to question the juror about whether he could follow the instructions, whether he could reexamine his own views, and again whether he could participate with an open mind.  See id.  In comparison, here, the judge's significantly shorter colloquy with juror no. 1 was more restrained, emphasized twice that the juror not surrender her feelings, and thus contained fewer indicia of coercion.

The second reason for concluding that the improper instruction was not prejudicial is that the jury here continued to deliberate for a substantial amount of time following the judge's exchange with juror no. 1.  The colloquy with juror no. 1 took place around 3:30 P.M. on the fourth day of deliberations.  The jury then resumed deliberations for another two and one-half hours that afternoon, and they returned the following day and deliberated another five hours before returning verdicts.  The amount of time the jury continue to deliberate is probative of how coercive the instruction was.  See Lowenfield v. Phelps, 484 U.S. 231, 240 (1988) (verdict soon after supplemental instruction suggests possibility of coercion); United States v. Webb, 816 F.2d 1263, 1267 (8th Cir. 1987) (that jury deliberated only fifteen minutes after receiving Allen charge went to coercive effect).  But see Smalls v. Batista, 191 F.3d 272, 281 (2d Cir. 1999) (length of deliberation did not diminish coerciveness of supplemental charge).

Finally, we must consider the difficult position in which the judge found himself when juror no. 1 refused to reenter the jury room after the jury were polled, revealing nonunanimous verdicts.  The jury had not previously indicated that they were deadlocked, and thus it would have been inappropriate to deliver the traditional Tuey-Rodriquez charge to the full jury.  See Commonwealth v. Torres, 453 Mass. 722, 736 n.17 (2009) (judge correctly did not administer Tuey-Rodriquez after jury returned with nonunanimous verdict after polling). Dismissing juror no. 1 would have raised a host of other issues. See, e.g., Commonwealth v. Connor, 392 Mass. 838, 846 (reversible error when judge dismissed deliberating juror without holding hearing to determine if there was good cause for dismissal). [FN 20].

> [FN 20]. The judge noted that the jury had not stated that they were deadlocked:
>
> "[W]e have not heard, once, from this jury that they are at an impasse of any kind.  They have continued their deliberations after having been sent

out yesterday for well over two hours, and when told that they had an
option to continue yesterday evening or come back today and resume their
deliberations they elected to come back today without suggesting that they
were at an impasse."

Dismissing juror no. 1 would have raised a host of other issues. There was not at that
point any evidence concerning an issue personal to juror no. 1 about which it would have
been appropriate for the judge to conduct a voir dire of the juror to determine if she was
able to be impartial. See, e.g., Torres, supra at 727, 733 (juror's potential bias against
police officers and wish to go home not "mere euphemism" for assertion of minority
position, and thus proper for judge to question individual juror).

The judge was in a difficult situation. He made a concerted effort to blunt the coercive
aspect of his instruction — "it is important that you listen to your fellow jurors with an
open mind and see if you can come to a unanimous decision" — by sandwiching it
between two admonitions that juror no. 1 not surrender her honestly held beliefs. While
this approach certainly lessened the coercive effect, it did not eliminate it entirely, given
the "risk of coercion inherent in questioning jurors, particularly in individual colloquies."
Ray, 463 Mass. at 5 n.5. We recognize that "trial judge[s], 'unlike us,' interact[ ] with
jurors while presiding at the trial" (citation omitted). Id. at 6. Situations arise during a
jury trial that simply cannot be anticipated, and judges must respond to these situations
with agility and leeway. "It is not always clear at the outset whether a juror's problem is
of a personal nature," Commonwealth v. Williams, 486 Mass. 646, 656 (2021), and here
the judge needed to address why juror no. 1 refused to reenter the jury deliberation room.
"It is no easy task for a judge to discuss the juror's concerns generally, and do so without
delving into deliberations" (quotations and citation omitted). Id. Here, the judge was
able to do so. That he went too far with the juror in referencing aspects of the Tuey-
Rodriquez charge at sidebar is an example of the type of error that may arise even in the
pursuit of the most perfect trial. In recognition of the precarious position the trial judge
was in, we set out guidance for speaking with jurors in similar situations in the Appendix
to this opinion. Ultimately, we hold that the charge — although erroneous — did not
have such a coercive effect as to require reversal. Flebotte, 417 Mass. at 353 (error not
prejudicial if it "did not influence the jury, or had but very slight effect").

Chalue, 486 Mass. at 858-866 (citations omitted).

### 2.      Clearly Established Supreme Court Law Governing Jury Coercion Claims.

For purposes of analyzing a jury coercion claim under 28 U.S.C. § 2254(d), clearly

established Supreme Court holdings are "sparse." Wong v. Smith, 131 S. Ct. 10, 11 (2010)

(Alito, J., dissenting from denial of certiorari, joined by Roberts, C.J., and Scalia, J.). The

Supreme Court's decision in Jenkins v. United States is of no help to the petitioner in the context

of his federal habeas corpus claim.  380 U.S. 445, 446 (1965).  <u>See</u> Doc. No. 20 at 30, 46.  There, after deliberating for a little over two hours, the jury sent a note to the trial judge indicating that it had been unable to agree on a verdict because of insufficient evidence.  <u>Jenkins</u>, 380 U.S. at 446.  The judge recalled the jury into the courtroom and instructed that 'You have got to reach a decision in this case.'  <u>Id</u>.  The jury then entered a guilty verdict on one count and a not guilty verdict on the other.  <u>Id</u>.  Acting pursuant to its supervisory powers over the federal courts, the Court remanded the case for a new trial after determining that the judge's instruction to the jury was coercive.  <u>Id</u>.  <u>See</u> <u>Lowenfield</u>, 484 U.S. at 239 n.2.  The petitioner also cites to <u>Brasfield v. United States</u> in his memorandum.  272 U.S. 448 (1926).  <u>See</u> Doc. No. 20 at 35.  However, that case is equally unhelpful to him here.  In <u>Brasfield</u>, the trial judge inquired how the jury was divided numerically after the jury had deliberated for a few hours and indicated that there was a lack of agreement.  272 U.S. at 449.  The Court determined that the judge's inquiry was grounds for reversal where such an inquiry tended to be coercive and corrupted the "fair and impartial conduct of the trial."  <u>Id</u>. at 448.  Like <u>Jenkins</u>, the Supreme Court in <u>Brasfield</u> exercised its supervisory powers to reverse the convictions and makes no mention of any constitutional provision.  <u>Lowenfield</u>, 484 U.S. at 239-240 n.3.  Because both decisions relied solely on the supervisory powers of the Court and not on constitutional grounds, they are irrelevant to a § 2254(d)(1) analysis.  <u>See</u> <u>Early v. Packer</u>, 537 U.S. 3, 10 (2002) (federal jury coercion cases premised solely on supervisory powers rather than constitutional grounds not basis for federal habeas corpus relief).

One Supreme Court case, <u>Lowenfield v. Phelps</u>, has addressed the extent to which the Constitution permits (or forbids) coercive jury instructions.  484 U.S. 231 (1988).  There, during the sentencing phase of a death penalty case, the trial judge polled a deliberating jury as to whether further deliberation would enable them to reach a verdict, and then gave them a

supplemental instruction that encouraged them to reach a verdict if they could do so without surrendering any of their own "honest" beliefs.  Id. at 234-235.  Shortly thereafter, the jury returned a sentence of death.  Id. at 235.  The defendant sought federal habeas relief, arguing that the trial judge had coerced the jury to deliver the death sentence.  Id. at 236.  The Court declared that its analysis of whether the "the jury was improperly coerced require[d] [it to] consider the supplemental charge given by the trial court in its context and under all the circumstances."  Id. at 237 (quotation omitted).  While the Justices ultimately held on the particular facts presented that "the combination of the polling of the jury and the supplemental instruction was not coercive in such a way as to deny petitioner any constitutional right," they cautioned that their decision was not to "be understood as saying other combinations of supplemental charges and polling might not require a different conclusion."  The Court emphasized that "[a]ny criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body."  Id. at 241.

> Against this backdrop, at least three Justices have recognized that
>
> the clearly established law in this area provides very little specific guidance. About all that can be said is that coercive instructions are unconstitutional, coerciveness must be judged on the totality of the circumstances, and the facts of Lowenfield (polling a deadlocked jury and reading a slightly modified Allen charge) were not unconstitutionally coercive.  A general standard such as this gives state courts wide latitude for reasonable decisionmaking under [the federal habeas statute].

Wong, 131 S. Ct. at 11-12 (Alito, J., dissenting from denial of certiorari, joined by Roberts, C.J., and Scalia, J.).  The First Circuit has reached similar conclusions, characterizing Lowenfield as "scant precedent on which to hang [a] § 2254 claim" and questioning whether such "dicta" is actually clearly established law which would support a habeas petition.  See Clements v. Clarke, 592 F.3d 45, 57 (1st Cir. 2010) (noting that, "[t]o the extent that Lowenfield does constitute clearly established federal law, that law can be summarized as follows:  defendants have a right

against coerced jury verdicts, and any potential coercion should be measured based on the totality of the circumstances"; further stating that "Lowenfield's totality-of-the-circumstances test, to the extent that it constitutes clearly established federal law to begin with, allows for a great deal of leeway").

    **3.**    **The SJC Reasonably And Correctly Rejected The Petitioner's Jury Coercion Claim.**

To the extent Lowenfield v. Phelps constitutes clearly established federal law, the SJC's decision did not run afoul of it.  The court recognized the right to an uncoerced jury, analyzed the trial judge's instruction to the minority juror within the context of the totality of the circumstances, and determined that, while error, the instruction was not so coercive as to require reversal.  See Chalue, 486 Mass. at 860-866.  Such an analysis falls squarely within the broad dictates of Lowenfield.  Thus, any claim that the SJC's rejection of the petitioner's jury coercion claim was contrary to clearly established Supreme Court precedent must fail.  See generally Clements, 592 F.3d at 57 (Noting that "[b]ecause the Supreme Court has established so little in the way of a constitutional rule governing state courts' use of polling and voir dire during jury deliberations, there is equally little for a state court to contradict.").

The petitioner's assertion that the SJC unreasonably applied Lowenfield in rejecting his jury coercion claim fares no better.  To the extent it constitutes clearly established federal law, given the generality of Lowenfield's totality-of-the-circumstances test, courts are afforded a great deal of leeway in applying it.  See Clements, 592 F.3d at 57, citing Yarborough, 541 U.S. at 664.  The SJC's application of that general standard in rejecting the petitioner's jury coercion claim fell well within the wide range of reasonableness afforded here.

The SJC first acknowledged the potentially coercive impact of an Allen charge when given to a lone juror, noting that such a scenario could lead a juror to question even honestly held

beliefs.  Chalue, 486 Mass. at 860-862.  For this reason, the SJC determined that the trial judge's

instruction, given solely to a minority juror, and which asked the juror to "keep an open mind

and see whether the jury could come to a unanimous decision[,]" at a time when the judge knew

she was in the minority and the juror knew the judge was aware of her position, was improper.

Id.  However, the inquiry into whether that instruction resulted in a coerced jury verdict does not

end there.  See, e.g., United States v. Hernandez-Albino, 177 F.3d 33, 38-39 (1st Cir. 1999)

(Allen charge, although erroneous, did not coerce jury into convicting defendant, as evidenced

by length of deliberations and verdict's internal consistency); Williams v. Parke, 741 F.2d 847,

850-851 (6th Cir. 1984) (although Allen charge given was less than ideal, it was not, under

totality of circumstances, sufficiently coercive so deprive petitioner of constitutional rights and

entitle him to habeas corpus relief).

      The SJC appropriately assessed the totality of the circumstances to determine whether the

instruction to the juror was prejudicial.  The exchange between the judge and the minority juror

took place at sidebar, in the presence of both parties, which is a less coercive atmosphere than ex

parte and in camera.  Contrast United States v. Zabriskie, 415 F.3d 1139, 1142 (10th Cir. 2005)

(noting that Allen charge is especially coercive when given in private).  That exchange was brief

and restrained.  Contrast id. at 1142-1143 (judge's exchange with lone dissenting juror was

heavy-handed, lengthy, and included questioning of juror as to whether he had an open mind five

times in a row).  The judge instructed juror no. 1 only once to keep an open mind and see if the

jury could come to a unanimous decision.  Chalue, 486 Mass. at 863-864.  This instruction was

sandwiched between two admonitions not to surrender her honestly held beliefs.  Id. at 864, 865

Compare Lowenfield, 484 U.S. at 235 (Allen charge was proper where it included instruction to

jurors to hold on to honestly held beliefs and encouraged jurors to decide case for themselves

while also considering views of others), with Smalls v. Batista, 191 F.3d 272, 280 (2d Cir. 1999)

(absence of cautionary language instructing minority jurors to hold on to own conscientiously held beliefs rendered <u>Allen</u> charge coercive and violative of petitioner's constitutional rights).

Additionally, the jury deliberated for a significant amount of time following the judge's exchange with the juror no. 1. <u>Chalue</u>, 486 Mass. at 864. <u>Contrast</u> <u>Zabriskie</u>, 415 F.3d at 1148 (coerciveness of <u>Allen</u> charge, given to lone dissenting juror in private, evidenced by fact that jury returned verdict same day despite prior indications of hopeless deadlock). After the juror returned to the deliberation room, the jury continued to deliberate for two-and-a-half more hours that day. <u>Chalue</u>, 486 Mass. at 864. This was their fourth day of deliberations. <u>Id</u>. The jury returned for a fifth day and resumed deliberations for another five hours before returning verdicts. <u>Id</u>. The length of time the jury deliberated, particularly the amount of time they continued to deliberate after juror no. 1's exchange with the judge, suggested that the instruction was not prejudicial. <u>See</u> <u>Lowenfield</u>, 484 U.S. at 240 (verdict returned soon after supplemental instruction suggests possibility of coercion); <u>Hernandez-Albino</u>, 177 F.3d at 39 (length of deliberations negated "any suggestion of coercion"); <u>United States v. Ajiboye</u>, 961 F.2d 892, 894 (9th Cir. 1992) (jury's deliberation for additional two days following <u>Allen</u> charge suggested that charge was not impermissibly coercive).

Finally, as the SJC aptly noted, the trial judge was in a difficult position. <u>Chalue</u>, 486 Mass. at 865. Juror no. 1 was refusing to re-enter the jury room after the jury were polled, revealing non-unanimous verdicts. He needed to address why she would not return to the jury room and do so without delving into the substance of the deliberations. He was able to do that in his exchange with juror no. 1. Where the trial judge engaged in an exchange with juror no. 1 at sidebar, in the presence of both parties, was brief and restrained in his comments, and emphasized twice the importance of not surrendering her honestly held beliefs, the SJC reasonably concluded that his instruction was not prejudicial. The lack of a prejudicial effect

was evidenced by the fact that the jury continued to deliberate for a substantial amount of time

following the judge's exchange with juror no. 1.  The SJC reasonably and correctly rejected the

petitioner's jury coercion claim.  For the very same reasons why the SJC's determination was not

unreasonable, any error did not have a substantial and injurious effect on the verdict.  See Brown

v. Davenport, 142 S.Ct. 1510, 1517 (2022).

> **B.      The Petitioner Is Not Entitled To Relief On His Claim That The Trial Judge Impermissibly Permitted Prior-Bad-Act Evidence To Be Admitted.**

The petitioner also claims that the SJC unreasonably rejected claims that the trial judge

wrongly permitted certain evidence to be introduced.  In particular, he argues that the judge

should not have permitted the prosecution to introduce evidence of his affiliation with the Aryan

Brotherhood and evidence of his codefendant's possession of certain weapons and anatomical

depictions.  See Doc. No. 20 at 47-61.  As discussed in more detail below, those claims are not a

basis for federal habeas corpus relief.

> **1.      Background.**

> **a.      Aryan Brotherhood Evidence.**

Four Commonwealth witnesses testified to the petitioner's affiliation with the Aryan

Brotherhood.  The Commonwealth argued that this evidence was relevant for two purposes: "to

show how Hall induced Casey to help bury the remains and to establish the credibility of

testimony from several jailhouse informants."  Chalue, 486 Mass. at 867.  As to the first purpose,

Casey testified that Hall told him that the petitioner was a member of the Aryan Brotherhood

when he introduced him to the petitioner.  TVI/243.  Casey also testified that he was worried

about repercussions "from either the Hell's Angels or the Aryans" if he were to cooperate fully

with police.  TVI/252.

The SJC affirmed the admission of this testimony, concluding:

> that Casey's testimony was probative to explain why he cooperated with Hall and
> why he did not initially go to the police or tell anyone else about what he had
> done. See Mass. G. Evid. § 401. Moreover, given that this reference to the Aryan
> Brotherhood was so limited, its probative value was not outweighed by risk of
> unfair prejudice. See Crayton, 470 Mass. at 249.

Chalue, 486 Mass. at 867. Regarding the second purpose, evidence of the petitioner's

affiliation with the Aryan Brotherhood was admitted through the testimony of three jailhouse

informants. Id. Jason Lemieux testified that the petitioner told him while they were incarcerated

together that he was involved in the Aryan Brotherhood. TXI/144. Jethro Kempton testified that

both he and the petitioner were members of the Aryan Brotherhood, that the petitioner talked

about the hierarchy of the local chapter and who might be the leader in the future, and that the

petitioner had said that he felt like he could trust Kempton. TXI/212-213, 214-215, 221-222,

226, 228, 229-233. Jeffrey Cashman, another inmate affiliated with the Aryan Brotherhood, also

testified that the petitioner indicated that he trusted Cashman. TXIIAM/56-57, 62.

The SJC affirmed the admission of most of the jailhouse informants' testimony regarding

the petitioner's affiliation with the Aryan Brotherhood, concluding:

> [e]vidence that the [petitioner] was a member of the Aryan Brotherhood makes it more
> likely that the [petitioner] truthfully confided the details of his case to some of these
> particular inmates and thereby enhanced the credibility of their testimony. [FN 21].
>
>> [FN 21]. Typically, a party must wait to bolster its own witness's credibility until
>> the witness has been impeached and thereby requires rehabilitation. There are a
>> limited number of circumstances, however, where one can bolster before
>> impeachment, such as first complaint witnesses, prior statements of identification,
>> and plea agreements. See P.C. Giannelli, Understanding Evidence § 22.02 (5th
>> ed. 2018).
>>        The situation here is akin to a prosecutor introducing evidence of a
>> cooperating witness's statements in a plea bargain concerning the obligation to
>> give truthful testimony. Generally, "any attempts to bolster the witness by
>> questions concerning his obligation to tell the truth should await redirect
>> examination, and are appropriate only after the defendant has attempted to
>> impeach the witness's credibility by showing the witness struck a deal with the
>> prosecution to obtain favorable treatment." Commonwealth v. Washington, 459
>> Mass. 32, 44 n.21 (2011), citing Commonwealth v. Ciampa, 406 Mass. 257, 264
>> (1989).

And yet this is not an "absolute prohibition that prevents any and all direct examination reference to the agreement's terms concerning 'truthful' testimony." Commonwealth v. Rolon, 438 Mass. 808, 813 (2003). We have held that where defense counsel questions a Commonwealth witness's credibility in the defense's opening statement, it is not improper for the prosecutor to bolster the witness on direct examination by eliciting testimony regarding the plea agreement's requirement to tell the truth. See, e.g., Commonwealth v. Webb, 468 Mass. 26, 32-34 (2014); Rolon, supra at 814.

Here, defense counsel extensively attacked the credibility of the jailhouse informants in his opening statement. Thus, it was clear from the outset the jailhouse informants were going to be impeached. It was therefore unnecessary for the Commonwealth to wait until redirect to elicit the Aryan Brotherhood evidence to enhance their credibility.

Because it is not common to share inculpatory details about one's case with fellow inmates, the shared membership in a secret gang showed why the [petitioner] would have trusted inmates who were also members. Thus, all of the Aryan Brotherhood testimony was relevant.

Further, we hold that with one exception discussed infra, the judge's determination that the probative value of the relevant evidence was not outweighed by prejudicial effect did not amount to a clear error of judgment outside the range of reasonable outcomes, and there was no abuse of discretion in admitting the evidence. See L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014). The judge took multiple steps to minimize the prejudicial impact of the testimony. During individual voir dire, he asked each prospective juror whether evidence of the [petitioner's] affiliation with the Aryan Brotherhood would affect his or her ability to be fair and impartial, and excused multiple potential jurors who answered yes. Moreover, the judge gave repeated limiting instructions, telling the jury they could only consider evidence of affiliation with the Aryan Brotherhood -- which was not illegal -- as it related to the relationship between the [petitioner] and the witnesses in the case, and not as evidence of the [petitioner's] bad character. [FN 22].

> [FN 22]. A judge seeking to blunt the prejudicial effect of this type of group membership evidence may also consider allowing reference to "a secret type of prison organization" instead of the more specific term "Aryan Brotherhood." This was the approach the trial judge took in United States v. Abel, 469 U.S. 45, 48-49 (1984), and here it may have been able to achieve the same effect of explaining why the defendant confided in Kempton, Cashman, and Lemieux, while avoiding other prejudicial associations of the Aryan Brotherhood.

Additionally, despite mention of the [petitioner's] affiliation with the Aryan Brotherhood, the jury heard very little detail about the group's status as the largest and deadliest prison gang in the United States or that it is known for its white supremacist ideology. [FN 23].

[FN 23].  Southern Poverty Law Center, Aryan Brotherhood, https://www.splcenter.org/fighting-hate/extremist-files/group/aryan-brotherhood [https://perma.cc/F5BB-BCPC].

"'[W]e afford trial judges great latitude and discretion' with respect to the probative-unfairly prejudicial analysis, and 'we uphold a judge's decision in this area unless it is palpably wrong.'" Commonwealth v. Facella, 478 Mass. 393, 401(2017), citing Commonwealth v. Sicari, 434 Mass. 732, 752 (2001), cert. denied, 534 U.S. 1142 (2002).  Here, we hold that it was well within the judge's discretion to admit most of the Aryan Brotherhood evidence.

Chalue, 486 Mass. at 867-869.  However, the SJC found that the trial judge abused his discretion in admitting a portion of Cashman's testimony, in which he explained what "making your bones" meant.  TXIIAM/71.

 The SJC wrote:

Cashman testified that the [petitioner] sent him a package of discovery materials from his case along with a note that referenced Cashman's need to "mak[e] [his] bones." Cashman explained that "making your bones" meant killing someone -- a prerequisite to becoming a full member of the Aryan Brotherhood.  This statement was not necessary to explain why the [petitioner] confided in Cashman, and instead implied that the [petitioner's] affiliation with the Aryan Brotherhood meant that he had committed murder.  Thus, the judge abused his discretion in allowing this statement to be admitted. We conclude, however, that because this aspect of the Aryan Brotherhood was only mentioned once, and given the evidence that the [petitioner] made statements glorifying the killings and dismemberments of the victims, the error was not prejudicial. See Commonwealth v. Graham, 431 Mass. 282, 288, cert. denied, 531 U.S. 1020 (2000), quoting Flebotte, 417 Mass. at 353, (error not prejudicial "if we are sure that the error did not influence the jury, or had but very slight effect").

Chalue, 486 Mass. at 869.

### b.     Anatomical Drawings.

The Commonwealth introduced into evidence, over the petitioner's objection, anatomical drawings found at co-defendant Veiovis's home.  TIX/156-158.  These drawings depicted images of human dissections and amputations of body parts.  TIX/76-77.

The SJC found that the drawings were relevant to show state of mind and motive.  As to state of mind, the SJC wrote:

The drawings tend to show Veiovis's "state of mind as a person fascinated by amputation and human dissection, and of an intent to seize the opportunity of these killings to engage in actual amputations and human dissection." Veiovis, 477 Mass. at 484. There is no evidence that the [petitioner] approved of the drawings in any way, and thus we cannot impute Veiovis's state of mind to the [petitioner]. See Commonwealth v. Keo, 467 Mass. 25, 33 (2014) (improper to impute codefendant's wall decoration saying "crip killer" to defendant where no evidence that defendant had seen words and affirmed that he too wished to be "a 'crip killer' ").

Veiovis's state of mind remains relevant, however, in a more general manner. In Commonwealth v. Fernandes, 427 Mass. 90, 95 (1998), we found that evidence of a coventurer's state of mind was admissible not because it could be imputed to the [petitioner], but because it "put the killing into the context of a narrative that was comprehensible to the jury and was relevant to the purpose of the joint venture." The same is true here. Although the jury could not impute Veiovis's state of mind to the [petitioner], it was nonetheless relevant to the circumstances of the crimes and helped explain why the victims were dismembered. Given the crimes' gruesome nature, information about one of the coventurers' state of mind would no doubt have helped the jury attempt to comprehend what precipitated the event.

Chalue, 486 Mass. at 870-871. As to motive, the SJC wrote:

Finally, the evidence is admissible to show motive for the same reasons explained in Hall and in Veiovis. Although the motive for the killings was to silence Glasser and the two men who would have been witnesses to Glasser's kidnapping, that does not explain why the victims were dismembered. Veiovis, 477 Mass. at 484. The drawings tend to show Veiovis's fascination with amputation and human dismemberment, offering "an explanation for what would otherwise be inexplicable." Id. at 485. Because Veiovis was a coventurer with the [petitioner], Veiovis's potential motive is relevant to the [petitioner]. See Commonwealth v. Carroll, 439 Mass. 547, 553 (2003) ("There is no requirement that joint venturers share a motive for the success of the venture"). Thus, here the drawings are relevant both for state of mind and for motive of a coventurer.

Chalue, 486 Mass. at 871. The SJC held:

that the judge here did not abuse his discretion in admitting the drawings. In Veiovis, we found that the judge did not abuse his discretion in ruling that the probative value of this evidence was not outweighed by prejudicial effect because there were three relevant, noncharacter purposes for admitting the drawings. Veiovis, 477 Mass. at 485. See Hall, 485 Mass. at 163 (no abuse of discretion in admitting drawings). What exacerbated the drawings' prejudicial effect in Hall and Veiovis was the admission of Hall's statement that "one of the guys" liked chopping people up. That statement gave the jury a light in which to view the anatomical drawings, and all but cemented the drawings' meaning in the jury's mind as signs of Veiovis's inclination to chop people up.

Here, even though there were only two relevant, noncharacter purposes, on the other side of the scale there was also less prejudice than in the codefendants' cases: Hall's statement

that "one of the guys really enjoyed torturing and cutting [the victims] up" was not admitted. Hall, 485 Mass. at 162.  Veiovis, 477 Mass. at 482.  The jury could have made an inference that Veiovis had a passion for dismemberment, but such an inference was much weaker without the context supplied by Hall's statement.  Further, given that there was no direct connection between the [petitioner] here and the drawings, there is less prejudice than there was in Veiovis, where the jury could have inferred that Veiovis himself had a peculiar interest in dismemberment and thus the propensity to commit the crimes.  Thus, the judge did not abuse his discretion in finding that the probative value of the drawings was not outweighed by unfair prejudice.

Chalue, 486 Mass. at 871-872.

### c.    Weapons.

The Commonwealth also introduced into evidence, over the petitioner's objection,

photographs of various weapons found at co-defendant Veiovis's home.  TIX/145, 148-151, 154.

The weapons found included: various knives, cleavers, and hatchets; a machete; a sickle, and a

bat with nails.  Id.  The SJC held:

> that the judge properly admitted most of the photographs of weapons, although it was error to admit evidence of the bat with nails and the hatchet.  This error, however, was not prejudicial.
>
> In both Veiovis and Hall, there was evidence that the machete, cleaver, hatchets, and knives were consistent with the tools used to dismember the victims, and could have served as the means to accomplish the dismemberment.  See Hall, 485 Mass. at 161-162; Veiovis, 477 Mass. at 485-486.  Although they tested negative for blood at the time the apartment was searched -- approximately two weeks after the killing -- they could not be excluded as the weapons used in the killings.  Veiovis, supra.  Thus, we held that photographs of them were admissible to show Veiovis and Hall had the means to dismember the victims' bodies.  See Hall, supra at 162; Veiovis, supra at 486.  Further, in those cases we held that it was error to admit the photograph of the spiked baseball bat because there was no evidence that it could have been used in the commission of the crimes.  See Hall, supra; Veiovis, supra.  We held that the error was not prejudicial, however, given the other admissible evidence depicting what was found in Veiovis's apartment.  See Hall, supra; Veiovis, supra, citing Graham, 431 Mass. at 288.
>
> Here, the same photographs of weapons were admitted, yet the forensic testimony differed slightly. The forensic anthropologist testified that the machete and the cleaver shown in the photographs could have been used in the commission of the crimes.  But, unlike in Veiovis, the forensic anthropologist testified that the injuries were not consistent with cuts from a hatchet.  See Veiovis, 477 Mass. at 485.  Thus, photographs of the machete and cleavers were admissible because these weapons could have been used in the commission of the crimes.  See id. See also Commonwealth v. Pierre, 486

Mass. 418, 424 (2020) ("Evidence regarding a weapon that could have been used in the course of a crime is admissible, in the judge's discretion, even without direct proof that the particular weapon was in fact used in the commission of the crime" (quotation and citation omitted)).  In contrast, it was error to introduce the photographs of not only the spiked baseball bat, [FN 25].

> [FN 25].  The forensic anthropologist did not specifically exclude the spiked bat as a possible weapon, although he did not include it -- or any similar spiked instrument -- when describing possible weapons used.

but also the hatchet because these weapons could not have been used to commit the crimes.  See id. at 425 ("Where a weapon definitively could not have been used in the commission of the crime, [this court has] generally cautioned against admission of evidence related to it" [citation omitted]).  However, as in Hall and Veiovis, we conclude that this error was not prejudicial given "the other admissible evidence, particularly the testimony regarding the injuries inflicted, the weapons consistent with those injuries, and the weapons that were ultimately found at Veiovis's apartment."  Hall, 485 Mass. at 162.  In other words, the jury had ample evidence to find that the [petitioner] had access to potential tools of dismemberment.

Chalue, 486 Mass. at 872-873.

### 2.   Clearly Established Supreme Court Law Regarding Due Process Claims Based on Evidentiary Rulings.

The petitioner claims that the SJC "violated clearly established federal law by affirming [the petitioner's] convictions where [several] challenged evidentiary rulings were so fundamentally unfair that they violate due process."  Doc. No. 20 at 47.  The trial court's rulings, which the petitioner argues resulted in the admission of so-called bad acts or propensity evidence, were grounded in state law.  To the extent the petitioner attacks the SJC's review of whether the trial court's rulings were a proper application of state law, such a challenge does not provide a basis for federal habeas corpus relief.  Errors in applying state law do not provide a basis for federal habeas corpus relief.  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  See Pulley v. Harris, 465 U.S. 37, 41-42 (1984) (federal court cannot issue writ based on perceived error of state law). "It is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."  Estelle, 502 U.S. at 68.  Rather, in conducting habeas

corpus review, a federal court analyzes only whether a state prisoner is in custody in violation of the Constitution or laws or treaties of the United States.  Swarthout v. Cooke, 562 U.S. 216, 219 (2011); Rose v. Hodges, 423 U.S. 19, 21 (1975).

The petitioner's claim that the SJC violated "clearly established law" in rejecting his due process argument fares no better.  Although the petitioner asserts that the SJC violated "clearly established law," he has not cited to any Supreme Court case that addresses directly whether the admission of so-called bad acts or propensity evidence offends the federal Due Process Clause. Nor has the respondent found one.  The closest the Supreme Court has come to addressing this type of claim was in Estelle v. McGuire.  See Gomes v. Silva, 958 F.3d 12, 25, n.9 (1st Cir. 2020), quoting Estelle, 502 U.S. at 75, n.5 (citation omitted).  However, in that case, the Court expressly declined to reach the issue.  Estelle, 502 U.S. at 75, n.5.  The lack of clearly established Supreme Court precedent that squarely addresses the issue raised by the petitioner precludes review under § 2254.  Jenkins v. Bergeron, 824 F.3d 148, 153 (1st Cir. 2014).  See, e.g., Alberni v. McDaniel, 458 F.3d 860, 864, 865-867 (9th Cir. 2006) (rejecting claim that admission of propensity evidence violated due process and noting, "when the Supreme Court has expressly reserved consideration of an issue, as it has here, the petitioner cannot rely on circuit authority to demonstrate that the right he or she seeks to vindicate is clearly established"); Bugh v. Mitchell, 329 F.3d 496, 512-513 (6th Cir. 2006) (rejecting claim that admission of prior bad acts evidence was contrary to Supreme Court precedent where "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence").

To the extent his claim is reviewable under § 2254, the petitioner is faced with the uphill battle of showing that the SJC's rejection of it was an unreasonable application of the broader fair-trial principle.  See Gomes, 958 F.3d at 25, quoting Coningford v. Rhode Island, 640 F.3d

36

478, 485 (1st Cir. 2011) (In similar circumstances, First Circuit noted that "[t]he absence of an on-point pronouncement from the Supreme Court leaves hanging by the slimmest of threads the petitioner's claim that the state court's admission of the [challenged] evidence can be deemed an unreasonable application of the broader fair-trial principle.").  "A misbegotten evidentiary ruling that results in a fundamentally unfair trial may violate due process and, thus, ground federal habeas relief."  Coningford, 640 F.3d at 484, citing Montana v. Egelhoff, 518 U.S. 37, 43 (1996). The Supreme Court "'has defined the category of errors that violate 'fundamental fairness' very narrowly.'"  Gomes, 958 F.3d at 23, quoting Dowling v. United States, 493 U.S. 342, 352 (1990).  Thus, a violation of state law alone "is not a denial of due process."  See Engle v. Isaac, 456 U.S. 107, 121, n.21 (1982).  Rather, "[t]o be a constitutional violation, a state evidentiary error must so infuse the trial with inflammatory prejudice that it renders a fair trial impossible." Lyons v. Brady, 666 F.3d 51, 56 (1st Cir. 2012), quoting Petrillo v. O'Neill, 428 F.3d 41, 44, n.2 (1st Cir. 2005).  See Sanna v. Dipaolo, 265 F.3d 1, 11 (1st Cir. 2001) (error of state law must "betray[ ] a fundamental principle of justice" to offend due process, a circumstance likely to occur only in "extreme cases").  In other words, that violation must be "so arbitrary and capricious as to constitute an independent due process . . . violation."  Lewis v. Jeffers, 497 U.S. 764, 780 (1990).  See also Patterson v. New York, 432 U.S. 197, 201-202 (1977), quoting Speiser v. Randall, 357 U.S. 513, 523 (1958) (Decision made by state courts regarding procedures under which their laws are carried out "is not subject to proscription under the Due Process Clause unless 'it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'").  To hold otherwise, the Supreme Court has noted, would turn every erroneous decision by a state court into an error of federal constitutional dimension.  Engle, 456 U.S. at 121, n.21.  As the SJC reasonably determined, the petitioner cannot meet this high due process standard.

3.      **The SJC Reasonably And Correctly Rejected The Petitioner's Claim.**

The SJC explained that, while so-called prior bad act evidence may not be introduced to demonstrate a defendant's bad character, it is admissible if relevant for a non-propensity purpose.  Chalue, 486 Mass. at 866, citing Commonwealth v. Crayton, 470 Mass. 228, 249 (2014).  See Mass. G. Evid. § 404(b) (2020).  This recitation of state law is consistent with the federal evidentiary standard.  See Fed. R. Evid. 404(b).  The court also recognized the well-established state law tenet that, even if such evidence is relevant for a proper purpose, it will not be admitted if a judge determines that its probative value is outweighed by a risk of unfair prejudice to the defendant.  Chalue, 486 Mass. at 866.  The state evidentiary standard is, again, consistent with its federal counterpart.  See Fed. R. Evid. 403.  The SJC's application of these state laws to assess the admission of the challenged evidence was sound, in conformity with federal evidentiary principles, and, therefore, consistent with due process.  See Robertson v. Ryan, United States District Court Civil Action No. 16-cv-1609-ADB, 2019 WL 2501491 at *8 (June 17, 2019) (noting that while Federal Rules of Evidence are inapplicable in state proceedings, some courts have relied on them by analogy in assessing a due process habeas claim related to admission of prior bad act evidence because "a court can conclude that a petitioner received due process if the state court's evidentiary ruling would also have been proper under the Federal Rules of Evidence").

a.      **The SJC Reasonably And Correctly Rejected The Petitioner's Claim That Admission Of The Aryan Brotherhood Evidence Violated His Due Process Rights.**

As the SJC noted, Casey's testimony was relevant to explain why he cooperated with Hall and why he did not initially go to the police or tell anyone about what he had done, and the jailhouse informants' testimony was relevant to show why the petitioner truthfully divulged details of his crimes to some of his fellow inmates.  Chalue, 486 Mass. at 867-868.  The

petitioner's affiliation with the Aryan Brotherhood enhanced the credibility of these witnesses' testimony by, in Casey's case, providing a reasonable explanation for agreeing to help bury the victims and for not immediately disclosing what had happened, and, in the jailhouse informants' case, for why the petitioner would have confided in other inmates, specifically Kempton and Cashman.  Id.  Other courts have upheld the admission of this kind of evidence in similar circumstances.  See, e.g., United States v. Abel, 469 U.S. 45, 52-53 (1984) (evidence of a witness's and party's common membership in a gang was admissible to show witness's bias); Blackmon v. Booker, 696 F.3d 536 (6th Cir. 2012) (noting evidence of petitioner's gang affiliation was relevant, at least for purposes of federal due process analysis, where it "tended to make fact of witness bias in favor of [p]etitioner based on fear more probable" and where it made petitioner's presence at scene of shooting more likely than it would have been without evidence).

The admission of this relevant evidence did not cause the petitioner undue prejudice. Although the jury heard that the petitioner was affiliated with the Aryan Brotherhood, they were provided little detail about "the group's status as the largest and deadliest prison gang in the United States or that it is known for its white supremacist ideology."  Chalue, 486 Mass. at 868-869.  Where the jury did not hear these details, the evidence was less inflammatory.  Moreover, the trial judge made efforts to blunt the evidence's prejudicial impact during trial.  He asked a question during individual voir dire aimed at ferreting out potential bias and excused several potential jurors on this basis.  See, e.g., TI/28.  On multiple occasions, including prior to or just after the evidence was introduced and during his final charge, the judge instructed the jury that they should not use the petitioner's affiliation with the Aryan Brotherhood as evidence of his bad character and, instead, the evidence could be used only as it related to the relationships between the petitioner and the witnesses in this case.  TVI/243; TXI/213-214, 246; TXIIPM/4,16;

TXIII/91-92.  See, e.g., Gomes, 958 F.3d at 25 (SJC reasonably determined that trial court's

limiting instruction that jury consider evidence for circumscribed purpose rather than for

purposes of criminal personality or bad character weighed against finding of prejudicial error).

Nor was the Ayran Brotherhood evidence a central part of the trial.  Five witnesses

(Casey, Lemeiux, Kempton, Cashman, and Lieutenant Foley) out of eighty-one referenced the

petitioner's affiliation with the Aryan Brotherhood in their testimony.[8]  In three of those

witnesses' (Casey, Lemeiux, and Foley) testimony, that reference was limited.  Casey referenced

the petitioner's affiliation with the Aryan Brotherhood in response to two questions.  TVI/243,

252.  Lemeiux made such a reference in one response to the prosecutor's questioning.  TXI/144.

Foley testified only to the execution of a search warrant in the petitioner's cell, from which

photographs and documents with Aryan Brotherhood symbols were seized.  TXIIPM/6, 8, 15-16.

In a lengthy opening, the prosecutor referenced the petitioner's affiliation with the Aryan

Brotherhood only three times.  TIII/37, 57, 59.  In each instance, the prosecutor appropriately

referenced this affiliation only in context with his relationship to certain witnesses.  In closing,

the prosecutor's reference to the petitioner's affiliation with the Aryan Brotherhood was again

limited.[9]  TXIII/64.

Where the Aryan Brotherhood evidence was relevant and not unduly prejudicial, the trial

court's admission of it was "well within the universe of plausible evidentiary rulings."  See

Coningford, 640 F.3d at 485 (where evidentiary ruling "was well within the universe of plausible

---

[8] The petitioner incorrectly states that Dawson and Ely testified that the petitioner was an Aryan
Brotherhood member.  Doc. 20 at 51.  While the Superior Court allowed such testimony, it was
not introduced.  TVI/12-17, 101-103.

[9] While the prosecutor's argument involving the Aryan Brotherhood evidence in closing was
improper, as stated infra Argument Section II(C)(4)(d), the SJC reasonably and correctly
determined that that error was not prejudicial.

evidentiary rulings[,] . . . . [i]t was . . . not so arbitrary and capricious as to work a denial of the petitioner's constitutionally secured fair-trial right."). As such, the SJC's decision affirming the trial court's decision, as to most of that evidence, was not only reasonable but correct.

The SJC also reasonably and correctly determined that, while a limited portion of Cashman's testimony was introduced in error, it did not cause the petitioner undue prejudice. See Brown, 142 S.Ct. at 1524. As the SJC noted, the explanation of what "making your bones" meant was referenced only once. Chalue, 486 Mass. at 869. This single reference was overshadowed by the petitioner's own statements in which he glorified the killings and dismemberments of the victims. Id. The SJC rightly rejected the petitioner's claim that admission of the Aryan Brotherhood evidence violated his due process rights. For the very same reasons why the SJC's determination was not unreasonable, any error did not have a substantial and injurious effect on the verdict. See Brown, 142 S.Ct. at 1517.

> **b.** **The SJC Reasonably And Correctly Rejected The Petitioner's Claim That The Admission Of Anatomical Drawings Found In A Co-Defendant's Apartment Violated His Due Process Rights.**

The petitioner claims that the anatomical drawings were erroneously admitted in violation of his due process rights where they were irrelevant to any issue at trial and were overly graphic. Doc. 20 at 58-61. The SJC reasonably and correctly rejected the petitioner's claim.

The SJC correctly determined that the anatomical drawings were relevant to show co-defendant Veiovis's state of mind, which provided context to the circumstances of the killings and helped to explain why the victims were dismembered. Chalue, 486 Mass. at 870-871. The drawings were additionally relevant to demonstrate Veiovis's motive to dismember the victims. Id. at 871. Where this crime was a joint venture, a co-defendant's potential motive was relevant to the petitioner. Id., citing Commonwealth v. Carroll, 439 Mass. 547, 553 (2003).

Additionally, as the SJC noted, the prejudice to the petitioner, based on admission of these anatomically drawings, was minimal.  Id. at 872.  While the jury could have inferred that Veiovis had a passion for dismemberment based on these drawings, that inference was much weaker without the statement admitted at Hall's and Veiovis's trial that "one of the guys really enjoyed torturing and cutting [the victims] up."  Id. at 871.  The jury was also aware that the drawings were found at Veiovis's apartment, and that the petitioner had no direct connection to them.  Moreover, these drawings were a very small part of a lengthy trial.  They were referenced in only two witnesses' testimony, Dr. Pokines, a forensic anthropologist, and Steven Jones, one of the investigating troopers who executed the search warrant on Veiovis's apartment.  TIX/76-77; 155-158.  The prosecutor did not mention them in either his opening or closing remarks.

The SJC reasonably and correctly affirmed the trial court's weighing of the evidence's probative value versus prejudicial effect and, in doing so, reasonably and correctly rejected the petitioner's claim that admission of this evidence violated his due process rights.  See Kater v. Maloney, 459 F.3d 56, 64 (1st Cir. 2006) (noting that on "extreme facts" it is theoretically possible for a state court's evaluative judgment to be such an unreasonable application of clearly established federal law so as to render a trial fundamentally unfair; however, in practice, "such a case – if one exists – will be very rare.").  For the very same reasons why the SJC's determination was not unreasonable, any error did not have a substantial and injurious effect on the verdict.  See Brown, 142 S.Ct. at 1517.

        **c.**     **The SJC Reasonably And Correctly Rejected The Petitioner's Claim That Admission Of Photographs Of Weapons Found At A Co-Defendant's Apartment Violated His Due Process Rights.**

The petitioner claims that admission of photographs of weapons found at Veiovis's apartment violated his due process rights because the photographs bore no purpose other than

showing that Veiovis, and by extension, the petitioner, had a propensity to violence.  Doc. No. 20 at 57-58.  The SJC reasonably and correctly rejected this claim.

Contrary to the petitioner's claim, photographs of the knives, cleaver, and machete were relevant because these weapons could have been used in the commission of the crimes.  TIX/73-74.  Where the photographs were relevant to an issue at trial, their admission was not violative of due process.  See generally Estelle, 502 U.S. at 70 (where prior injury evidence was relevant to an issue in the case, its admission did not violate federal due process clause).  While photographs of the other weapons should not have been admitted because they could not have been used in the commission of the crimes, the SJC rightly determined that this error was not prejudicial given the ample evidence the jury had before them to find that the petitioner had access to potential tools of dismemberment.  Chalue, 486 Mass. at 873.  See TIX/75.  The jury heard testimony regarding the injuries inflicted, the weapons consistent with those injuries, and the weapons found at Veiovis's apartment.  TIX/73-75, 145-151.   Additionally, like the anatomical drawings, the photographs of weapons were only a small part of this lengthy trial.  They were referenced in only two witnesses' testimony and the prosecutor did not make mention of them in either his opening or his closing statements.  Because the admission of most of the photographs was proper where they served a relevant purpose and, given the non-prejudicial nature of the improperly admitted ones as well as the limited reference to them during the trial, the SJC's rejection of the petitioner's due process claim was entirely reasonable.  For the very same reasons why the SJC's determination was not unreasonable, any error did not have a substantial and injurious effect on the verdict.  See Brown, 142 S.Ct. at 1517.

**C.     The Petitioner Is Not Entitled To Relief On His Claim That The Prosecutor Engaged In Misconduct During His Opening Statement And Closing Argument.**

The petitioner contends that he prosecutor repeatedly misstated the evidence, implied prosecutorial knowledge of [the petitioner's] intent to kill a trial witness, and improperly used other bad act evidence to argue that [the petitioner] had a criminal propensity.  See Doc. No. 20 at 61-76.  The SJC rejected the petitioner's assertions regarding the prosecutor's opening statement based upon an adequate and independent state-law ground that bars this court from reviewing it here:  the petitioner's failure to comply with the state's contemporaneous objection rule.  With respect to the petitioner's assertions concerning the prosecutor's closing argument, the SJC found no prejudicial error requiring relief.  Its conclusion was not contrary to or an unreasonable application of clearly established federal law.  See generally Chalue, 486 Mass. at 876-880.  Habeas relief is inappropriate.

**1.     The SJC's Decision.**

The SJC addressed the petitioner's prosecutorial misconduct claim in the following terms:

> The [petitioner] argues that the prosecutor made numerous statements in his opening and closing remarks that misstated the evidence, argued inferences with no basis in the record, suggested he had knowledge of facts not in evidence, and attempted to excite the jury's passion and prejudice.  We analyze each in turn.
>
> i. *Opening*. "The proper function of an opening is to outline in a general way the nature of the case which the counsel expects to be able to prove or support by evidence" (citation omitted). Commonwealth v. Fazio, 375 Mass. 451, 454 (1978). See Mass. G. Evid. § 1113(a). The prosecutor's expectation must be "reasonable and grounded in good faith." Fazio, supra at 456. Where defense counsel did not object to the opening, we review to determine whether there was misconduct and, if so, whether it created a substantial likelihood of a miscarriage of justice. See Commonwealth v. Silva, 455 Mass. 503, 514 (2009).
>
> In his opening statement, the prosecutor contended that the underlying dispute began in July of 2009 when Glasser took carburetors that belonged to the [petitioner].  Further, the prosecutor contended that the [petitioner] stopped in Lenox to procure the guns used in the murders.  It appears that in both of these

instances, the prosecutor meant to refer to Hall, not the [petitioner].  [FN 27].

> [FN 27]. The Commonwealth concedes this, at least with regard to the second statement about procuring guns in Lenox.

These mistakes seem more akin to a slip of the tongue than bad faith.  Moreover, defense counsel pointed out the mistakes immediately afterward in his own opening statement, and thus the jury were unlikely to give much credence to them — especially where there was no evidence presented at trial to substantiate them.  Thus, we hold that the misstatements did not give rise to a substantial likelihood of a miscarriage of justice.

Also in his opening, the prosecutor referred to the [petitioner] burning clothing and argued that the [petitioner] was a lookout while Hall and Casey buried the bodies.  Because the prosecutor repeated these same remarks in his closing — where they were objected to — we conduct the relevant analysis *infra*.

ii. *Closing*. Remarks made during closing argument are considered in the context of the entire argument, in light of the judge's instructions to the jury, and in view of the evidence presented at trial. Commonwealth v. Whitman, 453 Mass. 331, 343-345 (2009). See Mass. G. Evid. § 1113(b). "Prosecutors are entitled to argue theories supported by evidence and reasonable, possible inferences from the evidence." Commonwealth v. Auclair, 444 Mass. 348, 359 (2005). "We consider four factors in determining whether an error made during closing argument is prejudicial: '(1) whether the defendant seasonably objected; (2) whether the error was limited to collateral issues or went to the heart of the case; (3) what specific or general instructions the judge gave the jury which may have mitigated the mistake; and (4) whether the error, in the circumstances, possibly made a difference in the jury's conclusions.' " Commonwealth v. Alvarez, 480 Mass. 299, 306 (2018), quoting Commonwealth v. Silva-Santiago, 453 Mass. 782, 807 (2009). Here, defense counsel timely objected to the relevant portions of the closing argument.

A. *Statements that the [petitioner] burned clothing with Hall*.  In closing, the prosecutor stated that the [petitioner], along with Hall, burned clothing at the Hells Angels clubhouse after the murders. [FN 28].

> [FN 28]. The prosecutor made similar statements in his opening remarks.

The evidence did not support this remark.  Ocean testified that Hall alone burned clothing.  She testified that she was holding the clothing for Hall and that the clothes, which bore the Hells Angels insignia, belonged to Hall, not the [petitioner].  She stated explicitly that the [petitioner] "had no part in the burning of the clothes."  State police Trooper Michael Scott testified that he observed the scorched metal plate, and he said that he received no indication that the [petitioner] burned any clothing, only that Hall had.

The Commonwealth argues that a fair inference could be drawn from this evidence that the [petitioner], in addition to Hall, burned the clothing because there was evidence that,

later, the [petitioner] and Hall together threw other pieces of evidence off a bridge. We disagree. Ocean clearly stated that Hall, not the [petitioner], burned the clothing, and Scott did not contradict her. Inferences that run contrary to the evidence are by definition unreasonable. See Auclair, 444 Mass. at 359 (in closing, prosecutors may only argue reasonable and possible inferences from evidence).

Nevertheless, we hold that these remarks were not prejudicial error. Insofar as the prosecutor relied on the remarks to show that the [petitioner's] destruction of evidence indicated a consciousness of guilt, it is unlikely that it made a difference in the jury's conclusions, because there was other testimony that the [petitioner] actually had helped Hall destroy other pieces of evidence, thus similarly indicating a consciousness of guilt. [FN 29]. See Alvarez, 480 Mass. at 306.

> [FN 29]. Ocean testified that she saw the [petitioner] and Hall throwing items from a bridge.

B. *Statements that [the petitioner] was a lookout*. In his closing, the prosecutor asserted multiple times that the [petitioner] had acted as a lookout outside the Cole property while Hall and Casey buried the bodies. [FN 30].

> [FN 30]. The prosecutor made similar remarks in his opening statement as well.

Casey testified that on Monday, August 29, he met Hall and the [petitioner] at the Pavoni residence where the Buick was parked with the bodies inside. Casey and Hall then drove to the Cole property, approximately three miles away in Becket, with the intention of burying the bodies. The two of them checked the Cole house to make sure no one was home, and then they returned to the Pavoni house, where Hall got out of the car and spoke with the [petitioner], who was still there. Hall then followed Casey in the Buick back to the Cole residence, where the two of them used the excavator to dig a hole to bury the bodies. Hall and Casey then returned to the Pavoni house, where the [petitioner] was still "hanging around."

The [petitioner's] cell phone records indicated that he called and sent text messages to Hall multiple times while Hall and Casey were at the Cole house. At 11:58 A.M., the [petitioner] sent Hall a text message saying, "Hey, what's going on?" At 12:33 P.M., the [petitioner] sent Hall a text message saying, "Dude, I'm ready to leave. I don't know what to tell you." Special Agent Eric Perry of the Federal Bureau of Investigation testified that the [petitioner's] cell phone records indicated that, during the time he made these calls and text messages to Hall, he was closer to the Pavoni property than to the Cole property. But in the agent's opinion, the towers that the cell phone was utilizing showed that it was likely that the cell phone was not stationary at the Pavoni home during that whole time period; more likely, it was traveling. The Commonwealth further points to Cashman's testimony to show that the [petitioner] was a lookout. Cashman testified that the [petitioner] told him that the [petitioner] was "in the car parked in the driveway" during the burial.

It was up to the jury to decide whether the [petitioner] was truly a lookout. But the evidence of the [petitioner's] cell phone's location, coupled with Cashman's testimony

that the [petitioner] was parked in the driveway during the burial, supports a reasonable and possible inference that the [petitioner] was indeed a lookout at the Cole property during the burial.  See Commonwealth v. Jones, 432 Mass. 623, 628 (2000) ("inferences drawn from the evidence need not be necessary and inescapable, only reasonable and possible"). Thus, we discern no error in the prosecutor's statements. Thus, we discern no error in the prosecutor's statements.

C. *Statements that the [petitioner] intended to kill a witness*.  The [petitioner] argues that in the Commonwealth's closing, the prosecutor insinuated that the [petitioner] planned to kill a witness.  The prosecutor stated:

"And as his being a lookout, the idea that can't possibly happen because Hall's phone is out, what do you think the plan was going to be, that if Mr. Cole decided to come home during the middle of the day he's going to call him?  They're going to drop what they are doing and leave all of the evidence there?  No, unfortunately, ladies and gentlemen, he was just simply going to follow Hall until he got there.  And at that point Mr. Cole would just be another witness."
The [petitioner] argues that because the Commonwealth's theory of the case was that Frampton and Chadwell were killed because they were witnesses to Glasser's kidnapping, the meaning of the prosecutor's statement that "Mr. Cole would just be another witness" was to imply that if Cole had returned home, he, too, would have been killed.
We agree with the [petitioner] that, in this context, the phrase "would just be another witness" implies that the [petitioner] would have at the very least harmed Cole if he had returned home.

Although we think it reasonable to infer that the [petitioner] was a lookout, the further inference that his role as a lookout meant he would have hurt or killed potential witnesses is not a reasonable and fair inference based on the evidence.  However, we hold that this improper statement was not prejudicial error in light of the judge's instructions that the opening and closing are not evidence, [FN 31], and because the implication of this statement was subtle and limited to a collateral issue.  See Alvarez, 480 Mass. at 306.

> [FN 31]. In the jury charge, the judge instructed the jury that the "closing arguments of counsel are not evidence" and told them that their "collective memory of the evidence controls, not the memory of the attorneys."

D. *Statements regarding the Aryan Brotherhood*.  In his closing argument, the prosecutor referenced the Aryan Brotherhood evidence and stated:

"Well, you have to ask yourself, did the [petitioner] take orders from The Big Dummy [(Hall)]?  Without knowing beforehand or even asking afterwards?  The guy who strolls in and takes over the local Aryan Brotherhood, he's the one unknowingly taking orders?  Ask yourselves, really?"

The [petitioner] had previously told Cashman that he considered Hall to be a "[b]ig dummy, goofball, idiot," and explained that he (the [petitioner]) "was just using [Hall]" to obtain access to guns.  Thus, in its closing, the Commonwealth was

implying that the [petitioner] was culpable because he was not merely taking orders from Hall, but rather had some amount of control over him.

The [petitioner] argues that this reference in the closing statement exceeded the permissible uses of the Aryan Brotherhood evidence. At sidebar, in response to the [petitioner's] objection, the judge stated that the Aryan Brotherhood evidence was admitted in large part to establish the nature of the relationship between the [petitioner] and the three jailhouse informants, but that it was not specifically limited to the informants because the language of the instruction referred to "any witnesses in the case."

As discussed *supra*, the Aryan Brotherhood evidence was properly admitted to show the relationship between the [petitioner] and the jailhouse informants, as well as to show why Casey did not initially come forward. But we do not agree with the judge that the Aryan Brotherhood evidence was permissible to establish the relationship of the [petitioner] with *any* witnesses in the case — especially here, where the prosecutor used it to imply that the [petitioner's] association with the Aryan Brotherhood meant he would not be "unknowingly taking orders" and instead had an active role in plotting the murders. Where in other contexts the Aryan Brotherhood evidence was properly used, here it crossed the line into being used as impermissible propensity evidence.

This error, however, was not prejudicial. As discussed *supra*, the judge asked during individual voir dire whether evidence that the [petitioner] was a member of the Aryan Brotherhood would impair jurors' impartiality, and he repeatedly instructed that the Aryan Brotherhood evidence could not be used as evidence of the [petitioner's] bad character or criminal propensity. Thus, this statement by the prosecutor does not amount to prejudicial error.

Chalue, 486 Mass. at 876-880 (citations omitted).

2.     **Because The SJC Relied Upon An Adequate And Independent State-Law Ground To Reject Two Of The Petitioner's Claims Of Misconduct, Those Claims Are Barred From Federal Habeas Review.**

The petitioner's claims of misconduct in the prosecutor's opening statement are barred from federal review because the SJC resolved them on an adequate and independent state-law ground. With respect to those claims, the SJC noted that the petitioner failed to object, and conducted review under its substantial-likelihood-of-a-miscarriage-of-justice standard, which applies to unpreserved claims. Lynch v. Ficco, 438 F.3d 35, 45 (1st Cir. 2006) (explaining the substantial-likelihood-of-a-miscarriage-of-justice standard, and its relationship to unpreserved claims and procedural default on habeas review). Because "the Massachusetts requirement for

contemporaneous objections is an independent and adequate state procedural ground [for decision], firmly established in the state's jurisprudence and regularly followed in its courts," Janosky, 594 F.3d at 44, the SJC's invocation of it here bars the opening-statement claims from federal habeas review unless the petitioner demonstrates cause and prejudice or actual innocence.[10, 11]   See supra, Argument Section I(C).

The petitioner cannot make either showing as to the opening-statement claims.  With respect to "cause," he has pointed to no external circumstance that thwarted his ability to object on the bases asserted here, and that failure alone should preclude a finding of any such circumstance.  Hodge, 739 F.3d at 43.  Further, no external circumstance is apparent to the respondent.  And even if there were any basis to claim ineffective assistance regarding the failure to object (a point that the respondent does not concede), such claims could not constitute cause,

---

[10] The SJC's election to conduct its "discretionary miscarriage-of-justice review does not amount to a waiver of the state's contemporaneous objection rule."  Janosky, 594 F.3d at 44.

[11] As is clear from the SJC's decision, see supra, Argument Section II(C)(1), the Court analyzed some of the claims of misconduct in the opening statement in conjunction with its discussion of similar statements made during the closing argument (to which the petitioner did object).  In so doing, the SJC assessed whether the prosecutor's statement amounted to error and, if so, whether the error was prejudicial.  This analytical approach did not amount to a waiver of the state's contemporaneous objection rule as to the opening-statement claims.  When analyzing whether a waived claim gives rise to a substantial likelihood of justice, the first question that the state courts will ask is whether there was error.  E.g., Commonwealth v. Barnett, 482 Mass. 632, 638 (2019) ("Because the defendant was convicted of murder in the first degree, we review for a substantial likelihood of a miscarriage of justice by asking whether there was error and, if so, whether the error was likely to have influenced the jury's conclusion."  (Quotation omitted.)).  So, by asking whether any of the alleged misconduct in the opening statement amounted to error (through its analysis of the similar statements made during the closing argument), the SJC was simply proceeding to the first step of its miscarriage-of-justice analysis.  Cf. Miranda v. Mendonsa, No. 12-CV-11957-IT, 2017 WL 1362021, at *6 (D. Mass. Apr. 11, 2017) (unpublished) (applying adequate-and-independent-ground rule where the SJC stated in its underlying decision, "The defendant challenges portions of the prosecutor's argument.  He failed to object at trial on the grounds he now raises.  We therefore review his claims to determine whether there was error and, if so, whether it gave rise to a substantial risk of a miscarriage of justice.").

for no such claims have been exhausted in the state courts. <u>Yeboah-Sefah</u>, 556 F.3d at 76. With respect to prejudice, the petitioner cannot prevail, because his claims are without merit for the reasons set forth in the SJC's decision and <u>infra</u>, Argument Section II (C)(4). And finally, the petitioner cannot demonstrate that a miscarriage of justice occurred, because the evidence against him was strong. Further, he has not advanced a claim of actual innocence here. <u>See</u> <u>Hodge</u>, 739 F.3d at 43.

### 3.   Clearly Established Supreme Court Law Regarding Prosecutorial Misconduct Claims.

When analyzing a claim that a prosecutor's improper statements require reversal of a conviction, the "relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986), quoting <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974). "[T]he touchstone of the due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." <u>Smith v. Phillips</u>, 455 U.S. 209, 219 (1982).

For example, <u>DeChristoforo</u> declined to find a due process violation when the prosecutor, referring to the defendant and his attorney, said, "'They . . . said they hope that you find him not guilty. I quite frankly think that they hope that you find him guilty of something a little less than first-degree murder.'" 416 U.S. at 640, 642. The Justices concluded that "such remarks, in the context of the entire trial, were [not] sufficiently prejudicial" and did not "ma[ke] [the defendant's] trial so fundamentally unfair" as to violate his due process rights.[12] <u>Id</u>. at 639, 645, 648, n.23 (noting brevity of comments, length of overall argument, vagueness of statements,

---

[12] The majority in the court below had "held that the prosecutor's remarks deliberately conveyed the false impression that [the defendant] had unsuccessfully sought to plead to a lesser charge." <u>DeChristoforo</u>, 416 U.S. at 639.

general and specific instructions, and context of case).  The situation was unlike prior cases

involving "consistent and repeated misrepresentation of a dramatic exhibit," "the introduction of

specific misleading evidence important to the prosecution's case in chief[, or] the nondisclosure

of specific evidence valuable to the accused's defense."  Id. at 646-647 (quotation omitted).

DeChristoforo explained that "[i]solated passages of a prosecutor's argument, billed in advance

to the jury as a matter of opinion not of evidence, do not reach the same proportions," and the

lower court's result (reversing the conviction on grounds of misconduct) had "le[ft] virtually

meaningless the distinction between ordinary trial error of a prosecutor and the sort of egregious

misconduct held . . . to amount to a denial of constitutional due process."  Id. at 646-648.

The Supreme Court again confronted a claim of prosecutorial misconduct in Darden, 477

U.S. at 178-183.  There, "[s]ome [of the prosecutor's] comments implied that the death penalty

would be the only guarantee against a future similar act.  Others incorporated the defense's use

of the word 'animal.'  [One p]rosecutor . . . made several offensive comments reflecting an

emotional reaction to the case."  Id. at 180-181 (footnotes omitted).  While the Court deemed the

comments improper, it still found no constitutional error.  Id. at 178-183.  It noted as follows:

> The prosecutors' argument did not manipulate or misstate the evidence, nor did it
> implicate other specific rights of the accused such as the right to counsel or the
> right to remain silent.  Much of the objectionable content was invited by or was
> responsive to the opening summation of the defense.  . . . The trial court instructed
> the jurors several times that their decision was to be made on the basis of the
> evidence alone, and that the arguments of counsel were not evidence.  The weight
> of the evidence against petitioner was heavy; the "overwhelming eyewitness and
> circumstantial evidence to support a finding of guilt on all charges" reduced the
> likelihood that the jury's decision was influenced by argument.

Id. at 181-182 (citations omitted) (quoting state decision).

As described above, the DeChristoforo-Darden standard for a violation of due process,

based upon prosecutorial misconduct, is a broad or general one that allows state and lower

federal courts more discretion in the outcomes that they reach.  Parker v. Matthews, 567 U.S. 37,

48 (2012); see also United States v. Young, 470 U.S. 1, 10 (1985) (recognizing that "courts must not lose sight of the reality that a criminal trial does not unfold like a play with actors following a script" and that "[i]t should come as no surprise that in the heat of argument, counsel do occasionally make remarks that are not justified by the testimony, and which are, or may be, prejudicial to the accused" (quotations and brackets omitted)); Hardy v. Maloney, 909 F.3d 494, 501 (1st Cir. 2018) (applying the DeChristoforo-Darden standard in the context of a habeas claim).

### 4. The SJC Reasonably And Correctly Rejected The Petitioner's Prosecutorial Misconduct Claims.

The SJC's resolution of the petitioner's claims was both reasonable and correct. To begin, and with respect to each claim of prosecutorial misconduct, there was no contrary-to violation for purposes of 28 U.S.C. § 2254(d)(1), because the SJC's analysis was consistent with the approach in DeChristoforo and Darden. That is, the SJC addressed whether the statements at issue were improper, taking into account the context of the argument as a whole, the evidence admitted at trial, and the judge's instructions to the jury.[13]

### a. The SJC Reasonably And Correctly Concluded That Relief Was Unwarranted With Respect To The Claim That The Prosecutor Committed Misconduct By Arguing That The Petitioner Burned Certain Clothing With Hall.

As noted, the SJC determined that the evidence adduced at trial did not support the prosecutor's statements to the effect that the petitioner burned certain clothing with Hall following the murders. But it declined to grant relief because the misstatements were not prejudicial. The SJC understood the comments to have suggested the petitioner's consciousness

---

[13] The Massachusetts state-law standard for prosecutorial error is "functionally equivalent" to the federal standard, and is therefore "at least as protective of the [petitioner's] rights as its federal counterpart." Dagley v. Russo, 540 F.3d 8, 15 n.3 (1st Cir. 2008) (quotation omitted).

of guilt (that is, that he participated in the burning of the clothing to conceal his role in the murders), and the Court reasoned that they were "unlikely" to have "made a difference in the jury's conclusions, because there was other testimony that the [petitioner] actually had helped Hall destroy other pieces of evidence." Chalue, 486 Mass. at 877. The SJC's no-prejudice determination was both reasonable and correct.

For one thing, other evidence did indeed reflect that the petitioner and Hall had destroyed other pieces of evidence. There was testimony that they threw pieces of clothing off a bridge in Lenox in the aftermath of the murders. See TVII/126-128, 135, 136, 166-167, 176-178; XIIAM/87-88.

In addition, given the level of violence that attended the murders and the lengths to which the three perpetrators went to hide their crimes, it seems unlikely that the suggestion of certain evidence being burned would have overcome the jurors and prompted them decide the case on an improper basis. It was obvious to any juror, permissibly exercising common sense, that the trio was trying to conceal what they had done. Cf., e.g., United States v. Cortez, 449 U.S. 411, 418 (1981) ("Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers." (Emphasis added.)). And besides, the remarks at issue here were far less emotionally charged than those at issue in Darden, 477 U.S. at 178-183.

Finally, the Superior Court instructed the jurors that they were the exclusive factfinders, TXIII/87, that the lawyers' arguments were not evidence, TXIII/98, and that it was up to the jury to decide the facts based upon the testimony given and evidence received, TXIII/87-88, 94-95.[14]

---

[14] The Superior Court also permitted the jurors to retain a written copy of the instructions in the jury room during deliberations. TXIII/86.

These instructions were clear and direct, they mitigated any prejudice, and the jurors are presumed to have followed them.  See, e.g., Richardson v. Marsh, 481 U.S. 200, 206 (1986) (describing "the almost invariable assumption of the law that jurors follow their instructions"); Commonwealth v. Watkins, 425 Mass. 830, 840 (1997) (similar); see also Boyde v. California, 494 U.S. 370, 384-385 (1989) ("[A]rguments of counsel generally carry less weight with a jury than do instructions from the court.  The former are not evidence, and are likely viewed as the statements of advocates; the latter, [the Court] ha[s] often recognized, are viewed as definitive and binding statements of the law." (Citations omitted.)); Darden, 477 U.S. at 182 (noting, as one reason to reject a claim of prosecutorial misconduct, that "[t]he trial court instructed the jurors several times that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence").  In light of all these circumstances, there was no unfairness or substantial and injurious effect on the verdict.  Supra, Argument Section I(B).

        **b.**      **The SJC Reasonably And Correctly Rejected The Claim That The Prosecutor Committed Misconduct By Arguing That The Petitioner Acted As A Lookout Outside The Cole Property While Hall And Casey Buried The Bodies.**

The SJC reasonably and correctly denied relief as to the prosecutor's statement that the petitioner acted as a lookout while Hall and Casey buried the bodies.  First, as the SJC aptly recognized, evidence supported the prosecutor's statement in that regard.  The petitioner's text messages, the location of his cellular telephone, and his statements to one of the "jailhouse informants" that he was at the foot of the driveway during the burial all supported the reasonable inference he was acting as a lookout.  TX/132-136, 160-169; TXIIAM/85; TXI/245.  See generally See United States v. Hernandez, 218 F.3d 58, 68 (1st Cir. 2000) ("Prosecutors are free to ask the jury to make reasonable inferences from the evidence submitted at trial.  This statement was not improper and simply called on the jury to employ its collective common sense

in evaluating the evidence and to draw reasonable inferences therefrom."  (Quotation omitted.)).
See also Young, 470 U.S. at 7-9, nn. 3, 5 (citing American Bar Association standards that stated
in part that a prosecutor "may argue, on his analysis of the evidence, for any position or
conclusion with respect to [such] matters," and "may argue all reasonable inferences from
evidence in the record").

Second, the challenged comments were responsive to the closing argument of the
defense, which suggested that the petitioner was not the lookout.  TXIII/40-41.  See Darden, 477
U.S. at 182 (assigning significance to the fact that "[m]uch of the objectionable content was
invited by or was responsive to the opening summation of the defense"); see also Young, 470
U.S. at 12-20 (explaining that courts must take account of defense counsel's opening "salvo" and
whether it invited the prosecutor's response, and ultimately concluding that "any potential harm
from [the prosecutor's] remark was mitigated by the jury's understanding that the prosecutor was
countering defense counsel's repeated attacks on the prosecution's integrity and defense
counsel's argument that the evidence established no such crime").

And third, as noted above, the Superior Court instructed the jurors that they were the
exclusive factfinders, TXIII/87, that the lawyers' arguments were not evidence, TXIII/98, and
that it was up to the jury to decide the facts based upon the testimony given and evidence
received, TXIII/87-88, 94-95.  These instructions were clear and direct, they mitigated any
prejudice, and the jurors are presumed to have followed them.  See, e.g., Richardson, 481 U.S. at
206; Watkins, 425 Mass. at 840; see also Boyde, 494 U.S. at 384-385; Darden, 477 U.S. at 182.
In light of all these circumstances, there was no unfairness or substantial and injurious effect on
the verdict.  Supra, Argument Section I(B).

c.   **The SJC Reasonably And Correctly Rejected The Claim That The Prosecutor Committed Misconduct When He Insinuated That The Petitioner Intended To Kill A Witness While He Served As The Lookout.**

The SJC reasonably and correctly denied relief as to the prosecutor's statement, insinuating that the petitioner intended to kill Cole if he returned while the bodies were being buried.  As noted above, the SJC concluded that, while it was a proper inference that the petitioner was acting as a lookout, the evidence did not support the further inference that he was prepared to harm or kill an additional witness; this remark was therefore in error but not prejudicial, "in light of the judge's instructions that the opening and closing are not evidence, and because the implication of this statement was subtle and limited to a collateral issue." Chalue, 486 Mass. at 879.

Given the level of violence that attended the murders and the rather subtle nature of the point the prosecutor was insinuating (as the SJC aptly observed), it seems unlikely that the very brief suggestion that the petitioner might harm Cole would have overcome the jurors and prompted them decide the case on an improper basis.  Donnelly, 416 U.S. at 645-648 (noting in part that comments at issue consisted of "a few brief sentences in the prosecutor's long and expectably hortatory closing argument").  And besides, this remark, too, was far less emotionally charged than those at issue in Darden, 477 U.S. at 178-183.

Additionally, as noted above, the Superior Court instructed the jurors that they were the exclusive factfinders, TXIII/87, that the lawyers' arguments were not evidence, TXIII/98, and that it was up to the jury to decide the facts based upon the testimony given and evidence received, TXIII/87-88, 94-95.  These instructions were clear and direct, they mitigated any prejudice, and the jurors are presumed to have followed them.  See, e.g., Richardson, 481 U.S. at 206; Watkins, 425 Mass. at 840; see also Boyde, 494 U.S. at 384-385; Darden, 477 U.S. at 182.

56

In light of all these circumstances, there was no unfairness or substantial and injurious effect on the verdict.  <u>Supra</u>, Argument Section I(B).

> **d.      The SJC Reasonably And Correctly Rejected The Claim That The Prosecutor Committed Misconduct When He Made Statements Concerning The Aryan Brotherhood.**

Finally, the SJC reasonably and correctly denied relief as to the prosecutor's statements concerning the Aryan Brotherhood.  As noted, the SJC found that the statements at issue were improper insofar as they "crossed the line into being used as impermissible propensity evidence." <u>Chalue</u>, 486 Mass. at 880.  But the Court determined that they were not prejudicial because of the judge's careful voir dire (as to whether the petitioner's membership in the Aryan Brotherhood would affect the jurors' impartiality) and his repeated instructions that the "Aryan Brotherhood evidence could not be used" as evidence of the petitioner's bad character or criminal propensity.  <u>Id</u>.

As the SJC correctly observed, the trial judge discussed whether evidence concerning the Aryan Brotherhood or the petitioner's affiliation with that group would affect the venirepersons' impartiality during empanelment.  <u>See</u>, <u>e.g.</u>, TI/28-29, 37, 42.  In addition, he gave a limiting instruction regarding proper use of any testimony regarding the Aryan Brotherhood on many separate occasions during the trial, TVI/243; TXI/213-214, 246; TXIIPM/4,16, and he gave a limiting instruction during the final charge, TXIII/91-92.  Further, as noted above, the Superior Court gave general instructions to the jurors that they were the exclusive factfinders, TXIII/87, that the lawyers' arguments were not evidence, TXIII/98, and that it was up to the jury to decide the facts based upon the testimony given and evidence received, TXIII/87-88, 94-95.  The judge's careful voir dire to ferret out potential prejudice arising from the Aryan Brotherhood evidence, and his many instructions as to the proper use of that evidence, neutralized the risk that the jurors would use it to decide the case on an improper basis, especially where the remarks at

issue here were far less emotionally charged than those at issue in <u>Darden</u>, 477 U.S. at 178-183.

See, e.g., <u>Richardson</u>, 481 U.S. at 206; <u>Watkins</u>, 425 Mass. at 840; <u>see also</u> <u>Boyde</u>, 494 U.S. at

384-85; <u>Darden</u>, 477 U.S. at 182.  In light of all these circumstances, there was no unfairness or

substantial and injurious effect on the verdict.  <u>Supra</u>, Argument Section I(B).

## <u>CONCLUSION</u>

For the foregoing reasons, the petitioner is not entitled to habeas corpus relief and the

petition should be dismissed.

Respectfully submitted,

ANDREA JOY CAMPBELL
ATTORNEY GENERAL


/s/ Nicole Nixon_____
Nicole Nixon (BBO# 688255)
Assistant Attorney General
Office of the Attorney General
One Ashburton Place
Boston, MA  02108
617-963-2852
Nicole.M.Nixon@state.ma.us

Dated: February 6, 2023

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document was filed through the ECF system on February 6, 2023
and will be sent electronically to the registered participants as identified on the Notice of
Electronic Filing, including Andrew Crouch, Esq., counsel for the petitioner in this matter.
There are no non-registered participants involved in this case.


/s/ Nicole Nixon_____
Nicole Nixon
Assistant Attorney General